MELINDA HAAG (CABN 132612)
United States Attorney

MIRANDA KANE (CABN 150630)
Chief, Criminal Division

PETER B. AXELROD (CABN 190843)
JOHN H. HEMANN (CABN 165823)
Assistant United States Attorneys

   450 Golden Gate Ave., Box 36055
   San Francisco, California 94102
   Telephone:  (415) 436-7200
   Fax: (415) 436-7234
   E-Mail: peter.axelrod@usdoj.gov; john.hemann@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>PANGANG GROUP COMPANY, LTD.,<br>PANGANG GROUP STEEL<br>VANADIUM & TITANIUM<br>COMPANY, LTD.,<br>PANGANG GROUP TITANIUM<br>INDUSTRY COMPANY, LTD., and<br>PANGANG GROUP<br>INTERNATIONAL ECONOMIC &<br>TRADING COMPANY,<br><br>    Defendants. | No. CR 11-0573 JSW<br><br>UNITED STATES' OPPOSITION TO<br>PANGANG GROUP DEFENDANTS'<br>MOTION TO QUASH SERVICE<br><br>Date : June 7, 2012<br>Time: 2:00PM<br>Courtroom: Hon. Jeffrey S. White |

**TABLE OF CONTENTS**

I.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   A.  The Pangang Group Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   B.  Pan America, Inc.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      1.   Creation and Ownership. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      2.   PAI's Employees Entered the United States as Intra-Company Transfers.. . . . . . 6

      3.   PAI is Pangang Group's Representative in the United States... . . . . . . . . . . . . . . 9

      4.   PAI Performs Work Only for Pangang Group.. . . . . . . . . . . . . . . . . . . . . . . . . . 11

      5.   PAI's Office Merger Was Directed by Pangang Group.. . . . . . . . . . . . . . . . . . . 12

   C.  PAI Assisted Pangang Group in the Investigation that Resulted in This Prosecution... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III. ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

   A.  Rule 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

   B.  The United States Served PAI, Pangang Group's General Agent, and Mailed the Summonses to the Agent's Principal Place of Business in the United States... . . . . . . . . 14

   C.  The Pangang Group Defendants Received Notice of the Superseding Indictment and Court Proceedings... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

   D.  PAI Is the Pangang Group Defendants' General Agent in the United States.. . . . . . . . . . 15

      1.   PAI Performs Services in the United States That Are Sufficiently Important That If it Did Not Perform Them, a Representative of Pangang Group Defendants Would Perform Them.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      2.   Pangang Group Has the Ability to Control the Activities of PAI.. . . . . . . . . . . . 19

   E.  PAI Is the Alter Ego of the Pangang Group.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      1.   Defendants Should Be Estopped from Arguing That PAI Is Not Their Alter Ego... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      2.   The Evidence Proves That PAI Is the Pangang Group's Alter Ego.. . . . . . . . . . . 22

   F.  The United States' MLAA with China is Irrelevant.. . . . . . . . . . . . . . . . . . . . . . . . . . . 26

V.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bauman v. DaimlerChrysler Corp.,* 644 F.3d 909 (9th Cir. 2011).. . . . . . . . . . . . . . . . . . . . *passim*

*Chan v. Society Expeditions, Inc.,* 39 F.3d 1398 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . 14, 16

*Doe v. Unocal Corp.,* 248 F.3d 915 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 24

*Fallen v. United States,* 378 U.S. 139 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Heise v. Olympus Optical Co., Ltd.,* 111 F.R.D. 1 (N.D. Ind. 1986). . . . . . . . . . . . . . . . . . . 14

*Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,* 206 F.3d 411
    (4th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Jablon v. United States,* 657 F.2d 1064 (9th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.,* 526 U.S. 344 (1999). . . . . . . . . . . . . . . . 15

*NetJets Aviation, Inc. v. LHC Commincations, LLC,* 557 F.3d 168 (2d Cir. 2008). . . . . . . . . . 23

*United Elec. Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.,* 960 F.2d 1080
    (1st Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Chitron Elec. Co., Inc.,* 668 F.Supp.2d 298 (D.Mass. 2009). . . . . . 15, 23, 26, 27

*United States v. Debrow,* 346 U.S. 374 (1953). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*United States v. Standard Beauty Supplies Stores, Inc.,* 561 F.2d 774 (9th Cir. 1977). . . . . . . . 24

*United Steelworkers of America v. Connors Steel Co.,* 855 F.2d 1499 (11th Cir. at 1988). . . . . 26

*Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406 (9th Cir. 1977). . . . . . . . . . . 15, 16

*Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . 17

## FEDERAL STATUTES, RULES AND GUIDELINES

Fed. R. Civ. P. 4(h)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fed. R. Crim. P. 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Crim. P. 4(c)(3)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

1

## I.   INTRODUCTION

Perhaps relying on Frank Robinson's nickname, "the Judge," defendants lead with his wisdom from the diamond rather than with authority from a court.  Speaking to Time Magazine in 1973, the Reds and Orioles great said, "Close don't count in baseball. Close only counts in horseshoes and grenades."  Time Magazine (July 31, 1973).  Robinson's many accomplishments certainly made him an authority on baseball, but it is equally certain that he was not thinking about serving summonses on Chinese companies under Rule 4.

Baseball calls are, indeed, black and white – balls are balls, strikes are strikes, and you're either out or safe.  But baseball's truths don't always carry into the courtroom.[1]  Chief Justice Warren – an actual judge – explained that the Federal Rules "are not, and were not intended to be, a rigid code to have an inflexible meaning irrespective of the circumstances."  *Fallen v. United States*, 378 U.S. 139, 142 (1964).[2]  Unlike district court judges, baseball umpires do not analyze multi-factor tests, look for hallmarks to determine substance, or consider the exceptions that exist to general rules – all of which defendants (appropriately) invite and encourage this Court to do in deciding whether service of the summonses on Pan America, Inc. (PAI) was effective under Rule 4.  *See* Def's Mem. at 5-10.

In the law, where the goal is justice rather than victory, circumstances matter.  Here, the circumstances reveal three things:   (1) the Pangang Group defendants received actual notice of the Superseding Indictment; (2) PAI is the general agent in the United States for the Pangang Group defendants; and (3) PAI is the alter ego of the Pangang Group defendants.  For these reasons, defendants' motion to quash should be denied.

---

[1] Hall of Fame baseball executive Bill Veeck contrasted the rigidity of baseball rules with the reality of the law: "Baseball is almost the only orderly thing in a very unorderly world.  If you get three strikes, even the best lawyer in the world can't get you off."

[2] Elevating substance over form is the guiding principle of the Federal Rules:  "These rules are to be interpreted to provide for the just determination of every criminal proceeding, to secure simplicity in procedure and fairness in administration, and to eliminate unjustifiable expense and delay.  Fed. R. Crim. P. 2.  The Criminal Rules were designed to "eliminate technicalities" and "secure simplicity."  *United States v. Debrow*, 346 U.S. 374, 376 (1953).

1    First, there is no denying that service on PAI resulted in actual notice.  The four Chinese

2    corporate defendants – all part of the Pangang Group of companies – received the summonses,

3    hired attorneys, and appeared before the Court on the date designated by the summonses.  The

4    purposes of Rule 4 – to notify the defendants of the charges and bring them before the Court –

5    have been accomplished.  Perhaps as a result of this most obvious circumstance weighing so

6    strongly against them, defendants contend that Rule 4 is both narrow and unyielding, and then

7    argue that PAI resides outside the of realm of "alter ego" and "authorized agent for service of

8    process" they declare to be the appropriate standard under the Rule.

9    The first flaw in defendants' approach is that they propose that the Court start with an

10   exception (alter ego) and work back at some point to the test actually prescribed by the Rule

11   (agency).  They compound this flaw by studiously ignoring the relevant provision of Rule 4

12   ("general agent") and invite the Court to instead chase a red herring ("agent authorized to receive

13   service").

