Volume 20

Pages 3849 - 4029

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jeffrey S. White, Judge

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
  VS.                           )        NO. CR 11-00573 JSW
                                )
WALTER LIEW; ROBERT MAEGERLE;   )
and USA PERFORMANCE TECHNOLOGY, )
INC.,                           )
                                )
            Defendants.         )
_____ )
                        San Francisco, California
                        Wednesday, February 12, 2014

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:
                        MELINDA HAAG
                        United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                  BY:   **PETE AXELROD**
                        **JOHN H. HEMANN**
                        **ASSISTANT UNITED STATES ATTORNEYS**

                        U.S. DEPARTMENT OF JUSTICE
                        600 E Street NW
                        Washington, D.C.  20044
                  BY:   **RICHARD S. SCOTT**
                        **ASSISTANT U.S. ATTORNEY**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

1    **APPEARANCES:   (CONTINUED)**

2    For Defendant Walter Liew and USA Performance Technology, Inc.:
                              KEKER & VAN NEST LLP
3                             633 Battery Street
                              San Francisco, California  94111
4                        BY:  **STUART L. GASNER**
                              **SIMONA A. AGNOLUCCI**
5                             **KATHERINE M. LOVETT**
                              **CHRISTINA BLAIS**
6                             **ATTORNEYS AT LAW**

7    For Defendant Robert J. Maegerle:
                              MCKENNEY & FROELICH
8                             1349 West Peachtree Street
                              Two Midtown Plaza - Suite 1250
9                             Atlanta, Georgia  30309
                         BY:  **JEROME J. FROELICH, JR.**
10                            **ATTORNEY AT LAW**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           **I N D E X**

2    Wednesday, February 12, 2014

3    **DEFENDANTS' WITNESSES**                              **PAGE**   **VOL.**

4    **COOPER, PAUL ANTHONY (RECALLED)**
     (PREVIOUSLY SWORN)                                     3857    20
5    Direct Examination resumed by Mr. Gasner               3858    20
     Cross-Examination by Mr. Axelrod                       3933    20

6                         **E X H I B I T S**

7    **TRIAL EXHIBITS**                           **IDEN**   **EVID**   **VOL.**

8
     189                                                    3983    20
9
     2285                                                   3870    20
10
     2318                                                   3871    20
11
     4011                                        3933             20
12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PROCEEDINGS**

```
1   Wednesday - February 12, 2014                    7:51 a.m.m.

2                     P R O C E E D I N G S

3                        ---000---

4       (Proceedings were heard out of the presence of the jury:)

5          THE COURT:  Good morning.  Please be seated.

6       Please call the case.

7          THE CLERK:  Calling Case Number CR-11-573,

8   United States versus Walter Liew, United States versus Robert

9   Maegerle, and United States versus USAPTI.

10      Counsel, please state your appearances.

11         MR. AXELROD:  Good morning, Your Honor.  Pete Axelrod,

12  John Hemann, and Richard Scott for the United States.

13         THE COURT:  Good morning.

14         MR. GASNER:  Good morning, Your Honor.  Stuart Gasner,

15  Simona Agnolucci for defendants USAPTI and Walter Liew.

16  Mr. Liew is present.

17         THE COURT:  Good morning, everybody.

18         MR. FROELICH:  Good morning, Your Honor.

19         MS. AGNOLUCCI:  Good morning, Your Honor.

20         THE COURT:  All right.  So I hear that the parties

21  don't have any issues to raise this morning.  Is that correct?

22         MR. GASNER:  That's true, Your Honor.

23         MR. AXELROD:  That's correct, Your Honor.

24         THE COURT:  All right.  So the only issue that the

25  Court needs to address is the submission that the Court ordered
```

1   from the defendants Walter Liew and USAPTI.

2          **MR. GASNER:**  Your Honor, if I might interrupt briefly,

3   I would ask Mr. Cooper to leave.

4          **THE COURT:**  Yes.  Thank you.

5                    (Pause in proceedings.)

6          **THE COURT:**  All right.  Mr. Cooper is gone.

7          So the defendants produced two volumes of documents.  One,

8   the first volume were, I think, the documents that -- the

9   relevant documents, and the second volume, simply, was the

10  report submitted in the case by Mr. Cooper so the Court could

11  determine whether -- the extent to which the documents

12  submitted were subsumed within Mr. Cooper's report.

13         Having reviewed the documents submitted by the defendants,

14  the Court does not find that any of those documents constitute

15  Jencks material, reverse Jencks.  The standard is not -- and

16  the statute is not -- this is not a civil case.  We're not

17  dealing with Rule 26; we're dealing with Rule 16.  And I don't

18  find any of these documents to be -- constitute Jencks -- or

19  reverse Jencks; and, therefore, they will not be turned over to

20  the United States.

21         The one housekeeping matter that I wanted to raise with

22  the defendants is, the defendants, with their documentary

23  submission, included or submitted a four-page, in effect,

24  summary with some argument -- summary of the documents and some

25  argument as to why the documents were not Rule 16 or were not

1  reverse Jencks, were not Rule 16 materials and discoverable.

2      And, so, my question to you, Mr. Gasner is:  Is there any

3  reason why this document, this summary or argument, could not

4  be filed in the public record?

5          **MR. GASNER:**  Your Honor, it does describe the

6  materials.  We filed it under seal in camera, and it was really

7  for the Court's guidance in light of the Court's ruling.  We

8  don't think it's appropriate for it to be on the public record.

9          **THE COURT:**  But is that true of all of this?  Because

10 there are documents -- there are some -- I mean, as you know,

11 Mr. Gasner, the Court is supposed to be, given the proceedings

12 are public, fairly strict when it comes to filing matters under

13 seal; and there are portions of the -- I won't even call it a

14 brief, but the submission that clearly are not either work

15 product or properly subject to seal.

16     I mean, as an example -- and I won't get into the detail,

17 but there's a procedural history here which clearly is not

18 subject to being sealed, and there may be other aspects of it.

19 I don't know.

20     But I would suggest, then, that the -- I'll give the

21 defendants an opportunity to present a redacted version, and I

22 will look at it, as I would any matter that is proposed to be

23 filed under seal, and determine whether I agree with the

24 defendants' position.  And if I do agree, then we'll just file

25 the redacted version in the public record.

**PROCEEDINGS**

1          I'm not asking for or even allowing the Government to

2    respond, because they don't get to respond on this and I've

3    already made my decision.  It's pretty clear that these

4    materials are not Jencks.  So that's the Court's ruling, and

5    this will be -- should be filed -- the documents themselves

6    should be filed appropriately with the clerk under seal, and

7    that sealing will continue.

8          **MR. GASNER:**  When would the Court prefer that we file

9    our redacted version?

10         **THE COURT:**  There's no hurry.  You can do it by close

11   of business tomorrow.

12         **MR. GASNER:**  Should that be filed, Your Honor, or

13   lodged with the Court?

14         **THE COURT:**  I think filed because, by definition, the

15   defendants' position is going to be that the unredacted

16   version -- or the redacted version is the one that they are

17   proposing to be filed.

18         So unless I say, "Oh, no, the defendant should have sealed

19   more of it," which I doubt I will do, it should be filed in the

20   public record as you would when you make any application, as

21   you have in this case, to seal documents.

22         **MR. GASNER:**  Very well.

23         **THE COURT:**  All right.  Yes, anything you want to say?

24         **MR. AXELROD:**  No, Your Honor.

25         **THE COURT:**  Okay.  Very well, then.  Let's see if the

 1    jury is here.

 2        Ms. Ottolini, if they are, we can resume with the

 3    testimony.

 4                    (Pause in proceedings.)

 5        **MR. FROELICH:**  Your Honor, just one thing.  It's a

 6    housekeeping matter.  I've stayed up late and worked on the --

 7    and got up early this morning and worked on the charges.  My

 8    office is shut down.  Everything is shut down in Atlanta.  I

 9    may be -- I'm going to have to print out everything from my

10    hotel, and it may be a few minutes late.  It won't be much

11    late, but I think, actually, if my secretary can file it from

12    her home, it would be all right.  But I won't know until we

13    take a break.

14        **THE COURT:**  All right.  Well, let us know, and

15    hopefully your mayor won't handle this storm the way he did the

16    last one.  He can only improve on what he did.

17        **MR. FROELICH:**  I was just going to say, Your Honor, it

18    can only get better.

19        **THE COURT:**  Yes.

20        **MR. FROELICH:**  The whole city is shut down.  They shut

21    the whole city down yesterday at noon.

22        **THE COURT:**  All right.  That's fine.

23                    (Pause in proceedings.)

24        **MR. HEMANN:**  Your Honor, just for the record,

25    Mr. Scott -- I'm sorry, Jo Ann.

**PROCEEDINGS**

1    I think that Mr. Froelich actually --

2         **THE CLERK:**  We're just waiting for one juror.

3         **THE COURT:**  Yes?  Okay.  Thank you.

4    **MR. HEMANN:**  Mr. Froelich didn't formally enter his

5    appearance this morning.  I think we moved on before

6    Mr. Froelich announced himself.

7         **THE COURT:**  Oh, I apologize.  I'm sorry, Mr. Froelich.

8    I do that to you all the time.

9         **MR. FROELICH:**  I don't mind staying under the radar.

10   Your Honor, Jerry Froelich for Mr. Maegerle.  Mr. Maegerle

11   is present in the courtroom.  We've been here all through this.

12        **THE COURT:**  I know you were.  I apologize,

13   Mr. Maegerle.

14   **MR. HEMANN:**  Thank you, Your Honor.  And thank you,

15   Your Honor, for looking at those this morning early, the Jencks

16   material or not Jencks materials.

17        **THE COURT:**  You're welcome.

18                    (Pause in proceedings.)

19    (Proceedings were heard in the presence of the jury:)

20        **THE COURT:**  Please be seated.

21   You may resume the stand, Mr. Cooper.

22                    **PAUL ANTHONY COOPER**,

23   called as a witness for the Defendants, having been previously

24   duly sworn, testified further as follows:

25        **THE COURT:**  You may proceed.

COOPER - DIRECT / GASNER

1    First, good morning, ladies and gentlemen.  Thank you

2  again for your punctuality, and we're ready to start; and we're

3  continuing in the defendant Walter Liew and USAPTI's case with

4  the direct examination of Mr. Cooper, the Defense expert on

5  technology.

6    You may proceed.

7      **MR. GASNER:**  Thank you, Your Honor.

8      **DIRECT EXAMINATION**  (resumed)

9  **BY MR. GASNER:**

10 **Q.**  Good morning, Mr. Cooper.

11 **A.**  Good morning.

12      **MR. GASNER:**  Mr. Guevara, if you could put up 2618,

13 previously admitted.

14 **Q.**  We're in the oxidation part of the plant; right,

15 Mr. Cooper?

16 **A.**  That's correct.

17 **Q.**  And I'd like to talk a little bit about the reactor here

18 in the 30K plant.

19    So if we could zoom on that, Mr. Guevara.  Okay.  Let's

20 zoom in a little bit.  Great.

21    Okay.  So if you could just identify briefly for the jury

22 the different parts of the oxidation reactor.

23 **A.**  Certainly.  The back of the reactor is what is called a

24 combustion chamber.  That is where oxygen comes in and we burn

25 toluene.

**COOPER - DIRECT / GASNER**

1   **Q.**   Okay.  And kind of go in the direction of the flow of the

2   process, if you would.

3   **A.**   The next section has various names.  I call it the core

4   reducer.  The diameter -- the inside diameter of the pipe is

5   reduced so you get the oxygen flowing in a straight line, which

6   is this section here (indicating).

7   **Q.**   Okay.  Maybe you can give us an arrow.

8   **A.**   (Witness complying.)

9   **Q.**   Perfect.  Okay.

10      And then what happens after that point in the process?

11  **A.**   Then after that, in this section here (indicating) -- let

12  me try and draw a circle.

13  **Q.**   Okay.

14  **A.**   -- that's what is called the insert in which the TiCl4 is

15  introduced through a -- basically, a gap between two pipes, and

16  that's called the slot, in general, in our industry.  TiCl4

17  enters and begins to react with the oxygen that's flowing down

18  the center of the pipe.

19  **Q.**   Okay.  So the slot is in that narrow part that you've got

20  the circle drawn around?

21  **A.**   That is correct.

22  **Q.**   Can you describe for the members of the jury -- we heard a

23  lot from Dr. Diemer about the slot and research that he did in

24  that regard.  Can you describe, in kind of verbal terms, what

25  the slot looks like and what it does?

1    **A.**    The way I describe it, it looks like if you hold two

2    toilet rolls together but don't quite touch them, the bit in

3    the middle is called the slot.  In other words, there's two

4    cylinders coming together but not quite touching, and the gap

5    between is called the slot.

6    **Q.**    And do slots come in different dimensions?

7    **A.**    Yeah.  There's two main dimensions associated with the

8    slot.  One is the inside diameter, and one is, actually, the

9    width of the slot, the distance apart of the two cylinders.

10   They vary -- even on the plants that I've worked on, they vary

11   significantly.

12   **Q.**    And if you could tell us, what is the -- what's the

13   function of the slot?

14   **A.**    It's to get the TiCl4 flowing.  And because it's a

15   circular gap, it spreads the TiCl4 uniformly around so when it

16   enters the oxygen, it mixes uniformly.  And it also creates a

17   mincing action.  So the TiCl4 actually mixes into the oxygen.

18   How fast it flows through the slot determines how fast it

19   mixes.

20   **Q.**    So there's a slot that goes all the way around the insert.

21   Is that the way it works?

22   **A.**    That is correct.

23   **Q.**    And you described it as two kind of ill-fitting cylinders?

24   **A.**    Yes.

25   **Q.**    Okay.  Let's take a look at previously admitted

COOPER - DIRECT / GASNER

1   Exhibit 2940.

2          MR. GASNER:  May I approach, Your Honor?

3          THE COURT:  Yes, you may.

4   BY MR. GASNER:

5   Q.   Have you reviewed that document?

6   A.   Yes, sir, I have.

7   Q.   What is it?

8   A.   This is the detail design specification for the oxidation

9   reactor for the 30K.

10  Q.   So let's go to -- I believe it's page 10, Mr. Guevara.

11  And let's blow up the side view.

12       So we looked at the 3D drawing, and now we're looking at a

13  cross-section of it.  Can you, again, walk the jurors through

14  the different parts of the reactor from left to right?

15  A.   Certainly.  This section here (indicating) is what is

16  called a combustion chamber.  All of this section is refractory

17  line.  This is very high temperatures that we're talking about,

18  in excess of 1500 degrees centigrade.

19       Oxygen comes in at the back.

20  Q.   Okay.  And you've drawn a horizontal line on the left side

21  of the drawing.

22  A.   There, coming into that area there (indicating).  Oxygen

23  flows into there.  Also in that area is what is called the

24  toluene nozzle.

25  Q.   What is toluene?

1   **A.**   Toluene is a hydrocarbon that is used as a fuel in this

2   case.  It's used because it has relatively low amounts of

3   hydrogen.  Hydrogen will react with chlorine to form

4   hydrochloric acid, and you don't want to form that because you

5   could roast the plant.

6   **Q.**   Okay.  So that heats up the oxygen.  Then walk us through

7   the reactor left to right, if you would.

8   **A.**   So the -- there is a very hot flame in here in this area,

9   approximately here (indicating).  The oxygen then flows down

10  this pipe (indicating) into what I call the core reducer.  And

11  what the reducer does, it lines up the oxygen flow to enter

12  into where the TiCl4 is going to come into the process.

13       It then expands a little bit here (indicating) to match

14  what we talked about yesterday, which is the insert, which

15  is -- this is the insert part.

16  **Q.**   Okay.  And that's the part that has the little holes where

17  the nitrogen comes in you talked about?

18  **A.**   That is correct.

19  **Q.**   Okay.  And where does the TiCl come in?

20  **A.**   It's not very clearly shown, but it's actually in this

21  area here (indicating).

22  **Q.**   All right.  Now, if you go above that, there's some words

23  that say "spacer," "adjustable section," and "spacer."  Do you

24  see that?

25  **A.**   Yes, I do.

**COOPER - DIRECT / GASNER**

1  **Q.**  Can you tell the members of the jury what that means?

2  **A.**  The speed of the TiCl4 entering the oxygen is quite

3  critical to how small or how large the particles are made.

4  It's an area where, certainly in my experience, there's a lot

5  of trial and error goes on to get this exactly right.

6      You can do some approximate calculations; but, in general,

7  as I said, the reactors I've worked with, they all allow this

8  slot dimension width to be adjusted until you get it right.

9  It's very flow-rate sensitive.  It's very pressure sensitive.

10  It's temperature sensitive.  So you really have to fit it into

11  the particular reactor you're running.

12  **Q.**  Is it fair to call this an adjustable slot?

13  **A.**  Yes, that's what it's called.

14  **Q.**  And when was this designed, this particular exhibit, 2940?

15  This is --

16  **A.**  I see this is November '08 on the drawing.

17  **Q.**  Okay.  And based on your review of the design of the

18  reactor, did this adjustable slot design ever change?

19  **A.**  No, it was always the same.

20  **Q.**  Who makes decisions in titanium dioxide plants as to how

21  big to make the slot?

22  **A.**  Generally, you do get a recommendation from the R&D; but

23  in most cases it's plant personnel like me, as the process

24  engineering manager, who determine what the pigment is actually

25  looking like, particle size.  And then we would make

1  recommendations and, actually, do the design to alter the width

2  of the slot to alter the pigment.

3  **Q.**   When you say "R&D," you mean research and development?

4  **A.**   Research and development.

5  **Q.**   And these are the R&D people in the plant after it's

6  constructed?

7  **A.**   No.  No, they usually stay back in their nice clean

8  offices in their research department.  They don't often visit

9  the plant.

10  **Q.**   Okay.  So they may be in the home office, but they're

11  giving advice to people at the plant after the plant is built.

12      Is that the way it works?

13  **A.**   That is correct.

14  **Q.**   Okay.  Let's talk a little bit about the flue pond.

15      So, Mr. Guevara, you can take that off.  Thank you.

16      And I'd like to show you one of the emails that was

17  discussed.  This is Exhibit 108, which I seem not to have the

18  original of.  If we can get that quickly.

19          **MR. GASNER:**  May I approach, Your Honor?

20          **THE COURT:**  Yes, you may.

21  BY MR. GASNER:

22  **Q.**   So I've displayed one of the emails that the Government

23  discussed with Mr. Dayton, and it talks about checking the

24  Kuan Yin design and scaling up to get a total pond square

25  footage.

1          Did you review this email?

2    **A.**   Yes, I did.

3    **Q.**   So you reviewed Mr. Dayton's testimony, I take it?

4    **A.**   Yes, I did.

5    **Q.**   And if I recall correctly, Mr. Dayton admitted that one is

6    able to calculate the length of the flue pond from

7    Google Earth.

8          Do you recall his testimony on that?

9    **A.**   Yes.  Yes.

10   **Q.**   But his testimony was that you cannot work out the area of

11   the flue pond from Google Earth.  Do you remember him talking

12   about that?

13   **A.**   Yes, I do.

14   **Q.**   What do you say in response?

15   **A.**   It is possible to estimate the diameter of the flue pond

16   from Google Earth; however, you don't really need to do that.

17   There are a number of patents which actually tell you what the

18   DuPont cooling-length diameter is.  Once you know the diameter

19   of the pipe, you very easily, simple mathematics, calculates

20   the area.

21   **Q.**   Let's --

22          **MR. GASNER:**  Your Honor, may I approach?

23          Actually, what I'd like to do, Your Honor, if I might, is

24   to use the ELMO to show some Google Earth photographs by -- as

25   a demonstrative.

1          **THE COURT:**  Very well.

2          **MR. GASNER:**  Thank you.

3     **Q.**   So I'm putting on the ELMO a Google Earth photo of the

4     DeLisle plant.  Do you recognize this document?

5     **A.**   Yes.  I did it.

6     **Q.**   And how did you go about doing it?

7     **A.**   You just use Google Earth, which is a free program on the

8     Internet.  You know the address of the DeLisle plant because

9     they're all published.  So you zoom in on it, and then you take

10    what is called a screen capture to actually get a photographic

11    quality.

12         **MR. AXELROD:**  Your Honor, I think before this is

13    displayed -- I understand this is a demonstrative, but before

14    it's displayed to the jury, it would be useful to have some

15    foundation about when this photograph was taken?

16         **THE COURT:**  Yes.  Would you do that?  Take it off the

17    screen, please.  I think that's a fair comment.

18         **MR. GASNER:**  Certainly.

19         **THE COURT:**  Please lay some further foundation.  Thank

20    you.

21    **BY MR. GASNER:**

22    **Q.**   When did you take this screenshot from Google Earth?

23    **A.**   The end of last year.

24    **Q.**   And based on your research, when was Google Earth

25    available?

1    A.    The earliest ones I've looked at, purely relating to

2    titanium dioxide, about 1997 was the earliest I found.

3    Q.    And other than Google Earth or other publicly available

4    Internet satellite imagery, was one able to get photographs of

5    comparable quality to the one that we were just looking at,

6    Exhibit 3509, through other means within your industry?

7    A.    Yes.  In fact, I think it was Hurricane Katrina came

8    through the gulf.  NOAA, which is a Government organization,

9    took numerous photographs because DeLisle was destroyed in that

10   hurricane.  It was flooded out.  And they published them on

11   their website.

12   Q.    Were NOAA photographs -- and that's the National

13   Oceanographic --

14   A.    National Oceanographic and Atmospheric Administration, I

15   think it is.

16   Q.    Were NOAA satellite photographs available even before

17   Hurricane Katrina?

18   A.    Not of the TiO2 plants.  I think it was the first time

19   they'd actually shot one with their high-resolution satellites.

20           MR. GASNER:  Your Honor, may I display Exhibit 3509?

21           MR. AXELROD:  I don't believe there's a foundation of

22   when the actual picture on the board was taken.

23           THE COURT:  All right.  When did you take the picture,

24   sir?

25           THE WITNESS:  I dropped it down about November of last

1    year.

2               THE COURT:  All right.

3               MR. AXELROD:  I'm sorry, Your Honor.  The question I

4    have is not when he looked at it, but when the actual picture

5    on Google Earth was taken.  There's no indication of when the

6    picture was taken.

7               THE COURT:  All right.  Do you know when it was

8    actually taken?

9               THE WITNESS:  No, but it's actually on the photograph.

10              THE COURT:  To the extent that's an objection, I'll

11   overrule the objection.  It's only a demonstrative aid, and I

12   think sufficient foundation has been set forth, and you may

13   display it.  It won't go into evidence.

14   BY MR. GASNER:

15   Q.   So just -- I believe, that there is an imagery date that's

16   in the lower left-hand corner.  Do you see that?

17   A.   That is correct.

18   Q.   That's 9/17/2007; is that right?

19   A.   That is correct.

20   Q.   Okay.  So let's -- just for purposes of illustrating your

21   testimony, can you tell us what -- where I'm pointing with a

22   pen, what is that?

23   A.   That is one of the flue ponds.  DeLisle has two lines.

24   That is one of them, and the one next to it is the other flue

25   pond.

1   **Q.**    Okay.  So this is another flue pond over here

2   (indicating)?

3   **A.**    Yes.

4   **Q.**    And what is the kind of serpentine thing?

5   **A.**    That is actually the flue pipe that we're discussing.

6   It's slightly fuzzy because it's actually under water.

7   **Q.**    Okay.  So as we were discussing --

8          **MR. GASNER:**  I'm going to take this off if I might,

9   Your Honor.

10          **THE COURT:**  Yes, you may.

11  **BY MR. GASNER:**

12  **Q.**    As we were discussing, Mr. Dayton admitted that you can

13  calculate the length of the flue pond from Google Earth; and

14  you were saying that from patents, you can calculate the area.

15       Can you tell the members of the jury how one would go

16  about doing that?

17  **A.**    Well, the patents actually tell you the diameter of the

18  pipe.  So the surface area of the pipe is just pi, which is a

19  fixed number.  You multiply it by the diameter, which gives you

20  square foot per foot; and then you multiply by the total length

21  of the pipe, which gives you the total square foot, which is

22  similar to the number quoted in this email.

23  **Q.**    Let me show you one of the patents that you discussed in

24  your report.

25          **MR. GASNER:**  May I approach, Your Honor, with

1    Exhibit 2285?

2              **THE COURT:**  Yes.

3    **BY MR. GASNER:**

4    **Q.**   What is this, Mr. Cooper?

5    **A.**   This is a DuPont patent of 1970.

6    **Q.**   Does it relate to your opinions about the ability to

7    calculate the area of a flue pond from public information?

8    **A.**   Yes, it does.

9              **MR. GASNER:**  Your Honor, move the admission of 2285.

10             **THE COURT:**  Any objection?

11             **MR. AXELROD:**  No objection, Your Honor.

12             **THE COURT:**  It's admitted.

13         (Trial Exhibit 2285 received in evidence)

14             **MR. GASNER:**  Mr. Guevara, if you could blow up the

15   front section of the patent.

16   **Q.**   Can you tell us who this patent was assigned to?

17   **A.**   This was assigned to DuPont.

18   **Q.**   What year was the patent issued?

19   **A.**   1970.

20   **Q.**   Can you take a look at Column 2, lines 53 through 55?

21   **A.**   Yes, I have them.

22   **Q.**   Okay.  Can you tell the members of the jury what is

23   significant to your opinions in this area?

24   **A.**   Yes.  This is going back one stage from the calculation

25   I've just described.  What it tells you is the flow in the

 1   first part of the flue pipe is going to be about 200 feet a

 2   second.

 3        Using that 200 feet per second and going to the process

 4   flow diagram, you know what the flow rate of all the gases down

 5   that flue pipe is.

 6        So, very simply, you can calculate the diameter of the

 7   pipe using those two numbers.  It's a couple of lines of simple

 8   mathematics.

 9        Again, once you've got the diameter, then you can

10   calculate the surface area of the pipe.

11             MR. GASNER:  Your Honor, may I approach with

12   Exhibit 2318?

13             THE COURT:  Yes.

14   BY MR. GASNER:

15   Q.   What is 2318, Mr. Cooper?

16   A.   This is another patent assigned to DuPont, dated 1990.

17   Q.   And does it relate to your opinions about calculating the

18   area of a flue pond from public materials?

19   A.   Yeah.  The first picture shows a diagram of a modified

20   flue pipe that is used.

21             MR. GASNER:  Your Honor, I move the admission of 2318.

22             THE COURT:  Any objection?

23             MR. AXELROD:  No objection, Your Honor.

24             THE COURT:  Admitted.

25        (Trial Exhibit 2318 received in evidence)

1         **MR. GASNER:**  So, again, Mr. Guevara, if you could --

2  you've already got it up there.

3  **Q.**  Is this a DuPont patent?

4  **A.**  Yeah, this is a DuPont patent.

