Volume 21

Pages 4030 - 4238

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jeffrey S. White, Judge

UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )
                                )
  VS.                           )       NO. CR 11-00573 JSW
                                )
WALTER LIEW; ROBERT MAEGERLE;   )
and USA PERFORMANCE TECHNOLOGY, )
INC.,                           )
                                )
          Defendants.           )
_____)
                                San Francisco, California
                                Thursday, February 13, 2014

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

        MELINDA HAAG
        United States Attorney
        450 Golden Gate Avenue
        San Francisco, California  94102
    BY:  **PETE AXELROD**
        **JOHN H. HEMANN**
        **ASSISTANT UNITED STATES ATTORNEYS**

        U.S. DEPARTMENT OF JUSTICE
        600 E Street NW
        Washington, D.C.  20044
    BY:  **RICHARD S. SCOTT**
        **ASSISTANT U.S. ATTORNEY**


      **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by: Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
          Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
          Official Reporters

```
 1   APPEARANCES:   (CONTINUED)

 2   For Defendant Walter Liew and USA Performance Technology, Inc.:
                            KEKER & VAN NEST LLP
 3                          633 Battery Street
                            San Francisco, California   94111
 4                     BY:  STUART L. GASNER
                            SIMONA A. AGNOLUCCI
 5                          KATHERINE M. LOVETT
                            CHRISTINA BLAIS
 6                          ATTORNEYS AT LAW

 7   For Defendant Robert J. Maegerle:
                            MCKENNEY & FROELICH
 8                          1349 West Peachtree Street
                            Two Midtown Plaza - Suite 1250
 9                          Atlanta, Georgia  30309
                       BY:  JEROME J. FROELICH, JR.
10                          ATTORNEY AT LAW

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4032

```
1                    I N D E X

2   Thursday, February 13, 2014

3   GOVERNMENT'S WITNESSES              PAGE  VOL.

4   LIVINGSTON III, SAMUEL HILARY (IN REBUTTAL)
    Direct Examination by Mr. Axelrod        4184  21
5   Cross-Examination by Mr. Gasner          4191  21
    Cross-Examination by Mr. Froelich        4199  21
6   Redirect Examination by Mr. Axelrod      4201  21

7   DEFENDANTS' WITNESSES              PAGE  VOL.

8   COOPER, PAUL ANTHONY (RECALLED)
    (PREVIOUSLY SWORN)                       4046  21
9   Cross-Examination resumed by Mr. Axelrod 4046  21
    Cross-Examination by Mr. Froelich        4113  21
10  Redirect Examination by Mr. Gasner       4116  21

11  HERNANDEZ, CYNTHIA
    (SWORN)                                  4125  21
12  Direct Examination by Ms. Agnolucci      4126  21
    Cross-Examination by Mr. Hemann          4155  21
13  Redirect Examination by Ms. Agnolucci    4160  21

14  LIEW, WALTER LIAN-HEEN (OUT OF PRESENCE OF JURY)
    (SWORN)                                  4171  21
15  Examination by The Court                 4172  21

16  MAEGERLE, ROBERT (OUT OF PRESENCE OF JURY)
    (SWORN)                                  4174  21
17  Examination by The Court                 4174  21
    (SWORN)                                  4184  21

18                  E X H I B I T S

19  TRIAL EXHIBITS              IDEN  EVID  VOL.

20    943                             4068  21

21    946                             4073  21

22    949                             4079  21

23    950                             4082  21

24

25
```

# I N D E X

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 951 | | 4084 | 21 |
| 1014 | | 4154 | 21 |
| 1015 | | 4154 | 21 |
| 1016 | | 4155 | 21 |
| 1130 | | 4128 | 21 |
| 1131 | | 4143 | 21 |
| 1132 | | 4150 | 21 |
| 1133 | | 4153 | 21 |

```
 1   Thursday - February 13, 2014                        7:56 a.m.

 2                        P R O C E E D I N G S

 3                            ---000---

 4        (Proceedings were heard out of the presence of the jury:)

 5        THE COURT:  Good morning.  Please be seated.

 6   And call the case, Ms. Ottolini.

 7        THE CLERK:  Calling Case Number CR-11-573,

 8   United States versus Walter Liew, United States versus Robert

 9   Maegerle, and United States versus USAPTI.

10        Counsel, please state your appearances.

11        MR. HEMANN:  Good morning, Your Honor.  John Hemann,

12   Pete Axelrod, and Richard Scott for the United States.

13        THE COURT:  Good morning.

14        MS. AGNOLUCCI:  Good morning, Your Honor.  Simone

15   Agnolucci, Stuart Gasner, and Katie Lovett for defendants

16   Walter Liew and USAPTI; and Mr. Liew is here with us today.

17        THE COURT:  Good morning.  Good morning, everybody.

18        MR. GASNER:  Good morning, Your Honor.

19        MR. FROELICH:  Good morning, Your Honor.  Jerry

20   Froelich for Mr. Maegerle.  Mr. Maegerle is standing next to

21   me.

22        THE COURT:  Good morning, everybody.

23        DEFENDANT MAEGERLE:  Good morning.

24        THE COURT:  All right.  You may be seated, everybody.

25   So I understand there's a couple of issues before we bring
```

1   the jury in.

2          MR. HEMANN:  Well, sort of one issue and one, I think,

3   piece of good news.

4       I think we're in good shape on the notebooks that we had

5   discussed with counsel and the Court yesterday.  The

6   Government's looked at them; and given the Court's indication

7   regarding the ruling, I think we're fine with the notebooks

8   coming in.

9       And our suggestion, given that the witness, the paralegal

10  from Keker, doesn't have sort of personal knowledge of these,

11  that they be offered through her; and she can testify as to how

12  Keker came to have them and the location, and items like that,

13  nothing really as to the substance, and then we're fine as to

14  them coming in.

15      There's some personal information, personal to Mr. Liew,

16  unrelated, and Mrs. Liew, unrelated to the merits of the case

17  that we think that should probably be redacted, and I think

18  counsel agrees with that.  But that's -- so that's one thing.

19      There are a couple of documents that counsel wishes to

20  offer through the witness that the Government believes are

21  hearsay.  I'd like to hand them up to the Court.  It's

22  Exhibits 1014 and 1016, and I don't believe that there's a

23  foundation to overcome the hearsay objection as to these

24  documents.

25      They both -- the first one, 1014, appears to be notes

PROCEEDINGS

 1   taken by -- taken on a computer.  The metadata says "Walter

 2   Liew"; but, as the Court knows, that doesn't mean that Walter

 3   Liew actually wrote them.  They appear to relate to the Chengde

 4   project in 1997 slash '98.  We believe that they're hearsay and

 5   there's not an exception that proves that.  Because it's the

 6   Chengde project, the relevance is, obviously, very low in

 7   addition.

 8       The second document appears to be notes about how one

 9   might go about pursuing or looking into a chemical project.  We

10   don't know anything about that document other than it was

11   located on one of the computer devices.

12       That document does not appear on its face to relate to

13   TiO2 specifically.  We don't have any evidence as to who the

14   author of that document is, when it was written, who it was

15   written by, et cetera.

16       And for the same reason -- as to the second document, we

17   have both a relevance and a hearsay objection; as to the first

18   document, we do as well.

19           **THE COURT:**  Ms. Agnolucci?

20           **MS. AGNOLUCCI:**  Yes, Your Honor.

21       I would first respond on the issue of the notebooks or

22   binders, if you will.  We appreciate Mr. Hemann's flexibility

23   in terms of admitting the entire notebook.  We had initially

24   planned to go through and only seek to admit certain pages, but

25   this will certainly speed up the examination of Ms. Hernandez.

**PROCEEDINGS**

1      We do intend to have her read some of the patent numbers

2  from the pages of the binders, but she won't be giving any

3  substantive testimony other than that regarding the binders.

4      As for the documents that Mr. Hemann refers to, I have the

5  metadata here for Exhibit 1014.  I'd like to hand it up to the

6  Court.  It's marked as Exhibit 1015, and that's something that

7  we would seek to introduce along with Exhibit 1014.

8      The metadata indicates that it was -- that the document

9  was written by Mr. Liew and that it was written by Mr. Liew in

10  1997.  At that time he was exploring titanium dioxide projects,

11  and we think this document is critical to his state of mind

12  because it refers on the second page to researching DuPont

13  patents; and specifically in item 10 says:  (reading)

14          "The oxidizer reactor design will be as per DuPont

15      patents."

16          **THE COURT:**  All right.  Go ahead.

17          **MS. AGNOLUCCI:**  And it's clearly authenticated by the

18  metadata, which Your Honor has considered in the past in

19  admitting, for example, the Pangang memos where there was no

20  sponsoring witness, and clearly highly relevant and probative

21  of Mr. Liew's state of mind.

22          **MR. HEMANN:**  Well, again, the difference is that --

23  the rule is different as to who's offering -- the offering

24  party.

25      This is a document -- as Ms. Agnolucci indicates, this is

1    a document that is being offered to prove a fact believed by

2    Mr. Liew at the time, which is that the oxidation reactor --

3    which was never done for this project, by the way.  There was

4    never a design of this project because the project didn't go

5    forward.  But it was -- it's being offered to prove a fact

6    believed by Mr. Liew.

7        That is outside the scope of -- it's specifically outside

8    the scope of the mental-state exception in 803(3).  And, again,

9    without the testimony of a person with knowledge, we believe

10   that it's misleading.

11       The Defense expert has testified that there are portions

12   of the oxidation reactor --

13       **THE COURT:**  I'm going to interrupt you.

14       Mr. Cooper, your ears may be burning, but I think when it

15   mentions you, it's probably -- it's protocol for you to leave.

16   Thank you very much, sir.

17       **MR. HEMANN:**  Thank you, Your Honor.  I apologize for

18   not noticing that.

19       **THE COURT:**  That's okay.  Well, I did notice it, but

20   we weren't talking about him.  So once you mentioned his

21   name....

22       **MR. HEMANN:**  And I only just wanted to say,

23   Your Honor, I don't want to belabor the point, that the Defense

24   expert has testified that portions of the oxidation reactor

25   cannot be designed off of patents.  In fact, the Defense expert

1   testified yesterday that he does not design any part of a TiO2

2   plant off of patents.

3       And, so, again, I believe that it's misleading, and it's

4   particularly misleading without our ability to cross-examine on

5   this, what the Defense contends, is a very important fact.

6       **THE COURT:**  Well, I'm going to overrule the objection.

7   Having now been steeped very deeply in the instructions and the

8   law having to do with the case -- you know, I understand that

9   the defendants have a defense, a good faith defense, with

10  respect to some of the counts; and how that is phrased to the

11  jury, we'll be discussing at another time.

12      But I think this is certainly relevant to that defense

13  because -- you know, it's certainly debatable.  There's been a

14  lot of debate in the trial with the experts, if at all, about

15  the extent to which, if at all, the patents reveal what

16  otherwise might be public knowledge and render what might have

17  been a trade secret to not be a trade secret.

18      The issue, however, is that, to the extent that this

19  entire document is being offered, Exhibit 1014, I don't see

20  where all of this has to come in without a witness testifying

21  to it, what its significance is.

22      If we need, you know, the metadata and the issue about --

23  or the statement about researching patents, that may be, you

24  know, relevant.  But all this other stuff, without a witness,

25  without an expert or somebody, to talk about what does this

1    mean, it just -- I don't think there's a basis in the record

2    from what the expert said, all the experts and all the

3    testimony, to really link up all of this document.

4         So I would be interested in your position in light of

5    what's the Court's inclination to give the defendant the

6    opportunity to present their defenses, but not just throw in

7    all this stuff.  There's a lot of stuff already; but this

8    particular -- since we're arguing about this document, I think

9    to some extent both sides have a point.

10        So what's your response to that?

11            MS. AGNOLUCCI:  Well, Your Honor, I would say that,

12   first of all, I don't see anything on the face of the document

13   that says that it refers to the Chengde project.

14        Second of all, the Government has made an assertion that

15   Mr. Liew's collections of patents were litigation-inspired

16   maneuvers.

17        Now, what we're going to do is put in these binders, which

18   clearly date back to 1996 and 1997.  They have documents

19   printed from the late '90s in them, and they also have a bunch

20   of microfiche in them.  That shows Mr. Liew going to the

21   library and researching patents.

22        Both Exhibit 1014 and 1016 support that story, and

23   specifically 1016 talks about going to the Oakland Public

24   Library and the Sunnyvale Patent Library and conducting patent

25   searches.

**PROCEEDINGS**

1          And, you know, as we've said, and as Mr. Gasner said --

2          **THE COURT:**  Well, I don't have as much of a problem

3    with 1016, quite frankly, and I think it's -- to the extent

4    that this is found in the files of the defendant, it may well

5    go to support his defense and the company's defense with

6    respect -- you know, of good faith and what he did or didn't do

7    and what he knew and didn't know.  So I would allow that in.

8          But I'm less inclined to let in, as I look at it, 1014

9    because there's no testimony about it at all.  And this

10   wouldn't even be -- I don't even understand -- I can't even

11   imagine what a fair inference or argument would be from these

12   documents.

13         Yes, it mentions some things that we've heard a lot about,

14   you know, in terms -- you know, chlorine, chlorinators; but a

15   lot of it is just a lot of chemical stuff.

16         Now, of course, it cuts both ways because, you know, item

17   number 10 on page 2 says:  (reading)

18              "The oxidizer rector design," I don't know if that

19         means "reactor," but "rector design," it probably means

20         "reactor," "will be as per DuPont patents as shown in

21         attached sketches."

22         But how does, in terms of -- I'll go back to sort of 901,

23   authenticity.  How does this prove what you offer it to prove

24   when there's no way of knowing what, whoever wrote this, let's

25   say it's Mr. Liew, is talking about, what projects, much less

**PROCEEDINGS**

1    the specific one that we're dealing with here?

2         MS. AGNOLUCCI:  It goes to his state of mind that

3    there are DuPont patents out there that discuss the oxidation

4    reactor.  That goes to his reasonable belief about whether

5    something is a trade secret, which is --

6         THE COURT:  Well, I would admit 10, for whatever it's

7    worth.

8         MS. AGNOLUCCI:  And we're happy with that, and we're

9    happy with a limiting instruction as well, Your Honor.

10        THE COURT:  All right.  My ruling is going to be the

11   heading of the document will come in and paragraph 10 will come

12   in and nothing else, and I will give an instruction on redacted

13   documents.

14        MR. HEMANN:  Actually, Your Honor, the Government's

15   preference would be that if that's the Court's ruling, that the

16   whole document come in.

17        THE COURT:  Okay.  Do you object?  I assume --

18        MS. AGNOLUCCI:  No objection, Your Honor.

19        MR. HEMANN:  And then I, actually, Your Honor, have a

20   stronger objection to 1016 because it doesn't mention titanium

21   dioxide at all, and Mr. Liew was involved -- or date at all;

22   and Mr. Liew, the testimony and the evidence has been, was

23   involved in numerous other projects during his time at

24   LH Performance slash Performance Group.

25        And, so, 1016 seems to lack more -- be more lacking in

**PROCEEDINGS**

1  authenticity than 1014 because it is completely untethered

2  without any supporting testimony to any project.  There's no

3  metadata for that document.  It comes from a computer that all

4  manner of people may or may not have had access to.

5          THE COURT:  All right.  I understand.

6      Is there metadata for this document?

7          MS. AGNOLUCCI:  The metadata is what the Government

8  provided us with at the top, which shows that it was seized

9  from a hard drive in Orinda in Mr. Liew's house.

10         MR. HEMANN:  That's not metadata, Your Honor.  That's

11  a file path.

12         MS. AGNOLUCCI:  Well, that's what has been provided to

13  us.

14         THE COURT:  All right.  Well, I will admit this

15  document.  I think it's reasonable.  To the extent that

16  Mr. Liew had a custom and habit of searching public sources,

17  there may be some relevance there.  What Defense can say about

18  it reasonably, I'm not sure, but I think that's what closing

19  arguments and objections to closing arguments are made of.  If

20  I don't feel it's a fair inference, I'll sustain an objection.

21         MR. HEMANN:  And then, Your Honor, the Government's

22  request with both of these documents is that the Court admit

23  them subject to our objection, but admit them and ask the

24  Defense to offer them, but not show them or go through them

25  with the witness because I think it gives the witness -- it

PROCEEDINGS

1   gives the document some -- the witness can't testify nothing

2   about these documents, and --

3          THE COURT:  I agree.  If these were not part of the

4   Keker production, I don't think the witness should testify

5   about these.  You can read them during closing argument.  I'm

6   going to let them in with a limiting instruction, by the way,

7   that goes only to state of mind of the defendant.

8          MS. AGNOLUCCI:  Your Honor, I mean -- sorry.  I don't

9   mean to interrupt.

10         THE COURT:  Yes.

11         MS. AGNOLUCCI:  This is exactly what Special Agent Ho

12  did, and the reason that we called Ms. Hernandez was to obviate

13  the need to also call Special Agent Ho.

14         THE COURT:  Well, I understand that, but this is sort

15  of a very technical housekeeping point.  Why do you need her to

16  read this document?

17         The other ones I understand because, in a sense, she's

18  authenticating them that they came from the law firm's files,

19  you know, and contemporaneously and chain of custody.  But

20  these documents are not of the same ilk; and I don't know what

21  prejudice there is if -- to the extent when you do your closing

22  argument you want to point to these, you can do it.

23         I just need -- in terms of -- the Court has the discretion

24  in the way it manages the trial to allow documents to be

25  published or not published.  These are two that I would not

PROCEEDINGS

```
1    agree to publish at this point.

2         So you have them in.  I'll give the limiting instruction.

3    You can use them during closing, but I'm not going to have -- I

4    don't think it's necessary and I don't think it's a good use of

5    time, so I'm not going to allow the witness to go into these

6    documents.  We'll just offer them before the jury.

7         All right.  Anything else?

8              MR. HEMANN:  No, Your Honor.

9              THE COURT:  All right.

10             MR. HEMANN:  Thank you.

11             MS. AGNOLUCCI:  Thank you, Your Honor.

12             THE COURT:  Okay.  Let me give these back.

13        And let's get the jury.  And then we'll see how the time

14   goes, and we'll talk about schedule.

15        Somebody can get Mr. Cooper.  Thank you.

16        (Proceedings were heard in the presence of the jury:)

17             THE COURT:  All right.  Please be seated.

18        Good morning, everybody.  I hope you got your caffeinated

19   coffee this morning, and you're wide awake with or without it.

20        And we are continuing with -- we're in the Defense case,

21   defendants Mr. Liew and USAPTI, and we are in cross-examination

22   the Defense expert, Mr. Cooper; and the Government is

23   continuing that.

