Volume 22

Pages 4239 - 4281

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jeffrey S. White, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )      NO. CR 11-00573 JSW
                               )
WALTER LIEW; ROBERT MAEGERLE;  )
and USA PERFORMANCE TECHNOLOGY,)
INC.,                          )
                               )
          Defendants.          )
_____)
                        San Francisco, California
                        Friday, February 14, 2014

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

                    MELINDA HAAG
                    United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
              BY:   **PETE AXELROD**
                    **JOHN H. HEMANN**
                    **ASSISTANT UNITED STATES ATTORNEYS**

                    U.S. DEPARTMENT OF JUSTICE
                    600 E Street NW
                    Washington, D.C.  20044
              BY:   **RICHARD S. SCOTT**
                    **ASSISTANT U.S. ATTORNEY**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

1    **APPEARANCES**:   **(CONTINUED)**

2    For Defendant Walter Liew and USA Performance Technology, Inc.:
                         KEKER & VAN NEST LLP
3                        633 Battery Street
                         San Francisco, California  94111
4                BY:  **STUART L. GASNER**
                      **SIMONA A. AGNOLUCCI**
5                     **KATHERINE M. LOVETT**
                      **CHRISTINA BLAIS**
6                     **ATTORNEYS AT LAW**

7    For Defendant Robert J. Maegerle:
                         MCKENNEY & FROELICH
8                        1349 West Peachtree Street
                         Two Midtown Plaza - Suite 1250
9                        Atlanta, Georgia  30309
                 BY:  **JEROME J. FROELICH, JR.**
10                     **ATTORNEY AT LAW**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | <u>Friday - February 14, 2014</u>                          <u>8:05 a.m.</u> |
| 2 | <u>P R O C E E D I N G S</u> |
| 3 | ---o0o--- |
| 4 | (Proceedings were heard out of the presence of the jury:) |
| 5 | **THE COURT:**  Good morning, everybody.  Please be |
| 6 | seated. |
| 7 | **THE CLERK:**  Calling Case Number CR-11-573, |
| 8 | United States versus Walter Liew, United States versus Robert |
| 9 | Maegerle, and United States versus USAPTI. |
| 10 | Counsel, please state your appearances. |
| 11 | **MR. HEMANN:**  Good morning, Your Honor.  John Hemann, |
| 12 | Pete Axelrod, and Richard Scott for the United States. |
| 13 | **MR. AXELROD:**  Good morning, Your Honor. |
| 14 | **THE COURT:**  Good morning, everybody. |
| 15 | **MS. LOVETT:**  Good morning, Your Honor.  Katie Lovett, |
| 16 | Stuart Gasner, and a slightly delayed Simona Agnolucci for |
| 17 | Walter Liew and USAPTI; and Mr. Liew is present. |
| 18 | **THE COURT:**  Good morning, everybody. |
| 19 | **MR. FROELICH:**  Good morning, Your Honor.  Jerry |
| 20 | Froelich for Mr. Maegerle.  Mr. Maegerle is present. |
| 21 | **THE COURT:**  Good morning.  I'm sure you're happy |
| 22 | you're out here for not necessarily being in trial, but given |
| 23 | what's going on in your home city, Mr. Froelich. |
| 24 | So what I'd like to do is, we made available to you the |
| 25 | latest draft of the instructions; and before we get into, you |

1    know, the later issue of the theory of defense, I wanted to ask

2    if anybody had any comments, additional objections, or

3    discovered typos, or any aspect of this draft that they think

4    ought to be changed.  I'll start with the Government.

5         **MR. AXELROD:**  Thank you, Your Honor.

6         Just a few things, and I think perhaps the best place to

7    start is with the bankruptcy instructions, which are Counts 20

8    through 22.

9         **THE COURT:**  Yeah.  By the way, I just want to say, I

10   guess it's just fatigue, but I erred in responding to

11   Mr. Hemann's question about which counts the change applied to.

12   And he asked me -- I forgot what counts you had, but they

13   actually were exactly the way it was, and I think the draft

14   reflects what I intended.

15        **MR. HEMANN:**  Okay.

16        **THE COURT:**  So hopefully that was clear.

17        **MR. HEMANN:**  Thank you, Your Honor.  I think we

18   understood where the Court was coming from, yes.

19        **THE COURT:**  Okay.  Go ahead.

20        **MR. AXELROD:**  So in looking at the bankruptcy fraud

21   instructions, Your Honor, it occurred to us that they should

22   probably track the actual language in the Indictment.  They'd

23   gotten, I think, in response to a Defense suggestion, cut down

24   to a narrower description; but it left out, actually, some of

25   the statements that Mr. Liew made.  So what I would suggest,

PROCEEDINGS

1   and I'm happy to hand up to the Court, is just tracking the

2   language of the Indictment.

3           THE COURT:  All right.  Have you given a copy of that

4   to Ms. Lovett?

5           MR. AXELROD:  Yes.

6           MS. LOVETT:  Yes, Your Honor.

7           MR. AXELROD:  I've given a copy to the Defense.

8           THE COURT:  Thank you.

9           MR. AXELROD:  I have another copy if the Court would

10  like as well.

11          THE LAW CLERK:  What would be lovely is an email copy.

12          MR. AXELROD:  Yes.  And I figured if this was

13  something the Court wanted, we would email it to the Court.

14          THE COURT:  Okay.

15                  (Pause in proceedings.)

16          MS. LOVETT:  Your Honor, if I may briefly respond to

17  this.

18          THE COURT:  Go ahead.

19          MS. LOVETT:  I believe that the Court has made this

20  instruction more precise than the instruction that was

21  requested by the defendants, and the defendants are perfectly

22  fine with the way the instruction is now in the draft final

23  instructions.

24      We think that the Government's proposed language goes a

25  little too far in terms of being specific.  They've put on

1    evidence of what Mr. Liew said or didn't say; and pointing out

2    the parts of the bankruptcy petition where -- or statements in

3    the bankruptcy proceeding is sufficient to direct the jury's

4    attention to wherever they need to look in their notes or in

5    their memory, and they don't need to indicate which specific

6    statements Mr. Liew made.

7         THE COURT:  Well, I guess the question is really, I

8    guess, more to the point is:  Is there any reason why the Court

9    shouldn't track the Indictment language unless -- and the

10   reason not to, for example, is if there were essentially, I

11   won't use the term "variance," but if the evidence and the

12   Government's theory, as it was presented at trial, was

13   different than the Indictment, then it would be appropriate.

14        So, for example, the Court excluded one of the overt acts

15   because there was no proof of that overt act.  So that would be

16   a reason.