14   The facts reveal, however, that PAI is the *general agent* for the Pangang Group defendants in

15   the United States.  *See* Fed. R. Crim. P. 4(c)(3)(C) ("A summons is served on an organization by

16   delivering a copy to [a] . . . general agent . . . .).  PAI satisfies the Ninth Circuit's test for general

17   agency by performing activities that would be performed in its absence by other employees or

18   agents of the Pangang Group defendants, and because defendants have the ability to control the

19   business activities of PAI.  As it is a general agent of defendants, service of the summonses on

20   PAI was appropriate under Rule 4.

21   Finally, PAI is very much the alter ego of the Pangang Group defendants.  Although this

22   finding is not necessary given that PAI is a general agent under Rule 4, it is an easily sustainable

23   alternative conclusion (and one the government requests that the Court reach).  The facts to

24   support this conclusion are set forth in detail below, but one of the more compelling comes in the

25   form of a letter written to U.S. immigration authorities on behalf of the senior PAI employee,

26   Qizhi Wang.  The letter is written on the letterhead of PAI, complete with PAI's address in New

27   Jersey, its phone number, and website.  *It is not, however, from PAI* -- it is signed by the

28   Chairman of the Pangang Group itself, Fan Zhengwei, and concerns the importance of PAI to the

1   Pangang Group's business in the United States:  "*Our* company transferred Mr. Wang to the

2   United States as the General Manager of Pan America, Inc. to establish, manage and direct the

3   operations of the company.  In this position, he has been successful in developing *our* business

4   relationships and opportunities."  Declaration of Peter B. Axelrod, Ex. F at 1 (emphasis added).

5   Chairman Fan is not an officer, director, or employee of PAI.  Yet, in communicating with the

6   United States Government on an important legal matter, his signature and position are placed on

7   PAI letterhead -- as well as on the accompanying immigration forms as the representative of PAI,

8   thus destroying any semblance of an argument that these companies maintain separate identities.

9   *Id.* at 2-10.

10      Defendants cannot have it both ways and should be estopped from so arguing.  They did not

11  adhere to PAI's claimed separate existence when they had Chairman Fan sign legal documents

12  sent *to* the U.S. government on PAI's behalf; they cannot now contend that PAI and Pangang

13  Group are separate entities when trying to avoid being held to have received documents *from* the

14  U.S. government.

15      The United States seeks a trial on the merits of the claims against the Pangang Group

16  defendants named in the Superseding Indictment.  Defendants' pusillanimous effort to hide

17  behind their three-person New Jersey outpost in an attempt to avoid a trial is factually

18  unsupportable, legally unjustifiable, and equitably barren.  Their motion should be denied.

19  II.  FACTS

20      A.  The Pangang Group Defendants

21      The four Chinese corporate defendants in this case are part of a group of companies that are

22  controlled by the government of the People's Republic of China (PRC).  The Pangang Group

23  Company, Ltd., which also is known as the Panzhihua Iron and Steel (Group) Company (the

24  name was changed from the latter to the former in 2008), is the umbrella entity and the entity that

25  is controlled directly by the State Asset Supervision and Administration Commission (SASAC)

26  of the State Council.  Declaration of Andrew Z. Szamosszegi, ¶¶ 13, 16 & 21-22.  As explained

27  by Qizhi Wang of PAI in a January 2011 letter to Ecuador's state oil company, EP Petroecuador:

28  "Pangang Group Company Ltd. (http://www.pzhsteel.com.cn), . . . is one of the biggest iron and

steel integrated companies in China, a state-owned company, directly under the central government, the State-owned Assets Supervision and Administration Commission of the State Council (http://www.sasac.gov.cn) of the People's Republic of China."[3]  Declaration of FBI Special Agent Katherine Pattillo, Ex. F.

Pangang Group owns and controls a subsidiary listed on the Shenzhen Stock Exchange, defendant Pangang Group Steel Vanadium and Titanium Company, Ltd. (PGSVTC). Szamosszegi Decl., ¶ 15.  It is common for PRC state-owned enterprises to create stock-exchange-listed subsidiaries, over which they maintain "operational control."  *Id.*, ¶ 4.  This is the case with the Pangang Group and PGSVTC, in that officials of Pangang Group subsidiaries that are technically owned by PGSVTC report to no one at PGSVTC and instead report directly to officials of the state-owned parent, Pangang Group.  Pattillo Decl., ¶ 13 (employees of PGSVTC-owned companies reported directly to Pangang Group superiors, including Chen Yong, a Pangang Group official).

The two defendant organizations that are owned by PGSVTC but report up to Pangang Group are Pangang Group Titanium Industry Company, Ltd. (Pangang Titanium), and Pangang Group International Economic and Trading Company, Ltd. (PIETC).  Defendant Pangang Titanium was established by Pangang Group in 2007 and is formally owned by PGSVTC.  Pangang Titanium employees report directly to Chen Yong of Pangang Group.  Pattillo Decl., ¶ 13.  Defendant PIETC is the Pangang Group's international trading company and is owned by Pangang Group, along with a separate Pangang Group subsidiary Panzhihua Iron and Steel Co., Ltd. (PISCO).

Management of the various parents and subsidiaries is shared and officers, directors, and employees are shuffled routinely from company to company.  "[S]haring of management personnel is typical of the relationship between SOEs and their subsidiaries and a means by which the [Chinese Communist] Party and SASAC control the SOEs and subdivisions."

---

[3] Li Rongrong, the Director of SASAC and Secretary of the CPC Central Committee, describes Pangang Group as "the biggest three-line enterprise for the comprehensive utilization of [China's] resources of vanadium and titanium in the defense, military, and industrial packaged services."  *See* Pattillo Decl., Ex. S at 3.

1    Szamosszegi Decl., ¶ 22.

2         In 2010, Pangang Group merged with Anshan Steel (Angang Group).  The merger was

3    completed by year end and all of the merged company's assets are now owned by the Anshan

4    Iron and Steel Group Corporation, which is 100% owned by the central SASAC.  Szamosszegi

5    Decl, ¶ 20; *see also* Pattillo Decl., Ex. S.

6         B.   Pan America, Inc.

7              1.   Creation and Ownership

8         PAI was created in 2008 by the Pangang Group for the purpose of dealing "directly" with

9    Pangang Group's U.S. customers and doing "after-sale work."  Patillo Decl., ¶ 8.  Seventy-five

10   percent of PAI stock is owned by Pangang Group and 25% is owned by PIETC.  PAI was

11   capitalized entirely by contributions from Pangang Group ($1.5 million) and PIETC ($500,000).

12   Pattillo Decl., Ex. Q.  When the company was formed, Pangang Group Chairman Fan Zhengwei

13   promised that "the parent company will increase its investment to make Pan America Inc. play a

14   more important role in the economic exchange between China and the United States."  Axelrod

15   Decl., Ex. D at 7.

16        PAI's original board of directors consisted of three individuals -- Qizhi Wang, one

17   representative of PIETC (Zusheng Zhang, who has since been replaced by another PIETC

18   official), and one representative of Pangang Group (Bin Xue).  Pattillo Decl., ¶ 8.  Since the

19   retirement of the PIETC representative in 2011, the board has had only two members.  *Id.*  The

20   board meets periodically in the Pangang Jinmao Mansion, Chengdu City, Sichuan Province,

21   where Pangang Group's offices (and the auditors who review PAI's books) are located.  *See*

22   Pattillo Decl., Exs. P and T.

23        The company is organized as a corporation in New Jersey, but it is shown on PIETC's

24   internal organization chart (provided to the United States in support of Wang's application for

25   legal permanent residency) as a division of PIETC, along with PIETC's other international and

26   domestic sales offices.  Axelrod Decl., Ex. F at 11; *see also* Pattillo Decl., ¶ 7 & Ex. U.