5  **Q.**  Let's take a look at Column 4, line 14.  And can you tell

6  the members of the jury how this public disclosure relates to

7  your opinions about the ability to calculate the area of a flue

8  pond from public materials?

9  **A.**  Actually, it starts line 14 goes through about line 17,

10  and what it says is the end of the conduit, which in this case

11  is the flue pipe, had an interior diameter of 11.5 inches which

12  tapered to 12.25 inches interior diameter.

13      In other words, it told you the diameter of the pipe that

14  is used in this case, and that was before you use the diameter

15  to calculate the surface area of the foot, and then multiply by

16  the length of the flue pond, and you have the total surface

17  area.

18  **Q.**  We heard some testimony earlier in the case about the

19  elbows in a flue pond and how they're shaped.

20      Did you read that testimony?

21  **A.**  Yes, I did.

22  **Q.**  Can you tell the members of the jury, is there a body of

23  literature around designing elbows for pneumatic systems?

24  **A.**  Yeah.  The flue pipe itself does two things.  One, it

25  cools the gases, but also it conveys the titanium dioxide so it

COOPER - DIRECT / GASNER

1    can be collected later on in the process.

2         Pneumatic conveying has got a whole study section of its

3    own because it's used in many, many industries; and there are a

4    number of designs of bends, particularly because bends wear

5    rapidly as the solids change direction.  They rub against the

6    pipe and wear the pipe.  So there's a detailed background.

7    There's books and papers and articles written on how to avoid

8    this wear.

9         MR. GASNER:  Your Honor, may I approach the witness

10   with Exhibit 3229?

11        THE COURT:  Yes.

12   BY MR. GASNER:

13   Q.   What is this, Mr. Cooper?

14   A.   This is a paper from the *Chemical Engineering Progress*

15   *Magazine*, which is a publication of the American Institute of

16   Chemical Engineers, dealing with solids handling and selecting

17   elbows for pneumatic conveying systems.

18   Q.   Does this relate to your opinions about the design of the

19   elbows for the 30K and 100K systems?

20   A.   Yes, it does.

21        MR. GASNER:  Your Honor, I request permission to

22   display this just for demonstrative purposes.

23        THE COURT:  All right.  Any objection?

24        MR. AXELROD:  No objection, Your Honor.

25        THE COURT:  All right.  Go ahead.

BY MR. GASNER:

Q.   Sir, if you can tell the members of the jury what this article is about, just at a high level.

A.   Basically, what it's saying is that in order to avoid abrasion, which is the wear of the pipe by the solids flowing inside it, you can use various designs of bends.

The straight pipes are not a problem.  They don't wear because the solids don't strike the pipe walls, but at the bends -- and this actually shows various types of design that can be used in pneumatic conveying systems.

Page 30 is one I'm particularly familiar with because I've actually used that design.

Q.   Let's take a look at page 30, if we could, Mr. Guevara. Let's go -- there you go.  And let's blow up the pictures.

Is that -- are those the designs that you've used in your practice?

A.   Yeah.  The one on the left particularly.

Q.   Okay.  So perhaps you can tell the members of the jury, what does this illustration tell us about the process of designing elbows for pneumatic systems in terms of corrosion and wear?

A.   What it tells you, in general, is that you have to put some wear-resistant material in to prevent the wear happening. There's some very hard materials.

However, in this case you will actually form a pocket of

1  the material you're conveying so that the conveying materials

2  strike that and, basically, wear against themselves, not

3  against the pipe.

4  **Q.**  So is the design of elbows pneumatic systems, is that

5  something that mechanical engineers learn how to do?

6  **A.**  Oh, yes, and chemical engineers.

7  **Q.**  Let's turn to moving through the system.

8      Let's go back, Mr. Guevara, if we could, to our CAD

9  drawing, 2618, and get ourselves oriented as we continue our

10 tour of the plant.  So perhaps you can spin that around so we

11 can -- there we go.

12     We've heard about oxidation direct-fired heaters.  That

13 was part of testimony that we heard.

14     Can you tell the members of the jury, what is an oxidation

15 heater?

16 **A.**  There are two on the plant, and these, as we were

17 discussing yesterday, look a bit like wine bottles with long

18 necks.  This is one (indicating); this is the other

19 (indicating).  The one on the right is the TiCl4 vaporizer; the

20 one on the left is the oxygen preheater.

21     These are fired heaters, the majority of which are used in

22 the petrochemical industry.  They're very common in the

23 petrochemical industry.  And this design was adapted to go into

24 the titanium dioxide industry because they are very efficient,

25 they work well, and they're commonly available.

1          **MR. GASNER:**  Your Honor, may I approach with

2    previously admitted Exhibit 111?

3          **THE COURT:**  Yes.

4    **BY MR. GASNER:**

5    **Q.**   This is an email that the Government discussed that,

6    again, is from Mr. Maegerle to Mr. Liew.

7    **A.**   I see that.

8    **Q.**   CC'd to Jatin Patel.  And in it, Mr. Maegerle says

9    (reading):

10             "Walter,

11             "Attached is a preliminary specification for the

12        Pangang oxidation heaters.  If you approve, I will send

13        this spec to Lou Kahl for advance review by Petro-Chem

14        prior to the possible visit by Pangang Group to Petro-Chem

15        in October."

16        Do you see that?

17   **A.**   Yes, I do.

18   **Q.**   What's Petro-Chem?

19   **A.**   Petro-Chem Development is one of the largest suppliers of

20   this type of fired heater.  Huge business.  They've been taking

21   over recently by Heurtey.

22   **Q.**   Have you worked with Petro-Chem in your career?

23   **A.**   Yes.  I've ordered about eight of their units.

24   **Q.**   And can you tell the members of the jury, what is the

25   process that you went through in your career in dealing with

1   Petro-Chem for an oxidation-fired heater?  Just at a high

2   level, how does that work?

3   **A.**   Basically, what you do is, you send them an outline

4   specification, which may be four or five lines, with a flow

5   rate, the temperature, and the pressure.

6       And they then review that.  Then they do a complete detail

7   design, including all the mechanical stressing, the burner

8   design, the outside casing design, the foundation design.  They

9   will even fabricate it for you, if you want it, on site.

10      So they provide a complete start-to-finish design.  You

11  don't -- typically, I have not done detail design of these

12  units because I'd be wasting my time.  I let Petro-Chem do it.

13  **Q.**   Did you review materials relating to USAPTI and

14  Performance Group's interactions with Petro-Chem as part of

15  your opinions?

16  **A.**   Yes, I did.

17      **MR. GASNER:**  Your Honor, may I approach with Trial

18  Exhibit 1971?

19      **THE COURT:**  Yes, you may.

20  **BY MR. GASNER:**

21  **Q.**   What is 1971, Mr. Cooper?

22  **A.**   These are the detail specifications prepared by Petro-Chem

23  for the Pangang Group Chongqing Titanium Industry Company.  So

24  this is the 100K design.  It contains all the details, all the

25  documents, all the services that Petro-Chem is going to provide

1   to Pangang for both the oxygen and the TiCl4 vaporizer.

2           **MR. GASNER:**  Your Honor, I'd like to display this for

3   demonstrative purposes only to help illustrate Mr. Cooper's

4   explanation of the relationship with Petro-Chem.

5           **THE COURT:**  Any objection?

6           **MR. AXELROD:**  No, Your Honor.

7           **THE COURT:**  All right.  You may proceed.

8           **MR. GASNER:**  Thank you, Your Honor.

9   **Q.**   So let's look at the header, if you will, Mr. Guevara.

10      And the top line is a fellow named Robert O'Connor at

11  Petro-Chem, and then it's to Mr. Liew, cc'd to a variety of

12  people.

13      Do you see that?

14  **A.**   Yes, I do.

15  **Q.**   Okay.  And then in the attachments, it talks about an

16  oxygen heater and a TiCl heater.

17      Do you see that?

18  **A.**   That's correct.

19  **Q.**   Okay.  And then further down in the body of the email,

20  there's some back-and-forth between Mr. Liew and Mr. O'Connor

21  about the project.

22  **A.**   That's correct.

23  **Q.**   Okay.  Let's go to page 3, if we could, Mr. Guevara.

24      And then there's this set of technical annexes.  Do you

25  see that?

**COOPER - DIRECT / GASNER**

1    **A.**    I do.

2    **Q.**    And thereafter --

3        Let's go to page 5, if we could, Mr. Guevara.

4        There are tables with all kinds of parameters in there.

5    And can you tell the members of the jury just, in this kind of

6    technical annex, how typically would a TiO2 plant designer deal

7    with Petro-Chem to kind of come up with the right specs for the

8    oxidation heater?

9    **A.**    Because of the type of equipment, the supplier of the

10    equipment requires a lot of site data for where the piece of

11    equipment is actually going to be built and used.  You need to

12    know how high it is because that alters the air density.

13    They're designing the foundation, so you need to know about

14    earthquake situations.

15        You also need to know all the utilities that are available

16    to you, so the voltages, the electricity supply.  Clearly in

17    this case nitrogen is also used.  So what is the condition of

18    the nitrogen?

19        And then, most importantly, what is the fuel that is

20    available on-site for use for these big burners?

21    **Q.**    Okay.  And then what happens?  After there's all the

22    site-specific information, what happens next, typically, in

23    this process?

24    **A.**    Then the supplier, in this case Petro-Chem, basically,

25    goes away and designs the unit and prepares.

1      First of all, there will be a big document which,

2  actually, tells you what the estimated price is, which is not

3  in this document.  But attached to that will be all technical

4  annexes relating to -- very slightly, but usually it has a

5  description of what they're supplying in terms of how it

6  operates.  There will be flow rates, temperatures, pressures,

7  lifes, all specified by the supplier, who often is required to

8  guarantee this data.

9  **Q.**   Let's pause there.  All these flow rates and other things

10  are specified by Petro-Chem?

11  **A.**   No.  The flow rate, temperature, and the pressure will be

12  supplied by -- usually by the technology supplier.  So it will

13  be about -- I don't know -- five, eight lines of typing.  It's

14  not very much.  Then Petro-Chem take that and do the detail

15  design.

16  **Q.**   So let's take a look at page 44 of the report.  That's

17  based on the pages in the document, not necessarily the 44th

18  page.

19      Mr. Guevara, if you can --

20          **MR. GUEVARA:**  Is that the Bates number?

21          **MR. GASNER:**  It's Annex 10.

22          **MR. GUEVARA:**  Do you know what the Bates number is?

23          **MR. GASNER:**  The Bates number ends in 8727.

24          **MR. GUEVARA:**  Thank you.

25

1  BY MR. GASNER:

2  Q.   So let's blow that up.

3       And what we're looking at on the screen now is a bunch of

4  references to DuPont.  Do you see that?

5  A.   Yes, I do.

6  Q.   And this is called a reference list, and it's got a

7  partial listing of TiCl vapor superheaters.

8       Do you see that?

9  A.   I do.

10 Q.   And then it gives the job number, and there are some

11 parameters off on the side there.

12      Do you see those?

13 A.   Yes, I do.

14 Q.   Can you tell the members of the jury, what's this?

15 A.   This is to give confidence to the buyer that Petro-Chem,

16 in this case, has supplied these units before and gives

17 references of major use -- users of these specific items in

18 this specific duty.

19      So they're not Petro-Chem references; they're purely

20 related to titanium dioxide manufacture.

21 Q.   And, so, they're, basically, telling USAPTI, "You know,

22 here's what we've supplied to DuPont at these various plants";

23 right?

24 A.   That's correct.

25 Q.   Is there anything unusual or improper about Petro-Chem

COOPER - DIRECT / GASNER

1   doing that in your experience?

2   **A.**   No.  It's their own design, so they're free to do it.  In

3   fact, two of those are my heaters.

4   **Q.**   Which ones are yours?

5   **A.**   The United Engineers SCM Chemicals, Ashtabula, Ohio, and

6   the BWDS SCM Chemicals, South Humber, UK.

7       I'm sorry.  The next one, as well, is mine.  SCM

8   Chemicals, Sunbury, Australia.

9   **Q.**   And do you feel that's compromising SCM for Petro-Chem

10  doing this?

11  **A.**   No, I don't.

12  **Q.**   Why not?  Why isn't that --

13  **A.**   Because it's their equipment.  We don't design it.  It's

14  their designs; it's not ours.

15  **Q.**   So that's the oxidation heater, those beer or wine bottle

16  structures?

17  **A.**   That's correct.

18  **Q.**   Let's go back to the CAD drawing and move on to the next

19  step of the oxidation plant.  Oxidation bag filters.  Where are

20  those?

21  **A.**   These are these items up at the top of the building

22  (indicating).

23  **Q.**   Okay.  And, so, tell us what all these vessels are.

24  **A.**   After the gases pass through the flue pond to cool and

25  they have the solid titanium dioxide in them, what you need to

1  do is separate the solid titanium dioxide from the gases,

2  because the gases are going to be sent back to the chlorinator

3  for reuse.  So these bag filters are fabric filters.  They are

4  supplied usually by somebody like MikroPul.  They're fairly

5  standard in the industry.

6  Q.  Let me ask you to take a look -- well, just while we're

7  still on this, can you just describe -- let's back up a little

8  bit, Mr. Guevara, and perhaps you can just kind of walk us

9  through.

10     We see the flue pond there.  We've talked about that.  And

11  then there's, like, a vertical pipe coming out of it.

12     Is that -- is that the direction of flow is going up the

13  pipe?

14  A.  That is correct.

15  Q.  Okay.  And then it goes into these four vessels that look

16  like a snow cone with a very tall cylindrical piece of snow on

17  top of them?

18  A.  Yes.

19  Q.  And perhaps you can just walk us through.  So these

20  cooled-down particles are now going into the bag filters.  Is

21  that where we are?

22  A.  That's correct.

23  Q.  And what's inside these things?

24  A.  They are a tube of fabric, very similar to the old vacuum

25  cleaner bags.  In fact, they operate the other way around in

1  that the dirt, the TiO2 in this case, sticks to the outside of

2  the bags.  The gases pass into the inside of the bags and then

3  flow out of these top pipes here (indicating).

4  **Q.**  Okay.

5  **A.**  And the bag --

6  **Q.**  So the -- how hot is the dust going into the bottom?

7  **A.**  You have to get the temperature down to between 175 and

8  200 degrees C, centigrade, because the bags limit the

9  temperature that they can operate at.

10  **Q.**  And the vacuum cleaner fabric is inside.  And what does

11  that do?

12  **A.**  It's, actually, a number of very long tubes of a fabric

13  which is fine enough to collect the titanium dioxide, and it

14  forms a coating on the outside.  Every so often you need to

15  remove this TiO2 that's collected, just like you're emptying

16  the bag.  And you inject nitrogen, which, actually, causes the

17  bag to expand and contract, and that releases the titanium

18  dioxide from the bag surface.

19       Small bag filters will have 60 or 80 of these bags in

20  them.  Big ones have -- the biggest I ever saw was not on TiO2,

21  but that had about 4,000 bags.

22  **Q.**  So the dust goes in; it gets caught up in the fabric; and

23  then you hit it with nitrogen.  And then the dust goes where?

24  **A.**  Falls off.  It falls off into the bottom of the

25  cylindrical section here (indicating), so it can be dropped

 1  down for slurrying in another part of the process.

 2          **MR. GASNER:**  Your Honor, may I approach with

 3  Exhibit 112, previously admitted?

 4          **THE COURT:**  Yes, you may.

 5  **BY MR. GASNER:**

 6  **Q.**   This was an email that the Government talked about

 7  relating to oxidation filters.  And, again, from Mr. Maegerle

 8  to Mr. Liew, cc'd to a USAPTI engineer, "Oxidation Filter

 9  Spec."  And then there's an attachment.

10       Do you see that?

11  **A.**   (Witness examines document.)  Yes, I do.

12  **Q.**   And if you go to the third page, there's some performance

13  specifications.  Do you see that?

14  **A.**   Yes, I do.

15  **Q.**   And then on the last page -- we'll just go there

16  briefly -- there are U.S. suppliers.

17       Do you recognize those companies?

18  **A.**   Yes, I do.

19  **Q.**   Can you tell the members of the jury, what are those

20  companies?

21  **A.**   MikroPul is the major supplier of this piece of equipment

22  in the industry.  Fisher-Klosterman supply a similar type.

23  Personally, I don't use them.  I use MikroPul's.

24  **Q.**   Let's go back to the preceding page.  And did you have a

25  chance to review the information here about the specs on the

1   oxidation filters?

2   **A.**   Yes, I did.

3   **Q.**   Did you see anything in here that wasn't publicly

4   disclosed or readily ascertainable, in your opinion?

5   **A.**   No.  Everything on there is from patents or textbooks.

6   There's nothing there that's unusual.

7   **Q.**   I mean, looking at it, does this strike you as an

8   oxidation filter spec that's substantially different from

9   others you've seen in your career?

10  **A.**   No.  I've written them just like this.

11  **Q.**   Let me show you a document that I've marked as Trial

12  Exhibit 1803.

13          **MR. GASNER:**  May I approach, Your Honor?

14          **THE COURT:**  Yes.

15  **BY MR. GASNER:**

16  **Q.**   Can you tell the members of the jury what this is, at a

17  high level?

18  **A.**   Yes.  This is a quotation from MikroPul to USAPTI with a

19  quotation for the bag filters for -- I believe it's the 30K

20  plant.  Yes, the 30K filter.

21  **Q.**   And does this relate to your opinions about the process

22  that USAPTI and Performance Group used to specify the oxidation

23  bag filters?

24  **A.**   Yes.  It's a bit like the heaters.  These are designed by

25  the supplier.  They know all the details.  They know how to

COOPER - DIRECT / GASNER

1  fabricate and construct them.

2       So what you do is, you send a preliminary quote, which was

3  a previous document, and then, in this case, MikroPul write

4  back and say, "Yes, we like your quotation and your

5  specification and we will manufacture it."

6       Sometimes they say, "We don't like it at all and we'd like

7  to recommend an alternative."  Usually --

8  **Q.**   Is that what happened here?

9  **A.**   Yes.  They changed some of the things.

10          **MR. GASNER:**  Your Honor, I'd just like to display this

11  for demonstrative purposes to help the witness express his

12  opinion.

13          **MR. AXELROD:**  No objection, Your Honor.

14          **THE COURT:**  All right.  You may.

15          **MR. GASNER:**  Let's go to the third page, and one more

16  page, if you would, Mr. Guevara.  I guess it's the fourth.

17  There we go.  And under "Notes" if you could blow that up.

18  **Q.**   Are these notes by the buyer, that is, USAPTI or

19  Performance Group; or are these from the vendor, that is,

20  MikroPul?

21  **A.**   These are from MikroPul, the vendor.

22  **Q.**   So can you tell the jury what the first note signifies, in

23  your opinion?

24  **A.**   They're, actually, telling USAPTI that they didn't like

25  USAPTI's design regarding where the gas and titanium dioxide

 1  entered the bag filter and they were recommending an
 2  alternative design.
 3  **Q.**  So what was it that USAPTI was recommending?  Do you
 4  recall?
 5  **A.**  They were recommending a -- I believe, a tangential inlet.
 6  In other words, it would go into the side of the filter to
 7  allow the gases to spin and reduce the dust loading on the
 8  filters.
 9      What MikroPul said was, "This stuff is too abrasive, and
10  we'd like to go straight on and put in a diffuser to,
11  basically, stop the abrasion."
12  **Q.**  What did USAPTI end up doing?  Did they go with what they
13  recommended initially, or did they follow the vendor's
14  recommendation?
15  **A.**  They followed the vendor's recommendation.
16  **Q.**  How about note 2?  Tell us about that.
17  **A.**  Tables of construction, what they're saying is, there was
18  a suggestion to use aluminum for the bag filter material for
19  the casing, the outside vessel.  They're saying they don't do
20  that anymore; so you'll have to go, for the internal bits and
21  pieces, with 316 stainless steel, which is a chemical grade of
22  stainless steel.
23      They don't say it, but they're making a strong point that
24  this is what they've used before, and this is what they would
25  recommend.

**COOPER - DIRECT / GASNER**

1  **Q.**  Let me ask you a few questions about slurry.  What is

2  slurry?

3  **A.**  Slurry is water with titanium dioxide particles suspended

4  in it.  It's a bit like milk of magnesia, if you know what that

5  is.

6  **Q.**  I do.  I've seen it in the drugstore.

7     So let's go back to the CAD drawing, if we could.

8     And where is slurry involved at this stage of the process,

9  if at all?

10 **A.**  Okay.  What happens is, the titanium dioxide solid drops

11 into the cone of the bag filters down here (indicating) and

12 then is -- drops into what is called a screw conveyor, which is

13 a piece of pipe with a screw in it which, actually, moves the

14 pigment so it can be collected together and then, in this case,

15 discharged into this vessel here (indicating) -- sorry -- this

16 vessel (indicating), which is the slurrying tank.

17    The powder drops in; it's mixed with water so it can be

18 handled later on.  The finishing plant, which we're going to go

19 into next, handles slurry.  It needs to have it with water.  So

20 this is where you do that.

21    The pigment, the base pigment, because it's not got

22 treatment on it at this time, has a very large surface area, so

23 it tends to absorb some of the gases that are in the process.

24 And one of the things that this is designed to do is actually

25 the gases then, as they, what is called, dissolve, come off the

COOPER - DIRECT / GASNER

1  surface, it has to be led away and treated.  So that's also in

2  this system.

3  **Q.**   Is this a standard part of the chloride-route process?

4  **A.**   This is -- there are a few times, but all of them have

5  this, with one exception that I can recollect.  This system was

6  the original Ashtabula 1 design.

7  **Q.**   So if I understand you correctly, we've shaken the vacuum

8  filters and gotten the dust, and now it's -- do you add water

9  into this tank?

10 **A.**   That is correct.

11 **Q.**   Okay.  And then that allows it to get rid of some absorbed

12 gases and send it to the finishing plant?

13 **A.**   That is correct.

14        **MR. GASNER:**  Your Honor, may I approach with

15 Exhibit 125?

16        **THE COURT:**  Yes, you may.

17 **BY MR. GASNER:**

18 **Q.**   This is one of the emails that the Government discussed in

19 its case in chief.

20        Have you reviewed this?

21 **A.**   Yes, I have.

22        **MR. GASNER:**  And could we display this previously

23 admitted exhibit?

24        **THE COURT:**  Yes, you may.

25        **MR. GASNER:**  Thank you, Your Honor.

**COOPER - DIRECT / GASNER**

1 **Q.**   Again, an email from Mr. Maegerle to Mr. Chen at USAPTI,

2 cc'd to Mr. Liew, subject "Slurry viscosity."

3       What is viscosity?

4 **A.**   That's how thick, whether it's like treacle or it's like

5 water when you put your spoon in it and stir it.

6 **Q.**   And looking down at the rest of the email, have you

7 studied those descriptions of slurry viscosity in reaching your

8 opinions?

9 **A.**   Yes, I have.

10 **Q.**   And how does this description of slurry viscosity compare

11 to anything else you've seen in your career?

12 **A.**   I copied the Ashtabula 1 design for this system, so these

13 numbers are very familiar to me.

14 **Q.**   What do you mean by that?

15 **A.**   20 centipoise, which is the viscosity, I have used.

16 **Q.**   Okay.  So at Ashtabula 1, how does this description that

17 we see in the email of slurry viscosity compare to what you

18 know from your Ashtabula 1 days?

19 **A.**   This is almost identical to the Ashtabula 1.

20 **Q.**   Okay.  We're almost out of the oxidation plant.

21       Actually, let's go briefly -- let me ask you.  This will

22 make more sense if I show you the email.

23           **MR. GASNER:**  May I approach, Your Honor?

24           **THE COURT:**  Yes.

25

1    BY MR. GASNER:

2    Q.   I'm showing you what's been previously marked as

3    Exhibit 67.  Again, this is another email introduced by the

4    Government in their case from Mr. Maegerle to Mr. Liew talking

5    about demineralized water and nitrogen, and it says (reading):

6              "Walter, I was somewhat mistaken.  Kuan Yin

7         Basic Data does not call for demineralized water, but does

8         call for a hot water head tank to supply 70-degree" -- or

9         "70F water to the filters" --

10             MR. AXELROD:  Your Honor, I just want -- I apologize

11   to Mr. Gasner.

12             MR. GASNER:  I'm sorry.  I will edit the numbers --

13             MR. AXELROD:  Thank you.

14             MR. GASNER:  -- and move to self-strike that number

15   that I inadvertently --

16             THE COURT:  All right.  The motion is granted.

17             MR. HEMANN:  -- stated.

18   Q.   So going back, hot water head tank to supply a certain

19   temperature of water to the filters, and it goes on from there

20   with different numbers.

21        Did you take a look at this?

22   A.   Yes, I did.

23   Q.   And a little bit further down, there are other emails

24   between Mr. Maegerle and Mr. Liew talking about this issue of

25   how hot the water should be and what kind of water to use for a

**COOPER - DIRECT / GASNER**

1    certain phase of the process.

2        Do you see that?

3    **A.**   Yes, I do.

4    **Q.**   Can you tell the members of the jury, where are we in the

5    plant at this point?

6    **A.**   We're, actually, in the finishing plant now.

7    **Q.**   Okay.  So let's just pause for a second.

8        Do we have the CAD drawing for the finishing plant,

9    Mr. Guevara?  2616, previously admitted.

10       In your reviewing the allegations in this case, did you

11   see much involving the finishing plant?

12   **A.**   No.  There's really only two main items that were

13   mentioned.

14   **Q.**   And, again, we talked about the TiCl plant, the oxidation

15   plant.  Now this is the third part of TiO2 factories?

16   **A.**   That is correct.

17   **Q.**   Can you tell the members of the jury, what does the

18   finishing plant do?

19   **A.**   Titanium dioxide, as it comes out of the oxidation unit,

20   has some quite difficult properties for the end user to work

21   with.  It doesn't go into paint.  It doesn't disperse, so it

22   settles very quickly.  It doesn't go into plastics.  It

23   flocculates and forms lumps on the surface.  So what you have

24   to do is modify --

25   **Q.**   You need to tell us what flocculate meets.

1   **A.**    Oh.  It clumps together.  Sorry.

2   **Q.**    All right.  So continue, please.

3   **A.**    So what you do in the finishing plant, mainly, is you put,

4   as I said in my earlier testimony, a coating a bit like the

5   shell of an M & M on it.  This helps it go into the mediums

6   that the customer wants.  It disperses easily.  It doesn't

7   settle.  It doesn't clump together.  And it makes it a lot

8   easier for the paint manufacturer or the plastics manufacturer

9   to use.

10       There are a number of surface coatings used.  They are

11   fairly limited in number, so we all tend to use the same ones.

12       But when you put this surface coating on, you form sodium

13   chloride, salt, as a by-product, which dissolves in the water.