24        And please continue.

25
```

COOPER - CROSS / AXELROD

```
1              PAUL ANTHONY COOPER,
2  called as a witness for the Defendants, having been previously
3  duly sworn, testified further as follows:
4          MR. AXELROD:  Thank you, Your Honor.
5              CROSS-EXAMINATION   (resumed)
6  BY MR. AXELROD:
7  Q.  Mr. Cooper, good morning.
8  A.  Good morning.
9  Q.  I'd like to clarify something from yesterday regarding
10 stack tip velocity.  We talked about that.  And the email was
11 Exhibit 91.
12      Ms. Mahoney, if you could bring that up.  Thank you.  If
13 you could blow that up just to sort of orient us.  Thank you.
14      Mr. Cooper, do you recall this conversation we were having
15 about the velocity of the tip of the stack?
16 A.  Yes, I do.
17 Q.  And you had -- we looked at an OSHA document together that
18 you had reviewed previously.  Do you recall that?
19 A.  Yes.
20 Q.  Okay.  And the stack, a lab stack, which is what the OSHA
21 document was about, that's like a 4- or 5-foot stack; right?
22 A.  Not necessarily.
23 Q.  Well, typically, it's a pretty small stack; isn't it?
24 A.  It has to clear the laboratory building.  Sometimes it's
25 taller than that.
```

COOPER - CROSS / AXELROD

1  Q.   But a stack from a TiO2 facility is, like, a hundred feet?

2  A.   That is correct.

3  Q.   Okay.  So we're talking about two very different things?

4  A.   The design criteria is still the same.

5  Q.   Well, that's -- I'm glad you mentioned that, because

6  that's what I want to clarify.

7       The number in the email about the velocity at the stack

8  tip is about dispersion out of the stack; right?

9  A.   That is correct.

10  Q.   Okay.  And, so, yesterday, and it may be that we just got

11  crossed up, but I thought you said that you design a stack for

12  a 60- to a 100-mile-per-hour wind?

13  A.   No.  What I said was I design my plants for 60- to

14  100-mile-an-hour winds.

15  Q.   So that is -- but that's not for the dispersion out of the

16  top of the stack?

17  A.   That is also used for dispersion out of the top of the

18  stack.

19  Q.   Okay.  So what you're saying is you design the tip of the

20  stack for dispersion of a 60- to 100-mile-an-hour wind?

21  A.   At the maximum, yes, that's correct.

22  Q.   Right.  But this is about dispersion when there's no wind;

23  right?  Because that's the concern you have with a TiO2

24  facility; isn't it?

25  A.   That's not what the email says.

4048

COOPER - CROSS / AXELROD

1    Q.    Okay.  But I'm asking you more generally about the stack

2    tip and the particular velocity you need.  The concern in TiO2

3    is, if there's no wind and you have these chemicals coming out

4    of the top of the stack, that it is properly dispersed; right?

5    A.    That is not always the case.

6    Q.    But that may not be always the case, but that's typically

7    what the issue is, the velocity, the tip of the stack?

8    A.    If I may give an example.  In the Australian plant we were

9    discussing yesterday, there was some quite large hills not very

10   far away from the plant, and you did not want high winds to

11   turn the stack over so it would hit these high hills.

12        So there is one end of the scale of velocities.  Then you

13   are quite right, there is a second end of the scale, which is

14   low velocities where there is no wind; but you do the design

15   based on the same thing.

16   Q.    Okay.  Okay.  Let's move on.

17        Ms. Mahoney, can you pull up Exhibit 125?

18        Do you recall, Mr. Cooper, we talked about this email

19   about slurry viscosity?

20   A.    (Witness examines document.)

21   Q.    And if we could blow -- thank you, Ms. Mahoney.

22   A.    Yes, I do.

23   Q.    Okay.  And I believe, just looking at the pH numbers

24   there, you indicated that the minimum pH number is public;

25   right?

COOPER - CROSS / AXELROD

1   A.   I believe I said the average number was public.

2   Q.   The average number is public.

3        Okay.  And you base that on the two patents that are cited

4   in your report?

5   A.   That is correct.

6   Q.   Okay.

7                    (Pause in proceedings.)

8        MR. AXELROD:  And I believe that these are --

9   Your Honor, may I approach with 2281 and 2307?

10          THE COURT:  Yes, you may.

11          THE CLERK:  What was the second number?  I'm sorry.

12       MR. AXELROD:  2307.

13          THE CLERK:  Thank you.

14  BY MR. AXELROD:

15  Q.   Mr. Cooper, I'm handing you the two patents that are cited

16  in your report.

17  A.   (Witness examines documents.)

18  Q.   Is that number, the number that's in the email, is that

19  disclosed in those patents?

20  A.   Very close to it, yes.

21  Q.   My question is very specific.  You're an engineer and

22  you're used to very specific numbers; right?

23  A.   I'm used to ranges of numbers usually, frankly.

24  Q.   Well, when you design specific pieces of equipment, having

25  very specific information is very important; isn't it?

COOPER - CROSS / AXELROD

1   A.    Yes.  And I stated I usually work on ranges of numbers.

2   Q.    I'm asking you about the specific number mentioned there.

3   In the email, there's a specific number mentioned for the

4   average.

5   A.    I see that.

6   Q.    Do you see that in either of the patents, that specific

7   number?

8   A.    No, I do not.

9   Q.    And I believe -- yesterday you did say that the minimum

10  number was public; didn't you?

11  A.    I believe I said I knew the number.  I believe it is

12  public, yes.

13  Q.    Okay.  But you haven't identified a public source for that

14  specific number, have you?

15  A.    I don't believe so.

16        MR. AXELROD:  Your Honor, may I approach with

17  Exhibit 2252, which has been admitted into evidence?

18        THE COURT:  Yes, you may.

19        MR. AXELROD:  Thank you.

20  Q.    Mr. Cooper, I'm handing you a patent that you discussed

21  yesterday with Mr. Gasner.  Do you recall that patent?

22  A.    (Witness examines document.)  Yes, I do.

23  Q.    And that's a patent for sulfate route wet treatment?

24  A.    (Witness examines document.)  Yes, it is.

25  Q.    And it introduces this idea or concept of neutralizing

**COOPER - CROSS / AXELROD**

1   TiCl on pigment surface to improve quality; right?

2   **A.**   (Witness examines document.)   Sorry.   Could you repeat the

3   question?

4   **Q.**   Sure.   That patent introduces the concept of neutralizing

5   TiCl on the pigment surface to improve quality; right?

6   **A.**   And aluminum, yes.

7   **Q.**   Well, that's a fair read of what the patent is?

8   **A.**   With my comment, yes, it is.

9   **Q.**   But that hasn't been practiced in at least 25 years;

10  right?

11  **A.**   That is not correct.

12  **Q.**   Is that commercially practiced now?

13  **A.**   Yes, it is.

14  **Q.**   In the TiO2 industry?

15  **A.**   Yes, it is.

16  **Q.**   Okay.   Who practices it?

17  **A.**   Cristal Global.

18  **Q.**   In what facilities?

19  **A.**   They moved it.

20  **Q.**   Huh?

21  **A.**   I believe it's now done at Ashtabula 1.   It used to be

22  Ashtabula 2.

23  **Q.**   Okay.   So that's part of their commercial process?

24  **A.**   Yes.   It's a product called RCL-9.

25  **Q.**   Would you say it's widely practiced in the industry?

COOPER - CROSS / AXELROD

1    A.   I can -- it's an older grade, so I can only think of maybe

2    one other instance off the top of my head.

3    Q.   I want to ask you about a few more patents, and I want

4    to -- I'm going to borrow the patent board that you looked at

5    with Mr. Gasner yesterday.

6                        (Pause in proceedings.)

7    BY MR. AXELROD:

8    Q.   And we've talked about a number of these patents in our

9    discussions; haven't we?

10   A.   Yes.

11   Q.   Okay.  And I want to talk about a few more.

12        MR. AXELROD:  Your Honor, may I approach with

13   Exhibit 2310?

14        THE COURT:  Yes.

15        MR. GASNER:  May the Court ask Mr. Axelrod perhaps to

16   rotate the board so --

17        MR. AXELROD:  Sure.  I'm sorry, Mr. Gasner.

18        THE COURT:  Is that better?

19        MR. GASNER:  Pull it back just a little bit.  Thank

20   you.  Thank you.

21   BY MR. AXELROD:

22   Q.   Do you recognize that patent, sir?

23   A.   I believe so, yes.

24   Q.   Well, it's 4,424,138, this one (indicating)?

25   A.   Yes, I see that.

COOPER - CROSS / AXELROD

1  **Q.**   This patent has to do with a plastic catalyst

2  manufacturing; right?

3  **A.**   That is correct.

4  **Q.**   It has absolutely nothing to do with TiCl?

5  **A.**   TiCl, that is correct.

6  **Q.**   It has absolutely nothing to do with TiO2?

7  **A.**   That is correct.

8         **MR. AXELROD:**   Your Honor, may I approach with

9  Exhibit 2297, which has not been admitted?

10        **THE COURT:**   Yes.

11        **MR. AXELROD:**   Thank you.

12 **Q.**   Mr. Cooper, I'm handing you what's been marked as

13 Exhibit 2297.   That's another -- do you recognize that

14 document?

15 **A.**   (Witness examines document.)   Yes, I do.

16 **Q.**   That's 3,753,336.   It's another one on your board?

17 **A.**   That's correct.

18 **Q.**   Okay.   This patent concerns the paper industry; doesn't

19 it?

20 **A.**   That is correct.

21 **Q.**   And it has to do with a piece of equipment called a

22 nonreversing cyclone?

23 **A.**   That is correct.

24 **Q.**   This wouldn't work in TiO2; would it?

25 **A.**   Yes, it would.

COOPER - CROSS / AXELROD

1   **Q.**   Oh, this would work?

2   **A.**   Oh, yes.

3   **Q.**   Okay.  Is it used in TiO2 in this particular way?

4   **A.**   In a very similar way, yes.

5   **Q.**   No, but in this way.

6   **A.**   It is very similar to the way it is used in TiO2.

7   **Q.**   But it's not the same?

8   **A.**   Not identical, no.

9   **Q.**   Ms. Mahoney, could you bring up Exhibit 5?

10          Mr. Cooper, when we were -- we talked quite -- some

11   yesterday and you spoke with Mr. Gasner about this particular

12   plan from Edgemoor, the oxidation area with RPS.  Do you recall

13   that?

14   **A.**   Yes, I do.

15   **Q.**   And we discussed yesterday that at Edgemoor, slurry is

16   made on site; right?

17   **A.**   That is correct.

18   **Q.**   And that it's stored in tanks?

19   **A.**   That is correct.

20   **Q.**   And a significant portion of it is shipped by train to

21   another DuPont facility.  We discussed that yesterday?

22   **A.**   I didn't know it was a significant part.  I don't believe

23   you said that yesterday.

24   **Q.**   Okay.  Well, we --

25   **A.**   Some of it you told me was shipped.

**COOPER - CROSS / AXELROD**

1  Q.   So we talked about some being shipped by train to a DuPont

2  facility where it goes through finishing; right?

3  A.   So I understand.

4  Q.   Okay.  I want to go back to the Western Australia plant

5  that you worked on that we were talking about.

6  A.   Yes.

7  Q.   That's a place where they also make slurry at a facility;

8  right?

9  A.   That's correct.

10  Q.   And then it gets stored in tanks; right?

11  A.   Correct.

12  Q.   And then it gets shipped 13 kilometers to a finishing

13  plant?

14  A.   Correct.

15  Q.   And then it also gets finished off site, and it's a dry

16  product and sold?

17  A.   Correct.

18  Q.   Much like what happens with the DuPont process?

19  A.   I believe what I said is it is not a product.  And in

20  Western Australia, none of the slurry you're describing.  It

21  goes direct to the finishing plant and then becomes a product.

22  Q.   But the process of making a slurry and then having it

23  finished some distance away into a dry product, that's what

24  DuPont does with its Edgemoor slurry; right?

25  A.   I understand it's a small part, yes.

COOPER - CROSS / AXELROD

1    **Q.**   Well, that's what they do.

2    **A.**   Okay.

3    **Q.**   And that's exactly what SCM did in Western Australia.

4    **A.**   Not the same way, no.

5    **Q.**   Well, it's the same -- it's the same concept of taking a

6    slurry, and then moving it and having it finished somewhere

7    else; right?

8    **A.**   It is the same concept, but not the same practice.

9    **Q.**   But you're not even familiar with the DuPont practice.

10   **A.**   The design of this particular plant is not the design of

11   the West Australian plant, and it functions in a different way.

12   **Q.**   But you don't know how DuPont does its process with the

13   creation of dry product out of the slurry from that plant, do

14   you?

15   **A.**   That is correct.

16   **Q.**   Now, I want to talk a little bit about your experience at

17   Jinzhou.

18   **A.**   Certainly.

19   **Q.**   You said that you met Mr. Liu Changhe; right?

20   **A.**   I got his card; therefore, I must have met him, yes.

21   **Q.**   And he was the -- he is the author of a textbook that you

22   relied upon?

23   **A.**   Correct.

24   **Q.**   You consider him an expert in the field?

25   **A.**   I didn't rely on his textbook for my expert report.  I

 1    reviewed it, but I did not rely on it.

 2    **Q.**   Okay.  I thought that when Mr. Gasner was questioning you,

 3    he asked you if that was -- that textbook was something you

 4    relied on, and you said yes.

 5    **A.**   I thought he said I read it and as part of my report.  Did

 6    I rely on it?  No, not really.

 7    **Q.**   So you don't consider him an expert in the field?

 8    **A.**   I do consider him an expert.

 9    **Q.**   Okay.  Well, you consider him an expert in the field.

10          And you mentioned that Jinzhou has an oxidation unit;

11    right?

12    **A.**   Correct.

13    **Q.**   And it was operating?

14    **A.**   Correct.

15    **Q.**   And that it was a commercially successful plant?

16    **A.**   I didn't say that.

17    **Q.**   You did say it was commercially successful.

18    **A.**   I said it was commercially operating.

19          Let me go back.  It's been a long time.

20          I may well have said that, yes.

21    **Q.**   Okay.  I mean, you said it's a continuous process; right?

22    **A.**   Part of it is continuous, yes.

23    **Q.**   And that it was commercially successful?

24    **A.**   I believe probably I did say that, yes.

25    **Q.**   And they had lots of engineers there; right?

1    A.    At the meeting I went to they had a lot of engineers.   I

2    don't know where they came from.

3    Q.    So when they wanted to improve their facilities, what did

4    they do?  They didn't open a bunch of textbooks; did they?

5    A.    I don't know what they did.

6    Q.    Well, you know that they had Mr. Liew come over to pitch

7    his technology; right?

8    A.    I learned that later on, yes.

9    Q.    Right around the time that you were there?

10   A.    So I later found out, yes.

11   Q.    Right.  And you know that the person that you worked for

12   at Sinotech, Professional Development Sinotech Corporation, was

13   also pitching for that very same contract?

14   A.    I didn't know that at the time.

15   Q.    But you learned that later?

16   A.    I did.

17   Q.    So they were looking for technology from somewhere else,

18   from America; right?

19   A.    I presume so.

20   Q.    So with all their technology that they had that you saw

21   that was commercially successful, and their access to public

22   information, and the expertise of Mr. Liu, Mr. Liu Changhe, why

23   didn't they just do it themselves?

24   A.    Because you want the best; therefore, you always talk to

25   other experts.  It's natural to do it.  Clearly, they -- in one

COOPER - CROSS / AXELROD

1   area they didn't have personal expertise, or as a group they

2   didn't have expertise.

3   Q.   Right.  Because that expertise was not publicly available.

4   A.   That is not correct.

5   Q.   So what you're saying is, they paid Mr. Liew $6.1 million

6   on a contract for information that was publicly available; is

7   that your testimony?

8   A.   I don't know that.

9   Q.   Well, you know they paid him -- you know he had a

10  6.18-million-dollar contract as a result of that November 2005

11  agreement?

12  A.   I have seen the number.  I don't know what it truly

13  relates to.

14  Q.   Well, they did that because Mr. Liew was selling DuPont

15  technology; right?

16  A.   I don't know that.

17  Q.   Let's talk a little bit about your report.

18       You'll recall yesterday we talked a little bit about the

19  team that Mr. Liew had at USAPTI and Performance Group, and we

20  compared that to the team that you had in Western Australia.

21  Do you recall that?

22  A.   Yes, I do.

23  Q.   And we talked about the opinions that were in your report

24  on that subject matter; right?

25  A.   Correct.

COOPER - CROSS / AXELROD

1    **Q.**   Do you recall that?

2        So my question to you is:  Who wrote the words in your

3    report about the experience and qualifications of the USAPTI

4    team?  Who wrote that?

5    **A.**   I believe I started it, and it was refined by

6    Keker & Van Nest when we wrote the final report.

7    **Q.**   Okay.  So your testimony is that, in the very first

8    instance, the very first time those words got written out,

9    those were your words?

10   **A.**   Or something like them, yes.  I don't remember my first

11   report.

12   **Q.**   Okay.  So what you're saying is, because we talked about

13   this yesterday -- and you spoke to Mr. Gasner about the fact

14   that you'd gotten all these documents, you reviewed the

15   documents, you figured out what you thought was relevant, and

16   then you did analysis.  So are you saying you did that and,

17   based on everything you saw then, you wrote the words that are

18   in this report about the qualifications and experience of

19   USAPTI, you personally?

20   **A.**   I can't remember in which of the revisions those words

21   came in.

22   **Q.**   So my question is:  In the first draft, did you say the

23   following:  (reading)

24            "It is my opinion from the information presented to

25        me that Mr. Liew and his team had ample experience and

**COOPER - CROSS / AXELROD**

1          qualifications to carry out the work they performed"?

2          Is that something that you wrote in the first instance?

3     A.   That, or something like it.

4     Q.   And that was based on the documents that you reviewed?

5     A.   What I saw was a whole bunch of documents for the 30K and

6     the 100K.  When I looked at the documents, particularly for the

7     100K plant, it had every document in that was properly there

8     for a feed project; and the content of those documents were, at

9     least, the same quality as I would have put together for, say,

10    the Western Australian job.  That's what I based my conclusions

11    on.

12    Q.   Right.  But you're making representations in your report

13    about the qualifications and credentials of his team you say

14    that you believe had ample academic and engineering

15    credentials; right?

16    A.   From the review of the documents.

17    Q.   And that was your language?

18    A.   As I said, I don't know when that specific wordage came

19    in.  I did many, many revisions of the documents.  Then

20    Keker & Van Nest put it into the legal format because I don't

21    write legal documents.  So sometime within that period, those

22    words were created.

23    Q.   Who created them?

24    A.   The sense of them, certainly I did.

25    Q.   Okay.

COOPER - CROSS / AXELROD

1  **A.**  Whether the exact words were mine, I don't remember.

2  **Q.**  So this report that you wrote is 80 pages; right?

3  **A.**  Correct.

4  **Q.**  How much of the language in it is yours?

5  **A.**  Altogether I sign off to all the content of the report.

6  **Q.**  I understand that, but my question is:  In creating this

7  80 pages, how much of it did you personally draft?

8  **A.**  Probably about 85 percent.

9  **Q.**  Okay.  And you talked a little bit about Google Earth

10  images with Mr. Gasner.  Do you recall that?

11  **A.**  Yes, I do.

12  **Q.**  How much time did you spend researching Google Earth

13  images in anticipation of your testimony?

14  **A.**  I've been researching Google Earth for the past five

15  years.  So for this particular -- for the jobs and for my own

16  interest.  For this particular one, probably -- the hard part

17  is taking the screen captures, so probably 10 hours, plus 10

18  hours to get the screen captures into correct form.

19  **Q.**  Okay.  So that's 20 hours on Google Earth?

20  **A.**  That's about right.

21  **Q.**  And then what you were testifying to is, well, you could

22  take those images and that would give you an estimate, right,

23  of just the length of the piping?  Right?

24  **A.**  That's correct.

25  **Q.**  And then -- but that wouldn't give you -- so 20 hours to

1   look at images and figure out what the length might be?

2   **A.**   Yes.   Google Earth prints a scale on the bottom of all

3   their shots, and you can blow them up.   Some are easier to

4   increase the resolution on than the others, but you can get

5   within a couple of feet --

6   **Q.**   Okay.

7   **A.**   -- for the length.

8   **Q.**   Right.   But you're in a business where a couple feet

9   multiplied by a diameter might make a difference; right?

10   **A.**   No.

11   **Q.**   Okay.   But then to calculate the surface area, you still

12   need to know the particular diameter of the pipes; right?

13   **A.**   That's correct.

14   **Q.**   And you can't figure that out from Google Earth?

15   **A.**   Yes, you can.

16   **Q.**   You can figure that out, the specific diameter?

17   **A.**   For some plants the Google Earth photographs have such a

18   high resolution that you can keep blowing them up and blowing

19   them up.   Providing you print them out at the highest

20   resolution, you can get very close.

21   **Q.**   Okay.   So why didn't you do that?

22   **A.**   I did.

23   **Q.**   So you identified the specific surface area to a certainty

24   of a particular DuPont facility in this case?

25   **A.**   In this case, Edgemoor.

1   Q.   Really?  I haven't seen that.  It's not in your --

2           MR. GASNER:  Objection, Your Honor.

3   BY MR. AXELROD:

4   Q.   Is that in your report?

5           THE COURT:  Sustained.

6   BY MR. AXELROD:

7   Q.   Is that in your report?

8   A.   I don't know whether we finally included it.

9   Q.   Did you testify about that with Mr. Gasner?

10  A.   I'm sorry.  I can't recollect that.  We used the patent

11  information to calculate it.  It's much easier.

12  Q.   But you don't know if that patent information corresponds

13  to the actual surface area at any DuPont facility, do you?

14  A.   Because it's an example, it has to --

15  Q.   That's a yes-or-no question, sir.

16  A.   Would you repeat the question?

17  Q.   Yeah.  You don't know if that is the same as the actual

18  surface area of a specific DuPont plant, do you?

19  A.   My understanding of the patent is, yes, it is.

20  Q.   Sir, I'm asking you a different question.

21  A.   Okay.

22  Q.   Do you know -- other than looking at the documents that

23  you've seen from DuPont in this case where it's, actually,

24  specifically identified what those dimensions are, you cannot,

25  through publicly available means, figure out the exact surface

**COOPER - CROSS / AXELROD**

1   area of any currently operating DuPont facility, can you?

2   **A.**   If you mean -- can I just --

3   **Q.**   No.  I'm just asking you.  That is a yes-or-no question.

4   **A.**   Currently operating, the answer is no.

5   **Q.**   Thank you.

6        And if you're spending 20 hours of time figuring out what

7   the Google Earth images are and then looking at the patent,

8   which gives you a range, and making an educated guess based on

9   your experience what that gets you, wouldn't it just be a lot

10  easier to go to the page in the Basic Data Document that has

11  the actual number from the actual plant?

12  **A.**   I would not do that.

13  **Q.**   I'd like to talk to you about how in the TiO2 business

14  companies -- the industry and companies in the industry keep

15  their technology proprietary.  Okay?

16  **A.**   Okay.

17  **Q.**   You'd agree that TiO2 technology is highly protected by

18  companies in the industry?

19  **A.**   They try to highly protect it.

20  **Q.**   They try.

21       Okay.  And the technology is, generally, not commonly

22  available; is it?

23  **A.**   The vast majority is.

24  **Q.**   But the specific parts that aren't known, you just -- you

25  can't get that, can you?  Oxidation reactor design, you can't

COOPER - CROSS / AXELROD

1   get that?

2           MR. GASNER:  Objection.  Compound.  Argumentative.

3           THE COURT:  Overruled.

4           THE WITNESS:  There are no direct references.  There

5   are public references to reactors.  There are patents relating

6   to reactors; but the present designs, like 2013, no, they are

7   not available.

8   BY MR. AXELROD:

9   Q.   Well, any successful TiO2 producer, they're going to have

10  their own oxidation reactor design; right?

11  A.   No.

12  Q.   Okay.  So the producers that have their own designs, that

13  category of producers, that's not something they would

14  disclose, the details of that design; would they?

15  A.   Not deliberately, that is correct.

16  Q.   And they would -- they control the drawings?

17  A.   To some extent, yes.

18  Q.   Okay.  Well, employees at these companies, they execute

19  confidentiality agreements, don't they?

20  A.   I believe so.  I don't know specifically.

21  Q.   You're here testifying as an expert on the TiO2 industry;

22  right?

23  A.   That is correct.

24  Q.   And you've been in the industry a long time?

25  A.   Yes.

COOPER - CROSS / AXELROD

1   Q.   And are you saying that you don't know whether in general

2   terms people in the industry signed confidentiality agreements?

3   A.   In general terms, yes, they do.

4   Q.   Okay.  And --

5   A.   I should point out, I've signed a secrecy agreement, for

6   instance, with Tronox.  I know what's in it, but I don't know

7   what the general Tronox secrecy agreement is.

8   Q.   And the purpose of these agreements is to protect

9   proprietary information; right?

10  A.   Correct.

11  Q.   And those agreements, they prohibit the employees who sign

12  them from disclosing that confidential information outside

13  their companies; right?

14  A.   I can only speak to my own.

15  Q.   Okay.  Well, then, let's talk about your agreement.

16       You were employed by SCM and Millennium for over 30 years;

17  right?

18  A.   And Laporte.  Most of my time was with Laporte.

19  Q.   Okay.  And you worked on the technology, the

20  chloride-route technology?

21  A.   Yes, I did.

22  Q.   And as part of that, you obtained access to confidential

23  information and know-how; right?

24  A.   Correct.

25  Q.   And it related to that TiO2 technology that you worked on?

COOPER - CROSS / AXELROD

1    **A.**   And a lot of other things.

2    **Q.**   And you entered an agreement not to disclose that

3    information; right?

4    **A.**   The secret information, yes.

5    **Q.**   Okay.  And yesterday you described that agreement as,

6    basically, you shall not reveal trade secrets; that's what it

7    said?

8    **A.**   That's correct.

9    **Q.**   So let's actually look at the agreement.

10        **MR. AXELROD:**  Your Honor, may I approach with

11   Exhibit 943?

12        **THE COURT:**  Yes, you may.

13   **BY MR. AXELROD:**

14   **Q.**   Mr. Cooper, I'm handing you what's been marked as

15   Exhibit 943.  Do you recognize that document?

16   **A.**   (Witness examines document.)  This is the document I first

17   signed -- excuse me -- when I became employed by the American

18   SCM company, yes.

19   **Q.**   Okay.  And that's your signature?

20   **A.**   Yes, it is.

21        **MR. AXELROD:**  Your Honor, the Government offers 943

22   into evidence.

23        **MR. GASNER:**  No objection.

24        **THE COURT:**  Admitted.

25        (Trial Exhibit 943 received in evidence)

1          **MR. AXELROD:**  Ms. Mahoney, if you could bring that up.

2    Thank you so much.

3          Ms. Mahoney, can you please blow up the top paragraph?

4    Thank you.

5    **Q.**   And could you just read the first sentence there,

6    Mr. Cooper?

7    **A.**   Certainly.  (reading)

8              "I agree to the terms of the following numbered

9          paragraphs in consideration of my employment and the

10         compensation paid and to be paid me by SCM Chemicals, and

11         because I recognize that during such employment

12         confidential information and know-how may be disclosed to

13         me or I may devise or develop confidential information and

14         know-how as a result of my employment with SCM."

15   **Q.**   And then if we could go down to the second paragraph.

16   And, Ms. Mahoney, if you could use the other function to blow

17   that up, I think it might make it a little bigger.  Actually,

18   the second numbered paragraph.  Thank you.

19         And, Mr. Cooper, could you please read that paragraph?

20   **A.**   Just a second.

21   **Q.**   Of course.  Take your time.  And I believe there's water

22   up there as well.

23   **A.**   Yes, there is.  Thank you.  My voice gets a bit gravelly.

24   (reading)

25             "I will not disclose to anyone outside of SCM or use

1              in other than SCM's business any confidential information

2              or know-how of SCM, either during or after my employment

3              with SCM; and, further, upon termination of my employment,

4              I will deliver to SCM all my notes, laboratory notebooks,

5              drawings, blueprints, customer lists, work product, and

6              other papers belonging to SCM, and will not retain any

7              copies thereof.  I also understand that information and

8              materials received by SCM in confidence from third parties

9              is included within the meaning of this paragraph."

10    **Q.**   So this restricts -- this particular paragraph restricts

11    what you can do with the information, the confidential and

12    proprietary information, you learn at SCM; right?

13    **A.**   That is correct.

14    **Q.**   And that obligation continues forever?

15    **A.**   In fact, this one doesn't.

16    **Q.**   Well --

17    **A.**   Because I have a superseding secrecy agreement to this

18    one.

19    **Q.**   Right.  And we'll get to that, but I -- the ones that --

20    this one in particular says, "During or after my employment";

21    right?  So it doesn't limit you to a time period in which you

22    can disclose confidential information?

23    **A.**   That's exactly what I said yesterday.

24    **Q.**   Okay.  But that's what this agreement says?

25    **A.**   That's correct.

**COOPER - CROSS / AXELROD**

1  Q.   And if we could go to paragraph 6, the next page,

2  Ms. Mahoney.  And if you could blow up paragraph 6 when you get

3  there.  Thank you.

4       Can you please read that paragraph, Mr. Cooper?

5  A.   (reading)

6          "I understand that I am being employed by SCM for my

7          knowledge, experience, and skills and that I am not to

8          divulge to SCM or any of its personnel, nor does SCM wish

9          to receive any confidential information and know-how of

10         any former employer I may have had.  It is general known

11         in the" -- I don't understand this.  "It is general known

12         in the trade, or the subject matter of patents or

13         published patent applications or other publications is not

14         within the above prohibition."

15 Q.   Okay.  So this provision says, "We don't want to know what

16 you learned somewhere else"; right?

17 A.   That's correct, unless it was published or known within

18 the trade or patents or other types of information.

19 Q.   Right.  But the basic idea is, "If you learn something

20 confidential at another employer, we don't want to know about

21 it"?

22 A.   That's not quite what it says.

23 Q.   Okay.  So you would disagree with the idea that what this

24 agreement says is, "If you know something confidential from

25 another job, don't tell us about it"?

**COOPER - CROSS / AXELROD**

1  **A.**   Confidential, I think that's a fair qualification, yes.

2  **Q.**   And it says, if you go down -- Ms. Mahoney, could we go to

3  paragraph 9?

4       Can you read that, Mr. Cooper?

5  **A.**   (reading)

6          "This agreement cannot be changed or modified except

7          in writing signed by me and by an officer of SCM."

8  **Q.**   Okay.  So you can't change the agreement unless you do it

9  in writing?

10  **A.**   That's correct.

11  **Q.**   And then below that there's your signature, is that

12  right --

13  **A.**   Yes.

14  **Q.**   -- in 1990?

15       And you referenced another agreement that you had with the

16  company; and is that the agreement, your separation agreement

17  or termination agreement?

18  **A.**   I have four other agreements with the company.

19  **Q.**   Okay.  I'm talking --

20  **A.**   Sorry.  Three other agreements with the company.

21  **Q.**   So what I'm talking about are the ones that are related to

22  your employment at SCM prior to your termination in 2001.

23  **A.**   This is the -- prior to my termination, this is the only

24  one with SCM.

25  **Q.**   Okay.  And then there was an agreement, a separation

**COOPER - CROSS / AXELROD**

1   agreement, in 2001?

2   **A.**   That is correct, and there's two following that.

3   **Q.**   Okay.  And focusing on the agreement in 2001, let's take a

4   look at that.

5        **MR. AXELROD:**  Your Honor, may I approach with

6   Exhibit 946?

7        **THE COURT:**  Yes, you may.

8        **MR. AXELROD:**  Thank you.

9   **Q.**   Mr. Cooper, I'm handing you what's been marked as

10  Exhibit 946.  Do you recognize that document?

11  **A.**   (Witness examines document.)  Yes.  This is a release

12  agreement I signed when I was laid off.

13  **Q.**   And that's your signature on the last page there?

14  **A.**   It is.

15  **Q.**   Okay.

16        **MR. AXELROD:**  Your Honor, the Government offers

17  Exhibit 946 into evidence.

18        **MR. GASNER:**  No objection.

19        **THE COURT:**  It's admitted.

20     (Trial Exhibit 946 received in evidence)

21        **MR. AXELROD:**  And, Ms. Mahoney, if you could bring up

22  946 on the first page there.

23  **Q.**   And if we could go -- this is the first page of the

24  release, Mr. Cooper.

25  **A.**   Uh-huh.

**COOPER - CROSS / AXELROD**

1   **Q.**   And for a moment I want to go to the second page and ask

2   you to read paragraph 10.

3   **A.**   All of it?

4   **Q.**   Yes, please.

5   **A.**   (reading)

6           "Employee acknowledges and affirms his/her continuing

7       obligation not to divulge or utilize any secret or

8       confidential information, knowledge or data concerning the

9       affairs of Company, its affiliates, customers and

10      suppliers, whether of a technical or business nature.

11      Such information, knowledge or data includes, but is not

12      limited to, trade secrets and matters of technical or

13      business nature or pertaining to Company's research and

14      development or its sales and marketing strategies.

15      Employee agrees that his obligation includes the return to

16      Company of all documents, reports, studies, drawings, and

17      all other materials, and all copies thereof, related in

18      any way to the affairs of Company, its affiliates,

19      customers and suppliers, which are in Employee's

20      possession or under his/her control.  Employee further

21      acknowledges and agrees that Company's remedies at law for

22      any breach of his/her obligations relative to these

23      matters is inadequate and that in addition to money

24      damages, withholding or delay of payments and any other

25      remedies for such breach, Company shall also be entitled

1          to injunctive or other equitable relief to enforce

2          Employee's obligation to Company."

3   **Q.**   So this paragraph is a reminder about -- a specific

4   acknowledgment about the obligation not to divulge or utilize

5   any secret or confidential information; right?

6   **A.**   That's correct.  Unfortunately, they never defined what

7   was secret; and I have to say that now because that's -- it

8   doesn't tell you what's secret.

9   **Q.**   Let's go up to paragraph 8.  Can you please read that

10  paragraph?

11  **A.**   Yeah.  (reading)

12          "Employee understands and agrees that, effective on

13          the date of termination of employment as set forth in

14          Paragraph 2, he/she will immediately turn over, or will

15          make appropriate arrangements to turn over to Company all

16          files, memoranda, records, and other documents (including