17        So I guess my question to you is, more particularly, why

18   wouldn't tracking the language of the Indictment be

19   appropriate; or is the language in the Indictment different

20   from what the evidence actually showed?

21        MS. LOVETT:  Your Honor, as you know, I wasn't here

22   for the bankruptcy testimony, but I have reviewed the

23   transcripts.  I can't say that the evidence differed from the

24   Indictment.

25        What I can say is that adding this language to Counts 20

PROCEEDINGS

1  through 22 would make these counts much more specific than any

2  other count in the instructions in terms of telling the jury

3  exactly what Mr. Liew said or didn't say, and it just concerns

4  me that giving all these details about what Mr. Liew said or

5  did will cause the jury to put a lot of weight on what is said

6  in the instructions rather than what they recall the Government

7  presenting in evidence.

8      Defendants' concern proposing the language we did the

9  other day was that the instructions weren't specific enough

10  about what particular kinds of statements the Government had

11  indicted Mr. Liew for allegedly making.

12      **THE COURT:**  All right.  Anything further you want to

13  say on this point?

14      **MR. AXELROD:**  No.  Just that we should either have a

15  general instruction or a specific instruction, not one that's

16  in the middle.

17      **THE COURT:**  Well, I'll take this one under advisement.

18  I understand your arguments.

19      All right.  Any others?

20      **MR. AXELROD:**  No, not -- I mean, other than the

21  Defense -- the Defense theory instruction.

22      I would note, Your Honor, in Count 1 on page 23, in the

23  description of the foreign instrumentalities, it goes through

24  the specific Pangang Group entities; and then at the end

25  there's a phrase "collectively Pangang Group companies" in

1   brackets, which is -- that's sort of the only place it's

2   mentioned.  It may be appropriate to just strike that off so

3   there's no confusion about the specific entities.

4        **THE COURT:**  That sounds -- it is confusing.  Do you

5   have any problem with that?

6        **MS. LOVETT:**  We'd be perfectly fine with that, Your

7   Honor.

8        **THE COURT:**  Okay.  So we'll strike the words parens,

9   on line 25 on page 23, the words, quote, "collectively Pangang

10   Group companies," unquote, closed paren, will be stricken.

11        **MR. AXELROD:**  Very well.

12        **THE COURT:**  Ms. Lovett, we'll discuss the

13   theory-of-defense issue after we get to anything else; sort of

14   low-hanging fruit, if you will.

15        **MS. LOVETT:**  Your Honor, we didn't notice anything

16   along those lines.  I just want to note for the record, and the

17   Court noted it yesterday, we reserve all of our prior

18   objections.

19        **THE COURT:**  Of course.  And they are reserved, and

20   that's by order of the Court.

21       Okay.  That's fine.

22       So let's move on to the bigger issue, the issue of theory

23   of defense.

24       I've read both sides' proposals and reviewed authorities

25   cited by the parties and others, and I just want to give my

```
 1   own -- not my own -- my own sort of take on what the
 2   Ninth Circuit teaches in this area.
 3       A couple of cases are really instrumental -- not
 4   instrumental, but illustrative and helpful to the Court that I
 5   wanted to focus on.  One is U.S. versus Lopez-Alvarez,
 6   970 Fed. 2d 583.  And that was a case involving the issue of
 7   whether the defendant was actually present -- this involved the
 8   murder of Agent Camarena, kidnapping and murder of Camarena.
 9   And the theory of the defense was that the defendant wasn't at
10   the scene of the kidnapping, and any information he gave the
11   agents about his involvement was by hearsay and not by virtue
12   of him being present at the interrogation and kidnapping of the
13   agent.
14       And they wanted -- the defendant asked for an instruction
15   that, basically, if you find that the defendant was not present
16   at the crime while the crime was being committed, because it
17   was a felony murder charge as well, then you must acquit the
18   defendant.
19       The District Court rejected the proposed instructions of
20   actually it was both defendants.  And the Ninth Circuit said
21   the following on page 597, it's a quote, and I'll go slowly for
22   the court reporter:  (reading)
23           "We believe that the District Court did not commit
24       reversible error in rejecting the proposed instructions.
25       The jury was properly instructed in the elements of each
```

1     offense and the Prosecution's burden of proof.  These

2     instructions made it obvious to the jury that if it found

3     that Lopez-Alvarez' admissions did not come from personal

4     knowledge of the Camarena affair but were fabricated on

5     the basis of information received from other sources, it

6     should find him innocent.  In addition, under the facts of

7     the case, it should have been clear to the jury, even

8     without the instruction, that Lopez-Alvarez should be

9     acquitted if it found that he was not present during any

10    of the criminal occurrences.  Thus, the defendant's

11    proposed instructions were not necessary to explain to the

12    jury the legal effect of the theory of the defense.  A

13    defendant is not entitled to any particular form of

14    instruction, nor is he entitled to an instruction that

15    merely duplicates what the jury has already been told.

16    Accordingly, the District Court did not err in refusing

17    the proposed instructions."

18         The other case that I wanted to talk about was,

19    interestingly enough, another case involving a defendant named

20    Lopez, the *United States versus Lopez*, 885 Fed. 2d 1428.  And

21    in that case, that was a case involving a helicopter escape

22    from a federal prison.  It sounded like a movie, but it was a

23    pretty serious case.  And the defense was necessity.  The

24    defendant who -- the rescuer if you will, said he was trying to

25    rescue his girlfriend because he felt that the guards were

1  going to kill her, so it was a necessity defense.

2      The Court gave, at the defendant's request, an instruction

3  on necessity; but, unfortunately for the Government, it was an

4  erroneous substantive instruction, and the question was then:

5  Should the Court, the Ninth Circuit, reverse?

6      And the Ninth Circuit there said -- first they gave the

7  standard of review, a District Court failing to instruct on a

8  defendant's theory of the case; and they say, and I'm quoting

9  at page -- I don't have the jump cite right now, but it's at

10  Headnote 5678:  (reading)

11          "Moreover, we have deemed such a failure to give,"

12      theory of defense instruction, "error if the instruction

13      'is supported by law and has some foundation in the

14      evidence.'"

15  And I'm excluding the internal citations:  (reading)

16          "It is not error, however, to reject a

17      theory-of-the-case instruction if other instructions in

18      their entirety cover the defense theory.  Indeed, so long

19      as the instructions fairly and adequately cover the issues

20      presented, the judge's formulation of those instructions

21      or choice of language is a matter of discretion."

22  And the Court goes on to say:  (reading)

23          "In the instant case, it is clear that Lopez' defense

24      theory necessity was adequately presented to the jury

25      through the instructions actually given by the trial

PROCEEDINGS

1      court."