27        PAI operates according to "Policies and Procedures" mandated by the "Head Office" in

28   China.  These policies and procedures, referred to as "the P&P," set strict limitations on the

discretion and authority of PAI's management.  The P&P manual provides, among other things:

- "This P&P basically is in line with the Head Office's General Affairs P&P and followed by some minor amendments in order to comply with the common practice of the local business environment."

- "The P&P, and any subsequent modifications should become effective following approval by Head Office of the Company."

- "For other procedures not mentioned in the P&P, the overseas units should follow the policies and procedures of the Head Office."

- The P&P sets purchase and spending limitations, including a requirement that any unforseen purchase or purchases "which have value of US$20,000 and above, an official memorandum should be forwarded to Head Office/Parent Company for approval by the appropriate authority."

- Computer purchases and equipment leases must be in accordance with Head Office policy and procedure and leases must be approved by the Head Office.

- PAI officials may not spend more than $6,000 without Head Office approval, must seek permission to spend for unbudgeted operational expenses, have no authority to make unbudgeted capital expenditures or charitable donations, and cannot spend over $300 for entertainment without approval.

Pattillo Decl., Ex. D.  The P&P contains numerous additional limitations on the authority of PAI

management to operate without Head Office approval.  These limitations are effectively policed

by the Head Office, who sends auditors from China to PAI to review the U.S. office's books.  *See*

Pattillo Decl., ¶ 12 & Ex. T.

The "Head Office" is Pangang Group Company, Ltd., and PAI acts as its representative in the

Americas, as was explained by Mr. Wang of PAI in his January 2011 letter to EP Petroecuador.

Pattillo Decl., Ex. F.  He went on to explain that

Pan America, Inc., a U.S. company, registered in New Jersey of the United States, is a subsidiary of Pangang Group Company Ltd., and represents Pangang Group Company Ltd. in the whole America, including North America, South America and Central America.

*Id*. Another version of the same letter, dated the following day and also signed by Mr. Wang, is

virtually identical, except that it more specifically describes PAI as the "marketing arm of the

Pangang Group Company Ltd." which it "represents" in the Americas.  Pattillo Decl., Ex. G.

2.     PAI's Employees Entered the United States as Intra-Company Transfers.

At the time the summonses were served, PAI had three employees:  two Chinese nationals

and one local hire.  The two Chinese nationals, Qizhi Wang and Chun Zhang are long-time

Pangang Group employees, both having worked for Pangang Group companies since finishing their educations.  Axelrod Decl., Ex. D at 10-12 and Ex. E at 14-15, 23.

Both Wang and Zhang were admitted to the United States carrying "P" passports issued by the PRC government.  Declaration of Mark McGovern, ¶ 3.  "P" passports are "public affairs" passports issued by the PRC Ministry of Foreign Affairs of the PRC government.  *Id.*, ¶ 4.  They are issued to lower-level government employees and employees of state-owned companies for the purpose of travel related to company and/or government business.  *Id.*

When they entered the United States for the purpose of forming and staffing PAI, both Wang and Zhang entered the country on L1-A visas issued to them by the U.S. Government.  Axelrod Decl., Exs. D & E.  L1-A visas are issued for the limited purpose of "intra-company transfers" of employees.  The applicable regulations allow for such transfers where a U.S. subsidiary is controlled by a foreign parent and the foreign parent wishes to temporarily transfer staff to the United States to work at the subsidiary.  Declaration of Aaron York, ¶¶ 4-5, 7, 9.

When Chun Zhang, one of PAI's two management employees, applied for visas through the consulate in Chengdu in 2008 and 2010, the Pangang Group certified to the consulate that Zhang, who they described as an employee of PIETC, would lead a "delegation" of Pangang Group company employees for approximately two years.  The certifications stated that "[a]ll of the expenses including health & medical insurance, accommodation and international airfare, etc. that may occur in the trip will be paid by Panzhihua Iron and Steel (Group) Company."  Axelrod Decl., Ex. E at 13.

A letter submitted to the U.S. Citizenship & Immigration Service (USCIS) in support of Wang's 2009 L-1A "intra-company transfer" visa applications describes PAI as a subsidiary of Panzhihua Iron and Steel (Group) Company (PISCO)[4] and as jointly owned by PISCO and PIETC, and states that PAI is "an agency" for their "trade business."  Axelrod Decl., Ex. D at 5. An attachment to the letter entitled "Business Summary and projection" also describes PAI as an

---

[4] PISCO, Pahzhihua, and Pangang Group are used interchangeably.  For a detailed discussion of the complicated and evolving ownership structure of the monolithic Pangang Group, see the Declaration of Andrew Szamosszegi.

"agency for trade business, inviting bids or biding for overseas contract work etc." Axelrod Decl., Ex. D at 9.

The L1-A letter on behalf of Wang was signed by Fan Zhengwei, the Chairman of the Pangang Group.  Axelrod Decl., Ex. D at 8.  This letter was written on PISCO letterhead (in Chinese characters).  The letter from Chairman Fan demonstrates that it was Pangang Group's decision to transfer Wang and Zhang to the United States and is replete with references to how PAI and Wang are important to the *parent company's business* in North America:

- "*We* wish to continue to employ Mr. Wang at *our* Northern Hemisphere head office in Englewood Cliffs, New Jersey in the position of General Manager of *our* U.S. office, Pan America, Inc. (PAI)."

- "Mr. Wang was employed with PISCO . . . as the General Manager of the Huanan Sales Company until his transfer to the U.S., *PISCO wishes* to continue to employ Mr. Wang in the same position . . . ."

- "*Our* corporate goal is to establish a comprehensive marketing system and development of business relationships with the United States and other companies . . . ."

- "*PISCO transferred* Mr. Wang to the United States . . . ."

- "*We wish* to continue to employ Mr. Wang . . . he has been instrumental in developing *our* business . . . ."

Axelrod Declaration, Ex. D at 5-7 (emphasis added).

Zhang continues to reside in the United States and work at PAI on a temporary intra-company L1-A visa.  In 2010, however, PAI filed a formal petition with USCIS to adjust Wang's status to that of lawful permanent resident.  The first letter authored in support of the petition and dated March 2010 was nearly identical to the earlier letters submitted in support of Wang's L1-A visa applications.  PAI also submitted formal Notice of Entry of Appearance as Attorney or Accredited Representative in support of the petition, and a follow-up letter in July 2010 on PAI letterhead that is essentially a one-page summary of the much longer March letter.  All of these documents, two of which are on PAI letterhead and one that represents PAI to be the authorized petitioner are signed, not by an employee, officer, or director of PAI, but *by the Chairman of the Pangang Group, Fan Zhengwei*.  Axelrod Decl., Ex. F.

The March 2010 letter provides some further details regarding Wang's job duties.  One of his principle duties is to attend to the Pangang Group's customers in the United States; another is to

"[e]stablish business operation procedures and interfaces with *corporate Headquarters* to ensure the communication and chain of operation is effective, efficient and in compliance with our parent company operations;" and another is to "[a]nalyze company financials and make recommendations to the Board of Directors *and superiors in China . . . ." Id.* at 10 (emphasis added).