14       And what this particular email deals with is washing that

15   salt out of the pigment before you dry it; otherwise, it would,

16   in the case of paint, corrode the subsurface, the metal you're

17   painting on, because salt is corrosive.  So you have to wash it

18   out.

19   **Q.**    Is that a standard part of the chloride-route process?

20   **A.**    Chloride and sulfate, they all have them.

21   **Q.**    So this is in the old sulfate process, you still have to

22   wash the pigment to get the salt out?

23   **A.**    That is correct.

24   **Q.**    And where -- where does that happen in the CAD drawing?

25   **A.**    This one, actually, is for the 100K design.  U.S.A. --

COOPER - DIRECT / GASNER

1  there are a few different types of filter where you will wash

2  out the sodium chloride.  The more later models are these here

3  (indicating), which are called pressure filters.  However, this

4  document refers to an older style, which are called rotary drum

5  filters, which have been around since well before I was born,

6  but they are slowly being replaced by pressure filters because

7  they're better at the job.

8  **Q.**  So just -- perhaps you can just give us a quick overview.

9      And, Mr. Guevara, I don't know if you can flip this around

10  so that we go left to right, as we've been doing.

11      So just quickly, if you can tell us, what's the process in

12  the 100K plant for finishing, as you see it, on this CAD

13  drawing?

14  **A.**  On the extreme left are the tanks that contain the

15  treatment chemicals.  These are, again, all solutions because

16  now everything is in the water phase; everything is

17  water-based.

18      Next to those are the treatment tanks.  With a couple of

19  exceptions, the industry uses batch tanks.  You put a certain

20  amount of titanium dioxide in; then you put your treatment

21  chemicals in; you stir them around usually at 80.  70 to

22  80 degrees centigrade is the typical temperature.

23      After a certain period of time, the coating has formed on

24  the titanium dioxide, so you stop the reaction.  And then you

25  pump it forward into the next stage, which is the filter area.

**COOPER - DIRECT / GASNER**

1  **Q.**  Those are kind of the boxcar-looking things we talked

2  about?

3  **A.**  Those are the boxes.

4  **Q.**  Okay.  So then it gets filtered there.  And then going

5  left to right, what happens next?

6  **A.**  In the filters, what you do is, you actually form

7  something that's called a cake because it actually looks the

8  consistency of cake.  And you pass water through it, which

9  absorbs the sodium chloride and washes it out.

10  **Q.**  Where does that happen?

11  **A.**  This is happening in these filters presses here

12  (indicating).

13  **Q.**  Okay.

14  **A.**  It then, in general, needs to be dried, because most

15  customers require a dry powder to go into their formulations.

16  So the next section is drying, and these are these items here

17  (indicating).

18  **Q.**  Okay.  And you're pointing to the -- some other snow

19  cone-looking things?

20  **A.**  These are fluidized.  In other words, you blow hot air

21  through the filter cake, the $TiO_2$.  Because the titanium

22  dioxide is so small and so light and so fluffy, it blows out of

23  the dryer as it dries.

24      So the next section, again, is to remove the titanium

25  dioxide from the gas stream.  And we have a whole series, then,

1    of more bag filters, very similar to the ones in oxidation.

2    **Q.**   Okay.  So in the oxidation plant, there was powder; it's

3    turned into slurry; it goes to the finishing plant; and there's

4    a process that you've described; and then it ends up back as

5    powder again?

6    **A.**   That's correct.

7    **Q.**   So let's go to email 67.

8          **THE COURT:**  Before we do that, let's take a stretch

9    break.

10         **MR. GASNER:**  Very well, Your Honor.

11                    (Pause in proceedings.)

12         **THE COURT:**  All right.  Please be seated when you're

13   ready, ladies and gentlemen.

14      And when they do, you may proceed.

15         **MR. GASNER:**  Thank you, Your Honor.

16   **Q.**   So, Mr. Cooper, let's go back to the email that we were

17   talking about, Number 67, and I want you to note the number,

18   the temperature of the water that is in the top email.

19      Do you see that?

20   **A.**   Yes.  It says 70 degrees Fahrenheit.

21   **Q.**   Whoop.  You've got to keep that --

22         **MR. GASNER:**  I'll move to strike that, Your Honor.

23         **THE COURT:**  Yes.  Granted.

24   **BY MR. GASNER:**

25   **Q.**   So we're going to simply talk about comparing two numbers

1    on the record. The jury can see what we're talking about. You

2    don't need to say it out loud.

3         But the number that's next to the water to the filters --

4         MR. GASNER: And if I might approach, Your Honor, with

5    3100.

6         THE COURT: Yes.

7    BY MR. GASNER:

8    Q.   What is Exhibit 3100?

9    A.   This is an email with attachments from Mr. Amerine and

10   also from FLSmidth, again, who were, actually, the agent for a

11   company called IMCO, who make the rotary drum filters that were

12   used in the 30K process.

13        MR. GASNER: Your Honor, permission to display 3100

14   just for illustrative purposes?

15        THE COURT: Yes, you may.

16        THE CLERK: It's been admitted.

17        MR. GASNER: Oh, this has been admitted?

18        THE COURT: Yes.

19        MR. GASNER: Thank you.

20   Q.   So let's go to the 3100, Mr. Guevara, and let's go to the

21   top header.

22        This is from Mr. Amerine to Mr. Liew, BJ, and

23   Mr. Maegerle, and it refers to technical appendix Jinzhou 2005,

24   then there's a .pdf.

25        Do you see that?

**COOPER - DIRECT / GASNER**

1   **A.**   Yes, I do.

2   **Q.**   And then below that -- let's go to the second page, if we

3   could.

4        We met Mr. Amerine here in court.  It seems like a long

5   time ago.  But let's go to the technical appendix.

6        What is this?

7   **A.**   Again, these are standard pieces of equipment which are

8   designed by a supplier.  They know how to do it; so they

9   provide the design, the design details, that have worked in

10  their experience.

11  **Q.**   So let's go to the page, Mr. Guevara, that ends in Bates

12  Number 3022.

13       And without getting into particular temperatures, do you

14  see where it says, "wash water temperature"?

15  **A.**   Yes, I do.

16  **Q.**   And there's a number there?

17  **A.**   Yes.

18  **Q.**   And can you, just for the record, tell us, is that

19  different than the number in Exhibit 67?

20  **A.**   (Witness examines document.)  Yes, it is significantly

21  different.

22  **Q.**   So how, in your experience, does it happen that there

23  might be an email talking about one temperature number and then

24  when it comes time to order the part, it ends up another

25  number?

1   **A.**   In this particular case, there would have been discussions

2   between the supplier and USAPTI, Mr. Amerine.  The supplier in

3   this case, the agent for the supplier, FLSmidth, would have

4   said, "You've got it wrong, and this is what we would recommend

5   for you."

6       The number in the email is much lower than the one in this

7   document.  So they're telling them, "You've got to use hotter

8   water to make this work."

9   **Q.**   And in your experience with titanium dioxide plants that

10  you've worked at or learned about over the years, is there a

11  normal range of what temperature water is used to get the salt

12  out of the slurry?

13  **A.**   Yes, there is.

14  **Q.**   And are both these numbers in that range?

15  **A.**   No.  The one in the quotation is more likely to be

16  correct.

17  **Q.**   That's the quotation from the vendor?

18  **A.**   That's correct.

19          **MR. GASNER:**  I'd like to take a look at a large

20  demonstrative.  If I can pull over the blackboard, Your Honor.

21          **THE COURT:**  Yes.

22                  (Pause in proceedings.)

23  **BY MR. GASNER:**

24  **Q.**   I'm going to show you what has been marked as Exhibit 2

25  and admitted into evidence and talked about a lot.  And we've

COOPER - DIRECT / GASNER

1    referred to this from time to time as Trade Secret 2, or I

2    should say alleged Trade Secret 2.

3         Have you had a chance to study this document?

4    **A.**   Yes, in detail.

5    **Q.**   And, Mr. Guevara, if we could also put up the electronic

6    version of this, please, which is up on the screen now.

7         So let's do a little guided tour of this.

8              **MR. GASNER:**  And, Mr. Axelrod, I've left you a

9    demonstrative with some colors that we're going to overlay.

10   **Q.**   So let's go to part 1, lower right-hand corner, in the

11   actual exhibit, Mr. Guevara.

12        Okay.  Can you tell the members of the jury, again, what

13   information did you derive from this title block?

14   **A.**   This is a standard title block.  What it tells you is this

15   drawing is for the Edgemoor plant, the oxidation unit.  W/RPS

16   means width.  RPS -- RPS is a product.  It's a very specific

17   product which we may want to talk about later.

18   **Q.**   Let's talk about it now.  What does it stand for?

19   **A.**   Rutile paper slurry.

20   **Q.**   So tell us -- let's break that down.  What does rutile

21   mean?

22   **A.**   Rutile is the crystal structure that we produce in the

23   chloride plant.  It's the most common use in the United States.

24   It's a harder, it's a denser, it's a more durable, it's a much

25   better crystal.

COOPER - DIRECT / GASNER

1  Q.   Now, the next word in that is "paper."

2  A.   Yes.

3  Q.   Is rutile crystal usually used for paper?

4  A.   No, it's not.

5  Q.   What's usually used for paper?

6  A.   Usually for paper is anatase, which is a different crystal

7  structure.  It's used because it's a softer crystal, and it

8  doesn't erode these big paper-making machines in Kimberly-Clark

9  and places like that.  So this is a very unique product.

10 Q.   So what is the point of making a paper slurry with rutile

11 crystal?

12 A.   There are a few customers in the U.S. who actually use

13 this for quite specialized usages.  The Edgemoor plant produces

14 almost the complete U.S. supply.  There's one other small

15 supplier, but it doesn't do very much.

16      It is fading as a product to be replaced by more anatase

17 because anatase is actually cheaper.  So I wouldn't say it's a

18 dying grade, but it's certainly diminishing in importance in

19 the industry.  But it is very specific to the paper industry.

20 Q.   Okay.  So in a big picture, this is a drawing that relates

21 to what you describe as a niche product for this rutile paper

22 slurry.

23      What's the slurry?  Doesn't everybody have slurry?

24 A.   No, they don't.  This is -- Edgemoor is a very different

25 plant.  I've talked -- we just talked about finishing plants.

1   This doesn't have a finishing plant.  It does not produce any

2   dry product whatsoever.

3   **Q.**   Okay.  So this is unusual in that it's a rutile paper

4   product and it doesn't have a finishing plant?

5   **A.**   That's correct.

6   **Q.**   All right.  What else were you able to derive just looking

7   at Section 1 here, the title block?

8   **A.**   It's a very old drawing.  It's done in 1993.  It does

9   appear to be a proper engineering drawing as opposed to the

10  other drawing we saw, as this is done by the engineering

11  department.

12      I recognize the numbering system because a similar type

13  numbering system was used at Ashtabula 1, line 1.

14  **Q.**   And is there any confidentiality legend on this document?

15  **A.**   Not on this drawing.

16  **Q.**   All right.  So let's go to Section 2.  It's a little tiny

17  one.  And let's blow up the text there.

18      Did you review this?

19  **A.**   Yes, I did.

20  **Q.**   And did you review the testimony of Mr. Dayton, who talked

21  about the different levels of confidentiality within DuPont?

22  **A.**   Yes, I did.  It was quite confusing.

23  **Q.**   But despite the confusion, did you --

24          **THE COURT:**  Please don't comment in that way.

25          **THE WITNESS:**  I'm sorry, Your Honor.

1          **THE COURT:**  Thank you very much.

2    **BY MR. GASNER:**

3    **Q.**   Were you able to learn the regime of confidentiality at

4    DuPont the way Mr. Dayton described it?

5    **A.**   Yes.  As he described it, this was a low-level-type

6    confidential -- it wasn't even confidential-type document, but

7    it was a low-level-security type.

8    **Q.**   And that's what you've gleaned by comparing Mr. Dayton's

9    testimony to this legend that we're looking at on the screen?

10   **A.**   That is correct.

11         **MR. AXELROD:**  I'm going to object, Your Honor.

12         **THE COURT:**  Sustained.

13         **MR. AXELROD:**  And can we have it stricken?

14         **THE COURT:**  Yes.  The jury will disregard the witness'

15   last answer.

16   **BY MR. GASNER:**

17   **Q.**   We'll talk about confidentiality with what I hope will be

18   a proper foundation later today, but for now let's move on.

19         **THE COURT:**  Hopefully not too much later.

20         **MR. GASNER:**  Yes, indeed.  Point well taken,

21   Your Honor.

22   **Q.**   So let's move along quickly to the area 3 at the top of

23   the drawing.

24         Can you tell the members of the jury what that is?

25   **A.**   This is a flow table showing the chemical compounds, the

**COOPER - DIRECT / GASNER**

1   temperatures, the pressures, the flow rates for each of the

2   numbered lines, which is shown as the line number on top, 1, 2,

3   3, 4, for instance, on this one.

4   **Q.**   Okay.  And this does -- unlike the other drawing we looked

5   at, this does have figures in it; true?

6   **A.**   Yes, it does.

7   **Q.**   And can you describe for the members of the jury how this

8   part of the document, typically, works in process flow diagrams

9   of this type?

10  **A.**   This is specific to the design of plant that you're doing

11  at the time.  What it's used to do is calculate various

12  equipment sizes and line sizes, but it is very specific to the

13  particular project you're working on.

14  **Q.**   So let's move on.  That's area 3 on the diagram.  Let's go

15  to areas 4 and 4A.  So that's in this left side of the diagram.

16       What's in 4 and 4A?

17  **A.**   4 is the TiCl4 vaporizer system that we've been

18  discussing.  It has one interesting unique feature, that it has

19  an extra piece of equipment in it, which is, in fact, called a

20  preheater here.

21  **Q.**   So Mr. Dayton talked a little bit about that.  In your

22  review of the 30K and 100K drawings, did you find any such

23  piece of equipment in the USAPTI or Performance Group drawings?

24  **A.**   No, I did not.

25  **Q.**   Other than that, 4A and 4, what's your opinion about how

1  what we see on Exhibit 2 compares to what is standard in the

2  industry?

3  **A.**    These are standard pieces of equipment.

4  **Q.**    Let's go on to area 5, AlCl3 generator.

5      Can you refresh the memory of the jurors as to what that

6  is and does?

7  **A.**    This is the Al chloride generator system.  DuPont called

8  their vessels by different names to what I'm used to, but the

9  G vessel is the Al chloride generator where you react aluminum

10  pellets with chlorine to form aluminum chloride, which is later

11  reacted in the reactor itself.

12      The feed system above it, the pellet bin, the scale and

13  feeder system, and then, quite importantly, the valves beneath

14  that are typical of the industry; because this system is

15  operating at relatively high pressure, and as you drop the

16  pellets in, you don't want gases going out to atmosphere

17  because there's chlorine in TiCl4.  So you have an interlock

18  system of a number of valves.  This is typical of a number of

19  plants, particularly Ashtabula 1, because I replaced it.

20  **Q.**    And these other structures that we see in this section --

21  storage bin, manual feed, shop bin, all those things -- how do

22  those fit into your sense of what's standard in the industry?

23  **A.**    They're standard.  You have to store the aluminum pellets

24  on-site.  They normally come in one-ton bags.  So you offload

25  them into a storage bin.  They're then dropped down into the

1    feeder where they're weighed and then dropped through the valve

2    system into the generator itself.  This is very typical.

3    **Q.**   Let's go to area 7, scrub salts or scrubs.

4        Can you tell the members of the jury, what are scrubs?

5    **A.**   There are a number of different types of material used

6    here.  As I mentioned, in the insert the titanium dioxide tends

7    to build up, and then as it goes down the flue pond, it builds

8    up even more.

9        So what you do is, you add a -- what is called a scrubs,

10   which scrubs the surface of the pipe clear of titanium dioxide

11   that's stuck there.

12       Every TiO2 plant has this -- chloride-route TiO2 plant has

13   this problem.  So there's a number of different scrubs used.

14   This doesn't, actually, say which one it is, but sometimes it's

15   sand; sometimes it's rock salt; sometimes it's actually

16   titanium dioxide itself mating to pellets.

17       But this is typical of a feed system, three-bin system,

18   with a -- this piece of equipment here (indicating) is a rotary

19   valve.

20   **Q.**   Where are you pointing?

21   **A.**   Sorry.  That line there, right there (indicating).

22   **Q.**   Okay.

23   **A.**   Which, actually, meters the amount of the material going

24   into the flue pond.

25   **Q.**   Did you come to learn, in your research, what USAPTI uses

1 as its scrubs material?

2 **A.**   Yes.  They use rock salt.

3 **Q.**   Okay.  And without saying what it is, did you come to

4 learn what DuPont uses?

5 **A.**   Yes.  It is different.

6 **Q.**   Are they the same or different?

7 **A.**   It's different.

8 **Q.**   Okay.  So let's go on to the next section, 8, the flue

9 pond.  We've heard a lot about that.  Is anything on this

10 drawing drawn to scale?

11 **A.**   No, nothing's to scale.

12 **Q.**   All right.  So the flue pond is a very large object; the

13 oxidizer is a very small object.

14      So tell us about what, if anything, is significant to you

15 or might be useful to the jury in looking at Exhibit 2 about

16 the flue pond.

17 **A.**   This is a much bigger diameter flue pond.  It actually

18 tells you the diameter of the flue pipe.  The hot end it tells

19 you 6 --

20 **Q.**   Don't say any numbers.

21 **A.**   It says that number.

22 **Q.**   Okay.  A number.  All right.

23 **A.**   And then it shows it dropping to a smaller number here

24 (indicating).

25 **Q.**   Okay.  And there's indication of two kinds of basins over

1   to the right.  What, if anything, does that tell you about how

2   the design on this drawing compares to USAPTI and Performance

3   Group's designs?

4   **A.**   DuPont -- you have to take out a lot of heat out of the

5   flue pond.  So DuPont -- and it was shown on the Google Earth

6   pictures -- actually mount a cooling tower on the end of the

7   flue pond, mounted right up against it, so it's close.  And you

8   actually see it in the screen captures.

9        That is fairly common, but USAPTI chose to have a separate

10  cooling tower that served most of the plant rather than just

11  this one specific duty.

12  **Q.**   So USAPTI did it in a different way than what's shown on

13  this diagram?

14  **A.**   That is correct.

15  **Q.**   Let's go on to area 10 off to the right side here, fume

16  collection.

17       What did you learn in your research about the method shown

18  here compared to publicly available material?

19  **A.**   This is -- this is a system that is specifically designed

20  for Edgemoor plant by this drawing.  Typically, we combine them

21  with the other scrubbing systems that we saw yesterday.  You

22  don't normally have a separate scrubbing system.

23       However, USAPTI did have a scrubbing system in this area,

24  but I've never heard of a paleface scrubber.  USAPTI uses a

25  standard scrubber.  You're trying to scrub out chlorine, as I

1  mentioned, that dissolves from the TiO2.

2  **Q.**   Is there anything about this section of the plant that was

3  unique, in your opinion, to this rutile paper slurry product?

4  **A.**   No, it's not specific to the rutile paper slurry.  It's

5  just specific to Edgemoor, the way it's done.

6  **Q.**   And in terms of -- there are some slurry tanks shown in

7  area 10.  Tell us about that.

8  **A.**   This is different because they have two slurry tanks.

9  What they're doing, actually, these are the product tanks,

10  which, actually, you export from these, the product rutile

11  paper slurry.

12      All of the plants use this as an intermediate tank, a

13  single tank, to feed the finishing plant.  But here you're

14  actually pulling product off it, there's two tanks, four pumps.

15  Normally you have one tank and two or three pumps.

16  **Q.**   So these would be only useful if you were -- if your final

17  product was the slurry?

18  **A.**   They would only be useful if you're making rutile paper

19  slurry, and not even useful for making slurry because, again,

20  there's no treatment plant.

21  **Q.**   Okay.  So I think we've covered all the different parts of

22  the plant.

23      No, 11.  We haven't hit 11.

24      Tell us about gas compression.  What did your study of

25  this diagram and the USAPTI products reveal?

1   **A.**   What this reveals is that Edgemoor plant uses a compressor

2   system to reduce the reactor pressure.  This is not typical of

3   the high-pressure process.  It is typical of the low-pressure

4   process.  So this plant operated somewhere in between low and

5   high pressure.  This equipment is not in any of the USAPTI

6   designs.

7   **Q.**   And you mentioned that this is kind of a high-pressure

8   system operating at a lower pressure; is that right?

9   **A.**   That's exactly right.

10  **Q.**   And how does that affect all these numbers up here

11  (indicating) in Section 3?  Does that affect it?

12  **A.**   It tells us all of the pressure lines.  There's a line

13  specifically that says "Pressure," and those are all different.

14        **MR. GASNER:**  Let me approach, if I may, Your Honor,

15  with Exhibit 70.

16        **THE COURT:**  Yes.

17     Are you getting close to the end here?

18        **MR. GASNER:**  Yes.

19        **THE COURT:**  All right.  Please do.

20        **THE CLERK:**  Was that Exhibit 7-0?

21        **MR. GASNER:**  Seven zero.

22        **THE CLERK:**  Thank you.

23        **THE COURT:**  Yes, you may approach.  Thank you.

24        **THE CLERK:**  And that's been admitted.

25        **MR. GASNER:**  Let's display that, Mr. Guevara, if you

**COOPER - DIRECT / GASNER**

1    would.

2    **Q.**   Let's just identify at the top.  It's from Mr. Maegerle to

3    Mr. Liew, and it's a question on AlCl3 balances.

4          Do you see that?

5    **A.**   Yes, I do.

6    **Q.**   Let's go further.  This is an email that the Government

7    talked about in its case in chief, and let's go a little bit

8    further down to the first email.

9          And a long time ago Agent Ho testified about the line that

10   Mr. Guevara has kindly highlighted for me that talks about the

11   AlCl3 generator inlet.  Do you see that?

12   **A.**   Yes, I do.

13   **Q.**   And this is part of an email from Mr. Liew to Mr. Maegerle

14   that, if we go up a little bit above the numbers, Mr. Liew is

15   saying, "Since the amount of aluminum is not shown in your flow

16   sheet, I checked this with the reference sheet that I got from

17   Spitler.  The values used there are" --

18          Do you see that?

19   **A.**   Yes, I do.

20   **Q.**   And Agent Ho, did you read her testimony where she talked

21   about those numbers appear similar to some of the numbers in

22   this upper part?

23   **A.**   Yes, I did.

24   **Q.**   Okay.  Can you put into context for us what, in your

25   expert opinion -- translate this into English, if you could.

1    There's a lot of technical terms in here.

2    **A.**    The Edgemoor plant is -- first of all, it's a very large

3    plant.  It's capable of the number that's shown in Column 1,

4    which indicates it's got a very high throughput.  It's well

5    known in the industry what it is.

6        The numbers that say "outgoing generator inlet" and

7    "outlet" specifically refer to the numbers and flows required

8    for this large plant.  In particular, if you look there, it has

9    an aluminum chloride number and above that it has a chlorine

10   number and an Al number, which is aluminum.  So it's, actually,

11   telling you the flow rates to the generator, the inputs and

12   outputs.

13   **Q.**    Let's just go up a little bit further in Mr. Liew's email,

14   and after the pleasantries in the first line, Mr. Liew says,

15   quote:  (reading)

16            "I started working on putting balances on PFD for

17        oxidation and finishing."

18        Do you see that?

19   **A.**    Yes.

20   **Q.**    Can you tell the members of the jury what that means in

21   laymen's terms?

22   **A.**    The table that's at the top of this particular drawing,

23   USAPTI were beginning to create their own numbers to put in

24   those tables.

25   **Q.**    And he goes on to say, "There's an error in molecular

COOPER - DIRECT / GASNER

1    weight of AlCl3.  You have 187.  The correct MW for AlCl3 is

2    133.34."

3         Translate into English, please.

4    A.   They have got the -- what is the weight of one molecule of

5    Al chloride.  They got it wrong in their original calculations.

6    Q.   So Mr. Liew is pointing out an error in this one molecular

7    weight figure that Mr. Maegerle used?

8    A.   That's correct.

9    Q.   Okay.  Then the next line Mr. Liew says, "Will this change

10   affect your flow sheet numbers at the AlCl3 generator?"

11        I think you described what that meant.

12        And the next paragraph he says (reading):

13             "I used stoichiometric calculation to get the

14        theoretical balances of the reaction," and he goes on from

15        there.

16             Okay.  What does "stoichiometric" mean?

17   A.   It means, that equation, you need two atoms of aluminum

18   and three molecules of chlorine exactly to get two molecules of

19   aluminum chloride.  "Stoichiometric" means "exact."

20   Q.   Okay.  And then the next sentence Mr. Liew talks about

21   making -- "to make 350 pounds per hour of AlCl3, we need a

22   certain amount of chlorine."  And he goes on from there.

23        Can you translate that into nontechnical terms?  What's

24   Mr. Liew saying at this juncture of the email?

25   A.   What he's saying is, if you use the stoichiometric, the

1  exact amounts that you require to form two molecules of

2  aluminum chloride, for their particular flow rates they need

3  300 -- sorry, 287 pounds of chlorine to produce 360 pounds of

4  aluminum chloride precisely.

5  **Q.**  Okay.  And then could you tell us what the rest of the

6  email means in laymen's terms in terms of translating from

7  technical to laymen's terms?

8  **A.**  Because of the chemistry in the Al chloride generator, you

9  need an excess of chlorine to make the reaction work at all.

10 So in the larger numbers down below, you can see that they have

11 a large amount of chlorine leaving the generator.

12     In the USAPTI design, they have a very small amount of

13 unreacted chlorine leaving the generator.  So they're not

14 pro rata, I think is the -- they're not in ratio, these

15 numbers.  They're actually -- USAPTI's design is much less

16 chlorine flow.

17 **Q.**  Okay.  And let's go back up to the top part where

18 Mr. Maegerle responds, if we could, Mr. Guevara.

19     And can you translate Mr. Maegerle's response into

20 laymen's terms?

21 **A.**  Yeah.  What he is saying is, with the 40 pounds of

22 aluminum I am adding, I need 158 pounds of chlorine exactly,

23 which leaves --

24 **Q.**  I'm sorry.  Let's go to the next email up.  Sorry.  I

25 misdirected you, Mr. Guevara.

**COOPER - DIRECT / GASNER**

1    No, I want to go to the one below that.  Keep that one up

2    there, but there's one in the middle above.  Yeah.  Okay.

3    So the one from Mr. Maegerle is -- just going in order,

4    below, Mr. Liew referred to some numbers, apparently, on this

5    sheet and raised some chemical issues.  And then what does

6    Maegerle say back, in laymen's terms?

7    **A.**    Basically, I made a typo, typographical error, and instead

8    of writing 133.5, I actually wrote 187.

9    **Q.**    Okay.