17          any of the foregoing which are electronically stored),

18          including all copies, and any physical or personal

19          property which employee received from Company and which

20          are the property of the Company."

21  **Q.**   Okay.  So that's an obligation to turn over everything

22  you've got from the company when you're departing?

23  **A.**   That they say must be turned over, yes.

24  **Q.**   Did you turn over all of your materials when you left?

25  **A.**   Yes, all my -- I had to go through all my files, my

COOPER - CROSS / AXELROD

1   computers with my boss at the time.  He then said, "Yes, you

2   can take this.  No, you can't take that."

3   **Q.**   Okay.  And after --

4           **THE COURT:**  Mr. Axelrod, let's take a stretch break.

5           **MR. AXELROD:**  Yes, of course.

6           **THE COURT:**  All right.

7                          (Pause in proceedings.)

8           **THE COURT:**  All right.  Please be seated.

9       You may continue.

10          **MR. AXELROD:**  Thank you, Your Honor.

11  **Q.**   Mr. Cooper, these kinds of terms, are these industry

12  standards for confidentiality?

13  **A.**   No.

14  **Q.**   Okay.  So having an obligation not to disclose

15  confidential information is not a standard practice in the

16  industry?

17  **A.**   Not as it's written in here, no.

18  **Q.**   And the agreement we looked at before, the agreement from

19  1990, was that a pretty standard industry agreement?

20  **A.**   At the time it may have been, but I've come to learn that

21  it is not a standard agreement in my industry in my consulting

22  career.

23  **Q.**   So I want to look with you at another -- if we could go,

24  Ms. Mahoney, back to the first page of Exhibit 946.  So if we

25  could go to 946, page 1.

**COOPER - CROSS / AXELROD**

1          And in the middle of the -- if you could blow up the

2    middle of the fourth numbered paragraph where it says, "In

3    addition."

4          And, Mr. Cooper, do you see there where it says, "In

5    addition, provided that Employee executes"?  Do you see that?

6    **A.**   That is correct.

7    **Q.**   Okay.  Could you please read that sentence?

8    **A.**   (reading)

9               "In addition, provided that Employee executes and

10              does not revoke this Release, as a consideration of

11              Employee's guarantee and contractual commitment to not

12              accept employment, provide consulting services or

13              otherwise provide technical or business advice to any TiO2

14              manufacturer, for a period of one (1) year from the date

15              that Employee executes this Release, the Company will make

16              a lump sum payment to the Employer" -- sorry -- "Employee

17              in the amount of $25,999.98 within ten (10) days after all

18              revocation periods, as provided for herein, have lapsed."

19   **Q.**   So that's a noncompete clause?

20   **A.**   That's a noncompete clause.

21   **Q.**   Okay.  So that means for this one-year period, you can't

22   consult in the TiO2 business?

23   **A.**   Or join another company in the TiO2 business, that is

24   correct.

25   **Q.**   Okay.  And that noncompete obligation is different than

COOPER - CROSS / AXELROD

1    the confidentiality obligation?

2    **A.**   That is correct.

3    **Q.**   Okay.  So you have a confidentiality obligation under

4    these agreements that you have to keep in perpetuity?

5    **A.**   That was the way the contract was written, yes.

6    **Q.**   Right.  And in the industry, sometimes people get letters

7    from their companies if they hear they've left the company and

8    they're engaged in other activity, and the company has concerns

9    about what's happening to their technology; right?

10   **A.**   Yes.  I've got two of them.

11   **Q.**   Okay.  So that's a way in the industry that companies

12   protect their intellectual property; right?

13   **A.**   All I know, it's a letter saying, "We're reminding you of

14   your obligations," yes.

15   **Q.**   And you're aware of the fact that those letters go out in

16   many circumstances?

17   **A.**   I'm not aware of that.

18   **Q.**   So you're not aware of the fact that companies send

19   letters to former employees of that nature?

20   **A.**   To the best of my knowledge, I am one of only two people

21   who have received that letter from Cristal Global.

22   **Q.**   Okay.  And you're not aware of anyone else in the industry

23   ever receiving a letter like that?

24   **A.**   I'm not aware of that.

25   **Q.**   Okay.  Well, let's talk about your circumstances.

**COOPER - CROSS / AXELROD**

1          You got one of these letters; right?

2    **A.**   Two of them.

3    **Q.**   Two of them.

4          Okay.  And why don't we look at the letter, at least one

5    of them.

6              **MR. AXELROD:**  Your Honor, may I approach with

7    Exhibit 949, which is not in evidence?

8              **THE COURT:**  Yes.

9              **MR. AXELROD:**  Thank you.

10   **Q.**   Mr. Cooper, do you recognize Exhibit 949?

11   **A.**   (Witness examines document.)  I believe this is the first

12   letter I received from Cristal, yes.

13   **Q.**   And this relates to -- Cristal is reminding you of your

14   obligations under the confidentiality agreement?

15   **A.**   They said that I joined/retained by another TiO2 titanium

16   dioxide manufacturer, and then they reminded me of my

17   obligations.

18        Excuse me.

19             **MR. AXELROD:**  Your Honor, the Government offers

20   Exhibit 949 into evidence.

21             **THE COURT:**  Objection?

22             **MR. GASNER:**  No objection.

23             **THE COURT:**  Admitted.

24        (Trial Exhibit 949 received in evidence)

25

COOPER - CROSS / AXELROD

BY MR. AXELROD:

Q.   And I think, Mr. Cooper, you're referring to the first
paragraph.  This is a letter from July in 2009?

A.   That's correct.

Q.   And then you were referring to the first paragraph there?

A.   That is correct.

Q.   Okay.  And it says -- I'm sorry, Ms. Mahoney, can you
leave that?

     And, Mr. Cooper, can you please read it?

A.   (reading)

        "It has come to the attention of Millennium Inorganic
     Chemicals, Inc. ("Millennium"), that you have been
     retained by a titanium dioxide TiO2 manufacturer to assist
     in the planning and/or construction of a TiO2
     manufacturing plant in China."

Q.   And then the letter goes on to remind you of your
obligations under that 2000 -- the 1990 agreement we looked at
a little bit earlier, Exhibit 943?

A.   That's correct.

Q.   Okay.  And --

A.   It was totally false.

Q.   I'm sorry, sir, the --

A.   The letter was totally false.  They sent a second one with
a very much modified set of statements.

Q.   Okay.  But I'm not asking you about the assertion about

1   your practices.  I'm just talking about the confidentiality

2   agreement and the communications that you had with your former

3   employer about the confidentiality of its information.

4   **A.**   Yeah.  And this has been superseded by another agreement.

5   **Q.**   Okay.  And it says at the bottom -- if you could blow up

6   that last paragraph, Ms. Mahoney -- it says:  (reading)

7            "Millennium reminds you of the obligations you agreed

8       to abide by in the signing agreement and demands that you

9       do not divulge or utilize any of Millennium's secret or

10      confidential information, knowledge or date."

11      Do you see that?

12  **A.**   Yes.

13  **Q.**   So is it fair to say that's a reminder about your secrecy

14  obligations?

15  **A.**   Yes.

16  **Q.**   And they asked you to respond to it; right?

17  **A.**   I did.

18  **Q.**   And you did.

19      And I'd like to hand you what's been marked as

20  Exhibit 950.

21          **MR. AXELROD:**  Your Honor, may I approach?

22          **THE COURT:**  Yes.

23          **MR. AXELROD:**  And this is not admitted.  This is a

24  July 15th, 2009, letter.

25          **THE CLERK:**  Thank you.

COOPER - CROSS / AXELROD

1   BY MR. AXELROD:

2   Q.   Do you recognize that document?

3   A.   Yes.  This is my reply to the letter.

4   Q.   Okay.

5        MR. AXELROD:  And, Your Honor, the Government offers

6   Exhibit 950.

7        MR. GASNER:  No objection, Your Honor.

8        THE COURT:  Admitted.

9        (Trial Exhibit 950 received in evidence)

10       MR. AXELROD:  And can you blow up the text?

11  Q.   So the correspondence you received from the company said,

12  "Please respond," and then this is your response?

13  A.   Correct.

14  Q.   Okay.  And can you please read that?  Just the text.

15  A.   (reading)

16       "Dear Mr. Koutras:

17       "I do not know where you got your information but it

18       is totally incorrect.  I have not been, nor have I

19       previously been, 'retained by a titanium dioxide

20       manufacturer to assist in the planning and/or construction

21       of a titanium dioxide manufacturing plant in China' nor is

22       it my present intention to become involved with such a

23       project."

24  Q.   And did you respond again after this letter?

25  A.   Yes, I did.

1   Q.   Let me find that.

2   A.   Mr. Koutras then revised his letter and sent me another

3   letter; and I responded to that because, frankly, I was rather

4   ticked off because I'd already told them who I was working for.

5   Q.   Were you working for a manufacturer in China?

6   A.   No, I was not.

7   Q.   And let me try to find that other letter.

8                     (Pause in proceedings.)

9            MR. AXELROD:  May I have a moment, Your Honor?

10           THE COURT:  Yes.

11                    (Pause in proceedings.)

12  BY MR. AXELROD:

13  Q.   I'll come back to that letter; but the upshot of it is you

14  had -- you signed these agreements; there was an assertion

15  made, a concern raised, a reminder of your obligations, and

16  then you responded to that; right?

17  A.   That is correct.

18  Q.   Okay.  And you are saying that's the only time that you

19  have heard of a company sending a letter to a former employee

20  reminding them of their confidentiality agreements?

21  A.   No.  I said there were two of us who received the letters.

22  Q.   Okay.  But anybody -- you never heard of anyone else

23  receiving those kinds of letters?

24  A.   I haven't.

25  Q.   Have you reviewed the evidence of those types of letters

1    in this case?

2    **A.**    Could you be a little bit more specific?

3    **Q.**    Well, have you seen any other agreements or letters to

4    employees, former employees, of other companies raising issues

5    about confidentiality?

6    **A.**    I don't believe so.

7    **Q.**    Okay.

8                        (Pause in proceedings.)

9            **MR. AXELROD:**  And just to complete the discussion

10   we've been having, Your Honor, may I approach with Exhibit 951?

11           **THE COURT:**  Yes, you may.

12   **BY MR. AXELROD:**

13   **Q.**   Mr. Cooper, do you recognize that document?

14   **A.**    Yes.  This is my response to the second letter from

15   Mr. Koutras.

16   **Q.**    Okay.  And, Ms. Mahoney, could you --

17           **MR. AXELROD:**  And, Your Honor, the Government offers

18   Exhibit 951 into evidence.

19           **MR. GASNER:**  Your Honor, I don't have it handy.

20   Perhaps, may I approach and take a look at it?

21           **THE COURT:**  Sure.

22                        (Pause in proceedings.)

23           **MR. GASNER:**  No objection.

24           **THE COURT:**  Admitted.

25        (Trial Exhibit 951 received in evidence.)

COOPER - CROSS / AXELROD

1  BY MR. AXELROD:

2  Q.   And it says here, Mr. Cooper -- could you --

3       MR. AXELROD:  If we could blow that up, Ms. Mahoney,

4  the text of the letter.

5  BY MR. AXELROD:

6  Q.   So, first of all, it says:

7       "I have been further reviewing your letter of July 9,

8       2009, and my letter of July 15, 2009."

9       Do you see that?

10 A.   Correct.

11 Q.   So it doesn't reference another letter from Mr. Koutras,

12 but you indicated that there was?

13 A.   Yes.

14 Q.   During that time period or later?

15 A.   Uhm, during this time period.

16 Q.   Okay.  But not one that you chose to reference in this

17 particular correspondence?

18 A.   Correct.

19 Q.   Okay.  And could you please read that text of your letter.

20 A.   Certainly.  (reading)

21       "Dear Mr. Koutras, I have been further reviewing your

22       letter of July 9, 2009 and my letter of July 15, 2009.

23       "Firstly, I can assure you that I have never divulged

24       any trade secrets or confidential information belonging to

25       Millennium or SCM and obtained during my employment with

SCM and Millennium to persons outside of the company who
could make use of that information to the detriment of
SCM, Millennium or Cristal.

"Secondly, when I was laid off by Millennium in 2001
I signed a noncompete agreement valid for a period of one
year, and I have also fulfilled those obligations.
Clearly, some 7 years after the expiration of that
noncompete agreement I consider myself free to work in the
titanium dioxide.  Senior management at Cristal and their
legal advisors at King & Spalding are aware I have done so
and have raised no objections.

"Thirdly, I should point out that I received
information from Millennium after I left Millennium, as I
was employed by Cristal as a member of the due diligence
team and transition team during the acquisition of
Millennium by Cristal.  The second (sic) agreement
associated with that employment relates only to
nondisclosure of information not in the public domain and
I have fulfilled and continue to fulfill the requirements
of that secrecy agreement.

"Fourthly, I have received information from sources
other than SCM, Millennium or Cristal but relating to SCM,
Millennium and Cristal since I was laid off by Millennium.
This information is clearly outside the scope of my
agreements with SCM, Millennium or Cristal.

COOPER - CROSS / AXELROD

1              "Sincerely Paul A. Cooper."

2    **Q.**   So it sounds like you have a very good understanding of

3    what you can and can't do under the terms of your agreements,

4    right?

5    **A.**   As an engineer, yes, that is correct.

6    **Q.**   Right.  So you -- you know what's secret and what's not

7    secret, right?

8    **A.**   No, I don't, still to this day.

9    **Q.**   Well, when you correspond with Mr. Koutras you indicated

10   that you hadn't divulged any trade secrets, right?

11   **A.**   That is correct.

12   **Q.**   Okay.  So you must have had something in mind when you

13   said that?

14   **A.**   I have something in my mind, but it's never been defined.

15   **Q.**   Well, let's talk about that for a minute.

16   **A.**   Please.

17   **Q.**   So is it your testimony that if an agreement like the ones

18   that we've talked about, that you are subject to, it's entirely

19   subject to your discretion to decide what is or isn't a trade

20   secret?

21   **A.**   That is correct.

22   **Q.**   Okay.

23   **A.**   I was actually asked this question before --

24   **Q.**   Okay.

25   **A.**   -- in front of the London High Court Judge.

**COOPER - CROSS / AXELROD**

1    Q.   Okay.  But you make a point in this letter of saying that

2    legal advisors and the senior management at the company are

3    aware of your work, and they haven't raised an objection,

4    right?

5    A.   That is correct.

6    Q.   So you know that there are people out there that you could

7    consult if you had questions about the scope and nature of your

8    agreement?

9    A.   That is correct.  And I have done so.

10   Q.   So when you have a question you get counsel about where

11   things fit, right?

12   A.   I have talked to lawyers about this particular subject,

13   yes.

14   Q.   Okay.  And --

15   A.   Including this gentleman I refer to here at

16   King & Spalding.

17   Q.   I want to ask you about the technology from Ashtabula.

18        SCM and --

19   A.   Sorry, can you be more precise?

20   Q.   No.  I'm actually asking you generally about the

21   technology related to Ashtabula.

22   A.   Ashtabula 1; Ashtabula 2; Line 1; Line 2?

23   Q.   Understood.  Fair point.

24        I'm talking about the Ashtabula Line 1 technology, the

25   technology that the company -- that SCM had acquired from

COOPER - CROSS / AXELROD

1    Sherwin-Williams.

2    **A.**    Thank you.

3    **Q.**    Yes.  That technology has never been put in the public

4    domain, has it?

5    **A.**    When it came up for sale, I was told --

6    **Q.**    I'm sorry, sir, I'm not asking you a question about what

7    you were told.  I'm asking you a question, a yes or no

8    question.

9           **MR. GASNER:**  Your Honor, that wasn't a yes or no

10   question.

11          **THE COURT:**  Will you rephrase, please.

12          **MR. AXELROD:**  Sure.

13   **BY MR. AXELROD:**

14   **Q.**    Has the technology from Ashtabula Line 1 -- excuse me,

15   Ashtabula 1, ever been made public by the company?

16   **A.**    Which company?  Sherwin-Williams or SCM?

17   **Q.**    I'm talking about SCM and its successors.

18          Has SCM or its successors ever made that Ashtabula Line 1

19   technology public?

20   **A.**    Some of it, yes.

21   **Q.**    The technology that had been acquired by SCM from

22   Ashtabula 1, you worked on, right?

23   **A.**    Correct.

24   **Q.**    And you worked on improving it, right?

25   **A.**    No.  I took those designs from Hawkins Point Plant.

COOPER - CROSS / AXELROD

1  **Q.**   So you never used the technology and worked on improving

2  the technology from Ashtabula 1?

3  **A.**   I worked on removing some of it.

4  **Q.**   Okay.  So the technology that was acquired in Ashtabula

5  Line 1 was not something that was of use to you in your work?

6  **A.**   It had already been developed --

7  **Q.**   Okay.

8  **A.**   -- further.

9  **Q.**   Right.  And when it was developed further --

10 **A.**   I used that technology.

11 **Q.**   Right.  And that technology that you used, that was never

12 publicly disclosed?

13 **A.**   Some of it has been.

14 **Q.**   So I want to ask you about the following statement, ask

15 you if you agree or disagree, okay?

16 **A.**   Yes.

17 **Q.**   The technology utilized by SCM chemicals in the

18 manufacture of titanium dioxide is a proprietary technology

19 initially acquired from the Sherwin-Williams company and

20 subsequently refined and developed to a point that it is

21 exclusively utilized by SCM Chemicals.

22 **A.**   That's a very complicated question.

23        The complication is that --

24 **Q.**   I'm sorry, can you answer whether you agree or disagree

25 with that statement?

COOPER - CROSS / AXELROD

1    **A.**    It's not a yes or no answer.  I'm sorry.

2    **Q.**    Okay.  Let me try to break it down then.

3         The technology utilized by SCM Chemicals in the

4    manufacture of titanium dioxide is a proprietary technology.

5    Do you agree with that statement?

6    **A.**    No, I do not.

7    **Q.**    Okay.  Do you agree that that technology was subsequently

8    refined and developed?

9    **A.**    Some of it, yes.

10   **Q.**    And do you agree that the portion, the some of it that was

11   refined and developed, is proprietary?

12   **A.**    Yes.

13   **Q.**    So I gather it's your testimony that some portion of the

14   Ashtabula 1 technology is publicly available?

15   **A.**    That is correct.

16   **Q.**    Okay.  So let's say I wanted to acquire an Ashtabula Line

17   1 process flow diagram.

18   **A.**    Yes.

19   **Q.**    Could I go buy that on the public market?

20   **A.**    No.  You can find it on the Internet.

21   **Q.**    So all -- are you saying that the Ashtabula Line 1, all

22   the technology, all the flow sheets are publicly available,

23   they're all on the Internet?

24   **A.**    That's not what I said.

25   **Q.**    Okay.

**COOPER - CROSS / AXELROD**

1    **A.**    I said the process flow diagrams can be found on the

2    Internet.

3    **Q.**    Okay.  The specific operating conditions -- can the

4    specific operating conditions of Ashtabula Line 1 be found on

5    the Internet?

6    **A.**    Some of them can be.

7    **Q.**    How about the process design briefs, can you find those on

8    the Internet?

9    **A.**    That specific document, no, you can't find.

10   **Q.**    How about R&D reports that were authored by the company?

11   **A.**    They are not on the Internet.

12   **Q.**    And I gather for Ashtabula Line 1 -- excuse me, Ashtabula

13   1 there is quite a few different process flow diagrams, right?

14   **A.**    There actually aren't very many but, yes, there are a

15   number.

16   **Q.**    How many are there?

17   **A.**    For Line 1, probably five, maybe six, if my recollection

18   is correct.

19   **Q.**    And that's your recollection as of 2000 what?

20   **A.**    No, the last time I saw them was 1989.

21   **Q.**    '89.

22          And how about for Line 2?

23   **A.**    Line 2, I probably last saw them in the 1990s.

24   **Q.**    Okay.

25   **A.**    But they themselves are not public.

COOPER - CROSS / AXELROD

1    Q.    And how many of those are there?

2    A.    I can't be really specific, but maybe eight.

3    Q.    So your testimony here today is that the process flow

4    diagrams -- of the five or six Line 1 from Ashtabula 1, you

5    said there's about five or six process flow diagrams, right?

6    A.    Correct.

7    Q.    And just for ease of conversation, I'll call them PFDs.

8    A.    Fine.

9    Q.    Your testimony today is how many of those specific

10   documents are available on the Internet?

11   A.    I'm just trying to remember because it's part of a court

12   case.  Probably all of them.

13   Q.    And does your report, the 80-page report that you wrote,

14   does it mention that in it?

15   A.    No.  I found these recently.

16   Q.    I see.

17        And how about the designs for the Ashtabula Line 1

18   oxidation reactor, are those publicly available?

19   A.    Not to my knowledge, with one exception, and that is the

20   original patents for the Antioch plants.

21   Q.    Let's talk for a moment about your involvement.  I think

22   you've alluded to it.  You talked about earlier, at some point

23   after you left Millennium you came back and advised the company

24   that was going to acquire Millennium, right?

25   A.    Cristal Global, that is correct.

**COOPER - CROSS / AXELROD**

1   **Q.**   And that's doing due diligence, right?

2   **A.**   Two parts.  One is -- the first part is due diligence

3   before the acquisition.  And then I was part of the transition

4   team after we had actually acquired Millennium.

5   **Q.**   Okay.  So let's focus on the due diligence part.

6       To do due diligence -- and was that your first involvement

7   in a due diligence operation?

8   **A.**   No, it was not.

9   **Q.**   Okay.  When else had you done due diligence?

10  **A.**   For -- twice before.

11  **Q.**   Okay.  And what were those instances?

12  **A.**   Private equity, purchasing or trying to purchase the TiO2

13  assets of Kerr-McGee.  And then again private equity company,

14  trying to purchase Tronox after bankruptcy.

15  **Q.**   Okay.  So when you worked with -- on the Kerr-McGee

16  potential acquisition, were you subject to a nondisclosure

17  agreement?

18  **A.**   No, I was not.

19  **Q.**   Okay.  So you were not -- were you provided with access to

20  technology?

21  **A.**   Yes, I was.

22  **Q.**   Okay.  And how about on the Tronox deal, were you subject

23  to a nondisclosure agreement?

24  **A.**   Yes, I was.

25  **Q.**   And with respect to the advising Cristal, were you subject

COOPER - CROSS / AXELROD

1  to a nondisclosure agreement?

2  **A.**   Yes, I was.

3  **Q.**   Okay.  And the nondisclosure agreement limited what you

4  could do with the information you learned during the course of

5  that due diligence?

6  **A.**   That's correct.  And for a time period afterwards.

7  **Q.**   And one of the things you did was you evaluated the R&D

8  group at Millennium, right?

9  **A.**   No, I did not.

10  **Q.**   Okay.  So you --

11  **A.**   Not during the due diligence part.

12  **Q.**   Okay.  So during due diligence you were not involved in

13  looking at the -- what R&D had done at Millennium?

14  **A.**   We were under -- because we were a competitor --

15  Cristal Global was already manufacturing TiO2, as was

16  Millennium -- we were governed by SEC rules.  And we were not

17  allowed direct acc- -- we, the group working for Cristal, were

18  not entitled nor could request certain information.  We had to

19  be a bit hands-off, so we hired a consultancy who acted as a

20  sort of barrier between the two companies.

21      After the purchase transaction we became free to know

22  everything, obviously.

23  **Q.**   Okay.  So but during that time where you had a consultant,

24  I gather one of the things you did was look at the consultant's

25  work product about the R&D portfolio at Millennium?

1    **A.**    We were not shown that.

2    **Q.**    Okay.  Were you provided information from the work that

3    the consultants were doing?

4    **A.**    Me personally, no.

5    **Q.**    Okay.  So you were never aware of what -- of any

6    information about the R&D development work at Millennium during

7    this due diligence phase?

8    **A.**    I believe that's correct.  We may have had a quick walk

9    around the facility, but I think that was probably it.

10   **Q.**    Okay.  Well, as you understood it, what was the purpose of

11   looking at the R&D group at all?  Why bother hiring a

12   consultant to look at it?

13   **A.**    Because consultants may well have done a much more

14   thorough job.  We were not allowed, under SEC rules, to see

15   that information as a competitor.  So they evaluated and they

16   produced, I believe, although I never saw it, a very sanitized

17   report, more on the lines is:  We agree that the claims made by

18   Millennium were correct.

19   **Q.**    Okay.  And were those claims related to their R&D

20   portfolio?

21   **A.**    I believe they were nonspecific.  As I say, I didn't see

22   the report.

23   **Q.**    I want to talk to you for a moment about DuPont and

24   their -- and the lines that they have.  And I'm going to get

25   the board here for a moment.

1      (Government and defense counsel confer off the record and

2   out of hearing of the reporter and jury.)

3          **MR. GASNER:**  I was planning to use that on my

4   redirect.  I do have a photograph, and I will re-putt it up on

5   the board in my handwriting, if that's okay with you.

6          **MR. AXELROD:**  I'm sure it will be neater than mine.

7   **BY MR. AXELROD:**

8   **Q.**   Okay.  What I'd like to do is have you tell me about

9   the -- the DuPont lines, and sort of give me a sense of their

10  operating -- their output, what they're doing.  And we can use

11  today's -- you know, today's time frame as a reference.

12       So let's sort of run through the different DuPont

13  facilities and their output.

14  **A.**   Okay.  What I can say is this information is from other

15  reports, so I'm passing on things that I've read.  Is that

16  okay?

17  **Q.**   That's fine.

18  **A.**   Okay.

19  **Q.**   Okay.  So let's -- let's start -- why don't you just start

20  going down the list of plants.

21  **A.**   Edgemoor.

22  **Q.**   Okay?

23  **A.**   The last number I saw actual production today is 105,000.

24  **Q.**   Okay.  So that's 105,000 tons per year?

25  **A.**   Yeah.  That's not their main capacity, but that's what I

**COOPER - CROSS / AXELROD**

1  saw was actually being produced.

2  **Q.**  Okay.  And is that -- what's next?

3  **A.**  DeLisle 1 and 2.

4     And 2.  I can't split them up from the information I've

5  got.

6  **Q.**  You can't -- you don't know?

7  **A.**  Don't know how they split.

8  **Q.**  Okay.

9  **A.**  They may be different sizes, they may be the same size.

10  **Q.**  How about -- what other facilities?

11  **A.**  New Johnsonville.

12  **Q.**  What do you have for New Johnsonville?

13  **A.**  To my memory, they had a Line 1, Line 2, and a half a

14  line.

15  **Q.**  So for New Johnsonville, for Line 1?

16  **A.**  I can't split them out.

17  **Q.**  Do you have a total?

18  **A.**  370,000.

19     And for DeLisle 320,000 total.

20  **Q.**  Okay.  So you say 320 for DeLisle.  So we could call that

21  160 a line?

22  **A.**  I can't because looking at the photographs they don't

23  appear to be the same size.

24  **Q.**  Okay.  And how about for New Johnsonville?

25  **A.**  There's a half a line there.

**COOPER - CROSS / AXELROD**

1    **Q.**   So there's one, two, and another half?

2    **A.**   Two and a half, whatever you want to call it.  That was my

3    reading of the data.

4    **Q.**   Okay.  Would you feel comfortable on DeLisle 1 saying each

5    line's over a hundred thousand, or a hundred now?

6    **A.**   Oh, I would be comfortable in saying that, yes.

7    **Q.**   Okay.  So a hundred and a hundred.  I will put a squiggle.

8    Those are estimates?

9    **A.**   Approximates, yes.

10   **Q.**   And then for New Johnsonville, would you be comfortable

11   saying each one of those, the two lines at least is a hundred

12   or 125?

13   **A.**   They are greater than 100,000.

14   **Q.**   Are they greater than 125, do you think?

15   **A.**   Probably.

16   **Q.**   Okay.  Will you be comfortable with 125 as a --

17   **A.**   Greater than, yes.

18   **Q.**   And how about the two and a half?

19   **A.**   Know very, very little about that.  It was just reports

20   that they had a half a plant stuck in the middle.

21   **Q.**   Okay.  How about -- what else?

22   **A.**   Kuan Yin.

23   **Q.**   I'm sorry?

24   **A.**   Kuan Yin.

25   **Q.**   Kuan Yin.  And what have you got for Kuan Yin?

COOPER - CROSS / AXELROD

1    A.    120,000.

2    Q.    So Edgemoor, the two lines at DeLisle, two and a half

3    lines at New Johnsonville, Kuan Yin, and what else?

4    A.    Altamira.

5    Q.    Okay.

6    A.    Somewhere between 120 and 150.

7    Q.    And --

8    A.    And, finally, they have a finishing plant.

9    Q.    Okay.

10   A.    At Arembepe.

11         Arembepe.  I'm sorry, I'm pronouncing it for the --

12   Q.    I would love it if you spelled it.

13   A.    A-r-e-m-b-e-p-e, I believe.

14   Q.    Okay.  So that's finishing?

15   A.    That's only finishing.

16   Q.    Okay.  So that doesn't really have an output the same way?

17   A.    This is the one we were having some discussions about

18   earlier on --

19   Q.    Yeah.

20   A.    -- having a finishing plant.

21   Q.    Okay.  Is there a number associated with it?

22   A.    No, because it comes from somewhere else.

23   Q.    Okay.

24         THE COURT:  Mr. Axelrod, is this a good time?

25         MR. AXELROD:  Yes.

1          **THE COURT:**  Ladies and gentlemen, we are going to take

2     our first break of the morning.  Please remember the Court's

3     usual admonitions and keep an open mind.  Fifteen minutes.

4          You may step down and step out of the courtroom, please.

5          **THE WITNESS:**  Thank you.

6     (Proceedings were heard out of presence of the jury:)

7          **THE COURT:**  Mr. Axelrod, how much more time do you

8     have?

9          **MR. AXELROD:**  Not too much longer.

10         **THE COURT:**  Our hour and a half seems to have gone

11    asunder here.

12         **MR. AXELROD:**  I will be wrapping up, I'm guessing, 15

13    minutes.

14         **THE COURT:**  All right.  Great.

15         **MR. AXELROD:**  Yes.

16         **THE COURT:**  All right.  Fifteen minutes.

17                    (Recess taken at 9:41 a.m.)

18                    (Proceedings resumed at 9:57 a.m.)

19    (Proceedings were heard out of presence of the jury:)

20         **THE COURT:**  We're back in session.

21         You had something you wanted to bring up?

22         **MR. AXELROD:**  Yes.  Thank you, Your Honor.

23         I'm just trying to anticipate, based on Mr. Gasner's

24    comments about wanting to use the board that I had done

25    yesterday with Mr. Cooper, it sort of raises a concern that I

1    think is worth discussing before we get to redirect, which is

2    Mr. Cooper said what he said about the employees.

3        My concern is that Mr. Gasner is going to now try to lead

4    Mr. Cooper through a series of employee files, and things of

5    that ilk, which are not things that he relied on.  He

6    specifically said he relied on the work product.

7        And to have him be led through an effort to rehabilitate

8    the fact that he doesn't actually know who the employees of the

9    company are would be improper, and it would be improper to have

10   him led.  It would be improper to show him records that are not

11   the basis of his expert report.

12       So I wanted to front that.  Now -- because I'm concerned

13   that that's where this may be heading based on his comment that

14   he wanted to use the board that I created.  And I think that

15   would be an improper examination.

16       **MR. GASNER:**  I disagree vigorously, Your Honor.

17       Mr. Axelrod gave a very incomplete list of employees and

18   asked him selected ones.  I think I'm entitled to try to

19   refresh the witness's memory as to documents that he, I think,

20   has reviewed, and employees that he did become familiar with

21   their work, and ask him:  Is this one of the employees that you

22   became familiar with?  And he's either going to say yes or no.

23       I have not talked to him so I'm shooting blind.  But I

24   think I am entitled to rehabilitate him after the ambush, which

25   I thought was unfair.

1          **THE COURT:**  Well, I wouldn't call it an ambush because

2     he made the comment about what he viewed as the competence and

3     experience level.  So I don't think -- I think for

4     cross-examination it's definitely not an ambush.  And that's a

5     central issue in the case, is how well qualified USAPTI

6     employees were to do what they did.

7          **MR. GASNER:**  That was probably the wrong, exaggerated

8     metaphor.

9          What I object to is that Mr. Axelrod led, as he was

10    entitled to, and came up with a pretty partial, small list and

11    acted as though that was it.

12         I think that Mr. Cooper will have his memory refreshed as

13    to many people, and I think I'm entitled to try especially with

14    exhibits that have been admitted into evidence.  He'll say

15    yes -- or no, I never heard of that guy; or yes, I did, and

16    that was part of the materials that I reviewed.

17         **THE COURT:**  All right.

18         **MR. AXELROD:**  Well, a couple of points, Your Honor,

19    first of all, the Court may recall that I actually asked some

20    very open-ended questions about this.  I didn't lead him

21    through.  I actually asked him to tell me who the employees

22    were, and he didn't know any, and he explained why he didn't.

23         If the defense wants to argue in closing about all the

24    records that show all the other employees, that's fine.  But to

25    have this expert review exhibits that weren't part -- are not

1    part of his expert disclosure is improper.

2         **MR. HEMANN:**  Those are the questions that you asked.

3         **MR. AXELROD:**  Right.  I asked:

4         "Can you go ahead and start telling me the names of

5    the people on the team."

6    There was no effort to mislead or create -- any partial

7    list that was created is because that's what the witness knows.

8    To create a suggestion in front of the jury that he knew

9    lots of things because there were exhibits that have nothing to

10   do with his testimony --

11        **THE COURT:**  Well, here's the point:  The point is, so

12   you asked the open-ended question.  Fair enough.  He gave the

13   answer that he could remember in response to the question.

14   And I think it's fair, without getting into -- I don't

15   think what we want to do is get into an exercise, because it

16   would be unfair to both sides in the search for truth here, to

17   have him say, oh, here's this resume of such and such; don't

18   you agree that that says X, Y, Z?

19   You can ask him, you know, you can certainly ask him if he

20   remembers any other employees.  And if he says no, you ask,

21   Would showing you a document refresh your memory?  And I'll

22   instruct him carefully about that, what he is to do; not just

23   read it and say, oh, yeah, it says in her resume X, Y, Z, so

24   that's what I remember.

25   Why isn't that a fair completion of the point?

1          **MR. AXELROD:**  Because there's a foundational issue,

2     which is it would certainly be appropriate for him to share

3     with him, In your review in this case you looked at document X.