2          And, finally, the last case that I wanted to discuss or

3      bring up is the *Mason* case that was cited by the defendant, and

4      this is a case where -- this is at 902 Fed. 2d 1434 decided in

5      1990 by the Ninth Circuit.  That was a case where the defendant

6      claimed that -- it involved an escort service, and the

7      defendant claimed that the activities of the defendant were

8      authorized by the Government.

9          And the Court, in response to a request for a

10     legal-defense-theory instruction, gave an instruction on

11     entrapment; and then the Court goes on to talk about what that

12     instruction said.

13         And, so, what the Court said, it said that:  (reading)

14             "It is apparent that this entrapment instruction does

15         not adequately express the defendants' theory of the case

16         as the district court initially recognized.  This is not

17         an entrapment situation in which a covert government agent

18         engages in a criminal transaction with a defendant."

19         And then they talk about why the issue is different.  And

20     then the Court goes on to say:  (reading)

21             "The evidence produced at trial was sufficient for a

22         jury reasonably to find that the government authorization

23         continued through the times of the misconduct alleged in

24         the indictment."

25         And the defendants properly objected to the instruction.

**PROCEEDINGS**

1       So it says, the Court went on to say that -- it cites --

2   traces the cases involving defense-theory instructions, and

3   said that in this case such an instruction was appropriate:

4   (reading)

5           "The Government argues that the instructions defining

6       'unlawfully' and 'willfully,'" which the Court did give in

7       its general instructions, this is what the Government

8       contended on appeal, "appropriately instructed the jury on

9       the theory of the defense.  The difficulty with these

10      instructions is the defendants acknowledge that, in

11      running the prostitution business" --

12  I guess it wasn't an escort service after all.  When I

13  first read this, I said, "That's not a crime," but I'm pretty

14  naive.  (reading)

15          "The difficulty with these instructions is the

16      defendants acknowledge that, in running the prostitution

17      business, they were knowingly doing something contrary to

18      law and intentionally doing something the law forbids; but

19      they contend this was authorized by the law enforcement

20      agents of the federal government in order to use them as

21      informants."

22  And the Ninth Circuit goes on and says:  (reading)

23          "In fairness, these instructions on general intent do

24      not meaningfully express to the jury the theory of the

25      defense, particularly when considered with a misleading

**PROCEEDINGS**

1      entrapment instruction that immediately followed the

2      general instructions."

3          So the Court, basically, said, in that case they

4  criticized the District Court for not giving the instruction.

5  And in that case they found that in this case:  (reading)

6          "... the instructions as a whole in the context of

7      this trial did not fairly convey to the jury the law on

8      the theory of the defense, particularly in light of the

9      misleading entrapment instruction."

10         So that brings me kind of full circle and to ask Defense

11 counsel this:  Tell me -- and I actually looked at all of your

12 requests for theory-of-defense instructions and tried to craft

13 one that would accurately capture the defense theory of the

14 case.  And in so doing, I kept running up against other

15 instructions -- for example, definition of trade secrets,

16 reasonable belief that it's a trade secret, intent,

17 willfulness, et cetera -- and came to the sort of tentative

18 view that all of the aspects of the defenses that are asserted

19 and in the instructions are captured by the overall

20 instructions.

21         The other thing that strikes me, this whole area of theory

22 of defense is not new and typically involves issues, like in

23 the *Lopez* case, where you have a defense that is outside of the

24 Government's affirmative case; such as, potentially duress,

25 necessity, or insanity, or something that's a stand-alone

PROCEEDINGS

1  affirmative defense.

2     And I have a feeling that the defendants here are

3  conflating what is a defense and what is their theory of the

4  case or their legal theory as distinguished from their theme or

5  their narrative.

6     So I guess I'm asking a very specific question.  First of

7  all, I find that the instructions requested by the defendants

8  are not appropriate the way they're phrased; but I would like

9  to know from both Defense counsel what aspects of their defense

10 are not covered by the instructions that the Court has already

11 said it was going to give.

12         MR. GASNER:  May I respond, Your Honor?

13         THE COURT:  Yes.  Yes, please.

14         MR. GASNER:  First of all, just to respond to the

15 humorous ring, that I think that the cases that the Court cited

16 are factually distinguishable in all ways from the current

17 case.

18         THE COURT:  Right.

19         MR. GASNER:  They're involving the murder of Mr. Kiki

20 Camarena and prostitution rings, and the like.  And I say that

21 simply in a humorous vein.

22     But more seriously and to respond to the Court's question,

23 the way the trade secret case proceeded and was prosecuted and

24 cross-examined gave the impression that our defense is that

25 every single thing that was ever done in the 30K and 100K

 1    projects had to be tied to a patent, and that's not our theory.

 2         Our theory is that, starting back in 1996 and 1997,

 3    Mr. Liew did a lot of research.  We saw the notebooks.  There

 4    are -- there's an Exhibit 221 in which there's a letter to

 5    Mr. Maegerle from Mr. Arbogast in which he says that the method

 6    of operation that Mr. Marinak and Mr. Liew, and potentially

 7    Mr. Maegerle, were going to engage in, "as unbelievable as it

 8    sounds, is to gather technical and process information from

 9    available public sources and patent literature and put a

10    package together."

11         So starting back in 1997, there was a lot of research

12    done.  There were many discussions with the Condux Expert

13    Service.  There were meetings in Delaware with Mr. Marinak and

14    Mr. Arbogast, Mr. Liew, Mr. Maegerle, all meeting together, at

15    which this concept was originally presented.

16         They then went forward, and there are other documents and

17    testimony about that method of operation, in which Mr. Maegerle

18    would rely upon his knowledge of his days many years prior at

19    DuPont to go forward; and it's on that basis that the parties

20    went forward.

21         A huge piece of our defense, as the Court well knows from

22    Mr. Cooper's testimony and elsewhere, is that there are no

23    trade secrets as alleged by the Government; that these, based

24    on his expert opinion and his research, were found by him,

25    based on his long experience, not to be trade secret.

1    **THE COURT:** Let me interrupt you and apologize for the

2    interruption. I don't know that you're answering me.

3    As I'm listening to you give, you know, your argument and

4    each time -- because I did this late last night. I actually

5    sat there with a checkmark and went through your instructions

6    and then went through the instructions the Court was going to

7    give.

8    So you just said, "Well, this is not a trade secret.

9    That's not a trade secret." Well, the terms "trade secret" are

10   carefully and, hopefully, correctly defined in this case and

11   gives you the leeway to argue, based upon the evidence, that

12   because this material was in the public domain or DuPont didn't

13   protect it, or whatever your theory is, you haven't told me

14   what part of the instructions don't capture, as a legal matter,

15   your defense.