Corporate headquarters and the superiors in China manage PAI in one particularly critical and controlling respect: they set the salaries and other compensation of PAI's two managers, Wang and Zhang. A memorandum obtained from PAI shows that Pangang Group, through PGSVTC, establishes salaries and incentive targets for employees of the company's overseas sales offices. Pattillo Decl., Ex. H. The memo is addressed to PIETC and concerns its foreign subsidiaries in Europe, Hong Kong, and the United States. The memorandum sets the compensation, including base salary and performance pay, for the General Manager (in PAI's case, Wang) and other "internally dispatched staff." For example, the base salary for the general manager "is set at ¥200,000 after tax according to the company's location." A compensation ceiling is also established. The compensation is set not in dollars, but in Chinese yuan. *Id.*

     3.    <u>PAI is Pangang Group's Representative in the United States.</u>

The Pangang Group defendants established PAI for the purpose of interacting with Pangang Group's customers in the United States. Axelrod Decl., Ex. F at 6-14; Pattillo Decl., Exs. B & C. According to those customers, PAI's employees act as the U.S. domestic representatives of the Pangang Group defendants and handle many of the duties and responsibilities that were handled by Pangang Group employees prior to the creation of PAI. *See* Declarations of Laird Walker, Phil Poce, Spencer Brog, and Bradley Decker.

For example, World Metals, a California customer of Pangang Group, was instructed by PAI after its formation to direct any inquiries regarding Pangang Group business to PAI. A World Metals officer explains:

> Pan America employees performed the same services in the United States for WMI that Pangang and PIETC employees had performed prior to the creation of Pan America. From the context of our relationship, I considered Pan America to be the United States arm of Pangang Group and was able to communicate with the Pangang Group through Pan America, as needed.

Walker Decl., ¶ 2.

Another California customer, Coutinho & Ferrostaal, purchases steel from the Pangang Group defendants and has a similar relationship with PAI:

> Based on my dealings with Pangang Group and past correspondence with Pan America, as well as the manner in which Mr. Wang represented himself and Pan America, I believe that the purpose of Pan America is to represent Pangang Group's interests in the United States.  Before I became aware of Pan America's existence, employees of Pangang Group and PIETC provided the same services to Coutinho that Pan America employees began performing after it was established.

Decker, Decl., ¶ 3.

A customer in Pittsburg, California, Viking Industrial, conducts all substantive discussions and negotiations with Pangang Group employees in China.  PAI provides what is essentially back-office support for Pangang Group in its interactions with Viking in that, after substantive deals are reached, PAI "assist[s] with the administrative functions of producing the final contracts, handling letters of credit and inspecting defective material."  Brog Decl., ¶ 3.  As to Viking, PAI performs services that Pangang Group employees used to perform before PAI was formed.  *Id.*

> Qizhi Wang was Viking's contact at Pan America.  It was our sense that when Viking asked Wang questions regarding issues such as specifications, capacity, or mill parameters, he (Wang) would have to check with Pangang employees in China in order to answer.  Based on my experience, all final decisions with regard to pricing and availability were made in China.  We considered the Pan America office in New Jersey as an extension of Pangang in China.

*Id.*, ¶ 4.

A&K Railroad Materials has a similar relationship with defendants and PAI.  All important negotiations and discussions are conducted with Pangang Group, terms are reached, and then PAI handles the necessary paperwork on behalf of Pangang Group.  "Based on my experience, people in China working on behalf of Pangang and PIETC make all of the decisions, and the Pan America representatives serve as clerks to run certain documents through."  Poce Decl., ¶ 3.

Of particular relevance to the issue before the Court now, PAI regularly acts as a conduit for communications regarding legal matters.  When claims arise regarding product defects, PAI employees have inspected defective products, communicated with customers regarding settlement payments by the Pangang Group, and facilitated the wiring of refund payments to

1  resolve claims for defective products flowing from China to customers in the United States.  *See*

2  Walker Decl., ¶ 4; Poce Decl., ¶ 5; Brog Decl., ¶ 4-5; Decker Decl., ¶ 4; *see also* Pattillo Decl., ¶

3  6 & Exs. J - M. PAI has acted as an intermediary for cross-border communications regarding the

4  legal claims.  Pattllo Decl., Exs. A & I.

5      PAI's role as the U.S. support organization for the Pangang Group's overall operations is

6  detailed in a memorandum authored by PIETC in which PAI's responsibilities are dictated by

7  PIETC.   Pattillo Decl., Ex. O.  The purpose of the memorandum is to "maximize [the Pangang]

8  (Group's) limited resources, optimize the company's overall structure, and minimize risk."

9  According to the memorandum, PIETC is responsible for formulating the "overall trade

10  strategy," "resources, price administration," "VIP client administration," and other production-

11  side duties; PAI is responsible for serving the customers in the United States, focused on

12  marketing and "after service on sales."  *Id.* at 1.  The memorandum makes clear that PIETC and

13  Pangang Group are the decision-makers with regarding to filling orders:

14      America Inc. will on a monthly basis collect orders from clients in the America region
        market and submit reporting of its resource plan to International Trade Company from
15      which the International Trade Company will report to the (Group) company and New
        Steel and Vanadium Company, pending confirmation for balance of resources, at which
16      time the America Inc. will be notified by the International Trade Company.

17  *Id.* at 3.

18          4.    PAI Performs Work Only for Pangang Group.

19      In his declaration in support of defendants' motion, Mr. Wang contends that PAI is not

20  limited to selling products of PIETC and is "actively engaged" in looking for other suppliers with

21  whom to do business.  Wang Decl., ¶ 6.

22      However, PAI *is* the Pangang Group's "U.S.A. Exclusive Sales Office."  Pattillo Decl., Ex.

23  E.  Moreover, both Wang and Zhang admit that PAI has never worked with any company other

24  than the Pangang Group companies.  Pattillo Decl., ¶¶ 8 & 10.  According to publicly available

25  information regarding imports, PAI has been listed since 2009 as the U.S. consignee in ten

26  import shipments to the United States -- nine from PIETC and one from a Pangang Group joint

27  venture.  Szamosszegi Decl., ¶ 24.  In other words, all of PAI's business comes from the Pangang

28  Group.

5.   PAI's Office Merger Was Directed by Pangang Group.

The level of control the Pangang Group exercises over PAI is exemplified by its direction to PAI that it move office space in June 2011, following the merger between Pangang Group and Angang Group.

In May 2010, Pangang Group and Angang Group merged into a single company.  Declaration of Pasquale Garofalo, Ex. A; *see also* Pattillo Decl., Ex. R.  As a result of the merger between the parent companies, it was decided that their U.S. subsidiaries should merge as well.  *Id.*  In late-June 2011, three employees of Pan America, Inc. moved into the Angang office space.  *Id.*, ¶ 3. The employees of the two merged U.S. subsidiaries work in a common space, and Angang pays the rent.  *Id.*, ¶¶ 4-5.

The decision and direction regarding the office merger came from PIETC -- it was not a decision of PAI or its board.  A January 2011 "Notice" sent from PIETC to PAI stated:

Pan America, Inc.

According to the merger and reorganization plan between Ansteel and Pangang, it is requested that your company implement the office merger with Ansteel America, Inc. before March 30th, 2011.  Please have your company submit specific suggestions and existing issues regarding the office merger in writing to the International Trading Company before January 31st, 2011.

Notice is hereby given.

Pangang Group International Economic & Trading Co., Ltd.

Pattillo Decl., Ex. R.

C.   PAI Assisted Pangang Group in the Investigation that Resulted in This Prosecution.

PAI acted as the Pangang Group defendants' agent in the United States when Pangang Group employees traveling in the United States were ordered to remain here as material witnesses for several months in 2011.

In July 2011, the United States conducted a search of the hotel rooms in which a number of Pangang Titanium and PIETC employees were staying in Alameda, California.  In September 2011, the United States obtained material witness warrants for three of those employees, two from Pangang Titanium and one from PIETC.  The material witnesses retained counsel in the

1    United States, were required to attend court proceedings, and met with counsel for the

2    government on several occasions.