10   **A.**    And the next --

11   **Q.**    And then let's highlight the part, Mr. Guevara, that

12   corresponds to that.  Just right in there.  Okay.

13   So he says, used 133.5 but he wrote 187.  And then what is

14   Mr. Liew's response, in laymen's terms?

15   **A.**    Basically, he's saying if you get the numbers right, you

16   need 40 pounds per hour of aluminum and 158 pounds per hour of

17   chlorine.  We had, actually, written 160, so there's only

18   2 pounds of excess chlorine leaving the generator, which is the

19   unreacted amount.

20   And then what he says is, "I'll change the number Al

21   chloride to 198 pounds an hour to correct for the number on the

22   flow sheet to make it right," basically.

23   **Q.**    Okay.  And did you study the later drawings that included

24   the mass balance tables to see their -- they ended up?

25   **A.**    Yes, indeed, and these are the numbers they used on these

1 tables that I highlighted.

2 **Q.** So if I understand you correctly, Mr. Liew referred to

3 some numbers on this chart to say, "Hey, it looks like it

4 generates an excess amount of chlorine; and, Bob, it looks like

5 you got the molecular weight wrong"; is that true?

6 **A.** That's correct.

7 **Q.** And Bob then says, "Actually, it's a typo." It should --

8       **MR. AXELROD:** I object.

9       **THE COURT:** Is there a question in our future here?

10       **MR. GASNER:** There is.

11       **THE COURT:** All right. Let's get to it.

12       **MR. GASNER:** Okay.

13 **Q.** Could you summarize for the members of the jury just the

14 sequence of events that you perceived from the email chain that

15 we have as Exhibit 70?

16       **MR. AXELROD:** I'm going to object. The email is

17 there.

18       **THE COURT:** Sustained.

19       **MR. GASNER:** Let's move on.

20       **THE COURT:** We're wasting time now. Sustained.

21       **MR. GASNER:** Very well, Your Honor.

22 **Q.** Let's talk about the Diemer equation, alleged Trade

23 Secret 3. Have you reviewed Exhibit 162?

24 **A.** Yes, I have.

25       **MR. GASNER:** Your Honor, may I approach?

COOPER - DIRECT / GASNER

1        **THE COURT:**  Yes, you may.

2   **BY MR. GASNER:**

3   **Q.**   Do you have the Exhibit 162 in front of you?

4   **A.**   Yes, I do.

5   **Q.**   So what is this?

6   **A.**   This is a report done by Mr. Sills in '94, which

7   correlates, which means he takes two numbers and compares them,

8   regarding the oxidation reactor model that had been developed

9   by Mr. Diemer in 1985, I believe the document was dated.

10  **Q.**   And can you tell us, what's a model?

11  **A.**   A model is a theory, a theoretical construct, because you

12  can't see what's going on inside the reactor.  And, so, what

13  you do is, you try and create a model, just like a toy model or

14  something like that, which represents some of the things that

15  are going on inside the reactor.  Specifically in this case it

16  relates to the slot that we were talking about earlier on.

17  **Q.**   Have computer modeling techniques changed since 1993?

18  **A.**   They have changed dramatically.  The power of computers

19  has got so much greater.  Today this would be done by programs

20  called computational fluid dynamics, which are very powerful

21  programs, and they can actually show you on a computer screen

22  what's actually going on inside a reactor.

23  **Q.**   Has reactor design changed since the 1980s?

24  **A.**   Oh, yes, absolutely.  There's been dramatic improvements

25  in the reactors.

1  **Q.**   What are some of those improvements?

2  **A.**   The main ones are related to what we call

3  multiaddition-point reactors.  They've got various names, star

4  reactors.  Each of the companies has its own terminology.

5       And what that means is, instead of, as it described in the

6  USAPTI design, instead of only having one point where you add

7  the titanium tetrachloride, the TiCl, you have many points at

8  which you add it.

9       This gives you a number of very significant advantages in

10  terms of product quality and also throughput.

11  **Q.**   Did you study the Diemer report and the Sills report as

12  part of your work in this case?

13  **A.**   Yes, I did.  I have to admit, it's a long time since I did

14  any FORTRAN programming, which is a computer language.  And

15  there are some explanations of the terms he uses but -- I can

16  understand the equation, but the program itself, I really don't

17  understand.

18  **Q.**   So Appendix B wasn't of any use to you?

19  **A.**   None at all.

20  **Q.**   And then in terms of the Sills report, at the front we

21  heard testimony about some of the tables in that report.  Did

22  you study those?

23  **A.**   Yes, I did.

24  **Q.**   And Mr. Diemer said that -- or Dr. Diemer said that you

25  could design a reactor from this document.  Do you agree?

1  **A.**   No, I don't agree at all.

2  **Q.**   Would this -- would you be better off designing a reactor

3  from scratch or with the help of this document?

4  **A.**   As I said, this specifically relates to the slot area.

5  It's a section.  I can't say the number, but a very small

6  section of the reactor.  You've got to redesign the rest of the

7  reactor.

8       The -- some of the data in the tables is, actually,

9  straight out of the patents that we've already looked at today.

10      I went back last night and had a look at the data in the

11  table.  And, in fact, you can make a very good approximation to

12  what is called the slot width from very basic chemical

13  engineering.  It wouldn't get you exactly there, but it would

14  get you very close.

15  **Q.**   Is it your opinion that Exhibit 162 would have any value

16  to a person designing a TiO2 plant?

17  **A.**   None at all.

18  **Q.**   How about alleged Trade Secret 2?  Is it your opinion that

19  this would have any value to a person designing a titanium

20  dioxide project?

21  **A.**   No.  It's absolutely specific to the Edgemoor plant, which

22  is a single-product plant.  Nobody does this like this.

23  **Q.**   Let me ask you about alleged Trade Secret 5, which we've

24  referred to during the trial as the Basic Data Manual.

25      Have you reviewed that?

**COOPER - DIRECT / GASNER**

1  **A.**    Yes, I have.

2  **Q.**    Can you tell us your perception of how it compares to

3  other documents similar to it that you've seen in your career?

4  **A.**    This is, in my opinion, something I may have done very

5  early as a concept.  It is not useful at all to design a

6  chemical plant.  There is insufficient data in it.  The main

7  benefit to it is it refers to a large number of DuPont

8  drawings, which are not included in the manual.

9        So if you had the whole DuPont drawing office available to

10  you, yes, you could say, yes, it might be valuable.  But, in

11  general, because you don't have those drawings, it's valueless.

12  **Q.**    We heard some testimony during the Government's

13  case-in-chief about overlaps between words and phrases and

14  numbers in parts of the Basic Data Manual compared to certain

15  emails, some of which we've gone over today.

16        Do you recall reading that testimony?

17  **A.**    Yes, I have.

18  **Q.**    Do you agree that there was some overlap in language?

19  **A.**    There are a few.

20  **Q.**    Do you ascribe any significance to that?

21  **A.**    None at all because they -- the ones that I reviewed, in

22  fact, were very different to the final numbers used by USAPTI.

23  **Q.**    And the Basic Data Manual that has been discussed in this

24  case dates back to 1985?

25  **A.**    That is correct.

COOPER - DIRECT / GASNER

1  Q.   And what technological advances have there been in TiO2

2  design since 1985?

3  A.   The main one is the plants have got a lot bigger.  So this

4  was designed for X tons per year.  Plants are not built at that

5  size anymore.

6       The reactor development are tremendously different.  The

7  finishing plant changes, particularly around the area of

8  washing and drying, micronizing, have all changed.

9  Chlorination is somewhat stable in terms of design, but they

10  have got a lot bigger when they're associated with a TiO2

11  plant.

12       The scrubbing systems have got more complicated because of

13  various environmental regulations.  So, essentially, there's

14  been a huge amount of change in the industry from the '80s.

15  Q.   If you were designing a titanium dioxide plant in 2006 or

16  later, would you want to have a copy of this Basic Data Manual

17  as a reference?

18  A.   No.  It's useless to me.

19            THE COURT:  All right.  Is this a good time to break?

20            MR. GASNER:  Absolutely.

21            MR. AXELROD:  Your Honor, may we have a brief sidebar?

22            THE COURT:  Sure.  Well, can we take -- the jury

23  doesn't have to be here during this.

24            MR. AXELROD:  No, but it's a scheduling issue so it

25  may be useful.

1          **THE COURT:**  All right.  You can stand.  You'll be

2    getting a break in about two minutes.

3          **MR. HEMANN:**  Your Honor, it's just scheduling.  We may

4    not need the court reporter.  It's just a scheduling issue.

5          **THE COURT:**  All right.  Madam Court Reporter, you can

6    stay where you are.

7          **THE REPORTER:**  Thank you, Your Honor.

8          (Sidebar conference heard but not reported.)

9          **THE COURT:**  All right.  So we are going to take our

10   break.  And remember the Court's usual admonitions, and keep an

11   open mind and don't discuss the case.  And we'll see you in 15

12   minutes.

13        Did you get more caffeinated coffee?

14                    (Laughter)

15        **THE COURT:**  Good.  Thank you very much.  We tried.

16   Thank you.

17        (Proceedings were heard out of the presence of the jury:)

18        **THE COURT:**  15 minutes, ladies and gentlemen.

19        You may step down, sir.

20        **THE WITNESS:**  Thank you, Your Honor.

21                 (Recess taken at 9:45 a.m.)

22              (Proceedings resumed at 10:08 a.m.)

23        (Proceedings were heard out of the presence of the jury:)

24        **THE COURT:**  All right.  Please bring in the jury.

25        (Proceedings were heard in the presence of the jury:)

 1          **THE COURT:**  All right.  Please continue.

 2   **BY MR. GASNER:**

 3   **Q.**  Mr. Cooper, we're in the home stretch of your direct

 4   testimony, and I promise I'm not going to go through all the

 5   patents on this chart that I've got here, but I do want to ask

 6   you about the number of patents you reviewed.

 7          Did you write a report in this case?

 8   **A.**  I did.

 9   **Q.**  And in that report, did you cite patents in the course of

10   memorializing your opinions?

11   **A.**  Yes, I did.

12   **Q.**  And did you review your report to figure out the specific

13   patents that are referenced in the body of your report?

14   **A.**  Yes, I did.

15          **MR. GASNER:**  Your Honor, may I approach?

16          **THE COURT:**  Yes.  What are you going to show him?

17          **MR. GASNER:**  I'm just going to give him a copy of his

18   report for reference.

19          **THE COURT:**  Very well.

20   **BY MR. GASNER:**

21   **Q.**  So you've got a full copy of your report, which has the

22   report on the top and then various appendices; is that right?

23   **A.**  Correct.

24   **Q.**  And can you tell the members of the jury what's in the

25   appendices?

COOPER - DIRECT / GASNER

1  **A.**   The appendices list all the references I used to develop

2  my opinions for the report.

3  **Q.**   In preparation for your testimony, did you have a chance

4  to go through with some help from our paralegals and put

5  together the list of patents that are referred to in your

6  report?

7  **A.**   Yes, I did.

8         **MR. GASNER:**  And I'm showing you a chart that we can

9  mark for identification as the next in order.  And I believe

10  it's 4,000 something.

11         **THE CLERK:**  I don't know, because they're out of

12  order.

13         **MR. GASNER:**  Okay.  So we'll provide the next

14  demonstrative exhibit number in order.

15  **Q.**   Is this an accurate copy of the list that you prepared

16  with some help from our paralegals?

17  **A.**   Yes, it is.

18  **Q.**   And, roughly, how many patents are on there?

19  **A.**   There's about 180.

20  **Q.**   And in your report, did you just kind of splatter them out

21  there or did you do more than that?

22  **A.**   No.  These are specifically referred to in my report.  I

23  reviewed a lot more than that, but they weren't included in my

24  report.

25  **Q.**   Okay.  As I said, we're not going to go through it, but I

1  just wanted to just memorialize for the record the identity of

2  the patents that you did review.

3      I want to switch gears and talk about confidentiality

4  practices, both in terms of the effectiveness, in your opinion,

5  of DuPont's and your own practice in terms of reconciling

6  different obligations.  So those are two areas I want to talk

7  about, but let's talk about your background in each of those.

8      So, first, with respect to DuPont's confidentiality

9  practices, have you studied the testimony and exhibits in this

10  case as to DuPont's confidentiality practices?

11  **A.**   Yes, I have.

12  **Q.**   And in the course of your -- is it 44 years in the

13  industry?

14  **A.**   That's correct.

15  **Q.**   -- have you encountered former DuPonters working for other

16  companies?

17  **A.**   Yes, I have.

18  **Q.**   Have you dealt with, in your own companies, with the issue

19  of what ex-DuPonters are allowed to talk about in their

20  dealings with your various employers over the years?

21  **A.**   Yes, I have.

22  **Q.**   In terms of your own practices, have you signed

23  confidentiality agreements of your own?

24  **A.**   Yeah, about 10 or a dozen in total.

25  **Q.**   Have you, in your various positions in the industry,

COOPER - DIRECT / GASNER

1  negotiated confidentiality agreements with vendors, for

2  example?

3  **A.**   Not vendors as such, but the engineering contracting

4  companies.  I was involved with two major ones.

5  **Q.**   And have you looked at vendor contracts in the course of

6  your responsibilities over the last 44 years?

7  **A.**   Yes, I have.

8  **Q.**   Have you become familiar with the different

9  confidentiality terms used in the TiO2 industry over your last

10  44 years in the business?

11  **A.**   Yes, I have.

12  **Q.**   So let's talk about the confidentiality agreement that you

13  had with SCM.  Do you recall the terms of that?

14  **A.**   Yes, I do.

15  **Q.**   Can you tell the members of the jury, what were those

16  terms?

17  **A.**   In the case of, in fact, it was Millennium the last one I

18  signed, basically they say you shall not reveal trade secrets.

19  It's a very bold statement.  No definition of what a trade

20  secret is.  No time scale, no nothing.  It just says, "You will

21  not reveal trade secrets."

22  **Q.**   And after you left Millennium, did you go on to work in

23  consulting arrangements for other companies?

24  **A.**   Yes.  I've done about 10 of those.

25  **Q.**   And how did you, in your own experience, reconcile your

1  obligation to your former employers not to reveal trade secrets

2  with the work that you did for many other employers thereafter?

3  **A.**   It is difficult; but when I was asked the question by

4  another judge, in fact, I said:   There are certain things that

5  are obviously secret.   There are things that are obviously not.

6  The area in between is huge, and you just have to use your own

7  personal discretion and ethics on how you can work it.

8  **Q.**   To the extent that DuPont has made a variety of efforts

9  through policies and manuals, and all the documents you look at

10  to maintain absolute confidentiality surrounding everything it

11  does in its titanium dioxide plants, do you believe that's been

12  effective in your experience?

13          **MR. AXELROD:**  Objection.

14          **THE COURT:**  Sustained.

15  **BY MR. GASNER:**

16  **Q.**   Do you have an opinion, generally, as to whether policies

17  alone can be effective to protect everything a company does?

18          **MR. AXELROD:**  Objection.

19          **THE COURT:**  Sustained.

20  **BY MR. GASNER:**

21  **Q.**   In the course of your time at Ashtabula 1 back in

22  Ashtabula, Ohio, did you come to learn about the business deal

23  in which DuPont built a plant for Sherwin-Williams at that same

24  site?

25  **A.**   Yes, I did.

**COOPER - DIRECT / GASNER**

1    **Q.**   How did you become familiar with that?

2    **A.**   There was still people at Ashtabula 1, when I went there

3    in '87 and '89, who were present at or very shortly after the

4    acquisition of the plant by SCM Chemicals, and they told me all

5    about it.

6    **Q.**   Was that important to know as part of your

7    responsibilities?

8    **A.**   Not really.  It was just a time line for me at that time.

9    **Q.**   So in terms of the time line, what do you mean by that?

10   **A.**   The important thing for me was that there clearly was some

11   time limitation about using the technology out of SCM Plant 1

12   and the rest of the plants, and that time line had expired,

13   that time limitation.  So we felt free to use all that

14   technology in our other plants, which we did.

15   **Q.**   Did you ever have occasion to look at the actual agreement

16   between DuPont and Sherwin-Williams as part of your

17   responsibilities?

18   **A.**   Not at that time.

19   **Q.**   Have you reviewed it in preparation for your testimony?

20   **A.**   Yes, I have.

21          **MR. GASNER:**  Your Honor, may I approach the witness?

22          **THE COURT:**  Sure.  You may approach the witness.

23          **MR. GASNER:**  Thank you.

24   BY MR. GASNER:

25   **Q.**   Upon your review of the Sherwin-Williams contract, did you

 1 | find any sections of it that squared with your understanding of
 2 | the time line for confidentiality back when you were employed
 3 | at Ashtabula?
 4 | **A.**   Yes, there was --
 5 |          **THE COURT:**  Just a moment.  I have to rule -- there's
 6 | an objection coming.
 7 |          **MR. AXELROD:**  Objection, Your Honor.
 8 |          **THE COURT:**  Sustained.  The jury will disregard the
 9 | last answer.
10 |          **MR. GASNER:**  Your Honor, Exhibit 900 has been admitted
11 | into evidence.
12 |          **THE COURT:**  Right.
13 |          **MR. GASNER:**  Simply for demonstrative purposes, may I
14 | ask the witness questions about this?
15 |          **THE COURT:**  I only rule on one question at a time.
16 | So, again, I don't give advisory opinions.  So ask the question
17 | and then I'll rule on the objection, if there is one.
18 |          **MR. GASNER:**  Permission to display 900, which has been
19 | admitted?
20 |          **THE COURT:**  No -- yes, of course, you can.  It's been
21 | admitted.  First of all, it's formally offered and admitted;
22 | correct?
23 |          **MR. GASNER:**  Yes.
24 |          **THE COURT:**  So, of course, you can display an admitted
25 | document.

1            **MR. GASNER:**  Mr. Guevara, can we display

2    Exhibit 900 --

3            **MR. AXELROD:**  Your Honor, I'm sorry.  I believe this

4    was the subject of discussion about how this -- about this

5    particular exhibit.

6            **THE COURT:**  Well, there was, but it's in evidence, so

7    he can certainly display it.  The issue may arise if questions

8    are asked about it.

9            **MR. AXELROD:**  I understand.

10           **THE COURT:**  I understand what we discussed.

11           **MR. AXELROD:**  Thank you, Your Honor.

12           **MR. GASNER:**  Let's go to the page, it's page 900-14,

13   Mr. Guevara, and if you could blow up Article XI.

14   **Q.**  And do you see the portion that refers to a 15-year period

15   for confidentiality?

16           **MR. AXELROD:**  Objection.

17           **THE COURT:**  Sustained.

18   **BY MR. GASNER:**

19   **Q.**  What was your understanding when you worked at SCM as to

20   how long the period of confidentiality was?

21           **MR. AXELROD:**  Objection.

22           **THE COURT:**  Sustained.

23           **MR. GASNER:**  No further questions, Your Honor.

24           **THE COURT:**  Thank you.

25           Ladies and gentlemen, what we're going to do, we're about

**COOPER - DIRECT / GASNER**

1   to have cross-examination.  It's going to take a while to set

2   up; and rather than have you here and even stretching, I'm

3   going to -- we're going to give you a little bit of a break

4   here of about 30 minutes.

5        So it's about 20 after 11:00 -- 20 after 10:00, excuse me,

6   and we'll break until 10 of 11:00.  And then we'll continue on;

7   and we'll take another break, don't worry, before the end of

8   the day.  But I think it's more efficient to give counsel a

9   chance to set up, and we have some administrative matters to

10  take care of.

11       So 30-minute break, remembering the usual admonitions, and

12  we'll see you in 30 minutes.

13       (Proceedings were heard out of the presence of the jury:)

14           **THE COURT:**  You may take a break as well, sir.

15           **THE WITNESS:**  Thank you, Your Honor.

16           **THE COURT:**  All right.  30 minutes.

17       **MR. AXELROD:**  Thank you, Your Honor.  Thank you for

18  the additional time.

19           **THE COURT:**  Of course.

20               (Recess taken at 10:20 a.m.)

21           (Proceedings resumed at 10:53 a.m.)

22       (Proceedings were heard out of the presence of the jury:)

23           **THE COURT:**  All right.  Are we ready for the jury?

24       **MR. AXELROD:**  Yes, Your Honor.  Thank you so much.

25           **THE COURT:**  All right.  Bring out the jury.

1          (Proceedings were heard in the presence of the jury:)

2          **THE COURT:**  All right.  Please be seated.  I hope you

3     enjoyed your extended break and got a little chow in.

4     Something smelled good out in the hall, so I'm sure you had a

5     good time, but probably not enough time.

6          Let's proceed with cross-examination.

7          **MR. AXELROD:**  Very well, Your Honor.

8          **MR. GASNER:**  Your Honor, briefly for the record, the

9     demonstrative that we last showed was Number 4011.

10          **THE COURT:**  Thank you very much.

11          **THE CLERK:**  Thank you.

12          (Trial Exhibit 4011 marked for identification)

13          **MR. AXELROD:**  Thank you, Your Honor.  May I proceed?

14          **THE COURT:**  Yes, you may.

15                        **CROSS-EXAMINATION**

16     BY MR. AXELROD:

17     **Q.**  Mr. Cooper, good morning.

18     **A.**  Good morning.

19     **Q.**  I'd like to talk to you about your experience in designing

20     new lines and new plants at SCM and Millennium.  I know that

21     you had said you had worked on a number of major projects

22     there; right?

23     **A.**  That's correct.

24     **Q.**  And you -- I kind of want to go over them with you.

25          Could you just sort of walk us through -- I think you said

COOPER - CROSS / AXELROD

1   there were about four major projects that you designed?

2   **A.**   That's correct.

3   **Q.**   Could you just sort of briefly describe which ones they

4   were and what your role was?

5   **A.**   1985 was the oxidation replacement project where we

6   replaced the whole oxidation unit at Stallingborough in the UK.

7   The second one was the conversion at the West Australian

8   plant, 2007, where we took a sulfate plant and built a new

9   front end, which is the TiCl plant, oxidation plant, gas

10  scrubbing, waste treatment plant.

11  The third project in 1989, which was building the second

12  line at Ashtabula 1 plant.

13  And the fourth major project was at Ashtabula 2 where we

14  increased the capacity of the plant by about 50 percent.

15  **Q.**   And when was that one?

16  **A.**   That was '91 through '95.

17  **Q.**   Okay.  So the first one was in Stallingborough.  That was

18  in '85, this oxidation replacement?

19  **A.**   Correct.

20  **Q.**   And what was your role in that?

21  **A.**   I was the process engineer for it.

22  **Q.**   Okay.  And, so, what did that require you to do?  What did

23  you do?

24  **A.**   I ran a team of contractors.  I provided all the

25  basic data to draw the process flow diagrams, the piping and

COOPER - CROSS / AXELROD

1    instrumentation drawings, the equipment process specifications,

2    the instrument specifications, the interlock schedules; and

3    also I led the HAZOP, which is the safety assessment of the

4    plant, and then I assisted with the commission of the plant.

5    **Q.**    Okay.  And the second one, the Western Australia plant,

6    was in '87?

7    **A.**    It started in '87, yes.

8    **Q.**    And that was, basically, a new plant you were building?

9    **A.**    We had an existing sulfate plant in Western Australia, so

10   we retained the finishing plant and built what is called a

11   front end, which is a TiCl plant, oxidation plant, gas

12   scrubbing, waste treatment, and all the utilities on a new

13   site.

14   **Q.**    And that was a chloride route project?

15   **A.**    Correct.

16   **Q.**    Okay.  What was your role in that project?

17   **A.**    I started off as the lead process engineer.

18   **Q.**    Okay.

19   **A.**    Again working and leading a team of contract engineers to

20   do all the process engineering stuff, process flow diagrams,

21   piping and instrumentation diagrams, control diagrams,

22   specifications, equipment; and that one we also did a hazard

23   and operability study because it was requested by the West

24   Australian Government, of about 23 weeks.

25   **Q.**    Okay.

1  **A.**   Then when we went to Australia, I took over as part of

2  doing the instrumentation because the instrumentation was late,

3  and then part of the commissioning team to actually start up

4  the plant.  Then I was left behind to close out the site as

5  essentially -- they don't call it a close-out manager, but

6  that's what it is, shut down all the construction activities.

7  **Q.**   And then in '89 you said you were involved in the

8  Ashtabula 1 doing a second line there?

9  **A.**   That's correct.

10  **Q.**   So what was your -- so this was -- on the design part of

11  it, what was your job function?

12  **A.**   It started off purely to review the designs that were

13  being done by others.  It was very quickly realized that the

14  designs were not of the latest that we'd included in both the

15  UK plant and the Western Australian plant.  So I took over the

16  oxidation process design, all the instrumentation design apart

17  from the computer itself, and ultimately became, not officially

18  but actually, the assistant project manager.

19  **Q.**   And the last project you mentioned was this expansion at

20  Ashtabula 2.  Was that a new line?

21  **A.**   No.  We had a very large TiCl plant, much larger than was

22  required; and, so, we actually redesigned the oxidation and

23  finishing lines to take, basically, the spare capacity that was

24  available from the TiCl plant.

25  **Q.**   What was your role in that project?

COOPER - CROSS / AXELROD

1  A.   I led the team.

2  Q.   Okay.  And I gather that on any of these projects, you're

3  constantly wanting to improve the process?

4  A.   That is correct.

5  Q.   Okay.  So you start with a process; and then if you learn

6  things as you go and you can make improvements, you incorporate

7  them into the next set of designs?

8  A.   No, that is not quite right.

9  Q.   Okay.

10  A.   We'd already completed the new design at Stallingborough,

11  which was the latest and greatest, so the revisions you make

12  are to the details of the design.

13  Q.   Understood.

14      So you -- all of these projects are sort of major chemical

15  designs; right?  The four projects that we just talked about?

16  A.   Oh, yes.  They're all in excess of a $100 million.

17  Q.   And the USAPTI and performance projects were also major

18  designs; right?

19  A.   With the work that I did, we went fully through to the

20  construction drawings.

21  Q.   Okay.

22  A.   Okay.  So we, actually, went right through, and in the end

23  we were responsible for building the plants.

24  Q.   Okay.  But designing a hundred-thousand-ton plant, that's

25  a big project; right?  That's a major chemical design project?

**COOPER - CROSS / AXELROD**

1    A.    Depending on what stage you go to.

2    Q.    Okay.  Well, let's talk about sort of the starting point.

3    There's, in any major chemical design, there's a normal

4    progression; right?

5    A.    Correct.

6    Q.    Okay.  And in that progression, I think you mentioned this

7    yesterday, you start with a set of numbers; right?

8    A.    You develop a set of numbers.  Actually, that's not the

9    first thing you do.  The first thing you do is, you start with

10   an outline process description which specifies the basics of

11   the process.

12   Q.    Okay.  Well, you know, you did -- you said yesterday it

13   was a normal major progression in any major chemical design to

14   start with a set of numbers; right?