4          So if they want to show him documents within the universe

5     of documents that he identified in his expert report, that is

6     fair.  But to now expand the scope to a bunch of other things,

7     there's no foundation for him to do that.  He's an expert in

8     particular matters, not an expert about all the things that the

9     defense wants to show him.

10          **THE COURT:**  All right.  Well --

11          **MR. AXELROD:**  It's not foundation.

12          **THE COURT:**  It's pretty clear that if the expert --

13     because he did a very thorough job of identifying either

14     specifically or categorically the documents he reviewed, if

15     it's a document he didn't review in the course of preparing his

16     report, then I'm not going to let it be used for any purpose

17     whatsoever because that would be an ambush.  That's the fair

18     game.  We've been playing by those rules.

19          So unless you can demonstrate from his report and from the

20     attachments, Mr. Gasner, that this is included and relied upon

21     by him, then I won't allow it.

22          It's a different kettle of fish for the cross-examiner, as

23     you did very effectively with the government experts, to ask

24     him questions that are outside, if you will, the wheelhouse of

25     their opinions or what they relied upon to test, well, did you

know about this? did you know about that?

It's different on direct and redirect. So I'm going to require that showing of offer proof before I allow even for refreshing of recollection.

You can certainly ask him: Do you have any further recollection about employees? And I won't let you lead him. And if he says, yeah, now that you mention it I do, and if he says no -- and a particular document wasn't relied on by him in his report, that's the end of the inquiry, as far as I'm concerned.

MR. GASNER: As far as open-ended questions about identifying an employee, how about this person, is this a person that you -- you know, without showing him the document. And then he either remembers the person and can identify who they are, or not. I think that's kind of the middle ground.

I mean, his stack of exhibits is 12 inches high.

THE COURT: Well, but the burden is on you if you're going to be trying to put that forth. The government has raised an appropriate objection. You're going to have to say, you know -- Mr. Axelrod has a few more minutes to go. I will hold him to that.

MR. GASNER: I'll do the best I can.

MR. FROELICH: Your Honor, I want to remind the Court, I have five or six questions.

THE COURT: Please do remind me before I put it

1    back -- it's never clear to me, not that important but an

2    interesting academic exercise, whether you get to do the direct

3    of the expert or the cross because, arguably, he's identified

4    with your side.  But we're not going to split hairs.

5         **MR. FROELICH:**  It's going to be very easy, Your Honor.

6    It's not going to be difficult.

7         **THE COURT:**  All right.  Let's go ahead and get the

8    witness.

9         **THE CLERK:**  All rise for the jury.

10        **THE COURT:**  Someone ask the witness to rejoin us.

11   Thank you.

12        (Jury enters at 10:05 a.m.)

13        **MR. HEMANN:**  May I grab the exhibits, Your Honor?

14        **THE COURT:**  Sure.  All right.  Please be seated.

15   You may resume the stand, Mr. Cooper.

16        **THE WITNESS:**  Thank you, Your Honor.

17        **THE COURT:**  And you may proceed.

18        **MR. AXELROD:**  Thank you, Your Honor.

19   **BY MR. AXELROD:**

20   **Q.**   Mr. Cooper, before the break we were talking about your

21   estimates of the output of the DuPont -- current output of the

22   DuPont facilities; do you recall that?

23   **A.**   Yes.  Could I revise a little bit?

24   **Q.**   Yes.

25   **A.**   The business went through a tremendous decrease in

1    production last year, so these may or may not be actually what

2    the plants are running at today.

3    **Q.**    Okay.  Understood.  But these were the -- these are sort

4    of the estimates up to that point?

5    **A.**    Correct.

6    **Q.**    Okay.  And -- but fair to say that all the lines that you

7    identified have a capacity in excess of 100,000 tons per year?

8    **A.**    That's correct.

9    **Q.**    And these are all chloride route facilities?

10   **A.**    Correct.

11   **Q.**    All right.  So let's talk about China.

12          And, again, let's talk about chloride route TiO2

13   facilities currently operating in China.

14   **A.**    That's fine.

15   **Q.**    Can you identify for me the plants in China that operate

16   on chloride route?

17   **A.**    The plant at Jinzhou has two lines, approximately 12,000

18   apiece; 12,000 tons of TiO2, approximately.

19   **Q.**    What's next?

20   **A.**    Xinli.  X-i --

21   **Q.**    I'm going to ask you to spell that for me.  Go ahead.

22   **A.**    X-i-n-l-i.

23   **Q.**    X-i-n-l-i?

24   **A.**    That's correct.

25   **Q.**    Okay.  How many lines?

1   **A.**    One line.

2   **Q.**    Okay.

3   **A.**    Presently being commissioned, about 60,000.

4   **Q.**    Okay.  But it's not currently producing 60,000 tons?

5   **A.**    Uhm, part of it are; part of it aren't.

6   **Q.**    Okay.  So there's a chloride route facility at Xinli

7   that's operating.  What's your best estimate of its current

8   output?

9   **A.**    When it's running, probably about 30- to 40,000.

10  **Q.**    How often is it running?

11  **A.**    Not very frequently at the moment.

12  **Q.**    So when it's running it's at the 30-, 40,000, what

13  percentage of the time is it running?

14  **A.**    I don't know that.

15  **Q.**    I'm asking you to give your best estimate of the actual

16  output, you know, say in the last year.

17  **A.**    In the last year?

18  **Q.**    Yeah.

19  **A.**    Less than 10,000.

20  **Q.**    Okay.  What's the next one?

21  **A.**    Those are the only plants that are presently operating

22  today, chloride route TiO2 plants.

23  **Q.**    Okay.  So -- so you have one facility with two 12,000-ton

24  per year output, right?

25  **A.**    Correct.

1    Q.    Okay.  And another one with less than 10?

2    A.    Presently, over the last year, yes.

3    Q.    Okay.  Now, there's a lot of engineers in China, right?

4    A.    That's correct.

5    Q.    And, in fact, there's a recognized expert,

6    Mr. Liu Changhe, right?

7    A.    That is correct.

8    Q.    And he knows about TiO2?

9    A.    That is correct.

10   Q.    He's written a manual, a textbook you've relied upon?

11   A.    That's correct.

12   Q.    And, of course, they have access to all the patents that

13   are in the public domain, right?

14   A.    That's correct.

15   Q.    And they have access to all the textbooks in the public

16   domain, right?

17   A.    Correct.

18   Q.    And they can go online and look at satellite images and

19   things like that?

20   A.    That's correct.

21   Q.    Okay.  So all the public information that's out there,

22   they could use too, right?

23   A.    Yes.

24   Q.    And with Jinzhou they -- they already had a plant that was

25   operating, right?

1    **A.**   That's correct.

2    **Q.**   But despite all of that, they don't have the technological

3    ability to operate chloride route facility?

4    **A.**   That has not been their focus in TiO2, is the chloride

5    route.  They built a million tons of sulfate capacity.

6    **Q.**   Okay.  But you'd agree that they're trying to develop

7    chloride route technology now?

8    **A.**   They are trying to develop chloride route technology now.

9    And there are a number of licenses that have been let recently.

10   **Q.**   Right.  But despite their desire to obtain that chloride

11   route technology and the existence of all the information

12   that's currently in the public domain, they have been

13   unsuccessful in doing so beyond these two small plants that you

14   just described?

15   **A.**   Yes, except that they built -- their focus has been on the

16   sulfate route plants, and they built a million tons.  That's

17   been their focus as an industry.

18   **Q.**   So the focus that we have here, though, is on the chloride

19   route process?

20   **A.**   That's right.

21   **Q.**   And the point is that with respect to chloride route

22   process they've got a ways to go?

23   **A.**   That's correct.

24   **Q.**   So I want to ask you about the -- the trade secrets in

25   this case.

1          You have spent over 800 hours working on this case, right?

2     **A.**    That's correct.

3     **Q.**    Okay.  And at that point that's -- based on your rate

4     that's over $200,000?

5     **A.**    That's correct, to date.

6     **Q.**    Okay.  And I gather one of your central focuses was to see

7     if you could find these particular documents in the public

8     domain?

9     **A.**    That's correct.  One of the focuses, yes.

10    **Q.**    And this is the Basic Data Document from Kuan Yin, Exhibit

11    161?

12    **A.**    Yes, I've seen it.

13    **Q.**    Right.  Can you find this particular compilation, this

14    particular grouping of information in the public domain?

15    **A.**    All in one place?

16    **Q.**    Yes.

17    **A.**    No, you can't.

18    **Q.**    And you've seen this, this is the Accession Report?

19    **A.**    Yes, I have.

20    **Q.**    Did you look for this in the public domain?

21    **A.**    Yes, I did.

22    **Q.**    And did you find this particular document in the public

23    domain?

24    **A.**    That specific document, no.

25    **Q.**    And then there are a couple of plans, right?

**COOPER - CROSS / FROELICH**

1   **A.**    That's correct.

2   **Q.**    And there's the Oxidation with RPS Flow Sheet that we've

3   talked about, right?

4   **A.**    Correct.

5   **Q.**    And there's also the Chlorinations document that we talked

6   about as well?

7   **A.**    Purely the chlorination, yes.

8   **Q.**    Did you look for these specific documents in the public

9   domain?

10  **A.**    Those specific documents, yes.  And I can't find them.

11  **Q.**    They're not available in the public domain?

12  **A.**    Those specific documents.

13          **MR. AXELROD:**  I have no further questions, Your Honor.

14          **THE COURT:**  Thank you.

15  Mr. Froelich, you may examine, if you wish.

16          **MR. FROELICH:**  I just have a few.

17          **THE COURT:**  Okay.  Whatever you want to do.

18                    <u>**CROSS-EXAMINATION**</u>

19  BY MR. FROELICH:

20  **Q.**    Mr. Cooper, I'm Jerry Froelich, and I represent

21  Mr. Maegerle.

22  **A.**    Good morning.

23  **Q.**    Good morning.

24          You graduated -- where did you graduate college again?

25  **A.**    University of Manchester Institute of Science Technology

**COOPER - CROSS / FROELICH**

1    in England.

2    **Q.**   And that was with a degree in engineering?

3    **A.**   Chemical engineering, yes.

4    **Q.**   Chemical engineering.

5         Now, when you come out of college with a degree in

6    engineering you know some of the basics that they teach in

7    college, and that's about it; is that right?

8    **A.**   That's pretty much the case, yes.

9    **Q.**   And then you learn on the job?

10   **A.**   Mainly, yes, that's correct.

11   **Q.**   And that's what -- that's what builds your reputation and

12   your abilities as an engineer, your on-the-job training?

13   **A.**   That's correct.

14   **Q.**   And the more -- and particularly like when you get in

15   TiO2, you start learning -- you learn about the TiO2 process;

16   isn't that correct?

17   **A.**   That's correct.

18   **Q.**   And that adds to your knowledge; isn't that correct?

19   **A.**   That's correct.

20   **Q.**   And it becomes the knowledge in the trade; is that right?

21   **A.**   Yes, that's a fair way of putting it.

22   **Q.**   And that's one of the things that makes you an engineer

23   and allows you to do other things in the TiO2?

24   **A.**   That's correct.

25   **Q.**   Okay.  And I noticed that in one of your agreements that

**COOPER - CROSS / FROELICH**

1   they showed to you, one of the exceptions was you were allowed

2   to carry the knowledge of the trade with you; isn't that

3   correct?

4   **A.**   That's correct.

5   **Q.**   Now, there were two -- there was a couple of other things

6   that you were shown.  And rather than putting them up, I

7   noticed that both in the letters to you and the agreements that

8   you had, that the things that you were not allowed to reveal

9   was -- there were two different types of documents that -- or

10  information you were not allowed to receive -- reveal:

11  Confidential information; is that correct?

12  **A.**   Correct.

13  **Q.**   And then there was a second group, in all your documents,

14  of trade secrets; isn't that correct?

15  **A.**   That's correct.

16  **Q.**   And there's a difference between confidential information

17  and trade secret information, isn't there?

18  **A.**   In my interpretation, yes, there is.

19  **Q.**   And they specifically separate them in your agreements?

20  **A.**   They do.

21  **Q.**   Now, you said that you went to -- you talked about it both

22  on direct and cross-examination, that you went to the Jinzhou

23  plant in China?

24  **A.**   That's correct.

25  **Q.**   Okay.  And that's the -- that's the plant that was in

**COOPER - REDIRECT / GASNER**

1  existence.  How long has that been in existence; do you know?

2  **A.**    From about the early 1990s, approximately mid 1990s.

3  **Q.**    Okay.  And that -- you saw the flue pond there, didn't

4  you?

5  **A.**    I did.

6  **Q.**    And that had square elbows, didn't it?

7  **A.**    Yes, it did.

8           **MR. FROELICH:**  That's all I have.

9           **THE COURT:**  Thank you.

10  Mr. Gasner, do you have any examination?

11           **MR. GASNER:**  I do, Your Honor.  Thank you.

12           **THE COURT:**  You may proceed.

13           **MR. GASNER:**  Thank you, Your Honor.

14                    **REDIRECT EXAMINATION**

15  **BY MR. GASNER:**

16  **Q.**    Good morning, Mr. Cooper.

17  **A.**    Good morning.

18  **Q.**    Mr. Axelrod asked you some questions about the big patent

19  board we had --

20  **A.**    Yes.

21  **Q.**    -- out yesterday.  Do you recall that?

22  **A.**    I do.

23  **Q.**    And I believe he pointed out some patents that don't

24  involve titanium dioxide specifically.  Do you recall that?

25  **A.**    That's correct.

COOPER - REDIRECT / GASNER

1  Q.  Can you explain to the members of the jury why it is that

2  disciplines outside TiO2 can sometimes be useful in building a

3  TiO2 plant.

4  A.  Certainly.

5     One of the specific ones was, in fact, a spray dryer.

6  Spray dryers are used in many industries.  In fact, the TiO2

7  industry usages are quite small; whereas, in things like flour,

8  corn, ceramics, and other things, they're widely used.  So

9  there's many more out there doing other things other than TiO2.

10  Q.  And are those disciplines still useful in designing and

11  building a TiO2 plant?

12  A.  Oh, absolutely, because they are the same designs; they

13  just use TiO2 instead of the other things.

14  Q.  Mr. Axelrod asked you some questions about the employees

15  and their credentials.  Do you recall that line of examination?

16  A.  Yes, I do.

17  Q.  And I believe his point was that many of the employees of

18  USAPTI didn't have specific credentials in TiO2.  Do you recall

19  that?

20         MR. AXELROD:  Objection.

21         THE COURT:  Overruled.

22         THE WITNESS:  Yes, I do.

23  BY MR. GASNER:

24  Q.  And in looking at the documents that you looked at, did

25  you think it significant to know whether a mechanical engineer

**COOPER - REDIRECT / GASNER**

1  designing tanks had done them for a TiO2 plant or for some

2  other kind of plant?

3  **A.**    No.  It's immaterial.

4  **Q.**    How about in other disciplines like chemical engineering,

5  is the expertise you develop as a process engineer outside of

6  TiO2 still useful in designing a plant?

7  **A.**    Oh, yes, it is.

8  **Q.**    Can you explain to the members of the jury, why is that?

9  **A.**    Because -- because chemistry doesn't change.

10  Thermodynamics, which is another of the more difficult

11  disciplines, doesn't change.  You just apply it to TiO2 instead

12  of polyethylene production.

13       And I should really add, and I think it was a bit limiting

14  what I said earlier, when we talk about the term "process

15  engineer" they are not all chemical engineers.  In fact, we

16  have chemists, we have mechanical engineers also acting as

17  process engineers.

18  **Q.**    Mr. Axelrod asked you about your employment agreement for

19  SCM.  Do you recall that line of questioning?

20  **A.**    Yes, I do.

21  **Q.**    And there's one point where he talked about the fact that

22  one portion of the agreement didn't involve matters generally

23  known in the trade.  Do you recall him asking you about that?

24  **A.**    Yes, I do.

25  **Q.**    There was also another line of questioning where he --

COOPER - REDIRECT / GASNER

1    well, let's just pause there.

2         Can you tell the members of the jury, in looking at that

3    part of the agreement, what do you understand to be matters

4    that are generally known in the trade?

5    **A.**   Uhm, there are certain processes which we all know about

6    and how they're done.  For instance, the finishing plant

7    treatment, how you do treatments, we all know how it's done.

8    We may do it differently, but we all know how it's done.

9         Clearly, some of the things around micronizing, around

10   spray drying, finishing, chlorinators, it's all well known

11   within the industry.  Some of us just choose to do it

12   differently.

13   **Q.**   Is that true within all three areas of the plant, to

14   varying degrees?

15   **A.**   Yes, it is.

16   **Q.**   Mr. Axelrod went through some of the emails that you and I

17   went across -- went through yesterday.  Do you recall that?

18   **A.**   Yes, I do.

19   **Q.**   And when you and I went through the whole plant and we

20   looked at certain emails that the government had emphasized, at

21   points you said that things in those emails were publicly

22   available.  Do you recall that?

23   **A.**   Yes, I do.

24   **Q.**   Do you recall that at other points you said that some

25   matters were readily ascertainable.  Do you recall that?

COOPER - REDIRECT / GASNER

1   **A.**    Yes, I do.

2   **Q.**    And in some instances you said that they were both, but

3   they were both publicly available and readily ascertainable?

4   **A.**    That's correct.

5   **Q.**    And in the time that we had available to go you through in

6   front of the jury all of your opinions, were you able to go

7   through every email and describe your opinions in detail as to

8   every single one?

9   **A.**    No, I was not.

10  **Q.**    By way of summary, though, is it fair to say your opinion

11  is that having reviewed all the government's allegations that

12  are presented at the trial, and comparing those allegations to

13  the design materials for the 30K and 100K plant, that all of

14  the government's examples of what they consider improper

15  conduct are either publicly disclosed or readily ascertainable

16  or both?

17          **MR. AXELROD:**  Objection.

18          **THE COURT:**  Sustained.

19  BY MR. GASNER:

20  **Q.**    Was there anything in the points that Mr. Axelrod made in

21  his examination with you that have caused you to alter your

22  opinions in any way here?

23  **A.**    No way.

24  **Q.**    Now, for those points where you relied on a combination of

25  public disclosures and what is readily ascertainable, can you

**COOPER - REDIRECT / GASNER**

1    explain to the members of the jury, what is the engineering

2    thought process that you employed in making that connection?

3    **A.**    Basically, what I did is if I could start with, say, a

4    fluidizing velocity for the chlorinator then given the flow

5    rates that were in the process flow diagrams I could calculate

6    the diameter of the chlorinator.

7        So you start with a fact, you do calculations, and you

8    come out with a design.

9    **Q.**    How does that thought process relate to the profession of

10   engineering?

11   **A.**    That's typically how it's done.  We start with facts.  We

12   then do the calculations in the middle to apply it specifically

13   to a design.

14   **Q.**    Now, for some of those patents Mr. Axelrod drilled down

15   and got you to admit that you can't tell from a patent in a

16   certain year how things are done at DuPont plants in 2013 or

17   2014.  Do you recall him asking you that?

18   **A.**    Yes, I do.

19   **Q.**    Let me ask you about the Basic Data Document we've heard

20   so much about.  Does that tell you anything about how DuPont

21   plants are currently run?

22   **A.**    No.  It was written in the mid '80s, and DuPont has moved

23   on tremendously since those days.

24        **MR. GASNER:**  Nothing further, Your Honor.

25        **THE COURT:**  Any recross?

1              **MR. AXELROD:**  No, Your Honor.

2              **THE COURT:**  Mr. Froelich?

3              **MR. FROELICH:**  No, Your Honor.

4              **THE COURT:**  Thank you, sir.  You're excused.  You may

5       leave the exhibits there.

6          (Witness excused)

7              **THE COURT:**  Next witness, Mr. Gasner or Ms. Agnolucci.

8              **THE WITNESS:**  Your Honor, may I remain?

9              **THE COURT:**  Sure, absolutely.

10             **MS. AGNOLUCCI:**  Your Honor, before the defense calls

11      its next witness it would ask to read from the parties'

12      stipulation, to the jury.

13             **THE COURT:**  Of course.

14             **MS. AGNOLUCCI:**  Thank you, Your Honor.

15         These are portions of the stipulation that the parties

16      entered into and filed on January 14th.

17             **THE COURT:**  Okay.

18             **MS. AGNOLUCCI:**  The handwriting in the following

19      exhibits is Walter Liew's:

20         Exhibit 1130, pages 2 to 64, 73 to 81, 84 to 85, 92, and

21      part of 82.

22         Exhibit 1131, pages 4 to 7, 10, 123, 124, 126, 127, 133,

23      141, 154 to '55, 159 to '62, 171 to '73, 175, 189, 213, 251,

24      260 to 262, 273 to 275, 292, 301 to '04, 312, 316, 318 to '19,

25      332, 360, 367, and part of page 2.

1          Exhibit 1132, pages 27, 31, 35, 51, 63 to 65, and parts of

2     page 2.

3          Exhibit 1133, pages 3 to 17, page 19, pages 25 to 76,

4     pages 28 to 29, pages 31 to 44, pages 48 to 50, page 52, and

5     pages 54 to 60.

6          Exhibit 1134, pages 10, 28, 34, 38 to 39, 53, 56, 100, and

7     131 to '32.

8          And, finally, Exhibits 2040 and 2441.

9               **THE COURT:**  All right.

10              **MS. AGNOLUCCI:**  There's a little bit more, Your Honor.

11              **THE COURT:**  Okay.

12              **MS. AGNOLUCCI:**  If I may.

13              **THE COURT:**  Okay.

14              **MS. AGNOLUCCI:**  Exhibit 1057 is a translation of

15    Exhibit 1056.

16         Exhibit 1059 is a translation of Exhibit 1058.

17         Exhibit so 1058 is the attachment to Exhibit 1056.

18         Exhibits 1130 to 1134 are documents that were located at

19    the USAPTI office in Oakland, but not seized during the

20    searches.  They were thereafter kept in storage, provided to

21    defendant Walter Liew and USAPTI's counsel at Keker & Van Nest,

22    and then produced by Keker & Van Nest to the government.

23         Exhibits 1520, 2040 to '42, 3182, 3183, and 3185 through

24    3217 were seized from the Liews' residence.

25         Exhibit 3180 was seized from the Liews' residence.  It is

1    authentic under Federal Rule of Evidence 901.

2         Exhibit 1519 was seized from the USAPTI in Oakland office.

3    It is authentic under Federal Rule of Evidence 901.

4         Exhibits 2392, 2441 through '55, 2458 through '64, 2467

5    through '69, 2470 through '89, and 3167 through '77 were seized

6    from the USAPTI office in Oakland.  They are authentic under

7    Federal Rule of Evidence 901.

8         Exhibit 1016 is from a device numbered SVE034329.

9    SVE034329 was seized from the Liews' residence.

10        Exhibit 1016 is authentic under Federal Rule of Evidence

11   901.

12        Exhibit 1000 is SVE034297, and it is a forensic image of a

13   server located at the USAPTI office in Oakland.

14        Exhibit 2829 is an index of the folder directory from

15   WDHDDSVE034294, which is Exhibit 1001 from the safe-deposit box

16   at the Bank of Asia.

17        Exhibit 1006 contains the metadata for Exhibit 694.

18        Last one.  Exhibits 1008, 1014, and 2594 through 2600 are

19   from SVE034309.  That device was seized from the USAPTI office

20   in Oakland, and is one of Walter Liew's computers.

21        Exhibit 2529 references metadata and contains accurate

22   information for the following categories: file name; author;

23   creation date; last saved on; and last saved by.

24        Exhibit 1009 is the metadata for Exhibit 1008.

25        Exhibit 1015 is the metadata for Exhibit 1014.  And

1    Exhibit 1015 contains accurate information for the following

2    categories: file name; author; creation date; last saved on;

3    and last saved by.

4        Thank you, Your Honor.

5            **THE COURT:**  All right.  Are you ready to call your

6    next witness?

7            **MR. SCOTT:**  Ms. Agnolucci ...

8        (Government and defense counsel confer off the record and

9    out of hearing of the reporter and jury.)

10           **MS. AGNOLUCCI:**  I apologize.  I may have read one of

11   the numbers wrong.

12       Exhibit 2595 references metadata and contains accurate

13   information for the following categories: file name; author;

14   creation date; last saved on; and last saved by.

15           **THE COURT:**  All right.

16       Next witness, please.

17           **MS. AGNOLUCCI:**  Yes, Your Honor, the defense calls

18   Cynthia Hernandez, please.

19           **THE COURT:**  All right.  Ms. Hernandez, please come

20   forward.

21           **THE CLERK:**  Raise your right hand, please.

22                    <u>**CYNTHIA HERNANDEZ**</u>,

23   called as a witness for the Defendant, having been duly sworn,

24   testified as follows:

25           **THE WITNESS:**  Yes.

1          THE CLERK:  Please be seated, and state and spell your

2    full name for the record.

3          THE WITNESS:  Cynthia Hernandez.  C-y-n-t-h-i-a,

4    Hernandez, H-e-r-n-a-n-d-e-z.

5          THE CLERK:  Thank you.  Please speak into the

6    microphone.

7          THE WITNESS:  I'm sorry.

8                      DIRECT EXAMINATION

9    BY MS. AGNOLUCCI:

10   Q.   Good morning, Ms. Hernandez.

11   A.   Good morning, Ms. Agnolucci.

12   Q.   How are you employed?

13   A.   I am a paralegal at Keker & Van Nest.

14   Q.   You work with myself?

15   A.   Yes.

16   Q.   And with Mr. Gasner and with Ms. Katie Lovett?

17   A.   Yes.

18   Q.   And have you ever testified in court before?

19   A.   No.

20   Q.   All right.  And do you work on this case concerning

21   Mr. Walter Liew and USAPTI?

22   A.   Yes, I do.

23   Q.   Through your work on this case, have you come to recognize

24   Walter Liew's handwriting?

25   A.   I have.

**HERNANDEZ - DIRECT / AGNOLUCCI**

1    **Q.**    How have you?

2    **A.**    I have watched him write, and through reviewing a bunch

3    of -- I have mountains of documents.  I have recognized his

4    handwriting on them as well.

5    **Q.**    Have you also, during the time that you've worked at

6    Keker & Van Nest, had the opportunity to work on patent cases?

7    **A.**    Yes.  We have a lot of patent cases at Keker & Van Nest.

8    **Q.**    Is it fair to say that you know how to recognize a patent?

9    **A.**    Yes.  Yes, I do know how to recognize a patent.

10   **Q.**    And can you recognize a citation to a patent number?

11   **A.**    Yes, I can.

12       **MS. AGNOLUCCI:**  Your Honor, may I approach the witness

13   with Exhibit 1130, which has not been admitted?

14       **THE COURT:**  Yes, you may.

15       **MS. AGNOLUCCI:**  As I just read out loud, Your Honor,

16   the parties have stipulated that this binder was located at the

17   USAPTI office; was not seized; was thereafter kept in storage;

18   was provided to Keker & Van Nest; and was then produced by

19   Keker & Van Nest.

20       **THE COURT:**  All right.

21      Is that correct?

22       **MR. HEMANN:**  Yes, it is, Your Honor.

23       **THE COURT:**  All right.  So stipulated, ladies and

24   gentlemen.

25

1    BY MS. AGNOLUCCI:

2    Q.   Ms. Hernandez, are you familiar with this document?

3    A.   Yes.

4    Q.   Have you reviewed the document?

5    A.   Yes, on more than one occasion.

6    Q.   And this is a copy of the red binder that I just described

7    through the stipulation?

8    A.   Yes.

9         MS. AGNOLUCCI:  Your Honor, I move to admit Exhibit

10   1130.

11        THE COURT:  Any objection?

12        MR. HEMANN:  No, Your Honor.

13        THE COURT:  Admitted.

14      (Trial Exhibit 1130 received in evidence.)

15      (Document displayed.)

16   BY MS. AGNOLUCCI:

17   Q.   Ms. Hernandez, you said you've reviewed this document.

18   Have you seen in this document or this binder, rather, any

19   indicator how old it is?

20   A.   Well, the binder itself just looks older.  The binder

21   paper holder is damaged.  There are documents -- there are

22   documents that have print dates on them that are contained in

23   the binder from 1996.

24        There is documents that appear to be printed, that are

25   printed from microfiche.  It has the microfiche index number on

1    the side.

2         And there are -- there are documents that contain

3    references to LH Performance.  And LH Performance is a company

4    that -- is Mr. Liew's first company, that was around from 1993

5    to 2004, I'm pretty sure.

6         **MS. AGNOLUCCI:**  Thank you.

7         Mr. Guevara, if you could go to the page that's Bates

8    numbered 165.  And it's stamped 1130, page 1.

9         (Document displayed.)

10        **MS. AGNOLUCCI:**  And if you could rotate it so it's

11   right side up.

12   **BY MS. AGNOLUCCI:**

13   **Q.**   Ms. Hernandez, do you see that number at the top of the

14   page there?

15   **A.**   Uhm, my screen doesn't show it but I --

16        **THE COURT:**  There's always a delay, so you have to

17   wait a couple of minutes.

18        **THE WITNESS:**  Yes, I see.

19   **BY MS. AGNOLUCCI:**

20   **Q.**   And do you recognize that as a number of a patent?

21   **A.**   Yes, that is a patent number.

22        **MS. AGNOLUCCI:**  Your Honor, the parties have

23   stipulated that this page of the binder is in Mr. Liew's

24   handwriting.

25        **THE COURT:**  Is that correct, Mr. Hemann?

1            **MR. HEMANN:**  Yes, it is, Your Honor.

2            **THE COURT:**  So stipulated.

3  **BY MS. AGNOLUCCI:**

4  **Q.**   Are you also familiar, Ms. Hernandez, with this chart of

5  patents?

6  **A.**   Yes.

7  **Q.**   Did you hear Mr. Cooper testify that this was a chart of

8  patents that are cited in his report?

9  **A.**   Yes.

10  **Q.**   And have you also reviewed his report?

11  **A.**   I have.  I helped create that chart.

12  **Q.**   And do you recognize the patent number that's highlighted

13  on your screen as also being one of the patents that Mr. Cooper

14  referred to in his report?

15  **A.**   Yes.  It is the first one on the second column.

16            **MS. AGNOLUCCI:**  Mr. Guevara, if you could please

17  display page 168, which is stamped as 1130, page 2.

18        (Document displayed.)

19  **BY MS. AGNOLUCCI:**

20  **Q.**   Do you see a patent number on the top of that page,

21  Ms. Hernandez?

22  **A.**   Yes, I do.

23  **Q.**   And is that patent number also on this chart of patents

24  referred to in Mr. Cooper's report?

25  **A.**   Yes, yes.

1              MS. AGNOLUCCI:  Mr. Guevara, if you could display,

2     please, page 171, which is also Bates marked as Exhibit 1130,

3     page 3.

4          (Document displayed.)

5     BY MS. AGNOLUCCI:

6     Q.   Ms. Hernandez, do you see a patent number at the top of

7     that page?

8     A.   Yes, I do.

9              MS. AGNOLUCCI:  The parties have stipulated that this

10    page is in Mr. Liew's handwriting.

11             THE COURT:  Is that correct, Mr. Hemann?

12             MR. HEMANN:  Yes, it is, Your Honor.  I'm sorry, yes.

13             THE COURT:  All right.  So stipulated.

14             MS. AGNOLUCCI:  And I should add, Your Honor, that the

15    parties have also stipulated that the prior page we were

16    looking at, page 168, is also in Mr. Liew's handwriting.

17             THE COURT:  All right.

18    BY MS. AGNOLUCCI:

19    Q.   Ms. Hernandez, do you recognize the patent number on the

20    top of that page as one of the patents that Mr. Cooper referred

21    to in his report?

22    A.   Yes, I can see it on the chart.

23             MS. AGNOLUCCI:  Mr. Guevara, if you could please

24    display page 172, also marked as Exhibit 1130, page 4.

25          (Document displayed.)

1            MS. AGNOLUCCI:  The parties have stipulated that this

2    page is in Walter Liew's handwriting.

3    BY MS. AGNOLUCCI:

4    Q.   Ms. Hernandez, do you recognize the patent number on the

5    top of this page?

6    A.   Yes, I do.

7    Q.   And is that also one of the patents that Mr. Cooper

8    referred to in his report?

9    A.   Yes.  I can see it on the chart.

10           MS. AGNOLUCCI:  Mr. Guevara, if you could please

11   display page 174.

12           (Document displayed.)

13           MS. AGNOLUCCI:  Which the parties have stipulated also

14   is in Walter Liew's handwriting.

15   BY MS. AGNOLUCCI:

16   Q.   Ms. Hernandez, do you see a patent number at the top of

17   that page?

18   A.   I do.

19   Q.   And is that also one of the numbers on the chart of

20   patents Mr. Cooper referred to in his report?

21   A.   Yes.  I can see it on the chart.

22           MS. AGNOLUCCI:  Mr. Guevara, if you could please

23   display the next page.

24           (Document displayed.)

25           MS. AGNOLUCCI:  Page 175, which is also marked as

 1  Exhibit 1130, page 6.

 2      The parties have stipulated that this page is in

 3  Mr. Liew's handwriting as well.

 4  **BY MS. AGNOLUCCI:**

 5  **Q.**  Let's start with the patent, starting with four comma nine

 6  at the top of the page.

 7      Ms. Hernandez, is that also one of the patents that

 8  Mr. Cooper referred to in his report?

 9  **A.**  Yes.

10  **Q.**  And a little bit farther down the page there's a patent

11  starting with 3,208,866.

12      **MS. AGNOLUCCI:**  It's in the section that says

13  "Oxidation," Mr. Guevara.

14      (Document displayed.)

15  **BY MS. AGNOLUCCI:**

16  **Q.**  Is that patent, 3,208,866, also one of the patents that

17  Mr. Cooper referred to in his report?

18  **A.**  Yes.

19  **Q.**  And do you see right below it a patent starting with

20  3,505?

21  **A.**  I do, yes.

22  **Q.**  Is that also a patent that Mr. Cooper referred to in his

23  report?

24  **A.**  Yes.

25      **MS. AGNOLUCCI:**  Mr. Guevara, if you could please

1   display the next page, page 176, which has also been stamped as

2   Exhibit 1130, page 7.

3        (Document displayed.)

4        **MS. AGNOLUCCI:**  The parties have stipulated this page

5   is also in Mr. Liew's handwriting.

6        **THE COURT:**  All right.  So stipulated.

7   **BY MS. AGNOLUCCI:**

8   **Q.**   Ms. Hernandez, do you see a patent number starting with

9   3,883,636 on that page?

10  **A.**   Yes.

11  **Q.**   And is that also a patent that Mr. Cooper relied on in his

12  report?

13  **A.**   Yes.

14  **Q.**   The next patent down the page is patent number 3,591,333.

15  Do you see that?

16  **A.**   Yes.

17  **Q.**   And is that also on Mr. Cooper's chart?

18  **A.**   Yes.

19  **Q.**   The last patent on the page, 2,446,181 --

20  **A.**   Yes.

21  **Q.**   -- is that also a patent on Mr. Cooper's chart?

22  **A.**   It is.

23        **MS. AGNOLUCCI:**  If we could please move on to the next

24  page, Mr. Guevara, which is Bates marked 177, stamped as

25  Exhibit 1130, page 8.

1              (Document displayed.)

2    **BY MS. AGNOLUCCI:**

3    **Q.**   Do you see there, Ms. Hernandez -- I've lost my place, so

4    if I may have a moment.

5         Ah, the patent at the top of the page, 5,266,108?

6    **A.**   Yes.

7    **Q.**   And do you also see that patent on the chart of patents

8    that Mr. Cooper relied on?

9    **A.**   I do.

10             **MS. AGNOLUCCI:**  Mr. Guevara, if you could display,

11   please, the page Bates marked 179, that's also been stamped as

12   Exhibit 1130, page 9.

13             (Document displayed.)