16   And let me go on one thing further, and this is slightly

17   off topic but I meant to bring it to your attention. When I

18   asked you to come up with -- when I asked the defendants to

19   come up with an instruction, and I said I wanted it to be

20   generic and a real instruction rather than the Court's

21   imprimatur on a closing argument, what I had in mind, actually,

22   it was something in this *Mason* case, the prostitution case.

23   Interestingly, the defendants' instruction was that, which

24   implicitly the Ninth Circuit said in that case was appropriate,

25   the proposed instruction, which the Court rejected, was as

1    follows -- remember, the issue was that the Government knew

2    about and authorized this conduct -- quote:  (reading)

3              "Where a person carries on," a person, "carries on

4         criminal conduct at the request or behest or asking of the

5         government," et cetera, "the law, as a matter of policy,

6         forbids his or her conviction in such a case.  If the

7         evidence leaves you with a reasonable doubt as to the

8         defendant's intents and purposes to commit the charges in

9         this indictment, then it is your duty to find him or her

10        not guilty.  The burden is on the government to prove

11        beyond a reasonable doubt that the defendants were not

12        induced by governmental behavior or asked to commit the

13        charged offense."

14        And, in my view, you haven't given me anything yet, any

15   part of your argument, that's not covered by the instructions.

16        **MR. GASNER:**  There's no doubt, Your Honor, that there

17   is a very small Venn diagram overlap that would create a

18   defense theory of the case if the approach is anything that is

19   covered by some other instruction.

20        So, for example, good faith.  Good faith is almost always,

21   I would think, covered, to some extent, by simply negating the

22   Government's proof as to elements of the offense.

23        **THE COURT:**  Right.

24        **MR. GASNER:**  We certainly plan to do that.

25        So the elements that we were trying to capture -- we

1    knocked out good faith in our dialogue with the Government

2    because they cited *Shipsey*; and we thought, "Okay.  There's

3    another way to express good faith."

4         That led us to the locution that we used in the proposal

5    that we submitted to the Court simply because the clock ran

6    out.

7              THE COURT:  No, I understand.

8         MR. GASNER:  This is really hard, and I said yesterday

9    I'm not sure that my defense can be encapsulated in the period

10   of time in an elevator, so I do think there's some tension

11   here.

12             THE COURT:  I hope it was a big building.

13        MR. GASNER:  Even with a big building, it would take

14   more time.

15             THE COURT:  Yes.

16        MR. GASNER:  So I appreciate the Court's thought

17   process that you do bump into other areas.

18        There were many times where I thought, "This is too hard.

19   Why bother?"  But --

20             THE COURT:  That's kind of where I came at 11:00

21   o'clock last night.  I always try to rewrite it, especially in

22   light -- you know, I actually didn't have this *Mason* case in

23   mind at the time, I read it this morning; but it struck me, not

24   that why bother, but it can't be done because to fairly

25   encapsulate Mr. Liew and USAPTI's defense would take, really,

1    almost writing your closing argument.

2         And, you know, when I teach trial practice, I teach the

3    trial practices as various elements.  One is your theme, which

4    is the moral imperative; and the Government will have their

5    theme that, you know, it's a case about whatever.  And you'll

6    say, "No, it's a case about ingenuity being penalized by the

7    Government," or whatever you want to call it.

8         And then you'll have what I call the narrative, the story,

9    what happened here.

10        And then you have the legal theory:  From the Government's

11   standpoint, why they are entitled to a verdict of conviction;

12   and from your perspective, why the Government hasn't proved

13   that.  And your legal theory is, usually in this case, mostly

14   negating the elements.

15        And, so, you were -- you know, we were all sort of

16   conflating legal theory and narrative together and asking the

17   Court to present that for you, and I struggled with how to do

18   it here.  And if it can't be done, then it can't be done.

19             **MR. GASNER:**  If I might, Your Honor, I did survey my

20   law firm and try to get some samples; and one that I got from

21   Mr. Keker from the *Bruce Karatz* case read as follows:

22   (reading)

23             "The Defense contends that Mr. Karatz acted in good

24        faith at all times because he never believed that

25        KB Home's stock option branding practices were illegal or

**PROCEEDINGS**

1    improper.   That is demonstrated by the fact that KB Home's

2    stock options process were known to many individuals

3    within the Legal, Finance, and Human Resources Department,

4    none of whom sought to keep the practice secret or thought

5    it was illegal.   In 2006, Mr. Karatz further demonstrated

6    his good faith by recommending an outside investigation of

7    KB stock option practices."

8        **THE COURT:**  Was that ever blessed by the

9    Ninth Circuit?

10       **MR. GASNER:**  I don't know, and --

11       **THE COURT:**  It probably would be because it would be

12   only the Government who would object, and they wouldn't -- I

13   don't think they'd necessarily care much about what the

14   Government had to say about an instruction that was given if

15   it's not error.

16       **MR. GASNER:**  So I apologize.   I don't know whether

17   this was given, but I used it as a bit of a model for trying to

18   capture, you know, in a short instruction that encapsulates

19   many aspects.

20       And good faith is an important part of it, and I

21   struggled, too.   And the things that came to my mind, one is

22   the idea that based on research -- pretty much what I said

23   before, Your Honor.   I won't repeat it.

24       If the Court feels that argument is going to solve this

25   problem along the lines that the Court indicated, and it seems

**PROCEEDINGS**

```
 1    that's the way the Court is headed, and we're prepared simply
 2    to argue.
 3        But for the record, I would simply state that if given a
 4    little bit more time to submit something, we would do so; and
 5    what I would say is that it would include elements of good
 6    faith; of the two lines that weren't objected to in the
 7    Government's opposition, that these were commercial contracts
 8    and in performing these engineering services, USAPTI and
 9    Mr. Liew received designs and information from Mr. Maegerle;
10    and then some phrasing that would capture the idea that
11    residual knowledge is a permissible area for consultants to
12    rely upon in doing their jobs, and that many aspects of what
13    went forward were usual and ordinary.  And they --
14        THE COURT:  Well, here's my problem with that:  In the
15    instructions that the Court has indicated it would give, there
16    is an instruction that the Court has now incorporated into the
17    "trade secret" definition about skill, acquired skill, and all
18    that.  So there's another problem.
19        And at the end of the day, the reality is, as far as, you
20    know, the clock running out and all that, you know, the Court
21    gave the parties an opportunity to present an instruction.  I
22    don't think the instruction is proper the way it's phrased.  I
23    think that some aspects of it are not even supported by the
24    evidence, and it doesn't even fully -- it's misleading because
25    it doesn't fully capture the fullness of the defense from your
```

PROCEEDINGS

1    own perspective.