3        Acting at the direction of Chairman Fan and the Pangang Group, PAI employees were

4    dispatched to provide assistance to the employees of the Pangang Group during their required

5    stay in the Northern District of California.  Zhang flew to the Bay Area to provide the employees

6    with financial support and stayed with them at their hotel in Alameda.  Zhang also attended court

7    proceedings with the Pangang Group employees and acted as a translator for their

8    communications with their retained attorneys.  Wang traveled to the Bay Area to meet with the

9    Chinese employees and took them to dinner, spending $1800 to entertain them.  Pattillo Decl., ¶

10   7 & 11.

11       In addition, PAI was asked by the Pangang Group defendants to advance the legal fees paid

12   to counsel for the employees.  PAI ultimately advanced at least $600,000 to lawyers for the

13   individual Chinese material witnesses on behalf of Pangang Titanium and PIETC that did not

14   require the payment of interest on the advanced sums.  Pattillo Decl., ¶¶ 7, 9-10 & Ex. W.  The

15   agreements require Pangang Titanium and PIETC to reimburse PAI, but they do not require the

16   payment of interest on what is in substance a $600,000 loan.

17       Finally, while Zhang was in California assisting the individual employees, he acted as a

18   conduit for information between the employees and their Pangang Group company employers in

19   the PRC.  Zhang spoke to officials of both PIETC and Pangang Titanium regarding expenses

20   incurred by the employees.  Zhang also received and related to the employees instructions from

21   the General Manager of Pangang Titanium regarding the computers that were seized when the

22   FBI searched their motel rooms.  According to Zhang, the General Manager asked him to advise

23   the employees to take the position that the computers belonged to them and that their company

24   was not responsible for the content of the information on the computers.  Zhang relayed this

25   information to the employees.[5]  Pattillo Decl., ¶ 10.

26

27       [5] It is not the purpose of this brief to parse the meaning of this instruction, but suffice it to
28   say that it appears that the material witnesses were being directed what to tell the FBI regarding
     the contents of their computers.

1    III. ARGUMENT

2        A.  Rule 4

3    Federal Rule of Criminal Procedure 4(c)(3)(C) provides that service of a summons on an

4    organizational defendant is effected as follows:

5        A summons is served on an organization by delivering a copy to an officer, to a managing
     or general agent, or to another agent appointed or legally authorized to receive service of
6    process.  A copy must also be mailed to the organization's last known address within the
     district or to its principal place of business elsewhere in the United States.

7        The purpose of Rule 4 is to "bring the defendant notice of the action so that it has a

8    reasonable opportunity to appear and defend the suit."  *Heise v. Olympus Optical Co., Ltd.*, 111

9    F.R.D. 1, 6 (N.D. Ind. 1986).  Contrary to defendants' contention that Rule 4 should be applied

10   rigidly, "Rule 4 is a flexible rule that should be liberally construed to uphold service so long as a

11   party receives sufficient notice of the complaint."  *Chan v. Society Expeditions, Inc.*, 39 F.3d

12   1398, 1404 (9th Cir. 1994).[6]

13       B.  The United States Served PAI, Pangang Group's General Agent, and Mailed the
         Summonses to the Agent's Principal Place of Business in the United States.

14

15       After the Superseding Indictment was returned by the grand jury, the magistrate judge

16   issued summonses for the four Pangang Group defendants.  The magistrate judge ordered that the

17   summonses be mailed by the clerk's office to PAI's address in New Jersey, which is the address

18   set forth on the summonses.  Although the Clerk's office apparently did not in fact mail the

19   summonses to PAI, the U.S. Attorney's office did so by certified mail.  Axelrod Decl., ¶ 5, Ex. B.

20       In addition, the summonses issued by the Court were delivered by an FBI agent to Brenda

21   Kong, a PAI employee, at PAI's office in New Jersey.  Counsel for PAI acknowledged receipt of

22   the summonses by PAI and advised the United States that additional service on Mr. Wang was

23   not necessary to effect service on PAI.  Executed summonses have been filed with the Court.

24   _____

25       [6] The Federal Criminal Rules and the Federal Civil Rules contain virtually identical
     provisions for effecting service of summonses on organizational defendants. *Compare* Fed. R.
26   Crim. P. 4(c)(3)(C) *with* Fed. R. Civ. P. 4(h)(1)(B).  Not only is the language of the two
     provisions materially the same, the courts that have published rulings on service of corporate
27   defendants in criminal cases have relied heavily on civil case law concerning service of
     summonses.
28

1  Axelrod Decl., ¶ 4, Ex. A.

2  Because PAI is a general agent of the Pangang Group defendants, personal service of the

3  summonses on PAI followed by mailing the summonses to PAI's office in the United States

4  satisfies Rule 4(c)(3)(C).  *See United States v. Public Warehousing Co K.S.C.*, 2011 WL

5  1126333, *5 (N.D. Ga. 2011) (holding that personal service and service by mail on corporate

6  defendant's U.S. alter ego was sufficient); *United States v. Chitron Elec. Co., Inc.*, 668

7  F.Supp.2d 298, 306 (D. Mass. 2009); *see also Heise*, 111 F.R.D. at 6 (the group president of the

8  American subsidiary was "a person whose position is one of sufficient responsibility so that it is

9  reasonable to assume that he would transmit notices to" the foreign parent, making it a

10  general agent under Rule 4).

C.  The Pangang Group Defendants Received Notice of the Superseding Indictment and
11     Court Proceedings.

12  The Court should begin its analysis with the reality that defendants simply ignore.  The

13  Pangang Group defendants received notice of the Superseding Indictment, hired attorneys, and

14  appeared in court in San Francisco on the date designated by the summonses.  The purpose of

15  Rule 4, therefore, has been accomplished.

16  While this is not the end of the analysis -- the requirements of Rule 4(c)(3)(C) must be met --

17  "actual notice is a relevant consideration in determining that service on an agent in an otherwise

18  proper manner was sufficient."  *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406,

19  424 n.20 (9th Cir. 1977).  The fact that the Pangang Group defendants actually received notice as

20  a result of service of the summons on PAI speaks directly to the sufficiency of the delivery

21  method of the summonses.  It is, as defendants point out, "fundamental" that defendants in

22  litigation be "notified of the action, and brought under the court's authority, by formal process."

23  *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999).  There is no

24  denying that after formal process was issued by this Court, the Pangang Group defendants were

25  in fact notified and appeared before the Court through counsel.  The fundamental tenet that

26  notice be given has been met.

27

28

D. <u>PAI Is the Pangang Group Defendants' General Agent in the United States.</u>

In framing their motion, the Pangang Group defendants focus on whether PAI was their "alter ego." Def's Mem. at 1:12-14 & 9-10. Along the way, defendants throw out a straw horse observation that PAI was "not an authorized agent for service of process for any of the Pangang defendants." Def's Mem. at 4:8-9.

Defendants fail, however, to address the obviously relevant provision of Rule 4(c)(3)(C), which permits service of a summons on an organization by serving that organization's "general agent." PAI is the Pangang Group's general agent in the United States, and service was properly effected on the Pangang Group defendants by serving PAI.

Whether a subsidiary like PAI is a "general agent" is determined by applying a two-part test adopted by the Ninth Circuit in the context of personal jurisdiction cases, but also applicable to determining whether service of process was effective. *See Chan v. Society Expeditions, Inc.*, 39 F.3d 1398, 1404-05 (9th Cir. 1994) (finding that service would be effective if general agency test for personal jurisdiction were satisfied); *see also Bauman v. DaimlerChrysler Corp.*, 644 F.3d 909, 920-23 (9th Cir. 2011) (explaining two-pronged test for general agency). The test is:

(1) Does "the subsidiary function[] as the parent corporation's representative in that it performs services that are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services"? *Bauman*, 644 F.3d at 920, *quoting Chan*, 39 F.3d at 1404-05.

(2) Does the parent have sufficient ability to control the activities of the subsidiary? *Bauman*, 644 F.3d at 920-21.