15   A.    I believe I said it was a process description I started

16   with.

17   Q.    Okay.  So I'm just reading --

18   A.    They do contain some numbers.

19   Q.    Okay.  And you said that, for example, for Western

20   Australia and for Stallingborough, you provided all the

21   basic data, the process flow diagrams, the P&IDs; right?

22   A.    That is correct.

23   Q.    Okay.  So I just want to sort of explore with you the

24   dataset that you start with.  Okay?

25         So could you describe, when you sat down to design the

1    Western Australia plant, what was the body of information that

2    you started with?

3    A.    The first thing you start with is an agreement about what

4    the capacity of the plant is going to be and what product it's

5    going to produce.

6         You develop a document, which I call a process design

7    brief, which has the raw material, specifications, the utility

8    specifications, the total throughput of the plant, any design

9    safety factors, any throughput safety factors that you're going

10   to incorporate in the design.  That document is available as

11   the sort of reference document to the basics of what then

12   follows.

13   Q.    And, so, it includes raw materials, utilities, your total

14   throughput; right?

15   A.    Correct.

16   Q.    Any other design criteria or information?

17   A.    Yes.  Usually if you're building on another site, okay,

18   you'll have all the site details, location.  You need

19   seismographical data, earthquake zone -- because you have to

20   design to earthquake zones -- maximum wind speed, maximum and

21   minimum atmospheric temperatures.  Everything that forms a

22   background to the design.

23   Q.    Do you also -- does it include anything else?

24   A.    Usually it includes a list of the regulations you're going

25   to use, a list of the units; in other words, if we're designing

COOPER - CROSS / AXELROD

1  in the States, we design feet and inches, pounds per square

2  inch.  In Australia it would be fully metric -- sorry, SI, not

3  metric.  Those are all specified in this document so

4  everybody's got it for reference.

5  **Q.**  Okay.  And would it include information -- I assume that

6  that's a document that's also used to get funding for the

7  project?

8  **A.**  No.

9  **Q.**  It's not?

10  **A.**  No.

11  **Q.**  Okay.  So the people who are making decisions about

12  whether to proceed with this project, they've already made that

13  decision?

14  **A.**  Yes.

15  **Q.**  Okay.  And what information are they relying on when they

16  make that decision?

17  **A.**  Surprisingly, the ones that I've done usually end up about

18  five pages that go to the Board of Directors.  It will have the

19  throughput, number of tons produced.  It will particularly have

20  a marketing support document.

21  **Q.**  How much did you say these projects were?

22  **A.**  About a hundred million.

23  **Q.**  Okay.  So you're saying that the people making the

24  financial decisions on a hundred-million-dollar expenditure are

25  relying on a five-page document?

1    **A.**   The Board of Directors that approve it, yes.

2    **Q.**   Okay.

3    **A.**   The chief executive officer will have had a number of

4    briefings with the team that's proposing the project.  He will

5    have a lot more information, but the actual submission within

6    SCM was probably five pages and mainly dealing with profit and

7    loss projections.

8    **Q.**   Okay.  Well, so, when you started the Western Australia

9    project, you had this process design brief; right?

10   **A.**   Correct.

11   **Q.**   And then you had PFDs?

12   **A.**   That's the next thing you do, correct.

13   **Q.**   Okay.  And to create your PFDs, did you start from

14   scratch?

15   **A.**   For the Western Australian job, yes.

16   **Q.**   And when you started from scratch, did you use any of the

17   information that was available to SCM, or do you just start out

18   with a clean piece of paper and start writing?

19   **A.**   For the Western Australian job, it was a clean piece of

20   paper.

21   **Q.**   And, so, you didn't incorporate any of the information

22   that was available to SCM or Millennium about how to build on

23   the prior experience of the company?

24   **A.**   In the terms of the process flow diagram, that is correct.

25   **Q.**   Well, how about with respect to the rest of the

1  information you used to start this process?

2  **A.**   The start of that process starts with the raw materials

3  specifications.  So we would go and determine which ore we were

4  going to use, which coke we were going to use, whether we were

5  going to have an on-site chlorine supply or a delivered

6  chlorine supply, whether we were going to have our own oxygen

7  and nitrogen plant, whether we were going to do our own waste

8  disposal or contract it out.  When you've got that, then you do

9  a process flow diagram which includes a schematic of the

10 process you're going to use.

11 **Q.**   And the schematic that you used for Western Australia, was

12 that built on the prior knowledge of SCM or Millennium?

13 **A.**   Yes.  It was based on -- part of it was based on the UK

14 plant.

15 **Q.**   Okay.  And, so, was the UK plant a basis, a starting

16 point, for those sketches?

17 **A.**   For the oxidation unit, yes.

18 **Q.**   Okay.  And how about for chlorination?

19 **A.**   No.  That was a complete start-from-scratch design.

20 **Q.**   So despite the fact that there were other chlorination

21 units in operation at the plant, you didn't look at any of that

22 information?

23 **A.**   I used my knowledge and when I visited around.  Yes, we

24 put -- in my mind, we put together what it was probably going

25 to look like.

COOPER - CROSS / AXELROD

1  Q.   Well, understood.  And when you did that, you looked at

2  what you were aware of and the information you had available to

3  you working there; right?

4  A.   That is correct.

5  Q.   Okay.  So you had access to information about the

6  chlorination process that was used in your company; right?

7  A.   That is correct.

8  Q.   And you used that to start the process in Western

9  Australia?

10  A.   That is correct.

11  Q.   Okay.  So that's chlorination and oxidation.

12      And, of course, that makes perfect sense because you want

13  to build off of the experience that your company already has;

14  right?

15  A.   Yes.

16  Q.   And you yourself in particular at the company were keen on

17  improving the technology; right?

18  A.   That's a difficult question to answer.  Obviously, you

19  want to build the best that you can; but one of the things that

20  you have always to bear in mind about these plants is that

21  they, frankly, are extremely dangerous, and it is often best to

22  go with what you know, what has been proven in practice, rather

23  than put new stuff in it.

24  Q.   Okay.  So if something's been proven over time, that's

25  something you would go with?

COOPER - CROSS / AXELROD

1    A.    Yes.

2    Q.    Okay.  Now, when you started out -- so you have this

3    process design brief.  It sounds like -- and for these

4    drawings, for oxidation and chlorination that we were just

5    talking about, were those the PFDs?

6    A.    That's what you start with, yes.

7    Q.    Okay.  So the PFD for oxidation was based off of

8    Stallingborough?

9    A.    That is correct.

10   Q.    Okay.  Did you consider or use, in creating that PFD,

11   oxidation from any of the other plants?

12   A.    At that time, no, because it was a different size of

13   plant.  Stallingborough was the nearest size of plant, so it

14   was predominantly -- the oxidation unit was predominantly based

15   on Stallingborough.

16   Q.    Okay.  And for chlorination -- I'm sorry, what did you

17   start -- what did you use as your basis?  I think you indicated

18   you used information that you had from the company's practices.

19   Could you elaborate?

20   A.    Yes.  We had some from the Stallingborough plant, and some

21   of the information came out of our Hawkins Point plant.

22   Q.    That's the one in Baltimore?

23   A.    That's the one in Baltimore.  That was more difficult

24   because that was a much smaller plant.

25   Q.    Okay.

COOPER - CROSS / AXELROD

1   **A.**   But some of the ideas we did use from that plant.

2   **Q.**   Any other places for ideas within the company for starting

3   up PFDs?

4   **A.**   Not at that time.

5   **Q.**   Okay.  And, so, you have that information.  So is that --

6   would it be fair to say that's what you sat down with to start

7   drafting the PFDs?

8   **A.**   I started with what I knew because I was doing the design.

9   **Q.**   Okay.

10  **A.**   And, yes, you are correct.

11  **Q.**   Okay.  So you didn't sit down with a bunch of patents and

12  a pad of paper, did you?

13  **A.**   No, I did not.

14  **Q.**   And you didn't sit down with a bunch of textbooks?

15  **A.**   Yes, I did, on some occasions.

16  **Q.**   Okay.  Did you refer to Barksdale to do those?

17  **A.**   No, I don't use Barksdale.

18  **Q.**   Okay.  Now, you also mentioned yesterday that these major

19  design projects were all team projects, not one person; right?

20  **A.**   That is correct.

21  **Q.**   Okay.  And I want to go -- I want to focus for a moment

22  with you on the project in Western Australia.  You designed

23  that plant; right?  I know it's just the front end, it was the

24  chlorination and oxidation.  It wasn't the finishing part;

25  right?

COOPER - CROSS / AXELROD

1    **A.**    That is correct.

2    **Q.**    But you designed that?

3    **A.**    Yes, I did.

4    **Q.**    Okay.  Could you talk about, sort of by the team -- who

5    was involved in that team?

6    **A.**    The team consisted of a project manager who oversaw the

7    project; one process engineer, myself.

8    **Q.**    That was you?

9    **A.**    Uh-huh.

10   **Q.**    Okay.

11   **A.**    Two mechanical engineers, two instrument engineers was the

12   team that SCM put together.

13         We then hired a contractor who had approximately, I think

14   it was, two process contract engineers, two project engineers,

15   one instrument engineer, and then a few specialized engineers

16   very much part time.

17   **Q.**    Okay.  What were the specialized engineers doing?

18   **A.**    Things like refractory.  There's a discipline called

19   "rotating machinery" who design the pumps.

20   **Q.**    Okay.

21   **A.**    And then we had some, in those days, draftsmen who

22   actually drew the drawings.

23   **Q.**    Okay.  So -- and could you explain the relationship

24   between the SCM team and the contractors for this design?

25   **A.**    In this particular case, the two process engineers had

**COOPER - CROSS / AXELROD**

1   worked with us at Stallingborough.

2   **Q.**   The contractors?

3   **A.**   Yes.  The rest of the team was new, and they provided that

4   discipline expertise.  They didn't know anything about the

5   process.

6   **Q.**   I'm sorry.  But they worked with you at Stallingborough,

7   so they had --

8   **A.**   The process engineers were different.  They had worked

9   with us at Stallingborough so they knew.

10  **Q.**   Oh, I'm sorry.  I apologize.  You were talking about the

11  project engineers?

12  **A.**   I was talking about the process engineers.

13  **Q.**   Okay.  I think I lost you there.  So could you please say

14  that again?

15  **A.**   Yeah.  The two process engineers that we worked with had

16  worked on the Stallingborough job.  So they were familiar with

17  the process.

18  **Q.**   Okay.

19  **A.**   The rest of the contract engineers were, essentially, new

20  to the team, and they didn't know anything about the process.

21       The draftsmen were what we call "job shoppers"; in other

22  words, we hired them in for the job and then they would be let

23  go at the end of this job.

24  **Q.**   Okay.  And this -- the team that you're talking about, the

25  SCM team and the contractors, they worked on the design from

1  the beginning until the end?

2  **A.**   In the first stage, which is what is called the front-end

3  engineering design, it's a relatively small team.  You know, we

4  were seven, thereabouts.  The contract team would have their

5  own project manager, probably the same number of engineers, and

6  then the draftsmen to do the package.

7       When you get into the detail design, we went from a team

8  of seven contractors to over 200.

9  **Q.**   Okay.  And, so, the detail design is doing the detail

10  design drawings, the equipment specifications, things like

11  that?

12  **A.**   No.  The equipment specs are already done.

13  **Q.**   Okay.  So would detail design drawings be part of the

14  detail design part that you're just describing?

15  **A.**   Yes.

16  **Q.**   So you had 200 contract engineers.

17       And would that, once -- is detail design the end of the

18  process for designing?

19  **A.**   It depended on which specific job; but, generally, that

20  was the case.

21  **Q.**   Okay.  So using this Western Australia example, the new

22  plant there, you start out, on the SCM team you've got a

23  project manager; right?

24  **A.**   Correct.

25  **Q.**   There's a process engineer, one process engineer?

**COOPER - CROSS / AXELROD**

1   **A.**   Correct.

2   **Q.**   Two mechanical engineers?

3   **A.**   Correct.

4   **Q.**   Two instrumentation engineers?

5   **A.**   Correct.

6   **Q.**   Okay.  So that's six people?

7   **A.**   Yes.  And we had one secretary.

8   **Q.**   Okay.  Engineer or some support person?

9   **A.**   No, secretary, support.

10  **Q.**   Okay.  And then at the start, you have a team of

11  contractors.  You've got two process engineers who worked with

12  you in Stallingborough, and then a team of people that hadn't

13  worked with you before, two project engineers, an instrument

14  engineer, and then some specialists in various subject matters?

15  **A.**   That is correct.

16  **Q.**   Okay.  And after you get through the feed stage, you start

17  out with that team for feed; and then after, when you get to

18  the detail design, you bring in 200 more people?

19  **A.**   Not all at once.  That was the peak number for the

20  project.

21  **Q.**   Okay.

22  **A.**   You start with the same team, basically, if you can, that

23  have completed the feed.  Then as the workload increases, you

24  increase the number of staff on the project.

25  **Q.**   So what's the very first stage of feed?

**COOPER - CROSS / AXELROD**

1   **A.**   As I said, the process design brief.

2   **Q.**   Okay.  And then things like PFDs and --

3   **A.**   P&IDs is the next thing.

4   **Q.**   -- P&IDs?

5        Okay.  And the feed ends at what point?  Is there a set of

6   drawings that sort of defines the outer bounds of the feed

7   process?

8   **A.**   Yes, there is.

9   **Q.**   And what is it?

10  **A.**   It will be the process design brief, the PFDs, P&IDs, the

11  process description, the outline control system -- not the

12  details, just the outline -- process specification sheets for

13  equipment, process specification sheets for instruments.  And

14  on certain equipment, we would go to the next level of a little

15  more detail in the drawings.

16       Then we would also have, in this particular case, the

17  safety interlock systems, the pressure release systems, the

18  environmental regulation.  Basically, it's a brief that goes to

19  the Government to say what we're doing.

20  **Q.**   You said there were, for certain equipment, you would do

21  detailed drawings?

22  **A.**   Not full detail drawings, but more detail than a process

23  specification sheet.

24  **Q.**   For which pieces of equipment?

25  **A.**   These would be the chlorinator.  In this particular case,

1    that was all we did.

2    **Q.**   You didn't do it for the oxidation reactor?

3    **A.**   No, we didn't.

4    **Q.**   Would you typically do it there for an oxidation reactor?

5    **A.**   Yes and no.  We've done it both ways.

6    **Q.**   Okay.  And I want to -- I want to -- I want to make sure

7    I've got this, so I want to write this down.

8                        (Pause in proceedings.)

9    **BY MR. AXELROD:**

10   **Q.**   My handwriting is not great, but that says

11   "West Australia."

12   **A.**   I can read that.

13   **Q.**   Okay.  Good.

14        So the first person you described for the -- and this was

15   an SCM project, right, or was it Millennium at that point?

16   **A.**   This was still SCM.

17   **Q.**   Okay.  You said a project engineer; right?

18   **A.**   Project manager.

19   **Q.**   Project manager.  Excuse me.

20        And then you said there was a process engineer; right?

21   **A.**   Correct.

22   **Q.**   And then you said there were two mechanical engineers?

23   **A.**   Correct.

24   **Q.**   And I'm just going to put "ME" here for short for

25   mechanical engineer.

COOPER - CROSS / AXELROD

1    A.    Okay.

2    Q.    Okay.  And then you said two instrumentation engineers?

3    A.    Correct.

4    Q.    Okay.  And that's the SCM part of it.  And then we've got

5    the contractors; right?

6    A.    Correct.

7    Q.    Pardon me for turning my back.

8          And for that we've got two process engineers.

9    A.    May I correct you?  You've got a project manager.

10   Q.    Oh, project manager for that, too; right?

11   A.    Oh, yes.

12   Q.    Okay.  One project manager, two process engineers, one

13   instrumentation.  And then you said you had some specialists;

14   right?

15   A.    Right.

16   Q.    About how many?

17   A.    If you call it full-time equivalents, because they were in

18   and out all the time --

19   Q.    Right.

20   A.    -- one.

21   Q.    Okay.  I'll put one FTE, full-time equivalent specialist.

22         And then you have some draftspeople?

23   A.    That is correct.

24   Q.    How many?

25   A.    Three, maybe four at that time.

**COOPER - CROSS / AXELROD**

1   **Q.**   So let's talk about the project manager.  Who was it?

2   **A.**   He was a manager actually that we'd hired for the

3   Stallingborough job specifically.  He was ex-Kronos.  He was a

4   mechanical engineer.

5   **Q.**   Okay.  So he was -- what was his -- what was his name?

6   **A.**   Oh, Bill Allen.

7   **Q.**   Bill Allen.  And he was an ME, mechanical engineer?

8   **A.**   Yes.

9   **Q.**   How many years in the business?

10   **A.**   I don't know how long he worked for Kronos, but with us he

11   started in '85 with the project, Stallingborough.

12   **Q.**   When he started in '85, I mean, do you have some sense --

13   I gather you worked with him; right?

14   **A.**   Yeah.  He probably worked for Kronos for maybe 10 years.

15   **Q.**   Okay.  And this project was in '87; right?

16   **A.**   Yes.

17   **Q.**   So he had at least about 12 years in the business?

18   **A.**   I believe so, yes.

19   **Q.**   Okay.

20   **A.**   I'm not a hundred percent sure.

21   **Q.**   And that's 12 years in the TiO2 industry?

22   **A.**   Yes.

23   **Q.**   Okay.  Working on chloride route?

24   **A.**   No.

25   **Q.**   Okay.  This was his first chloride-route project?

COOPER - CROSS / AXELROD

1   **A.**   Stallingborough was his first chloride-route project.

2   **Q.**   So when he worked at Kronos, it wasn't chloride route?

3   **A.**   I don't believe he was working on chloride route at that

4   time.

5   **Q.**   The process engineer, who was that?

6   **A.**   Me.

7   **Q.**   Okay.  And you're a chemical engineer?

8   **A.**   Chemical engineer.

9   **Q.**   So I'm going to put CE for that?

10  **A.**   CNG is better.

11  **Q.**   I'm, sorry, what's that?

12  **A.**   CNG is better.

13  **Q.**   Well, this is as good as it gets here.

14  **A.**   Because that's civil engineer.

15  **Q.**   I'll just leave it at that for now.

16  **A.**   Okay.

17  **Q.**   At the time you had done that project, how long had you

18  been in the TiO2 business?

19  **A.**   I started in '69, so that's '70 -- 28 years.

20  **Q.**   28 years.  And that 28 years all chloride route?

21  **A.**   All chloride.

22  **Q.**   Okay.  Now, you said there were two mechanical engineers.

23  Who?

24  **A.**   Correct.

25  **Q.**   So tell me who the first one was.

COOPER - CROSS / AXELROD

1    A.   Bob Daniels.

2    Q.   Okay.  And what was Mr. Daniels' background?  What kind of

3    engineer?

4    A.   Chemical engineer, actually.

5    Q.   Okay.  And how long had he been in the business?

6    A.   At that time, two.

7    Q.   Two, okay.  Two years.

8         And who was the other mechanical --

9    A.   Bob Waddington.

10   Q.   What was his background?

11   A.   He was originally pharmaceuticals.  Then he joined the

12   company on the sulfate plant, I want to say, in the mid-'70s.

13   Q.   Okay.

14   A.   Chloride, actually, nil.

15   Q.   Okay.  But educationally what was his background?

16   A.   Oh, mechanical engineer.

17   Q.   Okay.  And he'd been in the TiO2 business how long?

18   A.   I want to say he joined the company in 1975 on the sulfate

19   plant.  So that would be 22 years total TiO2.  Chloride -- this

20   was his second chloride job.  So that would have been two years

21   as well.

22   Q.   Okay.  So, I'm sorry, this -- you said he joined in '75?

23   A.   Yes.

24   Q.   And this we're talking about, what year was the project?

25   A.   Sorry -- yes, that's right, '75.  This project was '87.

COOPER - CROSS / AXELROD

1   **Q.**   So 12 years?

2   **A.**   12 years.

3   **Q.**   Okay.  And you said there were two instrumentation

4   engineers?

5   **A.**   Correct.

6   **Q.**   Okay.  Can you tell me their names?

7   **A.**   The first one was John Grey, G-R-E-Y.

8   **Q.**   And what was his background?

9   **A.**   Electrical engineering.

10  **Q.**   Okay.  And how long had he been in the business?

11  **A.**   Probably about 15 years.

12  **Q.**   Okay.  And the other instrumentation engineer?

13  **A.**   Bill Vogtmann, V-O-G-T-M-A-N-N.

14  **Q.**   Can you repeat the last name?

15  **A.**   V-O-G-T-M-A-N-N.

16  **Q.**   And his educational background?

17  **A.**   Chemical engineer.

18  **Q.**   And how long had he been in TiO2?

19  **A.**   I'm not exactly sure but probably about three years.

20  **Q.**   Okay.  With respect to the contractors, you said there was

21  a project manager.  Who was that?

22  **A.**   That was a guy called Bill Fisher on this job.

23  **Q.**   Okay.  And what was his background?

24  **A.**   Mechanical.

25  **Q.**   How long had he been in TiO2?

**COOPER - CROSS / AXELROD**

```
 1   A.   None.

 2   Q.   I thought you said he worked at Stallingborough.

 3   A.   No, the process engineers worked at Stallingborough.

 4   Q.   Okay.  So this -- Mr. Fisher had no TiO2 experience?

 5   A.   This was his first job with us.

 6   Q.   Okay.

 7   A.   My recollection, it was his first job.

 8   Q.   And the process engineers?

 9   A.   I can't remember one of the names.

10   Q.   That's okay.  Do you remember --

11   A.   One of them was called Bill Oakes.  He'd worked with us at

12   Stallingborough, so he would have had two years when the job

13   started.

14   Q.   And what was his educational background?

15   A.   Chemical engineer.

16   Q.   And how about the other process engineer?

17   A.   I'm trying to remember.  In TiO2, the same, because he

18   came on board with the Stallingborough job, the first TiO2 job.

19   He'd worked with us previously on other projects.

20   Q.   Okay.  In TiO2?

21   A.   No, not in TiO2.

22   Q.   Okay.

23   A.   So for this job, he'd been on the Stallingborough job, so

24   that would have been two years.

25   Q.   And then who was the other process engineer?
```

COOPER - CROSS / AXELROD

1  A.    I said I can't remember his name.

2  Q.    Do you remember his background?

3  A.    Chemical engineer.

4  Q.    And the other is a chemical engineer who had experience or

5  background?

6  A.    Stallingborough two years, yes.

7  Q.    Okay.  And then the instrumentation engineer, do you

8  remember who that was?

9  A.    No, I don't.

10  Q.    Educational background?

11  A.    Instrument engineering.  I do remember that.

12  Q.    Background instrumentation engineering?

13  A.    Yes.

14  Q.    Any TiO2 experience?

15  A.    No.

16  Q.    And then the specialist, could you just describe -- you

17  had, like, a number of specialties.  You said "rotary machine"

18  and "refractory."  Could you just describe what those are?

19  A.    Rotating machinery is pumps, agitators and the like.

20  Refractory helped us design the refractory systems and specify

21  the refractories for the chlorinator and the reactor.  We had a

22  hazard engineer who helped us doing the hazard analysis, and we

23  had one environmental engineer for a very short time who helped

24  us with the environmental.

25  Q.    How long, just sort of in time, was this team working on

1    that first part that we talked about, starting, you know, from

2    the beginning of the feed process to the end?

3    **A.**   Starting from the feed process to the -- right to the end?

4    **Q.**   Yeah, all the way through to -- well, actually, detail

5    design starts the new step; right?

6    **A.**   Yes.

7    **Q.**   Okay.  So just from the beginning of the process until

8    detail design.

9    **A.**   We did two complete feed designs for this job because we

10   changed halfway through.

11   **Q.**   Okay.  So how long?

12   **A.**   Six months.

13   **Q.**   So this team was working for six months on two different

14   designs?

15   **A.**   No, one year, six months each.

16   **Q.**   Okay.  So they worked for a year?

17   **A.**   Yes.

18   **Q.**   Okay.  And I notice that from what you described, there is

19   one, two, three, four, five chemical engineers; right?

20   **A.**   Yes, if that's the count, yes.

21   **Q.**   And that's not surprising because it's a chemical process?

22   **A.**   We had some chemical engineers doing other tasks, like

23   instrument engineering; but that round number is probably

24   typical for the jobs we do.  We don't run a lot of mechanical

25   engineers.

1   **Q.**   Okay.  So you have -- there's a healthy number of chemical

2   engineers involved in your design process?

3   **A.**   Yes.

4   **Q.**   Okay.  Now, I want to talk a little bit about the USAPTI

5   team.  Okay?  And I want to ask you, at the beginning of this

6   you wrote a report; right?

7   **A.**   Correct.

8   **Q.**   And in your report you said it's your opinion, from the

9   information that had been presented to you, that Mr. Liew and

10   his team had ample experience and qualifications to carry out

11   the work they performed.

12   **A.**   That is correct.

13   **Q.**   Okay.  And that's your opinion as we sit here right now?

14   **A.**   It is.

15   **Q.**   Okay.  And you also said:  (reading)

16       "I believe that Mr. Liew and his team had ample

17       academic and engineering credentials.  Mr. Liew functioned

18       largely as a project manager and his Master's degree in

19       electrical engineering was appropriate for this task.  He

20       relied on consultants and employees for more specific

21       details of chemical, mechanical, and other engineering

22       disciplines.  Those consulting -- those consultants,

23       including Mr. Maegerle, had deep experience and skill in

24       their respective fields."

25       That was your report; right?

COOPER - CROSS / AXELROD

1    **A.**    That was what I said, yes.

2    **Q.**    And that's your testimony here today?

3    **A.**    It is.

4    **Q.**    So what I'd like to do is talk about the USAPTI and

5    Performance Group team, design team.

6    **A.**    Okay.

7    **Q.**    Can you -- you go ahead and start telling me the names of

8    the people on the team.

9    **A.**    I don't know the people on the team.  I know some of the

10   names that I've seen in emails, but I don't believe I ever saw

11   a complete list of the people who were working on the project.

12   I can't remember seeing that.

13   **Q.**    Well, let's -- but, sir, you just said that you had an

14   opinion about that team.

15   **A.**    The work product that they produced I had an opinion on.

16   **Q.**    Well, no, actually, you also had an opinion about the

17   people on that team.

18   **A.**    Mr. Liew certainly I had an opinion on.

19   **Q.**    Okay.  So we'll put Mr. Liew up there.  What is his

20   educational background, Mr. Walter Liew?

21   **A.**    I understand electrical engineer.

22   **Q.**    Okay.  How many years of experience in the industry?

23   **A.**    Clearly from what I've seen, none.

24   **Q.**    Okay.  So Mr. Liew is an electrical engineer with zero

25   experience in TiO2?