14   **BY MS. AGNOLUCCI:**

15   **Q.**   Ms. Hernandez, do you see at the top of that page a patent

16   starting with 3,591,333?

17   **A.**   Yes.

18   **Q.**   Does that patent also appear on Mr. Cooper's chart?

19   **A.**   It does.

20             **MS. AGNOLUCCI:**  Mr. Guevara, if you could please

21   display the next page.

22             (Document displayed.)

23             **MS. AGNOLUCCI:**  Page 108, Bates marked 1130-10.  And I

24   should add that both this page and the prior page are subject

25   to the parties' stipulation that this is Mr. Liew's

1    handwriting.

2          **THE COURT:**  All right.

3    **BY MS. AGNOLUCCI:**

4    **Q.**   On this page, Ms. Hernandez, do you see a patent number

5    3,883,636 at the top?

6    **A.**   I do.

7    **Q.**   And is that patent also one of the patents Mr. Cooper

8    referred to in his report?

9    **A.**   Yes.

10         **MS. AGNOLUCCI:**  Mr. Guevara, if we could display the

11   page Bates marked in 183, which also has been stamped as

12   Exhibit 1130, page 11.

13         (Document displayed.)

14         **MS. AGNOLUCCI:**  The parties have stipulated that this

15   page is in Mr. Liew's handwriting.

16         **THE COURT:**  All right.

17   **BY MS. AGNOLUCCI:**

18   **Q.**   Ms. Hernandez, do you see at the top of that page --

19   actually, towards the middle, the reference to a patent

20   3,512,219?

21   **A.**   I do.

22   **Q.**   And is that one of the patents that Mr. Cooper relied on

23   in his report?

24   **A.**   Yes, it is on the chart.

25   **Q.**   And right beneath it do you see a patent 4,803,056?

HERNANDEZ - DIRECT / AGNOLUCCI

1    **A.**    I do.

2    **Q.**    And is that patent also here on Mr. Cooper's chart?

3    **A.**    Yes, it is.

4          **MS. AGNOLUCCI:**   Mr. Guevara, could you please display

5    the document ending in Bates number 185, which also has been

6    stamped as Exhibit 1130, page 12.

7          (Document displayed.)

8          **MS. AGNOLUCCI:**   The parties have stipulated that this

9    page is also in Mr. Liew's handwriting.

10         **THE COURT:**   All right.

11   BY MS. AGNOLUCCI:

12   **Q.**    Ms. Hernandez, do you see a patent number on that page?

13   **A.**    I do.

14   **Q.**    And is that also 4,961,911?

15   **A.**    Yes, I see that one.

16   **Q.**    And is that 4,961 patent one of the patents that

17   Mr. Cooper relied on in his report?

18   **A.**    Yes.

19   **Q.**    Right there, right (indicating)?

20   **A.**    Yeah.

21         **MS. AGNOLUCCI:**   Mr. Guevara, if you could please

22   display the page ending in 215, Bates number 215, which has

23   also been marked as Exhibit 1130, page 13.

24         (Document displayed.)

25

1   BY MS. AGNOLUCCI:

2   Q.   Do you see at the top of that page, Ms. Hernandez, a

3   reference to patent number 3,208,866?

4   A.   Yes, I do.

5   Q.   And is that one of the patents that Mr. Cooper relied on

6   in his report?

7   A.   Yes.

8   Q.   Do you see beneath it a reference to patent number

9   3,437,502?

10  A.   Yes, I do.

11  Q.   And is that also a patent referred to in Mr. Cooper's

12  report?

13  A.   Yes.

14  Q.   And, finally, on that page, do you see patent 3,505,091?

15  A.   Yes.

16  Q.   And is that also a patent that Mr. Cooper relied on in his

17  report?

18  A.   Yes.

19  Q.   Thank you.

20       MS. AGNOLUCCI:  We only have about seven more patents

21  to go through --

22       THE COURT:  All right.

23       MS. AGNOLUCCI:  -- in this notebook.

24       Mr. Guevara, if you could please display the page ending

25  in Bates 281, which has also been marked as page 1130, page 14.

HERNANDEZ - DIRECT / AGNOLUCCI

1              (Document displayed.)

2              MS. AGNOLUCCI:  And the parties have stipulated that

3     this page is also in Walter Liew's handwriting.

4              THE COURT:  All right.  So stipulated.

5     BY MS. AGNOLUCCI:

6     Q.   Ms. Hernandez, do you see a reference at the top of the

7     page to patent number 4,461,810?

8     A.   Yes.

9     Q.   And is that also one of the patents referred to in

10    Mr. Cooper's report?

11    A.   Yes, yes.

12             MS. AGNOLUCCI:  Mr. Guevara, if you could please

13    display page ending in Bates number 229, which also has been

14    marked as Exhibit 1130, page 15.

15             (Document displayed.)

16             MS. AGNOLUCCI:  The parties have stipulated that this

17    page is in Walter Liew's handwriting as well.

18             THE COURT:  So stipulated.

19    BY MS. AGNOLUCCI:

20    Q.   Ms. Hernandez, do you see at the top of the page a

21    reference to patent 5,196,181?

22    A.   I do.

23    Q.   And is that also one of the patents that Mr. Cooper relied

24    on in his report?

25    A.   Yes, I see it on the chart.

1          **MS. AGNOLUCCI:**  Mr. Guevara, if you could please

2    display the page Bates marked 232, and also stamped as Exhibit

3    1130, page 16.

4          (Document displayed.)

5    **BY MS. AGNOLUCCI:**

6    **Q.**   Do you see at the top of that page reference to DuPont

7    patent 5,389,353?

8    **A.**   Yes, I do.

9          **MS. AGNOLUCCI:**  The parties have stipulated that this

10   page is also in Mr. Liew's handwriting.

11         **THE COURT:**  Very well.

12   **BY MS. AGNOLUCCI:**

13   **Q.**   Ms. Hernandez, is that also one of the patents that

14   Mr. Cooper relied on in his report?

15   **A.**   Yes.

16         **MS. AGNOLUCCI:**  Mr. Guevara, if you could please

17   display the page ending in Bates number 234.  And it's also

18   been stamped as Exhibit 1130, page 17.

19        And the parties have stipulated that this page also is in

20   Mr. Liew's handwriting.

21        (Document displayed.)

22   **BY MS. AGNOLUCCI:**

23   **Q.**   Ms. Hernandez, do you see a reference at the top of the

24   page there to a DuPont patent 3,437,502?

25   **A.**   I do.

1    Q.    And is that also one of the patents referred to in

2    Mr. Cooper's report?

3    A.    Yes.  It's on the chart.

4          MS. AGNOLUCCI:   Mr. Guevara, if you could please

5    display page 235, which has been Bates marked as Exhibit 1130,

6    page 18, and which the parties have stipulated is in Walter

7    Liew's handwriting.

8          (Document displayed.)

9    BY MS. AGNOLUCCI:

10   Q.    Do you see a reference to patent 3,505,091 at the top of

11   that page?

12   A.    I do.

13   Q.    And, Ms. Hernandez, is that also one of the patents that

14   Mr. Cooper relied on in his report?

15   A.    Yes, it is.  It is on the chart.

16         MS. AGNOLUCCI:   Just a few more.

17      Please, Mr. Guevara, if you could display page Bates

18   marked 237, also stamped as Exhibit 1130, page 19.

19         (Document displayed.)

20         MS. AGNOLUCCI:   And the parties have stipulated that

21   this page also is in Walter Liew's handwriting.

22   BY MS. AGNOLUCCI:

23   Q.    Ms. Hernandez, do you see reference to a patent number

24   4,125,412 at the top of the page?

25   A.    I do.

1    Q.   And is that also one of the patents that Mr. Cooper relied

2    on in his report?

3    A.   Yes, I see it as well on the chart.

4         MS. AGNOLUCCI:  Finally, Mr. Guevara, if you could

5    please display a page Bates marked 240, which is also stamped

6    as Exhibit 1130, page 20, and which the parties have stipulated

7    is in Walter Liew's handwriting.

8         (Document displayed.)

9    BY MS. AGNOLUCCI:

10   Q.   Do you see towards the bottom of that page a patent

11   4,461,810?

12   A.   Yes.

13   Q.   And is that also one of the patents that Mr. Cooper relied

14   on in his report?

15   A.   Yes.

16   Q.   Beneath it do you see a patent 4,781,761?

17   A.   Yes, I do.

18   Q.   And is that also one of the patents that Mr. Cooper relied

19   on in his report?

20   A.   It is.

21        MS. AGNOLUCCI:  Thank you very much.

22   Your Honor, may I approach the witness with Exhibit 1131,

23   please?

24        THE COURT:  Yes, you may.

25        MS. AGNOLUCCI:  Thank you.

1        The parties have stipulated that this binder was located

2   at the USAPTI office; was not seized by the FBI; was thereafter

3   kept in storage; was provided to Keker & Van Nest; and then was

4   produced by Keker & Van Nest.

5            **THE COURT:**  So stipulated.

6   **BY MS. AGNOLUCCI:**

7   **Q.**   Ms. Hernandez, do you recognize this document?

8   **A.**   Yes, I do.

9   **Q.**   Have you reviewed its contents?

10  **A.**   Yes, on more than one occasion.

11  **Q.**   Do you see any indicators of the age of this binder?

12  **A.**   I do, same as the last one.  The binder hole pages are

13  damaged; the pages are a little yellowed; there is -- yeah, a

14  frayed yellow piece of paper that appears to be printed on fax

15  paper; more microfiche printouts.

16      I think this might be -- yes, and the ink has transferred

17  onto the binder pocket, so it's -- that doesn't happen

18  overnight.  That's something that, I think, happens over the

19  course of years.

20           **MS. AGNOLUCCI:**  Your Honor, I move to admit Exhibit

21  1131.

22           **THE COURT:**  Objection?

23           **MR. HEMANN:**  No objection.

24           **THE COURT:**  Admitted.

25       (Trial Exhibit 1131 received in evidence.)

1          **MS. AGNOLUCCI:**  Mr. Guevara, could you please display

2    the page ending in 383.

3          (Document displayed.)

4    **BY MS. AGNOLUCCI:**

5    **Q.**   Ms. Hernandez, you've been here in court watching most of

6    the testimony in this case, correct?

7    **A.**   I have.

8    **Q.**   And you've also reviewed the transcripts of the testimony

9    in this case?

10   **A.**   Yes, I have.

11   **Q.**   Do you recall the testimony of an individual by the name

12   of Mike Marinak?

13   **A.**   I do.

14   **Q.**   And do you recall that Mr. Marinak testified regarding

15   this piece of paper?

16   **A.**   Yes, I do.

17   **Q.**   What do you recall that he said regarding this list?

18         **MR. HEMANN:**  Objection.

19         **THE COURT:**  Sustained.

20   **BY MS. AGNOLUCCI:**

21   **Q.**   Is Mr. Marinak's testimony regarding this list one of the

22   indicators of the date of this binder?

23   **A.**   Yes.

24         **MR. HEMANN:**  Objection.

25         **THE COURT:**  Sustained.

1      Counsel, that's something you can argue later on.  Thank

2   you.

3           MS. AGNOLUCCI:  I'm going to do -- I'm going to

4   address the patents on this page *en masse* so as to conserve

5   time, if I may.

6           MR. HEMANN:  Your Honor.

7           THE COURT:  Yes.

8           MR. HEMANN:  The government would be willing to

9   stipulate that if we could get a list of the patents in these

10  binders, that the patent numbers in the binders appear on this

11  chart.

12          THE COURT:  All right.

13          MR. HEMANN:  If we could -- if that would shorten the

14  presentation.  I understand there's a mechanical issue.  We do

15  want to stipulate to it, if it can be worked out.

16          THE COURT:  Is that something you would be willing to

17  do?

18          MS. AGNOLUCCI:  Your Honor, I could read the patent

19  numbers out right now.

20          THE COURT:  How many are there?

21          MS. AGNOLUCCI:  From this binder I could read them,

22  and I would say that there are, I'm guessing here, eyeballing,

23  a list of probably 22.

24          THE COURT:  How about this, because this is what

25  patent lawyers do -- I always get a chill when I say that.

1         (Laughter)

2         THE COURT:  -- is to refer to the last three numbers,

3    because that's typically what they do.

4         MS. AGNOLUCCI:  Yes, I'm familiar with that procedure.

5         THE COURT:  Yes, okay.

6         MR. HEMANN:  Absolutely, Your Honor, whatever the

7    Court would like.

8         THE COURT:  It will just save a lot of extra time.  So

9    just read those off, and the government can follow along.

10        MS. AGNOLUCCI:  Sure.

11        THE COURT:  And they will tell whether they stipulate.

12   If they do, so be it.

13        MR. HEMANN:  We'll stipulate based on Ms. Agnolucci's

14   representation as to the numbers being in these binders.

15        THE COURT:  All right.  You've got a blank check here.

16        MS. AGNOLUCCI:  All right.  Well, I'll get out my pen.

17        THE COURT:  Okay.

18        MS. AGNOLUCCI:  The patents listed -- and I should

19   also add that the parties have stipulated that the pages on

20   which there are references to these patents are all in

21   Mr. Liew's handwriting.

22        THE COURT:  All right.  Very well.  Thank you.

23        MS. AGNOLUCCI:  And I will read out the relevant last

24   three digits of the patent numbers at issue.

25        THE COURT:  Sounds good.

1              **MS. AGNOLUCCI:**  The '181 Patent.

2          The '913 Patent.

3          The '064 Patent.

4          The '387 Patent.

5          The '708 Patent.

6          The '519 Patent.

7              **THE COURT:**  Slow down just little bit.

8              **MS. AGNOLUCCI:**  I apologize, Your Honor.

9              **THE COURT:**  Thank you.

10             **MS. AGNOLUCCI:**  The '744 Patent.

11         The '347 Patent.

12         The '529 Patent.

13         The '108 Patent.

14         The '412 Patent.

15         The '789 Patent.

16         The '810 Patent.

17         The '761 Patent.

18         The '076 Patent.

19         The '333 Patent.

20         The '636 Patent.

21         The '353 Patent.

22         The '911 Patent.

23         The '519 Patent.

24         The '744 Patent.

25         The '708 Patent.

HERNANDEZ - DIRECT / AGNOLUCCI

1           The '347 Patent.

2           The '529 Patent.

3           The '313 Patent.

4           The '064 Patent.

5           The '181 Patent.

6           The '091 Patent.

7           The '519 Patent.

8           The '179 Patent.

9           The '108 Patent.

10          The '353 Patent.

11          The '911 Patent.

12          The '633 Patent.

13          The '333 Patent.

14          And the '202 Patent.

15   BY MS. AGNOLUCCI:

16   Q.   Ms. Hernandez, we've gone through this notebook and

17   identified the references to those patents in Mr. Liew's

18   handwriting together, correct?

19   A.   Yes.

20   Q.   And are all of those patents that I just listed off also

21   patents that Mr. Cooper referred to in his report?

22   A.   Yes.

23           MS. AGNOLUCCI:   Your Honor, may I approach the witness

24   with Exhibit 1132?

25           THE COURT:   You may.

1          **MS. AGNOLUCCI:**  And this is the penultimate collection

2     of documents.

3          **THE COURT:**  Okay.

4     **BY MS. AGNOLUCCI:**

5     **Q.**   Ms. Hernandez, do you recognize this Redweld of documents?

6     **A.**   Yes, I do.

7     **Q.**   What is it?

8     **A.**   It is a collection of papers, documents.

9          **MS. AGNOLUCCI:**  And I should add that the parties have

10    stipulated that these documents were located at the USAPTI

11    office in Oakland; were not seized; were thereafter kept in

12    storage; were provided to Keker & Van Nest; and were then

13    produced by Keker & Van Nest.

14         **MR. HEMANN:**  That's correct, Your Honor.

15         **THE COURT:**  All right.  So stipulated.

16         **MS. AGNOLUCCI:**  This will be very short, Your Honor.

17         **THE COURT:**  All right.

18    **BY MS. AGNOLUCCI:**

19    **Q.**   You stated that you recognize this collection of

20    documents.  Ms. Hernandez, do you see anything that dates this

21    collection of documents?

22    **A.**   Yes, more microfiche printouts.  There is a print date on

23    one of the documents from 1997, pardon me, 1996; another one

24    from 1996; yeah, several -- several documents dated -- with a

25    print date at the bottom of 1996; and one with 1997.

1              **MS. AGNOLUCCI:**  Your Honor, I move to admit Exhibit

2    1132.

3              **MR. HEMANN:**  No objection.

4              **THE COURT:**  It's admitted.

5         (Trial Exhibit 1132 received in evidence.)

6              **MS. AGNOLUCCI:**  Mr. Guevara, could you please display

7    the page ending in Bates 0078.

8         (Document displayed.)

9    **BY MS. AGNOLUCCI:**

10   **Q.**   Do you recognize this page, Ms. Hernandez?

11   **A.**   Yes, I do.

12   **Q.**   What is it?

13   **A.**   It is an abstract of a patent.

14   **Q.**   And is it abstract of patent 5,599,519?

15        Mr. Guevara has highlighted it on the screen for you.

16   **A.**   Yes.  Yes, it is.

17   **Q.**   And is that one of the patents on the chart of patents on

18   which Mr. Cooper relied?

19   **A.**   Yes.

20              **MS. AGNOLUCCI:**  Mr. Guevara, if you could please

21   display the following page.

22        (Document displayed.)

23   **BY MS. AGNOLUCCI:**

24   **Q.**   What is this, Ms. Hernandez?

25   **A.**   This is a U.S. Patent.

HERNANDEZ - DIRECT / AGNOLUCCI

1    Q.    It's a copy of the actual patent, right?

2    A.    Yes.

3    Q.    And is that one of the patents on this list that

4    Mr. Cooper relied on?

5    A.    Yes.  Yes.

6    Q.    3,725,526?

7    A.    Yes, it is.

8          MS. AGNOLUCCI:  Mr. Guevara, could you please display

9    the page ending in Bates 88.

10         MR. HEMANN:  Your Honor, our offer stands to this

11   binder as well.

12         THE COURT:  All right.

13         MS. AGNOLUCCI:  We've got two patents in this binder.

14         THE COURT:  Please read the last two numbers.

15   BY MS. AGNOLUCCI:

16   Q.    Yes.  Do you recognize on this page the '056 Patent?

17         (Document displayed.)

18   A.    Yes, I do.

19   Q.    And is that also one of the patents on which Mr. Cooper

20   relied?

21   A.    Yes.

22         MS. AGNOLUCCI:  Finally, Mr. Guevara, if you could

23   please display page 094.

24         (Document displayed.)

25

HERNANDEZ - DIRECT / AGNOLUCCI

1   BY MS. AGNOLUCCI:

2   Q.   Do you recognize the '579 Patent on this page as one of

3   the patents on which Mr. Cooper relied?

4   A.   Yes.

5        MS. AGNOLUCCI:  Your Honor, may I approach the witness

6   with a final collection of documents, marked as Exhibit 1133?

7        THE COURT:  Yes.

8        MS. AGNOLUCCI:  The parties have stipulated that this

9   binder was located at the USAPTI office; was not seized; was

10  thereafter kept in storage; and was then provided to

11  Keker & Van Nest; and produced by Keker & Van Nest.

12        THE COURT:  Is that correct?

13        MR. HEMANN:  Yes, Your Honor.

14        THE COURT:  So stipulated.

15  BY MS. AGNOLUCCI:

16  Q.   Ms. Hernandez, do you recognize this document?

17  A.   Yes, I do.

18  Q.   Have you reviewed it?

19  A.   Yes.  Again, on more than one occasion.

20  Q.   Do you see any indicators of the age of this binder?

21  A.   Yes.  Again, the binder holes for the pages are damaged;

22  pages are faded; there are print dates at the bottom of pages

23  from 1996 and 1997.  Yes, and there's a handwritten date from

24  1997, in Mr. Liew's handwriting.

25        MS. AGNOLUCCI:  Your Honor, I move to admit Exhibit

HERNANDEZ - DIRECT / AGNOLUCCI

1    1133.

2                MR. HEMANN:  No objection.

3                THE COURT:  Admitted.

4         (Trial Exhibit 1133 received in evidence.)

5         (Document displayed.)

6             MS. AGNOLUCCI:  Mr. Guevara, if you could please

7    display the page ending in Bates 001, which has also been

8    stamped as Exhibit 1133, page 1.

9         (Document displayed.)

10   BY MS. AGNOLUCCI:

11   Q.   Do you see on that page, Ms. Hernandez, multiple patents

12   that were referred to in Mr. Cooper's report?

13   A.   Yes.

14           MS. AGNOLUCCI:  Mr. Guevara, if you could display the

15   following page, page 002.

16       (Document displayed.)

17           MS. AGNOLUCCI:  Which has been stamped as Exhibit

18   1133, page 2.

19   BY MS. AGNOLUCCI:

20   Q.   Do you see on that page, Ms. Hernandez, references to the

21   '064, '181, and '911 Patents?

22   A.   I do.

23   Q.   And are those also patents which Mr. Cooper referred to in

24   his report?

25   A.   Yes.

1          **MS. AGNOLUCCI:**  Your Honor, may I approach the witness

2     with Exhibits 1014 and 1015?

3          **THE COURT:**  Yes, you may.

4          **MR. HEMANN:**  Your Honor, these are the subject of the

5     Court's discussion.

6          **THE COURT:**  Right.  They are just going to be admitted

7     and not displayed at this time.

8          **MS. AGNOLUCCI:**  Yes, Your Honor.  I move for admission

9     of Exhibits 1014 and 1015.

10         **MR. HEMANN:**  Subject to the prior discussions.

11         **THE COURT:**  Yes, they are admitted subject to the

12    prior discussion.

13         **(Trial Exhibit 1014 and 1015 received in evidence.)**

14         **THE COURT:**  And, ladies and gentlemen, we've agreed

15    they won't be displayed at this moment, but you'll have them in

16    your deliberations.  And counsel is free to refer to them

17    during their closing arguments.

18         **MS. AGNOLUCCI:**  Your Honor, may I also move to admit

19    Exhibit 1016?

20         **THE COURT:**  Yes.

21         **MS. AGNOLUCCI:**  Subject to prior discussion.

22         **THE COURT:**  Yes.

23         **MR. HEMANN:**  Same discussion, and then the state of

24    mind instruction, if you would, Your Honor.

25         **THE COURT:**  Yes.

1          With respect to both these documents which you haven't

2     seen, and you'll see later and hear about later, they will be

3     admitted only for a limited purpose, which is not for the truth

4     of whatever is said in the documents, but just to show the

5     state of mind, if you find it's appropriate, of Mr. Liew and

6     USAPTI, and for no other purpose.  All right.

7              (Trial Exhibit 1016 received in evidence.)

8              **MS. AGNOLUCCI:**  Thank you, Your Honor.  I have no

9     further questions of Ms. Hernandez.

10             **THE COURT:**  Thank you.

11             **MS. AGNOLUCCI:**  May I approach to retrieve the

12    exhibits?

13             **THE COURT:**  Unless the government is going to be using

14    them.

15             **MR. HEMANN:**  You can leave them.

16             **THE COURT:**  Thank you.  We'll retrieve them later.

17             **MR. HEMANN:**  I don't have very much, Your Honor.

18             **THE COURT:**  All right.

19                        **CROSS-EXAMINATION**

20    **BY MR. HEMANN:**

21    **Q.**   Hello, Ms. Hernandez.  How are you?

22    **A.**   Hello, Mr. Hemann.  I'm good.

23    **Q.**   Nice to see you up there rather than back there.

24          All of the binders that you just looked at, would you say

25    they're from 1996-1997, that time frame, based on what you saw?

1    **A.**    I have --

2              **MS. AGNOLUCCI:**  Objection.

3              **THE COURT:**  Overruled.

4              **THE WITNESS:**  I have found pages within the documents

5    that are dated from 1996-1997.

6    BY MR. HEMANN:

7    **Q.**    And did you find pages in the documents that had dates

8    later than that?

9    **A.**    I did not.

10   **Q.**    Keker & Van Nest received this set of binders from

11   Christina Liew, Walter Liew's wife, correct?

12   **A.**    Yes.

13   **Q.**    You don't know where the binders were stored in the

14   office, the USAPTI office; is that correct?

15   **A.**    Uhm, that is correct.

16   **Q.**    And you don't know whether Mr. Liew had an occasion to

17   look at the binders after 1996, 1997?

18             **MS. AGNOLUCCI:**  Objection.

19             **THE COURT:**  Overruled.

20             **THE WITNESS:**  No, I don't know any of that.

21   BY MR. HEMANN:

22   **Q.**    And you don't know how, if at all, Mr. Liew used the

23   documents contained in these binders?

24             **MS. AGNOLUCCI:**  Objection, Your Honor.  There is

25   privileged information here.

1           **THE COURT:**  That's correct.  I think you need to

2    narrow --

3           **MR. HEMANN:**  I can give a narrowing --

4           **THE COURT:**  So to keep things transparent, obviously,

5    the witness works for a law firm.  And it's very possible that

6    she gained some knowledge in what's called privileged

7    discussions.

8         Discussions between a client and an attorney are

9    privileged and, with rare exception, they are not subject to

10   being disclosed to juries or anybody else, even to the Court.

11        So in asking the question that Mr. Hemann did, the Court

12   just wants to avoid any reference to anything that may be

13   privileged.  And I'm sure Mr. Hemann was not seeking to adduce

14   such information.  So we'll just ask him to narrow the question

15   a bit.

16          **MR. HEMANN:**  Thank you.  And I was not, Your Honor.

17   BY MR. HEMANN:

18   Q.   Based on your firsthand knowledge, and not knowledge --

19   not information that you may or may not have been told by

20   another person, you don't know how, if at all, Mr. Liew used

21   these documents between 1996 and 2011?

22   A.   Firsthand knowledge, I wasn't at the offices so no.

23   Q.   Are there any references in the binders to either the

24   binders or the information contained in the binders being

25   provided to Mr. Maegerle?

1    **A.**    I'm sorry, can you repeat the question?

2    **Q.**    Uhm, you said you looked at the binders?

3    **A.**    I did, yes.

4    **Q.**    Several times?

5    **A.**    Yes.

6    **Q.**    Is there any reference in the binders to either the

7    documents in the binders or the binders themselves being

8    provided to Mr. Maegerle?

9    **A.**    Uhm, no reference -- not that I saw.

10   **Q.**    You mentioned several of the patents.  You went through a

11   list of some patents with Ms. Agnolucci, correct?

12   **A.**    Yes.

13   **Q.**    How many of the patents in the lists are repeats?  Do you

14   know?

15   **A.**    I do not know.

16   **Q.**    I mean, I think, and correct me if I'm wrong, I heard

17   '911 -- and that's the one that stuck in my mind -- three

18   times.  Is that accurate?

19   **A.**    I -- I did see -- I did notice that there were patent

20   numbers that were repeated.  I can't tell you how many there

21   were off the top of my head.  I wasn't tracking that.

22   **Q.**    You guys didn't do a calculation of how many of the patent

23   numbers are repeated?

24   **A.**    Some of them were repeated on the same page, so that's --

25   it was written at the top, and then further down on the list it

1   was written again.  So that's what I noticed.

2   Q.   You testified that you had worked on -- worked on

3   preparing the chart, correct?

4   A.   Yes.

5   Q.   It's a fact, is it not, that the numbers that came -- the

6   numbers that were put in the chart were put in the chart

7   because they were located in Mr. Liew's old notes; is that

8   correct?

9            MS. AGNOLUCCI:  Objection.

10           THE COURT:  Just a moment.

11       Sustained.

12  BY MR. HEMANN:

13  Q.   When the documents, the binders were produced by Mrs. Liew

14  to the law firm, the law firm provided those binders to

15  Mr. Cooper to assist him in preparing his report, correct?

16  A.   Correct.

17  Q.   So Mr. Cooper was able to go through that list and figure

18  out which to put in -- what patents to put in his report,

19  correct?

20  A.   I can't speak to how Mr. Cooper prepared his report.

21  Q.   You testified on direct that you were here in court for

22  Mr. Cooper's testimony, correct?

23  A.   Yes.

24  Q.   And you heard Mr. Cooper testify that he does not use

25  patents to design factories, correct?

1   **A.**   That specific sentence I don't recall.

2          **MR. HEMANN:**  Thank you, Your Honor.  No further

3   questions.

4          **MS. AGNOLUCCI:**  I have one quick question, Your Honor.

5          **THE COURT:**  All right.  Remember you have to see her

6   back in the office.

7          (Laughter)

8          **MS. AGNOLUCCI:**  I know.  I know.

9                    <u>**REDIRECT EXAMINATION**</u>

10  **BY MS. AGNOLUCCI:**

11  **Q.**   Ms. Hernandez, you testified that at Keker & Van Nest we

12  provided Mr. Cooper with copies of the binders that you

13  discussed?

14  **A.**   Yes.

15  **Q.**   Do you recall whether that was after he had already

16  compiled his report and compiled the list of patents on which

17  he relied?

18  **A.**   I do not recall.

19          **MS. AGNOLUCCI:**  Thank you.  No further questions.

20          **THE COURT:**  All right.  You may be excused.  You can

21  go back to being a paralegal.

22          (Laughter)

23          **THE COURT:**  Careful.

24          (Laughter)

25          **THE COURT:**  It wasn't that difficult, was it?

1          THE WITNESS:  No, no.

2          THE COURT:  Thank you very much.

3          MS. AGNOLUCCI:  May I now approach to retrieve the

4    exhibits, Your Honor?

5          THE COURT:  Please do, yes.

6       Ms. Ottolini is going to retrieve them for us.

7          MS. AGNOLUCCI:  Thank you, Ms. Ottolini.

8          THE COURT:  Does Mr. Liew and USAPTI have any further

9    witnesses?

10         MR. GASNER:  Subject to the Court's colloquy, no

11   further witnesses.

12         THE COURT:  All right.  So are you prepared to rest at

13   this time?

14         MR. GASNER:  Yes.

15         THE COURT:  All right.  Mr. Froelich, does

16   Mr. Maegerle wish to call any witnesses?

17         MR. FROELICH:  No, Your Honor.  We'll rest at this

18   time.

19         THE COURT:  Very well.  Parties having rested, does

20   the government have anything else?

21         MR. HEMANN:  Your Honor, we would like to discuss with

22   the Court calling a rebuttal witness, but we would suggest

23   having a conversation with the Court out of the presence of the

24   jury first.

25         THE COURT:  I think that's probably a good idea.

1        What I'm going to do at this time, ladies and gentlemen,

2    it's almost a quarter after 11:00, I'm going to give you a

3    break.  It will be a minimum of 15 or so minutes.

4        So you can go out and, you know, rest and do whatever for

5    15 minutes, and then come back to the jury room.  And then

6    we'll let you know, update you on where we are.  I have some

7    things to discuss with counsel that will impact the schedule.

8    So if you don't mind, please bear with us.

9        The one thing I wanted to say before you leave, I won't

10   let this go unnoticed, is that what you see in terms of

11   cooperation among the lawyers and the parties with stipulations

12   is very, very rare, very rare, because lawyers in their DNA

13   have -- they must have come from warrior cults way back in

14   ancient times.

15       (Laughter)

16       **THE COURT:**  That's why they get into this.

17       Seriously, it's very difficult.  Many lawyers don't

18   understand that you're an advocate for your client but you're

19   also partners with the Court in doing justice for the parties

20   and to be efficient in the administration of justice.  So you

21   learn to fight where you think there's something that is -- is

22   appropriate; you learn to represent your client vigorously

23   whether it's a private client or the government; and then you

24   agree where there's really not a dispute or no basis to

25   disagree.

 1        And so seeing that, don't take it for granted.  If you

 2    ever are on another jury, I think you'll be retroactively very

 3    impressed by all the lawyers here, with the cooperation that

 4    you see.  And it's just really a very -- from the Court's

 5    perspective, it's a very positive thing.  And I don't see it

 6    very often, unfortunately.

 7        So that's my homily for the morning.

 8        (Laughter)

 9        **THE COURT:**  Remember the Court's usual admonitions,

10    and we'll see you in a few minutes.

11        (Proceedings were heard out of the presence of the jury:)

12        **THE COURT:**  All right.  The jury has retired.

13        **MR. AXELROD:**  Yes, Your Honor.  The United States

14    intends to call Sam Livingston, who's a vice president at

15    Cristal, which is the company that obtained the Ashtabula

16    technology, to testify as a rebuttal witness in this case.

17        **THE COURT:**  All right.

18        **MR. AXELROD:**  He's going to talk about the fact that

19    the company has maintained that technology as proprietary and

20    has not publicly disclosed that technology.

21        And that will be, you know, sort of the substance of his

22    testimony.  He'll have to explain who he is, what the company

23    is, what they do, the technology that they have, and how

24    they've kept it, which includes the Ashtabula technology; and

25    how they've kept that technology out of the public domain, in

1  particular the Ashtabula technology that the contract is now in

2  evidence.  That's the gist of it.

3      He did --

4          **THE COURT:**  Is that the Sherwin-Williams contract?

5          **MR. AXELROD:**  That's correct, Your Honor.

6          **THE COURT:**  And they're a party to the

7  Sherwin-Williams contract?

8          **MR. AXELROD:**  They are not.  They're the ones who

9  bought it.  So Sherwin-Williams -- so DuPont sold it to

10  Sherwin-Williams.  Sherwin-Williams then sold it to SCM.

11  Cristal bought what SCM then turned into Millennium, and then

12  Cristal bought Millennium.  So they are the current owners of

13  that factory, and they're the ones who own that technology.

14          **THE COURT:**  All right.  Mr. Gasner?

15          **MR. GASNER:**  We'd object, Your Honor.  This has been

16  an issue from day one, and the kind of witness that was clearly

17  reasonably foreseeable if the Government wanted to call them.

18      The efforts to maintain confidentiality at Ashtabula has

19  been front and center since day one.  Mr. Cooper's expert

20  report, all 80 pages of it, deals a lot with Ashtabula.  If

21  they had a point to make, it should have been a part of their

22  case in chief.

23          **MR. FROELICH:**  Your Honor, it's irrelevant because

24  it's not -- it's not what they did or not what Sherwin-Williams

25  did or SCM did.  It's DuPont lost its ability to control that

PROCEEDINGS

1    technology.

2        It's if I tell you a secret or I tell you something, just

3    because you've kept the secret, doesn't mean -- in other words,

4    it's irrelevant what everybody else did with it because the

5    point of the matter is DuPont doesn't have the technology

6    anymore.

7        The agreement says after 15 years, technology -- DuPont no

8    longer controls that technology.

9            THE COURT:  All right.

10           MR. AXELROD:  Your Honor, this is --

11           MR. GASNER:  One other point, if I might.

12           THE COURT:  Yes.

13           MR. GASNER:  He's not on the witness list.  Also,

14   Ms. Agnolucci advises me we've had no notice of him, no

15   documentation.  And I don't think that just calling him later

16   and delaying the trial in that way would be appropriate.

17       I really think the big point is, Ashtabula was all over

18   the Cooper expert report.  It's been one of our main arguments

19   all along, so I don't think it's proper rebuttal.

20           MR. AXELROD:  Well, Your Honor, we're exactly at the

21   point that you thought we'd be at when you --

22           THE COURT:  I did?  When?

23           MR. AXELROD:  When you agreed to admit this particular

24   document, the Ashtabula contract, you made the point that this

25   is exactly the kind of thing that is the subject of a rebuttal

1    case, and you warned the Defense about this.

2        And I would point out that this was -- the Ashtabula

3    contract was not produced or part of the exhibits until after

4    the exhibit list was filed.

5        It's not our job to respond to a case that the Defense may

6    or may not make.  They've chose to make this an issue.

7    Mr. Gasner spoke about the fact that the Ashtabula technology

8    is public repeatedly in his opening statement.

9        The reality is, what they have said is, Ashtabula

10   information is public.  We are now entitled to present evidence

11   that that is not true, and it absolutely relates to the

12   specific defense in this case about that technology.  They're

13   saying this is public, and it's not.

14           THE COURT:  All right.  I understand your argument.

15       Anything further you want to say?  I'm going to take it

16   under advisement because we need a break, too.

17           MR. AXELROD:  Oh, and just to respond to --

18           THE COURT:  And I'll give you folks a chance to

19   respond.

20           MR. AXELROD:  I do want to explain to the Court that,

21   of course, this individual wasn't on our witness list.  We

22   didn't have a witness list for a rebuttal case until we knew

23   whether there was anything to rebut.

24       What I can advise the Court is that we have talked to

25   Mr. Livingston on a couple of occasions, and we have reports --

**PROCEEDINGS**