2         So, you know, the Court doesn't have to write an

3    instruction.  The Court has to react.  And I don't think what

4    you've proposed is required by the Ninth Circuit; and I think

5    from my -- as far as Mr. Liew and USAPTI is concerned, I think

6    the instructions capture your entire theory of the case.

7         So my inclination is, as to your clients, is not to give

8    it.  If you want to try to come back, and it better happen

9    soon, with something different, you can do it; but you should

10   be prepared to tell me and annotate it with what aspects of the

11   instructions -- what aspects of your theory, more importantly,

12   are not captured by the instructions.

13        And to say, "Well, it's not captured in detail because it

14   doesn't mention Mr. Maegerle, you know, having a reasonable

15   belief and Mr. Liew relying on Mr. Maegerle," or whatever, then

16   you're going to run up against the Ninth Circuit's teachings in

17   these cases.

18        So if you want to do it, you need to do it, you know,

19   pretty quickly, like the end of today, because we have a

20   holiday weekend coming up, and I'm not -- my inclination is not

21   to give it.

22        And, I think, you know, you're a good lawyer and I think

23   you are very respectful of the Court's time and your own time.

24   If you in good faith think there's something that's within

25   these cases and is not covered by the totality of the

**PROCEEDINGS**

```
 1   instructions and you can convince me of that, then I'll

 2   consider giving it, but I need it by 5:00 o'clock today.

 3          MR. GASNER:  We won't waste the Court's time.  I think

 4   the Court's direction is clear, and I don't want to engage in a

 5   futile act to spend a lot of time preparing something it seems

 6   clear that the Court -- I think I understand the Court's legal

 7   view of what the nexus or lack of nexus needs to be between a

 8   theory-of-the-defense instruction and what's elsewhere in the

 9   instructions; and I think the record is clear that that's the

10   Court's view of the law.

11          I think we've presented what we would propose, and I think

12   it's likely going to be futile for us to try to package that

13   against --

14          THE COURT:  It's not because the Court is not willing

15   to listen.  I think it's futile because I think you're going to

16   butt up against what I think the Ninth Circuit's teachings are;

17   and I think -- and whether or not you agree with the

18   Ninth Circuit's view, it is the Ninth Circuit's view.

19          And unless, the way I look at it, unless there's some sort

20   of crisp, stand-alone issue -- authorization was one, necessity

21   was another -- which sort of is not captured -- because it's

22   almost like, the analogy I would think about is, you know,

23   there's certain pieces of evidence that are not admissible

24   because they're excluded by the extrinsic policy; such as,

25   settlement agreements, recent repairs, subsequent repairs in a
```

1   civil case, which are stand-alone.  Even if you find the person

2   did what you think they did, you can't consider this evidence.

3   That's the way I view what the Ninth Circuit is teaching us,

4   rather than the Court has an obligation to explain, essentially

5   help the Defense, by giving its own imprimatur on their theory.

6       So that's what you're up against.  I will say for the

7   record that that's my current inclination based upon what's

8   presented, but if you can give me something by 5:00 o'clock.

9   You know, my strong inclination is not to do it; but I will

10  definitely listen to it, apply the Ninth Circuit law, and

11  determine whether I'm going to reconsider.

12          MR. GASNER:  Thank you.

13          THE COURT:  All right.  Mr. Froelich?

14          MR. FROELICH:  Yes, Your Honor.  I have a different

15  view than he does.

16          THE COURT:  Oh, good.

17          MR. FROELICH:  I have different views than the Court.

18          THE COURT:  Okay.  Let's hear it.

19          MR. FROELICH:  Your Honor, first of all, I believe

20  this is -- I've asked for a good faith instruction, and I

21  believe that this is separate.  It's like entrapment.  It is

22  different.  It is a stand-alone defense because this is a case

23  where it could be a trade secret but it doesn't matter if he

24  had a good faith.

25      It's just like entrapment:  I violated the law, but I was

1   entrapped into violating the law.  So it's a consistent and

2   different defense that I believe a Court -- that a jury must be

3   instructed on.

4       I cited, in my initial, I cited to the United States

5   Supreme Court case in *Morissette versus United States*, 345

6   [sic] U.S. 246.  And at 265, among other places within it, it

7   says that the law recognizes a good faith defense as the

8   conversion, theft, things like -- and those type of offenses,

9   common law offenses.

10      And that's what we have here.  We have a theft or a

11  conversion.  And, so, I believe that we're entitled -- and I

12  changed -- Your Honor, as you saw, I limited my instruction

13  greatly.

14      One of the cases that the Court -- I mean, excuse me, that

15  the Government cites is, I think it's -- I don't know how to

16  pronounce it correctly; I'm terrible with pronunciation, as the

17  Court knows -- it's Shipley [sic] or what it is, but it's 363

18  Fed. 3d 962.

19      But one thing I have to say is, you know, a defendant is

20  entitled to a defense, and the Court is not going to make a

21  mistake if it gives the defendant's theory.  It can make

22  mistakes by not giving it, and we've been here seven or eight

23  weeks.

24      But listen to what the instruction was.  This is the

25  instruction that was approved in the Ninth Circuit when it said

1   that:  (reading)

2           "In determining whether or not a defendant acted with

3       the intent to defraud, you may consider whether or not a

4       defendant acted in good faith belief in the truthfulness

5       of his...."

6       That's the case that they cite to say you shouldn't get a

7   good faith instruction.  The Court gave a good faith

8   instruction, and it was approved, and that's the very language.

9   And I kind of, almost on top of that with my -- with what I

10  quoted and what I gave the Court.

11      So good faith is a separate defense.  It's like an

12  entrapment.  It's like Government -- a Government-blessing

13  defense.  You know, "I was entitled to do this because I was --

14  I had the authorization by the Federal Government," those type.

15      And without this, the jury doesn't understand about good

16  faith.  It never hears the word "good faith" except from me;

17  and they say, "Mr. Froelich says it.  What does that mean?"

18          **THE COURT:**  All right.  What's your response first on

19  the good faith piece?

20          **MR. HEMANN:**  First on the good faith, I don't think

21  that's what *Shipsey* said.  I didn't bring the case up with me,

22  but the holding of *Shipsey* is very clear.  The cases upon which

23  *Shipsey* relies are very clear.

24      I did not understand, candidly, *Shipsey* to have said that

25  the District Court gave the instruction that Mr. Froelich just

**PROCEEDINGS**

1   read.  I could be completely wrong.  I have to go down and look

2   at it again, Your Honor, but I believe that that's the

3   instruction that the Court rejected.

4        And I think that the premise that good faith is the

5   negation of the elements that the Court has instructed on is

6   the law of the Ninth Circuit, and the good faith instruction is

7   not required.