Determining whether a subsidiary is a general agent under this two-prong test is factually-intensive and must be decided on a case-by-case basis. *Bauman*, 644 F.3d at 920 n.12, *citing Wells Fargo*, 556 F.2d at 426.

Applying this test, the Court should conclude that the services provided by PAI are sufficiently important that, if it did not exist, the Pangang Group defendants would perform those services themselves, just as they did before PAI was created in 2008. The Court should further conclude that the Pangang Group defendants have the right to control PAI's business activities.

1

       1.    <u>PAI Performs Services in the United States That Are Sufficiently Important That If it Did Not Perform Them, a Representative of Pangang Group Defendants Would Perform Them.</u>

2

3    PAI performs as the Pangang Group defendants' agent in the United States by performing

4  services that the Pangang Group defendants would be required to perform if PAI did not exist --

5  and, indeed, did perform before PAI was created.  "[A] subsidiary acts as an agent if the parent

6  would undertake to perform the services itself *if it had no representative at all* to perform the

7  services."  *Bauman*, 644 F.3d at 921, *citing Doe v. Unocal Corp.*, 248 F.3d 915, 928 (9th Cir.

8  2001).  Or, "[a]s the Second Circuit explained, a court 'may assert jurisdiction over a foreign

9  corporation' when it affiliates itself with a local entity whose services 'are sufficiently important

10  to the foreign entity that the corporation itself would perform equivalent services *if no agent* were

11  available.'"  *Bauman*, 644 F.3d at 921-22, *quoting Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d

12  88, 95 (2d Cir. 2000).

13    As described above, Pangang Group created PAI to represent its interests and expand its

14  business in the United States.  Pangang Group transferred two long-term Pangang Group

15  company employees, Wang and Zhang, to PAI in an effort to expand and develop their business

16  in the United States, a role the Chairman of Pangang Group described in 2010 as "key."  Axelrod

17  Decl., Ex. F at 10.  The letter written by Chairman Fan of Pangang Group in support of Wang's

18  application demonstrate that the very purpose of PAI was to support and contribute to the

19  Pangang Group's business.   The evidence shows that PAI was not conceived or implemented as

20  anything more than an organization that exists for the support and benefit of the Pangang Group

21  companies.

22    PAI plays precisely this role, as it holds itself out to be the Pangang Group's agent in the

23  United States and the rest of the Americas.  In submissions to USCIS in support of Wang's and

24  Zhang's visa applications and status adjustments, PAI is described as an "agency" of the Pangang

25  Group's steel, vanadium, and titanium businesses.  Axelrod Decl., Ex. D.  PAI describes itself as

26  the Pangang Group's "representative" and "marketing arm" in the Americas.  Pattillo Decl., Exs.

27  F & G.

28    The declarations from the Pangang Group's U.S. customers establishes that PAI's role is to

act on the Pangang Group's behalf in the United States.  The duties that PAI employees

undertook to perform, after it was formed in 2008, are precisely the same duties that Pangang

Group employees performed prior to the formation of PAI.  Some of Pangang Group's customers

were asked to direct communications to PAI in lieu of Pangang Group beginning in 2009.  While

customers generally negotiate important matters regarding contract terms with Pangang Group

employees in China, routine, back-office tasks that once were performed by Pangang Group

company employees, are now performed by PAI employees.  A typical example of PAI's work is

PAI employee Zhang's role as intermediary between a World Metal executive and Pangang

Group officials in China regarding the itinerary for World Metal's visit to Pangang Group's

offices in Chengdu.  *See* Walker Decl., ¶ 3.

Particularly relevant to the issue before the Court, PAI performs responsibilities related to

legal claims U.S. customers have against the Pangang Group defendants.  When claims by

customers arise related to defective products supplied by Pangang Group manufacturers in China,

PAI employees have been dispatched to inspect the defective materials and participated in

negotiations to resolve those claims.  PAI has acted as a conduit for reimbursements to be paid by

Pangang Group to customers claiming that purchased goods were defective.  *See*, *e.g.,* Brog

Decl., ¶ 6; Pattillo Decl., Exs. J-M.  PAI has been an intermediary between U.S. customers and

the Pangang Group in China regarding legal claims arising in the United States.   Pattillo Decl.,

Ex. A.  This is *precisely* the role they play as recipient of service of legal process -- they are a

regular and obviously reliable conduit for communication regarding legal matters in the United

States.

PAI is, in fact, the Pangang Group's only agent in the United States -- or, as they put it, the

Pangang Group's "U.S.A. Exclusive Sales Office."  Pattillo Decl., Ex. E.  Wang asserts in his

declaration that PAI can seek to develop relationships with other Chinese suppliers.  But that is

not at all relevant to the question before the Court, which simply is whether PAI is the Pangang

Group defendants' agent.  Whether PAI may hypothetically someday be the agent for another

company (it hasn't done so yet) is immaterial.

Finally, in connection with the investigation that led to the Superseding Indictment in this

1    case, PAI acted true to purpose -- it handled the affairs of Pangang Group in the United States.

2    PAI's employees traveled to the Bay Area, stayed with the Pangang Group material witnesses,

3    attended to their financial affairs, acted as translators, attended court proceedings, arranged for

4    their legal fees to be paid, entertained them, and relayed communications to them from PIETC

5    and Pangang Titanium officials in China.

6        PAI exists only to benefit the interests of the Pangang Group and is the exclusive

7    representative of the Pangang Group in the United States.  The legal question relevant to the

8    determination of general agency is whether the services provided by PAI in the United States

9    would be performed by Pangang Group if PAI did not exist.  From the very nature of the duties

10   performed by PAI and the circumstances surrounding its creation by Pangang Group, that is

11   obviously so.  The Court need not speculate because these very services were in fact performed

12   by Pangang Group employees before PAI was created, as is documented in the declarations of

13   Pangang Group's U.S. customers.

14              2.    Pangang Group Has the Ability to Control the Activities of PAI.

15       Control, the Ninth Circuit holds, "is a traditional element of agency under common law

16   principles" and must be established in order to find general agency.  *Bauman*, 644 F.3d at 922.

17   The question is whether the foreign defendant has the right or ability to control the significant

18   business activities of its representative in the United States.  *Id.*  The  question for agency is not,

19   as defendants' wish to have it, whether the foreign defendant exercises actual control, because

20   that "conflates the agency and alter ego tests."  *Id.*

21       The test for an agency relationship does not require absolute control.  "[A] person may be an

22   agent although the principal lacks the right to control the full range of the agent's activities, how

23   the agent uses time, or the agent's exercise of professional judgment."  *Id.* at 923.  Agents, the

24   Ninth Circuit has explained, "may exercise a considerable amount of discretion in performing

25   their functions."  *Id.*

26       The Pangang Group certainly has the ability to control the conduct of PAI's business and the

27   evidence demonstrates that they actually exercise control over the most important aspects of the

28   business, including placement and compensation of key executives, office space, and

responsibilities for relationships with customers.

The evidence demonstrating Pangang Group's control over PAI is overwhelming and includes:

- The authority and discretion of PAI employees is severely circumscribed by company policy. Under the Policies and Procedures Manual, all significant expenditures must be approved by the Head Office in China. Pattillo Decl., Ex. O.

- Salary and compensation is set by the Pangang Group, not by PAI's board or management. *Id.*, Ex. H.

- The duties and responsibilities of PAI vis-a-vis U.S. customers are established by Pangang Group -- not by PAI. This goes to the very heart of PAI's existence; it is, after all, a sales office. The division of responsibilities between PAI and PIETC, moreover, can be broken down into two categories: PIETC has the important responsibilities; PAI has the clerical, the administrative, and the less important responsibilities. *Id.*, Ex. O & Customer Declarations.