**COOPER - CROSS / AXELROD**

1  **A.**   So I understand from the documentation, yes.

2  **Q.**   Okay.  Who else are you aware of on the team?

3  **A.**   Mr. Maegerle.

4  **Q.**   What's Mr. Maegerle's background?

5  **A.**   I understand mechanical engineer.

6  **Q.**   How many years in the industry?

7  **A.**   Many.  I never worked it out how many.

8  **Q.**   Okay.  So many.  Do you have a sense of how many?

9  **A.**   At least 30 or 40 years.

10  **Q.**   Okay.  So I'll put 30 plus.

11       Okay.  Who's next?

12  **A.**   I believe Mr. Maegerle was also acting as a process

13  engineer from the documentation that I saw.

14  **Q.**   Right.  But who else was on the team?

15  **A.**   Specific names I'm struggling to remember apart from the

16  lady I saw yesterday on the witness stand.

17  **Q.**   Okay.  That's Ms. Sanghi, Sudha Sanghi?

18  **A.**   That's correct.

19  **Q.**   What's her background?

20  **A.**   I don't know.

21  **Q.**   How much time in the industry?

22  **A.**   From what I read, zero.

23  **Q.**   What was her role on the team?

24  **A.**   What I would call a mechanical designer.

25  **Q.**   Okay.  She's like a draftsperson?

**COOPER - CROSS / AXELROD**

1   **A.**   Terms have changed over the years with computer-aided

2   drafting.  No.  I would put her a level above a draftsperson.

3   **Q.**   Okay.  And you would call her what?

4   **A.**   A mechanical designer.

5   **Q.**   Okay.  And what's the function of a mechanical designer?

6   **A.**   They go beyond the state, so they do all sorts of

7   drawings, including some detail mechanical drawings.

8   **Q.**   And you're not familiar with her educational background?

9   **A.**   No, I'm not.

10   **Q.**   Okay.  Who else?

11   **A.**   To be honest, that's all the names that I recollect

12   accurately.

13   **Q.**   Your report is right there in front of you.  Would it help

14   you to refer to that?

15   **A.**   Yes.  What page are you referring to?

16   **Q.**   Well, it's your report.  Why don't you take a look.

17   **A.**   (Witness examines document.)

18   **Q.**   And if it assists, I believe it's page 13 or 14 where you

19   rendered your opinion.

20   **A.**   I see that.

21      (Witness examines document.)  I see no other main names

22   mentioned in this report by name.

23   **Q.**   Okay.  Are there any other categories of persons that you

24   recall?

25   **A.**   They appear to have a mechanical engineer doing some

COOPER - CROSS / AXELROD

1   equipment design.

2   **Q.**   Okay.  And that mechanical engineer, what amount of TiO2

3   experience?

4   **A.**   I can't say because I can just remember they had one.

5   **Q.**   Okay.  So I'll just put a question mark there.

6        What other types of persons?

7   **A.**   I believe they had another mechanical designer.

8   **Q.**   So somebody -- a peer of Ms. Sanghi's?

9   **A.**   I believe so, yes.

10  **Q.**   Okay.  And what was that person's background?

11  **A.**   I don't know.

12  **Q.**   Do you know their training, their educational background?

13  **A.**   No.

14  **Q.**   Any TiO2 experience?

15  **A.**   Don't know.

16  **Q.**   Who else?

17  **A.**   They appeared to have an instrument engineer on the team,

18  but for the life of me, I can't remember.

19  **Q.**   Okay.  Do you know that person's educational background?

20  **A.**   No, I don't.

21  **Q.**   Any TiO2 experience?

22  **A.**   Don't know.

23  **Q.**   Anyone else?

24  **A.**   Not that I immediately recollect, no, but there were more

25  names I've seen on the emails.

COOPER - CROSS / AXELROD

1   **Q.**   Do you know how long Ms. Sanghi worked there?

2   **A.**   I believe I heard in testimony, was it two and a half

3   years yesterday?

4   **Q.**   Do you remember from when to when?

5   **A.**   No.

6   **Q.**   Okay.  How about this person, the mechanical engineer

7   doing equipment design?

8   **A.**   No, I can't add to those descriptions.

9   **Q.**   And same for these mechanical design engineers?

10  **A.**   Correct.

11  **Q.**   So there's -- looking at the USAPTI team, there's one

12  person who has experience in TiO2; right?

13  **A.**   That's the name I remember, yes, who was generating the

14  drawings.

15  **Q.**   Mr. Maegerle?

16  **A.**   Yes.

17  **Q.**   No one else?

18  **A.**   I believe early on, there was a chemical engineer.  I saw

19  reference to Tim Spitler.

20  **Q.**   Okay.  Mr. Spitler.  How many years of TiO2 experience did

21  he have?

22  **A.**   I don't know.

23  **Q.**   Now --

24  **A.**   And I saw one more name on the mechanical side called

25  Ernie.

1  Q.  Ernie?

2  A.  Ernie.  I don't remember the surname.

3  Q.  Okay.  Is that one of the people that we've already

4  identified or is that someone else?

5  A.  Someone else.

6  Q.  Okay.  And did Ernie -- what was Ernie's role?

7  A.  The role I saw in the documentation was designing the ore

8  and coke handling systems.

9  Q.  When?

10  A.  Sorry, I don't remember.

11  Q.  Do you know anything about his educational background?

12  A.  No, I don't.

13  Q.  Do you know if he has any TiO2 experience?

14  A.  I don't know.

15  Q.  Now, have you seen -- you don't have any information that

16  Mr. Spitler actually worked at USAPTI or Performance Group; do

17  you?

18  A.  That is correct.

19  Q.  Okay.  You know he attended one meeting with the Pangang

20  clients in San Francisco; right?

21  A.  Yes, I think I saw that.

22  Q.  Okay.  And, in fact, he provided Mr. Liew with some plans?

23  A.  I don't recollect that.  Sorry.

24  Q.  Okay.  But other than attending the one meeting, are

25  you -- he wasn't involved in the day-to-day of the business?

1   A.   From the documentation I saw, no, that is correct.

2   Q.   Okay.  So -- and he wasn't involved in the day-to-day

3   projects to design for USAPTI or Performance -- the 30,000-ton

4   project or the 100,000-ton project?

5   A.   I have no knowledge of that.

6   Q.   Okay.  So I just want to ask you again about your opinion.

7        USAPTI has one person, Mr. Maegerle, who you know has TiO2

8   experience.  That's it.

9   A.   Correct.

10  Q.   Is it still your opinion that Mr. Liew and his team had

11  ample experience and qualifications to carry out the work they

12  performed?

13  A.   From the documentation I saw, yes, that is correct.

14  Q.   And it is still your opinion that you believed Mr. Liew

15  and his team had ample academic and engineering credentials?

16  A.   From the documentation I saw, yes.

17  Q.   You have identified one electrical engineer, one

18  mechanical engineer by name, and that's it.

19  A.   That is correct.

20  Q.   Okay.  I want to move on with you to another area that was

21  talked about yesterday.

22           MR. AXELROD:  May I just have a moment, Your Honor?

23           THE COURT:  Sure.

24           MR. AXELROD:  I'm looking for an exhibit.

25                     (Pause in proceedings.)

1          **MR. AXELROD:**  Ah, here we go.

2    **Q.**   Mr. Cooper, you talked yesterday about this photograph;

3    right?

4    **A.**   That's correct.

5    **Q.**   Okay.  And you, looking at that picture, you can't -- you

6    can't determine the distance from the jets to the sidewalls

7    from that picture, can you?

8    **A.**   From this picture you can scale using knowing what the

9    width of the trailer is, actually.

10   **Q.**   So -- okay.  But I just -- I want to make sure that I'm

11   clear, because I'm asking you a specific question.  Okay?

12        And the question I'm asking you is:  You can't determine

13   the distance from the jets to the sidewall in this picture; can

14   you?  Just from this picture.

15   **A.**   From this picture, you can get an idea.  You can't

16   determine exactly.

17   **Q.**   Right.  You can't determine the exact number; can you?

18   **A.**   I can determine the exact number of risers.

19   **Q.**   That's not the question.  The question is:  Can you

20   determine the distance from the sidewall of that chlorinator to

21   the jets?

22   **A.**   That is correct.

23   **Q.**   You cannot determine that?

24   **A.**   That is correct.

25   **Q.**   Okay.  And you also can't determine the distance between

1   the jets from that picture; can you?

2   **A.**   That is correct.

3   **Q.**   Okay.

4   **A.**   You can't see the whole trailer.

5   **Q.**   Now, you talked about this chlorinator, and you said that

6   this was the Antioch chlorinator; right?

7   **A.**   By its location, yes, that's what it appeared to be.

8   **Q.**   Well, are you sure of it?

9   **A.**   A hundred percent sure?

10  **Q.**   Yes.

11  **A.**   No.  Just because it was in the location and it's a

12  chlorinator.

13  **Q.**   So what percentage sure are you?

14  **A.**   95.

15  **Q.**   Okay.  So you're 95 percent sure that's the DuPont -- or,

16  excuse me, the Antioch chlorinator?

17  **A.**   That is correct.

18  **Q.**   Okay.  But that's not the chlorinator design used at any

19  currently operating DuPont plant; is it?

20  **A.**   Precisely, that statement is correct.

21  **Q.**   Right.

22  **A.**   However, if I may elaborate a little bit?

23  **Q.**   No.  It's fundamentally different from what's currently

24  used by DuPont in their plants; isn't it?

25  **A.**   That is correct.

1  **Q.**  Okay.  That's not the Kuan Yin chlorinator; is it?

2  **A.**  Which Kuan Yin chlorinator?

3  **Q.**  Either of the Kuan Yin chlorinators.

4  **A.**  The one that's presently or that was designed by USAPTI?

5  **Q.**  I'm sorry.  I think you misheard me.  I'm talking about

6  Kuan Yin, the DuPont facility in --

7  **A.**  I apologize.  You're quite right.

8      That is correct.  I don't know what's been operating at

9  Kuan Yin at this time.

10  **Q.**  Have you ever been to Kuan Yin?

11  **A.**  No, I have not.

12  **Q.**  Have you ever seen a chlorinator there?

13  **A.**  No, I have not.

14  **Q.**  Okay.  And this isn't -- this picture, Exhibit 1726,

15  that's not the DeLisle chlorinator; is it?

16  **A.**  Certainly not, no.

17  **Q.**  Okay.

18  **A.**  It's not big enough.

19  **Q.**  You've never been in the DuPont facility at DeLisle; have

20  you?

21  **A.**  No, I have not.

22  **Q.**  You've never actually inspected the chlorinators they use

23  at DeLisle; have you?

24  **A.**  That is correct.

25  **Q.**  Okay.  And this isn't the Edgemoor chlorinator either?

COOPER - CROSS / AXELROD

```
 1   A.   That is correct.

 2   Q.   Okay.  And you haven't been there?

 3   A.   That is correct.

 4   Q.   You've never seen the chlorinator there?

 5   A.   That is correct.

 6   Q.   And it's not the chlorinator for New Johnsonville either?

 7   A.   That is correct.

 8   Q.   You've never been to New Johnsonville?

 9   A.   That is correct.

10   Q.   You've never seen the chlorinator at New Johnsonville?

11   A.   That is correct.

12   Q.   And this isn't the Altamira chlorinator either?

13   A.   That is correct.

14   Q.   You've never been to Altamira?

15   A.   Correct.

16   Q.   So you don't know what any of the actual currently

17   operating chlorinators look like in those plants?

18   A.   That is correct.

19   Q.   And, in fact, you've never known what they look like?

20   A.   That is correct.

21   Q.   So yesterday when you were saying that, basically, all

22   chlorinators in the industry are the same, you were just

23   speculating; right?

24   A.   No.

25   Q.   Well, you don't actually know about all the chlorinators
```

1  at DuPont facilities; right?

2  **A.**    What I said, I believe, was, basically, the same function.

3  You are quite correct in your statement.

4  **Q.**    I want to --

5          **MR. AXELROD:**    Could we switch back to the computer,

6  please?  Thank you.

7  **Q.**    I want to ask you about the Accession Report that you

8  talked about briefly with Mr. Gasner earlier today.  That's

9  Exhibit 162.  Do you recall that?

10  **A.**    Yes, I do.

11  **Q.**    And, Ms. Mahoney, could you bring up page 162-36,

12  Exhibit 162-36?

13  **A.**    I don't have it.

14  **Q.**    Oh, it might take a moment to show up on your screen.

15  **A.**    Now I have it.

16  **Q.**    Okay.  Is that acceptable or would you prefer the hard

17  copy?

18  **A.**    No, this is fine.  Thank you.

19  **Q.**    Okay.  Ms. Mahoney, can you please blow up the text?

20  Yeah, that whole box there.

21      Mr. Cooper, you've reviewed this document; right?

22  **A.**    That is correct.

23  **Q.**    And you're familiar with this chart; right?

24  **A.**    Correct.

25  **Q.**    And you understand that what it shows is actual operating

1   geometry, actual geometries of the oxidation reactors at

2   various DuPont facilities?

3   **A.**   I don't specifically know that.

4   **Q.**   Okay.  Well, you reviewed the testimony of Dr. Diemer;

5   didn't you?

6   **A.**   Yes, I did.

7   **Q.**   And that's what he had to say about this; right?

8   **A.**   That was his testimony.

9   **Q.**   Okay.  Do you have any reason to disbelieve him?

10  **A.**   It's a question of timing.  This was a very old report.

11  From the research I've done, these dimensions no longer apply.

12  **Q.**   That's not the question I asked you.

13  **A.**   I was trying to answer as fully as I could.

14  **Q.**   The question I asked you is:  Do you have any reason to

15  question that these are the particular specific geometries of

16  the DuPont oxidation reactors at DuPont facilities at a

17  particular point in time?

18  **A.**   I have no evidence to the contrary, that is correct.

19  **Q.**   Okay.  And, so, what you see there are specific geometries

20  for DL-I is DeLisle Line I; right?

21  **A.**   I presume so, yes.

22  **Q.**   And JV-II is Johnsonville Line II; right?

23  **A.**   I presume so.

24  **Q.**   And that's Edgemoor Line II is EM-II?

25  **A.**   Again, I presume so.

COOPER - CROSS / AXELROD

1   **Q.**   And JV-I is Johnsonville Line I; right?

2   **A.**   Correct.

3   **Q.**   And the last one is Antioch?

4   **A.**   Correct.

5   **Q.**   And then it's got the dimensions of -- beneath it of

6   various components of the oxidation reactor; right?

7   **A.**   It has got the dimensions of one part of the oxidation

8   reactor.

9   **Q.**   A very important part?

10  **A.**   Yes.  Correct.

11  **Q.**   And then it has the rate; right?

12  **A.**   That is correct.

13  **Q.**   And then it's got some other information about the process

14  as well?

15  **A.**   That is correct.

16  **Q.**   None of this information is publicly available?

17  **A.**   I must disagree with that statement.

18  **Q.**   You must disagree?

19  **A.**   Yes.

20  **Q.**   So where can you tell -- where can I find this particular

21  collection of information in the public domain?

22  **A.**   The rates of the plants can be calculated from reports

23  like IBMA, TZMI.

24  **Q.**   That's not what I'm asking you, sir.  This specific

25  collection of information, where can I find that in the public

**COOPER - CROSS / AXELROD**

1  domain?

2  **A.**    Certain patents actually quote what the flow rates are.

3  **Q.**    Okay.  Let me -- I'm going to have to break this down

4  then.

5       Let's just look at the top line.  The geometries of the

6  oxidation reactor, where can that be found in the public

7  domain?

8  **A.**    These particular dimensions cannot.

9  **Q.**    Okay.  They don't -- did you look for them?

10  **A.**    I found dimensions but, these weren't there.

11  **Q.**    No, but as part of your assignment and work on this case,

12  did you look to see whether this actual information was in the

13  public domain?

14  **A.**    No, I did not.

15  **Q.**    Okay.  But you're unaware of it being in the public

16  domain; right?

17  **A.**    This particular information, that is correct.

18  **Q.**    And that's not terribly surprising.  You worked in the

19  TiO2 industry for a long time.  Nobody would publish the

20  dimensions of their oxidation reactor; would they?

21  **A.**    Again, I must disagree with that statement.

22  **Q.**    So it's your testimony -- let me step back.

23       You'd agree with me, sir, that the oxidation reactor is

24  the heart of the process; right?

25  **A.**    Yes.

1  Q.    And companies, including the ones that you've worked for,

2  protect that technology?

3  A.    Yes.

4  Q.    And part of protecting that technology is maintaining the

5  secrecy of the particular geometries and design dimensions of

6  their reactors?

7  A.    That is correct.

8  Q.    Okay.  You were taking issue with the rate information,

9  the line rate information?

10  A.    That is correct.

11  Q.    Okay.  My question to you is:  Where in the public domain

12  can you find this collection of rate information?

13  A.    The collection of rate information, you cannot.

14  Q.    Okay.  Ms. Mahoney, could you go to page 38 of this

15  exhibit?

16      Okay.  And, Mr. Cooper, you're familiar with this

17  particular chart?

18  A.    I've seen it before, yes.

19  Q.    Okay.  So you know that this reflects plant-specific

20  information about mixing lengths and results?

21  A.    That is correct.

22  Q.    And this particular collection of information you cannot

23  find in the public domain; can you?

24  A.    This specific information, you are correct.  There is

25  other information out there.

1  Q.   I understand.  But this information you can't get?

2  A.   That is correct.

3  Q.   And that's particularly --

4  A.   Sorry.  May I correct myself?

5  Q.   Please.

6  A.   The first line, the second line, to be specific, you are

7  correct.  The rest of the information is readily available.

8  Q.   Okay.  Let's move on.

9       Well, no, before we do -- no, let's move on to page 9.  If

10  you could, Ms. Mahoney, could you go to page 9?

11      And, Mr. Cooper, are you familiar with this information

12  from the Accession Report?

13  A.   I've seen this page before, yes.

14  Q.   Okay.  So you're aware of the fact that it contains

15  specific information about the flue pond at Edgemoor?

16  A.   No, I wasn't, actually.

17  Q.   Well, did you read the report as part of your work?

18  A.   I didn't associate it with Edgemoor.  I just associated it

19  with a DuPont plant.

20  Q.   Okay.  Well, I believe if you look in the document, it,

21  actually, explains that these --

22  A.   I might have missed that.

23  Q.   Okay.  This specific collection of information, you can't

24  find this in the public domain either; can you?

25  A.   (Witness examines document.)  Some of it is available in

1   the public domain, yes, it is.

2   **Q.**   Okay.  Well, let's focus -- so -- but that's not my

3   question.  My question is:  All that information together, can

4   you find that?

5   **A.**   Together in one place, no.

6   **Q.**   Other than in this document, the Accession Report, would

7   this information, and Dr. Diemer's correlation, and all the

8   other information contained in it, can you find that anywhere

9   else other than in this specific document?

10  **A.**   This accumulation of information, no, you cannot.

11  **Q.**   Okay.  And did you, as part of your work, try to find it?

12  **A.**   I found some of this in separate documentation, yes.

13  **Q.**   Right.  But, I mean, as part of your work in testifying in

14  this case, did you go out and set about to see if you could

15  actually get a copy of the Accession Report in the public

16  market?

17  **A.**   Yes, I did; and, no, you can't.

18  **Q.**   And this type of data that we've been looking at, the

19  geometries of the oxidation reactors, the specific collection

20  of flue pond information, could you find that type of

21  information for Ashtabula 1 in the public domain?

22  **A.**   Specific to Ashtabula 1?

23  **Q.**   Yes.

24  **A.**   No, you can't.

25  **Q.**   Because that information is just not public; right?

COOPER - CROSS / AXELROD

1   **A.**   That is correct.  At Ashtabula 1, that is correct.

2   **Q.**   Well, Ashtabula 1 was the facility that SCM bought from

3   Sherwin-Williams; right?

4   **A.**   But if you make --

5   **Q.**   That's just a -- is that a correct statement?

6   **A.**   That is correct.

7   **Q.**   Okay.  So I want to talk to you -- and, Ms. Mahoney, you

8   can bring this down -- I wanted to talk to you for a moment

9   about equipment.

10       You mentioned, I think you mentioned yesterday, that

11  certain pieces of equipment are typically supplied by vendors;

12  right?

13  **A.**   That is correct.

14  **Q.**   Kind of off-the-shelf equipment?

15  **A.**   That is correct.

16  **Q.**   But I gather that there are other pieces of equipment that

17  aren't off the shelf?

18  **A.**   That is correct, too.

19  **Q.**   And there's -- TiO2 companies do custom design for certain

20  pieces of equipment; right?

21  **A.**   If you would define "custom" for me.

22  **Q.**   We're going to talk about that.  There's certain pieces of

23  equipment that a TiO2 company is going to make themselves;

24  right?  They're not going to just buy it off the shelf?

25  **A.**    No, most titanium dioxide companies do not manufacture

**COOPER - CROSS / AXELROD**

1    their own equipment.

2    Q.    I'm not asking about manufacturing, and maybe my question

3    wasn't clear.  I'm talking about designing, and pardon me if

4    that wasn't clear.

5    A.    That is correct, that statement.

6    Q.    Okay.  And, so, those kind of custom design pieces are

7    treated as proprietary by the companies; right?

8    A.    No, not necessarily.

9    Q.    Okay.  So let's just talk for a moment about the oxidation

10   reactors if they -- at SCM or Millennium; right?

11   A.    Fine.

12   Q.    That's a piece of equipment that the company treated as a

13   confidential and proprietary design; right?

14   A.    That is correct.

15   Q.    Okay.  And you've been in the industry a long time.

16   That's how everybody treats their oxidation reactors; right?

17   A.    No.

18   Q.    Okay.  Other than Kerr-McGee that did some licensing;

19   right?

20   A.    Correct.

21   Q.    Okay.  So everybody else, basically, keeps it to a close

22   hold?

23   A.    They -- that would be true to say, yes.

24   Q.    Okay.  And people would -- I mean, maybe you could give me

25   some examples of other pieces of equipment that would be sort

1    of custom designed other than the oxidation reactor.

2    **A.**    Probably the aluminum chloride generator.  That's the one

3    immediately springs to mind.  The others I would not consider,

4    by your definition, custom.

5    **Q.**    How about by your own definition, what else would you

6    consider?

7    **A.**    For SCM, that would be it, actually.

8    **Q.**    So SCM would not consider its chlorinator a proprietary

9    design?

10   **A.**    No, they wouldn't.

11   **Q.**    Okay.  Any other types of designs that wouldn't just come

12   from the vendor that you can think of?

13   **A.**    Clearly you would get, when you're building a plant, you

14   would get your engineering company to design certain pieces of

15   equipment, but they would be standard equipment like tanks,

16   piping, those sorts of things.  I don't consider them custom by

17   any means.

18   **Q.**    Okay.  And yesterday you testified that you reviewed some

19   of the USA -- you reviewed USAPTI's equipment lists for these

20   projects; right?

21   **A.**    That is correct.

22   **Q.**    So I'd like to, actually, show one to you.

23          **THE COURT:**  Let's take a stretch break.  A stretch

24   break while you're doing that.

25                    (Pause in proceedings.)

```
 1              THE COURT:  Okay.

 2              MR. AXELROD:  May I continue, Your Honor?

 3              THE COURT:  Yes, please.

 4              MR. GASNER:  Your Honor, could the Court inquire of

 5   Mr. Axelrod whether I can move this?

 6              THE COURT:  Yes, do you still need that?

 7              MR. AXELROD:  We can move that, of course.

 8              MR. GASNER:  Thank you.

 9              MR. AXELROD:  I'm sorry.

10              THE COURT:  Thank you.

11              MR. AXELROD:  May I approach, Your Honor?

12              THE COURT:  Yes.

13   BY MR. AXELROD:

14   Q.  Mr. Cooper, I'm approaching with Exhibit 189, Volume II.

15   It's a binder, "USA Performance Technology, Inc., BI Submittal,

16   Process Volume II."  Do you recognize that document?

17   A.  (Witness examines document.)  I believe I've seen all of

18   it in parts.  I'm not sure I've seen this exact compilation.

19   Q.  Okay.

20   A.  But, yes, I've seen it in parts.

21   Q.  Okay.  And if you could look -- there's an orange square

22   sticky is the page I was hoping we could look at together.

23   A.  (Witness examines document.)

24   Q.  And this is a document --

25              MR. AXELROD:  Your Honor, the parties have stipulated
```

COOPER - CROSS / AXELROD

```
 1   that this document is from the USAPTI office.

 2              THE COURT:  Is that correct?

 3              MR. GASNER:  Yes, Your Honor.

 4              THE COURT:  All right.  So stipulated.

 5              MR. AXELROD:  And the Government offers it into

 6   evidence.

 7              MR. GASNER:  No objection.

 8              THE COURT:  Admitted.

 9         (Trial Exhibit 189 received in evidence)

10              MR. AXELROD:  And, Ms. Mahoney, if you could pull up,

11   this is Exhibit 189, page 284.

12         Okay.  And if you could blow up, Ms. Mahoney, the top

13   third of that document.  That's not going to do it.

14              THE CLERK:  Counsel, can I just clarify?  Are there

15   two different binders, one's I and one's II, and this is only

16   Volume II?

17              MR. AXELROD:  That is correct.

18              THE CLERK:  Submitted volume I is not admitted?

19              MR. AXELROD:  That is correct.

20              THE CLERK:  Thank you.

21              MR. AXELROD:  Thank you.

22   Q.   And, Mr. Cooper, feel free to look at the larger print

23   document in front of you.

24   A.   Please.

25   Q.   This is, as sometimes we say, this is good enough for
```

COOPER - CROSS / AXELROD

1    Government work, so this is as good as I can get.  I apologize.

2         So could you describe what it is what we're looking at?

3    A.   You're looking at a list which is specified "Recommended

4    Import Equipment."  It's a list of equipment by process flow

5    diagram.  It has the identifier, the description, the area, the

6    specification, the materials of construction, and the supplier.

7    Q.   Okay.  So just to take an example, a little bit of the

8    ways down there it says -- the first one says "PFD-3," the

9    description is a "Coke and Ore Injection Pump Number 1."

10   That's a piece of equipment; right?

11   A.   That is correct.

12   Q.   And if you look across, it has a supplier FLSmidth and

13   Claudius Peters; right?

14   A.   That is correct.

15   Q.   And those are some of the vendors we've been talking

16   about?

17   A.   That is correct.

18   Q.   Okay.  And then if you go down a little bit further, it

19   says, "PFD Number 4, Spray Machine."  And that's in

20   chlorination.  And then what does it say for supplier?

21   A.   "USAPTI Custom Fabrication."

22   Q.   So that's one that USAPTI was going to be designing;

23   right?