```
 1    a report and a couple of pages of -- and two separate sets of

 2    notes from an agent that we're now prepared to hand over to the

 3    Defense; and that's where things stand.

 4              THE COURT:  All right.

 5              MR. FROELICH:  Your Honor, from opening statement,

 6    from the documents they've got, my client's position was, in

 7    good faith, he believed that the technology -- DuPont lost

 8    control of its technology.  It did lose control of its

 9    technology.

10         SCM isn't part -- this is an agreement between

11    Sherwin-Williams and DuPont; and the specific agreement says

12    after 15 years, DuPont can -- I mean, Sherwin-Williams can do

13    whatever it wants with the technology.  It can sell it.  It can

14    trade it.  It's gone.

15              THE COURT:  But I take it the argument is,

16    Mr. Froelich, the following:  When you say "it's gone," "it's

17    gone" means either it's out in the public domain or somebody

18    else has control of it.

19         What I understand the Government -- and I'm just thinking

20    out loud here -- the Government to be arguing, is that, to the

21    extent that there is an argument, and Mr. Cooper certainly

22    testified to this, that this technology from Ashtabula is out

23    in the public domain, and some evidence of that is the

24    contract, then why wouldn't the Government have the ability

25    to -- you know, and you have a right to argue that, of course;
```

1    you have through your questions, and the like, already started

2    arguing that -- why shouldn't the Government have the ability

3    to, since this was put in -- and Mr. Axelrod is right.  I

4    warned you, I warned all of you that if this comes in, then the

5    Government is going to have the opportunity to rebut it, and we

6    can look at the transcript, and you said, "We understand that."

7          MR. FROELICH:  Your Honor, the rebuttal is not -- the

8    rebuttal is -- what they were arguing is, "We don't interpret

9    the contract that way."

10       This person isn't even a partner -- a part of the

11   contract.  This is a contract between Sherwin-Williams and

12   DuPont, and they want --

13         THE COURT:  Right.  But you're missing my point.  The

14   point is not so much that somebody had the right to -- that

15   DuPont gave up its right to keep this material secret.  That's

16   one thing, and there's arguments that can be made on both sides

17   from that.

18       The next point, which has been argued extensively

19   throughout the Defense case through the questions and the

20   documents, is that it is now in -- that information that was

21   sold to Sherwin-Williams is now out in the public domain.  If

22   this witness can say, "No, it's not," then that particular

23   issue is joined.

24       But as far as the other argument, which says by -- which

25   may be a legal argument, it may be a factual argument:  If

**PROCEEDINGS**

1    DuPont cared so much about its technology, why, then, did it

2    let it out over the 15-year tail?  And maybe somehow that shows

3    that DuPont didn't think this material was either secret or

4    that its secretness, if you will, was, you know, was to go on

5    ad nauseam or ad infinitum.

6        So it's different.  And you still have your arguments on

7    both sides with respect to that point, because that would be

8    relevant to whether, you know, DuPont really cared.  So that's

9    kind of my thought process.

10        **MR. GASNER:**  Your Honor, one further thought.

11        In Mr. Cooper's report at pages 10 and 11, he had a long

12    section about sale and merger and shutdown of plants, and he

13    was going to testify that he -- his opinion is that because of

14    all these mergers and consolidations, that DuPont technology

15    has become widely known.

16        And I tried to get into that briefly, and the Court

17    sustained objections apparently on lack of foundation.  So --

18        **THE COURT:**  Right.  So now -- right.

19        **MR. GASNER:**  So two points.

20        **THE COURT:**  Okay.

21        **MR. GASNER:**  One is, as a rebuttal case, this is

22    nothing new.  The Sherwin-Williams document was on the Rule 17

23    subpoena.  We fought over that.  It's been on our witness list

24    since day one.

25        **THE COURT:**  But it was objected to by the Government,

 1    and I overruled, you know, the objection.

 2          **MR. GASNER:**  And I'm sure the Court's standard is not,

 3    "Well, gee, we didn't know what would be admitted or not, and

 4    rebuttal is for things that got admitted that we didn't think

 5    would get admitted."  I mean, the Court would have huge

 6    rebuttals if that was the case.

 7          **THE COURT:**  All right.  I don't want to hear any more

 8    argument on this on either side.

 9          What I'd like to do is, I want this case to proceed in an

10    orderly fashion.  So as far as the Court is concerned, both

11    parties having rested their cases, or all parties having rested

12    their case-in-chief, the next order of business would be

13    whatever appropriate motions are at this time.

14          And even -- but before that, I believe it's appropriate

15    for me to voir dire the individual defendants.  And I don't --

16    what -- not that I would ever defer to the Eleventh or the

17    Fifth Circuit; but is the procedure -- since it's something I

18    really haven't done, do they require that the individuals be

19    put under oath?

20          **MR. FROELICH:**  Yes, Your Honor, they do.

21          **THE COURT:**  Okay.

22          **MR. FROELICH:**  They do.  And there's only three

23    questions.  It's, you know:  Do you have a right to, have you

24    talked about it with your lawyer, and is it your decision?

25    Those are the three questions.

**PROCEEDINGS**

1        **THE COURT:**  All right.  Do you mind if I -- you don't

2  think it's appropriate or necessary for your --

3        **MR. GASNER:**  No, I think, out of an abundance of

4  caution, you ought to proceed with the colloquy.

5      Your Honor, one other point.  There are some individuals

6  that have been present in the courtroom, and I don't know if

7  any of them are Mr. Armstrong -- or, I'm sorry, Mr. Livingston;

8  but --

9        **THE COURT:**  Mr. Axelrod just shook his head in the

10  negative.

11        **MR. AXELROD:**  No.  There have been -- counsel for the

12  company have been there, and they're outside counsel; but I do

13  not believe Mr. Livingston has ever been in the courtroom

14  during proceedings.

15        **THE COURT:**  All right.

16        **MR. GASNER:**  I appreciate that.

17        **THE COURT:**  Again, I'm only cutting you off because I

18  think I have enough information to make a ruling.

19      So let's start with Mr. Liew.  Would you mind taking the

20  witness stand, sir?

21        **THE CLERK:**  Raise your right hand, please.

22                   **WALTER LIAN-HEEN LIEW**,

23  called as a witness for the Defendants, having been duly sworn,

24  testified as follows:

25        **THE WITNESS:**  Yes, I do.

LIEW - EXAMINATION / THE COURT

1          **THE CLERK:**  Thank you.  Please be seated.

2                         **EXAMINATION**

3     **BY THE COURT:**

4     **Q.**   Speak right into the microphone.  You know the drill from

5     all the witnesses.

6          Would you state your full name and spell it, please?

7     **A.**   Yes.  Walter Lian-Heen Liew.  Lian-Heen is spelled

8     L-I-A-N, H-E-E-N.

9     **Q.**   All right.  Mr. Liew, you've been sitting here throughout

10    the trial; correct?

11    **A.**   Yes, sir.

12    **Q.**   And you understand you're a defendant in this case?

13    **A.**   Yes, Your Honor.

14    **Q.**   As well as USAPTI?

15    **A.**   Yes, Your Honor.

16    **Q.**   And you heard the discussion with your attorney about your

17    decision not to testify; is that correct?

18    **A.**   Yes, Your Honor.

19    **Q.**   And without getting into the details, did you talk with

20    your attorneys about the pluses and minuses of your testifying

21    in your own defense?

22    **A.**   Yes, I did, Your Honor.

23    **Q.**   And just so I'm on the same -- I'm sure they've done an

24    excellent job, but you understand that you have an absolute

25    right not to testify in this case?  Do you understand that?

LIEW - EXAMINATION / THE COURT

1  A.    Yes, I do.

2  Q.    And by so doing, neither the Court nor the jury may infer,

3  in fact, they'll be told by me that they cannot infer any --

4  they cannot take your constitutional right to remain silent as

5  asserted by you in any way as proof of your guilt in any

6  fashion.  Do you understand that?

7  A.    Yes, I do.

8  Q.    And you also understand that if you do testify, then you

9  would be subject to the same cross-examination that you

10 witnessed over the last several weeks by Government counsel?

11 Do you understand that?

12 A.    Yes, I do, Your Honor.

13 Q.    And taking all of those factors into account, the pluses

14 and the minuses and your discussions with counsel, is it your

15 decision to testify or not testify in this case?

16 A.    Your Honor, I decided not to testify, like I said in my

17 declaration during the motion to severance, and that's where I

18 stand.  So I've made the decision, and I did discuss that with

19 my attorney and not to testify at this time.

20         THE COURT:  All right.  Very well.  That's your right.

21 So you may step down.  Thank you, sir.  You're excused.

22         THE WITNESS:  Thank you, Your Honor.

23         THE COURT:  Thank you.

24                  (Witness excused.)

25         THE COURT:  Let me call Mr. Maegerle.

MAEGERLE - EXAMINATION / THE COURT

```
 1              THE CLERK:  Raise your right hand, please.

 2                        ROBERT MAEGERLE,

 3  called as a witness for the Defendants, having been duly sworn,

 4  testified as follows:

 5              THE WITNESS:  Yes, I do.

 6              THE CLERK:  Thank you.  Please be seated.

 7          And state and spell your full name.

 8              THE WITNESS:  Robert Maegerle, M-A-E-G-E-R-L-E.

 9              THE CLERK:  Thank you.

10                         EXAMINATION

11  BY THE COURT:

12  Q.   Good afternoon, Mr. Maegerle.

13  A.   Good afternoon.

14  Q.   I guess it's still morning.  Good morning.

15  A.   Good morning.

16  Q.   You are Robert Maegerle, one of the individual defendants

17  in this case?

18  A.   That is correct, Your Honor.

19  Q.   And you've been here throughout the entire trial?

20  A.   Yes, I have, Your Honor.

21  Q.   All right.  And you've heard the discussion between your

22  attorney and the Court about your decision to assert your

23  Fifth Amendment right against testifying in your own defense in

24  this case?