8        I don't have any qualms about the Court's comments to

9   Mr. Gasner.  I don't need to comment unless the Court has a

10  question, or waste the Court's time with that.

11       I would only note that we did object to the entire

12  instruction as written because we think that it highlights a

13  factual argument that the defendant wants to make and is not a

14  legal -- it's not a legal instruction.

15            **THE COURT:**  All right.  Anything else?

16       I'm going to, obviously, think about this, see if anything

17  further is presented by the defendants in light of my comments.

18  I'm not requiring them to do so.  And they can certainly stand

19  on what they requested, and then it's in the record; and the

20  Court will -- I said I will not accept it and I won't give the

21  instruction.  But if another one is given, I'll rule on that,

22  you know, if I get it by 5:00 o'clock.

23       And then, of course, you'll have, both sides, everybody

24  will have their objections preserved.

25       Is there anything further that the Government wanted to

PROCEEDINGS

```
 1    say on instructions?
 2              MR. HEMANN:  No, Your Honor.  I was going to ask the
 3    Court to have a further discussion about the order of
 4    arguments, and then --
 5              THE COURT:  Oh, thank you.  Thank you.
 6              MR. HEMANN:  -- and I have a question about something
 7    in particular during closing and how the Court would like to
 8    handle it.
 9              THE COURT:  All right.
10              MR. HEMANN:  I can take them in either --
11              THE COURT:  Let's do the timing issue first.  So the
12    ruling of the Court is as follows:
13         I'm going to go with my initial inclination.  We're going
14    to start with the jury instructions, which took, I read it in
15    bed last night, 52 minutes.  And I tried to read it sort of Cat
16    in the Hat, you know, like I'm reading to my grandchildren so I
17    wouldn't kill the court reporter.  It took 52 minutes, so I
18    figure that's going to take 52 minutes and maybe a little -- if
19    I take a stretch break in the middle, maybe closer to 55
20    minutes.
21         Then I'm going to allow the Government to do their first
22    closing.  Then I'm going to have Mr. Gasner do his closing.
23         I'm going to tell the jury in the morning that we may --
24    that we're planning on going over.  In order to be fair to
25    everybody and to them and to do this in a balanced way, we're
```

**PROCEEDINGS**

1    not going to stick to the normal time.

2         So the jury won't be looking at their watch at 1:30, I'm

3    going to tell them that 1:30 doesn't apply on Tuesday.  So that

4    will take away some of the pressure.

5         I understand, Mr. Gasner, your point about, you know,

6    you'll be last and they'll be tired, but this is a pretty

7    vigorous jury.  They seem to write everything down and, you

8    know, they're on to, you know, every issue and even the coffee

9    and those kinds of things.

10        So that's what we're -- and then the following day we'll

11   start with Mr. Froelich's closing; and if there's something you

12   wanted to pass on, you know, transitionally, Mr. Gasner, I'm

13   sure Mr. Froelich will be very, you know, effective and

14   helpful.  But I'm not -- I won't tell you how to divide it up.

15        And then we'll have the Government's reply, and I'll --

16   but there's a piece of the instructions, which -- like, the

17   last couple, which are really more housekeeping ones, starting

18   with Duty to Deliberate on page 46, which I give after the

19   closing arguments.  So that will be the last thing, and then

20   they'll deliberate.

21        And as far as schedule, their own schedule, I told you

22   about that.

23        Now, has there been any further discussion about the

24   electronic presentation?

25             **MR. GASNER:**  Yeah.  Yes, Your Honor.  There has been

**PROCEEDINGS**

1    further discussion on our team, and perhaps Ms. Lovett can

2    address where we are.

3          **MS. LOVETT:**  Sure.

4       Your Honor, I emailed the Government about this yesterday,

5    but I imagine in the mix of everything, they haven't had a

6    chance to get back to us yet.

7       We propose that we set up a stand-alone computer back in

8    the jury room, either a desktop or a laptop, and a projector so

9    that they can all look at things at the same time, and load

10   .pdfs of all admitted exhibits onto that computer.

11      We haven't heard from the Government yet about whether

12   they're interested in that.

13         **THE COURT:**  You're saying all?  All right.  That

14   raises a question of the following:  Whether all of the

15   exhibits are electronically stored, including all those big

16   diagrams, and things like that.

17         **MS. LOVETT:**  We do have .pdf copies of all of the

18   exhibits.  What we're proposing wouldn't include the ability to

19   look at those autoCAD files in, like, a CAD viewer; but other

20   than that, all the digital files, I think, we have copies of.

21         **MR. HEMANN:**  So, Your Honor, we don't have an

22   in-principle objection to having that there.  I have a -- we

23   have a practical concern, which is mostly a quality control

24   concern.

25      There have been a large number of documents that have been

PROCEEDINGS

1   either redacted or only admitted in part.  I'm extremely

2   concerned that we will not have time between now and Wednesday

3   to do an adequate quality control and make sure that only those

4   portions of the exhibits that have been admitted are on

5   whatever the final disk or disks that go to the jury are.

6        And I think I would give one example that literally just

7   came to mind.  During either Mr. Lewis or Mr. Cooper's

8   testimony, and I believe it was Mr. Lewis, there was a --

9   remember there was the photographs of the Pangang officials

10  with their titles in Chinese and there was a page?

11          THE COURT:  Right.

12          MR. HEMANN:  The page that was displayed by the

13  Defense, the corresponding page, had actually been redacted at

14  the bottom, and the paper copy that had gone to the Court had

15  been redacted but the electronic copy had not been redacted.

16  And it's not a -- it's not an aspersion at all.  It's just a

17  thing that happens.  I'm sure our documents are in the same

18  shape.  And, so, that's my concern.

19          THE COURT:  But doesn't the same issue come up with

20  the hard copies?  You're still going to have to go through.

21  There was a couple of documents where, I don't know if -- there

22  were some documents where I allowed certain pages and not

23  others to go in.

24          MR. HEMANN:  We've been very careful with Ms. Ottolini

25  about that with our paralegals.

1    **THE COURT:** All right. Well, it's not worth talking

2  about. You know, we'll just -- if both parties are not

3  completely in the game, I would say that in the last -- not the

4  last -- two trials ago, the patent case, there were more

5  exhibits, if you can believe that, and much more complicated

6  exhibits, it was source code in Russian was in evidence, and we

7  did it. And I talked to the jury afterwards about the format

8  of it, and they thought it was great.

9    So, you know, it's a theory; but if the parties -- if both

10  parties are not absolutely comfortable with it, I don't want to

11  make work for the parties.