- Pangang Group Chairman Fan signs letters on PAI letterhead. In one of those letters, he recites Mr. Wang's responsibilities, which includes making reports to Wang's "superiors" in China. Axelrod Decl., Ex. F.

- When Pangang Group merged with another company, it "gave notice" to PAI that it would be moving its office to merge with the new company's U.S. subsidiary. Pattillo Decl., Ex. R.

- PAI's U.S. employees are in the United States on "P" passports, which are passports issued to employees of Chinese state-owned companies. Pangang Group is a state-owned company controlled by an agency of the central government. McGovern Decl., ¶¶ 3-4.

- PAI is shown as a division of PIETC on an organizational chart submitted to USCIS. Axelrod Decl., Ex. F at 11.

- Auditors dispatched from Pangang Group's offices in China audit the books and records of PAI. Pattillo Decl., Ex. T.

- Pangang Group controls PAI from the perspective of their customers, who explain that Pangang Group is the decision-maker regarding material issues and PAI carries out certain limited administrative responsibilities on behalf of Pangang Group. *See* Customer Declarations.

Perhaps the most definitive evidence establishing control is the L1-A visas that have been issued to PAI employees Wang and Zhang in order for them to enter the United States. An L1-A visa is a temporary, *intra-company* transfer visa. In order to obtain an L1-A visa for an employee of a foreign company to work for a subsidiary in the United States, the foreign company must show that it owns and controls the U.S. subsidiary. "In the event the foreign company does not own and control the qualifying organization, the law does not permit issuance of an L1-A visa

and any visa issued under such circumstances is subject to revocation."  Declaration of Aaron York, ¶ 9.  Thus, in order to obtain L1-A visas for Wang and Zhang, Pangang Group was required -- and through their letters and submissions did -- establish that Pangang Group owned and controlled PAI.

This evidence of control far exceeds the required showing of an "ability to control" required under the test for general agency established by the Ninth Circuit.

E.  <u>PAI Is the Alter Ego of the Pangang Group.</u>

The Pangang Group defendants focus their arguments on disproving a contention that PAI is their alter ego.  The bar for finding alter ego is, of course, higher than it is for finding general agency, which explains defendants' attempt to fix that as the hurdle the government must clear.  As set forth above, the primary basis for finding that service on PAI was effective is that PAI is the Pangang Group defendants' general agent in the United States.  However, the record also supports a finding that PAI is in fact the Pangang Group defendants' alter ego.

1.  <u>Defendants Should Be Estopped from Arguing That PAI Is Not Their Alter Ego.</u>

Equity forbids the Pangang Group defendants from arguing that PAI is not their alter ego.  In communicating directly with the United States government on immigration matters, the Pangang Group holds itself out to be a single entity, controlled by its state-owned parent.  Since the formation of PAI in 2008, the Pangang Group has repeatedly taken the position with the U.S. immigration authorities that its PAI employees are temporary transfers from the foreign parent that exercises control over the subsidiary.

- The L1-A visas which Wang and Zhang were issued to enter the United States are  "intra-company transfer" visas.

- In seeking visas from the U.S. consulate in Chengdu twice for Zhang, the Pangang Group defendants described him as "leading a delegation" of PIETC employees on a temporary assignment, during which all expenses would be paid by the Pangang Group.  Axelrod Decl., Ex. E.

- When seeking to adjust Wang's status to legal permanent resident of the United States, Pangang Group Chairman Fan authored letters to USCIS on PAI letterhead in which he explained the circumstances surrounding Mr. Wang's assignment to PAI and outlined in detail its benefits to the Pangang Group.  These letters not only disregard the distinction between Chairman Fan's company -- Pangang Group -- and PAI, but they conclusively establish that PAI exists for the benefit and growth of the parent company.  *See* Axelrod Decl., Ex. F.

- Perhaps most compelling, in the formal immigration application for Mr. Wang, Chairman Fan signs twice as the legal representative of PAI. As Chairman Fan is not an officer, director, or employee of PAI, the defendants simply ignored basic corporate formalities by having him sign as the representative of PAI. *Id.*

Defendants now make an argument that is flatly contrary to the positions they have taken in seeking entry for their employees into the United States. They should be estopped from making this argument before the Court. Equitable estoppel is a doctrine "'by which a person may be precluded by his act or conduct . . . from asserting a right which he otherwise would have had . . . .'" *Jablon v. United States*, 657 F.2d 1064, 1068 (9th Cir. 1981), *quoting* Black's Law Dictionary (5th ed. 1980); *accord Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 417-18 (4th Cir. 2000) ("[e]quitable estoppel precludes a party from asserting rights he otherwise would have had against another when his own conduct renders assertion of those rights contrary to equity.").

Having repeatedly taken the legal position with the U.S. government that the PAI's employees are intra-company transfers acting on behalf of the Pangang Group's interests and Chairman Fan having made direct representations to the government on behalf of PAI, defendants cannot now be heard to deny that PAI is defendants' alter ego. To permit this argument would be manifestly unjust.

     2.    <u>The Evidence Proves That PAI Is the Pangang Group's Alter Ego.</u>

The evidence to support that finding is largely duplicative of the evidence establishing agency -- particularly control -- set forth above. The question is, primarily, one of degree. Unlike control for agency purposes, which requires only a showing of ability, the question for alter ego purposes is whether the Pangang Group defendants' actually control PAI and ignore the corporate formalities necessary to maintain PAI as a separate entity.

As defendants point out, only four district court judges have published opinions that address service on foreign organizational defendants through a domestic subsidiary under Criminal Rule 4. Three of the cases address the government's argument that the domestic subsidiary was the

alter ego of the foreign parent defendant;[7] the fourth case, with minimal analysis, simply holds that the government failed to serve an agent specifically authorized to receive service of process.[8]

The test for whether a domestic subsidiary is the alter ego of a foreign parent is not clearly articulated in any of the reported cases. In *Chitron*, the district court focused on whether "the relationship between the parent and the subsidiary is such that the subsidiary is a mere conduit for the activities of its parent" and whether the government was able to show a "'lack of corporate independence, fraudulent intent, and manifest injustice.'" 668 F. Supp. 2d at 305, *quoting United Elec. Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1093 (1st Cir. 1992). In *Public Warehousing*, the court applied a multi-factor test used by the Eleventh Circuit to determine whether a subsidiary is the alter ego of its parent. 2011 WL 112633, at *5-6. And in *Alfred L. Wolff*, the district court focused primarily on the government's argument that the domestic subsidiary was formed and used for the purpose of effecting a fraud, 2011 WL 4471383, at *4-6, while mentioning in passing a number of factors that "'come into play when discussing whether separate legal entities should be regarded as alter egos.'" *Id.* at *6, *quoting Harper v. Delaware Valley Broadcasters, Inc.*, 743 F. Supp.1076, 1085 (D. Del. 1990). Importantly, all of the courts adhere to the principle that determining whether to disregard corporate form is a fact-specific exercise in equity that is not formulaic. "No single factor is determinant, and '[t]he legal test for determining when a corporate form should be ignored in equity cannot be reduced to a simple formula.'" *Id.*, *quoting NetJets Aviation, Inc. v. LHC Commincations, LLC*, 557 F.3d 168, 177 (2d Cir. 2008).

In the Ninth Circuit, the determination of alter ego "is predicated upon a showing of parental *control* over the subsidiary." *Bauman,* 644 F.3d at 920. The two basic prongs of the alter ego analysis are:

(1) that there is such unity of interest and ownership that the separate personalities of the

---

[7] *United States v. Alfred L. Wolff GMBH*, 2011 WL 4471383 (N.D. Ill. 2011); *United States v. The Public Warehousing Co. K.S.C.*, 2011 WL 1126333 (N.D. Ga. 2011); *United States v. Chitron Elec. Co., Ltd.*, 668 F. Supp. 2d 298 (D. Mass. 2009).