24   A.   That would be what I presume from this list, yes.

25   Q.   And there are other pieces of equipment -- and,

1   Ms. Mahoney, if you could scroll down on this drawing -- or,

2   excuse me, on this page.  And if you need to break out, I'd

3   like you to go -- let's go to the next page, if we could, 189,

4   page 285.  Thank you.

5        And the very first line there is the aluminum chloride

6   generator.  Do you see that, Mr. Cooper?

7   A.   Yes, I do.

8   Q.   And who's doing the design for that?

9   A.   USAPTI.

10  Q.   Okay.  And if we could go down a little bit further, if we

11  could back out -- I apologize, Ms. Mahoney.

12       There is a -- if you go down a little bit further, it

13  says, "Oxidation Reactor."  Do you see that?

14  A.   Yes, I do.

15  Q.   And, Ms. Mahoney, if you could blow that up.  Thank you.

16       And who's designing that?

17  A.   USAPTI.

18  Q.   So there are some items that are sort of off-the-shelf,

19  and you get those from the vendors; right?

20  A.   That is correct.

21  Q.   And then there's other items that are the more sensitive

22  items, and they get designed by USAPTI?

23  A.   Those you've specified, yes.

24  Q.   Okay.  Well, there's more on the list; right?

25  A.   Yes, but they aren't custom fabrications.

3986

COOPER - CROSS / AXELROD

1  Q.   Well, but the point is that the design is being conducted

2  by USAPTI; right?

3  A.   No.  They're being supplied by USAPTI, I believe.

4  Q.   Okay.  Do you know who on Mr. Liew's team designed those

5  pieces of equipment?

6  A.   I don't recollect who actually did the design.  The

7  original drawings that I saw came from Mr. Maegerle.

8  Q.   From Mr. Maegerle?

9  A.   Yeah.

10  Q.   Okay.  The oxidation reactor?

11  A.   Yes.

12  Q.   Chlorinator?

13  A.   Yes.

14  Q.   Aluminum chloride generator?

15  A.   Yes.

16  Q.   And is it your testimony that the necessary information to

17  design an oxidation reactor is publicly available?

18  A.   Parts of it is.  Parts of it are not.

19  Q.   What parts are not?

20  A.   I've not seen a design of the combustion chamber.  That's

21  about it.

22  Q.   So other than the combustion chamber, everything else is

23  publicly available?

24  A.   That -- there is sufficient information in the public

25  domain to do that design, yes.

**COOPER - CROSS / AXELROD**

1  Q.   And to do a design and have confidence that it would work

2  at a commercially viable size?

3  A.   That, I didn't say.  I don't know that.  There is enough

4  information in the patents to dimension those things.  Even

5  when you have that, the reactor doesn't necessarily work.

6  Q.   Exactly right.  You need to have experience with the

7  process; right?

8  A.   You need to, actually, run the reactor under the

9  conditions that you are going to run it at.

10  Q.   And are the specific conditions that you're going to run a

11  reactor at publicly available?

12  A.   In general, yes.

13  Q.   So the specific conditions for the Ashtabula Line 1

14  reactor are publicly available?

15  A.   They were available by the Antioch specification, yes.

16  Q.   No.  I'm asking you, sir, today if I wanted to know

17  Ashtabula 1, what it runs on, what the operating conditions

18  are, is that publicly available information?

19  A.   No.  SCM did not publish patents on that piece of

20  equipment.

21  Q.   Okay.  Well, let's -- I'm not asking you about patents.

22  I'm asking you about specific operating conditions.

23  A.   I'm sorry.  I must have misunderstood.  There are specific

24  operating conditions out there.  SCM chooses not to publish

25  that information.

COOPER - CROSS / AXELROD

1   **Q.**   In fact, it's never published that information?

2   **A.**   That, also is not quite correct.  There are patents on the

3   Stallingborough reactor.

4   **Q.**   Right.  But I'm talking about -- let's take

5   Stallingborough.  The specific operating conditions at

6   Stallingborough that the company uses today, are those specific

7   conditions available by looking -- is that actual information

8   in the public domain?

9   **A.**   There are pressures and temperatures for the operation of

10  the reactor, yes.

11  **Q.**   For that specific reactor?

12  **A.**   For that specific reactor.

13  **Q.**   I'd like to talk to you about -- I'd like to talk about

14  some of the patents that were discussed during your testimony.

15  And bear with me.  I've got to grab the....

16                       (Pause in proceedings.)

17          **MR. AXELROD:**  Your Honor, may I approach --

18          **THE COURT:**  Yes.

19          **MR. AXELROD:**  -- with Exhibit 2256?

20          **THE COURT:**  Yes.

21  BY MR. AXELROD:

22  **Q.**   Mr. Cooper, I'm handing you what's been marked as

23  Exhibit 2256.  Do you recognize that document?

24  **A.**   Yes.  This is one of the DuPont patents I looked at.

25  **Q.**   Okay.  And....

COOPER - CROSS / AXELROD

1                    (Pause in proceedings.)

2          **THE CLERK:**  It's admitted?

3          **MR. AXELROD:**  This is an admitted exhibit.

4      May I just have a moment, Your Honor, to collect my

5  documents here?

6          **THE COURT:**  Sure.

7                    (Pause in proceedings.)

8          **MR. AXELROD:**  Could I ask -- indulge the Defense to

9  ask Mr. Guevara to pull up Exhibit 2256?

10          **MR. GASNER:**  Absolutely.

11          **MR. AXELROD:**  Thank you.

12          **MR. GASNER:**  It's no problem.

13          **MR. AXELROD:**  Thank you very much.

14                    (Pause in proceedings.)

15  **BY MR. AXELROD:**

16  **Q.**  Now, yesterday you read the first sentence of the second

17  paragraph of Column 1.  So if we could go to Column 1 and that

18  second paragraph.

19      You read the sentence, that first sentence there that

20  says:  (reading)

21          "The preparation of titanium dioxide through reaction

22      of titanium tetrachloride in the vapor phase with an

23      oxygen-containing gas or by a so-called steam-splitting

24      reaction is already known."

25      Do you recall that?

COOPER - CROSS / AXELROD

1 **A.** Yes, I do.

2 **Q.** Okay. Now, you didn't read the rest of that paragraph,

3 did you?

4 **A.** I did not.

5 **Q.** Could you please read the rest of that paragraph?

6 **A.** (reading)

7         "However, such prior methods lack technical

8     importance and are not adaptable to nor feasible for

9     commercial exploitation due to the fact that they entail a

10     very difficult, costly, and discontinuous type of

11     operation and produce a titanium dioxide product which is

12     decidedly lacking in essential pigment properties..."

13     Shall I continue?

14 **Q.** Please. Thank you.

15 **A.** (reading)

16     "... e.g., exhibits such poor tinting strength and

17     coarse, nonuniform particle size distribution that it

18     fails to meet the stringent requirements demanded by

19     the TiO2 pigment trade."

20 **Q.** Can you please finish that paragraph? It might be hard to

21 see, but I think it still goes.

22 **A.** (reading)

23         "Also, control over the crystalline form of the

24     titanium dioxide produced from such procedures cannot be

25     effected, and such large excesses of oxygen are required

COOPER - CROSS / AXELROD

1          to convert the tetrachloride that contamination of the

2          gaseous chlorine simultaneously formed with the TiO2 takes

3          place to render the chlorine unfit for reuse."

4     Q.   And this patent related to a lab scale process; right?

5     A.   That's what the numbers tell me, yes.

6     Q.   Okay.  So this was not an actual commercial production

7     facility?

8     A.   No.  This is a purely historical document.

9     Q.   Okay.

10         MR. AXELROD:  Your Honor, may I approach with

11    Exhibit 2246?

12         THE COURT:  Yes, you may.

13    BY MR. AXELROD:

14    Q.   I'm handing you what's been marked as Exhibit 2246.  Do

15    you recognize that document?  It's an admitted exhibit.

16    A.   Yes, I do.

17    Q.   And I'm going to put this up on the ELMO.

18         Okay.  And you spoke about this patent as well yesterday;

19    right?

20    A.   Yes, I did.

21    Q.   But this patent concerns fixed bed chlorination; right?

22    A.   That's correct.

23    Q.   Not fluid bed chlorination?

24    A.   That is correct.

25    Q.   And the process that Mr. Maegerle designed was a fluid bed

COOPER - CROSS / AXELROD

1    process; right?

2    **A.**    That is correct.

3    **Q.**    And this particular patent that you referred to yesterday

4    concerns making briquettes out of carbon and molasses; right?

5    **A.**    That is correct.

6    **Q.**    And then putting those into a shaft furnace?

7    **A.**    That is correct.

8    **Q.**    So it has absolutely nothing to do with current practice?

9    **A.**    It was -- I read it purely as a historical document.

10   **Q.**    Okay.  And this process, this never worked in practice;

11   did it?

12   **A.**    A very similar one did.

13   **Q.**    Well, but my question is:  This process described in this

14   patent, that never worked commercially; did it?

15   **A.**    There was a commercial process in the UK that used a shaft

16   furnace with briquettes, yes.

17   **Q.**    Okay.  But you're familiar with Pittsburgh Paint and

18   Glass; right?

19   **A.**    Yes.

20   **Q.**    In fact, you do some work with them; right?

21   **A.**    I have done work with them, yes.

22   **Q.**    And you know that they attempted to commercialize this

23   process; right?

24   **A.**    I don't know that for a fact.

25   **Q.**    You don't?

1    **A.**   Not this process, no.

2    **Q.**   You're not familiar with them attempting that process?

3    **A.**   No, I am not.

4         **MR. AXELROD:**  Your Honor, may I approach with

5    Exhibit 2326?

6         **THE COURT:**  Yes.

7    **BY MR. AXELROD:**

8    **Q.**   Mr. Cooper, I'm going to hand you Exhibit 2326.  Do you

9    recognize that patent?

10   **A.**   Yes, I do.

11   **Q.**   Okay.  And that's another one of the ones that you

12   discussed yesterday?

13   **A.**   Yes, I did.

14   **Q.**   And we talked -- yesterday you testified regarding

15   conveying gas rates in one of Mr. Maegerle's emails.  Do you

16   recall that?

17   **A.**   Yes, I do.

18   **Q.**   And I want to -- if we could go --

19        **MR. AXELROD:**  And I apologize.  If we could flip over

20   to the computer for Ms. Mahoney.

21                  (Pause in proceedings.)

22        **MR. AXELROD:**  And when it comes on, Ms. Mahoney, would

23   you go to Exhibit 126, page 1?  Thank you.  And if you could

24   blow up the text there.

25        **THE WITNESS:**  I still don't have it on the screen.

1          MR. AXELROD:  Okay.  I think it will take a moment.

2          THE COURT:  There's a delay.  We have an engineering

3    problem here with a delay.

4          THE WITNESS:  Thank you, Your Honor.

5          THE COURT:  Yes.

6          THE WITNESS:  Yes, I have it now.

7          MR. AXELROD:  You have it now?  Okay.

8       And, Ms. Mahoney, could you blow up the text of that

9    email.

10   Q.   Okay.  So there's two things I wanted to ask you about,

11   Mr. Cooper.  First, it says:  (reading)

12             "The Kuan Yin nitrogen flow to inject ore and coke

13        solids into the chlorinator" --

14          THE COURT:  Slow down, please.

15          MR. AXELROD:  Yes.  I'm so sorry.  (reading)

16             "The Kuan Yin nitrogen flow to inject ore and coke

17        solids into the chlorinator is [number] of pounds per

18        hour.  This is through a [number] inch line."

19        Do you see that?

20   A.   Yes, I do.

21   Q.   So the first thing is, you never talked about the number

22   inch line, did you?

23   A.   No, I did not.

24   Q.   No.  But that specific information is found in the Basic

25   Data Document; isn't it?

**COOPER - CROSS / AXELROD**

1  **A.**   I believe so.

2  **Q.**   But you did talk about that number pounds per hour.  Do

3  you recall that?

4  **A.**   Yes, I do.

5  **Q.**   And you said that that patent that you now have in front

6  of you, 2326, made a public disclosure of that information.  Do

7  you recall that?

8  **A.**   Yes, I do.

9  **Q.**   But that's not true.  The patent -- where is that specific

10  number in the patent?

11  **A.**   (Witness examines document.)  The one I was referring to

12  was Column 8.

13  **Q.**   Uh-huh.

14  **A.**   I believe that was the reference I had made.

15  **Q.**   Okay.  But it doesn't identify that specific number.

16  **A.**   (Witness examines document.)  It identifies a number,

17  which is just slightly different than this one, that is

18  correct.

19  **Q.**   Okay.  So it's not the same number?

20  **A.**   It is not the same number.

21  **Q.**   And, in fact, the patent, actually, says nothing about

22  conveying gas rate, that specific conveying gas rate that's in

23  Mr. Maegerle's email?

24  **A.**   Sorry.  Could you repeat precisely what you mean?

25  **Q.**   Yes.  So the conveying -- the gas rate that's specifically

1    mentioned in Mr. Maegerle's email is not found in that patent?

2    **A.**   The pounds in hour, is that what you're meaning?

3    **Q.**   Yes.

4    **A.**   That is correct.

5    **Q.**   Okay.

6           **MR. AXELROD:**  Your Honor, may I approach with

7    Exhibit 3171?

8           **THE COURT:**  Yes, you may.

9    **BY MR. AXELROD:**

10   **Q.**   Mr. Cooper, I'm handing you what's been marked as 3171.

11   It's another one of the patents you talked about yesterday.

12   **A.**   (Witness examines document.)

13   **Q.**   And, Ms. Mahoney, could you please bring up Exhibit 78?

14   And can you blow up the text?  Thank you so much.

15        Now, there is a -- there's a fluid -- there's a

16   fluidization air rate in this email that's in front of you;

17   right?  There's a number FPS, normal velocity FPS?  Do you see

18   that?

19   **A.**   Feet per second, yes, that's correct.

20   **Q.**   Okay.  And you testified that that air rate appears in the

21   patent, which is 3171; right?

22   **A.**   That is correct.

23   **Q.**   Can you please show me where?

24   **A.**   Where I picked it from was Column 4.  It's either line 31

25   or 32.  The numbering is off there.

1   **Q.**   Okay.  But that specific number isn't in the patent.

2   **A.**   As I explained yesterday, normal rounding, because this is

3   in the patent, to one decimal place.  The number on the page is

4   two decimal places.  For all intents and purposes, with

5   mathematical rounding, they are the same number.

6   **Q.**   Okay.  That's your opinion.

7   **A.**   That is not just my opinion.  That is what you do

8   mathematically when you quote to a single decimal point.  You

9   don't know what the second decimal place is.

10  **Q.**   But the specific number mentioned in the email was from

11  the Basic Data Document; right?

12  **A.**   I believe that is correct.

13  **Q.**   And the number in the patent is different than that?  It's

14  not the same number.

15  **A.**   It is not identical to the number, that is correct.

16          **MR. AXELROD:**  Your Honor, may I approach with

17  Exhibit 1439?

18          **THE COURT:**  Yes, you may.

19          And we're going to break in about five minutes.  We're

20  going to give you a ten-minute break and then go the rest of

21  the afternoon until 1:30.

22  **BY MR. AXELROD:**

23  **Q.**   Mr. Cooper, I'm handing you what's been marked as

24  Exhibit 1439.  That's another one of the patents that you

25  talked about yesterday.

COOPER - CROSS / AXELROD

1    **A.**    Yes, I remember that.

2    **Q.**    And that patent concerns a process that was never

3    commercially practiced; right?

4    **A.**    That is my understanding.

5                         (Pause in proceedings.)

6    **BY MR. AXELROD:**

7    **Q.**    You also testified yesterday that -- we talked -- you

8    talked with Mr. Gasner about Fuller-Kinyon pumps.  Do you

9    recall that?

10   **A.**    Yes, I do.

11   **Q.**    And you testified that, basically, Fuller-Kinyon pumps,

12   they're all the same and they're, essentially, off-the-shelf

13   items; is that right?

14   **A.**    No, I didn't say that.  I said Fuller-Kinyon pumps are,

15   basically, off-the-shelf items.

16   **Q.**    Okay.  But you're familiar with the fact that DuPont

17   actually makes changes to those pumps; right?

18   **A.**    I have seen that, yes.

19   **Q.**    Right.  So they might buy a pump off the shelf, but then

20   they change it?

21   **A.**    I have seen that, yes.

22   **Q.**    And, so -- in fact, they specifically say in the Basic

23   Data Document that those improved designs should not be

24   divulged to Fuller-Kinyon; right?

25   **A.**    That is correct.

COOPER - CROSS / AXELROD

1  **Q.**  And that's not a publicly -- what they do is not publicly

2  known; is it?

3  **A.**  No, but USAPTI did not use the improvements by DuPont.

4  **Q.**  That's not my question, sir.

5  **A.**  I apologize.  What was your question again?

6  **Q.**  We'll move on to another document.

7      Ms. Mahoney, could you bring up Exhibit 91?

8      And you testified, I believe, from this email about stack

9  velocity; is that right?

10  **A.**  Yes, that is correct.

11  **Q.**  Okay.  And there's a specific figure there for stack

12  velocity; right?  It says:  (reading)

13      "Stack to be fire resistant with a discharge cone to

14      give [number] FPS tip velocity."

15      Then it says:  (reading)

16      "Stack internal velocity to be [number] FPS."

17      Do you see that?

18  **A.**  Yes, I see that.

19  **Q.**  And you looked at an OSHA document when you were talking

20  about this email.  Do you recall that?

21  **A.**  Among others, yes, that is correct.

22  **Q.**  Okay.  So I'm going to hand you, if I can find it, 3484.

23      **THE CLERK:**  Is it in evidence?

24      **MR. AXELROD:**  It's already admitted.

25              (Pause in proceedings.)

1  BY MR. AXELROD:

2  Q.   I'll try to get that document for you, but do you recall

3  that particular document in question?

4  A.   Not in detail, but I remember it.

5  Q.   Okay.  Then let me get it for you.

6          THE COURT:  While you're doing that, why don't we take

7  a break.  We'll take a ten-minute break.

8      And please remember the Court's usual admonitions, and

9  keep an open mind and do not discuss the case with anybody.

10  Ten minutes.

11      (Proceedings were heard out of the presence of the jury:)

12          THE COURT:  All right.  Ten minutes.

13      You can step down if you like.

14          THE WITNESS:  Thank you, Your Honor.

15                  (Recess taken at 12:39 p.m.)

16              (Proceedings resumed at 12:52 p.m.)

17      (Proceedings were heard out of the presence of the jury:)

18          THE COURT:  Let's bring in the jury, please.

19      (Proceedings were heard in the presence of the jury:)

20          THE COURT:  All right.  Please be seated.

21      You may continue, Mr. Axelrod.

22          MR. AXELROD:  Thank you, Your Honor.

23  Q.   Mr. Cooper, just to pick up where we left off, we were

24  talking about the tip velocity from this email from

25  Mr. Maegerle, which was Exhibit 91.

**COOPER - CROSS / AXELROD**

1        Do you recall that?

2    **A.**    Yes, I do.

3    **Q.**    And I just want to kind of clarify one point.  The

4    document -- a moment ago you said that you looked at the OSHA

5    document, among others, regarding this tip velocity; right?

6    **A.**    That is correct.

7    **Q.**    But yesterday when you talked about it, the only document

8    you actually talked about was the OSHA document; right?

9    **A.**    That is correct.

10   **Q.**    And I want to --

11           **MR. AXELROD:**  Your Honor, may I approach with 3484,

12   which is not admitted?

13           **THE COURT:**  Yes, you may.

14           **MR. AXELROD:**  Okay.

15   **Q.**    And, Mr. Cooper, I'm handing you a copy of 3484.

16       Do you recognize that as the OSHA document we've just been

17   talking about?

18   **A.**    Yes, I do.

19   **Q.**    Okay.  That OSHA document has nothing to do with

20   industrial stacks; right?

21   **A.**    (Witness examines document.)  No.  It's very generally

22   about stacks.

23   **Q.**    Right.  It's actually about stacks for lab hoods; right?

24   **A.**    That is correct.

25   **Q.**    Okay.  So it has nothing to do with stacks from TiO2

**COOPER - CROSS / AXELROD**

1    plants?

2    **A.**    The same rules apply.

3    **Q.**    Well, the thing is, this document, this OSHA document,

4    talks about stack velocity 1.4 times the wind velocity; right?

5    **A.**    That is correct.

6    **Q.**    Okay.  And the issue in a TiO2 factory is if there's no

7    wind; right?  I mean, the concern about dispersion is if

8    there's no wind and then the stuff just drops out?

9    **A.**    If there is low wind, yes.

10   **Q.**    Right.

11   **A.**    Not no wind.

12   **Q.**    But if you converted the number in the email, you'd have a

13   pretty significant wind, wouldn't you?  I mean, without saying

14   the number referenced there, you'd be talking in the, you know,

15   sort of 40-, 50-, 60-mile-an-hour range; right?

16   **A.**    I design my plants for between 60- and 100-mile-an-hour

17   winds.  Yes, you're correct.

18   **Q.**    Okay.  Now, I want to ask you about some comments earlier.

19   I want to talk about the Edgemoor with RPS drawing that you

20   talked about with Mr. Gasner, which is the big schematic that

21   he put up.

22   **A.**    Yes.

23   **Q.**    Which is -- I think he gave you the exhibit to copy, and

24   you made a point --

25            And, Ms. Mahoney, can you bring up Exhibit 5?

1    That's an electronic version that's been admitted into

2 evidence.

3    And can you just blow up that center part?

4    And one of the points that you made with Mr. Gasner was

5 that this was for a particular process, this rutile paper

6 slurry, and you said that that plant doesn't produce any dry

7 product.

8    Do you recall that?

9 **A.**  That is correct.

10 **Q.**  Okay.  Did you research DuPont's production out of that

11 plant?

12 **A.**  Yes, I did.

13 **Q.**  Okay.  So you know that between 1974 and 1990, they

14 actually did produce dry product on-site?

15 **A.**  That, I didn't know.  I only looked more recently than

16 that.

17 **Q.**  Okay.  Well, so do you know that today they produce

18 product there that is turned into dry product?

19 **A.**  That is turned into dry product?

20 **Q.**  Yeah.

21 **A.**  No, I did not know that Edgemoor produced dry product.

22 **Q.**  Okay.  But you did research; right?

23 **A.**  I did not find that product.  I found only RPS coming out

24 of this plant.

25 **Q.**  How much time did you spend trying to figure that out?

1    **A.**   I looked at the -- specifically the Delaware environmental

2    reports, and I also checked up on the various databases that I

3    generally look at, like TZMI, to see what they've done.

4    **Q.**   Okay.  So you were unfamiliar with the fact that,

5    actually, they do make product and ship it out and have it

6    finished elsewhere into dry product?

7    **A.**   That is not a dry product.  That is an intermediate

8    product, not a dry product.

9    **Q.**   But the result of it is a dry product?

10   **A.**   In Arembepe.  Is that the process you're talking about?

11   **Q.**   I am simply talking about the fact that you made a point

12   of saying you couldn't make dry product out of the process at

13   Edgemoor.

14   **A.**   A pigment product, that is correct.

15   **Q.**   Right.  And what I'm pointing out is, that's not true

16   because a dry product is made out of it; it's just finished

17   elsewhere.

18   **A.**   Therefore, it is not, by definition, a dry product.

19   **Q.**   Well --

20   **A.**   My definition, sorry.

21   **Q.**   Okay.  Fair enough.

22       I want to ask you about another patent that you talked

23   about yesterday, and I'm going --

24            **MR. AXELROD:**  Your Honor, may I approach?

25            **THE COURT:**  Yes.

COOPER - CROSS / AXELROD

BY MR. AXELROD:

Q.   I'm going to hand you what's been marked as 2285.

     Mr. Cooper, do you recognize that document as one of the patents you talked about yesterday?

A.   (Witness examines document.)  Yes, I do.

Q.   And you talked about it, I believe --

     Can we bring up -- Ms. Mahoney, can you bring up Exhibit 108?

     Okay.  So you talked about this patent, and you said that this was in conjunction with the flue pond; right?  And we were talking about -- you were talking about that patents could tell you the diameter of the pipe from this particular patent.

     Do you recall that?

A.   That is correct.

Q.   And what you said is you need to go to the PFD; right?

A.   That is correct.

Q.   What PFD do you go to?

A.   USAPTI PFD.

Q.   Well, okay.  But you need to have a PFD to start with; right?  You couldn't figure out the -- if we go to this email, which is Exhibit 108, that gives a particular surface area for a particular DuPont facility; correct?

A.   That is correct.

Q.   You couldn't figure that out from the USAPTI flow sheet; could you?

1  A.  No, and that's what I'm not -- I did not mean to say that

2  either.

3  Q.  Okay.  And you couldn't determine that specific dimension

4  from that patent, could you?

5  A.  From this patent, no, you cannot.

6  Q.  Okay.  I'd like to show you another patent that you looked

7  at yesterday.

8      **MR. AXELROD:**  Your Honor, may I approach with 2318,

9  which has been admitted?

10      **THE COURT:**  Yes, you may.

11      **MR. AXELROD:**  Thank you.

12  Q.  And, Mr. Cooper, I'm going to hand you Exhibit 2318.  Do

13  you recognize that document?

14  A.  Yes.

15  Q.  And you, in talking about -- I think this is talking about

16  flue pond pipe diameter.  You talked about a particular example

17  from this patent where there was an interior diameter of

18  11.5 inches and then it tapered into 12.25 inches.

19      Do you recall that?

20  A.  That's correct.

21  Q.  Okay.  But that the claim for the patent is between 2 and

22  50 inches; right?

23  A.  I didn't use the claim.

24  Q.  Right.  But the claim is a pretty broad range; right?

25  A.  Oh, absolutely.

**COOPER - CROSS / AXELROD**

1  **Q.**   All right.  And the specific example you used was that

2  11.5 to 12.25 inches; right?

3  **A.**   That is correct.

4  **Q.**   Where has that particular range been used in the real

5  world?

6  **A.**   It has been used in the real world.

7  **Q.**   Where specifically?

8  **A.**   Originally, the Stallingborough flue pond had similar --

9  I've got to be careful now -- similar dimensions.

10  **Q.**   Did it have those exact dimensions?

11  **A.**   I'm not able to state that.

12  **Q.**   Okay.  Anywhere else?  Is there anywhere that you can

13  publicly identify that used those specific dimensions?

14  **A.**   Publicly identify, no.

15  **Q.**   And those aren't the numbers used by DuPont?

16  **A.**   They are quoted by DuPont in an example.

17  **Q.**   Right.  But they're not quoted as what they actually used?

18  **A.**   Today?  Are you being specific about today --

19  **Q.**   Sure.

20  **A.**   -- or earlier on?

21  **Q.**   By the way, why can't you say what the Stallingborough

22  numbers are?

23  **A.**   Because I don't know what it is today.  I didn't check up

24  on it.

25  **Q.**   But you believe it's somewhere between those numbers?