25  A.   Yes, I have, Your Honor.
```

**MAEGERLE - EXAMINATION / THE COURT**

1   **Q.**   And did you discuss with your attorney, Mr. Froelich, all

2   of the pros and cons of testifying in your own defense?

3   **A.**   Yes, I have, Your Honor.

4   **Q.**   And you understand that if you continue with your decision

5   not to testify based upon your Fifth Amendment right, that

6   neither the judge nor the jury trying the case could infer or

7   presume that you were guilty just because you asserted your

8   right, and no evidence could be taken from that of your guilt

9   in the case?

10  **A.**   Yes, I understand that, Your Honor.

11  **Q.**   All right.  But you understand that if you do testify,

12  then you would be subject to the same cross-examination as any

13  other witness who testifies in the case?  Do you understand

14  that?

15  **A.**   Yes, I understand that also, Your Honor.

16  **Q.**   All right.  So understanding all of those pros and cons of

17  testifying, is your decision to testify in this case or to

18  assert your Fifth Amendment right and not testify?

19  **A.**   It is my final decision not to testify, Your Honor.

20          **THE COURT:**  Very well.  And we respect that and we

21  honor that, and you're excused.  Thank you, sir.

22          **THE WITNESS:**  Thank you.

23                      (Witness excused.)

24          **THE COURT:**  All right.  Is that adequate from your

25  perspective?

1      **MR. FROELICH:**  Yes, Your Honor.  That covered the

2  bases.

3              **THE COURT:**  And Mr. Gasner?

4      **MR. GASNER:**  Yes, Your Honor.

5              **THE COURT:**  All right.  Very well.

6      So now the evidence having been closed for the Defense, do

7  you wish to renew your motion?

8              **MR. FROELICH:**  Yes, Your Honor.

9      I wish to renew my motions -- my Rule 29 motion.  In

10  particular, Your Honor, the Count, I believe it's 10, that is

11  the obstruction of justice count, there's been no evidence,

12  Your Honor, about an obstruction of justice.

13      I've been both a federal prosecutor and a criminal defense

14  lawyer, and I've tried a lot of, both as a prosecutor and as a

15  criminal defense lawyer, obstruction of justice cases.

16      And, for example, here where you had people -- the

17  Government put up people that said in a bankruptcy -- they put

18  a bankruptcy expert up and everything.  They put nobody up

19  here.  All they did was put in the Answer.  They didn't explain

20  how that obstructed -- there was an obstruction of justice, how

21  that did anything.

22      And, therefore, there's a total lack of proof here as to

23  an obstruction of justice.  Just putting an Answer in isn't

24  sufficient.  No one testified that that did anything, that it

25  had any effect on anything.

1    And you're just asking the jury to guess that it had an

2  effect.  No one got on the stand and testified what an Answer

3  is, how an Answer is done, what it is.  Not just putting --

4  just saying, "Here's an Answer," just doesn't do it,

5  Your Honor, for obstruction of justice.

6    As to the other counts, Your Honor, I think there's been

7  plenty of evidence.  Mr. Cooper said that it was -- that it was

8  publicly available, and there's plenty of evidence.  In fact,

9  the Government's -- the agent got the testimony of my client in

10  who said that, you know, it was -- what he believed, that he

11  believed it was only under five years; that he believed that

12  this was public information because of the thing had been sold.

13    And, more importantly, Your Honor, I don't think there's

14  been any evidence as to what a trade secret is, and what the

15  trade secret is and what the exact trade secret is in this

16  case.

17    **THE COURT:**  All right.

18    **MR. FROELICH:**  And, so, that, Your Honor -- so I'd

19  move for -- the other thing, Your Honor, I would also renew my

20  argument that there's been no proof of an agreement between my

21  client and Mr. Liew or USAPTI, in fact, to violate the law.  In

22  fact, it's different.  It's absolutely -- the evidence is to

23  the contrary.

24    **THE COURT:**  All right.  Mr. Gasner?

25    **MR. GASNER:**  Thank you, Your Honor.

**MAEGERLE - EXAMINATION / THE COURT**

1          On behalf of USAPTI and Mr. Liew, we join in

2    Mr. Froelich's motions, as well as --

3          **THE COURT:**  I see a huge stack of documents there.  I

4    hope that's not a written --

5          **MR. GASNER:**  No.  No.

6          **THE COURT:**  All right.  I was going to say --

7          **MR. GASNER:**  This is still Mr. Cooper's expert report

8    in all its glory.

9          **THE COURT:**  -- poor Ms. Lovett, you know.  Yes.

10         **MR. GASNER:**  So we reiterate, of course, our prior

11   motions both pretrial and during the trial.

12         And if I might add one more thing for the record,

13   Your Honor.

14         **THE COURT:**  Go ahead.

15         **MR. GASNER:**  I have defended a lot of trade secret

16   cases on the civil side; and as Mr. Froelich just said, what

17   the trade secret is here has been particularly slippery.  I

18   just think it's ironic in a criminal case that it has been far

19   more difficult to pin down what is the secret and what is my

20   client being accused of.

21         And, you know, the Court has ruled on our motion to

22   dismiss, and I'm not going to reargue that here; but I do feel

23   as though, for the record, I just want to state that the

24   criminalization of civil trade secret law, Congress passed the

25   statute but I believe as applied here, it's just not what

MAEGERLE - EXAMINATION / THE COURT

1    Congress intended to happen, to have this kind of case putting

2    in jeopardy the individuals and the corporation at trial.

3        So I do think the Court faces interesting issues.  We're

4    going to go forward, presumably, to the jury unless the Court

5    reverses course suddenly; but I do think there are very

6    interesting and important issues throughout this case.

7            THE COURT:  All right.  I don't need to hear.  I'm

8    going to reserve.  As I said, I might want further briefing

9    later on on specific issues to be determined.

10       So here's what I'm going to do now.  I'm going to,

11   basically, take a break and think about the issue of rebuttal.

12       I'll get to you in a second.

13           MR. FROELICH:  I'm sorry.

14           THE COURT:  If there's rebuttal, then, you know, I'll

15   have something to say about that, and it will be very limited

16   and very narrow and very -- I can't -- I'm not going to limit

17   the defendants if I allow it, and I'm not saying I will; but

18   the direct is going to be -- would be very laser-like in terms

19   of its import if I allowed it at all.  Because I'm looking at

20   the clock and it's 20 to 12:00 and, you know, we're still here

21   possibly in testimony.

22       Depending upon the outcome of that, we'll decide whether

23   to move on to begin, at least, the issues relating to -- the

24   charging conference.  I think it will probably need to be

25   continued as well.  Either started tomorrow morning at 8:00 or

 1    continued to tomorrow.  I don't know that we're going to get

 2    through everything.  And then we'll talk about, at that time,

 3    the closing argument configuration.

 4        So let's take a -- yes?

 5            MR. FROELICH:  Your Honor, I just had one thing.

 6            MR. GASNER:  I don't know if this is part of what --

 7    hang on one second.

 8        I don't know if this is part of what the Court is taking

 9    under submission, but we would ask to call Mr. Cooper as a

10    surrebuttal witness.  He's an expert, and I think what -- I

11    think he'd be entitled to respond to whatever Mr. Livingston

12    says.

13            MR. FROELICH:  Your Honor, the only thing I'd like to

14    say is, this is the 302, what he's going to testify to, and I'd

15    like to give it to the Court to look at.

16            THE COURT:  Okay.  Do you have any objection to that?

17            MR. AXELROD:  No.

18            MR. FROELICH:  So you understand how broad.  They've,

19    actually, put all this testimony in before.

20            MR. AXELROD:  And just with that, Your Honor, so what

21    the United States has provided to the Defense is a 302 and

22    agent notes from two different conversations with

23    Mr. Livingston.

24        It is not the Government's intention to elicit all of this

25    information in the direct examination.  We take the Court's

1    comments to heart about having a focused direct examination.  I

2    think it's something that could be achieved in 20 or 30

3    minutes.

4         **THE COURT:**  All right.  Well, I will -- I'm going to

5    take a look at this, and I will get back to you.

6         **MR. FROELICH:**  Thank you, Your Honor.

7         **MR. HEMANN:**  Thank you.

8         **MR. AXELROD:**  Thank you.

9         **THE COURT:**  It will be a minimum of about ten minutes

10   or so, and 15 at the outside, and then we'll proceed.

11        **MR. GASNER:**  Thank you, Your Honor.

12                 (Recess taken at 11:36 a.m.)

13                 (Proceedings resumed at 11:49 a.m.)

14       (Proceedings were heard out of the presence of the jury:)

15        **THE COURT:**  Be seated, please.

16        All right.  So I've thought about this, and I'm going to

17   allow the witness to testify, but I'm going to set very strict

18   parameters.

19        I think this witness is only allowed to authenticate the

20   fact or testify as to his competence as a witness; that he's

21   aware of this contract and its execution; and the fact that the

22   provision with respect to purchasing or not being required to

23   maintain as secret the technology of DuPont; and the fact that,

24   if this is his testimony, that as far as he knows, none or not

25   all, or whatever his testimony is, of the technology is out in

1   the public domain and what steps they've taken -- his company

2   has taken to ensure that that was the case.

3        So I'm going to keep -- I don't want a lot of "who struck

4   John" here and a lot of background.  I don't want any testimony

5   about whether one could build a plant from this information,

6   which is alluded to in his 302.  It's going to be short and

7   narrow; and if you want to lead him through it, you can.  I'll,

8   of course, allow cross-examination.

9        I'm not inclined to allow Mr. Cooper to testify because he

10  doesn't have anything -- any personal knowledge of this

11  contract that I'm aware of.  He's already said -- it's in the

12  record, I just reviewed it -- that he didn't -- he thought this

13  material was made public and it's out there from other sources,

14  from patents, and that's a fair argument for the jury.  So I'm

15  going to keep this narrow on both sides and to the issue.

16       I think the parties are sort of two ships passing in the

17  night, in the sense that the defendants have their argument

18  that by entering into this contract, DuPont didn't take

19  reasonable efforts to maintain the secrecy, especially if they

20  had no -- I should slow down -- agreement with

21  Sherwin-Williams.

22       The other argument, though, is, was the technology, in

23  fact, made public, which would be another grounds to find that

24  this was not a trade secret.

25       So I think on that basis -- and I did check on what I

**PROCEEDINGS**

 1    said; and I did -- as a condition to allowing this contract to

 2    come in, I warned the defendants that this is going -- is the

 3    kind of material that would require or allow, not require, a

 4    rebuttal witness.  And, so, I'll stick to my word, and I think

 5    it is proper rebuttal.

 6        So let's get the witness.  No further argument on this.

 7    Just get the witness and let's do it.  Because I would like to

 8    get done with this and start the -- because I've got some

 9    homework assignments for you, all of you -- poor Ms. Lovett, is

10    she -- oh, yes, yes, she's there -- to rework these

11    instructions.

12        All right.  Let's call the witness.

13        Let's get the jury in.

14        The witness can come forward.

15        (Proceedings were heard in the presence of the jury:)

16        **THE COURT:**  All right.  Please be seated.

17        All right.  So, ladies and gentlemen, just to tell you --

18    update you on where we are.  So the Government, as you know,

19    rested its case last week.  All of the defendants have rested

20    their case.

21        And now at this point of the trial it's appropriate, under

22    certain circumstances, to allow the Government to call a

23    rebuttal witness to address any issue that was raised -- that

24    they believe, it's up to you to decide if this is correct, was

25    raised in the Defense case.

1        And, so, with that said, you can call your first -- your

2    only rebuttal witness.

3            **MR. AXELROD:**  Thank you, Your Honor.  The

4    United States calls Sam Livingston.

5            **THE COURT:**  All right.  Mr. Livingston, I presume?

6                        (Laughter)

7            **THE COURT:**  I had to do that.  I had to do that.  I'm

8    sorry.

9            **THE WITNESS:**  Well done.

10           **THE CLERK:**  Raise your right hand, please.

11                   <u>**SAMUEL HILARY LIVINGSTON III**</u>,

12   called as a witness for the Government, having been duly sworn,

13   testified as follows:

14           **THE WITNESS:**  I do.

15           **THE CLERK:**  Thank you.  Please be seated.

16       And state and spell your full name for the record.

17           **THE WITNESS:**  My full name is Samuel, S-A-M-U-E-L,

18   Hilary, H-I-L-A-R-Y, Livingston, L-I-V-I-N-G-S-T-O-N, the

19   Third.

20           **THE CLERK:**  Thank you.

21           **THE COURT:**  You may proceed.

22           **MR. AXELROD:**  Thank you, Your Honor.

23                   <u>**DIRECT EXAMINATION**</u>

24   BY MR. AXELROD:

25   **Q.**   Mr. Livingston, good morning.

1    Where are you presently employed?

2  **A.**   I am presently employed with Cristal.

3  **Q.**   And could you describe what Cristal is?

4  **A.**   Cristal is a manufacturing company that manufactures

5  titanium dioxide.  We are backward integrated into the

6  feedstock materials for feeding titanium dioxide plants.  So we

7  have -- we have mining operations, as well as we have some

8  downstream processing to make titanium metal.

9  **Q.**   What is your position at Cristal?

10 **A.**   I'm the vice president responsible for safety, health,

11 environment, quality, and technology.

12 **Q.**   And I want to ask you just to briefly give some context.

13 Your background in the TiO2 industry, how long have you been in

14 it and connected to your current position, just briefly?

15 **A.**   I have worked in the titanium dioxide industry my entire

16 career, which began in 1980.

17    I have had employment with three titanium dioxide

18 companies.  I had a 19-year career with Kerr-McGee Chemical

19 Corporation, which later became Tronox.

20    I had a short one-year career with Kemira, another

21 titanium dioxide company based out of Helsinki, Finland, where

22 I was working in Savannah, Georgia.

23    And then for the last 14 years, I have been working for

24 the Cristal Company, which has, actually, changed names three

25 times during my career.  I began with them in May of 2000 and

1    have been with them since May of 2000.

2    Q.   Okay.  And could you briefly describe your

3    responsibilities with respect to the protection -- with respect

4    to Cristal's technology and the protection of that technology?

5    A.   My responsibility for our technology is to ensure that we

6    keep it confidential, that we do protect it.  I have the

7    engineers, the research -- research -- process researchers that

8    work for me, as well as our process engineers throughout the

9    company are in my chain of demand.  So it is my responsibility

10   to ensure that our technology is protected.

11   Q.   And if you could, could you -- I want to talk to you about

12   sort of the technology that you possess.  And does Cristal

13   possess technology from a plant in Ashtabula called

14   Ashtabula 1?  Is that one of your plants?

15   A.   Ashtabula 1 is one of the plants in our portfolio of our

16   titanium dioxide facilities, yes.

17   Q.   And is that a plant that was originally acquired from

18   Sherwin-Williams?

19   A.   Yes.  It was a -- my recollection from the history was

20   that we, SCM, which is a predecessor of the company Cristal,

21   purchased that plant from SCM in or around 1974.  And it was

22   previously owned by Sherwin-Williams, and that technology was

23   acquired from a license from DuPont.

24   Q.   And the technology -- so SCM -- so just to make sure I've

25   got this right.  DuPont sells this technology to

LIVINGSTON - DIRECT / AXELROD

1   Sherwin-Williams; right?

2   **A.**    That is correct.

3   **Q.**    And then Sherwin-Williams sells it to SCM in around 1974?

4   **A.**    Yes.

5   **Q.**    And then, since that time, it's been in the possession of

6   one company, but the name has changed over the course of the

7   years?

8   **A.**    That is correct.  SCM acquired it in '74.  We have been

9   through a number of company changes, but the basic technology

10  has been owned through the family of companies that I currently

11  work for since 1974.

12  **Q.**    And could you briefly describe, with respect to that

13  Ashtabula plant, what that technology consists of?

14  **A.**    Well, that technology, as in all titanium dioxide plants

15  that are in the chloride process, requires -- there's three

16  basic unit operations to make titanium dioxide.  There is a

17  chlorination section, an oxidation section, and a finishing

18  section.

19      And that Ashtabula 1 site contains all three of those unit

20  operations.  It is a little bit different from the technology

21  that we use at our Ashtabula 2 facility; but the basic concept

22  of chlorination, oxidation, and finishing is the same.

23  **Q.**    And the technology that was acquired at Ashtabula 1, is

24  that technology that Cristal considers proprietary?

25  **A.**    Absolutely.

LIVINGSTON - DIRECT / AXELROD

1   Q.   And does Cristal protect that proprietary technology?

2   A.   Cristal does.   We go to whatever means that we can to

3   protect our technology.   It is proprietary to our company.

4        Obviously, that has been the same protocol, that the other

5   companies that I've worked for have all been very protective of

6   their technology not wanting that --

7        MR. FROELICH:   I'm going to object, Your Honor.   It's

8   beyond --

9        THE COURT:   Overruled.

10       Finish your answer.

11       THE WITNESS:   -- not wanting that technology to be

12  disclosed or be made aware to anybody that didn't work for our

13  company.

14  BY MR. AXELROD:

15  Q.   And why is that?

16  A.   The reality is that the titanium dioxide business is a

17  very capital-intensive business.   It is a very difficult

18  process to operate, and it is -- and it can be a very

19  profitable business.

20       So wanting -- we would not want any of our competitors,

21  nor another chemical entity, wanting to be able to take that

22  technology and use it and produce titanium dioxide and be a

23  competitor of ours.

24  Q.   Could you describe the steps that the company takes to

25  protect that proprietary technology?

1    **A.**    Well, there are a number of things that we do as a company

2    to try to protect our technology.  Obviously, our employees,

3    when they join the company, are required to sign a

4    confidentiality agreement that would request and demand that no

5    confidential information be disclosed without prior permission

6    from us as a company.

7         All drawings that are of proprietary nature are marked

8    with a confidential stamp.  The technology has changed for

9    protecting technology over the years.  When I first began in

10   the industry, we used to -- all drawings were done by hand and

11   were done with T-squares and on paper.  Today with electronic,

12   we have electronic security systems in place to protect our

13   drawings with limited access to those.

14        In our research and development areas, when we're doing

15   our R&D, our notebooks that our chemical engineers, Ph.D.

16   chemists, would be using are locked up in the labs with limited

17   access.

18        When research and development reports are written, they

19   are submitted to our librarian for electronic storage with

20   limited access to that documentation.

21        When we enter into agreements with engineering companies

22   that are going to potentially be doing projects for us, we go

23   through and exhaustively look at their security practices that

24   they have for ensuring that documentation that we may turn over

25   to them is protected.

1      We have requirements that at the end of that project, any

2  documentation that we have given them must be returned to us.

3      We specifically look; and if we believe that an

4  engineering company does not have adequate security procedures

5  to protect our technology, we would not -- we would not do

6  business with them.

7      In the case of some specific equipment, there are some

8  very specific proprietary equipment, such as the -- one of the

9  most, I guess, guarded pieces of technology in our process is

10  the oxidation step, and the particular oxidizer is a very, very

11  particular piece of equipment that we particularly guard.

12      When we have new oxidizers built and we're going out to a

13  machine company to, actually, have that piece of equipment

14  manufactured, we tend not to, actually, let one company build

15  the whole oxidizer.  We will -- we will split it up into parts,

16  and have one machine company make one part, another make

17  another, so that no one has access to all of our oxidizer

18  technology so that it would not be easy for anyone to steal

19  that technology.

20  **Q.**   I want to talk for a moment about the Ashtabula technology

21  that was originally acquired from DuPont.

22  **A.**   Right.

23  **Q.**   Does that -- has that technology -- does it exist

24  currently as it was initially passed onto the company?

25  **A.**   No.  Since 1974, obviously, that technology has

1    significantly morphed over time.  Through our own internal

2    process engineering and R&D efforts, that technology is

3    certainly not the same as it was in 1974.  There's been

4    significant improvements made to that -- to that technology

5    from when we acquired that in 1974.

6    **Q.**  Has that technology, whether initially or to the present,

7    ever been publicly available?

8    **A.**  To my knowledge, no.  Never would that technology be

9    publicly available.

10             **MR. AXELROD:**  I have no further questions, Your Honor.

11             **THE COURT:**  All right.  Mr. Gasner, would you like to

12   go first?

13             **MR. GASNER:**  Yes.  Thank you.

14             **THE COURT:**  All right.

15             **MR. GASNER:**  Thank you, Your Honor.

16             **THE COURT:**  You may proceed whenever you're ready.

17             **MR. GASNER:**  Thank you.

18                        <u>**CROSS-EXAMINATION**</u>

19   BY MR. GASNER:

20   **Q.**  Good morning, Mr. Livingston.

21   **A.**  Good morning.

22   **Q.**  I'm Stuart Gasner, and I represent Mr. Liew and his former

23   company USAPTI.

24   **A.**  Okay.

25   **Q.**  You said you've been in the business since 1980 or

LIVINGSTON - CROSS / GASNER

1   thereabouts?

2   **A.**   That's correct.

3   **Q.**   You started out at the Kerr-McGee in Hamilton,

4   Mississippi?

5   **A.**   That is correct.

6   **Q.**   And you started at Cristal, if I understand correctly, in

7   2000; is that right?

8   **A.**   It was Millennium at that time; but, yes, that is the

9   predecessor of Cristal.

10  **Q.**   And before that, you were at Kemira; is that true?

11  **A.**   I was at Kemira for one year.

12  **Q.**   All right.  So I just want to go through a little bit of

13  the chronology with you, if we might.

14  **A.**   All right.

15  **Q.**   The Sherwin-Williams contract with DuPont was in 1967;

16  true?

17  **A.**   Right.

18  **Q.**   And SCM took over the plant that DuPont built for

19  Sherwin-Williams at Ashtabula 1 in 1974; true?

20  **A.**   That is, yes, my recollection.  1974 is my -- I was not

21  with them at that time.

22  **Q.**   That's my point.

23  **A.**   Yeah.

24  **Q.**   You in 1974 weren't even in the TiO2 business?

25  **A.**   That is correct.

1   Q.   And you were at Kerr-McGee in Hamilton, Mississippi,

2   between 1980 and 1987; true?

3   A.   That is correct.

4   Q.   So you have no idea from personal knowledge as to what

5   information may have been disclosed from the Ashtabula 1 plant

6   when it was owned by SCM between 1974 and at least 1987; true?

7   A.   I would not have knowledge of anything that SCM did at

8   that time.

9   Q.   And between 1987 and 1997, you were in Australia; were you

10  not?

11  A.   That is correct.

12  Q.   And you were with Tiwest?

13  A.   That was part of the -- Kerr-McGee was a joint venture

14  between Tiwest and an Australian company.

15  Q.   So in that time period when you're in Australia, a long

16  way away from Ashtabula, Ohio, you have no idea from personal

17  knowledge what may have been disclosed in the normal course

18  from the Ashtabula 1 plant in that time period; true?

19  A.   That is correct.

20  Q.   Then you went to Kerr-McGee in 1997 until 1999; is that

21  right?

22  A.   I was back in the United States after Australia.  I went

23  back to Kerr-McGee and worked in that time frame, yes.

24  Q.   Then you went to Kemira in April of 1999?

25  A.   That is correct.

1  Q.   Now, it's common for people to move around a lot in this

2  industry; true?

3  A.   There are people that have moved, yes.  I wouldn't say

4  it's common, but it does happen.

5  Q.   Your experience in moving from one company to another is

6  not uncommon; true?

7  A.   No.  That is correct.

8  Q.   And when you moved from Kerr-McGee after many years there

9  to Tiwest, you took with you in your head many years of

10  accumulated experience and skills and knowledge that you had

11  developed at Kerr-McGee; true?

12  A.   When I went to Tiwest, Tiwest was owned by Kerr-McGee.

13  So, yes.  So I did -- the purpose of my job was to transfer the

14  technology from Kerr-McGee to the engineering company that was

15  building Tiwest.  That was --

16  Q.   So it sounds like, and what we've heard during this case

17  is, there's been lots of consolidation in this industry.  Do

18  you agree with that?

19  A.   Yes.

20  Q.   And each time there's a consolidation, the technology that

21  the old company had gets incorporated into the new company; has

22  that been your experience?

23  A.   That is true.

24  Q.   And it's -- also, you said this business has been

25  profitable.  Do you remember saying that?

**LIVINGSTON - CROSS / GASNER**

1    A.    It has been profitable.  It has times of profitability and

2    times of unprofitability.

3    Q.    It's a very cyclical industry; is it not?

4    A.    That's right.

5    Q.    And when the cycle goes down, these companies downsize; do

6    they not?

7    A.    They have downsized, yes.

8    Q.    And at each downsizing cycle, engineers are fired.  Does

9    that happen?

10   A.    That has happened, yes.

11   Q.    And a lot of those engineers go into consulting.  Have you

12   seen that in your career?

13   A.    I have.

14   Q.    And those consultants take with them the accumulated

15   knowledge that they've developed at each stage of their career;

16   true?

17   A.    They would take that knowledge, but they would take it

18   with whatever confidentiality agreement that they have signed

19   with their previous company.

20   Q.    You've signed those; true?

21   A.    Absolutely.

22   Q.    There's a lot of gray area in those agreements; is there

23   not?

24   A.    It is not particularly gray to me what is confidential and

25   not for me, personally.  It is -- it's very black and white to

1   me.

2   **Q.**   Black and white for you?

3   **A.**   Yes.

4   **Q.**   You've been in disputes with prior employers about your

5   confidentiality agreements, though; have you not?

6   **A.**   Absolutely.

7   **Q.**   You've been sued by former employers; have you not?

8   **A.**   Absolutely.

9   **Q.**   Did you think you were in the right when you got sued?

10  **A.**   When I was sued, I was, actually, asked not to work in the

11  chloride industry for Kemira.  During that suit, the company

12  argued that -- a principle of inevitable disclosure; that if I

13  was allowed to work for the Kemira in the chloride industry,

14  that inevitably, even though I did not intend to divulge

15  confidential information, that I might divulge confidential

16  information.

17  **Q.**   Did you agree with that principle?

18  **A.**   I did not agree with that principle.

19  **Q.**   You thought you could keep it straight in your own mind;

20  did you not?

21  **A.**   I absolutely did.

22  **Q.**   You thought you could use your judgment and your integrity

23  to decide what was part of common knowledge and what was

24  covered by your prior agreements; true?

25  **A.**   Absolutely.

1   Q.   And the solution to that dispute was that you went in the

2   penalty box and worked in sulfate for a year; true?

3           MR. AXELROD:  Objection.

4           THE COURT:  Sustained.

5   BY MR. GASNER:

6   Q.   But you felt as though in that dispute over your

7   confidentiality agreement, that your position was justified;

8   did you not?

9   A.   I did.

10          MR. GASNER:  No further questions, Your Honor.

11          THE COURT:  Thank you.

12          MR. GASNER:  Oh, I'm sorry.  I have one other one.

13  One other brief line.

14          THE COURT:  All right.

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. GASNER:

2    Q.   You mentioned that in dealing with other companies,

3    Cristal is very careful to trust the companies to whom it

4    discloses information?

5    A.   Yes.

6    Q.   And that if you determine the company is not trustworthy,

7    you're not going to let them see anything confidential; fair?

8    A.   Yes.

9    Q.   Isn't it true, sir, that the Pangang Company from China

10   visited Cristal in July of 2011?

11   A.   I am not aware of that visit.  I was not involved in that,

12   and I really cannot comment whether that is factual or not.

13   Q.   Okay.  Have you come to know that Pangang -- whether you

14   were directly involved or not, have you come to know that

15   Pangang visited the Cristal facilities in Saudi Arabia in July

16   of 2011?

17   A.   I am aware that that visit occurred.

18   Q.   And from that, we can infer, can we not, that the Pangang

19   Company was deemed trustworthy by Cristal because they invited

20   them to one of their facilities?

21          MR. AXELROD:  Objection.

22          THE COURT:  Sustained.

23   BY MR. GASNER:

24   Q.   Do you know what agreements, if any, were signed between

25   Cristal and Pangang in connection with the July 2011 agreement?

1   **A.**   I was not involved in that -- in that meeting nor what

2   agreements were or were not signed, so I would not be able to

3   comment on that.

4   **Q.**   Have you heard that the Pangang Group also visited Perth,

5   Australia, to visit facilities there?

6            **MR. AXELROD:**  Objection.

7            **THE COURT:**  Sustained.

8   **BY MR. GASNER:**

9   **Q.**   Are you personally aware of whether or not that visit

10  occurred?

11  **A.**   I'm not aware of that visit.

12           **MR. GASNER:**  No further questions, Your Honor.

13           **THE COURT:**  All right.

14       Mr. Froelich?

15           **MR. FROELICH:**  Yeah, I have a couple, Your Honor.

16           **THE COURT:**  Right.

17                        **CROSS-EXAMINATION**

18  **BY MR. FROELICH:**

19  **Q.**   Mr. Livingston, I introduced myself earlier.

20  **A.**   Yes.

21  **Q.**   I'm Jerry Froelich.  I represent Mr. Maegerle.

22       You were talking about the technology has changed, when

23  you were asked by the Government, from 19 -- you were talking

24  from 1974 to the present; weren't you?

25  **A.**   Yes.

1    Q.    So you're talking about a period of 40 or 50 years?

2    A.    That is correct.

3    Q.    And had you ever seen the contract between

4    Sherwin-Williams and DuPont?

5    A.    I have not.

6    Q.    But it's your understanding that your company has the

7    DuPont technology that was in the plant; is that correct?

8    A.    It's my understanding that the Ash 1 facility, which my

9    company purchased in 2000 -- in 1994, certainly has its base --

10   its root comes from DuPont technology.

11   Q.    Now, what's your position again with the company?

12   A.    VP of safety, health, environment, quality, and

13   technology.

14   Q.    Okay.  And I assume there's a president of the company?

15   A.    There is a president of the company.

16   Q.    And there's a Board of Directors?

17   A.    There is.

18   Q.    And if the Board of Directors decided that they wanted to

19   sell the company, they could do that; isn't that correct?

20   A.    That is true.

21   Q.    And if they wanted to license out the technology, they

22   could do that, too, couldn't they?

23   A.    They could.

24   Q.    And by licensing out, we mean just selling it; right?

25   A.    Yes, sir.

1  Q.  Okay.  And if they wanted to put it in the newspaper, they

2  have the right to do that, don't they?

3  A.  They do.

4  Q.  Okay.  In fact, they have the right to do whatever they

5  want with that technology; isn't that correct?

6  A.  They own it.  They can do what they want.

7  Q.  They own it; they can do it.

8      You were saying how the companies take care of their

9  documents and their technology.  Didn't you have occasion --

10  when you were working at another company, did one of your

11  employees bring you DuPont technical documents?

12  A.  I have on one occasion had an employee bring to me a

13  document that was clearly marked as a DuPont drawing.

14          MR. FROELICH:  Thank you very much.

15          THE COURT:  All right.  You don't have anything else,

16  I assume?

17          MR. AXELROD:  I need to follow up on that last one.

18          THE COURT:  Well, very quickly.

19          MR. AXELROD:  Very well, Your Honor.

20          THE COURT:  You're just about done.

21          MR. AXELROD:  Understood.

22                    <u>**REDIRECT EXAMINATION**</u>

23  BY MR. AXELROD:

24  Q.  Mr. Livingston, what happened?  What did you do when that

25  DuPont document was shown to you?

1    **A.**    I indicated to that employee that I did not want to see

2    that document again, that it was inappropriate; and we had

3    never asked him to divulge any DuPont technology to us, and

4    that we would not be using that as a drawing that we would use

5    within our company.

6    **Q.**    And Mr. Gasner and Mr. Froelich asked you about the

7    technology and that companies could sell it or make it public

8    in the newspaper if they wanted to; right?

9    **A.**    Yes.

10   **Q.**    Would it make any economic sense to just take all that

11   information and publish it?

12   **A.**    Absolutely not.

13   **Q.**    Why not?

14   **A.**    Because then you would be giving up your technology.  That

15   is how we make a profitable business.  We would not want to

16   give up that technology.

17            **MR. AXELROD:**  No further questions, Your Honor.

18            **THE COURT:**  All right.  You're excused.  Thank you.

19            **THE WITNESS:**  Thank you.

20                        (Witness excused.)

21            **THE COURT:**  Anything further?

22            **MR. AXELROD:**  No, Your Honor.

23            **THE COURT:**  The Government rests its rebuttal case?

24            **MR. AXELROD:**  Yes, Your Honor.

25            **THE COURT:**  Anything further from the defendants?

1           **MR. GASNER:**  No, Your Honor, in light of the Court's

2    earlier ruling.

3           **MR. FROELICH:**  No, Your Honor.

4           **THE COURT:**  All right.  So the evidence is closed.

5       So, ladies and gentlemen, what we're going to do now is,

6    in a moment I'm going to give you your final usual instruction

7    before we adjourn at the end of the day.

8       And then, just to kind of give you a teaser for next week.

9    Monday is a holiday, so we don't meet on holidays.  So you'll

10   have tomorrow, Friday, Saturday, Sunday, and Monday off from

11   this trial anyway.

12      And on Tuesday morning, you'll come back at the regular

13   time, and the first order of business would be -- in some

14   courts -- different courts do it differently in terms of giving

15   the instructions before the parties argue or after.  In this

16   court, my practice is to give the instruction beforehand so you

17   can evaluate the closing arguments in light of the jury

18   instructions that you'll already have.

19      So we'll do that, and then we'll proceed to the parties'

20   final arguments, and that will go as long as necessary; but I'm

21   not going to keep you passed your normal day, unless you're

22   just burning to hear more, stay later, which I don't think you

23   are, so I'm not going to keep you.

24      We'll finish on Wednesday with final argument, and then

25   the case will be yours.  And I'll talk to you more about your

1    schedule for deliberation and how we're going to present the

2    evidence to you, and a lot of good stuff -- I don't know about

3    good, but a lot of interesting stuff that you would want to

4    know, so you can conduct your proper business.

5         So here's the instructions, and I see my guard there has

6    the door locked.  Thank you very much, sir.

7         So I'm now going to remind you one -- not one last time

8    because you'll get the same instruction next week as well.  But

9    as you can guess, or as you cannot guess, but as you can

10   quickly see, the evidence that you've seen and are able to

11   consider has been very carefully discussed with counsel; and

12   each piece of evidence is something that the Court decides on

13   whether you're entitled under the law to hear.

14        And, so, it's very important that you honor these

15   instructions so you're not given any information that has not

16   been passed on by the Court with the ability of both sides to

17   examine and cross-examine and test by the adversary process.

18   So this is extremely important, and I'm sure you figured that

19   out very early on.

20        So, finally, your instruction.  First, keep an open mind

21   throughout your trial and do not decide what the verdict should

22   be until you and your fellow jurors have completed your

23   deliberations at the end of the case.

24        Second, because you must decide this case based only on

25   the evidence received in the case and on my instructions as to

1   the law that applies, you must not be exposed to any other

2   information about the case or to the issues it involves during

3   the course of your jury duty.

4        Thus, until the end of the case, or unless I tell you

5   otherwise, do not communicate with anyone in any way, and do

6   not let anyone else communicate with you in any way about the

7   merits of the case or anything to do with it.

8        This includes discussing the case in person, in writing,

9   by phone, Smartphone, or electronic means, via email, text

10  messaging, or in or on any Internet chat room, blog, website,

11  including such social networking media like Facebook, Myspace,

12  LinkedIn, YouTube, and, Twitter, or other feature.

13       This applies to communicating with your fellow jurors

14  until I give you the case for deliberation, and it applies to

15  communicating with everyone else, including your family

16  members, your employer, the media or press, and the people

17  involved in the trial, although you may notify your family and

18  your employer that you have been seated as a juror in the case

19  and continue to sit as a juror in this case.

20       But if you are asked or approached in any way about your

21  jury service, or anything about this case, you must respond

22  that you've been ordered not to discuss the matter and to

23  report the contact to the Court.

24       Because you will receive all the evidence and legal

25  instruction you properly may consider to return a verdict, do

1    not read, watch, or listen to any news or media accounts or

2    commentary about the case, or anything to do with it.

3        Do not do any research, such as consulting dictionaries,

4    searching the Internet, or using other reference materials that

5    do not make -- and do not make any investigation or in any

6    other way try to learn about the case on your own.

7        The law requires these restrictions to ensure the parties

8    have a fair trial based on the same evidence that each party

9    has had an opportunity to address.

10        A juror who violates these restrictions jeopardizes the

11    fairness of these proceedings, and a mistrial could result that

12    would require the entire trial process to start over.  If any

13    juror is exposed to any outside information, please notify the

14    Court immediately.

15        So you're now excused until Tuesday with the Court's wish,

16    and parties and counsel, that you have an enjoyable weekend and

17    extended weekend and holiday; and we will see you next Tuesday

18    morning at 8:00 o'clock.  Thank you for your attention and

19    punctuality.

20        (Proceedings were heard out of the presence of the jury:)

21        **THE COURT:**  So what I plan on doing now, it's 25 after

22    12:00, so we have about an hour, is take about a ten-minute

23    break.  Or 45 minutes, actually.  Ms. Ottolini just gave me the

24    look.  She has to set up the courtroom for the afternoon

25    calendar.

**PROCEEDINGS**

1    So yes?

2           **THE CLERK:**  And you have meetings.

3           **THE COURT:**  And I have meetings as well.

4    So I would propose to, in about ten minutes, start the

5    discussion of the jury instructions.

6       As you'll hear, I think I'm going to prioritize in a way

7    that, to the extent that I feel that some additional homework

8    is necessary, that that gets to you so we can complete this

9    tomorrow morning starting at 8:00 o'clock and finish the

10   instructions, so you'll know exactly what the Court intends to

11   give.

12      What I'm going to do in a few minutes is give you the next

13   iteration of the instructions because there are some points

14   that you all made, typos, and other things that I think were

15   not controversial, that the Court has incorporated into a next

16   draft.  So we'll be able to talk about those and then discuss

17   as much as we can today.

18      So ten minutes, and then we'll start the charging

19   conference.

20                    (Recess taken at 12:25 p.m.)

21      (Proceedings were heard out of presence of the jury:)

22           **THE COURT:**  All right.  So we are back on the record.

23   I see Mr. Hemann and Ms. Lovett --

24           **MR. HEMANN:**  We're solving all the word's problems

25   together, Your Honor.

PROCEEDINGS

1          THE COURT:  I was going to say maybe you reached a

2     settlement at least on the instructions.  I doubt that.

3          MR. HEMANN:  I made a proposal, but she rejected it.

4       (Laughter)

5          THE COURT:  To start out I just wanted to say -- and I

6     think I can only go until about a quarter after 1:00 because we

7     have to get ready for the next calendar.  But there are a

8     couple of things; two, actually.  One is a preliminary matter

9     and the second is a substantive idea that's going to require

10    some homework.

11         So as a preliminary matter, the Court has considered the

12    parties' objections to the Court's proposed final instructions

13    and the briefs submitted before the pretrial conference.  And

14    the Court is not going to go through every objection raised by

15    the parties, you'll either be happy or sad to hear.

16         All the parties have reviewed certain requests for

17    specific language or a specific instruction that were set forth

18    in the filings submitted in connection with the pretrial

19    conference.  If the Court chose not to use the language or did

20    give a proposed instruction in the proposed instructions filed

21    on February 6, 2014, then the Court has found no basis to

22    revisit those rulings; and the Court will overrule any

23    objections that are applicable; and those are preserved and not

24    waived by the parties.

25         Similarly, if the Court does not give an instruction

**PROCEEDINGS**

1    requested by the parties in their most recent filings, then

2    those objections, as well, are overruled.

3        After the Court distributes its final instructions, it

4    will permit the parties to renew any prior objections for

5    purposes of appeal, just to make sure that any such issues are

6    preserved.

7        And, again, the Court thanks the parties for bringing to

8    its attention typographical errors.  That's why the more eyes

9    we have on this the better.  For example, "attempted economic

10   espionage" in Count Five.  And the Court has corrected those

11   errors in the current iteration which the Court has given to

12   you.

13       Now, I want to go right to something that is going to

14   require some work among the parties because I don't have -- I

15   don't have -- I have a generic or categorical proposal, but

16   not -- and ruling, but not the actual wordsmithing.

17       So this has to do -- all the defendants request an

18   instruction on the defense theory of the case.

19       I think under Ninth Circuit law the defendants are

20   entitled to that instruction.  And I will give a defense theory

21   of the case, but I will not give the ones that are most

22   recently proposed by Mr. Liew and Mr. Maegerle.

23       Is he here?

24           **MR. HEMANN:**  Yes.

25           **THE COURT:**  Oh, there he is.

**PROCEEDINGS**

1      You were being blocked.  I'm sorry, Mr. Maegerle.

2      So I'm not going to give those instructions in that form.

3  I'm going to direct the parties to meet and confer.

4      But let me tell you my general thoughts are, number one,

5  that the instruction must make clear to what counts the

6  instruction applies.  Because there's a good faith belief that

7  these were not trade secrets, or whatever, has nothing to do

8  with the tax evasion charges or the obstruction of justice or

9  bankruptcy and the like.

10      And so I want the jury to be clearly told what counts the

11  defense is contending -- this is a defendant's theory of the

12  case -- that the instruction applies to.

13      In addition, the instruction should be more general.  For

14  example, I will not give the language proposed by Mr. Liew and

15  USAPTI, and I'm quoting from his request, "In the course of

16  many years of work, Mr. Liew had no reason to think that any

17  information he received was a trade secret," unquote, because I

18  don't think that that statement is fairly supported by the

19  evidence as it is in the now-closed record.

20      So I think it's better -- not better, I'm requiring that

21  the parties come up with language or at least an agreement to

22  disagree on some generic statement of the defense without

23  constituting a commentary on the evidence.  I don't comment on

24  the evidence at all, and by giving an instruction of the type

25  that was requested it would be inappropriate.

**PROCEEDINGS**

1      And I want there to be a preamble that clearly says the

2  Court does not and will not, it's not appropriate for the Court

3  to comment on the evidence, and by giving this instruction it

4  makes no comment on the evidence.  But this is what the

5  defendants contend -- this is the defense that the defendants

6  have set forth here, or put forth.

7      So it would be something as general as a good faith belief

8  that trade secrets -- that these items were not trade secrets,

9  or whatever it is that is appropriate to the actual defense and

10  supported by the evidence, and really addresses the evidentiary

11  issues.

12      Because in some cases the Ninth Circuit has said that the

13  Court is not required -- the Court can give an instruction on

14  intent, willfulness, et cetera, that captures this, but I think

15  the defendants are entitled to a statement of their

16  contentions, their theory of defense, so long as it's

17  applicable and relevant to the legal issues that the jury has

18  to apply to the facts as they find them.

19      So I want to keep it -- I think they'll hear it anyway

20  from counsel, but I think it's fair and it's appropriate, and

21  in some cases required, that the Court give some sort of

22  instruction, but I want to keep it as generic, as general as

23  possible, and away from a reference to specific evidence.

24  Because if we do that, then it requires the Court to do what it

25  did with respect to that one statement that I just said was not

1  supported by the evidence, in my view.  Of course, I won't say

2  that to the jury and I won't give something like that.

3      So be careful and work together.  Even if you disagree and

4  you get close, submit -- I want to get your competing responses

5  by 5 o'clock this afternoon.  So work on that one first.

6      There's not going to be a lot of other homework so,

7  Ms. Lovett, you'll be very happy.  And, Mr. Hemann, I don't

8  know who the back person is, or Mr. Scott.  You don't have to

9  admit that, Mr. Hemann.

10          **MR. HEMANN:**  Yes, Your Honor.  Thank you.

11          **MR. FROELICH:**  There is no back office.

12          **MR. HEMANN:**  I'll be working with Mr. Froelich on

13  this.

14          **THE COURT:**  Okay.

15          **MS. LOVETT:**  Your Honor, if I may clarify, briefly.

16          **THE COURT:**  Sure go ahead.

17          **MS. LOVETT:**  Do you contemplate two separate

18  instructions, one for Mr. Maegerle and one for Mr. Liew and

19  USAPTI?

20          **THE COURT:**  Yes, I do, because I think their defenses

21  are different.  They will overlap to some extent because it

22  captures the concept of good faith belief or whatever.  But

23  Mr. Maegerle's is, I think, different than Mr. Liew's.  And I

24  think it's fair for the reasons that Mr. Froelich has made

25  clear in his motion, various motions to sever and for mistrial,

PROCEEDINGS

1  that we don't want to lump the two of them together so the jury

2  feels, "If we don't buy that then we have to convict all the

3  defendants."  So that wouldn't be fair.

4      Does that answer your question?

5          **MS. LOVETT:**  Yes.  Thank you, Your Honor.

6          **THE COURT:**  Do any of you have any questions about

7  what the Court is requiring?

8          **MR. HEMANN:**  No, not at all, Your Honor.

9          **MR. GASNER:**  Your Honor, I would like to inquire

10  briefly, because I have consulted with Ms. Lovett on the theory

11  of the defense.

12          **THE COURT:**  Right.

13          **MR. GASNER:**  And just in surveying other theory of the

14  defense instructions that our firm has done, most of them have

15  been really short.  So that's why we were trying to encapsulate

16  things.  And there's also law that says you shouldn't give a

17  theory of the defense instruction that's covered by other

18  instructions.

19      So I'm just wondering if there's any other guidance that

20  the Court can give us on, for example, how long, if we hit

21  every instruction as to, you know, conspiracy to commit

22  economic espionage our theory is this.  I mean, it could get to

23  a page and a half.

24          **THE COURT:**  No.  I'm not -- I would expect at some

25  point, whether at the beginning or at the end of that

**PROCEEDINGS**

1   instruction, it would say -- probably at the beginning -- the

2   theory of the defense with respect to the following counts is

3   as follows.  And I would imagine no more than a paragraph or

4   two.

5       So the analogy I use when I teach trial practice at Bolt

6   is if you met me on a bus and I was going to get off two stops

7   down, and you had to tell me, hey, I'm trying this case, what's

8   the defense, that's what it is.  Because I think they're

9   entitled to know at large what your defenses are, and to focus

10  on those to set it up for you folks.

11      **MR. GASNER:**  Can that be broken down into different

12  sections of the instructions so that in connection with

13  bankruptcy there would be a theory of the defense?

14      Because I do -- what was causing me some consternation is

15  there's a lot of charges in this case in very different areas.

16  Trade secret being one, bankruptcy, tax, and obstruction being

17  the four main areas.

18      **THE COURT:**  Well, again, I don't want to buy the

19  proverbial pig in the poke here.

20      Work with the government.  But I don't want to get -- you

21  said it exactly correctly.  There's a lot to the instructions

22  on tax evasion and bankruptcy fraud and false statements which

23  really cover a lot of this.  And if the defense is, no, the

24  government hasn't proven X, Y, Z, and here's why, that's part

25  of argument.  That's not necessarily part of this instruction.

**PROCEEDINGS**

1    Because I think -- I would only give this instruction in

2    connection with a fairly complex defense, where it may not be

3    absolutely readily apparent because of how long this trial is

4    and all the exhibits and all.

5    So I wouldn't be -- in a continuum, I'd be much more

6    interested in giving an instruction as to your defense with

7    respect to the trade secrets.  The other ones, I think, are

8    relatively straightforward.  And I think whatever you could say

9    in your -- you can construct your argument around the

10   government failing to prove what it has to prove and whatever

11   the defenses are.

12            **MR. GASNER:**  That's very helpful.  Appreciate that.

13            **THE COURT:**  All right.  Work together on that.  If you

14   don't come to an agreement, give me your competing suggestions,

15   but understand the spirit.  So by 5 o'clock I would like to get

16   your best shot at that point.

17            **MR. HEMANN:**  Yes, Your Honor.

18            **THE COURT:**  And then we'll discuss it further

19   tomorrow.

20   So I think what I'll do with the remainder of the time is

21   just begin my list as I have put it together.  And we'll have

22   to finish tomorrow and also vet the final instructions.

23   And I've given you -- my law clerk has given you our next

24   iteration of the instructions which -- some of which I'm about

25   to say incorporates -- is incorporated into those instructions,

**PROCEEDINGS**

 1   only so you can see how the Court has translated into actual

 2   instruction ease, if you will, what my further tentative views

 3   are subject to hearing any further arguments tomorrow.  So

 4   that's why I've given you this draft, so you have something to

 5   work with tonight.

 6        So the first one -- and the way I'm going to organize this

 7   is to start with Mr. Maegerle's brief.  And if I don't -- as I

 8   said before, if I don't mention something then it means that

 9   I've either rejected or accepted positions that are previously

10   stated, and my tentative final views, if you will, are in the

11   final iteration that you've just been given.

12        So on the issue of Mere Association, the Court is inclined

13   to modify the second sentence of the first paragraph to read as

14   follows, quote:

15            "This instruction provides you with some general

16        principles regarding the law of conspiracy.  You are to

17        apply all of these general principles to the conspiracies

18        that are charged in Counts One, Two, Ten, and Thirteen."

19        So that's in the Mere Association.

20        Is that acceptable to the government?

21        **MR. HEMANN:**  Your Honor, I hate to ask you this, could

22   you refer me to the page that the Court is looking at?  We're

23   all sort of --

24        **MS. LOVETT:**  I think it's 22.

25        **MR. HEMANN:**  Okay.  Thank you, Your Honor.

PROCEEDINGS

1          **THE COURT:**  You have just been promoted.

2      (Laughter)

3          **THE COURT:**  Okay.  Yes.

4          **MR. HEMANN:**  Could you tell us that again, Your Honor,

5  please.

6          **THE COURT:**  Okay.  It's in here but it says, quote:

7          "This instruction provides you with some general

8      principles regarding the law of conspiracy.  You are to

9      apply all of these general principles to the conspiracies

10     that are charged in Counts One, Two, Ten, and Thirteen."

11     And then the rest will continue the way it was.

12         **MR. HEMANN:**  That's acceptable to the government, Your

13  Honor.

14         **THE COURT:**  And, Mr. Froelich, is that acceptable to

15  you?  It was your point.

16         **MR. FROELICH:**  Yes, Your Honor.  Yeah.  I think that

17  "You are to apply these general principles," it gives me the

18  ability -- I think it points to them and gives me the ability

19  to point it out too.  That was my concern, that they understand

20  that it applies to everything.

21         **THE COURT:**  With respect to Mr. Liew's and USAPTI's

22  objections, the first one is kind of easy.  If a witness is

23  involving special circumstances, Mr. Liew and USAPTI do not

24  think it's appropriate to give the instruction, and I will

25  accept that and not give it.  I think to the extent it says

**PROCEEDINGS**

1  what it says, it may benefit the defendants.  But if they wish

2  not to have it, then that's -- I think this is for their

3  purpose.

4      I assume the government has no objection.

5          **MR. HEMANN:**  None at all.

6          **THE COURT:**  Okay.  Now, with respect to the definition

7  of trade secret, let me find that page number.

8          **MR. HEMANN:**  Page 21, Your Honor.

9          **THE COURT:**  21, okay.  The pagination has changed

10 here.

11     Okay.  So Trade Secret, so I'm inclined to agree with the

12 defendants -- I'm sorry, I'm looking at a different

13 instruction.

14         **MS. LOVETT:**  You got me excited, Your Honor.

15     (Laughter)

16         **THE COURT:**  You'll hear it later so there's more

17 coming down the pike there for both sides.

18     As far as Trade Secret is concerned, I'm going to combine

19 the, quote, compilations and combinations, unquote, and, quote,

20 special skills, talents, and abilities part of this into this

21 instruction, so it's all in one place.

22     I think that the skills, et cetera, piece is a defense

23 point.  And the compilation point is a government point.  And

24 rather than highlight either one and unduly focus on it, I

25 thought it appropriately could be combined into the definition

**PROCEEDINGS**

1    so that both sides -- it's given sort of equal dignity for both

2    sides in one place.

3         It gives, essentially, what I said before, but it's

4    just -- it's just sort of changing the presentation.

5         So what's the government's position on that?

6         **MR. HEMANN:**  This is acceptable to the government as

7    it's set forth on page 21, Your Honor.

8         **THE COURT:**  All right.  Mr. Froelich?

9         **MR. FROELICH:**  Yes, Your Honor, that's fine.

10        **MS. LOVETT:**  Your Honor, as made clear in the brief we

11   filed, Mr. Liew and USAPTI object to the idea of a special

12   instruction on compilations and combinations, but are willing

13   to accept this if the Court disagrees.  Of course, we don't

14   waive our objection and would like to stand on that.

15        **THE COURT:**  Of course you don't.  At this point your

16   objection is preserved.  Obviously, it's overruled.  But this

17   just goes to the language as it's currently presented rather

18   than the underlying point, which you believe that compilation

19   should not be separately set forth.  Is that correct?

20        **MS. LOVETT:**  Yes, Your Honor.

21        **THE COURT:**  All right.  Now, the next point I wanted

22   to talk about, again, I think is -- should be an easy point,

23   but I want to ask for the government's input.  Count One in

24   Overt Act Seven in the indictment, where the defense makes a

25   point where there's been no evidence of such an agreement and

PROCEEDINGS

```
 1    they don't want me to read it to the jury.

 2             MR. HEMANN:  We agree it's an easy point.  It should

 3    be taken out, Your Honor.

 4             THE COURT:  Then I won't hear from the defense on

 5    that.

 6         Now, regarding the definition or the term "foreign

 7    government," in quotes, this one you're going to like, I think,

 8    I think the defense has the better argument.  And I will add

 9    the word, quote, "government" before the -- "the Government of

10    the People's Republic of China," because I think the law does

11    support and the statute does support that it's the government

12    rather than the country.

13         Whatever that means in this case, I don't know.  But I

14    think that's the law so I will give that.

15             MS. LOVETT:  Thank you, Your Honor.

16             THE COURT:  I know the government doesn't agree, but

17    is there anything further you want to say, Mr. Hemann, on that?

18             MR. HEMANN:  I don't know that we disagree, Your

19    Honor.  I think that we had it phrased differently, and believe

20    it was phrased appropriately earlier.  But I think that the

21    statute says "foreign government," and it's foreign government

22    rather than "foreign country."  And I don't think that we have

23    a particular objection to the way the Court -- I believe the

24    Court's referring to lines 20 through 22, on page 23.

25             THE COURT:  Yes.
```

**PROCEEDINGS**

1          **MR. HEMANN:**  Yes, Your Honor, that's fine with the

2     government.

3          **THE COURT:**  All right.  Okay.  The next one I want to

4     talk about is Count Fourteen.

5          Now, I'd adopted parties' stipulated instruction on this

6     count, but I'm amenable to including the date as is requested

7     by the defense.

8          What's the government's position?

9          **MS. LOVETT:**  Apologies, Your Honor, which count?

10          **THE COURT:**  Count Fourteen, which is on page 40.

11          **MS. LOVETT:**  Thank you.

12          **MR. HEMANN:**  That's fine, Your Honor.

13          **THE COURT:**  All right.  So that's what we've done and

14     that's what we'll continue to do.

15          Now, Counts Fifteen through Nineteen, the Court is

16     inclined to adopt Mr. Liew's proposal to clarify the entities

17     and tax years at issue because this is alleged in the

18     indictment and this is the way the case was presented.

19          Does the government object to doing that?  This is as to

20     Counts Fifteen through Nineteen, so it's on page 41.

21          **MR. HEMANN:**  One moment, Your Honor, please.  Can we

22     have one second?

23          **THE COURT:**  Sure.

24          **MR. HEMANN:**  Thank you.

25          (Pause)

**PROCEEDINGS**

1          **MR. HEMANN:**  Your Honor, this is fine with the

2    government.

3          **THE COURT:**  All right.  I assume it's okay with the

4    defense, since you asked for it.

5          **MS. LOVETT:**  Yes, Your Honor.  Thank you.

6          **THE COURT:**  So --

7          **MR. HEMANN:**  And, Your Honor, we're doing this

8    quickly.  Subject to going back and checking for --

9          **THE COURT:**  Absolutely.

10          **MR. HEMANN:**  Lining up things.

11          **THE COURT:**  We're doing sort of -- not 30,000-foot but

12    we're doing sort of the next cut on this.  If upon further

13    reflection anybody has an epiphany and says, That wasn't me

14    talking yesterday, that was somebody else ...

15          **MR. HEMANN:**  We don't have an objection to the

16    concept.  I don't remember which count of the indictment it is

17    and things like that.

18          **THE COURT:**  I'm asking everybody to put another set of

19    eyes and read this again because I don't want to discover it

20    when I'm reading it and say come to the sidebar.

21          **MR. HEMANN:**  Right.

22          **THE COURT:**  I do not think, with respect to those

23    counts, that there's support for the good faith language of the

24    instruction.  And I am not -- I'm just stating for the record

25    that I'm not going to give it.  There was really little

**PROCEEDINGS**

1    evidence that would support a good faith instruction with

2    respect to Mr. Liew.

3         And, certainly, he can argue about what the evidence

4    shows, but I don't think -- the Ninth Circuit law and Supreme

5    Court law only require giving that instruction when there's

6    evidence to support it, and I don't find there's evidence to

7    support it so I'm not going to give it.

8         Counts Twenty-One, Twenty-One and Twenty-Two, which is

9    Filing False Statements in a Bankruptcy Proceeding, I am

10   inclined to agree with the defendant -- this is where I was

11   reading before, Ms. Lovett -- that the specific statement

12   should be included; although, neither the government nor the

13   defendants asked for this in connection with their original

14   proposals.

15        So what is the government's position?

16        **MR. HEMANN:** And, Your Honor, if I may inquire, these

17   are the specific statements that are alleged in the actual

18   indictment?

19        **THE COURT:** Yes.

20        **MR. HEMANN:** I don't think we have an objection. I

21   would tentatively say we don't have an objection to this. And,

22   again, I'll -- I think it is a -- it's going to be a complex --

23   a bit of a complex instruction to read, but I don't think we

24   have a principal objection to it.

25        **THE COURT:** That's what you wanted, correct?

**PROCEEDINGS**

1          **MS. LOVETT:**  Yes, Your Honor.  Apologies for not

2    proposing it during the first round.

3          **THE COURT:**  Doesn't matter.  That's why we have a

4    charging conference.  And nothing is final until I give the

5    instructions and you come to the sidebar and tell me whether

6    you have any further additional objections.  I think that's

7    what's required.

8        But because of the way the case was presented, I think the

9    jury -- and they're not going to have the indictments.  It's an

10   interesting issue though.  Some judges I've talked to actually

11   have the indictment go to the jury room.  I have my own views

12   about that.  But it hasn't been requested here and I'm not

13   offering to do it.

14       So given that, I think we need to be as faithful to the

15   indictment as possible, unless as with the Overt Act there's no

16   evidence to support a particular allegation.

17         **MR. HEMANN:**  Your Honor, just for the record, I think

18   you said Twenty-One and Twenty-Two, and meant Twenty and

19   Twenty-One.

20         **THE COURT:**  Yes, I did it.  Sorry.

21         **MR. HEMANN:**  Sure, Your Honor.

22         **THE COURT:**  Okay.  With respect to the government's

23   objections, I am going to change the language at page 26, line

24   11 of the Court's proposed instruction from the plural to the

25   singular.  I think this is a fair change and that's why the

**PROCEEDINGS**

1   Court has made it.

2           **LAW CLERK:**  Your Honor, that's old page 26.

3           **THE COURT:**  I have my old draft here, so I need to

4   know the new.

5           **LAW CLERK:**  It's in reference to foreign

6   instrumentality versus foreign instrumentalities in the

7   conspiracy.

8           **THE COURT:**  Right.

9           **LAW CLERK:**  Count One.

10          **THE COURT:**  Okay.  Do you have any problem with that,

11  Ms. Lovett?

12          **MS. LOVETT:**  No, Your Honor.

13          **THE COURT:**  Mr. Froelich, this doesn't involve your

14  client.

15          **MR. FROELICH:**  Doesn't involve my client.

16          **THE COURT:**  Regarding Counts Two and Five, I will add

17  the word, quote, foreign, unquote, where, quote, in interstate

18  commerce is used, because I think this is about -- the evidence

19  the government contends, at least, this is involving foreign

20  commerce, correct?

21          **MR. HEMANN:**  It is, Your Honor.

22          **THE COURT:**  Do you agree, Ms. Lovett?

23          **MS. LOVETT:**  Yes, Your Honor.

24          **THE COURT:**  All right.  Counts Twenty through

25  Twenty-Two, the government objects to the fact that I omitted

PROCEEDINGS

1    the following language, which is proposed in connection with

2    these instructions, quote:

3            "The government is not required to prove that the

4        statement actually influenced the court, the trustee or a

5        creditor.  The government also is not required to prove

6        that the creditors were harmed by the false statement,"

7        unquote.

8        So that's the government's request.  The government draws

9    this language from the Seventh Circuit Model Jury Instructions.

10   However, the Court notes that the language is in brackets in

11   the Seventh Circuit Instructions, and there is no commentary to

12   suggest when and why the language should be given.

13       So I guess my question to the government, at this point,

14   before we close on this, is does the government have any

15   authority as to when it is appropriate to use the bracketed

16   language, and can it demonstrate that the facts of this case

17   require it?

18           **MR. HEMANN:**  I can't right now, Your Honor.  I would

19   like to just add one item to my homework for this afternoon and

20   look at that briefly.

21           **THE COURT:**  Let me tell you, my theory is the way the

22   government presented this was sort of straight -- you know,

23   straight and simple, which is, you know, authenticating the

24   relevant documents, having the person testify about what the

25   form means.  But there is no testimony that would justify an

**PROCEEDINGS**

1   instruction about who was harmed and who wasn't harmed, and

2   it's throwing in an element that really wasn't litigated.

3           **MR. HEMANN:**   I tend to agree with Your Honor.   I think

4   in the back of our mind is a concern that -- about an argument

5   that would come up about no debtor was harmed -- no creditor

6   was harmed.

7       I think that's fairly far away from the facts of the case,

8   and I guess we could probably stand up in rebuttal and say

9   there's no requirement, the statute doesn't require.   We could

10  make this argument.

11          **THE COURT:**   Well, but, again, it doesn't rise to the

12  level of the way the case was litigated.

13          **MR. HEMANN:**   I agree with that, Your Honor.

14          **THE COURT:**   And to throw that in in an instruction --

15  and this is a very astute jury, but I can't imagine them

16  saying, "Oh, what do the creditors say; we didn't hear anything

17  about creditors."

18          **MR. HEMANN:**   I'm inclined to agree with the Court.

19  And if we could just give it one more 20 minutes of thought,

20  that would be great.

21          **THE COURT:**   Okay.   Did you want to saying something?

22          **MR. GASNER:**   No, Your Honor.

23          **THE COURT:**   All right.

24          **MR. GASNER:**   I don't think that it's going to be in my

25  closing, but I'm still writing it.

PROCEEDINGS

```
1            THE COURT:  Okay.

2            MR. GASNER:  I don't think it should be in the

3    instruction.

4            THE COURT:  You mean Ms. Lovett is not giving the

5    closing?

6            MS. LOVETT:  Shocking.

7            MR. GASNER:  I may hand it off to her at the last

8    minute.

9            THE COURT:  We all say that with a smile.  The Court

10   seems to sometimes use a little levity, but I'm reminded that's

11   not always the most appropriate thing because these are serious

12   matters.

13        So, basically, all we'll need to do tomorrow, I've

14   actually finished my agenda, so I would tomorrow I'm going to

15   turn it over to you folks to say, there's typos; upon second or

16   third thought we think this should be changed; we have some

17   late-breaking authority.

18        Most importantly, we need to sort of figure out the theory

19   of the defense because that's the most substantive, I think.

20        A couple of things.  One is I have not done this before

21   and I don't know why I haven't, but I know why I'd like to do

22   it, is give the jury a table of contents.  Because what I tend

23   to do at the end of a trial is send out a questionnaire to the

24   jury just about the process, not about the case.  And one of

25   the things I get back is, why don't we have a table of contents
```

**PROCEEDINGS**

1    so we can find, you know, that instruction on X, Y, Z, rather

2    than have people doing that trial and error.

3        The other thing the parties really need to get back to me

4    on, preferably tomorrow because I just want to know, is how

5    you're going to present -- what we're going to send to the

6    jury.  Are we going to do the electronic in full, in whole, or

7    in part?  I suspect not.

8        But, as I said, in another trial that I had we did it --

9    we did it with a projector.  We had one of the technology

10   people put up, you know, the equipment with a terminal in there

11   and a directory.

12       At a minimum, I want a table of contents for all the

13   exhibits, sort of a user-friendly form of the exhibit list.  So

14   if the jury wants to find, hey, where was that email or

15   contract or something, they could find it.

16       But this is going to take some time and some work.  My

17   last druthers would be to just send all the paper in to the

18   jury with the table of contents.  I just think that's going to

19   be -- I might have to, you know, rent a room somewhere to do

20   it, but I think you all want -- whatever the outcome is going

21   to be, you want the jury to be able to find and process

22   whatever is there in an easily obtainable format.

23       So you've got some really good technology folks working

24   with you, and I'd like to get that done.  But if it can't be,

25   you know, the default is whatever's in evidence goes into the

1  jury room.  And there's an instruction that says some of the

2  demonstratives went in and some didn't go in, so we want to

3  make sure that's all buttoned down as to what they're getting

4  and how they're getting it.

5      So these are details the Court is supposed to worry about,

6  but when we get to the deliberations I want to make sure we

7  say, okay, here's what we're giving you.  Here's how we're

8  going to present it, et cetera.

9      Now, picking up, lastly, on Mr. Gasner's idea that he's

10  still writing his work in progress for closing argument, I do

11  want you to think about the time because, again, I don't cut

12  people off in criminal cases.  I don't put time limits.  I

13  don't put pressure on people, at least not overtly anyway, on

14  time.  But do think about this is a pretty smart jury, you

15  know, and they get it.

16      I don't know what the "it" is, but they seem to be very

17  attuned.  And to spend hours and hours going over, basically,

18  every piece of evidence or even categorically every piece of

19  evidence, number one, I think they'll find it insulting; number

20  two, I think it's going to be overkill and it won't be

21  absorbed.  And it's just not the best use of the Court's time.

22      That said, you know, parties can do what they expect.  And

23  I have viewed over Mr. Gasner's arguments about the split, and

24  I can't think of any way to do this.  I'm not going to have a

25  long day.  I have already told the jury that.  It's not fair.

**PROCEEDINGS**

1    Not that they won't be completely engrossed and enraptured by

2    your closings, it's a lot of material.

3        So I'm going to start with the government, have Mr. Gasner

4    argue, and then Mr. Froelich, and then the government do that.

5    And we'll see how the time goes.

6        But I think that, the instruction and those pieces are

7    going to take a substantial portion of the day.  We would then

8    continue on Wednesday.  And then the jury would go out sometime

9    midday Wednesday.  And they'd have Wednesday, Thursday.  And if

10   they want to deliberate on Friday, that will be up to them.

11   There are issues about that, you know, like I'm not going to be

12   here, but that -- you know, that's not -- no, that's the

13   following week.

14           THE CLERK:  Right.

15           THE COURT:  Sorry.  Thank you, Ms. Ottolini.  Time

16   goes quickly.

17           MR. GASNER:  Your Honor, we do have some further

18   thoughts on this.

19           THE COURT:  Yes.

20           MR. GASNER:  One thought that I had was, first of all,

21   we've been here for six weeks.

22           THE COURT:  Right.

23           MR. GASNER:  It's going to take two days.

24           THE COURT:  Right.

25           MR. GASNER:  The split between the two days, I don't

**PROCEEDINGS**

1   think, should matter as to whether the jury gets it a little

2   later on Wednesday or a little bit earlier in the day.

3        And I am troubled by the idea that after instructions and

4   then the government's closing, which may go longer than two

5   hours, my entire presentation is late in the day, they're going

6   to be tired, and I'm going to feel like I'm going to be time

7   constrained.

8        **THE COURT:**  Right.

9        **MR. GASNER:**  And so I asked Mr. Froelich, because I

10  think his closing is going to be shorter than mine, would he be

11  willing to go first.  And he understandably said no because

12  I've been carrying a lot of the water on kind of some basics of

13  the case.  And so he declined to do that.

14       But I do think that my very strong preference, having

15  thought about it, would be instructions and then the government

16  closing, and then they can just go as long as they -- as they

17  want, subject to the Court's recommendation that they not go

18  forever.  We let the jury go a little bit early on Tuesday, and

19  then I do my closing, Mr. Froelich would do his, the government

20  does its rebuttal and that we go from there.

21       **THE COURT:**  So implicit in what you're saying is you

22  don't mind the jury only hearing the government's closing

23  argument on Tuesday?

24       **MR. GASNER:**  Correct.

25       **THE COURT:**  Because that's the other part of the urban

1    myth, I think, is they'll have Mr. Hemann and/or -- who's going

2    to do the initial closing; do you know yet?

3            **MR. HEMANN:**  Mr. Axelrod will do the closing.

4            **THE COURT:**  -- ringing in their ear.  So that's one

5    possibility.

6        There's another possibility.  There's another possibility;

7    there's an interim possibility that I just thought of now,

8    which is what I thought you were going to say, if it's possible

9    by category or subject matter to have you begin on Tuesday and

10   continue on Wednesday.

11          **MR. GASNER:**  That would be fine too.  That would -- I

12   would be fine with that.

13       I just don't --

14          **THE COURT:**  With the guise a new fresh start.  I

15   wouldn't expect, if you went one hour you're going to go two

16   more hours on the following day.

17          **MR. GASNER:**  I would try to keep it all the same

18   length, regardless of whether it's split up.  That would be

19   acceptable, Your Honor.

20          **THE COURT:**  What's the government's position?  Do you

21   have a dog in this race here?

22          **MR. HEMANN:**  Well, I think the government's position

23   is that for the reasons the Court has alluded to, I think this

24   is a mountain out of a molehill kind of situation.

25       I think there are a lot of myths about this, and I don't

1   think that we should be setting the Court's schedule based on

2   myth.  But I will say I'll just leave it -- we'll just leave it

3   to the discretion of the Court to make a decision because this

4   is something that has to do with calendaring and scheduling,

5   and it doesn't really have anything to do with the merits of

6   the case.

7           **THE COURT:**  I think that's all -- obviously, it's the

8   Court's discretion.  And I will think about it, and I'll let

9   you know tomorrow so you'll know which way it's going to go.

10  And we'll see where we go from there.

11      All right.  We'll see you tomorrow --

12          **MR. FROELICH:**  May I ask?

13          **THE COURT:**  Yes.

14          **MR. FROELICH:**  Your Honor, normally, and I don't know

15  how Your Honor goes, in rebuttal the government is limited to

16  rebuttal and there's usually a time cap put on it.

17          **THE COURT:**  No, I don't put a time.  I don't usually

18  say this in criminal cases because I haven't seen it before,

19  but I see it in civil cases a lot, what I don't allow is

20  sandbagging.

21      So I don't allow, and I'm not saying anybody in this room

22  would do that and government counsel would do that, where

23  basically, you know, you have a short, perfunctory opening, and

24  then let all guns blaze on rebuttal.  It's got to be true

25  rebuttal.

**PROCEEDINGS**

1    Just like I know Mr. Gasner probably feels I violated my

2   own rule on the rebuttal case, but I didn't.  And if something

3   is not truly rebuttal and could have been raised in the

4   opening, I'll sustain an objection to that.

5    So I don't generally put time limits on the government

6   because what I have found over many years of trying criminal

7   cases as a judge, that the government generally realizes that

8   the jury is sick of hearing lawyers at that point.  And if they

9   hear something that they've heard, before they're going to just

10  really tune out or, worse case, get angry at that party.  So it

11  takes care of itself.  It's sort of like Darwinism.

12    (Laughter)

13    THE COURT:  Except the fittest isn't necessarily going

14  to go the longest.  You know, who knows when to stop and sit

15  down.

16    MR. FROELICH:  May I ask one other question, Your

17  Honor?

18    THE COURT:  Yes.

19    MR. FROELICH:  How does the Court handle the

20  alternates after they get the case?

21    THE COURT:  Great question.

22    MR. FROELICH:  I didn't want to -- you know, Lord

23  forbid something happens to a juror.

24    THE COURT:  The way I handle it is, first of all they

25  will not know, it hasn't come up, they may have speculated in

**PROCEEDINGS**

 1  their own minds, sure they weren't talking about it, after all

 2  the argument is done then I will excuse the -- I will sort of

 3  give a provisional excuse to the alternates.  I will tell them

 4  that the conduct of jury instruction fully applies to them

 5  unless and until they're told that they're released.

 6      And I talk about the fifth man or fifth woman in

 7  basketball, you know, they're important, and things have

 8  happened where they have to get in, and if they've been tainted

 9  then they're out of the game.  And so they need to keep the

10  Court's instruction, and we will let them know as soon as they

11  are free, which will be evidenced by the deliberations being

12  completed one way or the other.  So that's what I do, and they

13  won't know who they are until, literally, before they go out.

14      The other thing that I do -- and I have to stop now -- as

15  I said before, if the jury wants to go later than 1:30 to

16  deliberate, or on Friday, it doesn't usually happen but I'll

17  allow them to come in and deliberate on Friday.  But they have

18  to unanimously agree.

19      So once they get the case, typically what they'll do is

20  they'll -- we don't require that we have some opening ceremony

21  when they come in in the morning when they are in deliberation.

22  They just go to the jury room.  And when everybody is there and

23  the door is closed, they deliberate.  And we -- we exhort them

24  to go at least a full court day as we've defined it.  And then,

25  you know, if they want to work later on Friday they can do so.

**PROCEEDINGS**

1      And, typically, they don't want to work late.  They'll

2    say, we're going to work until 1:30 and then go home.  And

3    they're very businesslike.  I'll leave that up to them.

4      And I feel bad about having to keep you here tomorrow,

5    Mr. Froelich, but we do need to finish the instructions.

6         **MR. FROELICH:**  Your Honor, I've showed everybody what

7    my house looks like in Atlanta.  It's got white stuff about

8    this high (indicating) all over it.

9         **THE COURT:**  Good that you're in California.  I mean

10   under better circumstances it would be much better.

11     Thank you very much, counsel.

12        **MR. GASNER:**  During the deliberations are we going to

13   be on phone alert?

14        **THE COURT:**  Yes.  Ms. Ottolini will talk to you about

15   that.  We don't want any attorney or the Court to be the weak

16   link, if there's questions --

17        **MR. GASNER:**  We don't have to be in the courthouse?

18        **THE COURT:**  No, no.  You don't have to be in the

19   courthouse.  But be a cab ride away.  If you're at your

20   offices, that should be okay.  Not going to make you hang out

21   in our dining room.  That might be an Eighth Amendment problem.

22   Take care.  We'll see you tomorrow morning.

23        (Counsel simultaneously thank the Court.)

24        **MS. LOVETT:**  Thank you, Your Honor.

25        **MR. FROELICH:**  8 o'clock tomorrow, Your Honor?

PROCEEDINGS

```
 1            THE COURT:  Yes, please.

 2            MR. FROELICH:  Okay.

 3            THE COURT:  So 5 o'clock for your submissions.  Thank

 4    you.

 5                 (Proceedings adjourned at 1:17 p.m.)

 6                           ---oOo---

 7                   CERTIFICATE OF REPORTERS

 8            I certify that the foregoing is a correct transcript

 9    from the record of proceedings in the above-entitled matter.

10

11    DATE:   Thursday, February 13, 2014

12

13

14

15    _____

16         Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              U.S. Court Reporter
17

18

19    _____

20      Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
              U.S. Court Reporter
21

22

23

24

25
```