12    And where the downside is, if a party makes a mistake,

13  something improper goes to the jury. The case books are legion

14  with cases where nonadmitted documents or pieces of it went to

15  the jury. I actually once had a case where, when I was a

16  prosecutor, where the case report, the whole case report, which

17  was used for impeachment, went to the jury and had the rap

18  sheet of the defendant; and, of course, that was -- even in the

19  Fourth Circuit it was reversible error.

20              (Laughter)

21    **THE COURT:** That's pretty bad in the Fourth Circuit at

22  that time.

23    So I don't know if you want to say anything about it. I

24  don't know -- I don't want to make work for all of you; and if

25  there's not an agreement on that -- and Mr. Hemann raises an

4272

**PROCEEDINGS**

1   important issue.  And it seems like the amount of time it would

2   take to, you know, be a hundred percent sure is better put in,

3   you know, working with your respective sides on the closings.

4        And we'll just -- I will know, because Ms. Ottolini is

5   involved, that nothing will get to the jury that's not admitted

6   and appropriate for them to see.

7        **MS. LOVETT:**  Your Honor, we're fine with that

8   approach.  We're fine with just sending the paper copies back

9   to the jury.

10       **THE COURT:**  Yeah.  And they can just -- yeah, they may

11  look at all of it.

12       But where are you on the Table of Contents at least?

13       **MS. LOVETT:**  Your Honor, we're working with the

14  Government this weekend to prepare that Table of Contents, and

15  we should have it to the Court early next week, before the jury

16  deliberates for sure.

17       **THE COURT:**  Okay.

18       **MR. HEMANN:**  We're in good shape on that, Your Honor.

19       **MR. FROELICH:**  I think we're deciding on the format,

20  and just a couple other things.

21       **MS. LOVETT:**  Yeah.  We worked on that before court

22  this morning.

23       **THE COURT:**  I'll get to you Mr. Froelich.

24       So anything more on -- you said you wanted to discuss an

25  issue involving closing argument.

1      **MR. HEMANN:** A quick issue and it's more of a

2  question, Your Honor. With regard to the use of transcripts

3  during closing argument, we're happy to defer to whatever the

4  Court's usual practice is in a criminal case in terms of

5  displaying portions of transcripts, very obviously reading, you

6  know, "This is right in the transcript."

7      But my experience is that then almost invites the jury to

8  roll back in and say to the Court, "We'd like you to read us

9  the transcript of so and so."

10     And, so, my -- some judges do not want us to invite the

11 jury by talking about the transcript; other judges don't care.

12 I just wanted to air it so that we follow the correct practice

13 in the first instance and that we're all on the same page.

14     **THE COURT:** What's your view, Mr. Froelich? Do you

15 have a view?

16     **MR. FROELICH:** Yes, Your Honor. The way I've

17 always -- I've never seen anybody be able to put up transcripts

18 because that's not -- that's not evidence in the case.

19     **THE COURT:** I agree with that.

20     **MR. FROELICH:** And I think you can argue what was said

21 and you may say, "Do you remember this is what he said?" You

22 know, I think you can argue what was said, but I don't think

23 you can, you know, hold up a transcript.

24     **THE COURT:** I agree.

25     What do you think, Mr. Gasner?

 1          **MR. GASNER:**  I agree.

 2          **THE COURT:**  Okay.  So let's not make it obvious.  If

 3   it becomes a real issue in terms of, you know, somebody said

 4   the light was red and somebody said the light was green, you

 5   can say -- you know, I would give the instruction anyway, which

 6   is true, even though it's in the transcript, the jury's

 7   recollection controls.  You know, and if they happen to

 8   misrecollect, that's what they get to do.

 9          So I would -- I'm not going to bar you -- I don't have a

10   rule barring people from doing it, but I do have a rule which

11   doesn't allow display.

12          And I exhort counsel to, as much as possible, not have

13   long read-ins of testimony.  I think it's ineffective, number

14   one.  It loses the impact.  If there's a word here and there,

15   somebody said something, you know, an expert on direct or

16   cross, for example, and you say, "You know, this expert used

17   the word, you know, X," and assuming there's -- and I imagine,

18   because both sides -- it's sort of like mutually assured

19   destruction -- both sides have the transcript and will keep

20   each other sort of honest about not misstating something.

21          So I think that's a fair point.

22          **MR. HEMANN:**  Thank you, Your Honor.

23          **THE COURT:**  There's one point that I wanted to raise,

24   then I'll hear from Mr. Froelich, and I only raise it because

25   it always worries me in a case.  It worried me -- it worries me

PROCEEDINGS

 1   as a judge.  It worried me as a trial lawyer, although I didn't

 2   do criminal defense.  It worried me as a prosecutor.

 3        And we have two defendants that didn't testify in this

 4   case, and I want the Government to be very clear about -- and I

 5   know we have two very experienced and excellent prosecutors,

 6   but I would suggest you might -- that *Lopez-Alvarez* case has a

 7   very good explanation, sort of survey of the cases, on what one

 8   can say, what a prosecutor can say.  Because, of course, it's

 9   misconduct for a prosecutor to comment on a defendant's failure

10   to testify.

11        But the Court goes on to say at 585:  (reading)

12             "However, a prosecutor may properly comment upon the

13        defendant's failure to present exculpatory evidence as

14        long as it is not phrased to call attention to the

15        defendant's own failure to testify.  A comment on the

16        failure of the Defense as opposed to the defendant to

17        counter or explain the testimony presented or evidence

18        introduced is not an infringement of the defendant's

19        Fifth Amendment privileges."

20        So I don't want -- I know the Government won't get close

21   to the line.  I don't -- I don't want to have unnecessary

22   objections.  The law is pretty clear on this, and I think both

23   Mr. Axelrod and Mr. Hemann understand that.

24        And, of course, it's appropriate when a defense is put on,

25   or even if it isn't put on, for the Government to comment on,

```
 1   you know, "There's nothing in the record that contradicts X,"
 2   unless, you know, it's an explicit or a veiled reference to a
 3   defendant's failure to testify.  I just want to make sure we
 4   don't have that injected in the record and we don't come close
 5   to the line.
 6          MR. HEMANN:  We have been reviewing this with the
 7   appellate group in the office already, Your Honor, and we're --
 8   we understand where we are with the defendants and with the
 9   state of the evidence; and we had looked at the Lopez-Alvarez
10   case and that particular note yesterday, Your Honor.
11          THE COURT:  Okay.
12          MR. GASNER:  Your Honor, one big concern that I have
13   relates to the tax charges.  What is charged is a false
14   representation as to gross receipts on USAPTI's tax returns,
15   and the jury heard a lot of evidence about the subsequent
16   transfers to Singapore.  They heard some about transfers to
17   Christina Liew's relatives, but that's it.  And there was also
18   evidence about even the FBI couldn't get a lot of documents out
19   of Singapore or China, and there was talk about treaties and
20   their inability to go there, et cetera.
21          So I think really it would be the third rail for the
22   Government, and I believe they don't want a mistrial on this
23   case, to say effectively, in one way or another, an innocent
24   person would have come in and explained where the $22 million
25   went; and I'm hopeful that we won't hear that.
```

PROCEEDINGS

1           **MR. HEMANN:**  I can tell you exactly what -- well,

2    maybe not exactly, but largely what we would say.  We would not

3    say that, of course; but we certainly plan on talking about how

4    there's not a scrap of evidence that was seized in the

5    United States regarding the validity of these companies that

6    were -- to which the money was transferred.

7           So our focus would be on -- and Special Agent Ho testified

8    to that -- would be on the evidence that exists in the

9    United States.  We're not going to suggest that the Defense

10   should have or could have, you know, gotten evidence from a

11   particular place unless that argument is invited in the Defense

12   closing.

13          **THE COURT:**  Well, first of all, I don't want to

14   micromanage the closing arguments.  I'm almost sorry I raised

15   this question, because we can get -- we can sort of rehearse

16   the closing, and I can give you my proposed rulings on

17   objections, but then we'd be here for seven or eight hours.  So

18   I understand that.

19          I'm not one that is big on the rule of invited error.

20   I've seen it talked about, and the Ninth Circuit doesn't have

21   very much sympathy for that from the Government, having been

22   the subject of that myself, not inviting the error but somebody

23   inviting the Court to commit error, and the Court saying -- the

24   Ninth Circuit saying the Court did commit error and accepted

25   the invitation.  And they said, "Too bad.  That's the way it

**PROCEEDINGS**

1    goes."

2        So I'm not -- we have very good lawyers here.  I don't

3    expect any problem with going over the line.  And what I don't

4    want to hear, just I'll tell you, I don't expect to hear lots

5    of objections, especially in the rebuttal, where there's no

6    evidence of that.  Because then it just makes -- I usually just

7    say, "ladies and gentlemen, your recollection controls."

8        If somebody makes up a witness or a document that doesn't

9    exist, or something like that, then I will -- you don't even

10   have to object.  I'll be all over them.  So I follow that.

11       But don't -- I'm not big on objections in closing unless

12   something really -- something borders -- or is or borders on

13   misconduct, and I don't expect that.  Vouching in, for example,

14   I see so much of that and there's never an objection.  It just

15   makes my hair stand on end, those kind of things.  Asking the

16   jury to put themselves in the place of one of the parties is so

17   obviously wrong and nobody objects to it, so I don't do

18   anything about it.

19       All right.  So the next order of business will be, you

20   know, we'll hear what you have to say.  And if you're not going

21   to file anything, rather than just let the deadline slip, just

22   file something that says, "The Court is informed that the

23   defendants will rely on the instructions proposed."

24       **MR. FROELICH:**  Your Honor, can I go back to the

25   instructions for just one second?

```
 1            THE COURT:  Yes.

 2            MR. FROELICH:  It dawned on me, I was looking at some

 3   of the exhibits, that on, for example, 161 and 162, the

 4   Government's Exhibits 161 and 162, stamped on the exhibits

 5   there is a confidentiality that we agreed upon.  It was a C-1.

 6   We agreed to certain documents.

 7            And I would like, it just dawned on me this morning, quite

 8   frankly, I would like some type of instruction that that is not

 9   part of the document or something to be considered by the -- by

10   the -- that that was by agreement of counsel and not part of

11   the document itself and something that should not be

12   considered.

13            THE COURT:  All right.  Mr. Hemann?

14            MR. HEMANN:  I think many, many documents have Bates

15   numbers on them of one sort or another; and we certainly would

16   not object to an instruction by the Court saying, "In many

17   instances you will see Bates numbers on the bottom corner of

18   the documents."

19            THE COURT:  Mr. Froelich is not talking about Bates

20   numbers.

21            MR. FROELICH:  I don't care about Bates numbers.

22            THE COURT:  The term "confidential" as having been --

23            MR. GASNER:  I'm not sure whether the C-1 material

24   still has a legend on the original.

25            MR. HEMANN:  A legend, we would agree, should be
```

**PROCEEDINGS**

 1    redacted, a legend provided by us --

 2         **MR. FROELICH:**  Right.

 3         **MR. HEMANN:**  -- or provided by --

 4         **THE COURT:**  Well, it's not going to be redacted.  I

 5    will give an instruction that says -- and I don't know how to

 6    do this.  In theory it would say:  There are certain documents

 7    that are marked confidential.  They were -- you know, they were

 8    marked for purposes of the litigation and not --

 9         **MR. HEMANN:**  Your Honor, let me make a suggestion.

10    This is an area that's just -- it's going to be different for

11    every document.  We've just heard about this.  We're happy to

12    work with Mr. Froelich.

13         **THE COURT:**  Take a look at it.  I understand

14    Mr. Froelich's point because if a document that the defendants

15    claim, even one that was marked in the ordinary course of

16    business as, you know, supersecret or whatever, they contend,

17    "Well, that doesn't meet -- that's not legal," then that may be

18    part of one element what DuPont did to protect.

19         But if they see it on a lot of documents, the totality of

20    the throw weight of it might be, "Oh, you know, these are

21    really secret confidential documents."  And if they were

22    stamped in the litigation itself, the jury has a right to know,

23    "Hey, that's not the way they were kept in the ordinary

24    course."

25         **MR. HEMANN:**  Absolutely, Your Honor.  I don't think --

PROCEEDINGS

1  I think that the real issue is that some of them bear what

2  looks like -- what will look to the jury like a Bates number

3  that says C dash blah, blah, blah, but they're not going to

4  know what the "C" means.

5          THE COURT:  I think that would be overworrying this

6  case.

7          MR. FROELICH:  I don't worry about that.  It's just

8  when I saw the confidentiality.

9          THE COURT:  All right.  Well, why don't you guys and

10 ladies talk about it.

11         MR. HEMANN:  We'll work it out.

12         MR. FROELICH:  We'll talk about it.

13         THE COURT:  Thank you.  I'll see you on Tuesday.  Have

14 a great weekend, everybody.

15         ALL:  Thank you, Your Honor.

16         THE COURT:  The Court will take a few minutes to get

17 ready for the next case.

18              (Proceedings adjourned at 9:01 a.m.)

19                        ---oOo---

20

21

22

23

24

25

1

2

3                    **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5  from the record of proceedings in the above-entitled matter.

6

7  DATE:   Friday, February 14, 2014

8

9

10

11  _____

12        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25