[8] *United States v. Johnson Matthey PLC*, 2007 WL 2254676 (D. Utah 2007).

two entities no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice. The first prong of this test has alternately been stated as requiring a showing that the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former.

*Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001) (internal citations and quotation marks omitted). "Issues of alter ego do not lend themselves to strict rules and prima facie cases. Whether the corporate veil should be pierced depends on the innumerable individual equities of each case." *United States v. Standard Beauty Supplies Stores, Inc.*, 561 F.2d 774, 777 (9th Cir. 1977).

The evidence described above detailing the Pangang Group's control over PAI's activities applies with equal force in the alter ego analysis. The difference is that the question for control under the agency test is the *ability* to control, while the question when piercing the corporate veil is *actual* control, which requires a more exacting level of proof. *See Bauman*, 644 F.3d at 920. In this case there is little obvious distinction between the Pangang Group's ability to control PAI and its actual control of PAI. The most obvious manifestation of this is Chairman Fan's signature on PAI documents, but the remaining evidence is legion -- Pangang Group controlled PAI's salaries and compensation, its relationships with customers, its executives' spending authority, and myriad other significant facets of PAI's business activities. PAI's employees were dispatched to the United States as intra-company transfers and carry passports that are issued by the PRC Ministry of Foreign Affairs to employees of Chinese state-owned enterprises. The company's customers in the United States regard PAI simply as Pangang Group's U.S. manifestation -- a "conduit" for the Pangang Group in the United States. [cite].

Substantively, the evidence proves that PAI had no corporate personality separate from the Pangang Group. In his declaration, Wang attempts to recite a number of technical formalities maintained by PAI, but those formalities are revealed to be microscopically thin when held up to the light.

- PAI has its own board of directors, but that board now has only two members, both of whom were selected by the Pangang Group, are long-time Pangang Group employees, and meet only occasionally in Chengdu at the Pangang Group's office complex. Pattillo Decl., ¶ 8 & Ex. P.

- Wang claims PAI keeps separate books and has a domestic accountant, but those books

are audited by auditors from Pangang Group's finance department who go to PAI's New Jersey office for that purpose.  Pattillo Decl., ¶ 12 & Ex. T.

- Wang may be permitted to work with suppliers other than Pangang Group, but they don't . . . their only supplier is the Pangang Group and their only customers are Pangang Group's customers.  PAI is the Pangang Group's exclusive sales agent in the United States.  Pattillo Decl., Ex. E.

- General Manager Wang claims some local management responsibilities, but his duties are ministerial; his discretion and authority is tightly circumscribed by policies imposed by the "Head Office," Pattillo Decl., Ex. D, and on financial matters he answers "to his superiors in China," Axelrod Decl., Ex. F.

- Wang may "determine compensation and benefits" for PAI's office administrator, but his and Zhang's compensation and benefits are set by Pangang Group.  Pattillo Decl., Ex. H.

- Wang's assertion regarding his authority to make decisions regarding real estate is simply false; at the time the summonses were served, PAI was sharing an office with Angang America at the direction of PIETC and Angang was paying the rent.  Pattillo Decl., Ex. R.

The second prong of the alter ego test asks whether failing to pierce the corporate veil would result in an injustice.  In this case, failing to permit service of the Pangang Group defendants through PAI -- whether as a general agent or an alter ego -- would indeed be an injustice.  PAI was formed by Pangang Group to act as its representative in the United States and staffed by employees represented to the U.S. Government to be intra-company transfers.  PAI does the work of Pangang Group in the United States, including attending to legal affairs such as the handling of defective product claims by customers and assisting Pangang Group employees who are witnesses in a federal criminal investigation.

As alleged in the Superseding Indictment, the Pangang Group defendants intentionally sought out and obtained trade secrets developed in the United States.  Their employees repeatedly traveled to the United States and they made payment for stolen technology to their co-conspirators in the United States.  To allow the Pangang Group defendants to avoid answering the serious charges returned by the grand jury against them would be unjust indeed.

The cases capably summarized by defendants in their opening brief address primarily the issue of service under Rule 4 on the domestic alter ego of a foreign organizational defendant.  The cases make clear that the question must be resolved on a case-by-case basis, and because they are so factually distinct from this case, are of limited use.  However, the evidence supporting

an alter ego finding is at least as strong in this case as it was in either *Public Warehousing* or *Chitron*, where the Courts concluded that the domestic subsidiary was the alter ego of the foreign parent.[9]  *Public Warehousing* found that three factors of a twelve-factor test utilized by the Eleventh Circuit weighed in favor of the government, as well as the fact that "entities publicly presented themselves as a single company."  2011 WL 1126333, at *6-7.  In this case, at least six of the twelve factors considered in *Public Warehousing* weigh in favor of finding that PAI is the alter ego of Pangang Group,[10] as does the fact that PAI holds itself out publicly to to be part of the Pangang Group.  *See* Pattillo Decl., Ex. E.   Just as in *Public Warehousing*, the Pangang Group defendants have "not shown any reason for [PAI] to exist other than to conduct [their] business in the United States.  *Id.* at *8.

In *Chitron*, the district court's analysis and conclusion were even simpler.  It found that the U.S. subsidiary was a "mere conduit" for the business activities of the foreign parent defendant and was, therefore, its alter ego.  644 F. Supp. 2d at 305-06.  Although the particulars of the relationship between the subsidiary and the parent in that case are predictably different in that case than in this case, the conclusion that PAI is simply a conduit for Pangang Group's business in the United States, as it was intended to be at formation, could not be clearer.

F.   The United States' MLAA with China is irrelevant.

Two cases cited by defendants suggest that the purported availability of a mutual legal assistance treaty or agreement with the home country of the corporate defendants was a reason for finding that service on a U.S. subsidiary or employee was not effective.  We briefly address this in the event that defendants raise it more forcefully in their reply brief.

_____

[9] The other two cases cited by defendants, *Albert Wolff* and *Johnson Matthey* do not evaluate in any detail the business operations of the subsidiary or the parent companies under an alter ego test.

[10] "(1) the parent and the subsidiary have common stock ownership; (2) the parent and subsidiary have common directors or officers; (3) the parent and subsidiary have common business departments; . . . (5) the parent finances the subsidiary; (6) the parent caused the incorporation of the subsidiary; . . . [and] (9) the subsidiary receives no business except that given to it by the parent."  *Public Warehousing*, 2011 WL 1126333, at *5, *citing United Steelworkers of America v. Connors Steel Co.*, 855 F.2d 1499, 1505 (11th Cir. at 1988).

There is a Mutual Legal Assistance Agreement (not a treaty) between the United States and the PRC.  See Judicial Assistance Agreement Between the United States of America and China, Axelrod Decl., Ex. C (MLAA).   The existence of this agreement, however, is not relevant to these proceedings because, under its terms, the agreement is intended solely for the benefit of the signatory countries and does not create any rights in private parties.  MLAA, Art. 1, para. 3.   *See* *Chitron*, 668 F. Supp. 2d at 306-07 (rejecting argument that the government was required to attempt service under the MLAA with the PRC).

Moreover, the MLAA specifically exempts service of summons against those accused of crimes.  Although the agreement states that while the parties shall use their best efforts to serve legal documents on behalf of the requesting country, it provides an exception, noting that "the Requested Party shall not be obligated to effect service of a document which requires a person to appear as the accused."  MLAA, Art. 8, para. 1.  A summons is such a document.

V.   CONCLUSION

Defendants' motion to quash should be denied.

Dated: April 19, 2012                         Respectfully submitted,

                                              MELINDA HAAG
                                              United States Attorney


                                              _____/s/_____
                                              JOHN H. HEMANN
                                              PETER B. AXELROD
                                              Assistant United States Attorney