COOPER - CROSS / AXELROD

1   **A.**   Those numbers look somewhat familiar.

2   **Q.**   Okay.  Well, so when you said you were being careful, you

3   were being careful because you didn't want to misstate the

4   figure?

5   **A.**   That is correct.

6   **Q.**   Okay.  Do you believe that that specific figure would be

7   publicly available?

8   **A.**   Not from Stallingborough, no.

9   **Q.**   And it wouldn't be publicly available for any DuPont

10  facilities either that are currently in operation?

11  **A.**   Apart from the patent, you are correct.

12                     (Pause in proceedings.)

13          **MR. AXELROD:**  I want to -- Your Honor, may I approach

14  with Trial Exhibit 3229, which has not been admitted?

15          **THE COURT:**  Yes.

16  **BY MR. AXELROD:**

17  **Q.**   Mr. Cooper, I'm handing you what's been marked as

18  Exhibit 3229.

19  **A.**   Yes, I remember this.

20  **Q.**   Okay.  So -- and I want to -- Ms. Mahoney, could you --

21  could you bring up Exhibit 38?  I think it's page 2.  Yeah.

22  Can you blow that up?

23          Do you see that photograph, Mr. Cooper?

24  **A.**   Yes.  I'm having trouble making out any details, but I see

25  the photograph.

1   **Q.**   Okay.  And the article that you talked about, which is

2   Exhibit 3229, that's about selecting elbows for pneumatic

3   conveyance systems; right?

4   **A.**   That is correct.

5   **Q.**   Okay.  Does that article mention elbows that have been

6   field-tested?

7   **A.**   No, it does not.

8   **Q.**   So it doesn't mention whether they've been field-tested by

9   DuPont?

10  **A.**   Certainly not.

11  **Q.**   And does the article mention $TiO_2$?

12  **A.**   No, it does not.

13  **Q.**   Does it mention DuPont at all?

14  **A.**   No, it does not.

15  **Q.**   And the article doesn't specifically mention elbows in the

16  specific shape depicted in Exhibit 38, does it?

17  **A.**   Specifically, no, it does not.

18  **Q.**   Ms. Mahoney, can you bring up Exhibit 67, please?  And if

19  you could blow up the top email there.

20       And do you recall, Mr. Cooper, you spent some time with

21  Mr. Gasner talking about the particular temperature?  In that

22  first line, it says -- this is an email from Mr. Maegerle

23  (reading):

24            "Walter,

25            "I was somewhat mistaken.  Kuan Yin basic data does

COOPER - CROSS / AXELROD

1    not call for demineralized water" --

2         **THE COURT:**  Slow down.  Slow down.

3         **MR. AXELROD:**  I'm sorry, Your Honor.  And I apologize

4    to the court reporter.

5    **Q.**  (reading):

6         "Walter,

7         "I was somewhat mistaken.  Kuan Yin basic data does

8         not call for demineralized water but does call for a hot

9         water head tank to supply [number] degrees F water to the

10        filters."

11        Do you recall that?

12   **A.**  Yes, I do.

13   **Q.**  Okay.  And there is a particular figure there in degrees

14   Fahrenheit; right?

15   **A.**  Yes, there is.

16   **Q.**  And you know, from reviewing the Basic Data Document, that

17   that specific number in degrees Celsius is found in the Basic

18   Data Document; right?

19   **A.**  That is correct.

20   **Q.**  So it would be fair to say that's what we call a typo?

21   **A.**  I believe so, yes.

22   **Q.**  Okay.  Now, there were a lot of other references in this

23   series of emails that are found in the Basic Data Document;

24   right?

25   **A.**  There are some.  I wouldn't call it a lot, but there are

**COOPER - CROSS / AXELROD**

1   some.

2   **Q.**   Okay.  Well, let me just go down to the next sentence in

3   that email.  It says (reading):

4           "Maximum flow rate was specified at [number] GPN."

5       Do you see that?

6   **A.**   Yes, I do.

7   **Q.**   And that's in the Basic Data Document; right?

8   **A.**   I believe so, yes.

9   **Q.**   And you didn't talk about that with Mr. Gasner, did you?

10  **A.**   No, I did not.

11  **Q.**   And then if you go down --

12      Ms. Mahoney, could you go down to the bottom email there?

13  And if you could blow that up.

14      And, Mr. Cooper, in that third line it says (reading):

15          "Oxygen and nitrogen [number] and [number] metric

16      tons per hour, respectively, with the stipulation that

17      certain things, storage capacity, be provided by certain

18      [number] hours of operation."

19      Do you see that?  Do you see those references?

20  **A.**   Yes, I do.

21  **Q.**   And those specific references were also found in the Basic

22  Data Document; right?

23  **A.**   They appear to overlap with the information in the Basic

24  Data Book, yes.

25  **Q.**   Well, I mean, those specific figures are there, aren't

**COOPER - CROSS / AXELROD**

1    they?

2    **A.**    The 5 and the 2, yes, I found them.

3    **Q.**    Please refrain from the specific numbers.

4    **A.**    I apologize.  The two numbers I believe I found in the

5    Basic Data Document, yes, that's correct.

6    **Q.**    And you didn't talk about those with Mr. Gasner, did you?

7    **A.**    No, I did not.

8        I should point out, I believe for this design, the

9    900 gallons was in error.

10   **Q.**    Ms. Mahoney, could you bring up Exhibit 111?

11       Do you recall talking with Mr. Gasner about these

12   oxidation-area direct-fired heaters?

13   **A.**    Yes, I do.

14   **Q.**    Okay.  And a couple things.  I believe, when you

15   testified, you indicated that the flow rate temperature and

16   pressure are supplied by the technology provider.  Is that

17   right?

18   **A.**    That is correct.

19   **Q.**    Okay.  So in this case the technology provider would be

20   USAPTI; right?

21   **A.**    Correct.

22   **Q.**    And, Ms. Mahoney, could we go to the next page?  And,

23   Ms. Mahoney, could you blow up that top half?

24       So what we're looking at here, Mr. Cooper, is the

25   information that USAPTI had that it was going to be provided;

**COOPER - CROSS / AXELROD**

1   right?

2   **A.**    Correct.

3   **Q.**    And there is a specific design pressure identified.  Do

4   you see that?

5   **A.**    Yes, I do.

6   **Q.**    There's a number, PSIG at a particular temperature?

7   **A.**    Yes, I do.

8   **Q.**    And that specific information is from the Basic Data

9   Document, isn't it?

10  **A.**    It's also what I use.  So the answer is, I believe it

11  overlaps with the Basic Data Book, but it is not unique to the

12  Basic Data Book.

13  **Q.**    Right.  But it's in the Basic Data Book?

14  **A.**    Yes, it is.

15  **Q.**    Okay.  And then if you go down a little bit further, it

16  says, "Maximum tube velocity."  Do you see that?  And there's a

17  particular FPS there?

18  **A.**    Yes, I do.

19  **Q.**    And that's also from the Basic Data Book, isn't it?

20  **A.**    Yes, and it's also from other -- it's a commonly used

21  number.  It's not specific to the Basic Data Book.

22  **Q.**    Right.  The Basic Data Book is a compilation of a whole

23  bunch of information, isn't it?

24  **A.**    Yes, it is.

25  **Q.**    And some of it you can't get anywhere else; right?

1   **A.**   Yes.  This happens to be not one of those.

2   **Q.**   Understood.

3         And if you could go down, Ms. Mahoney, to the bottom half.

4   If you could step back and blow up that bottom half where it

5   says, "Oxygen heater."

6         And, Mr. Cooper, it says there, "Heat certain pounds per

7   hour of a certain percentage oxygen from a particular

8   temperature."

9         Do you see that?

10  **A.**   Yes, I do.

11  **Q.**   And that information is also from the Basic Data Book,

12  isn't it?

13  **A.**   Yes.  And it's available from other sources as well.

14  **Q.**   And that's the information the technology supplier was

15  providing in this case to its vendor?

16  **A.**   That is correct.

17  **Q.**   Ms. Mahoney, can you please bring up Exhibit 112?

18        Mr. Cooper, do you recall talking to Mr. Gasner about the

19  specifications for oxidation bag filters?

20  **A.**   Yes, I do.

21  **Q.**   Okay.  And if you could go to the next page, Ms. Mahoney,

22  to page 2.

23        So this is another example of the information -- the

24  specification coming from the technology supplier, which here

25  was USAPTI?

**COOPER - CROSS / AXELROD**

1   **A.**   Yes.  This is a preliminary specification.

2   **Q.**   Okay.  And on that page, do you see there's a line there

3   that says, "Bag surface should be based on a particular CFM

4   feet squared to bag filter area"?

5   **A.**   Yes, I do.

6   **Q.**   That's from the Basic Data Document as well?

7   **A.**   Yes, and from other sources.  And I should point out,

8   that's not what was used.

9   **Q.**   It was used right here, wasn't it?

10  **A.**   In this document, that is correct.  MikroPul actually

11  modified it when they sent back their quotation.

12  **Q.**   Ms. Mahoney, can you bring up Exhibit 125?

13          **THE COURT:**  After this exhibit, we're going to break.

14          **MR. AXELROD:**  Very well, Your Honor.

15          **THE COURT:**  All right.

16          **MR. AXELROD:**   And, Ms. Mahoney, if you could blow up

17  that -- thank you.

18  **Q.**   Mr. Cooper, do you recall talking with Mr. Gasner about

19  this issue of slurry viscosity?

20  **A.**   Yes, I do.

21  **Q.**   And when you testified, you said you used that last

22  number.  It says, "Estimated viscosity with pump and agitator

23  work input," and then it has a particular number.

24          Do you see that?

25  **A.**   I do.

COOPER - CROSS / AXELROD

1   Q.   Okay.  But there's a whole bunch of other numbers up

2   there; right?

3   A.   Correct.

4   Q.   And they're all found in the Basic Data Document; right?

5   A.   Yes, and from other sources.

6   Q.   Okay.  You also indicated that this information was almost

7   identical to Ashtabula 1?

8   A.   Line 1, yes, that is correct.

9   Q.   Ashtabula Line 1.  So which parts are identical?

10  A.   The pH range.

11  Q.   Okay.

12  A.   I cannot recall, but I know we mentioned dissolved

13  chlorine, the exact range there, 400 grams per liter --

14  Q.   If you could refrain from the specific number, sir.

15  A.   I'm sorry.

16  Q.   Thank you.

17  A.   I take them as well-known numbers.

18       And the relation to dissolved chlorine.

19       The relation to parts per million chlorides is similar to

20  what I'm familiar with from Ashtabula 1.

21       The grams per liter TiO2 is similar to what I'm familiar

22  with Ashtabula 1.

23       The pigment bulk density is a number I typically use

24  myself, and that also came from Ashtabula Plant 1.

25  Q.   Now, are those numbers publicly available?  I mean, could

4017

**COOPER - CROSS / AXELROD**

1  I go out and find them on the Internet?

2  **A.**    The pH range and the average is mentioned in patents.

3  **Q.**    That specific range and that specific average?

4  **A.**    The lower number certainly is, and I believe the average

5  is as well.

6  **Q.**    In what patent?

7  **A.**    One we quoted yesterday.  I'm sorry.  I don't remember the

8  number.

9  **Q.**    Okay.

10  **A.**    The dissolved chlorine, the absolute number, no; but the

11  fact that there is dissolved chlorine, yes.

12     Same comment regarding chlorides:  The absolute number,

13  no; but the fact that there are dissolved chlorides, yes.

14     400 grams per liter -- sorry.  The TiO2 content of the

15  water slurry, that is mentioned in patents.

16     The pigment bulk density.  I don't know whether I've seen

17  it publicly.  It's just a familiar number to me.

18  **Q.**    Have you ever seen this particular collection of numbers

19  in one place publicly available?

20  **A.**    No, I have not.

21         **THE COURT:**  All right.  We're going to break for the

22  day.

23     You may step down and be excused.

24         **THE WITNESS:**  Thank you, Your Honor.

25         **THE COURT:**  You can leave the courtroom if you wish.

1          (Pause in proceedings.)

2          **THE COURT:**  All right.  So just as soon as we close

3    the door, I'll give you your instruction for the evening.

4          All right.  The door is closed and locked.

5          So I'm going to remind you again of your conduct as

6    jurors.  It becomes more important every evening because you're

7    getting more and more information and more and more time and

8    effort is invested in the case.  So the stakes, for purposes of

9    keeping this conduct, is very, very important, or obeying this

10   instruction.

11         So, first, keep an open mind throughout the trial and do

12   not decide what the verdict should be until you and your fellow

13   jurors have completed your deliberations at the end of the

14   case.

15         Second, because you must decide this case based only on

16   the evidence received in the case and on my instructions as to

17   the law that applies, you must not be exposed to any other

18   information about the case or to the issues it involves during

19   the course of your jury duty.

20         Thus, until end of the case or unless I tell you

21   otherwise, do not communicate with anyone in any way and do not

22   let anyone else communicate with you in any way about the

23   merits of the case or anything to do with it.  This includes

24   discussing the case in person, by phone, Smartphone, or

25   electronic means, via email, text messaging, or in or on any

1    Internet chat room, blog, website, including such social

2    networking media like Facebook, Myspace, LinkedIn, YouTube, and

3    Twitter, or other feature.

4        This applies to communicating with your fellow jurors

5    until I give you the case for deliberation; and it applies to

6    communicating with everyone else, including your family

7    members, your employer, the media or press, and the people

8    involved in the trial, although you may notify your family and

9    your employer that you have been seated as a juror in the case.

10       But if you're asked or approached in any way about your

11   jury service or anything about this case, you must respond that

12   you have been ordered not to discuss the matter and to report

13   the contact to the Court.

14       Because you will receive all the evidence and legal

15   instruction you properly may consider to return a verdict, do

16   not read, watch, or listen to any news or media accounts or

17   commentary about the case or anything to do with it.  Do not do

18   any research, such as consulting dictionaries, searching the

19   Internet, or using other reference materials; and do not make

20   any investigation or in any other way try to learn about the

21   case on your own.

22       The law requires these restrictions to ensure the parties

23   have a fair trial based on the same evidence that each party

24   has had an opportunity to address.

25       A juror who violates these restrictions jeopardizes the

 1    fairness of these proceedings, and a mistrial could result that

 2    would require the entire trial process to start over.

 3         If any juror is exposed to any outside information, please

 4    notify the Court immediately.

 5         Just to update you on the schedule.  It's highly likely

 6    that we will complete the presentation of evidence tomorrow, in

 7    which case we will begin closing arguments on Tuesday after the

 8    long weekend, and then the case will be yours sometime next

 9    week, and then the schedule will be yours.  And we'll talk more

10    about the schedule of deliberation.

11         So with that said, thank you for your attention.  We'll

12    see you tomorrow morning, and have a wonderful evening.

13         (Proceedings were heard out of the presence of the jury:)

14         **THE COURT:**  All right.  The jury has left the

15    courtroom.

16         Let's get some estimates, Mr. Axelrod.

17         **MR. AXELROD:**  I'm guessing about an hour and a half,

18    Your Honor.

19         **THE COURT:**  Okay.  And I assume there will be some

20    redirect?

21         **MR. GASNER:**  A little.

22         **THE COURT:**  Okay.

23         **MR. GASNER:**  Not much, though, so far.

24         **THE COURT:**  Okay.  Are you going to have questions for

25    this witness?

1           **MR. FROELICH:**  Your Honor, I won't have more than five

2    or ten questions.

3           **THE COURT:**  Okay.  Great.  Good.  Okay.  Not good,

4    but --

5           **MR. FROELICH:**  I understand.

6           **THE COURT:**  -- I'm just acknowledging what you're

7    saying.

8       So I'm thinking a couple of hours tomorrow.

9       And then you have your paralegal, Ms. Agnolucci?

10          **MS. AGNOLUCCI:**  Yes, Your Honor.

11          **THE COURT:**  And how long would you anticipate she'll

12   be on?

13          **MS. AGNOLUCCI:**  It's not going to be very long.  I

14   would guess an hour and a half.  It could be shorter.

15          **THE COURT:**  All right.

16          **MR. HEMANN:**  And, Your Honor, I've looked at the

17   documents that Ms. Agnolucci identified.  There's five of them,

18   and I think that, given the Court's ruling, we'll move through

19   the admission of those documents pretty quickly.

20          **THE COURT:**  Okay.  Good.

21      So it may well be -- and do you anticipate at this point

22   any rebuttal case?

23          **MR. AXELROD:**  I do, but I think we need -- it would be

24   very brief, and I need to see where we end up.  But I do

25   anticipate a rebuttal case.

PROCEEDINGS

```
 1        THE COURT:  Okay.  Well, then I guess we're back to

 2   sort of playing it by ear.

 3      Yes.  You were going to say something?

 4        MR. AXELROD:  Well, depending on how the rest of

 5   tomorrow goes, it may be something that can be resolved

 6   tomorrow.  I mean, that would be my hope.

 7        THE COURT:  All right.  Well, it's got to be -- I

 8   would want it to be more than hope that we would complete the

 9   case tomorrow, because I don't think there's any reason to draw

10   it out any longer.  But we'll see what happens.

11      So depending upon when we conclude tomorrow with the

12   presentation of evidence will determine whether there's going

13   to be time tomorrow to at least begin talking about the jury

14   instructions and having our charging conference.

15      As a default, you know, we'll go into Friday, probably

16   Friday morning early, because it's a holiday and it would be

17   great if everybody can get -- you know, leave or do whatever

18   they need to do to prepare for next week.

19      So my current plan is to either begin or complete the

20   charging conference, if necessary, on Friday morning.

21      Now, I was kind of looking at the numbers that you all

22   estimated for closing argument, and I don't see how there's any

23   possible way that we could do all of the closing arguments and

24   the jury instructions in one day.  I mean, it would be -- I

25   mean, we could do it, but we'd go until about 4:00 o'clock, and
```

1    I think the jury would be -- have saucer eyes by that time.

2         So my proposal is what I said before, which is to do the

3    instruction, have the Government do their initial closing,

4    have -- I assume Mr. Liew and USAPTI will do their closing; and

5    then reserve Mr. Froelich and the rebuttal for the following

6    day, because it's going to take -- even doing what I just said,

7    it's going to take most of Tuesday, I think.

8         So unless you all can figure out some other configuration,

9    it's going to have to go over two days, and I can't think of

10   any other way to split this up that would not disadvantage

11   anybody else.

12        In fact, you know, if there's any, you know, words of

13   wisdom that Ms. Agnolucci and Mr. Gasner wanted to pass on to

14   Mr. Froelich to rebut something, they'd have that opportunity

15   to do that and make sure that that's covered.

16        So is that -- do you have any strong objection to that,

17   Mr. Gasner?

18        **MR. GASNER:**  Moderately strong, Your Honor.  I guess I

19   do believe in the mythology of primacy and last.  I would

20   rather have the Defense case and the Government rebuttal on the

21   same day, just because I think it really gives the Government

22   an advantage to listen to my entire closing, have overnight,

23   and then, you know, come in with guns blazing for an unlimited

24   amount of time.  I do think that's unfair.

25        **THE COURT:**  But how are we going to do that?  I mean,

1    it would mean -- if you run the numbers and just taking

2    estimates that you all, you know, gave, it came out to -- it

3    came out to about six hours -- six hours -- seven hours with

4    the instruction and everything.  So a seven-hour day.

5        I mean, I assume if we started -- even if we did sort of

6    the normal, you know, traditional day of something like 9:00 to

7    4:00, assuming the jury could do that, I'm not sure that we'd

8    get it all in.

9        I mean, it's to be determined, but I wouldn't say that the

10   Eighth Amendment applies to juries as far as cruel and unusual

11   punishment, but there is -- there's an element of -- and for

12   both -- and I'm saying it somewhat facetiously, but just in

13   terms of the ability to absorb it all is going to be difficult

14   and may just take away from the effectiveness.

15       So think about it.  And, again, I'm going to make the

16   final call, I think -- I don't think; I know it's

17   discretionary, but I do -- if we went a traditional day, it

18   would take seven hours.  That would -- we'd have to give the

19   jury at least 45 minutes for -- you know, for a lunch break or

20   something with a couple of shorter breaks.  That's getting

21   pretty -- you know, we'd be going to close to 5:00 o'clock.

22       And I'm just not sure that that's necessary or

23   appropriate, balancing it against what I think is the urban

24   myth.  Given the length of this trial, I don't think that the

25   verdict's going to be based on the closing arguments, as good

 1    as all of you, I'm sure, you will be.

 2         So I'm not going to take a position on it right now.

 3    Let's think about it.  Let's do a reality check.  If you have

 4    different -- and I was just taking the numbers that you all

 5    estimated.  So -- and I gave that -- you know, the fullest -- I

 6    just accepted those numbers and came up with this roughly seven

 7    hours of activity that we had to do, including breaks, the

 8    instruction, and all of your arguments.

 9         So, again, I'll think about it.  Maybe we'll ask the jury

10    about what their preference is.  I mean, I won't say, "Do you

11    want to hear eight hours of lawyers on one day or not?"  That's

12    not a very good choice.  But we'll figure out a way to pose it

13    to the jury.

14         So let's think about it, and I'm open, but I was just

15    running the numbers and thinking how -- I don't want you all to

16    have to rush.  I certainly don't want to rush through the

17    instructions.

18         And, so, I don't want -- I mean, especially in fairness to

19    the Government, who goes last, if they had to start at, let's

20    say, 4:00 o'clock and the jury has been at it for six hours, if

21    there's a level of unfairness there.

22         So we'll see.  We'll talk about it.  But my initial

23    thought is to split it up.  That's the way I've done it before,

24    and I don't think any issue that you're concerned about would

25    not be sufficiently mitigated, but I'm keeping an open mind.

 1          So keep your schedules open for -- I mean, tomorrow we

 2    won't go beyond 1:30 because I have a criminal calendar, and

 3    Friday, just plan on 8:00 o'clock just on your calendars.  And

 4    if we don't need it, we don't need it.

 5          I'm assuming that, not having seen your objections or

 6    reactions to the Court's proposed jury instructions, that the

 7    way I conduct these is, the parties have already briefed the

 8    issue; unless they have some new argument or new case or

 9    something or the Court reconsiders, I'm not going to have

10    arguments on every open jury instruction.

11          If I have specific questions, I'll ask them.  And then,

12    you know, you'll have your objections and requests, and they'll

13    be in the record, and we'll move on from there.

14          So I don't anticipate -- my charging conferences, except

15    in patent cases where we make it up as we go along because of

16    the claim construction, I don't anticipate taking that long.

17          Did you want to say something?

18          **MR. GASNER:**  Yes, Your Honor, just briefly.

19    Mr. Hemann, just on my way up to the podium, mentioned an idea

20    that I just want to throw out for the Court, and I may not have

21    it entirely correct.

22          But if, indeed, we don't have a lot of redirect tomorrow

23    and the examination of Ms. Hernandez goes relatively quickly

24    and the Court is going to have a short charging conference, it

25    may be possible to do the actual charging of the jury

**PROCEEDINGS**

```
 1   conceivably tomorrow or Friday.

 2          THE COURT:  I wouldn't do it Friday because they gave

 3   us their vote at the beginning no Fridays.

 4          MR. GASNER:  That's true.  That's true.

 5          THE COURT:  So it's a possibility.  There are

 6   logistical issues.  You know, it's not -- I've used the term

 7   before, immaculate conception, where I decide an instruction

 8   and it magically appears on the juror's desk.  It needs to be

 9   checked, it needs proofread by everybody and then copied,

10   because that's where a lot of errors get committed when you do

11   things fast.

12       So it's something to consider, and that would save us 45

13   minutes or an hour or whatever it is.  And I'm certainly

14   willing to consider that, although I think it's pretty

15   ambitious, and I don't want to rush through the charging

16   conference.

17       So let's let events unfold, and we'll see -- I understand

18   all the options.

19       Yes, Mr. Froelich?

20          MR. FROELICH:  Your Honor, two things.

21          THE COURT:  Did your office thaw out yet?

22          MR. FROELICH:  Yes.  My understanding is our

23   electricity -- power has come back, and Your Honor should have

24   it within -- I've got to check it when I leave here, but

25   Your Honor should have it.
```

PROCEEDINGS

```
 1        The other thing is, I know it may just be a formality, but
 2   I would renew my Rule 29s at the end of --
 3        THE COURT:  You should.  Everybody should do that,
 4   yes.
 5        MR. FROELICH:  -- end of the case.  So that won't take
 6   long, but I just wanted to --
 7        THE COURT:  No.  We have to reserve time.  And if I
 8   forget, which I sometimes do, just stand up and interrupt me
 9   whatever I'm doing.
10        MR. HEMANN:  And then Mr. Froelich -- there was some
11   discussion about voir diring the defendants with regard to
12   their decisions not to testify.  That's on the agenda as well.
13        THE COURT:  Yeah.  I understood from Mr. Gasner --
14   maybe I'm remembering wrong -- that he didn't think -- he
15   wasn't asking for it or didn't think it was appropriate with
16   respect to Mr. Liew.
17        MR. GASNER:  That's true.  But if the Court is going
18   to do it for Mr. Maegerle, then I think it would be prudent
19   just to have Mr. Liew go through that process as well.
20        THE COURT:  All right.  I can do them both at the same
21   time, actually.
22        MR. FROELICH:  Actually, it's only two or three
23   questions.
24        THE COURT:  Yeah.  Maybe more than that.  But, anyway.
25        All right.  And since you've already gone over it with
```

**PROCEEDINGS**

1   him, it should be pretty pro forma.

2       But, in any event, actually, I had a case where a

3   defendant said he wanted to testify after his lawyer said he

4   didn't.  We had to take a break at that point.  And he didn't

5   wind up testifying, but it's an interesting issue, because

6   they're now a Ninth Circuit case in certain circumstances,

7   which may be expanded at some point, that if a defendant wants

8   to testify, they have the absolute right to do that, and a

9   lawyer can't overrule them.  But that's in competency hearings.

10  So the Ninth Circuit has yet to speak on that.

11      **MR. FROELICH:**  The Fifth, Your Honor, is very strong

12  on you have to -- you know, you have to ask.

13      **THE COURT:**  Interesting.  In our state court it's

14  common, too, and I think it's a good practice.

15      **MR. FROELICH:**  Off the record, I thought of a way,

16  Your Honor, to -- we can shorten it a lot by just not allowing

17  the Government to have rebuttal.

18      **THE COURT:**  There are other ways we can shorten it,

19  too, which you probably wouldn't find very helpful either.

20      All right.  We'll see you tomorrow.  Thanks.

21      **MR. HEMANN:**  Thank you, Your Honor.

22      **MR. FROELICH:**  Thank you, Your Honor.

23              (Proceedings adjourned at 1:35 p.m.)

24                   ---oOo---

25

**CERTIFICATE OF REPORTER**

     I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Wednesday, February 12, 2014

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter