Volume 23

Pages 4282 - 4470

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jeffrey S. White, Judge

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
   VS.                          )      NO. CR 11-00573 JSW
                                )
WALTER LIEW; ROBERT MAEGERLE;   )
and USA PERFORMANCE TECHNOLOGY,)
INC.,                           )
                                )
            Defendants.         )
_____)
                          San Francisco, California
                          Monday, February 24, 2014

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

                    MELINDA HAAG
                    United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
            BY:  **PETE AXELROD**
                 **JOHN H. HEMANN**
                 **ASSISTANT UNITED STATES ATTORNEYS**

                    U.S. DEPARTMENT OF JUSTICE
                    600 E Street NW
                    Washington, D.C.  20044
            BY:  **RICHARD S. SCOTT**
                 **ASSISTANT U.S. ATTORNEY**


        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
              Official Reporters

1    **APPEARANCES**:   **(CONTINUED)**

2    For Defendant Walter Liew and USA Performance Technology, Inc.:
                         KEKER & VAN NEST LLP
3                        633 Battery Street
                         San Francisco, California  94111
4              **BY:   STUART L. GASNER**
                     **SIMONA A. AGNOLUCCI**
5                    **KATHERINE M. LOVETT**
                     **CHRISTINA BLAIS**
6                    **ATTORNEYS AT LAW**

7    For Defendant Robert J. Maegerle:
                         MCKENNEY & FROELICH
8                        1349 West Peachtree Street
                         Two Midtown Plaza - Suite 1250
9                        Atlanta, Georgia  30309
              **BY:   JEROME J. FROELICH, JR.**
10                   **ATTORNEY AT LAW**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2    Monday, February 24, 2014

3                                                **PAGE   VOL.**

4    Jury Instructions                            4303   23
     Closing Argument by Mr. Axelrod              4342   23
5    Closing Argument by Mr. Gasner               4429   23

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1   <u>**Monday - February 24, 2014**</u>                    <u>**7:04 a.m.**</u>

 2                    P R O C E E D I N G S

 3                        ---000---

 4      (Proceedings were heard out of the presence of the jury:)

 5         **THE COURT:**  Good morning, everybody.  Please be

 6   seated.

 7         Please call the case.

 8         **THE CLERK:**  Calling Case Number CR-11-573,

 9   United States versus Walter Liew, United States versus Robert

10   Maegerle, and United States versus USAPTI.

11         Counsel, please state your appearances.

12         **MR. HEMANN:**  Good morning, Your Honor.  John Hemann,

13   Pete Axelrod, and Richard Scott for the United States.

14         **THE COURT:**  Good morning.

15         **MR. GASNER:**  Good morning, Your Honor.  Stuart Gasner,

16   Simona Agnolucci, and Katie Lovett for defendants USAPTI and

17   Walter Liew who is present.

18         **THE COURT:**  Good morning, everybody.

19         **MR. FROELICH:**  Good morning, Your Honor.  Jerry

20   Froelich for Mr. Maegerle who's standing right next to me.

21         **THE COURT:**  Good morning.  Have a seat, everybody.

22      So we've had a few activities occur since we last met, one

23   of them hopefully is behind us, and that is the Court's

24   absence; and we've got some additional filings.

25      And what I'm going to do is, is I want to do, having

1   reviewed everything -- I'm not going to entertain a whole lot

2   of argument, but what I am going to do is, basically, tell you

3   where I am.

4       We sent out yesterday, Sunday afternoon, an updated draft

5   of instructions with bold type in there just to give you a

6   preview, if you had an opportunity to read it between then and

7   now, where the Court is inclined to go with the various

8   objections, typos, and the like.

9       And before we close -- you know, it's interesting with a

10  fresh pair of eyes looking at these instructions, we had found

11  additional typos and a structural issue regarding aiding and

12  abetting, which has now been addressed.  So maybe the time off

13  was well taken.

14      So in addition to the issues raised by the parties in

15  their briefs, as I mentioned, the Court has found additional

16  typographical errors in the last version of the instructions

17  before the one that we sent out yesterday afternoon, which we

18  have corrected.

19      And for ease of reference, we've distributed the updated

20  version of the intended final instructions, which sets forth

21  these changes -- or those changes in bold text.  So hopefully

22  you've had a chance to go through those.

23      I intend to give the Government's proposed instruction on

24  aiding and abetting for Count 14, and I've added that

25  instruction immediately following the instruction for the

1    substantive offense, which I think is what the Government has

2    requested.

3         Correct, Mr. Hemann?

4         **MR. HEMANN:**  That is correct, Your Honor.

5         **THE COURT:**  Okay.  Now, the Court has read and

6    considered Mr. Maegerle's renewed objection to the lack of a

7    good faith instruction, which was Docket Number 773, and the

8    Court again overrules the objection.  Mr. Maegerle has not

9    demonstrated that the jury instructions as a whole fail to

10   adequately instruct the jury on the elements of intent and

11   knowledge.

12        Further, the Ninth Circuit clearly stated in *United States*

13   *versus Shipsey* that, quote:  (reading)

14            "Notwithstanding the normal rules of governing theory

15        of defense request, the failure to give an instruction on

16        a good faith defense is not fatal so long as the Court

17        clearly instructed the jury as to the necessity of

18        specific intent as an element of a crime," unquote.

19        And that's *Shipsey*, 363 Fed. 3d 962 at 967, which was

20   decided by the Ninth Circuit in 2004.

21        Now, moving on to Mr. Maegerle's objection to the,

22   quote/unquote, trade secret instruction, there are five trade

23   secrets set forth in the Indictment.  And putting aside the

24   issue of Mr. Maegerle's request that the Court define "owner"

25   and his argument that, at least in part, there is an issue that

**PROCEEDINGS**

 1    the jury must decide about ownership of one or more of the

 2    trade secrets, my question, and I'll start with you,

 3    Mr. Froelich, do you concede that DuPont owns any of the five

 4    trade secrets alleged in the Indictment?

 5            **MR. FROELICH:**  No, Your Honor, I wouldn't because I

 6    think it's an element that has to be proved by the -- excuse

 7    me, Your Honor -- I think it's an element that has to be

 8    proved, and I don't think I would stipulate to any element.  I

 9    think that it has to be -- I think that instruction has to be

10    given.  It's an element that has to be found by the jury no

11    matter what.

12        You would -- like in a cocaine case, you would have to

13    know that it is a Schedule I narcotic even if the evidence was

14    that night.  I believe, Your Honor, that since it's an element,

15    that I would not, you know, concede that.

16            **THE COURT:**  All right.  Do you have anything to say to

17    that, Mr. Hemann?

18            **MR. HEMANN:**  Not on that point.  I think that the

19    Government's concern with regard to the ownership discussion is

20    that there's not evidence in the record that anybody else owns

21    any of the trade secrets, and the Indictment alleges that they

22    are DuPont trade secrets.

23        The jury -- I do agree with Mr. Froelich that the jury

24    would necessarily have to conclude that they were DuPont trade

25    secrets even under the jury instructions that the Court had

**PROCEEDINGS**

 1   initially proposed.

 2       I'd note for Your Honor that the parties all relied on the

 3   *Lan Lee* instructions, and the *Lan Lee* instructions allege or

 4   instructed the jury that it was the company's -- the name of

 5   the company's trade secrets that were at issue.

 6       I think our concern is that the ownership instruction that

 7   Mr. Froelich raised is not really supported by the evidence and

 8   that there's an alternative to DuPont; and it might make it a

 9   bit more confusing to the Government, although I don't think

10   the way the Court articulated it much more -- I'm sorry, more

11   confusing to the jury.  I don't think the way that the Court

12   articulated them is confusing.  I just think it's more

13   confusing than the earlier instructions that the parties agreed

14   upon.

15       **THE COURT:**  Well, I think Mr. Froelich has a point

16   with respect to whether or not it is -- that ownership rises to

17   the level of an element, as that term is frequently used, and

18   the Court separately sets out element.

19       Since it is -- there is some evidence, and there was in

20   the testimony, and some dispute about whether, perhaps, at some

21   point, even assuming DuPont actually owned all the trade

22   secrets, they may have alienated one or more.  So rather than

23   get into a lot of what I think will be more jury argument about

24   the ownership, I'm inclined to add the following language to

25   the end of the trade secret -- the, quote, "Trade Secrets

**PROCEEDINGS**

 1   Alleged in the Indictment" instruction.  And this is actually

 2   already embodied in the latest draft.

 3       Quote:  (reading)

 4           "In addition, the Government alleges that DuPont is

 5       the owner of each of the five alleged trade secrets.  I

 6       will define the term 'owner' for you later in these

 7       instructions."

 8       So I've, essentially, sustained Mr. Froelich's --

 9   Mr. Maegerle's objections, and will use the statutory

10   definition; and then the parties are free to argue the state of

11   the evidence to the jury about the issue of ownership.

12       Is that satisfactory, Mr. Froelich?

13           MR. FROELICH:  Yes, it is, Your Honor.

14           THE COURT:  All right.  Thanks for pointing that out.

15   It's kind of one of those things --

16           MR. FROELICH:  I'm sorry it was so late.  Before when

17   I started -- before I make arguments and do anything, I go back

18   and read the statute and the instructions, and I just -- you

19   know, it caught me.

20           THE COURT:  All right.  Well, you have a right, you

21   know, to object up to the last minute so I'm not going to fault

22   you for that.

23       Now, in order to better track the statutory language and

24   to address Mr. Maegerle's objection that we've just been

25   referring to, the Court is inclined to modify the instructions

1  on the trade secret charges so that they are drafted in a

2  fashion -- so they are not drafted in a fashion, not drafted in

3  a fashion, that presumes DuPont is the owner; and hopefully the

4  instructions, the way the Court redrafted them yesterday with

5  the changes in bold, will satisfy Mr. Maegerle's concern.

6      Do you agree with that?

7          MR. FROELICH:  Yes, Your Honor.  I've read it.

8          THE COURT:  Okay.  So the Court knows that this would

9  make these instructions consistent with the instructions for

10  Counts 6, 7, 8, and 9, which use the term "owner" not "DuPont."

11  So that's the consistency that the Court has hopefully put into

12  the instructions.

13      And I am inclined to add an instruction defining the term

14  "owner" immediately following the instruction defining the term

15  "trade secret," which is what I have done.  And, again, I would

16  define this term as it is defined in 18 United States Code,

17  Section 1839, sub (4); namely, quote:  (reading)

18          "The term 'owner' with respect to a trade secret

19      means the person or entity in whom or in which rightful,

20      legal, or equitable title to or license in the trade

21      secret is reposed."

22      So I've just simply grafted the statutory language.

23      And I assume that's satisfactory to you?

24          MR. FROELICH:  It is, Your Honor.

25          THE COURT:  All right.  Now, I want to turn to the

**PROCEEDINGS**

1   verdict form.

2       Well, first of all, before we get to the verdict form, did

3   anybody find any additional typos or any other errors before we

4   go to, as I say, final press here?

5           MR. HEMANN:  No, Your Honor.

6           THE COURT:  Okay.

7           MS. LOVETT:  Your Honor, if I may briefly, while we

8   generally agree with the new approach to the term "owner" in

9   the instructions, we're a little bit concerned by page 27 of

10  the Court's proposed instructions.

11      In the second paragraph there and in the third paragraph,

12  the Court has removed "DuPont's" from those formulations.  It

13  hasn't replaced it with "owner's," first of all; but, more

14  importantly, what is charged in this count is DuPont's titanium

15  dioxide process.  That is Trade Secret 1, and we would like the

16  word "DuPont" to stay in those two paragraphs.

17          THE COURT:  All right.  Mr. Maegerle -- Mr. Froelich,

18  is that satisfactory?  That is what the Indictment charges, and

19  you're free to argue that DuPont didn't own it; but that's --

20          MR. FROELICH:  Yes, Your Honor.

21          THE COURT:  All right.  So we'll leave "DuPont" in

22  there.

23          MS. LOVETT:  And, Your Honor, the same is true on

24  page 24.

25          THE COURT:  And also page 27, the last paragraph

4293

**PROCEEDINGS**

 1   starting at line 13 also has "DuPont" to be removed.  So now it

 2   will not be removed to be consistent; correct?

 3            **MS. LOVETT:**  Yes, Your Honor.

 4            **THE COURT:**  All right.  What was the next one?

 5            **MS. LOVETT:**  If you look back at page 24, we believe

 6   that "DuPont" should probably stay in that paragraph A and

 7   paragraph B as well.

 8            **THE COURT:**  All right.

 9            **MS. LOVETT:**  "Belonging to DuPont."

10            **THE COURT:**  Mr. Froelich, do you have an objection to

11   that?

12            **MR. FROELICH:**  I need to see the instruction.

13            **THE COURT:**  Page 24, starting at line 13, the

14   subsections there which the Court has bolded, "belonging to

15   DuPont."

16            **MR. FROELICH:**  Yes, Your Honor, "belonging to DuPont."

17            **THE COURT:**  Okay.  So we'll leave that in there.

18        Anything further?

19            **MR. HEMANN:**  Can I have one moment, Your Honor?

20            **THE COURT:**  Sure.

21            **MR. HEMANN:**  I'm not quite sure which side to be on

22   here.

23                         (Laughter)

24                    (Pause in proceedings.)

25            **MS. LOVETT:**  Your Honor, while they confer --

1    **THE COURT:**  Please don't.  It's not fair for them.

2    **MS. LOVETT:**  Okay.

3    **MR. HEMANN:**  So I just -- I think it might be a good

4    idea, Your Honor, to go through starting, and I'm sorry for

5    taking the Court's time on this, so Count 1 "belonging to

6    DuPont" would stay in at A and B.

7    **THE COURT:**  Correct.

8    **MR. HEMANN:**  On page 20 --

9    **THE COURT:**  And I assume that in order to

10   accommodate -- well, to accommodate Mr. Froelich's concern,

11   we'll leave in the bold on line 19 on page 24 that says:

12   (reading)

13        "Again, the Government alleges that DuPont is the

14        owner, as I have defined that term, of each of the trade

15        secrets alleged in the Indictment."

16   That way it makes it consistent.

17   **MR. HEMANN:**  Yes, Your Honor.

18   **MR. FROELICH:**  Yes, Your Honor.

19   **MS. LOVETT:**  Yes, Your Honor.

20   **THE COURT:**  All right.

21   **MR. HEMANN:**  And then on page 27, "DuPont," the word

22   "DuPont" in the second paragraph, and "DuPont's" in the third

23   paragraph will remain in.

24   **THE COURT:**  Correct.

25   **MR. HEMANN:**  And then the same word choice will then

PROCEEDINGS

```
 1    be applied in Count 2 on page 28 in A and B, "belonging to
 2    DuPont" will stay in.
 3        And then down at the bottom it says "to the economic
 4    benefit of someone other than..."  I don't know --
 5            MS. LOVETT:  We're fine with that staying "as the
 6    owner of the trade secret."
 7            MR. HEMANN:  I think we should be consistent,
 8    Your Honor.
 9            MS. LOVETT:  All right.  Mr. Gasner, I defer to him,
10    he would like "DuPont" there.
11            THE COURT:  Yes, "DuPont" is fine?
12            MR. GASNER:  Yes.
13            THE COURT:  Is that fine with you?
14            MR. FROELICH:  Yes, Your Honor.  I just wanted to make
15    sure that the element of the ownership was in.
16            THE COURT:  Okay.  And we've done that.  I think
17    you're right, and thanks to Mr. Gasner for making it a little
18    easier.
19        All right.
20            MR. HEMANN:  And then at page 29 there, the two
21    references to "DuPont" in what would be the third and the
22    fourth paragraph.
23            THE COURT:  Okay.
24            MR. HEMANN:  And then in Count 3 on page 32, I would
25    assume, to be consistent, "belonging to DuPont" would stay in.
```

**PROCEEDINGS**

1          **THE COURT:**  All right.

2          **MR. HEMANN:**  And then on page 33, the references to

3   "DuPont" in Count 5 would stay.

4          **MR. GASNER:**  Yes.

5          **MR. FROELICH:**  Yes.

6          **THE COURT:**  All right.  That's fine.

7          **MR. HEMANN:**  Let me just -- if I have one -- I think

8   that's it, Your Honor.

9          **THE COURT:**  Okay.  So that's it for the instructions.

10      Let me just turn briefly to the special -- yes?

11         **MR. FROELICH:**  Your Honor, may I ask one question?

12         **THE COURT:**  Yes.

13         **MR. FROELICH:**  Are you going to give -- I thought it

14   was very good -- an index to the jury?

15         **THE COURT:**  Yeah, Table of Contents.

16         **MR. FROELICH:**  Table of Contents is what I meant.

17         **THE COURT:**  Yes.  I don't usually read, and I won't

18   read the headings because I don't want to give them any -- but

19   they'll have them there so they can find them.  Yes, we'll have

20   a Table of Contents for the instructions.

21         **MR. HEMANN:**  And, Your Honor, will we have a paper

22   copy of them before?

23         **THE COURT:**  Oh, yeah.  As soon as we adjourn --

24         **MR. HEMANN:**  Thank you, Your Honor.

25         **THE COURT:**  -- we're going to make copies and give

PROCEEDINGS

1  them to you folks as well as make them for the jury.

2          **MR. HEMANN:**  Thank you very much, Your Honor.

3          **THE COURT:**  All right.  So with respect to the verdict

4  form, the Court has distributed the proposed verdict form,

5  which is drawn from the parties' proposal.

6      At the parties' request the Court will not differentiate

7  between the substantive offense and the aiding-and-abetting

8  liability theory of liability for Counts 8 and 14; and the

9  Court has removed the references to "aiding and abetting" and

10  "18 United States Code, Section 2" in those counts.

11      Is that what you requested?

12          **MR. HEMANN:**  Indeed, Your Honor.  Thank you.

13          **THE COURT:**  Is that fine with the defendants?

14          **MS. LOVETT:**  Yes, Your Honor.

15          **MR. FROELICH:**  That's the law, Your Honor.  I mean, I

16  looked at it.

17          **THE COURT:**  All right.  So that's basically it.  We're

18  going to go make the copies.  We'll get advanced copies out to

19  you, and then we'll get them to the jury, and then we'll get

20  ready to go as soon as the jury is here.

21      And I'm going to tell them, as I mentioned last time, that

22  we have a certain amount to finish today without regard to the

23  time limits that we have so that everybody is accommodated and

24  nobody gets an unfair disadvantage or advantage so they won't

25  be prepared to start looking at their watches at 1:30.

**PROCEEDINGS**

1          **MR. FROELICH:**  Your Honor, may I ask, will the Court

2    inquire today on the schedule the jury likes to keep?

3    Obviously -- I believe the Court was talking about being dark

4    on Thursday and Friday.  If that's true and the jury wants to

5    go home, then obviously I can go home; but if not --

6          **THE COURT:**  Well, the jury won't be dark Thursday

7    because the Court -- the jury will be deliberating Thursday

8    presumably.

9          **MR. FROELICH:**  Okay.

10          **THE COURT:**  Friday is up to them; and I will at some

11   point during the -- I don't want to -- I think maybe tomorrow

12   sometime I'll ask them to take a poll to see whether they want

13   to sit on Friday.  I won't be here on Friday, actually, but

14   it's -- what?

15          **THE CLERK:**  You're not here Thursday as well.

16          **THE COURT:**  Thursday afternoon.  I'm leaving at

17   2:00 o'clock --

18          **THE CLERK:**  Okay.

19          **THE COURT:**  -- or 1:30.  So we can deliberate

20   Thursday.

21          **THE CLERK:**  Okay.

22          **THE COURT:**  If there's a verdict, it's perfectly

23   acceptable for another judge to participate in that.

24          **THE CLERK:**  You'll need to let the jurors know

25   Thursday because their schedule shows no court Thursday.

**PROCEEDINGS**

1     **THE COURT:**  Right.  Okay.  Well, I'll mention that as

2   soon as they come out today, that in light of recent events,

3   they'll be deliberating on Thursday.

4       All right.  We'll see you as soon -- yes?

5           **MR. GASNER:**  One quick comment on the schedule.

6           **THE COURT:**  Yes.

7           **MR. GASNER:**  I took to heart the Court's trial

8   advocacy comments about a shorter closing.  The comments I got

9   when I was practicing was, "You didn't address this count in

10   enough detail"; and there are a lot of counts, as the Court

11   knows.  And, so, my closing is closer to three hours than two,

12   as I had predicted.

13       And I just leave that to the Court's discretion in terms

14   of how late we're going to go today.  If the Court is willing

15   to break up the day, that would still be my preference; but I

16   just want to alert the Court that mine is going to go a little

17   longer than I anticipated, and I hope not to drive the court

18   reporter crazy by solving the problem by just talking faster,

19   and I think it probably will go three hours.

20           **THE COURT:**  All right.  What's the Government's -- how

21   long do you think you're going to go?

22           **MR. AXELROD:**  I think probably a little over two

23   hours, maybe two hours, ten minutes.  That's about it.

24           **THE COURT:**  Okay.  So that would take us to, roughly,

25   with a break, well, with the Court's instructions, by 11:00 and

**PROCEEDINGS**

1    then three hours would be -- I think without pushing, we could

2    be done by 2:30, quarter to 3:00.

3        And if I set their expectations that way, they'll

4    understand.  Because what I don't want to do, I'm really

5    reluctant to break up your closing, you know, into pieces

6    because I think it really -- tactically it's a problem, and

7    it's also not good for the jury.  Let them hear it all.

8        And we'll take a number of breaks and we'll just -- you

9    know, we won't set their expectations too early.  We'll just

10   say it's going to go as long as it's going to go.

11          MR. GASNER:  I think realistically with breaks, it

12   could go closer to 3:00, 3:30.  I agree with the Court.  As

13   long as the jurors' expectations are calibrated, we'll do what

14   we can, but I just don't want to be in a position where I'm in

15   overtime in one of the more important parts of my closing

16   towards the end.

17          THE COURT:  No, there won't be any -- you know, I will

18   tell them that the time limits are -- you know, especially

19   given we lost a week, we're going to move it, you know, in a

20   different way and then we'll see where we go.  But I'm going to

21   tell them that.

22          MR. GASNER:  Thank you, Your Honor.

23          MR. HEMANN:  Thank you, Your Honor.

24          THE COURT:  And we'll take a number of breaks so they

25   won't feel like they're just squished there.

1       Yes, Ms. Agnolucci?

2           **MS. AGNOLUCCI:**  Your Honor, one very small

3   housekeeping matter about exhibits.

4           **THE COURT:**  Yes.

5           **MS. AGNOLUCCI:**  If you'll recall at the end, we

6   admitted a number of binders and collections of papers through

7   our paralegals, and the parties have agreed that there are two

8   pages in one of those collections that contain very private

9   medical information that we would like to remove.  Those are

10  pages 63 and 64 of Exhibit 1132.  And I just wanted to get that

11  on the record given that there have been stipulations about the

12  exhibits.

13      Would Your Honor need a written stipulation or can we do

14  this orally?

15          **THE COURT:**  Oh, no.  If the parties stipulate to

16  remove those pages, the record will so reflect.  You don't have

17  to do any more writings.

18          **MR. HEMANN:**  And we do, Your Honor.

19          **THE COURT:**  Okay.  Very well.

20          **MS. AGNOLUCCI:**  Thank you, Your Honor.

21          **THE COURT:**  Just make sure they don't go to the jury.

22          **MR. HEMANN:**  Thank you, Your Honor.

23          **THE COURT:**  All right.  Then as soon as we're done

24  with the copies and the jurors get here, then we'll get

25  started.

**PROCEEDINGS**

1      (Recess taken at 7:24 a.m.)

2      (Proceedings resumed at 8:04 a.m.)

3    (Proceedings were heard out of the presence of the jury:)

4        **THE COURT:** All right. Please bring in the jury.

5    (Proceedings were heard in the presence of the jury:)

6        **THE COURT:** Please be seated.

7      A belated welcome back. Sometimes even the Energizer

8    Bunny needs to be recharged, so that's where we are.

9                    (Laughter)

10       **THE COURT:** So we're going to proceed apace. We're

11   going to start off, as we were going to do last Tuesday, with

12   the Court giving you your final instructions as to the law, and

13   then we will begin the process of closing arguments by counsel.

14       We'll discuss, in light of last week's events, scheduling

15   later on; but what I intend to do is give you the instructions,

16   and then we'll take a stretch break, and then we'll begin with

17   the Government's closing argument.

18       I have provided you with copies of the instructions as was

19   the case with the preliminary instructions. You have your own

20   copies. You can either read along with the Court or just

21   listen to the Court, but I prefer that you not read ahead so

22   that I and the parties are assured that you're hearing all of

23   the instructions.

24       And this time we have given you a Table of Contents so

25   that when you go to deliberate, you'll have the ability to

1    retrieve officially instructions that you would like to refer

2    to.

3        So the instructions of the Court are as follows -- and, by

4    the way, you'll see there's a few at the end, which I'm not

5    going to read to you now because they are more

6    housekeeping-type instructions, which I'll give you after the

7    parties finish their closing arguments that has to do with your

8    deliberations.

9        And I don't read the captions or the bold at the top.

10   Those are just really to track to the Table of Contents for

11   your use during deliberations.

## JURY INSTRUCTIONS

13       **THE COURT:** Members of the jury, now that you have

14   heard all of the evidence, it is my duty to instruct you on the

15   law that applies to this case. A copy of these instructions

16   will be available in the jury room for you to consult, and you

17   actually have them now out in the jury box.

18       It is your duty to weigh and to evaluate all the evidence

19   received in the case and, in that process, to decide the facts.

20   It is also your duty to apply the law as I give it to you to

21   the facts as you find them, whether you agree with the law or

22   not. You must not decide the case solely -- you must decide

23   the case, you must decide the case solely on the evidence and

24   the law and must not be influenced by any personal likes or

25   dislikes, opinions, prejudices, or sympathy. You will recall

1    that you took an oath promising to do so at the beginning of

2    the case.

3        You must follow all these instructions and not single out

4    some and ignore others.  They are all important.  Please do not

5    read into these instructions or into anything I may have said

6    or done any suggestion as to what your verdict -- as to what

7    your verdict -- as to what verdict you should return.  That is

8    a matter entirely up to you.

9        An Indictment is not evidence.  Each defendant has pleaded

10   not guilty to the charges.  Each defendant is presumed to be

11   innocent unless and until the Government proves the defendant

12   guilty beyond a reasonable doubt.

13       In addition, each defendant does not have to testify or

14   present any evidence or prove innocence.  The Government has

15   the burden of proving every element of the charges beyond a

16   reasonable doubt.

17       Proof beyond a reasonable doubt is proof that leaves you

18   firmly convinced a defendant is guilty.  It is not required

19   that the Government prove guilt beyond all possible doubt.

20       A reasonable doubt is doubt based upon reason and common

21   sense, and is not based on -- is not based purely on

22   speculation.  It is the kind of doubt that would make a

23   reasonable person hesitant to act in a matter of importance in

24   his or her personal life.  It may arise from a careful and

25   impartial consideration of all the evidence or from lack of

1   evidence.

2       If, after a careful and impartial consideration of all the

3   evidence, you are not convinced beyond a reasonable doubt that

4   a defendant is guilty, it is your duty to find that defendant

5   not guilty.

6       On the other hand, if, after a careful and impartial

7   consideration of all the evidence, you are convinced beyond a

8   reasonable doubt that a defendant is guilty, it is your duty to

9   find that defendant guilty.

10      You are here only to determine whether the defendants are

11  guilty or not guilty of the charges in the Indictment.  The

12  defendants are not on trial for any conduct or offense not

13  charged in the Indictment.

14      The fact that USA Performance Technology, Inc., or USAPTI

15  is a corporation should not affect your verdict.  Under the

16  law, a corporation is considered a person, and all persons are

17  equal before the law.  Corporations are entitled to the same

18  fair and conscientious consideration by you as any other

19  person.

20      A separate crime is charged against one or more of the

21  defendants in each count.  The charges have been joined for

22  trial.  You must decide the case of each defendant on each

23  crime charged against that defendant separately.  Your verdict

24  on any count as to any defendant should not control your

25  verdict on any other count or as to any other defendant.

1    All the instructions apply to each defendant and to each

2 count unless a specific instruction states that it applies only

3 to a specific defendant or to a specific count.

4    The evidence you are to consider in deciding what the

5 facts are consists of:

6    1.  The sworn testimony of any witness; and,

7    2.  The exhibits received in evidence; and,

8    3.  Any facts to which the parties have agreed.

9    The parties have agreed to certain facts that have been

10 stated to you.  You should, therefore, treat these facts as

11 having been proved.

12    During the trial, the Government periodically informed the

13 Court and the jury that a particular witness would be providing

14 evidence related only to certain defendants or to certain

15 counts.  It also periodically informed the Court and the jury

16 that a particular exhibit applied only to certain defendants or

17 certain counts.

18    If the Government did not provide that information prior

19 to a witness' testimony or prior to the introduction of an

20 exhibit, you should assume that the Government offered the

21 testimony as to all of the defendants and all of the counts.

22    In reaching your verdict, you may consider only the

23 testimony and exhibits received in evidence.  The following

24 things are not evidence and you may not consider them in

25 deciding what the facts are:

**JURY INSTRUCTIONS**

1.   Questions, statements, objections, and arguments by the lawyers are not evidence.  The lawyers are not witnesses.  Although you must consider a lawyer's questions to understand the answers of a witness, the lawyer's questions are not evidence.  Similarly, what the lawyers have said in their opening statements, will say in their closing arguments, and at all other time is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.

2.   Any testimony that I have excluded, stricken, or instructed you to disregard is not evidence.  In addition, some evidence was received only for a limited purpose.  When I've instructed you to consider certain evidence in a limited way, you must do so.

3.   Anything you may have seen or heard when the court was not in session is not evidence.  You are to decide the case solely on the evidence received at the trial.

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is indirect evidence; that is, it is proof of one or more facts from which you can find another fact.

You are to consider both direct and circumstantial

evidence. Either can be used to prove any fact. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

A defendant in a criminal case has a constitutional right not to testify. You must not draw any inference of any kind from the fact that the defendants did not testify.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says or part of it or none of it.

In considering the testimony of any witness, you may take into account:

1. The witness' opportunity and ability to see or hear or know the things testified to;

2. The witness' memory;

3. The witness' manner while testifying;

4. The witness' interest in the outcome of the case, if any;

5. The witness' bias or prejudice, if any;

6. Whether other evidence contradicted the witness' testimony;

7. The reasonableness of the witness' testimony in light of all the evidence; and,

8. Any other factors that bear on believability.

1      The weight of the evidence as to a fact does not

2 necessarily depend on the number of witnesses who testified.

3 What is important is how believable the witnesses were and how

4 much weight you think their testimony deserves.

5      Documents have been admitted into evidence that are

6 written in Chinese.  Each of these documents also has an

7 English translation.  The evidence you are to consider is only

8 that provided through the translations.  Although some of you

9 may read Chinese, it is important that all jurors consider the

10 same evidence.  Therefore, you must accept the evidence

11 presented in the English translations and disregard any

12 different meaning.

13      In addition, some witnesses testified in another language

14 and did so through an official court interpreter.  The evidence

15 that you are to consider and on which you must base your

16 decision is only the English language interpretation provided

17 through official court interpreters.

18      Although some of you may know Chinese, including the

19 Mandarin or Cantonese dialects or Thai, you must disregard any

20 meaning of the non-English words that differed from the

21 official interpretation.

22      You must not make any assumptions about a witness or a

23 party based solely on the use of an interpreter to assist that

24 witness or party.

25      You have heard testimony that one or more of the

1  defendants made certain statements.  It is for you to decide,

2  one, whether the defendant made the statement; and, two, if so,

3  how much weight to give to it.  In making those decisions, you

4  should consider all the evidence about the statement, including

5  the circumstances under which the defendant may have made the

6  statement.

7       You have heard testimony from persons who, because of

8  education or experience, were permitted to state opinions and

9  the reasons for their opinions or testify regarding specialized

10  or technical knowledge.

11       Such testimony should be judged like any other testimony.

12  You may accept it or reject it and give it as much weight as

13  you think it deserves considering the witness' education and

14  experience, the basis given for the testimony, and all the

15  other evidence in the case.

16       During the trial, certain charts and summaries were shown

17  to you in order to help explain the evidence in the case.

18  These charts and summaries were not admitted in evidence and

19  will not go into the jury room with you.  They are not

20  themselves evidence or proof of any facts.  If they do not

21  correctly reflect the facts or figures shown by the evidence in

22  the case, you should disregard those charts and summaries and

23  determine the facts from the underlying evidence.

24       Certain charts and summaries have been admitted in

25  evidence.  Charts and summaries are only as good as the

1  underlying supporting material.  You should, therefore, give

2  them only such weight as you think the underlying material

3  deserves.

4      Counts 1 through 9 of the Indictment reference the

5  following five alleged trade secrets:

6      Trade Secret 1:  The DuPont chloride-route processing --

7  let me start that over again.  The DuPont chloride-route

8  process to manufacture titanium dioxide or TiO2.  Trade

9  Secret 1 includes ways and means in which proprietary and

10  nonproprietary components were compiled and combined by DuPont

11  to form substantial portions of the TiO2 manufacturing process,

12  and Trade Secrets 2 through 5 set forth below.

13      Trade Secret 2:  DuPont Drawing Number W1245258 entitled

14  "Edge Moor Plant Oxidation W/RPS System Drawing."

15      Trade Secret 3:  DuPont Accession Report 18135 titled

16  "Improved Mixing Correlation for the TiCI" -- sorry, let me

17  start that over again -- "for the TiCl4 Oxidation Reaction

18  Computer Model," dated September 7th, 1994, which appended a

19  mathematical equation referred to as the "Diemer correlation,"

20  and related code in the FORTRAN language for a computer model.

21      Trade Secret Number 4:  DuPont Flow Sheet Number EK2411

22  titled "Edge Moor Pigments Plant Flow Sheet - Reaction Area"

23  with handwritten notations.

24      And Trade Secret Number 5:  DuPont document EM-C-8510-0148

25  titled "60,000 Metric Tons Per Year Scope/Basic Data," dated

1   October 31, 1985.  The document has been referred to as the

2   Basic Data Document.

3       The Government has alleged in the Indictment that these

4   terms are trade secrets, and I will use the phrase "Trade

5   Secret Number" for ease of reference throughout these

6   instructions.  However, it is for you, the jury in this case,

7   to determine whether the Government has proved that they are

8   trade secrets; or, as we'll explain later in these

9   instructions, that the defendants reasonably believed them to

10  be trade secrets.

11      In addition, the Government alleges that DuPont is the

12  owner of each of the five alleged trade secrets.  I will define

13  the term "owner" for you later in these instructions.

14      The term "trade secret" means all forms and types of

15  financial, business, scientific, technical, economic, or

16  engineering information, including patterns, plans,

17  compilations, program devices, formulas, designs, prototypes,

18  methods, techniques, processes, procedures, programs, or codes,

19  whether tangible or intangible, and whether or how stored,

20  compiled or memorized physically, electronically, graphically,

21  photographically or in writing if:

22      1.  The owner thereof has taken reasonable measures to

23  keep such information secret; and,

24      2.  The information derives independent economic value,

25  actual or potential, from not being generally known to and not

1    being readily ascertainable through proper means by the public.

2        The term "trade secret" can include compilations of

3    information.  Combinations or compilations of public

4    information from a variety of different sources when combined

5    or compiled in a novel way can be a trade secret.  In such a

6    case, if a portion of the trade secret is generally known or

7    even if every individual portion of the trade secret is

8    generally known, the compilation or combination of information

9    may still qualify as a trade secret if it meets the definition

10   of trade secret set forth in the preceding paragraph.

11       In addition, facts and information acquired by an

12   employee, whether by memorization or some other means, in the

13   course of his or her employment may potentially be trade

14   secrets, but only if they meet the definition of trade secrets

15   set forth above.

16       However, the personal skills, talents, or abilities that

17   an employee develops at his place of employment are not trade

18   secrets.

19       The term "owner" with respect to a trade secret means the

20   person or entity in whom or in which rightful, legal, or

21   equitable title to, or license in, the trade secret is reposed.

22       In Counts 1, 2, 10, and 13, the Government alleges that

23   defendants conspired to commit certain offenses.  This

24   instruction provides you with some general principles regarding

25   the law of conspiracy.  You are to apply all of these general

1  principles to the conspiracies that are charged in Counts 1, 2,

2  10, and 13.

3      A conspiracy is a kind of criminal partnership, an

4  agreement of two or more persons to commit one or more crimes.

5  The crime of conspiracy is the agreement to do something

6  unlawful.  It does not matter whether the crime agreed upon was

7  committed.

8      For a conspiracy to have existed, it is not necessary that

9  the conspirators made a formal agreement or that they agreed on

10  every detail of the conspiracy.  It is not enough, however,

11  that they simply met, discussed matters of common interest,

12  acted in similar ways, or perhaps helped one another.  You must

13  find that there was a plan to commit at least one of the crimes

14  alleged in the Indictment as an object of the conspiracy with

15  all of you agreeing as to the particular crime which the

16  conspirators agreed to commit.

17      One becomes a member of a conspiracy by willfully

18  participating in the unlawful plan with the intent to advance

19  or further some object or purpose of the conspiracy even though

20  the person does not have full knowledge of all the details of

21  the conspiracy.

22      Furthermore, one who has willfully joins -- one who

23  willfully joins an existing conspiracy is as responsible for it

24  as the originators.  On the other hand, one who has no

25  knowledge of a conspiracy but happens to act in a way which

1  furthers some object or purpose of the conspiracy does not

2  thereby become a conspirator.

3      Similarly, a person does not become a conspirator merely

4  by associating with one or more persons who are conspirators,

5  not merely by knowing that a conspiracy -- let me read that

6  sentence again.  I misread that.

7      Similarly, a person does not become a conspirator merely

8  by associating with one or more persons who are conspirators,

9  nor merely by knowing that a conspiracy exists.

10     Walter Liew and USAPTI are charged in Count 1 of the

11  Indictment with conspiring to commit economic espionage in

12  violation of 18 U.S.C., Section 1831(a)(5).  In order for you

13  to find a defendant guilty of this charge, the Government must

14  prove each of the following elements beyond a reasonable doubt:

15     The first element the Government must prove is that

16  beginning in or about 1998 and ending in or about October 2011,

17  there was an agreement between two or more persons to commit at

18  least one crime as charged in Count 1 of the Indictment.

19  Count 1 of the Indictment charges that beginning in or about

20  1998 and continuing until at least October 2011 in the Northern

21  District of California and elsewhere, Walter Liew and USAPTI,

22  with the intent to benefit a foreign government or foreign

23  instrumentality, knowingly combined, conspired, and agreed with

24  others, both known and unknown, to commit two offenses:

25     (a)  To knowingly and without authorization duplicate,

1  sketch, draw, alter, photocopy, replicate, transmit, deliver,

2  send, communicate, or convey trade secrets belonging to DuPont

3  in violation of 18 U.S.C., Section 1831(a)(2); and,

4      (b)  To knowingly receive, buy, or possess trade secrets

5  belonging to DuPont knowing those trade secrets to have been

6  stolen, appropriated, obtained, or converted without

7  authorization in violation of 18 U.S. Code, Section 1831(a)(3).

8      Again, the Government alleges that DuPont is the owner, as

9  I have defined that term, of each of the trade secrets alleged

10 in the Indictment.

11     I will provide you with instruction on the definition of

12 the term "foreign instrumentality" later in these instructions.

13 For ease of reference, the Government alleges that the foreign

14 government is the government of the People's Republic of China;

15 and it alleges that the foreign instrumentalities are:

16 Pangang Group Company Limited or Pangang Group; Pangang Group

17 Steel Vanadium & Titanium Company Limited or PGSVTC;

18 Pangang Group Titanium Industry Company Limited, also known as

19 Pangang Group Titanium; and Pangang Group International

20 Economic & Trading Company or PIETC.

21     I will provide you with a definition of the term

22 "knowingly" later in these instructions.

23     The second element the Government must prove is that the

24 defendant became a member of the conspiracy knowing of at least

25 one of its objects and intending to help accomplish it.

**JURY INSTRUCTIONS**

1    The third element the Government must prove is that one of

2   the members of the conspiracy performed at least one overt act

3   for the purpose of carrying out the conspiracy with all of you

4   agreeing on a particular overt act that you find was committed.

5    The Government alleges that in furtherance of the

6   conspiracy and to accomplish its objects, Walter Liew, USAPTI,

7   and their coconspirators committed the following overt acts,

8   among others:

9    1.  On or about March 15th, 1998, Robert Maegerle sent a

10   facsimile to Walter Liew that contained proprietary and

11   confidential information about DuPont's TiO2 plant costs and

12   personnel data, including information from Trade Secret 5.

13    2.  On or about October 8th, 2005, Robert Maegerle

14   e-mailed Walter Liew a series of photographs from various

15   DuPont facilities that contained proprietary and confidential

16   information about DuPont technologies associated with its

17   chloride-route TiO2 process.

18    3.  On or about November 25th, 2005, Walter Liew, on

19   behalf of Performance Group USA, Inc., entered into a

20   6,180,000-dollar contract on the 30,000 metric tons per year,

21   or MTPY, chloride-route TiO2 project with PIETC on behalf of

22   Jinzhou Titanium Industry Co., Ltd., also known as Pangang

23   Jinzhou.

24    4.  On or about April 17th, 2008, Walter Liew directed

25   Mega International Commercial Bank, also known as Mega Bank, to

1  wire $759,952 to an account at the Development Bank of

2  Singapore, or DBS, in the name of Huadong Equipment Solutions,

3  Pte Limited, or Huadong, over which Walter Liew had signature

4  authority.

5      5.  On or about May 29th, 2008, Walter Liew directed DBS

6  to wire $749,972 from the Huadong account in Singapore to HSBC,

7  in account in Hong Kong belonging to Christina Liew's father, a

8  resident of the People's Republic of China, over which Walter

9  Liew had signature authority.

10     6.  On or about May 30th, 2008, Walter Liew directed the

11  transfer of approximately $670,000 from the HSBC account of

12  Christina Liew's father into a deposit account.

13     7.  On or about July 15th, 2008, Walter Liew and Christina

14  Liew informed Pangang Group Titanium that their drawings would

15  replicate DuPont's DeLisle plant.

16     8.  On or about August 22nd, 2008, Robert Maegerle

17  provided a USAPTI consultant with electronic copies of

18  confidential proprietary DuPont documents during a business

19  trip to the People's Republic of China, including Trade

20  Secret 2, Trade Secret 4, and a set of the photographs

21  described in Paragraph 2 above.

22     9.  On or about October 25th, 2008, Robert Maegerle

23  e-mailed Walter Liew specific information from Trade Secret 5

24  and stated that "the Jinzhou specifications were scaled down"

25  from information from Trade Secret 5.

**JURY INSTRUCTIONS**

10.  In or about July 2009, Robert Maegerle drafted a three-page document entitled "100,000K T/Y TiO2 Chlorinator Design," which referenced specific confidential, proprietary data contained in Trade Secret 5, which he used to scale up for the 100,000 MTPY project.

11.  On or about September 3rd, 2009, Robert Maegerle sent Walter Liew an e-mail containing a specific and confidential figure from Trade Secret 5.

12.  On August 8th, 2010, USAPTI executed a 796,000-dollar contract with PIETC for Pangang Group Chongqing Titanium Industry Co., Ltd., to procure equipment for the 100,000 MTPY project.

13.  In or about November, 2010, Walter Liew provided a portion of Trade Secret 3 to a USAPTI employee.

14.  A USAPTI employee e-mailed himself portions of Trade Secret 3 on February 22nd, 2011; March 4th, 2011; and March 8th, 2011.

15.  On or about July 19th, 2011, Walter Liew and Christina Liew concealed Trade Secret 2 and Trade Secret 4 at their residence in Orinda, California.

16.  On or about July 19th, 2011, Christina Liew attempted to prevent law enforcement from gaining access to a safe-deposit box at Bank of East Asia in Oakland, California, that contained copies of Trade Secret 2 and 4 and the photographs referenced in Paragraph 2 above.

1        An overt act does not itself have to be unlawful.  A

2    lawful act may be an element of a conspiracy if it was done for

3    the purpose of carrying out the conspiracy.  The Government is

4    not required to prove more than one overt act or that the

5    defendant personally did one of the overt acts.  However, to

6    find Walter Liew or USAPTI guilty on this count, you must agree

7    unanimously on at least one particular overt act that was

8    committed.

9        For purposes of this count, it is not necessary for the

10   Government to prove that DuPont trade secrets, one, were

11   actually copied, duplicated, sketched, drawn, altered,

12   photocopied, replicated, transmitted, delivered, sent,

13   communicated, or conveyed without authorization; or, two,

14   received, bought, possessed without authorization.  This is

15   because the crime of conspiracy is the conspiratorial agreement

16   to violate the law, plus, with respect to this count, an overt

17   act taken by one of the members of the conspiracy in

18   furtherance of the agreement.

19       For purposes of this count, it also is not necessary for

20   the Government to prove that the information regarding DuPont's

21   TiO2 process that the alleged conspirators intended to convert

22   was in fact a trade secret.  What is required is proof beyond a

23   reasonable doubt that the defendant and at least one other

24   member of the conspiracy knowingly converted information that

25   they reasonably believed was a trade secret and was being taken

1   for the benefit of a foreign government or foreign

2   instrumentality.  This is because the defendant's guilt or

3   innocence on this charge depends on what he believed the

4   circumstances to be and not what they actually were.

5       Walter Liew, Robert Maegerle, and USAPTI are charged in

6   Count 2 of the Indictment with conspiring to commit theft of

7   trade secrets in violation of 18 U.S. Code, Section 1832(a)(5).

8   This is a different conspiracy than the conspiracy charged in

9   Count 1.  The primary difference is that the intent to benefit

10  a foreign government or foreign instrumentality is not an

11  element of this crime.

12      In order for you to find a defendant guilty of this

13  charge, the Government must prove each of the following

14  elements beyond a reasonable doubt:

15      The first element the Government must prove is that

16  beginning in or about 1998 and ending in or about October 2011,

17  there was an agreement between two or more persons to commit at

18  least one crime as charged in Count 2 of the Indictment.

19  Count 2 of the Indictment charges that beginning in or about

20  1998 and continuing until at least October 2011, in the

21  Northern District of California and elsewhere, Walter Liew,

22  Robert Maegerle, and USAPTI combined, conspired, and agreed

23  with others, both known and unknown, to commit two offenses:

24      (a)  To knowingly and without authorization copy,

25  duplicate, sketch, draw, alter, photocopy, replicate, transmit,

1   deliver, send, communicate, or convey trade secrets belonging

2   to DuPont in violation of 18 U.S. Code, Section 1832(a)(2);

3   and,

4        (b)  To knowingly receive, buy, or possess trade secrets

5   belonging to DuPont knowing those trade secrets to have been

6   stolen, appropriated, obtained, or converted without

7   authorization in violation of 18 U.S. Code, Section 1832(a)(3).

8        Again, the Government alleges that DuPont is the owner, as

9   I have defined that term, of each of the trade secrets alleged

10  in the Indictment.

11       With regard to both of these object offenses, the

12  Indictment alleges that the defendants intended to

13  misappropriate a trade secret that was related to and included

14  in a product; namely, TiO2, that is produced for and placed in

15  interstate or foreign commerce to the economic benefit of

16  someone other than DuPont, and intending and knowing that the

17  offense would injure DuPont.

18       The second element the Government must prove is that the

19  defendant became a member of the conspiracy knowing of at least

20  one of its object and intending to accomplish it.

21       The third element the Government must prove is that one of

22  the members of the conspiracy performed at least one overt act

23  for the purpose of carrying out the conspiracy with all of you

24  agreeing on a particular overt act that you find was committed.

25  In furtherance of the conspiracy and to accomplish its objects,

1    the Indictment alleges that the defendants and the

2    coconspirators committed the overt acts that I previously

3    listed for you in the instructions I provided for Count 1.

4         As with Count 1, for the conspiracy charged in Count 2, it

5    is not necessary for the Government to prove that DuPont's

6    trade secrets, one, were actually copied, duplicated, sketched,

7    drawn, altered, photocopied, replicated, transmitted,

8    delivered, sent, communicated, or conveyed without

9    authorization; or, two, received, bought, or possessed without

10   authorization.  This is because the crime of conspiracy is a

11   conspiratorial agreement to violate the law, plus, with respect

12   to this count, an overt act taken by one of the members of the

13   conspiracy in furtherance of the agreement.

14        As with Count 1, for the conspiracy charged in Count 2, it

15   is not necessary for the Government to prove that the

16   information regarding DuPont's TiO2 process that the alleged

17   conspirators intended to convert was, in fact, a trade secret.

18   What is required is proof beyond a reasonable doubt that a

19   defendant and at least one other member of the conspiracy

20   knowingly converted information that they reasonably believed

21   was a trade secret and was being taken for the economic benefit

22   of someone other than the owner.  This is because the

23   defendant's guilt or innocence on this charge depends on what

24   he believed the circumstances to be, not what they actually

25   were.

1    The term "foreign instrumentality," in quotes, as used in

2 these instructions means an agency, bureau, ministry,

3 component, institution, association, or any legal, commercial,

4 or business organization, corporation, firm or entity that is

5 substantially owned, controlled, sponsored, commanded, managed,

6 or dominated by a foreign government.

7    An act is done knowingly if a defendant is aware of the

8 act and does not act through ignorance, mistake, or accident.

9 You may consider evidence of a defendant's words, acts, or

10 omissions along with all the other evidence in deciding whether

11 a defendant acted knowingly.

12    Walter Liew and USAPTI are charged in Count 3 of the

13 Indictment with attempted economic espionage in violation of

14 18 United States Code, Section 1831(a)(4), and Section 1834

15 period.  Section 1831(a)(4) makes it a crime to attempt to

16 commit economic espionage even if a defendant did not succeed

17 in committing economic espionage.

18    In order for you to find a defendant guilty of this

19 charge, you must find that the Government has proved each of

20 the following elements beyond a reasonable doubt:

21    First, on or about and between 2008 and July 19th, 2011,

22 the defendant knowingly attempted without authorization to

23 copy, duplicate, sketch, draw, alter, photocopy, replicate,

24 transmit, deliver, send, communicate, or convey a trade secret

25 belonging to DuPont, specifically Trade Secret 1.

1    In order to prove attempted economic espionage, the

2   Government is not required to prove that Trade Secret 1 was, in

3   fact, a trade secret.  However, the Government is required to

4   prove the defendant reasonably believed that the information

5   the defendant intended to convert was a trade secret.

6    Second, the defendant intended or knew that the offense

7   would benefit a foreign government or a foreign

8   instrumentality.

9    Third, the defendant did something that was a substantial

10  step to carry out the offense with all of you agreeing as to

11  what constituted the substantial step.  Mere preparation is not

12  a substantial step towards the commission of the crime of

13  attempted economic espionage.

14    To constitute a substantial step, the defendant's act or

15  actions must demonstrate that the crime will take place unless

16  interrupted by independent circumstances.

17    Walter Liew, Robert Maegerle, and USAPTI are charged in

18  Count 5 with attempted theft of trade secrets in violation of

19  18 U.S. Code, Section 1832(a)(4).  Section 1832(a)(4) makes it

20  a crime to attempt to commit trade secret theft even if a

21  defendant did not succeed in committing the crime.

22    In order for you to find a defendant guilty on this

23  charge, you must find that the Government has proved each of

24  the following elements beyond a reasonable doubt:

25    First, on or about September 2008 and July 2019 -- I'm

1    sorry.  Let me start that over again.

2        First, on or about and between 2008 and July 19th, 2011,

3    the defendant knowingly attempted without authorization to

4    copy, duplicate, sketch, draw, alter, photocopy, replicate,

5    transmit, deliver, send, communicate, or convey Trade Secret 1.

6        In order to prove attempted theft of trade secrets, the

7    Government is not required to prove that Trade Secret 1 was, in

8    fact, a trade secret.  However, the Government is required to

9    prove the defendant reasonably believed that the information

10   defendant intended to convert was a trade secret.

11       Second, the defendant intended that the offense would

12   economically benefit someone other than DuPont.

13       Third, the defendant intended or knew that the offense

14   would injure DuPont.

15       Fourth, the offense related to or included a product

16   produced for and placed in interstate or foreign commerce,

17   specifically TiO2.

18       And, fifth, the defendant did something that was a

19   substantial step to carry out the offense with all of you

20   agreeing as to what constituted the substantial step.

21       Mere preparation is not a substantial step toward the

22   commission of the crime of attempted theft of trade secrets.

23   To constitute a substantial step, a defendant's act or actions

24   must demonstrate that the crime will take place unless

25   interrupted by independent circumstances.

1       Walter Liew and USAPTI are charged in Counts 6, 7, and 9

2   of the Indictment with unlawful possession of trade secrets in

3   violation of 18 U.S. Code, Section 1832(a)(3).  In order for

4   you to find a defendant guilty on any of these counts, as to

5   each defendant and as to each count, you must find that the

6   Government has proved each of the following elements beyond a

7   reasonable doubt:

8       First, the items alleged were, in fact, trade secrets as I

9   defined that term for you.  The trade secrets alleged for each

10  count are as follows:

11      For Count 6:  Trade Secret 2;

12      For Count 7:  Trade Secret 3;

13      For Count 9:  Trade Secret 4;

14      Second, the defendant knew that these items were trade

15  secrets;

16      Third, the defendant knowingly received or possessed the

17  trade secrets knowing the same to have been stolen or

18  appropriated, obtained, or converted without authorization;

19      Fourth, the defendant intended to convert the trade

20  secrets to the economic benefit of anyone other than the owner

21  of the trade secrets;

22      Fifth, the defendant knew or intended the offense would

23  injure the owner of the trade secrets; and,

24      Sixth, the trade secret was related to or included in a

25  product that was produced for or placed in interstate or

**JURY INSTRUCTIONS**

1   foreign commerce, specifically TiO2.

2       A person has "possession" of something if the person knows

3   of its presence and has physical control of it or knows of its

4   presence and has the power and intention to control it.  More

5   than one person can be in possession of something if each knows

6   of its presence and has the power and intention to control it.

7       Mere presence at a place or another person possesses a

8   thing or mere knowledge that a thing is possessed by another

9   person is not sufficient to establish that a defendant

10  possessed the object, unless you find that the defendant was

11  jointly in possession and not merely a knowing spectator.

12      Walter Liew, Robert Maegerle, and USAPTI are charged in

13  Count 8 of the Indictment with unlawful copying of trade

14  secrets, specifically the Basic Data Document, in violation of

15  18 U.S. Code, Section 1832(a)(2).

16      In order for you to find a defendant guilty of this

17  charge, you must find that the Government has proved each of

18  the following elements beyond a reasonable doubt:

19      First, the Basic Data Document as alleged -- alleged as

20  Trade Secret 5 was, in fact, a trade secret as I defined that

21  term for you;

22      Second, the defendant knew that the Basic Data Document

23  was a trade secret;

24      Third, the defendant knowingly copied, duplicated,

25  sketched, drew, altered, photocopied, replicated, transmitted,

**JURY INSTRUCTIONS**

1  delivered, sent, communicated, or conveyed the trade secret;

2    Fourth, the defendant intended to benefit -- let me start

3  that over again.

4    Fourth, the defendant intended to convert the trade secret

5  to the economic benefit of anyone other than the owner of the

6  trade secret;

7    Fifth, the defendant knew or intended the offense would

8  injure the owner of the trade secret; and,

9    Sixth, the trade secret was related to or included a

10  product that was produced for or placed in interstate or

11  foreign commerce, specifically TiO2.

12    Walter Liew, Robert Maegerle, and USAPTI are charged in

13  Count 8 of the Indictment with aiding and abetting in violation

14  of 18 U.S. Code, Section 1832(a)(2), copying or using trade

15  secrets without authorization.

16    A defendant may be found guilty of violating 18 U.S.C.,

17  Section 1832(a)(2), even if a defendant personally did not

18  commit the act or acts constituting the crime but aided and

19  abetted in its commission.

20    In order for you to find a defendant guilty of this

21  charge, the Government must prove each of the following

22  elements beyond a reasonable doubt:

23    First, someone committed a violation of 18 U.S. Code,

24  Section 1832(a)(2);

25    Second, the defendant knowingly and intentionally aided,

1    counseled, commanded, induced, or procured that person to

2    commit each element of the crime; and,

3         Third, the defendant acted before the crime was completed.

4         It is not enough that the defendant merely associated with

5    the person committing the crime, or unknowingly or

6    unintentionally did things that were helpful to that person or

7    was present at the scene of the crime.  The evidence must show

8    beyond a reasonable doubt that the defendant acted with the

9    knowledge and intention of helping that person commit a

10   violation of 18 U.S. Code, Section 1832(a)(2).  The Government

11   is not required to prove precisely which defendant actually

12   committed the crime and which defendant aided and abetted.

13        Walter Liew, Robert Maegerle, and USAPTI are charged in

14   Count 10 of the Indictment with conspiracy to obstruct justice

15   in violation of 18 U.S. Code, Section 1512(k).

16        The Government contends that these defendants conspired to

17   file a false Answer to a Complaint filed by DuPont in a civil

18   case in the United States District Court for the

19   Northern District of California.

20        In order for you to find a defendant guilty of this

21   charge, the Government must prove each of the following

22   elements beyond a reasonable doubt:

23        First, beginning on or about April 6th, 2011, and ending

24   in or about May 11th, 2011, there was an agreement between two

25   or more persons to commit obstruction of justice in violation

**JURY INSTRUCTIONS**

1    of 18 U.S. Code, Section 1512(c), as charged in the Indictment.

2    The object of the conspiracy alleged in this count is

3    obstruction of justice in violation of 18 U.S. Code,

4    Section 1512(c).  The elements of this offense are:

5    A defendant obstructed, influenced, or impeded an official

6    proceeding.  An "official proceeding" includes a proceeding

7    before a judge or a court of the United States.

8    A defendant acted corruptly.  A person acts "corruptly" if

9    he or she acts with the purpose of wrongfully impeding the due

10   administration of justice.

11   Second, a defendant joined the conspiracy knowing of its

12   object and intending to help accomplish it.  Unlike the

13   economic espionage and trade secret conspiracy charges on which

14   I previously instructed you, the Government is not required to

15   prove an overt act in furtherance of the conspiracy.

16   Walter Liew is charged in Count 11 of the Indictment with

17   witness tampering in violation of 18 U.S. Code,

18   Section 1512(b)(1).  The Government contends that Walter Liew

19   tampered with former USAPTI employee Jian Liu, L-I-U, in

20   connection with the civil action brought by DuPont in United

21   States District Court for the Northern District of California.

22   In order for you to find Walter Liew guilty of this

23   charge, the Government must prove each of the following

24   elements beyond a reasonable doubt:

25   First, Walter Liew intimidated, threatened, or corruptly

1    persuaded another person.  To corruptly persuade means to act

2    knowingly with a wrongful, immoral, or evil purpose to convince

3    or induce another person to engage in certain conduct;

4        Second, Walter Liew acted knowingly as I have defined that

5    term for you;

6        Third, Walter Liew acted with the intent to influence,

7    delay, or prevent the testimony of the person in an official

8    proceeding.  An "official proceeding" includes a proceeding

9    before a judge or a court of the United States.

10       In order to act with the intent to influence, delay, or

11   prevent the testimony of a person in a particular official

12   proceeding, that official proceeding must have been foreseeable

13   to Walter Liew at the time of the act.  The Government need

14   only prove intimidation, threat or corrupt persuasion, not all

15   three; but to convict Walter Liew of this charge, you must

16   unanimously agree on the type of action he committed.

17       Walter Liew is charged in Count 13 of the Indictment with

18   conspiracy to obstruct justice in violation of 18 United States

19   Code, Section 1512(k).  The Government contends that Walter

20   Liew conspired to make false statements to the FBI in order to

21   conceal evidence and then acted to conceal evidence.

22       In order for you to find Walter Liew guilty of this

23   charge, the Government must prove each of the following

24   elements beyond a reasonable doubt:

25       First, on or about July 19th, 2011, there was an agreement

1    between Walter Liew and at least one other person to commit a

2    violation of 18 U.S. Code, Section 1512(b)(3), and 18

3    U.S. Code, Section 1512(c)(1), as charged in the Indictment;

4         Second, Walter Liew joined the conspiracy knowing of its

5    object and intending to help accomplish it.

6         The Government is not required to prove an overt act in

7    furtherance of the conspiracy to prove a violation of 18

8    U.S. Code, Section 1512(k).  However, in order to convict

9    Walter Liew of the conspiracy charge in Count 13, you must

10   agree unanimously on the object or objects of the conspiracy.

11        The Indictment charges two object offenses.  The elements

12   of the first offense, 18 U.S. Code, Section 1512(b)(3), are:

13        First, Walter Liew engaged or attempted to engage in

14   misleading conduct toward another person;

15        Second, Walter Liew acted knowingly as I defined that term

16   for you;

17        Third, Walter Liew acted with the intent to hinder, delay,

18   or prevent the communication of information to a law

19   enforcement officer of the United States or judge of the

20   United States; and,

21        Fourth, such information related to the commission or

22   possible commission of a federal offense.

23        The elements of the second offense, 18 U.S.C.,

24   Section 1512(c)(1), are:

25        First, Walter Liew concealed or attempted to conceal a

1    record, document, or other object;

2        Second, Walter Liew acted knowingly as I defined that term

3    for you; and,

4        Third, Walter Liew acted corruptly; and,

5        Fourth, Walter Liew acted with the intent to impair the

6    record's, document's, or object's availability for use in an

7    official proceeding.

8        A person acts "corruptly" if he or she acts with the

9    purpose of wrongfully impeding the due administration of

10   justice.

11       An "official proceeding" includes a proceeding before a

12   judge or a court of the United States, but does not include a

13   criminal investigation.

14       In order to act with the intent to impair the availability

15   of a record, document, or object in a particular official

16   proceeding, that official proceeding must have been foreseeable

17   to Walter Liew at the time of the act.

18       To find Walter Liew guilty of this charge, you must agree

19   unanimously that he conspired to commit at least one of these

20   two object offenses, and all of you must unanimously -- you

21   must -- let me start that over.

22       To find Walter Liew guilty of this charge, you must agree

23   unanimously that he conspired to commit at least one of these

24   two object offenses, and all of you must agree unanimously on

25   which of the two object offenses he agreed to commit.

1        Walter Liew is charged in Count 14 of the Indictment with

2    knowingly and willfully making a false statement in a matter

3    within the jurisdiction of a governmental agency or department

4    in violation of 18 U.S. Code, Section 1001.

5        In order for you to find Walter Liew guilty of this

6    charge, the Government must prove each of the following

7    elements beyond a reasonable doubt:

8        First, on or about July 19th, 2011, Walter Liew made a

9    false statement in a matter within the jurisdiction of the

10   Federal Bureau of Investigation or the FBI;

11       Second, Walter Liew acted willfully, that is, deliberately

12   and with knowledge that the statement was untrue; and,

13       Third, the statement was material to the activities or

14   decisions of the FBI; that is, it had a natural tendency to

15   influence or was capable of influencing the FBI's decisions or

16   activities.

17       Walter Liew is also charged -- also is charged in Count 14

18   of the Indictment with aiding and abetting in violation of

19   18 U.S. Code, Section 1001, making a false statement to the

20   Federal Bureau of Investigation.

21       A defendant may be found guilty of violating 18 U.S.C.,

22   Section 1001, even if the defendant personally did not commit

23   the act or acts constituting the crime but aided and abetted in

24   its commission.

25       In order for you to find a defendant guilty of this

1  charge, the Government must prove each of the following

2  elements beyond a reasonable doubt:

3      First, someone committed a violation of 18 U.S. Code,

4  Section 1001;

5      Second, the defendant knowingly and intentionally aided,

6  counseled, commanded, induced, or procured that person to

7  commit each element of the crime; and,

8      Third, defendant acted before the crime was completed.

9      It is not enough that the defendant merely associated with

10  the person committing the crime or unknowingly or

11  unintentionally did things that were helpful to that person or

12  was present at the scene of the crime.  The evidence must show

13  beyond a reasonable doubt that the defendant acted with the

14  knowledge and intention of helping that person commit a

15  violation of 18 U.S. Code, Section 1001.

16      The Government is not required to prove precisely which

17  defendant actually committed the crime and which defendant

18  aided and abetted.

19      Walter Liew is charged in Counts 15 through 19 of the

20  Indictment with filing false tax returns in violation of

21  26 U.S. Code, Section 7206(1).  The Government alleges that

22  Walter Liew submitted false tax returns for Performance Group

23  USA, Inc., for the years 2006, Count 15; 2007, Count 16; and

24  2008, Count 17; and for USAPTI for the years 2009, Count 18;

25  and 2010, Count 19.

**JURY INSTRUCTIONS**

1    In order for you to find Walter Liew guilty of any of

2    these charges, for each count the Government must prove each of

3    the following elements beyond a reasonable doubt:

4        First, for the tax year specified in each count, Walter

5    Liew made and signed a tax return that he knew contained false

6    information as to a material matter.  A material matter is

7    material if it had a natural -- is material if it had a natural

8    tendency to influence or was capable of influencing the

9    decisions or activities of the Internal Revenue Service.

10       Second, the return contained a written declaration that it

11   was being signed subject to the penalties of perjury.

12       Third, in filing the false tax return, Walter Liew acted

13   willfully.

14       In order to prove that Walter Liew acted willfully, the

15   Government must prove beyond a reasonable doubt that Walter

16   Liew knew federal tax law imposed a duty on him and that he was

17   intentionally and voluntarily -- and that he intentionally and

18   voluntarily violated that duty.

19       Walter Liew is charged in Counts 20 and 21 of the

20   Indictment with making a false statement in a bankruptcy

21   proceeding in violation of 18 U.S. Code, Section 152,

22   subsection (3).

23       In order for you to find Walter Liew guilty of any of

24   these charges, for each count the Government must prove each of

25   the following elements beyond a reasonable doubt:

1        First, there was a bankruptcy proceeding pending in the

2    United States Bankruptcy Court for the Northern District of

3    California in which Performance Group USA, Inc., was the

4    debtor;

5        Second, Walter Liew made a declaration or a statement or a

6    statement under penalty of perjury in relation to that

7    bankruptcy proceeding;

8        Third, the declaration or statement related to some

9    material matter;

10       Fourth, the declaration or statement was false; and,

11       Fifth, Walter Liew made the declaration or statement

12   knowing it was false and with the intent to deceive the

13   bankruptcy trustee or court.

14       A material matter is one that has a natural tendency to

15   influence or is capable of influencing the court, the trustee,

16   or any creditor.

17       In Count 20, the Government alleges that Mr. Liew made a

18   false statement related to Performance Group USA, Inc.'s,

19   schedules of assets and liabilities.  The alleged false

20   statement is as follows:

21       On "Schedule G - Executory Contracts and Unexpired

22   Leases," which requested a description of "all executory

23   contracts of any nature," including the "nature of debtor's

24   interest in contract" and "the names and complete mailing

25   addresses of all other parties to each contract described,"

1  Mr. Liew checked a box indicating "debtor has no executory

2  contracts."

3       In Count 21, the Government alleges that Mr. Liew made the

4  following false statements relating to Performance Group USA,

5  Inc.'s, statement of financial affairs:

6       (1)  In answer to Question 1, which requested the debtor

7  to state "the gross amounts received during the two years

8  immediately preceding this calendar year," Mr. Liew failed to

9  identify any gross amounts.

10      (2)  In answer to Question 10, which requested that the

11 debtor "list all other property other than property transferred

12 in the ordinary course of the business or financial affairs of

13 the debtor transferred either absolutely or as security within

14 two years immediately preceding the commencement of the case,"

15 Mr. Liew checked "none."

16      (3)  In answer to Question 11, which requested that the

17 debtor "list all financial accounts and instruments held in the

18 name of the debtor or for the benefit of the debtor which were

19 closed, sold, or otherwise transferred within one year

20 immediately preceding the commencement of this case," Mr. Liew

21 failed to disclose the existence of letters of guarantee for

22 the benefit of Performance Group USA that were closed in 2008.

23      To find Walter Liew guilty on Count 21, you must agree

24 unanimously that one or more of these statements was false with

25 all of you agreeing on a particular statement that he made.

**JURY INSTRUCTIONS**

1   Walter Liew is charged in Count 22 of the Indictment with

2   making a false oath in a bankruptcy proceeding in violation of

3   18 U.S. Code, Section 152, subsection (2).

4   In order for you to find Walter Liew guilty of this

5   charge, the Government must prove each of the following

6   elements beyond a reasonable doubt:

7   First, there was a bankruptcy proceeding before -- pending

8   in the United States Bankruptcy Court for the Northern District

9   of California in which Performance Group USA, Inc., was the

10   debtor;

11   Second, Walter Liew made a statement under oath in

12   relation to that bankruptcy proceeding;

13   Third, the statement under oath related to some natural --

14   to some material -- let me read that again.

15   Third, the statement under oath related to some material

16   matter;

17   Fourth, the statement under oath was false; and,

18   Fifth, Walter Liew made the statement under oath knowing

19   that it was false and with the intent to deceive the bankruptcy

20   trustee.

21   A material matter is one that has a natural tendency to

22   influence or is capable of influencing the court, the trustee,

23   or any creditor.

24   In Count 22, the Government alleges the following false

25   statements:

**JURY INSTRUCTIONS**

1      (1)  After advising Mr. Liew that "the following questions

2  are related to the petition, schedules, and documents you filed

3  with the court,"

4         (a)  The presiding Trustee asked Mr. Liew, "Did you

5       receive the schedules" -- let me start that over again.

6          The presiding trustee asked Mr. Liew, "Did you review

7       the schedules that were filed on behalf of Performance

8       Group, Inc.?"

9  And Mr. Liew responded, "Yes, I did."

10      (b)  The trustee then asked Mr. Liew, "Did it appear

11       that the schedules were complete and correct?"

12  And Mr. Liew responded, "Yes, Your Honor."

13     (2)  In response to the question from the presiding

14  Trustee, "How long had Performance Group, Inc., been closed

15  down," Mr. Liew responded, "Since the beginning of

16  November 2008."

17     (3)  In response to the following question from the

18  presiding Trustee, "Was there one of them that caused the

19  business to disappear or just," Mr. Liew responded, "Yeah, we

20  lost the business.  We didn't have any new contract and we ran

21  out of cash."

22     (4)  In response to the presiding Trustee's question,

23  "There was no -- nothing that happened?  You didn't have any

24  lawsuit or had a bad project or anything, just," Mr. Liew

25  responded, "Yes, it was both.  We had a bad project and we

 1   overspend.  And, you know, we had what some con --

 2   subcontractor ended up wanting more money than they deserve, so

 3   put us in a hardship."

 4        To find Walter Liew guilty on Count 22, you must

 5   unanimously agree that one or more of the statements was false

 6   with all of you agreeing on a particular statement that he

 7   made.

 8        The remaining instructions are the housekeeping ones on

 9   deliberations, so we're completed with this phase.  We'll now

10   take a stand-up stretch break while the Government gets ready

11   for its closing.

12                      (Pause in proceedings.)

13        THE COURT:  All right.  You may be seated.  All

14   spectators, find seats, please.

15        And just for your edification, we're going to take a break

16   about our usual time, about 9:45 or so, at a convenient

17   breaking point, and then take our usual 15-minute break.  We'll

18   talk about scheduling a little later in this morning's

19   proceedings.

20        Counsel, you may proceed.

21        MR. AXELROD:  May I proceed, Your Honor?

22        THE COURT:  Yes.

23                      CLOSING ARGUMENT

24        MR. AXELROD:  Thank you.

25        In December 1991, Walter Liew met with Mr. Luo Gan, who at

 1    the time was the Secretary General of the State Council of the

 2    People's Republic of China, and several other Chinese

 3    government agency officials, at the Diaoyutai State Guesthouse

 4    in China.

 5         Mr. Luo provided Mr. Liew directives.  And those

 6    directives, through Chinese government agencies, included key

 7    task projects for the benefit of the Chinese government.  Chief

 8    or key among those was the development of chloride route TiO2

 9    technology.  I'm paraphrasing.  These aren't my words; they're

10    Mr. Liew's.

11         And with Mr. Luo's directives to Mr. Liew, so began a

12    20-year course of conduct of lying and cheating and stealing.

13         Mr. Liew and Mr. Maegerle stole DuPont's technology; and

14    then in 2011, 20 years later, when the wheels came off, they

15    lied about it.

16         And on top of that, Mr. Liew cheated.  He cheated on his

17    taxes; he cheated the bankruptcy court; and he cheated to hide

18    the theft that he was committing.

19         Lying, cheating, and stealing is what this case is all

20    about.  And those are concepts that we all learned are wrong in

21    kindergarten.

22         Now, that doesn't mean that there isn't a lot to this

23    case.  You all have sat here through six weeks of evidence.

24    You've heard about a unique context, a request from the Chinese

25    government to develop this technology, that involved contracts

1   with Chinese state-owned entities.

2       It involved technology that's got a lot of complexity to

3   it because it is a high-pressure technology with dangerous

4   chemicals.  It's a very large capital project.  So there's a

5   lot to it.  But at the end of the day, what it boils down to

6   are basic fundamental concepts: lying, cheating, and stealing.

7       Now, I want to talk to you about the evidence in this

8   case.  And I want to make a few comments before I do.

9       At the beginning of the case Mr. Hemann stood up and he

10  told you that we were going to present what happened in the

11  defendants' own words, by their own actions, at the time of the

12  conduct.  And that's what we did.

13      You heard from 33 witnesses in the government case, and it

14  was a range of people.  There was the employees who worked for

15  Mr. Liew at USAPTI and Performance Group; it was the agents

16  involved in the investigation; and it was several of the

17  participants in this industry.

18      You heard several witnesses talk about the fact that there

19  are five major competitors in TiO2, in the chloride route TiO2

20  industry.  You've heard witnesses from DuPont that came in and

21  talked about their technology.  You heard Mr. Gibney, who

22  worked at Tronox, who talked about his technology experience in

23  the industry.  And, finally, you heard from Mr. Livingston, who

24  is at Cristal.  And you heard about that technology as well.

25      So we have, in the course of this case, provided you all

1    the context of not only what happened but how the industry

2    worked and how the industry protected its information.

3         In contrast, the defense presented two witnesses who were

4    paid an awful lot of money to come in here and tell you what

5    they were programmed to say.

6         And when we presented the evidence of what the defendants

7    said, I want to make something very clear here.  The defendants

8    in this case, like other criminals sometimes they tell the

9    truth; sometimes they lie.  Depends on the circumstances.

10        And when we presented these statements to you, we

11   presented them with context and corroborating evidence and

12   information and documents and the testimony of other witnesses.

13        So I urge you, when you go back and consider the evidence,

14   to think about that and think about the fact that there's a

15   corroborative body of information that we invite you and

16   encourage you to look at as you evaluate what actually happened

17   here.

18        The last thing I want to tell you before I really get

19   started is I'm not going to talk all day.  I'm only going to

20   talk to you for about two hours, maybe a touch more.  But I am

21   not going to sit here with you and go through every piece of

22   evidence that you heard over the last six weeks.  What I'm

23   going to do is my very best to highlight the evidence and the

24   jury instructions that are -- that I believe are important for

25   your work.

1    You will have all of the exhibits, all of the evidence,

2    all the instructions with you.  I'm going to do my very best to

3    hit the high points.  I hope I achieve that.  But I'm going to

4    keep it to two hours, more or less.

5        In conjunction with that, Mr. Hemann is going to operate

6    the computer, and he is going to be putting up various slides.

7    You will not have those slides with you back in the jury room.

8    But we're providing that, hopefully, to facilitate this

9    conversation and discussion over the next couple of hours.  So

10   just know that those things you won't have.

11       What I want to do now is start by talking about what

12   happened, what's the story, how did this all come to be.  And I

13   want to review with you some of the key events.  And we put

14   them up on the board.

15       And let's start in 1991, because that's where this 20-year

16   journey starts.  And as you'll recall, you've seen Exhibit 350,

17   in 1991 Mr. Luo Gan and other Chinese government officials

18   asked Walter Liew to pursue chloride route TiO2 technology.

19       Now, two points here:  Point number one, and you'll see

20   this when you look at the letter and through other exhibits, at

21   the time Mr. Liew was tasked with this assignment, he had

22   already developed projects for the Chinese government.  He had

23   already had experience satisfying their requests.  And now he

24   had a new task, and that was chloride route TiO2.

25       From 1991 -- and then the next sort of time period I want

**CLOSING ARGUMENT / AXELROD**

1    to talk about is 1994 to 1998.  And there's a few things to

2    talk about there.

3        And you may recall that Mr. Marinak came in and talked

4    about that time period.  And he was a retired engineer from

5    Dow, who hooked up with Mr. Liew.  And what he told you was

6    that Mr. Liew was working on a number of projects.

7        And you also heard that from Mr. Zisko, that Mr. Liew was

8    developing ACR projects in China, and he had many projects he

9    was working on.  One of those was TiO2.

10       And what Mr. Marinak explained was he didn't know anything

11   about chloride route TiO2, and Walter Liew certainly didn't

12   either.  And they did some investigation, some background work

13   by getting some patents.

14       And there is evidence in this case that in 1996 or 1997

15   Mr. Liew got some -- had some patents; Mr. Marinak provided him

16   some patents.  But that's the background.

17       And you'll recall that Mr. Marinak described going to

18   Chengde in China, to what he thought was going to be to pitch

19   some potential work on the TiO2 facility over there, and when

20   he got there, it turned out that the folks there had a much

21   different expectation.  There were about 45 engineers sitting

22   around, expecting these guys to explain chloride route TiO2 to

23   them.

24       And what Mr. Marinak explained was Walter Liew didn't know

25   anything about it, he didn't know anything about it, and the

 1   other guy they had with them didn't know anything either.  So

 2   they were not in a position to fulfill that contract, and that

 3   contract was never funded.

 4       The other thing that's very important that happens in that

 5   '94 to '98 time frame is that Mr. Liew meets Bob Maegerle.  And

 6   you heard testimony about when they initially met through

 7   Condux at the time.

 8       And what's critical about that time period is that

 9   Mr. Maegerle did very little work for Mr. Liew in 1997 and

10   1998.  He got paid about $4,200.  I think that's Exhibit 333.

11   And he didn't get into the full-blown work that comes later,

12   that we'll talk about.

13       The other important event that occurred in that time

14   period, and Mr. Marinak talked about this as well, is that

15   Mr. Liew and Mr. Marinak and Mrs. Liew went to Reno, Nevada to

16   see Tim Spitler.  Tim Spitler was a retired DuPont engineer.

17   And you heard about how they went to visit Mr. Spitler in the

18   1997 time period, and that is the early phase of this process.

19       So then we've got to skip ahead several years, to 2004.

20   And in 2004, what happens?  In 2004, Mr. Liew writes a letter

21   to Hong Jibi, the head of the Pangang Group Company, which is

22   also known as Panzhihua Iron & Steel.  This is the state-owned

23   entity that you heard testimony about from many people in this

24   case.  He wrote a letter to Mr. Hong because he wanted to get

25   business.  He wanted to get the Jinzhou contract.

1    And what's important here is, number one -- and this is a

2    really important point about how business is done in this case.

3    Mr. Liew, who knows nothing about TiO2, save and except what he

4    learned in a few patents he got in 1996 or 1997, writes to

5    Pangang Group.  He doesn't write to some engineer who's working

6    on the project, or maybe the project coordinator for that.  No.

7    No, he doesn't.  He writes to the guy at the top.  He writes to

8    the top person, the head of it.

9    You heard Mr. Hu come in here, who had worked at PIETC.

10   And he told you Pangang Group was about 50- or 60,000 people,

11   and Mr. Hong was at the top.  And that's who Walter Liew wrote

12   to, to tout his services.

13   And what he said in that letter, he said something very

14   important, and it's a very important point that overrides what

15   was motivating this whole venture for Pangang Group, for the

16   Chinese government, and for Mr. Liew.  And what he says in the

17   letter, he makes a point about what's essentially leapfrogging,

18   leapfrogging technology.

19   Because the Chinese, as you've heard some and as is in the

20   evidence, they didn't have the chloride route technology.  That

21   was an advanced, sophisticated technology that they just didn't

22   have yet, that DuPont and other companies had developed for --

23   DuPont developed for 70 years, and other companies had as well.

24   And that technology had a value.  It had a value to the Chinese

25   government because it was a technology that they didn't have

1   and they wanted.  And this is what Mr. Liew had to say about

2   it.  He said, quote:

3        "The many tricks of the trade in titanium white by

4        chlorination technology or experience, to include lessons

5        learned, have come from its construction or production

6        processes.  Therefore that technology cannot be had solely

7        from theory or from the lab.  From the standpoint of

8        research and development that takes too much time, and is

9        not compatible with China's current market needs and rate

10       of economic development."

11       That point, that it takes a lot of work, R&D work and time

12  and money and effort was not lost on Mr. Liew's business

13  partner, it wasn't lost on Mr. Maegerle.  Because you may

14  recall that several years later, when Agent Pattillo

15  interviewed Mr. Maegerle on July 19th, 2011, he made the exact

16  same point.  He told her that the Chinese government doesn't

17  seem interested in investing a lot in R&D, and that the Chinese

18  government had mandated the switch to chloride route TiO2, but

19  they don't want to pay for the research and development that

20  goes with it.

21       That point was made most clearly by Mr. Olson.  Now, this

22  is way back in the beginning of the trial, but you may recall

23  Mr. Olson came in from DuPont.  He was the former head of what

24  they call the DTT, the DuPont Titanium Technologies.  And he

25  talked about how much money DuPont spends on R&D and on the

1  chloride route TiO2 plants.  And he said just a couple of

2  numbers.

3      One, and I believe in this case he's talking about DuPont

4  as a whole, he said they spend $2 billion a year on R&D.  With

5  respect to their chloride route plants, he said they spend

6  $150 million a year.  That's a lot of investment for

7  technology.  And, by the way, that's a really good reason to

8  protect it.

9      So what happens is this well -- and, by the way, in that

10  letter Mr. Liew is very clear about what he's offering.  He's

11  offering the DuPont technology because he says so.  This is

12  Mr. Liew's own words, quote:

13          "My company has mastered the technology of the

14      complete DuPont method for titanium white by

15      chlorination."

16  So there's no mistake about what he's offering.

17      And there's another point here, which is at this point in

18  2004, we know that he has stolen DuPont technology.  How do we

19  know that?  Because he says so.  He says so in his own

20  handwriting.  He says so in his own electronic notes.  He says

21  so because, as he wrote on his computer, relating to a

22  conversation with Tim Spitler in February of 2000:

23          "Even with the best technology with stolen prints,

24      but without the startup people and maintenance experienced

25      people, the plant won't be successful."

**CLOSING ARGUMENT / AXELROD**

1      And what are the stolen prints?  These are the stolen

2  prints (indicating).  And how do we know he had them?  Because,

3  remember, Mr. Zisko came in, and he said he was in China with

4  Mr. Liew around this time, and he showed him the oxidation with

5  RPS drawing.

6      So at this point they're starting to get some traction.

7  The guy may not know anything about TiO2, but he has DuPont's

8  stolen technology and he knows that that's what the Chinese

9  government wants.

10      It's also important to note that around this time is when

11  he really starts working with Bob Maegerle.  And that's

12  important for a number of reasons.

13      The first is:  From that time in 2004 to 2011,

14  Mr. Maegerle is paid about $370,000.  That number may pale in

15  comparison to the amount of monies Mr. Liew received, the

16  $28 million that you heard about, but, you know what, that's

17  still a lot of money.

18      And we'll talk more about that later, and about the

19  technology transfer portion of it.  I think that was about

20  150,000.  But that is when Mr. Maegerle and Mr. Liew go to

21  work.

22      And you will recall that there's an email in 2005, in

23  October of 2005, where Mr. Maegerle emails Mr. Liew

24  photographs, proprietary photographs, Exhibit 38, of DuPont

25  facilities.

**CLOSING ARGUMENT / AXELROD**

1     And there's a couple from the flue pond.  And you heard

2  about those because you heard Mr. Dayton talk about how the

3  fact that you couldn't take those pictures, that they contained

4  proprietary information.  And then you heard Allen Chang come

5  in, he was one of the employee at USAPTI, and he said, oh,

6  yeah, I used that picture.  Mr. Liew gave me that picture and I

7  used it to help me size out a part of the flue pond.

8     Now, in 2005, Mr. Liew gets the 30,000K Pangang Jinzhou

9  contract.  And it goes to his company at the time.  That

10  company is called Performance Group.  We'll talk about the

11  phony bankruptcy later, but that's the company that he was

12  using at this point in time.

13     And, by the way, that company before and after the

14  bankruptcy, before and after he stiffed his employees, let them

15  go, owed 5-, $10,000, he received $12 million, over

16  $12 million.  Over $12 million.  So that starts in 2005.

17     And the next thing, the next sort of event is 2008.  So

18  now we're moving beyond the 30K contract at Jinzhou to the 100K

19  project for Performance Group.

20     And, again, he writes a letter.  And, again, he's not

21  writing to some project engineer responsible for the

22  contracting of this business.  He's writing to the person at

23  the top, Mr. Fan Zhengwei.  He's the replacement for Mr. Hong.

24  And who replaced him?  SASAC did.  SASAC that controls

25  state-owned entities like Pangang Group.

 1          And he writes that letter soliciting more business for
 2     himself.  Mind you, what he has now is more stolen DuPont
 3     technology.  He doesn't have any experience of his own.
 4          And in the letter -- and I'm not going to talk too much
 5     about this now, but when you go back and look at that letter,
 6     which is Exhibit 342, he talks about, to Mr. Fan, DuPont's
 7     technology and all the things that DuPont has done that enables
 8     them to stay number one in the industry.  Again, he's touting
 9     the DuPont technology.
10          So then we get to 2009.  And 2009 is significant for a
11     couple of reasons.  Reason number one, of course, they get the
12     contract so now this is the new company, right, this is USAPTI.
13     It's the same people.  They're doing the same work.  But he's
14     got a new company.  And they sign the contract.  And that's in
15     May of 2009.  He signs the 100K contract.
16          And, here again, because underlying all of this lying,
17     cheating, and stealing is a very, very powerful profit motive.
18     And the profit motive here is the $14 million he received from
19     USAPTI.
20          But that's not the only thing that happened in 2009,
21     because you'll recall, and we'll talk more about this later,
22     that in January of 2009, Mr. Liew filed a bankruptcy petition.
23     He filed a petition and told the Court later, in February, hey,
24     I'm out of money; ran out of business; no cash; didn't work
25     out.  We'll talk about that more later.

1          Those are all lies.  They are plain bald lies because we

2     know and you've seen and you have in evidence the summary

3     exhibits and all the bank records showing how much money

4     Performance Group was actually paid during that time period.

5     And in 2008, the year he was supposedly running out of

6     business, running out of cash, he received over $4 million.

7     That is 2009.

8          And that time period of 2009 is also important because

9     that is the heart of the technical transfer from the Basic Data

10    Document.

11         You'll recall that Agent White put in the series of

12    emails.  And this is an exhibit.  You'll have this with you

13    back in the jury room.  And put in a series of emails and

14    documents that were located in the course of the investigation.

15         And Mr. Dayton came in and Dr. Diemer came in.  But this

16    is primarily the testimony of Mr. Dayton, about the references

17    that were made.  And some of them are very explicit:  I checked

18    the Taiwan Basic Data Document; it said this.  I checked Kuan

19    Yin; it said that.  I checked my manual.

20         But what -- what we did and what's represented here is

21    these are all the references to different pages in the Basic

22    Data Document.

23         And when you look at this, you'll see that there's a real

24    period between 2008 and 2010, primarily in 2009, when they're

25    working on the project, where there's a lot of transmission of

1   the information from the Basic Data Document.  And we'll talk

2   about that document more later, but that's this one

3   (indicating).

4       This is the guidebook for how to make a TiO2 plant from

5   the ground up.  It was DuPont's best and latest technology in

6   1985, the one Mr. Maegerle received and worked on.  That's what

7   they were using.

8       Now, I'm going to skip ahead to 2011.

9       2011 is very important for a couple of reasons because in

10  2011, that's when the wheels come off.  That's when Walter Liew

11  and Bob Maegerle's plan and efforts are found out.  And that's

12  when DuPont starts putting 2 and 2 together and file a lawsuit.

13  And, ultimately, down the road the FBI conducts an

14  investigation.

15      The important thing to think about as you evaluate all

16  this evidence and evaluate the theories that the defense is

17  going to present and has presented in this case is:  What did

18  they do in 2011?  Do they behave like honest people and say,

19  oh, yeah, this is all fine; I was allowed to do this; this was

20  totally okay; I got approvals?  Is that what they told people

21  at the time?  No.  Not at all.

22      They engaged in a pattern of lying.  They tell witnesses

23  to lie.  They themselves lie.  They lie to the FBI.  We're

24  going to talk more about that.  They lie in English.  They lie

25  in Mandarin.  But it's all lies.

1   And when you think about that evidence and we evaluate

2   what happened in 2011, think, think about what they're trying

3   to tell you now.  Does it make any sense?

4       So what I'd like to do now is talk about the charges.

5       And I'm happy to keep going, Your Honor.  This is a

6   natural break point.

7           **THE COURT:**  All right.  Why don't we take our break

8   now.

9       And before I let you go, because of the interruption due

10  to the Court's illness, we're trying to maybe gain some more

11  time, so I wanted you, when you go back, perhaps, to discuss --

12  the closing arguments are going to span more than today.

13  They'll go into tomorrow.  And we're trying to figure out how

14  to split them up in a way that's fair to all sides as well as

15  makes logical sense to you.

16      So in a perfect world the Court's druthers would be that

17  we go later into the afternoon.  But I know you all perhaps

18  have made plans for the afternoon.

19      So if you could perhaps caucus just on this one issue,

20  don't discuss anything else in the case, about how late you

21  would be prepared to go this afternoon, so we could figure out

22  where would be appropriate to break to evenly distribute the

23  closing arguments.

24      The other thing I wanted you to start thinking about is

25  because of the Court's illness and the desire to get this case

1   to you sooner rather than later, the Court had said at the

2   beginning that we would not be sitting on Thursday.  Thursday

3   would simply be, most likely, almost certainly would be

4   beginning of deliberation.  I would like to revisit that with

5   you.  Again, if all of you can't come in on Thursday to

6   continue your deliberations, we'll adjourn until the following

7   Monday.

8        If you could caucus on those two points, schedule for

9   today how late you can go, and whether Thursday would be a

10  possibility for deliberations, let us know and then we'll be

11  guided accordingly.

12       Remember the admonitions.  Don't discuss the case.  Keep

13  an open mind.  And we'll see you in 15 minutes.

14       (Recess taken from 9:42 to 10:00 a.m.)

15       (The following proceedings were held in open court,

16  outside the presence of the jury:)

17       **THE COURT:**  So before we bring the jury in, in

18  response to the Court's question to the jury the following note

19  came out:

20            "Sorry, today we cannot stay late.  We can all come

21       in on Thursday.  We need a new schedule for this week."

22       Which we're going to give them.  "Tuesday we can stay

23       until 2:15."

24       So I know, Mr. Gasner, my courtroom deputy clerk inquired

25  as to whether there would be a point -- that you should figure

1    out a point which would be a logical breaking point so we can

2    stop at 1:30.  Wherever you are, you will just pick it up

3    tomorrow.

4            **MR. GASNER:**  That's fine, Your Honor.

5            **THE COURT:**  That should give us enough time, I think,

6    to finish tomorrow.  Gives us several more hours.  And then

7    Thursday we will have deliberation.  My plan now is not to have

8    them deliberate at all on Friday.

9        Mr. Froelich, if you want to go home --

10           **MR. FROELICH:**  Thank you, Your Honor.

11           **THE COURT:**  -- you are free to go back to Georgia.

12       Is that okay with you?

13           **MR. GASNER:**  It is, Your Honor.

14           **THE COURT:**  Okay, great.

15       Let's bring the jury back.

16           **THE CLERK:**  All rise for the jury.

17        (Jury enters at 10:02 a.m.)

18           **THE COURT:**  All right.  Please be seated.

19       Ladies and gentlemen, thanks for your input on the

20   schedule.  We'll stay to our regular time today.  And tomorrow,

21   if necessary, we'll go until 2:15 and finish the final

22   arguments.

23       I appreciate your ability to come in or your desire -- not

24   desire.  "Desire" is the wrong word.

25        (Laughter)

1      **THE COURT:**  -- your ability to come in on Thursday and

2   deliberate, if that's where we are in the case.  And we will

3   not sit on Friday.  You will not be here.  You will not be

4   deliberating.

5      So you can continue deliberations on Monday.  And then you

6   can go as late into the week as you wish or need, including

7   Friday, if you wish to do so, because once you have the case,

8   it's yours.  And the deliberation schedule, is up to you.  So

9   if you want to deliberate later in a given day or come in on

10  Friday we will defer to you at that point.  We'll get there

11  when we get there.

12     Thank you very much.  And you may continue.

13     **MR. AXELROD:**  Thank you, Your Honor.

14     Ladies and gentlemen, I would like to now focus on the

15  charges in this case and the evidence that supports those

16  charges.

17     And I said to you at the beginning, the case is about

18  lying and cheating and stealing.  And so what I want to focus

19  on first is the stealing, the stealing, the theft of the DuPont

20  technology.

21     So I'd like to start there.  And it's the same idea.  I'm

22  not going to talk about every instruction.  I am going to do my

23  best to cover the ground in the time I described.

24     One of the instructions that you have that the Court read

25  to you was about the specific trade secrets alleged in the

 1    indictment.  And I want to talk briefly about them with you so

 2    we're all on the same page.

 3         Trade Secret 1 is the DuPont chloride route process.  And

 4    I'll come back to that because we're going to talk about that

 5    in the first couple of charges.

 6         Trade Secret 2 is that is the DuPont drawing, the Edgemoor

 7    plant oxidation system with RPS drawing.  And that is -- that's

 8    this drawing (indicating).  I'm not going to unroll it now.

 9    But you'll recall that's the one that had the big set of data

10    at the top.  And we'll talk about that more later.

11         Trade Secret 3 is the Accession Report.  So that's this

12    document (indicating).  That is the report that Dr. Diemer

13    supervised, that contains Dr. Diemer's work product, his

14    correlation, the Fortran code that's in Appendix B.  And we'll

15    talk more about that.  But that's what Trade Secret 3 is.

16         Trade Secret 4 is the other flow sheets.  It's this one

17    (indicating) about the chlorination section.  That's -- that's

18    Trade Secret 3 -- excuse me, Trade Secret 4.  Trade Secret 4.

19         And Trade Secret 5 is the Basic Data Document, which is

20    this (indicating).

21         And so we're going to talk about all of these a little bit

22    later, but at the end of the day that's what the case is about

23    (indicating).  It's about that and lying and cheating and

24    stealing.

25         It's not about some stack of documents to the moon.  It's

1  got nothing to do with it, nothing at all.

2      So the first point, I'd like to talk a little bit about

3  the charges, the first two charges in the case.

4      Count One is the conspiracy to commit economic espionage.

5  And Count Two is the conspiracy to commit theft of trade

6  secrets.

7      And the important point here, we're going to focus for a

8  moment, both of those relate to Trade Secret 1, which is the

9  DuPont chloride route TiO2 process.  That's what the conspiracy

10  is about.  That's what the criminal agreement's about.

11      And so I want to talk a little bit about Trade Secret 1,

12  because what it is and how it's treated under the law is a

13  little bit different than these four documents that we are

14  going to talk about later.  It's a little bit different.

15      But the point is, Trade Secret 1 is the way DuPont does

16  it.  Doesn't mean that chloride route TiO2 is -- only belongs

17  to DuPont.  Of course it doesn't.

18      You heard testimony from the DuPont employees and the

19  other people that lots of people practice chloride route

20  technology, but DuPont has a particular way of doing it.  They

21  have a particular way of combining things that are proprietary

22  and nonproprietary, and making it work.  And it works well for

23  them.  And that process, that system, that technology is what

24  the Chinese government and the state-owned entity wanted, and

25  it's what Walter Liew promised.

1      He understood this because he said to himself -- and this

2  is what he said, I mentioned this earlier, about the DuPont

3  process.  He says:

4          "My company has mastered the technology of the

5      complete DuPont method for titanium white by

6      chlorination."

7      That is Trade Secret Number 1.

8      And he says in another document, Exhibit 720, he says,

9  quote:

10          "Our chloride route TiO2 technology is the first

11      class technology in the world, consisting of the most

12      advanced DuPont technical processes."

13     So there's no confusion, there's no mistake what he wants

14  to convey, what he's touting, what he's selling, is the DuPont

15  process, which is Trade Secret 1.

16     And it's the process, the actual DuPont process is the one

17  that Dr. Diemer worked on, the one that Dan Dayton worked on,

18  the one that Mr. Maegerle himself worked on over his whole

19  career at DuPont.

20     It's the one they try to make better every day -- and you

21  heard that from people who came in -- just like its competitors

22  do.  They have a process, they work on it, they improve it, and

23  they keep that know-how and advance to themselves because

24  that's what gives them a competitive advantage in the

25  marketplace.  That's the process.

1      The first point I want to make about these conspiracy

2  charges is that a conspiracy is an agreement.  And the

3  agreement here is actually essentially the same agreement in

4  both charges, which is to take the stolen DuPont technology and

5  transfer it to this company in China.  That's the conspiracy.

6  That's what they're agreeing to do.  And there's nothing magic

7  about calling it a conspiracy.  That just means a criminal

8  agreement.

9      And if you look at the instructions at page 23, the Court

10 provided you the instruction about what a conspiracy is.  And

11 it says:

12          "Conspiracy is a kind of criminal partnership, an

13      agreement of two or more persons to commit one or more

14      crimes.  The crime of conspiracy is the agreement to do

15      something unlawful."

16      So the unlawful something here is taking DuPont technology

17 and transferring it.  And this is important:  It does not

18 matter whether the crime agreed upon was committed, because the

19 crime is the agreement.  That is the crime of conspiracy.

20      And the difference, if you will, between Count One and

21 Count Two, Count One involves Mr. Liew and his company, USAPTI,

22 and Count Two involves -- and that's the economic espionage

23 conspiracy.  That's the conspiracy where there's an intent to

24 benefit the Chinese government or a Chinese instrumentality.

25 And I'll talk about that part of it later.

1      The Count Two conspiracy is the -- is that conspiracy

2  minus the intent to benefit the Chinese government.  And you

3  may recall at the beginning, Mr. -- and that Count Two involves

4  Mr. Maegerle.

5      And what Mr. Hemann said at the beginning is, look, the

6  difference is we don't have the proof beyond a reasonable doubt

7  that Mr. Maegerle knew this was intended to benefit the Chinese

8  government or the Chinese state-owned entity.  That's why he's

9  not in that count.

10     But there are overriding principles about the agreement

11  that pertain to both.  And the first thing I want to talk about

12  is the agreement, because you've got Pangang and Walter Liew

13  agreeing that they're going to -- that there's going to be a

14  transfer of this DuPont technology.

15     And I want to be clear here because I'm not talking about

16  the fact that they entered into contracts.  That is part of it.

17  Part of the agreement is they entered into these contracts.

18  And what underlies those contracts is the transfer of this

19  technology.

20     But what I'm talking about is the fact that Walter Liew

21  promised and Pangang understood that what they were getting was

22  the DuPont technology, and they were not allowed to have it.

23     So let me briefly review with you some of the evidence

24  that shows that, the proof, the documents in the language of

25  the defendants.

1          And when I -- when I talk about it, I want to step back

2     for a minute and remind you that you heard about -- you heard

3     about the searches on July 19th, of the USAPTI offices and the

4     Liews' residence.

5          And you also heard about how there were the employees of

6     the Pangang Group in town, staying at the Rodeway Inn in

7     Alameda, to meet with the Liews to further this project.

8          And what you heard about it was that the FBI learned about

9     that because, remember, they followed Christina Liew after she

10    said she was going out to breakfast, on July 19th.  And then

11    after that the FBI executed search warrants of the rooms of the

12    Pangang employees.  And we have introduced evidence from the

13    computers and the devices that were found there, that include

14    the information that Pangang had about this project and the

15    technologies.

16         And there's a couple of points that are important, and I'm

17    going to refer to some specific pieces of evidence.

18         Exhibit 279 references a meeting in July of 2008, when

19    Walter Liew and Christina Liew were in China meeting with

20    Pangang executives.

21         And you'll recall the day before that meeting DuPont had

22    met with Pangang and had a conversation.  And Mr. Olson talked

23    about that.  And the very next day Pangang had a meeting with

24    Walter Liew and Christina Liew.

25         And what the Liews said was that they are going to -- this

1    is about the 100K project, that they were going to use the

2    DuPont DeLisle factory as a sample, as a basis for their

3    proposal.  So in July of 2008, they're telling Pangang, hey,

4    we're going to base this off of DuPont, the DeLisle factory.

5         Then a few months later, in November of 2008, Walter Liew

6    showed oxidation DuPont blueprints to Pangang.  And that is

7    another document that's in evidence, from the Pangang search.

8              "DuPont de Nemours' 100k ton oxidizer.  Saw

9         blueprints provided by Liu Yuanxuan in Beijing November of

10        2008."

11        So this is before they enter the 100K contract.  Walter

12   Liew is promising them DuPont technology and showing them

13   DuPont technology.  And we know he had the DuPont technology

14   because he had the plans from Mr. Spitler, and he was working

15   with Mr. Maegerle and using the Basic Data Document.

16        Now, there's a lot more, because leading up to the time

17   that Pangang has to decide who they're going to choose for this

18   contract, is it going to be Performance Group or another

19   company, and they actually write a memo on the intellectual

20   property risks associated this project.

21        So Pangang is evaluating the information they are getting

22   from Performance Group, and they write a memo.  And this is in

23   March of 2009.  So this is before May of 2009, when they

24   actually sign the contract.

25        And Pangang identified the very specific risks.  They say,

1   and this is from Exhibit 369, they say:

2          "Since western companies have a complete blockade

3      against China on high end titanium by white chlorination

4      technologies" -- and, by the way, that means DuPont and

5      these other competitors aren't going to sell their

6      technology in China -- "the Pangang project can import

7      technology only through cooperation with international

8      consulting companies."  That means Performance Group.  "By

9      importing technology to consulting companies, Pangang has

10     not obtained the technology directly from its source

11     company."  In other words, they didn't get it from DuPont.

12     "Therefore, there will be certain risks as regards

13     intellectual property rights."

14  So before they sign a contract, Pangang knows very well

15  what they're getting into.  And, of course, Walter Liew does

16  too because he's the one pitching this.

17      And in this memo Pangang goes on to say:

18         "Pangang and the technical consultants, however,

19     during liaison with the consulting companies they have

20     clearly indicated that the source of the technology is the

21     DuPont Company in the USA."

22      And at the same time, the technical program and the

23  technical appendix is the technology being used by DuPont.

24      In that same memo where they're analyzing these risks

25  before they enter the contract, they go on to say, well, you

1    know, we're going to have to use some DuPont people and, quote:

2          "Therefore there may be problems regarding the

3      protection of trade secrets."

4      So Pangang understood that what Walter Liew was giving

5    them was the DuPont technology, and that that came with risks.

6    And then they went ahead and executed the contract in May, with

7    Mr. Liew.

8      And then Mr. Liew started transferring technology to them.

9    And what was the next thing that Pangang did?  Well, they got a

10   couple of experts, teams of experts together to look at what

11   Walter Liew had provided them, and assessed the work product.

12     And that is -- and then there was a report, a Pangang

13   report written up about the results of that effort.  And that

14   report is Exhibit 239.

15     So this is the review by outside experts of the work

16   product from DuPont -- from Walter Liew's company, from USAPTI,

17   by two companies:  One is Zhihua Company, and the other is

18   Xilian Company.

19     And I want to point out to you that the Xilian Company is

20   this Australian company.  And it's referred to in the memo as

21   TZPI.

22     Now, you may recall that when Connie Hubbard testified

23   from DuPont she talked about a company TZMI, the Australian

24   company providing her information about something going on.

25   This is the same company.

1      And this is -- this is what they're talking about.

2  Because TZPI provided information to Pangang when they looked

3  at Walter Liew's drawings and said, hey, wait a minute, this is

4  DuPont information; Mr. Liew doesn't own it so you better get

5  some legal advice.

6      That's what they knew in September of 2009.  And I'm just

7  going to read a few short passages from that memo.  It says:

8          "The technology originates from DuPont and possesses

9          relatively distinctive characteristics."

10     And then this is the TZPI, the Xilian company warning.  It

11  says, quote:

12          "Taking into consideration that the provider of this

13          technology is not the legal owner of the intellectual

14          property for the technology that is being provided, it is

15          recommended that buyer seek further legal counsel to avoid

16          any possible delays in the project schedule."

17     I don't know how to be any more clear.  They sign the

18  contract; know what they're getting into.  They get

19  confirmation from outside consultants.  And Pangang actually

20  adopts this feedback that's in the memo, at page 7.  So they

21  understood what they were doing.  Now, what did they do?  Did

22  they stop?  No.  They keep going with the contract; keep

23  getting deliverables from Mr. Liew; keep paying him millions

24  and millions and millions of dollars.

25     That is a criminal agreement to transfer DuPont

1  technology.

2      Now, I want to make another point about this conspiracy,

3  and that has to do with this Trade Secret Number 1, because the

4  Court instructed and the law requires not that as a matter of

5  fact Trade Secret 1 is a trade secret.  That's not what this

6  count is about.  This count is about an agreement and about the

7  reasonable belief of the people involved in that agreement

8  about what they were doing.

9      And so I want to read with you the instruction that the

10  Court read about -- and this pertains to both Count One and

11  Count Two, both conspiracy counts.  The Court said:

12          "For purposes of this Count it is not necessary" --

13      and this is on page 27 -- "it also is not necessary for

14      the government to prove that the information regarding

15      DuPont's TiO2 process," that's Trade Secret 1, "that the

16      alleged conspirators intended to convert was, in fact, a

17      trade secret.  What is required is proof beyond a

18      reasonable doubt that the defendant and at least one other

19      member of the conspiracy knowingly converted information

20      that they reasonably believed was a trade secret and was

21      being taken for the benefit..."  In this case, in Count

22      One for the foreign government or foreign instrumentality.

23      That requirement is not in the second count.

24      So the crime here and the evidence hinges on what did

25  Mr. Liew and USAPTI believe with respect to Count One, and what

1  did Mr. Liew, USAPTI, and Mr. Maegerle believe with respect to

2  Count Two?

3      And what the evidence proves beyond a reasonable doubt is

4  that before they got into this project, during the time they

5  were in this project and then after, when they got found out,

6  that they reasonably believed that this was a trade secret.

7      And I want to talk to you about the evidence in the

8  defendants' own words that establishes that.

9      The first is Mr. Liew's statements.  And this goes to his

10 beliefs, the reasonable beliefs that he had about the secrecy

11 of DuPont's technology.  Quote one:

12     "DuPont's titanium white by chlorination technology

13     is the most advanced, but DuPont has always monopolized

14     that technology and has never transferred that technology

15     to China."

16     That's Mr. Liew explaining that DuPont does not share the

17 technology.

18     And there's a handwritten note of Mr. Liew's, which is

19 Exhibit 393, quote:

20     "DuPont has always been the number one.  The main

21     reason" -- the main reason -- "the main reason is that

22     they do an excellent job at keeping it secret."

23     Then he also says, and this is in an email that we'll talk

24 more about later, in Exhibit 274, quote:

25     "The technology is tightly controlled by a few

1          manufacturers, and they are not willing to sell it to
2          China for the obvious reasons."
3      There's some more statements that Mr. Liew made on the
4  next slide.
5          "DuPont:  1 million tons per year.  Revenue greater
6          than 2 billion a year.  Technology not for sale!"
7      That's Walter Liew.
8      And, again, Walter Liew:
9          "DuPont did a good job of keeping the secret since
10         then."
11     And that "since then" refers to when they developed the
12  chloride route technology.
13     And he even has -- you know, he's actually echoing the
14  testimony you heard from the DuPont witnesses about the
15  reasonable measures they take to protect their technology.
16     Remember they talked about how they compartmentalize what
17  people know; and when they send things out to vendors they
18  compartmentalize what they can work on so no one really knows
19  the whole process.
20     That message was received and understood by Mr. Liew
21  because he says it himself:
22         "DuPont makes its people work on restricted area so
23         that no single person can know enough to leak all the
24         secrets."
25     And then, of course, there's the statement in his own

1  handwriting, and the statement that he wrote up on the computer

2  in his conversation with Mr. Spitler in 2000, way back in 2000:

3         "Even with stolen prints," it's not enough.

4     Now, Walter Liew isn't the only person who had this

5  reasonable belief about the secrecy of DuPont's chloride route

6  TiO2 process, because Bob Maegerle had the same reasonable

7  belief.

8     And how do we know that?  We know that from his own words

9  and from his time working at DuPont, working on the actual

10  protection of this technology.

11     And here's what we've got.  You'll recall one of the

12  exhibits is 895.  That was a letter that Mr. Maegerle wrote in

13  the mid '80s, I think it was '85 or '86, where they're working

14  out the Kuan Yin security because they're about to do this

15  project offshore, and he wants to make sure -- he's their lead

16  project engineer -- that the technology is protected.

17     And he sends this letter with a whole bunch of

18  attachments.  And one of them says:

19         "Register and issue Basic Data and flow sheets only

20      to DuPont personnel."

21     Well, isn't that interesting?  These are flow sheets, and

22  that's the Basic Data (indicating).  In fact, this is the very

23  Basic Data that he was talking about then.

24     So Mr. Maegerle, of course, it's not that he just

25  reasonably believed it; he knew this stuff.

1        And also from that document:

2            "Keep Basic Data, flow sheets, and security equipment

3        details under lock and in secure DuPont office area."

4        Now, there's another memo that he received in this time

5    period.  And we'll talk more about this phony Antioch story

6    later, the Ashtabula story about anything being public.  We'll

7    talk about that later.

8        But I just want to point out that back in the time, in the

9    mid '80s, this is what Mr. Maegerle knew, quote:

10           "Although one of our competitors knows about our

11       Antioch technology, others do not have that degree of

12       knowledge.  Even with Antioch technology, we all know the

13       other plants have technology beyond the Antioch process."

14       And that's that point about the sale of the Ashtabula

15   technology in the early '70s.  We'll talk more about that

16   later.

17       But Mr. Maegerle knew, as everybody else did in this

18   industry, when you're working -- in this case, you're always

19   improving your technology; you're always trying to make it

20   better.  And you keep that secret, and you don't let your

21   competitors know because that's how you make money.

22       That's not all the evidence that shows Mr. Maegerle

23   reasonably believed the DuPont process was secret.  Because

24   this next quote from Exhibit 848 is from Mr. Maegerle's own

25   hand, quote:

1              "As a general guideline, DuPont's chloride TiO2

2         process is to be considered DuPont confidential with

3         selected process information and design data sent to full

4         and cost plus contractors on a need-to-know only basis."

5         This is a technology that they protect, that Mr. Maegerle

6    himself protected.  And he knows that it's secret.  And he also

7    knows that after he leaves DuPont, because you'll recall that,

8    I think, in 1996 he sent a letter to someone at DuPont, and he

9    outlined he was going to do some consulting activity.  And he

10   was very careful about saying, I'm not going to reference

11   DuPont.  And he says, quote:

12             "If I feel DuPont technology is being compromised, I

13         will stop my consulting activities with the subject

14         engineering firm."

15        He knows.  He knows, like anybody else, you can go to work

16   after you leave DuPont, but what you can't do is take and use

17   the DuPont technology.

18        And, by the way, just as a matter of common sense, of

19   course, that's the case.  Because, otherwise, how would it

20   work?  Anybody could just leave the company, take all their

21   stuff and sell it.

22        I don't think there would be very many secrets left after

23   70 years because that's how it worked.  And, of course, that's

24   not how it worked because if it worked like that nobody would

25   pay $28 million for it.

1    And he signed agreements.  He signed a couple of
2  agreements when he started at DuPont.  And he was subject to
3  the same trainings that Dr. Diemer was, that Mr. Dayton was,
4  about the protection of their technology, the steps they go
5  through, the stamps, the control.  He was subject to all that.

6    And then when he left, he signed an agreement.  And you
7  have that in evidence.  And he -- it says and he signed that he
8  acknowledges a signed employee agreement not to use or divulge
9  at any time, not the day he left, not five years later, not six
10  years later, never, never at any time "any secret or
11  confidential information of DuPont."  He reasonably believed
12  that that technology was secret.

13    And what I'm talking about, what I just went through with
14  you, that's what Walter Liew and Bob Maegerle knew before they
15  started working on this.

16    Then when they're working on it what do they know?
17  They're working with these documents.  They say DuPont special
18  control contained trade secrets.  Bob Maegerle knows that.  And
19  Walter Liew knows that not only because he has these documents
20  but also because he employs the very same practices in his own
21  business.

22    We showed you the employee agreements he has with --
23  employees have to sign confidentiality agreements.  They can't
24  disclose the information they learned at USAPTI at any point in
25  time to anybody.

1     He's got those kinds of agreements with consultants.  He

2  has got those kinds of agreements with vendors.  He has those

3  agreements with some of the people in China that he's thinking

4  of doing business with.

5     Walter Liew knew very well that this DuPont information

6  was secret because the whole point of this was to keep things

7  secret.  And you couldn't get the DuPont process, as he said

8  time and again in his letters.

9     Now, I want to focus for a moment -- so, again, the

10  government on Count One and Count Two, the proof that Walter

11  Liew and Bob Maegerle reasonably believed that these were trade

12  secrets, is overwhelming.

13     I want to focus on Count One because that's the one that

14  has the intent to benefit a foreign government or a foreign

15  instrumentality.

16     And I want to talk for a minute because this is the key

17  difference between these two conspiracies -- oh, and I'm sorry,

18  before I do that, I do want to make one more point about why

19  they reasonably believed and how we know and how the evidence

20  shows they reasonably believed this technology was secret.

21     We talked about what they knew before.  We talked about

22  what they knew during.  But the kicker is what they did after.

23  It's what they did after.  It's what happened in 2011.

24     In 2011, when DuPont caught on and when the law

25  enforcement came, did they behave like everything they were

1    doing was okay and it was fine?  No.  They lied about it.

2        Why did they lie about it?  Because they knew you're not

3    allowed to do it.  And they couldn't tell the truth.  So they

4    lied.  And we'll talk more about all the specific instances of

5    lying later, but there shouldn't be any doubt, based on their

6    course of conduct, that not only did they reasonably believe

7    this was secret, they knew it was secret, and that motivated

8    their conduct in 2011.

9        Let me focus for a minute on the intent to benefit the

10   foreign government or instrumentality.

11       Now, the evidence here, and the government has to prove,

12   and the instructions walk through this, that Mr. Liew and

13   USAPTI intended to benefit either a foreign government or a

14   foreign instrumentality.

15       In this case there's evidence, lots of evidence to

16   establish both, but for purposes of your work and your findings

17   you need only find one.

18       So I'd like to start by talking about the evidence that

19   shows that this was done to benefit the foreign -- a foreign

20   government.  In this case, that government is the government of

21   the People's Republic of China.

22       And Walter Liew says it in his own words several times.

23   And this is the most succinct example, in Exhibit 374.  He

24   sends an email talking to Nora Lam about China wanting the

25   chloride route TiO2 technology and says:

1           "I got into this because of the request of the State
2     Council."
3           And you'll recall the testimony of Mr. Lewis and others
4     that the State Council is the highest executive organ in the
5     government of the People's Republic of China; it's the
6     executive branch; it's the White House of China.
7           And there he is saying he got into this because of a
8     request from the State Council.  And, as you'll recall from the
9     other letter, Exhibit 350, he got into it because of a request
10    from Mr. Luo Gan who at the time, in 1991, was the Secretary
11    General of the State Council.
12          Mr. Liew is working to benefit the Chinese government.
13    He's also benefiting a foreign instrumentality.  And in this
14    case the foreign instrumentality is the Pangang Group Company.
15          And there are two ways to show the foreign
16    instrumentality.  Way one is substantial ownership, that he's
17    benefiting a company that is substantially owned by the
18    government of the People's Republic of China.
19          The legal requirements are substantial ownership.  In this
20    case we have total and complete ownership.  And that, ladies
21    and gentlemen, is undisputed.
22          Mr. Lewis, the defense expert on China, acknowledged that
23    Pangang Group, also known as Panzhihua Iron and Steel Company,
24    is a hundred percent state owned.  It's owned by the Chinese
25    State and controlled and managed by SASAC, the State-Owned

**CLOSING ARGUMENT / AXELROD**

1    Asset Supervision Administration Commission.

2        And it's not just Mr. Lewis that said that.  You may

3    recall the testimony of Mr. Hu, who said, yeah, it's a

4    state-owned entity; anybody and everybody in China knows that.

5    And I think that Mr. Olson from DuPont also made the same

6    point.

7        So that is substantial ownership.  But there's another way

8    to prove foreign instrumentality, and that is substantial

9    control.

10       And here there's separate proof beyond a reasonable doubt

11   about substantial control because the Pangang Group is

12   controlled, really, by two components of the Chinese

13   government.  You'll recall -- and one is the Communist Party of

14   China.

15       You'll recall that Mr. Lewis said that Party's control is

16   pervasive in Chinese society.

17       And that pervasive control existed with respect to this

18   particular Pangang Group Company in a number of ways.  First of

19   all, the head person of Pangang Group, when it went to -- when

20   it became Panzhihua, he was also the Communist Party Secretary

21   for the company.

22       And you'll recall, when Mr. Lewis testified there was a

23   document that he discussed with Mr. Hemann, which was

24   essentially the -- the Exhibit 395 was the -- basically, the

25   Chinese Communist Party organizational document relating to

 1   Pangang Jinzhou.  And there's a number of aspects of that, that

 2   talk about the role and control of the Chinese Communist Party.

 3   That is one way of showing the control of the foreign

 4   instrumentality.

 5       The other way is through SASAC and the State Council.  And

 6   you heard testimony about SASAC, and they're a component of the

 7   State Council.  It's an executive branch agency.  And what they

 8   do is they manage and supervise the operation of central

 9   state-owned entities like Pangang Group.  Pangang Group is one

10   of them.

11       They hire and fire the executives.  There's -- I believe

12   it's Exhibit 960 shows you when SASAC replaces Mr. Hong with

13   Mr. Fan.  And that's their job.  We have from their website, in

14   English, SASAC's responsibilities.  That's one of them.

15       There's another very particular illustration of that

16   control in this case, and that occurred in 2004.  And I want to

17   talk about that for a moment because in 2004 you'll recall that

18   there is a State Council, okay, so we've talked about.

19       And then in the State Council there's different levels of

20   people, not unlike our executive branch.  So there's a

21   secretary general, there's state councilors, there's a vice

22   premier, and then there's Premier's Office.

23       And you may remember that when this whole thing started

24   back in 1991, Mr. Luo was the Secretary General of the State

25   Council.

1          Well, what I'm talking about is what occurred in 2004.

2     And in 2004, Mr. Luo, he was a state councilor.  And he worked

3     underneath these other components.  And the State Council

4     controlled -- had SASAC as an entity underneath it.

5          And as we talked about and the evidence here is

6     uncontroverted, SASAC owned and controlled the Pangang Group

7     Company.

8          And at the time in 2004, remember Mr. Hong was in charge

9     of Pangang Group.  And then there's other companies that were

10    underneath.  And you will recall that in Petaluma there was a

11    satellite office.  There was one guy, Mr. Hu, working in

12    Petaluma, California.  And he's at the bottom there.

13         You recall Mr. Hu coming and telling you, in 2004 he was

14    tasked with writing a report about Walter Liew's company.  In

15    conjunction with 2004, they're looking at this Jinzhou project

16    coming.  He gets tasked by PIETC, back in China, to talk with

17    Mr. Liew and write up a report.  And he does.  Sends it to

18    China and thinks that's the end of.

19         But let's talk about how government control works in the

20    real world.  Because what he's told you what he came to learn

21    was that in 2004, the head, someone from the Premiere's Office

22    at the State Council, reached out and contacted Mr. Hong.

23         And they reached out and contacted Mr. Hong because they

24    wanted to know about some negative report about Walter Liew's

25    company.

1    And what does Mr. Hong do?  He goes and calls the guy, the

2    one guy over in the United States, way far away.  I don't know

3    if he's employee 59,995, but he's down there.  And he gets a

4    call from the guy at the top, because the guy at the top got a

5    call from the Premiere's Office in the State Council, wondering

6    why was there a negative report about Walter Liew and his

7    company.

8    Ladies and gentlemen, that is control.  That is control.

9    Now, I want to move on for a minute and now talk about

10   these conspiracy charges.  There's two other charges that

11   relate to Trade Secret 1, which is the -- the DuPont process.

12   And those are two attempt charges, which are Counts Three and

13   Five.

14   And Counts Three and Five -- oh, I'm sorry, I neglected

15   one thing, which is on the conspiracy counts there's an overt

16   act requirement.  And I'm not going to go through all the overt

17   acts with you, but there is an overt act requirement.

18   You need only find one overt act.  It doesn't have to be

19   an illegal act in and of itself.  It has to be one done in

20   furtherance.  And we've identified a few for you.  There's a

21   whole bunch more.  But these are ones that we talked about

22   during the trial.  You'll have that, but I wanted to point out

23   that requirement.

24   Now, I want to switch gears or move on, still on Trade

25   Secret 1, and talk about the attempt charges.  So as I

 1    mentioned, Count Three is the economic espionage attempt.  That
 2    involves Mr. Liew and USAPTI Trade Secret 1.
 3         Count Five is the trade secret theft.  It's the charge
 4    involving those same defendants plus Mr. Maegerle still on
 5    Trade Secret 1.
 6         Two -- two points about the attempt charges.  Point number
 7    one is it's just like the conspiracy in the sense that it
 8    requires a showing that the defendants reasonably believed
 9    Trade Secret 1 was a trade secret.  Not that it actually is,
10    but the defendants reasonably believed that it was.  We talked
11    about that evidence.  It pertains here as well.
12         The second point is that an attempt is based on the idea
13    that he may not have been successful.  He may not have
14    completed the transfer.
15         A perfect example of that in this case is what Walter Liew
16    was doing in 2010 and 2011, with the Fortran code from the
17    Accession Report.
18         You remember that Mr. Duong testified that at some time in
19    November, December 2010, he got this assignment to scan in
20    attachment -- Appendix B to the report, which is the Fortran
21    code.  He did that.  Those exhibits are in evidence.
22         And then in the spring, Thongchai Thongthawee is working
23    on it, and they are working on it trying to figure out the
24    Fortran code.
25         That technology transfer was not complete.  That's the

 1   kind of thing that the attempt captures.  And that's what those

 2   charges are.  So those are the attempt charges.

 3       Now -- and, of course, that's interrupted because the FBI

 4   comes in July of 2011 and executes search warrants.

 5       I want to talk -- now I want to move on to the charges.

 6   We're still talking about stealing and still talking about the

 7   theft of trade secrets.

 8       I want to move on to the specific trade secrets alleged in

 9   the indictment, that were possessed and used in this case,

10   these documents (indicating).  And before I do, I want to make

11   a point about the team, Walter Liew's team, his TiO2 team.

12       Remember Mr. Gasner got up in opening and talked about his

13   team and all the people with expertise they had?  Well, that's

14   just not true.  They didn't have a team of people who knew

15   TiO2.  It's just a plain fact.  Mr. Cooper admitted it when he

16   got up and talked about it.

17       And the point about the team is this:  You met the

18   employees from Mr. Liew's companies, from USAPTI and

19   Performance Group.  They are perfectly nice people.  They just

20   don't know anything about TiO2.

21       But it turns out to design one of these plants you need to

22   know what you're doing.  And he didn't have that team.

23       In fact, Mr. Maegerle even told Agent Pattillo that he was

24   pretty unimpressed by the team that they had.  They didn't have

25   a chemical engineer.  They didn't have the expertise, they

1    didn't have what they needed.

2        And Mr. Liew himself acknowledged what his team really did

3    and really was when he went to bankruptcy court.

4        I want to play this -- we may have a glitch at the

5    beginning, but I want you to listen and think about, remember

6    Bob Maegerle is his only consultant who actually knows

7    anything.  And listen to what Mr. Liew had to say about his

8    team and his business in February of 2009.

9        (Audio recording played/transcription displayed as

10   follows:)

11           **"THE COURT:**  And what did -- and what did Performance

12      Group USA, Inc. do for -- how do they earn money?

13           **"THE WITNESS:**  Well, we do -- we offer consulting.

14      We offer engineering support services.

15           **"THE COURT:**  To what?

16           **"THE WITNESS:**  Engineering.

17           **"THE COURT:**  Okay.  All disciplines?

18           **"THE WITNESS:**  Partial.  We didn't do -- we just do

19      some calculations some -- some CAD work.  No civil, no

20      structural."

21           **"THE COURT:**  No design work or --

22           **"THE WITNESS:**  Not much.

23           **"THE COURT:**  So these calculations, were they to

24      confirm what -- what the design engineers had come up

25      with, or to determine loads and things like that of

1       particular options that they had, that type of thing?

2           "**THE WITNESS:**  Yeah.  We -- we basically based on the

3       information we got from the consultant, and then we just

4       work out the details and, you know, let them prove it.  So

5       we -- we hire some -- some people help us to -- to check

6       out the details.

7           "**THE COURT:**  And again, it had to do with

8       specifications, something -- the specifications determine

9       if the loads are right or if the --

10          "**THE WITNESS:**  Yeah, equipment, mostly on the

11      equipment specification.

12          "**THE COURT:**  Okay."

13          **MR. AXELROD:**  So when you go back and look at the

14  evidence, and think about this, this statement -- this here

15  statement reflects the realities of what Mr. Liew did.  They

16  didn't really do design work.  They didn't do much design work.

17  And that's true.  They didn't.  What they did do was get

18  information from a consultant, Mr. Maegerle, and figure out

19  information from that.  And that's what the witnesses told you.

20      Well, when they had questions, Mr. Maegerle would give

21  them the information.  He gave them the sketches, and then they

22  did what they did based on that and based on the other

23  information, the trade secrets that we're going to talk about.

24      That is a important factor when you talk, also, about the

25  value of these secrets and the value that they had to Mr. Liew

1   and Mr. Maegerle and the people that were working on this

2   project who knew nothing about designing a very complex

3   industrial process.

4        Okay.  So the specific trade secrets that we're going to

5   talk about are Counts Six, Seven, and Nine.  So Six is the

6   oxidation flow sheet; Seven is the Accession Report; Nine is

7   the chlorination flow sheet.  Those are charges with respect to

8   Mr. Liew and USAPTI.  And these are the documents from

9   Mr. Spitler.

10        And then Count Eight is the Basic Data Document, and

11   that's Mr. Maegerle and Mr. Liew.  And we'll talk about that.

12        I want to put up, for a moment, the trade secret

13   definition.  And I want to talk a couple of things about that

14   instruction.

15        First of all, there's a fact.  It says:

16            The term 'trade secret' can include compilations of

17        information."

18   And that's a very important point.  It says:

19            "Combinations or compilations of public information

20        from a variety of different sources when combined or

21        compiled another way can be a trade secret.  In such a

22        case if a portion of a trade secret is generally known but

23        even if every individual portion of the trade secret is

24        generally known, the compilation, the combination of

25        information may still qualify as a trade secret if it

1          meets the definition of trade secret set forth in the

2          preceding paragraph."

3          That is important because each one of these documents is a

4     compilation of information.  It's a whole bunch of information

5     put together in a unique way.  And some pieces of some of these

6     documents are in the public domain.

7          And, you know what?  That doesn't make one bit of

8     difference for whether it's a trade secret -- it says so right

9     there -- because these are unique and they meet the

10    requirements of the statute.

11         And, in a way, that kind of makes Paul Cooper's testimony

12    totally irrelevant.  Because, you remember, I asked him about

13    each one of these things.

14         Mr. Cooper, where can you find these things?  Can you find

15    them?  I want to buy them.  Can I get them in the public?

16         No, you can't do that.

17         And I'm sure he looked, in the $200,000 of work he was

18    doing on this case.

19         That's point number one.

20         Point number two is reasonable measures.  The owner and in

21    this case the owner of this information it's the -- is DuPont.

22    There's been no evidence to the contrary.  These documents are

23    all stamped "DuPont."  They are all marked "DuPont."  They're

24    DuPont documents.  I don't think that Dr. Diemer was working on

25    anything other than DuPont when he was working on that

 1   Accession Report.

 2       These are DuPont trade secrets.  And they have taken --

 3   and the evidence shows that they've taken reasonable measures

 4   to protect that information.

 5       I'm not going to go through all of them with you, but let

 6   me just point out a few that you've heard about.  There's the

 7   physical security surrounding the plants: they had fences; they

 8   had gates.  You can't just walk in.  If you get in and go

 9   through the guard gate, you're escorted even if you're an

10   employee from another place.  You can't take pictures.  You

11   can't take pictures.  You have your possessions being subject

12   to search.

13       The employees who work at these places sign

14   confidentiality agreements.  Just like, by the way, they do at

15   all the other companies in the industry, like Tronox where

16   Mr. Gibney worked, or at Cristal where Mr. Livingston worked.

17   And as Mr. Cooper talked about, we went through his

18   confidentiality agreements.

19       And DuPont had confidentiality agreements.  Mr. Maegerle

20   signed them multiple times.  And they had training.  He got

21   training.  He was actually -- you may recall that in one of the

22   exhibits he was -- in his personnel review he was the PIP

23   consultant.

24       The DuPont process, they have these Proprietary

25   Information Protection plan, called PIP.  They got people who

1    were consultants, who were like the experts in the field.  And

2    they did audits and things like that.  And Mr. Maegerle was one

3    of those people.  And that's the kind of measures that they

4    took.

5         And Mr. Diemer -- Dr. Diemer talked about how they had

6    trainings; they would routinely get trained; they had policies.

7    Those are all the kinds of measures that they took that are

8    more than reasonable.

9         They also protected technology by compartmentalizing it,

10   by having -- if they had outside vendors, they might take a

11   piece in and then do in-house modifications.  They didn't tell

12   anybody about it because that was their technology, and that

13   was another way they protected it.

14        The other point here is the value, and the value, actual

15   or potential, from not being generally known or readily

16   ascertainable.

17        Remember the goal here, the goal of this whole operation

18   was to provide the DuPont process; not somebody else's.  And

19   that's what they had, and that's what they used, and that's

20   what they worked on.

21        And, of course, it had value to them.  And you know the

22   best way of knowing it had value to them?  Because they used

23   it.  And we're going to talk about that with respect to these

24   trade secrets.  They used these trade secrets.  They used them

25   at the time when they were working on this.  And they've said

1    so in their very own words.  And we're going to go through

2    that.

3          But it's -- that value is enhanced in a case like this

4    where they don't have a team of people who know this technology

5    or know this business.

6          The other point is that facts and information memorized

7    can be trade secrets.  And this is a point, and it's set forth

8    in the instructions.

9          I'm not going to read it to you right now but the point is

10   this:  You can't cheat the system by memorizing something

11   that's a trade secret and then going out and using it.  It's

12   still a trade secret whether it's in your head or not.

13         And remember when Mr. Dayton testified and he talked about

14   things he had learned doing due diligence for someone else, and

15   he wasn't allowed to disclose or share with anybody, and he

16   made the point, he said, yeah, it's in my head, and it's going

17   to stay there.

18         So whether it's in your head or you have it on a piece of

19   paper, it's a trade secret plain and simple.  You don't get to

20   use it.  And that's the law, and it's what the evidence shows

21   that Mr. Maegerle understood.

22         So let's talk about the specific trade secrets.

23         Trade Secrets 2 and 4 are the two flow sheets.  The top

24   one there is Trade Secret 2, and the bottom one is Trade Secret

25   4.  And these are Counts Six and Nine.

 1        Both of these documents have DuPont confidential markings
 2   on them.  Both have legends that talk about the confidentiality
 3   of those agreements.
 4        Full copies of those documents were located in the closet
 5   in the garage at the Liew residence.  And they were located
 6   elsewhere in this case: electronically, in the office, the
 7   safe-deposit box, the thumb drive, the thumb drive of
 8   Mr. Maegerle.
 9        And they used this information.  And maybe the best
10   example of that is Exhibit 70.  And we're not going to go
11   through it now, but that is an email in which -- and maybe we
12   are.  That's an email where Mr. Maegerle and Mr. Liew are
13   talking about the aluminum chloride generator.
14        And this is what Mr. Liew has to say to Mr. Maegerle:
15             "Since the amount of aluminum is not shown in your
16        flow sheet, I checked this with a reference sheet that I
17        got from Spitler."
18        Remember, that's Mr. Spitler.  And he's talking about this
19   document, this trade secret.
20        And, remember, Mr. Dayton came down and showed you
21   specific numbers from the heat material balances are right
22   there in that email?  They're using this information.  And
23   Mr. Maegerle responds.
24        And that particular secret is particularly important
25   because it has very specific information about flow rates and

1   pressures and volumes and temperatures and things you just

2   can't find in the public domain because it's how DuPont did it

3   at its Edgemoor facility.

4       And that has a value because, as Mr. Dayton explained,

5   that helps you size equipment and figure things out.  And

6   that's what they had it for, and that's what they were using it

7   for.

8       There's also Trade Secret 4, which is the chlorination

9   drawing.  Now, I will tell you, that information is not as

10  developed as the information in Trade Secret 2.  It doesn't

11  have the same total body of information.  But it has an awful

12  lot of information that is not publicly available.

13      And as Mr. Cooper explained, this is the kind of document

14  R&D makes so they can start working on improvements.  That's

15  what that was.  That has a value.  It's not publicly available.

16  Walter Liew had it.

17      The next trade secret --

18          **THE COURT:**  Mr. Axelrod, let's take a break now.

19  Ladies and gentlemen, you can stretch if you like.

20      (Pause)

21          **THE COURT:**  All right.  Please be seated.

22  You may continue.

23          **MR. AXELROD:**  Thank you, Your Honor.

24      Trade Secret 3 is Count Seven.  That's the Accession

25  Report.  The point there -- and that, on its cover, you'll

1    recall Mr. Jian Liu testified that Walter Liew told him this

2    was an important document, and provided it to him.  And it says

3    right on the cover:

4            "This report contains confidential information, and

5        each holder is responsible for its safekeeping.  When no

6        longer needed, please destroy or dispose of in conformance

7        with PIP guidelines."

8        And you'll recall, Tim Spitler was one of the recipients

9    of this report.  It has the correlation from Dr. Diemer that

10   John Liu copied.  And that's Exhibit 163.  And you heard

11   Mr. Duong testify about how he scanned in the appendix and

12   Mr. Thongthawee worked on it.  You have those exhibits there,

13   and you'll have them with you.

14       The next trade secret is Trade Secret 5, and that's the

15   Basic Data Document.

16       And what you see on the slide is the cover sheet, and it

17   says right there "Confidential - Special Control."  This is the

18   copy that was provided to Mr. Maegerle.  This document is a

19   very important document because it contains the DuPont

20   technology for building a plant from the ground up.

21       And I'm not going to go through with you now all the

22   examples of the use of that document, but you will have this --

23   you have this with you, and you'll recall that there are dozens

24   of examples that we talked about in e-mails.  And Mr. Dayton

25   talked about he found 120, 130 instances where Basic Data was

 1    lifted and in the documents that Walter Liew and Bob Maegerle
 2    were working on.
 3         And one particular e-mail that I recommend to you when you
 4    go back and look is Exhibit 67, because that's one where
 5    Mr. Liew is actually asking Mr. Maegerle to go back and check
 6    the Basic Data from Kuan Yin.
 7         So he understood and knew that they were using this.  And
 8    that is, in the middle of that page he says -- in the bottom
 9    there's an e-mail where Mr. Maegerle is saying, you know, he --
10    here's the requirements from Taiwan Basic Data, and there's a
11    question about the numbers; and in the e-mail above it, in the
12    middle, it says, "Check with number gpm for Kuan Yin."
13         So that's Mr. Liew asking, "Hey, you've got these numbers,
14    but go back and check the Basic Data Document.  Check
15    Kuan Yin."  That's what they're talking about.
16         Now, I want to spend a moment talking about Mr. Cooper,
17    Mr. Cooper, the Defense TiO2 expert, because he testified for
18    an awfully long time on direct examination; and I want to talk
19    about some of the things that he said and why he just simply
20    can't be believed.
21         And the first is this disclosure issue.  Here's a guy who
22    worked on this case for well over a year, knew exactly what
23    this case was about, knew it involved the Jinzhou contract,
24    knew -- although, he claimed he didn't really know why he flew
25    all the way to China in October of 2005.  Well, he didn't

1   really remember.  He didn't know why he went there, but he did

2   go there.  And he said, "Well, I was just there for three days

3   so I didn't think I needed to disclose it on my report or tell

4   anybody."  Well, tell the Government or Court until he got on

5   the witness stand and testified in front of you.

6        And then -- because I asked him about this.  "Well" -- you

7   know, he said, "Well, it wasn't so important, just three days."

8        But then what did he do when Mr. Gasner started to ask him

9   questions?  "Oh, Jinzhou, yeah.  I looked at oxidation reactor.

10  They had a flue pond.  They had -- it was commercially

11  successful.  Mr. Liu Changhe was an expert.  I relied on his

12  treatise."

13       Do you really think that's not the kind of information

14  you're supposed to tell everybody about when you get involved

15  in the case?  Right there out of the gate you've got serious

16  questions about this guy.

17       But it got a lot worse because we're talking with him

18  about very specific instances.  Remember, we went through, I

19  think, 28 different documents with you with Mr. Dayton; and we

20  went through, "Hey, this specific number came from here in the

21  Basic Data Document, and that thing came from there in the

22  Basic Data Document."  It was painstaking, but that's the

23  evidence in the case; and it does show Bob Maegerle and Walter

24  Liew using trade secrets, and we went through it.

25       And what happened when Mr. Cooper got up?  Well, he said a

1  lot of things on direct examination; and then, "You know, well,

2  you can figure this out from this patent, and this is known and

3  that's known."

4      And then remember I started asking him, "Okay.  Let's look

5  at this e-mail, sir.  You show me where in the patent that

6  specific figure is disclosed."

7      And what was his answer?  This is what he said:  "I'm used

8  to ranges of numbers usually, frankly."

9      Well, this isn't about ranges of numbers.  This is about

10 specific information; and he knows, having worked in that

11 industry, that it is a highly precise process and the specific

12 numbers matter.  We're talking about chlorine gas.  We're

13 talking about TiCl.  We're talking about high temperatures,

14 dangerous materials.

15     And just think about Dr. Diemer.  Remember, he got down

16 and he showed you the specific slot sizes and the dimensions

17 and the reaction that happens in milliseconds; and then we

18 looked at the Accession Report, and there's very specific facts

19 and figures about how to design one of these things and the

20 dimensions?

21     What does Paul Cooper have to say about that?  "Well, you

22 know, I'm used to ranges of numbers."

23     That's just not credible.  Nobody in this business works

24 in ranges of numbers.  "Ranges of numbers" is what he says when

25 he won't admit that, in fact, the specific information that

 1   they used is not publicly available.

 2        The next thing he did or another thing he did, and, again,

 3   this is what he said, "Well, essentially chlorinators in the

 4   industry are the same."  That's what he said on direct.

 5        "Oh, okay.  Hey, let's talk about DuPont chlorinators.

 6   Have you ever been to a DuPont plant?

 7        "No.

 8        "Have you ever been to DeLisle?

 9        "No.

10        "Did you ever see a chlorinator there?

11        "No.

12        "How about Edgemoor?

13        "No, I haven't been there either.

14        "Altamira?

15        "No," and so on, and so on.

16        So he gets up on direct and tells you he knows about the

17   industry, but he actually doesn't know anything.  So he's not

18   someone that should be believed.

19        And this is another one.  We talked about sizing the

20   flue pond from Google Earth.  And the funny thing about this

21   is, the flue pond sizing the pipes, it's not just -- and we

22   talked about this somewhat -- it's not just the length of the

23   pipes.  It has to do with diameters and very specific

24   information because you have to figure out the surface area,

25   and you need to know the specific diameters and all the lengths

1    of the pipe and the length of the pipe.

2         And he gets up there and he says, "Oh, well, you know, I

3    was on Google Earth, and I figured out the length of things;

4    and I looked at the patent, and that gave me sort of range of

5    numbers."  But that's not what this is about.

6         By the way, by the way, he said he spent 20 hours doing

7    that.  Okay.  And I said to him -- and this gets to the point

8    of what's readily ascertainable -- because I said to him,

9    "Well, sir, first of all" -- and he admitted, well, he didn't

10   actually know the specific numbers that DuPont used.

11        And I said, "Well, but you could -- instead of spending 20

12   hours guessing, you could just look in the Basic Data Document

13   just like Bob Maegerle and Walter Liew did, and get a very

14   specific figure and calculate the math."

15        And he said, "Well, I wouldn't do that."

16        Really?  Really, you wouldn't use the actual specific

17   information from the people who make the process that you're

18   trying to copy?  You're going to pretend that you can just go

19   out and spend 20 hours and get to a range?  That's absurd.

20   That is absurd.

21        And this is another point, the patent list.  Remember the

22   patent list?  Isn't it amazing that his patents in his 80-page

23   report are the same ones that Walter Liew had in 1996 and 1997?

24   You think that's a coincidence?

25        And he was so evasive.  He spoke in grand generalities

1    about this.

2         Remember, Dr. Diemer and Mr. Dayton got up there, and we

3    talked very specifically about very specific figures and pieces

4    of information.

5         And then Mr. Cooper is just opining left and right about

6    the information without confronting the specific pieces of

7    information.  And he fought me on all sorts of things, even if

8    he said something, like -- he did say Jinzhou was commercially

9    successful.  And then I asked him about that the next day; and

10   he said, "Well, I didn't say that."  "I may well have said

11   that."  "I believe I probably did say that."

12        What's going on here?  Why can't he just answer the

13   questions and tell the truth?

14        And I think I just alluded to this, but the fact of the

15   matter is, he made lots of sweeping commentaries about things

16   being publicly available or readily ascertainable or reasonably

17   ascertainable from these documents without actually getting

18   into the weeds and explaining where and how and what.

19        And when I would confront him with these things, he would

20   go back to, "Well, I just deal with a range of numbers.  I

21   don't do specifics."  But this is about specifics, and that's

22   the value of it, is it's specific.

23        And, by the way, do you remember you had that nice chart

24   of the Trade Secret 2?  They broke it up into color-coded

25   portions.  They went through a whole tour.  The guy skipped the

1   heart of the whole process, the oxidation reactor. He never

2   talked to you about the oxidation technology. That's the heart

3   of this process.

4         Remember, there was real specific information about it in

5   the Accession Report, and there's specific information about it

6   and the piping sizes and the instruments in that very document,

7   in the process -- in the flow sheet, and he never talked about

8   it. He never talked about it. He just skipped over the things

9   that he didn't deem important to talk about, all the specifics

10  that we spent a lot of time talking about.

11        Yeah, this case is not about patents. It's not about

12  patents. The Defense may want you to believe that. And remind

13  yourself as you listen to the arguments: Really? Someone's

14  going to pay $28 million for a bunch of stuff that's publicly

15  available? Of course, not.

16        Mr. Cooper did admit that when he actually designs one of

17  these plants, he doesn't look at patents and he doesn't look at

18  Barksdale either. It's a bunch of hooey. And you know how we

19  know that? Because we actually spent a little bit of time with

20  him going through some of the patents that he talked about with

21  Mr. Gasner.

22        Do you remember there was the patent about chlorinators

23  running on molasses? Yeah. Sure. That's a highly developed

24  industrial process that everyone uses. It's just silly.

25        And when I asked him about it, what was his response?

1    "Oh, well, these were just purely historical."  Well, that's

2    fine.  There's nothing wrong with purely historical patents,

3    just like Walter Liew had some in 1996 or 1997.  That's fine;

4    but it's not the basis of this project, and it doesn't disclose

5    any of the information that this case is about, which is this

6    right here (indicating).  This is it.

7         You can't find it.  He didn't come in here and say, "Oh,

8    yeah, I found this unique compilation together at this place.

9    I went to Walmart and I bought the Basic Data Document."  Of

10   course not, because it's not true.

11        Okay.  This is another one.  The Defense spent a lot of

12   time talking about the Benicia Fabrication photo.  Remember?

13   "Oh, the DuPont chlorinator, that's publicly available because

14   there's a picture on the wall in a place, and you can figure

15   out everything from that."  And that's what Mr. Cooper said on

16   direct examination, "Yeah, you can figure out the chlorinator

17   from this picture."

18        Okay.  And then remember I asked him, because it's all

19   about the spacing of the jets and the distance from the wall,

20   and I said, "You can't figure this out from that picture."  And

21   you know what?  He said, "Yeah, you're right.  You can't."

22        And that's important because what Bob Maegerle did to

23   figure out that spacing in his own handwriting is, he got all

24   the information from the Basic Data Document about the spacing

25   of the jets.  You can't figure that stuff out from some picture

1    of some chlorinator on a wall.  You can't, and that's not what

2    they used.

3         All right.  I could go on.  I'm not going to go on

4    forever.  But his opinion, remember he talked about the

5    opinion, his opinion about Walter Liew's team and how they're

6    amply qualified to do this job?

7         And I'll give him credit.  He stuck to that story.  But,

8    boy, wasn't it amazing when we went through that exercise?

9    "Okay.  Mr. Cooper, tell me about his team."

10        "Well, there was Mr. Maegerle."  He did identify correctly

11   the one person who, actually, knew something about TiO2.  And

12   then he didn't identify anybody else that had any experience.

13   He recognized that Walter Liew had none, but he stuck to this

14   notion that somehow they had the credentials.  That doesn't

15   make any sense at all, and it doesn't make any sense in

16   particular after he talked about how he had this team of 14 or

17   16 people who had all this TiO2 experience when he was

18   designing a plant.  That is ridiculous.

19        And that brings us to the last point with Mr. Cooper that

20   I'm going to talk about.  He was paid more than $200,000 to

21   come in here.  And it's not just the money.  It's the time.  He

22   spent over 800 hours concocting this story.

23        You know what that is, 800 hours?  Just to give you some

24   perspective, Mr. Dayton came in and said, "Yeah, I spent about

25   three or four weeks getting ready for my testimony."  And we

 1   went through all those details.  Remember?  800 hours is five

 2   months of working 40 hours a week getting paid $10,000 a week

 3   to look at this stuff.  That's an awful lot of money.

 4        And when he came in and push came to shove, he didn't have

 5   an explanation for any of this, and he is not somebody whose

 6   opinion you should rely on.

 7        And speaking of money, ladies and gentlemen, that's a

 8   really nice segue to Walter Liew's cheating.  Let's talk about

 9   cheating because there are a whole series of charges relating

10   to his tax fraud and bankruptcy fraud, and I want to talk about

11   those right now.

12        So there are tax charges, Counts 15 through 19, and this

13   has to do with the returns.  You have those returns.  You have

14   those summary exhibits from Ms. Jiang, the IRS revenue agent

15   who talked about this.  I will summarize that slide by saying:

16   Boy, he only reported a little bit to the IRS, and he kept an

17   awful lot to himself that he shipped off to Singapore.

18        And these charges, these cheating charges, are very

19   important, not just for all the money and all the lies, but

20   because of what it -- how it relates to the trade secret theft.

21        He was concealing and hiding all the money he was getting,

22   and getting it out of the United States as fast as he could

23   because he didn't want anyone to know what he was actually up

24   to.  And he didn't tell his return preparer, Mr. Guan.  He

25   didn't tell the IRS.  He just funneled it off to himself

1    overseas for his family.

2        I want to talk about his control of the money.  First are

3    the contracts, and there's this series of contracts on the

4    bottom of this exhibit that show all the contracts that he

5    entered into.

6        Walter Liew was the person who signed the agreements on

7    behalf of his companies, and it required his companies to

8    provide services.  Not somebody else, not some other company,

9    Walter Liew's company, USAPTI or Performance Group.  And he

10   signed those contracts, and he collected money on those

11   contracts, and he did that through letters of credit and

12   letters of guarantee.  And those are -- those exhibit numbers

13   are those documents.

14       And you'll recall the testimony of Mr. Chan, the Mega Bank

15   employee who talked about getting the instructions.  And you'll

16   have all these documents, all the signed documents from Walter

17   Liew, "Hey, send this money to this company in Singapore.  Send

18   this to my wife in China."  All that stuff you will have and

19   you will be able to review.  The decision-maker on all of this

20   is Mr. Liew.

21       And those wire transfers, there's a lot of exhibit numbers

22   down there, but I believe they're all in the summary

23   Exhibit 919.

24       And he sent all of this money to Singapore to companies

25   that his own lawyer agreed in opening statements are shell

1    companies.  They're shell companies.  Shell companies don't do

2    business.  They're just pass-throughs for money, and he was

3    passing the money to himself.

4        And I'm going to just talk briefly about one example,

5    which is Huadong Equipment, and that's this company

6    (indicating).  We talked about it a little bit.  That was this

7    company that, yeah, he owned.  It's registered in Singapore in

8    2006.  It had a bank account.  He controlled that, too.

9        And what did he do?  What did he do with that money?

10   Because, remember, a lot of money came into the United States.

11   A lot of money went to Singapore.

12       Just by way of reference, and you have these exhibits with

13   you, between August 2006 and October 2008, just that

14   couple-year period, Mr. Liew himself directed the transfer of

15   $5.8 million.  $5.8 million.  That's just the Huadong company,

16   not to mention all the other companies that his wife owned or

17   she controlled the bank accounts, he did or family members.

18   That's a lot of money.

19       But you know what?  And then -- and you can review the

20   summary charts later, but remember he took a bunch of that

21   money and then he moved it into China in that account at HSBC.

22   It was in his father-in-law's name, but that he controlled and

23   he signed.  So the idea was get the money, and get it out of

24   the United States.  Don't let anyone know about it, and get it

25   into China.  That's what he was doing.

1     And let's talk about the money a little bit.  I just want

2    to talk about some engineering, some real engineering that

3    Mr. Liew did, tax engineering.  Because I'll tell you what, he

4    did some very impressive engineering.

5     What we're looking at now is a slide of -- this is -- this

6    relates to the tax counts.  This is all the money.  This

7    doesn't include the 2011 money.  This is 2006 through 2010, the

8    money that he received on these contracts he had with the

9    Chinese companies:  $22.5 million.  $22.5 million for

10   technology that was stolen, that didn't belong to him.  It

11   belonged to somebody else.  Nobody's paying anybody $22 million

12   for stuff you can figure out from a patent.

13    What did he do?  Because, remember, he's the guy that

14   makes the decisions about where the money goes.  What does he

15   do?  Well, there's the matter of how to divvy things up, and he

16   showed some real skill there.

17    We'll talk about the $17.7 million that he moved offshore

18   without ever reporting in a minute.  I just want to focus on

19   what he reported because it's actually impressive.

20    He reported $4.78 million of gross receipts, which is a

21   portion of the gross receipts that he received.  He declared

22   $4.821 million in deductions.  Do you think that that was just

23   some incredible coincidence that he actually had more

24   deductions than gross receipts, he came within $40,000 of those

25   numbers balancing out?  Of course, not.

1    Because what Mr. Liew was doing was zeroing things out.

2  And what was the result?  For the $22.5 million he received on

3  those contracts, he paid $4,000 in taxes.  $4,000 in taxes.

4    Agent Jiang testified that that is .02 percent.  I

5  misspoke.  .02 percent is 2/100ths of a percent.  I'm sure we'd

6  all enjoy that tax rate, but that's not reality.  That's a

7  crime.

8    And you can see that because there's that matter of the

9  $17 million he moved off to Singapore.  Because if he had

10  reported that, he would have owed a little bit more in taxes,

11  to the tune of $6 million.  That's a whole series of frauds, a

12  whole series of cheating for 2006 through 2010.

13    I want to talk about the bankruptcy fraud because these

14  things are -- it's all -- remember, remember, it's lying,

15  cheating, and stealing, and we're just focused on Mr. Liew's

16  cheating right now.

17    He didn't just cheat the IRS.  He cheated the Bankruptcy

18  Court, and he cheated the Bankruptcy Court by telling a story

19  about his business and it stopping to operate and how it

20  stopped to operate.  And what it is he said was -- well, you'll

21  have the transcript is Exhibit, I think, 511, and you've got

22  the audio; and in one of them he says, "Well, in November 2008,

23  you know, we were done."

24    And you can go back and look at the money flows, but let's

25  look at what he also told the Bankruptcy Court at the time.

1              (Audiotape played but not reported.)

2         **MR. AXELROD:**  He ran out of cash.  Really?

3     Let's look at the finances there.  This, what we're

4  looking at, is just the monies received by Performance Group

5  during the time period 2006 to 2011, which total over

6  $12 million; and, of course, almost 9 and a half goes to

7  Singapore.

8     But, remember, in 2008 when he's apparently run out of

9  money, how much money did he actually receive?  That's

10  $4.6 million, and he moved almost all of it to Singapore.  So

11  when he says he ran out of cash, I guess what he meant was,

12  "Well, I moved it all to Singapore, and then I ran out of

13  cash."  But that's not what he said.  He said he ran out of

14  cash.  He declares bankruptcy in January of 2009.

15     And, by the way, you'll recall that Ms. Darling came in

16  and testified and she said:  Look, the basic deal or bargain

17  with bankruptcy is the debtor gets, and this goes for a

18  company, the debtor gets some real benefits.  No litigation.

19  You stop everything.  There's this injunction, and then the

20  bankruptcy trustee liquidates their assets, and they get to

21  move on.

22     But the debtor has obligations, too.  They have to be

23  forthcoming and forthright and disclose what they've got, their

24  assets.  And, by the way, just like people do every day in the

25  20- or 30,000 bankruptcies that she talked about having in

1   Sacramento every year, and people from all walks of life come

2   in, read the forms, provide the information.

3       This was a sophisticated businessman who engaged in

4   multimillion-dollar contracts with people in China that touted

5   his skills.  He even, for good measure, threw in a Ph.D. he

6   didn't have, but he was a sophisticated person.  He could read

7   the form just like anybody else, and he did and then he lied.

8       And the point here is that one of his obligations is to

9   tell the Court about the gross amounts received in the two

10  years before the bankruptcy.  So that's those green arrows in

11  2007-2008.  That's over $5 million, but that's not what he told

12  the Bankruptcy Court.  I think he told the Bankruptcy Court

13  about a couple hundred dollars of gross receipts or a couple

14  thousand dollars.  He lied, and he lied again and again in

15  those proceedings.

16      And he completely omitted these contracts.  And what's

17  amazing is he said, "Well, we ran out of business, bad

18  contracts, no money."

19      Look at what happened after the bankruptcy in 2009.  First

20  of all, a few weeks after he goes in and lies to Mr. Thompson,

21  the bankruptcy trustee, he gets $500,000.  That's in February.

22  When you go back and look at the records, he testifies in the

23  beginning of February, and a few weeks later he receives

24  $500,000 on the contract, but no one's the wiser because he

25  didn't tell anybody about it.

1    And over that next few years he received well over another

2    million and a half, almost $2 million.  And that money, by the

3    way, doesn't belong to the company.  It belongs to the

4    bankruptcy trustee and it belongs to the creditors.  He stiffed

5    people about $134,000.  That money that he moved offshore

6    doesn't belong to him.

7    And you know what?  Walter Liew made decisions all the

8    time about money; and he made decisions like not to pay Steve

9    Amerine when he let him go in December 2008, or Yuping Jiao, or

10    Allen Chang, or Mr. Bhatnagar.  All those people who worked for

11    him, he didn't pay them; but he sure made sure to get those

12    millions of dollars out of the country.

13    Now, I want to briefly talk about the counts, the specific

14    bankruptcy counts.  Count 20 is the failure to disclose those

15    Jinzhou contracts.  You have those.

16    Count 21 are failure to disclose those gross amounts

17    received.  We talked about that.

18    Question 10 is the monetary transfers to Singapore because

19    that question you'll look at, it's sending money other than for

20    ordinary business purposes.  There was no business purpose to

21    sending that money to Singapore.  There's no evidence that

22    those companies in Singapore did anything.

23    In fact, the evidence is the people who worked at USAPTI

24    had never heard of these companies.  They never did work.  That

25    money that's transferred is not part of the ordinary business

 1   expense.  It should have been disclosed because the whole idea

 2   here is:  Tell the Bankruptcy Court what you got so they can

 3   equitably and reasonably apportion the money.

 4        Question 11, he didn't disclose letters of credit.  Those

 5   two exhibits are documents, I think, in 2008 under his

 6   signature saying, "Hey, this letter of credit is closed."  He

 7   knew exactly what he was doing.  He was hiding and concealing

 8   and cheating.

 9        Count 22 is the false statements to the trustee.  I'm not

10   going to go through all of those with you again.  You will have

11   the documents and the transcript and the audio with you.

12        Now, I want to move on to the lying.  We've talked about

13   the stealing.  We talked about the cheating.  Let's talk about

14   the lying.  Let's talk about 2011 because, like I said earlier,

15   this is when the wheels come off and they have to create a new

16   playbook.  They've got to come up with some excuses, and they

17   do, and many of them are the ones they're trying to continue

18   with right here.

19        So there's a series of counts.  Count 10 is the conspiracy

20   between Mr. Liew and Mr. Maegerle to file a false Answer in

21   response to the civil case, Count 11 is the conspiracy between

22   Walter Liew and Christina Liew to get Jian Liu to lie and hide

23   the existence of the DuPont people, 13 and 14 are counts

24   related to the lies to the FBI when they executed the search

25   warrant on July 19th, 2011.

1      So let's talk about the first, Count 10, the conspiracy

2  between Mr. Liew and Mr. Maegerle.  And, remember, as we're

3  talking about all of this lying and all of this obstruction,

4  just think about -- put yourself in the position of what

5  somebody who's doing -- being honest and fair and allowed to do

6  what they're doing, how they would handle the situation and

7  compare that to what they actually did.

8      Okay.  Let's talk about what happens after the DuPont --

9  DuPont files a lawsuit on April 6th.  Okay.  And, so, that's

10  when they cook up this Ashtabula cover story.  This is when

11  they need to come up with some excuse for what they're doing,

12  and they cook one up.  And we're going to look right at the

13  evidence.

14      First, on April 8th, Mr. Maegerle sends Walter Liew an

15  e-mail entitled "DuPont Civil Suit."  And he says, first of

16  all, and this is really interesting, he says, "I plan to use

17  your Yahoo! e-mail for comments on this Summons."

18      So remember all the e-mails where they're doing work that

19  we talked about?  That's all the work e-mail all going to

20  USAPTI; but, you know, now there's a lawsuit and maybe people

21  are going to get to see what he does and his company and see

22  those company e-mails.  So now Mr. Maegerle is switching e-mail

23  accounts.  That is a deliberate choice out of the gates.

24  They're going to switch over to a different account.

25      And he says, and this is talking about the Complaint,

1    "Charges appear to assume technical information from Kuan Yin

2    were obtained."

3        And he says, "The actual scope basis for Jinzhou was the

4    Ashtabula plant."

5        Okay.  This is, and we're going to go back and look at it,

6    this is where they're cooking up the story.  And he says, "This

7    30K 'sold technology' plant is also the scale-up basis for our

8    current 100K proposed plant.  No Kuan Yin design information

9    has ever been obtained for our current design."

10       Okay.  That's what he says after the lawsuit's filed, but

11   what did he say about the design basis back when they were

12   really working on it?  He actually says the exact opposite.

13       This is Exhibit 78 about chlorinator velocity, and what

14   does he say?  This is the 100K project.  He says, it's on the

15   bottom, "What was used to size the chlorinator diameter and

16   number of jets was the Basic Data for the Taiwan 60K plant."

17       Ladies and gentlemen, you are looking at a lie on the top

18   and a truth on the bottom.  You are looking at the evidence of

19   this conspiracy to lie and lie to the court.

20       And as if that wasn't clear enough, because we know they

21   used Kuan Yin, they talked about it directly in all these

22   e-mails and all these documents; and then remember on the top

23   he says, you know, Jinzhou was based on Ashtabula, except back

24   in the time that they were working on it, he said the exact

25   opposite.  He said, "The Jinzhou specifications were scaled

 1   down from the above units," which is the Kuan Yin units.  That

 2   is a lie.  It's not true.

 3       It's not the only one, and I'd like to look at another

 4   one.  In answering the -- working -- a couple days later

 5   Mr. Maegerle has more to say, "Comments on Complaint."  He

 6   sends an e-mail the next day to Mr. Liew, and he says the

 7   following, he says, "Comments on Complaint"; and one of the

 8   things he says is, "Okay.  Here's my initial comments.

 9   Paragraph 45, there is no direct comparison of USAPTI piping

10   specifications to Kuan Yin."  That's after the lawsuit's filed.

11       But what did he say back at the time?  And this is

12   Exhibit 126, and this is an e-mail between them, and I want to

13   make two points about this.  First, it contains the specific

14   piping specification from Kuan Yin.  Okay.  We showed it to

15   you.  You have it.  You can look at it back in the Basic Data

16   Document.  The reference is right here on this big chart.  But

17   he says, "The Kuan Yin nitrogen flow to inject ore and coke

18   solids in the chlorinator is number of pounds per hour."

19       This is through a certain number inch line.  So that is

20   the piping specification from Kuan Yin, and we showed that to

21   you.

22       And then he goes on to extrapolate, "Since Kuan Yin's a

23   certain thing, this size line that you're going to use should

24   be okay."

25       Okay.  The other point about this e-mail is I had a

 1    conversation with Mr. Cooper about it, and you'll recall that

 2    on direct examination on Exhibit 126 Mr. Cooper only talked

 3    about the nitrogen flow is a particular number of pounds per

 4    hour.

 5         And two things.  Number one, he didn't actually identify

 6    any publicly available information where that specific figure

 7    was referenced; and, number two, he never even talked about the

 8    piping specifications.  And that's the part, I mentioned this

 9    earlier, this guy's not credible.  We put up all this evidence

10    about all this specific information, and he just chose to

11    disregard, I guess, the tough ones, the ones he didn't have an

12    answer to.

13         But they were using that, and Mr. Maegerle knew it; and

14    Mr. Liew and Mr. Maegerle were creating a fiction for the court

15    about what actually happened.

16         And the result of all this was an Answer that was filed

17    that was false because the Answer -- and you have that.  That's

18    Exhibit 676.  In the Complaint DuPont says, "Hey," which you

19    also have, it says, "DuPont's process used at the Kuan Yin

20    facility has become the target of misappropriation."

21         And what does the Answer say, the one that Bob Maegerle

22    and Walter Liew were working on?  It says at paragraph 32,

23    quote:  (reading)

24              "Defendants have never misappropriated any

25         information from DuPont or any of its locations, whether

1      the Kuan Yin facility or otherwise."

2      Well, that's not true.  That's just simply not true, and

3  there's a lot of evidence that establishes that; and that is --

4  that is that count.  That's Count 10.

5      Count 11 is the witness tampering charge involving

6  Mr. Jian Liu.  And this is a charge in which you'll recall

7  Mr. Liu came in, Mr. Jian Liu came in, and he talked about the

8  fact that after the lawsuit was filed, Walter Liew told him not

9  to mention anybody, the DuPont employees, the old men.  Don't

10  mention Bob Maegerle.  Don't mention Tim Spitler.

11      And you may recall -- and, first of all, again, if this is

12  all okay and aboveboard, why is there a reason to tell people

13  not to admit, "Yeah, this guy was working here and that guy was

14  working here"?

15      What he told him was, "It's not good for you and it's not

16  good for your family.  It's not good for these guys and it's

17  not good for your family."

18      And Mr. Liu came in here, you will judge his demeanor.

19  That's one of your jobs.  He was nervous.  He was uncomfortable

20  because he was subject to the same concerns about Mr. Liew and

21  Mrs. Liew when he was here in court that he was back then.  He

22  had a vulnerability and it was exploited, and it was exploited

23  corruptly.

24      It doesn't mean that Mr. Liew said, "Hey, don't say

25  anything, or I'm going to beat you up."  No.  It's an economic

 1    threat.

 2        Mr. Jian Liu was losing his job, his wife was losing her

 3    job -- by the way, all because they worked with Mr. Walter

 4    Liew -- and he was vulnerable, and Mr. Liew exploited that.

 5        And what Mr. Jian Liu said is, "Look, I lied.  I had to

 6    honor my commitment to Mr. and Mrs. Liew," and he did.  And I

 7    submit to you that his demeanor and nervousness on the stand

 8    reinforced that fundamental abuse from Walter Liew.

 9        What he said, what Mr. Jian Liu said, was corroborated by

10    Exhibit 687, which was Walter Liew's own handwriting.  That's

11    the translation, but that corroborated the things that Jian Liu

12    told you about his conversations with Walter Liew.

13        Now, Counts 13 and 14 have to do with what happened on

14    July 19th, 2011.  It's all about the safe-deposit box and all

15    about the conspiracy and conduct by Walter Liew and Mrs. Liew

16    when the FBI came.

17        Again, it's another example of a different kind of

18    engineering that Walter Liew engaged in.  Because you'll recall

19    the testimony of Agent Bozman.  He was the FBI agent who was

20    assigned to watch over the Liews; and, unbeknownst to them, he

21    spoke and understood Mandarin, and he was able to listen to the

22    conversations they had.

23        And at one point Agent Ho came out and showed a

24    safe-deposit box key, and asked Christina Liew what it was for.

25    And Walter Liew looked down -- first they exchanged a glance.

 1   Walter Liew and Christina Liew looked at each other in a

 2   meaningful way.  He looks down and says, "You don't know.

 3   Don't know."

 4        And then what does Christina Liew do?  She follows

 5   Mr. Liew's lead and tells the agent, "I don't remember."  And

 6   now it's set in motion.  The FBI has the key to the

 7   safe-deposit box.

 8        So what happens?  They talk.  They've got to get to this

 9   meeting.  And Walter Liew -- she's -- Christina Liew is trying

10   to figure out, "How do I leave?"  And Walter Liew says to her,

11   "Hey, you're free to go.  Tell them you're going to get

12   breakfast."  Again, he's engineering another scheme.  "Tell

13   them you're going to get breakfast," and that's what she does.

14        And what does she do?  She goes -- she doesn't go and get

15   breakfast.  She goes right to the bank.  And what happens when

16   she gets to the bank?  She lies.  She doesn't just lie to the

17   FBI.  She lies to the bank teller, "Oh, I lost my key at BART.

18   I need to get into my safe-deposit box.  Can you schedule

19   drilling it open?"

20        Well, fortunately the FBI was following and figured it out

21   and got a search warrant.  And what happened when they got

22   inside that safe-deposit box?  They found a whole bunch of

23   evidence, a whole bunch of evidence that bears directly on this

24   case, the contracts, the wire transfers, information about the

25   Luo Gan letter, a whole host of information that bears on this

 1  case and the criminal conduct.

 2      And you know what's significant here?  Remember when

 3  Ms. Ng from the bank testified?  She testified, she said,

 4  "Well, she opened this safe-deposit box in May of 2010.  So she

 5  opened it.  Checked it out.  That's our procedure."

 6      When was the next time she used the safe-deposit box?  It

 7  wasn't until after the lawsuit was filed almost a whole year

 8  later in April 2011.  She didn't have any need for that

 9  safe-deposit box until the gig was up, and until DuPont had

10  figured out that there was a problem, and Walter Liew and

11  Christina Liew start putting all sorts of documents in that

12  safe-deposit box, including electronic copies of the flow

13  sheets and all sorts of things.

14      And between -- you'll have these records with you.  But

15  between April and July of 2011, there is a lot of trips to that

16  bank safe-deposit box.

17      **THE COURT:**  Mr. Axelrod, is this a good place to

18  break?

19      **MR. AXELROD:**  Yes.  I'm wrapping up, but this is fine,

20  Your Honor.

21      **THE COURT:**  How many more minutes do you have?

22      **MR. AXELROD:**  I think five, ten minutes.

23      **THE COURT:**  All right.  Well, let's take a break, and

24  I'll hold you to that after the break.

25      **MR. AXELROD:**  Very well.  Thank you.

 1          **THE COURT:**  Ladies and gentlemen, we're going to take

 2   our last break.  Remember the usual admonitions, keep an open

 3   mind, don't discuss the case or decide it; and we'll see you in

 4   15 minutes.

 5                    (Recess taken at 11:46 a.m.)

 6                 (Proceedings resumed at 12:01 p.m.)

 7        (Proceedings were heard out of the presence of the jury:)

 8          **THE COURT:**  All right.  So you're going to wrap up

 9   pretty soon?

10          **MR. AXELROD:**  Yes.

11          **THE COURT:**  All right.  Let's bring the jury in and

12   hear the wrap up.

13        (Proceedings were heard in the presence of the jury:)

14          **THE COURT:**  All right.  Please be seated.

15   You may continue.

16          **MR. AXELROD:**  Thank you, Your Honor.

17        Ladies and gentlemen, I want to talk briefly -- I think

18   we're a little bit more than two hours so I'm coming to the

19   end.

20        I want to talk a little bit about on these lying charges,

21   all these obstruction charges, a little bit of the evidence of

22   the intent to obstruct justice exhibited by Walter Liew and Bob

23   Maegerle.

24        You'll recall, first of all, that when Mr. Jubb, the

25   DuPont investigator, came to Jian Liu's house in March of 2011,

1   you had Christina Liew there masquerading as Jian Liu's wife

2   watching and participating in a conversation with Mr. Jubb.

3         And what did Mr. Liew do?  Did he do what any honest

4   businessperson would do?  No.  He ran and hid in the basement.

5   He didn't want the DuPont investigator to see him, know he was

6   there.  He ran and he hid.

7         Okay.  Then what happens?  We talked about this.  The

8   lawsuit comes, and all of a sudden you've got to start using

9   the new e-mail address.  That's what Mr. Maegerle does in

10  April 2011.

11        And remember in April 2011 what Walter Liew told Tony

12  Duong to do.  Yeah, go on the company server that they had and

13  let's have a new practice.  Let's start by deleting all the

14  documents that contain a reference to DuPont.

15        That's not some kind of corporate backup security plan.

16  That is hiding.  That is concealing.  It is a way of

17  manifesting the lies because they don't want anyone to see they

18  had all this DuPont stuff on their computer.  And he instructed

19  and directed Mr. Duong to do that and he did it, and that was

20  in April 2011.  And that is a function of the fact that there

21  was now this lawsuit pending.

22        As we talked about earlier, he started using the

23  safe-deposit box.  Now, Christina Liew may be the person on the

24  safe-deposit box account and going there; but make no mistake,

25  when Walter Liew gives her a direction or tells her not to

 1    remember, she knows what to do and she does it.  And the

 2    documents in that safe-deposit box are all about Walter Liew's

 3    business, his money movements, his activities related to these

 4    Pangang contracts.

 5         Mr. Liew, also in April 2011, asked Jian Liu to lie about

 6    the existence of the DuPont -- the former DuPont employees

 7    working for him.  He was hiding them.  He was concealing them.

 8    He was lying about them and making other people lie about them

 9    as well.

10         And he was also, Mr. Liew himself, was making false

11    statements to DuPont.  You'll recall that Mr. Jubb came and

12    talked about the meeting that got set up with Walter Liew and

13    his civil lawyers, and he didn't want Mr. Jubb there, but they

14    had this conversation.  And Walter Liew says to him, "You know,

15    if I was going to use DuPont technology, I wouldn't have hired

16    Chevron employees.  I would have hired former DuPont

17    employees."  Well, that's exactly what he did.  He just lied to

18    DuPont about it.

19         And then there's sort of the end piece on this whole

20    patent discussion.  So, remember, the evidence in the case is

21    1996-1997 he gets some patents.  There's some binders that the

22    law firm paralegal put in about the collection of patents he

23    had.  Mr. Marinak talked about the fact that he gave him some

24    patents for general background information, and he's got that

25    in 1996-1997.

**CLOSING ARGUMENT / AXELROD**

1    And then what's the other evidence about patents?  Well,

2    it's Ms. Jiao, Yuping Jiao, came in and she said, "Well, yeah,

3    when I started working there in the spring of 2011, there was

4    this lawsuit; and sometime in, like, June 2011 Mr. Liew asked

5    me to collect a bunch of patents, and I did."  And that

6    document, her collection efforts, are in evidence.

7    That's the patent evidence.  That and the fact that the

8    people who actually do this business don't use patents because

9    they use the know-how they have from their own companies.

10    And, finally, there's what happened on July 19th, 2011.

11    We talked a bit about the lies that Mr. Liew and Mrs. Liew

12    engaged in when they said, "Hey, going to breakfast.  I don't

13    know about the safe-deposit box key," and then make a beeline

14    first to the bank and then to the Pangang people.

15    But they're not the only people lying on July 19th, 2011.

16    Because you'll recall, at the same time the FBI is searching

17    here in the Bay Area, there's a team of FBI agents searching --

18    first before they search, actually having a conversation with

19    Mr. Maegerle and talking to him.  Of course, before

20    Mr. Maegerle knows they have a search warrant.

21    And in that time he's talking to them, he makes a lot

22    of -- he lies.  He makes a lot of false statements about what

23    happened.  He said that there were no DuPont employees

24    consulting for Walter Liew.

25    Now, mind you, the evidence shows that he knew full well

1    that Tim Spitler attended some of those meetings, and there's

2    meeting minutes that show that.

3        Mr. Maegerle said that -- of course, he never mentioned

4    that he'd worked on Kuan Yin.  He never mentioned that.  He

5    never thought to mention that in the conversation with

6    Agent Pattillo, even though he was the lead process engineer

7    for that project.

8        And Mr. Maegerle repeatedly denied using DuPont material

9    for USAPTI.  Well, we know that's false because he had the

10   Basic Data materials, and he used them over and over and over;

11   but he also had the same DuPont flow sheets that were found in

12   Walter Liew's closet, and he had them electronically.  He had

13   them on a thumb drive that Agent Pattillo found in his desk

14   drawer.

15       And those flow sheets were in a folder called "Flow Sheets

16   from Walter," because that's where he got them.  He got them

17   from Walter Liew, and they're DuPont documents.  So that was a

18   lie.

19       And, of course, he lied because he denied he provided

20   Walter Liew with any DuPont proprietary information.  And, most

21   significantly, he repeatedly lied when he denied providing or

22   using any Kuan Yin information.

23       Ladies and gentlemen, the defendants in this case engaged

24   in a practice of lying and cheating and stealing.  You sat

25   through a lot of testimony.  You're now going to have a job to

1  do to sift through it all; but at the end of the day, no matter

2  what anybody says, it really comes back to those fundamental

3  principles that you do learn in kindergarten.  You can't lie,

4  you can't cheat, and you can't steal.

5       But that's exactly what they did, and we know that from

6  all the evidence in their very own words and in their very own

7  actions back at the time they were doing this and back in the

8  time they were reacting to DuPont and law enforcement figuring

9  out what they were up to.

10      This is the verdict form (indicating).  These are all the

11  boxes you're going to have to check at the end of this.  I've

12  talked, maybe quickly, about all of the counts in here; and I'd

13  ask that when you go back and look at all these counts -- the

14  stealing, the cheating, the lying -- that you check the boxes

15  that are supported by the evidence in this case, by the proof,

16  by the proof beyond a reasonable doubt, that what Walter Liew

17  did and what Bob Maegerle did were a series of criminal acts,

18  and they now need to be held to account for that.  And I ask

19  that you find them and Mr. Liew's company, USAPTI, guilty on

20  all counts.

21      Thank you.

22          **THE COURT:**  Thank you, Counsel.

23      Would you like to begin?

24          **MR. GASNER:**  Yes, Your Honor.

25          **THE COURT:**  Thank you.

1                    (Pause in proceedings.)

2          **MR. GASNER:**  May I proceed, Your Honor?

3          **THE COURT:**  Please.

4                    **CLOSING ARGUMENT**

5          **MR. GASNER:**  Good morning, ladies and gentlemen.  At

6    the outset I want to thank you for your long service on this

7    jury.  We're very proud of the jury system in this country; but

8    when it's a long trial, as long as this one, it really is an

9    imposition on your personal lives.  And on behalf of Mr. Liew

10   and our Defense team and Mr. Maegerle and everybody else, I do

11   want to thank you.  You've been incredibly attentive.  I know

12   it's required some extra caffeinated coffee from time to time,

13   but you've been incredibly good as jurors, and it's deeply

14   appreciated by all of us.

15       I want to talk about something that the Government didn't

16   talk about at all in this case, a critical event in the

17   narrative that happened here, and I've put it up on the screen.

18   It's the anonymous letter that was sent by probably Peter Wong,

19   a disgruntled employee, who Mr. Liew fired in August of 2010.

20       And if you look at it up on the screen, what it says is

21   this is a report:  Walter Liew, Jian Liu, L-I-U, "embezzled

22   titanium technologies from U.S. DuPont Company and sold to

23   Panzhihua China."  This anonymous note was simply mailed to

24   legal counsel at DuPont.

25       This was like throwing a piece of bloody meat in front of

 1  a great white shark.  This was exactly what this large

 2  American, multinational company had been waiting for.  They had

 3  heard in 2009 from TZPI, this Australian company, that there

 4  was some small company in China that had a DuPont-like

 5  technology but they couldn't do anything about it.

 6      They wrote a letter talking about their patent mistake

 7  later in 2009.  Nothing came of that.

 8      But then here comes this anonymous letter claiming

 9  embezzlement.  This is like a bucket of chum that they throw in

10  front of the great whites during shark week; and what it did

11  was to launch this giant corporation to enlist Chevron, the

12  FBI, the Department of Justice, and the machinery of the United

13  States Government focused on one thing and one thing only, and

14  that's building a case against Mr. Liew, USAPTI, and whoever

15  else was working with him.  That became the focus.

16      And because of the way this case evolved, it was never of

17  interest whether DuPont actually has any trade secrets or

18  whether this small company actually used any of them; but,

19  rather, let's put the blinders on and just see what we can put

20  together, what we can cherry pick out of the evidence and the

21  statements from different people to build a case and crush this

22  little company and this man and the consultants he worked with.

23      That is how this case got started.  You didn't hear a word

24  about it from the Government because it's not a helpful set of

25  facts.

1          What the evidence showed -- I told you in the beginning of

2     this case in the opening statement that there was an unholy

3     alliance between DuPont and the Federal Government in this

4     case, and we showed that.  There were lots of DuPont witnesses.

5     Most of the witnesses in this case were either from the

6     Government or from DuPont.  And what we showed you, it's up on

7     the screen now, in August 2010 there was the anonymous letter.

8          DuPont's internal police force, James Jubb, hires a

9     private investigator.  He coordinates with Chevron.

10         In February of 2011, DuPont goes to the FBI in Wilmington.

11    And, mind you, this is based just on this one cryptic little

12    note that claims embezzlement.  They go into the FBI in

13    Wilmington and make their case:  Dayton, Reid, Taylor, lawyers

14    all go to the FBI with nobody there to present the other side

15    of the case, and they spoon-feed the FBI the case that DuPont

16    wanted to make.

17         March of 2011 they even offer to do the search terms.  You

18    saw e-mails where Mr. Jubb offers, "Here's a long list.  If

19    there's ever an opportunity to, like, search all the computers,

20    here's the terms you should use to try to dig up evidence to

21    make our case."

22         April of 2011, DuPont brings a civil lawsuit for damages.

23    They sue Walter Liew and they sue Jian Liu.  Now, Mr. Liu,

24    L-I-U, he took the stand and he told you that he didn't think

25    he did anything wrong, and that there were no red flags that

 1  suggested to him that there had been any trade secret

 2  misappropriation at all; but that doesn't stop DuPont from

 3  bringing a lawsuit against him April of 2011 seeking damages.

 4      May through June 2011, meeting after meeting DuPont

 5  spoon-feeding the Government their view of the case culminating

 6  in search warrants in July of 2011 where the FBI storms in and

 7  seizes pretty much everything in the home of the Liews, in

 8  their office.  They coordinate with the Wilmington office.

 9  They seize everything from Mr. Maegerle's house.  And here we

10  are.  Five terabytes of stuff now for the FBI to pour over for

11  years, and that's how we're here.

12      Now, you notice that I said they seized pretty much

13  everything.  What they didn't seize were notebooks.  These

14  notebooks, remember I showed these to Agent White when he was

15  on the stand, and he said, "Gee, I don't know why we didn't

16  seize these."

17      It was stipulated that these were at the USAPTI office and

18  the Liew home, that they were not seized, and that they were

19  put in storage, and our law firm later produced them to the

20  Government and, so, they're evidence now in this case.

21      But what the evidence showed is that all these notebooks

22  were not seized.  After they seized 5 terabytes of stuff, the

23  one thing they don't seize are these notebooks that show patent

24  after patent research over many years by Mr. Liew from 1996 and

25  1997 showing the work that he did over many years to learn this

**CLOSING ARGUMENT / GASNER**

1    area.

2         You'll have these in evidence.  You can take a look at

3    them.  And you'll see, as we showed on the chart that I showed

4    to Mr. Cooper, there were scores of patents and textbooks and

5    articles that were in those notebooks that the FBI was

6    completely uninterested in.

7         Why?  Because this isn't part of their case.  They were

8    singularly uninterested in whether DuPont has any trade

9    secrets.  They were completely bought into DuPont's view of the

10   world, DuPont's centric view of the world in which everything

11   they do, that they put a fence around, or they stamp as

12   "Confidential" is a trade secret.  And you heard from Paul

13   Cooper that that simply is not true, and you heard it from a

14   lot of witnesses.

15        So that's the way this case started, was with an attack by

16   DuPont based on an anonymous letter thrown over the transom,

17   and what it created was blinders so that the FBI looked at this

18   case through the DuPont lens.  They saw this case the way

19   DuPont wanted them to see it.

20        Now, what you have to do now having heard the evidence is

21   a completely different job.  As the Court has instructed you,

22   what you're to do is to do a careful and impartial

23   consideration of all the evidence.  Not just the evidence that

24   DuPont wants you to see, but all the evidence, and this is

25   evidence that nobody paid attention to until the trial.

**CLOSING ARGUMENT / GASNER**

1    And your job is to decide whether the Government has made

2    its case now before you beyond a reasonable doubt.  What does

3    that mean?  It's not just words on a page.  It's the highest

4    standard of proof that we have in the law.

5    If you, after hearing the closing arguments and thinking

6    back on the evidence, if you have doubt or you think a

7    reasonable person would have doubt, that standard is not met.

8    If it's 50-50, you go, "Oh, both sides have good points,"

9    beyond reasonable doubt standard, not met.  If the balance tips

10   a little bit in the Government's favor, as it would perhaps in

11   a civil case, that standard is not met.

12   Your job is to look at all the evidence carefully and

13   impartially; and to convict any of the defendants, you must be

14   satisfied beyond a reasonable doubt of every element of the

15   offense.

16   It's not enough to just stand up and talk about lying and

17   cheating and stealing.  There's been a lot of name calling in

18   this courtroom today, but that's not your job.  Your job is to

19   look carefully and impartially at the evidence, and to decide

20   whether the elements of these crimes have been met.

21   So let's take a look at one, just quickly, trade secret.

22   This is really what this case is about, and the Court

23   instructed you that there are several elements to it.

24   So the first is that the owner has taken reasonable

25   measures to keep such information secret; and, secondly, that

1   the information derives independent economic value, actual or

2   potential, from not being generally known by the public and not

3   being readily ascertainable through proper means.

4       So that's really the heart of this case.  And no one,

5   until you, have really given thought as to whether the matters

6   that have been before you meet that legal definition.  The only

7   person that really talked about that in detail was Paul Cooper.

8   He was the only witness that came before you who had taken the

9   time to actually look at what USAPTI did, to look at that giant

10  stack of documents.

11      We've got a small portion of them in those boxes that are

12  in evidence; but you heard from lots of witnesses, that's just

13  the tip of the iceberg.  There's tons and tons of the stuff.

14      He's the only person who looked at that.  He's the only

15  person who studied what was in the patent literature, in

16  textbooks, and that had been publicly disclosed by DuPont since

17  they got their first patents in the 1940s.  And he's the only

18  person who has the technical ability, who's not from DuPont,

19  who put that all together and told you that there are no trade

20  secrets that were involved in the work that was done here.

21      He found nothing in USAPTI's work that was not readily

22  ascertainable or generally known, and that's why Mr. Axelrod

23  went after him so hard.  That's why he turned the volume up to

24  11 and basically called Mr. Cooper a liar, another bit of name

25  calling this morning; and he said that, Mr. Cooper, if you

1   think about his testimony, quote, "actually doesn't know

2   anything."  Mr. Axelrod's words.

3        Different day in court than the one that, I submit to you,

4   happened when this good gentleman took the stand, told you

5   about his 44 years of experience in this area, took an oath,

6   and gave you his opinions.

7        And Mr. Axelrod apparently was quite proud of his

8   cross-examination, but I ask you to look back on that day and a

9   half and ask yourself whose credibility stood up on that day;

10  and I submit to you it was Paul Cooper.

11       And the reason the Government goes after him so hard with

12  what little they have is because they know that he's the most

13  important witness in this case.  Because if you find him

14  credible, the Government can't prove any of their trade secret

15  crimes beyond a reasonable doubt.  If you find him credible

16  when he says there are no trade secrets here, the Government

17  has no case.  If you find him credible, DuPont's illusion that

18  they rule the world with their trade secrets falls apart, and

19  there's no crime beyond a reasonable doubt.

20       So let me tell you what I want to talk about in the time

21  we have.  And, again, I thank you for the further time you're

22  going to spend listening to closing arguments; but it's been a

23  long trial and there are a lot of charges, and I do want to

24  take the time to go through them.

25       What I intend to do is to talk about what the Government

**CLOSING ARGUMENT / GASNER**

1  must prove beyond a reasonable doubt in several areas.  The

2  first, what I've got on the screen now, are the trade secret

3  crimes.

4      The one that I want to talk about first is the conspiracy

5  in Count 2 to steal trade secrets because that is really the

6  heart of the Government's case, the conspiracy between Mr. Liew

7  and Mr. Maegerle and Mr. Liew's corporation USAPTI to steal

8  trade secrets.

9      I also want to talk about the attempt to do that briefly.

10     And then I want to talk about the economic espionage

11  conspiracy because that is an umbrella over the trade secret

12  conspiracy, if you will.  If you don't find that there was a

13  conspiracy to steal trade secrets, the economic espionage case

14  falls apart as well.  So I want to talk about that a little bit

15  separately.

16     Then I want to talk about the possession counts, the Trade

17  Secrets 2, 3, and 4 in Counts 6, 7 and 9.

18     And then, finally, the copying of Trade Secret 5, the

19  Basic Data Manual in Count 6.

20     The second part of my closing I want to address the

21  financial and other crimes, the tax charges; that is, the

22  alleged willful misrepresentation of gross receipts on the

23  USAPTI tax return, that's Counts 15 through 19; the alleged

24  bankruptcy crimes, and that's 20 and 21 and 22; and then the

25  alleged obstruction of justice crimes.

1    So that's kind of an outline of where we're going to go.

2    We'll see how far we get today.

3    But where I want to start is the alleged conspiracy with

4    Maegerle to steal trade secrets.  That's Count 2.  And what the

5    Government alleges there is a conspiracy.

6    When you look at the instruction, it's really long, but

7    the heart of it is an agreement to commit crimes.  There are

8    overt acts that the Government goes through at length and the

9    Court read to you as part of the instructions, but overt acts

10   don't mean anything if they're not in furtherance of a criminal

11   agreement.  I want to focus on that concept of agreement.

12   It's an agreement to do something unlawful.  It's a kind

13   of criminal partnership.  That's really the essence of all the

14   conspiracy crimes.

15   And if you look at Count Two, what the government has

16   charged is that beginning in or about 1998, and continuing --

17   and ending in or about October 2011, Walter Liew, Robert

18   Maegerle, and USAPTI combined, conspired and agreed to commit

19   two offenses.

20   You've got this up on your screen.  This is in your jury

21   instructions.  This is just a portion.

22   The two offenses are:  Number one, to knowingly and

23   without authorization copy, and there's a long list of other

24   things, copy, transmit, replicate, et cetera, trade secrets

25   belonging to DuPont; and, B, knowingly receive trade secrets

1   belonging to DuPont, knowing those trade secrets to have been

2   stolen.

3       So you need an agreement to commit two crimes:  One is

4   basically to steal trade secrets, and the other is basically to

5   receive stolen property, if you will.  But the essence is an

6   agreement to commit crimes that started in or about 1998 and

7   goes on for 13 years.

8       So the essence of the government's charge is that these

9   men, when they met in 1998, agreed to commit crimes and did so

10  for 13 years.  Big chunk of their life.

11      What I want to do is to go through that time period and

12  talk about what the agreement really was.

13      And to do that I put together a little timeline.  And I

14  call this the pre-30K timeline.  So you heard about the 30K

15  contract.  So this is the time period leading up to the 30K

16  contract.

17      And this goes way back.  Goes back to 1919, which is when

18  tickle was first invented.  We heard about that.

19      I've got above the line -- I've got a timeline that goes

20  across the middle.  The first period is not to scale, is 1919,

21  which is when tickle was first invented to 1957, which is when

22  Mr. Maegerle started at DuPont.  Also happens to be the year

23  that Walter Liew was born in Malaysia, a long time ago.

24      And then my second part of the timeline is 1957 to '91.

25  That's when Maegerle worked at DuPont.  And then the last part

CLOSING ARGUMENT / GASNER

1    is '91 to 2005.  2005 is when Performance Group gets the 30K

2    contract with Jinzhou.

3        What's above the line is what was going on in the world at

4    large, the world of titanium dioxide.  And it's got tickle

5    being invented in 1919.  It's got this Barksdale textbook.

6    Paul Cooper talked to you about this, kind of yellow pages,

7    pretty old and musty.

8        And this was in 1949, up on the timeline here, which was

9    when the chloride route process -- there's a whole chapter in

10   it, in Barksdale, which Paul Cooper talked about.  It's also

11   when DuPont came up with the Edgemoor Delaware plant, which was

12   the first commercially successful plant.  They also did a plant

13   in Johnsonville in 1958, and right here in the Bay Area at

14   Antioch, California, in 1962.

15       The next item on here is really important.  This is the

16   DuPont contract with Sherwin-Williams in 1967.

17       We didn't talk about this much during the trial, but

18   you'll remember on the last day of trial we admitted into

19   evidence Exhibit 900, which is the Sherwin-Williams contract.

20   You'll have it to read in the jury room.  And I have excerpted

21   the key part.  It's at page 14, Article XI, X-I.  And what it

22   says is:

23            "Until the end of 15 years following Sherwin-Williams

24       first commercial use or sale of titanium dioxide pigments

25       made by Sherwin-Williams with DuPont technology furnished

**CLOSING ARGUMENT / GASNER**

 1          hereunder, Sherwin-Williams shall maintain as

 2          confidential, and refrain from disclosing to others,

 3          information furnished by DuPont hereunder."

 4      I know it's legalese language, but it makes clear, there

 5  is a 15-year time fuse on confidentiality of the information

 6  provided under this contract.

 7      When you read the rest of it, what you'll see is that the

 8  Antioch plant, you can see on the timeline it's the most

 9  advanced plant DuPont has at the time.  So it incorporates

10  everything they have learned at New Johnsonville and Edgemoor

11  up until that point.

12      And Sherwin-Williams, big paint company, wanted DuPont to

13  build them a plant so that they could make their own titanium

14  dioxide for paint rather than buying it from DuPont.

15      And the deal was that Sherwin-Williams would get the

16  plans, the know-how, the equipment, absolutely everything

17  equivalent to what was at Antioch in 1962, which was a lot.

18      You heard testimony that this technology is really old

19  and, for the most part, has not changed very much since its

20  inception.

21      There have been improvements here and there, but 1962 is

22  the DuPont chloride route process as it had been developed over

23  a period of roughly 20 years, that is still going today, and

24  that is most of what DuPont can claim as its technology.

25      And its deal with Sherwin-Williams said you have to keep

1  all of this information confidential for 15 years from the time

2  the plant was built.

3      And by no later than the late 1980s, that 15-year time

4  fuse has expired, and that SCM and Millennium and Cristal and

5  all these companies that took over that plant were, as far as

6  DuPont concerned, free to disclose that technology.

7      And that in terms of reasonable efforts to keep secret

8  your supposed trade secrets, DuPont gave it away in 1967.  And

9  this contract tells you that.  They gave away their rights to

10  whatever was in the Antioch plant in 1967.

11      So when they get up there on the witness stand and go,

12  everything we do is top secret and fabulous, and we've

13  maintained all this confidentiality, oh, yeah, except when you

14  basically sold to your customer with a 15-year time fuse in

15  1967 pretty much everything you've got.

16      And, yeah, they can write memos until the cows come home

17  and say, yeah, well, we stamp everything as confidential and we

18  do all these things.  But it is not reasonable efforts to

19  maintain the confidentiality of trade secrets when you enter

20  into a contract that says that whoever buys this plant only

21  needs to keep it secret for 15 years.  You've lost control of

22  your trade secrets.

23      And, yes, you can now try to stamp everything

24  confidential.  You can try to get your employees to sign these

25  agreements.  And they do it because it's their first day of

1   work.  You can try to intimidate the world into, you know,

2   we'll sue anybody that gets in our way.  But what the law says

3   is you don't have a trade secret unless you made reasonable

4   efforts to maintain it as confidential.  And that's not what

5   happened when DuPont sold this plant with a 15-year time fuse

6   to Sherwin-Williams.

7         And that, ladies and gentlemen, was what Bob Maegerle told

8   Walter Liew was part of his whole thought process.

9         You heard all about these obstruction charges.  When you

10  read the memo that Mr. Maegerle wrote, the so-called cover

11  story that the government claims was obstruction, it wasn't

12  obstruction.  It was the truth.  It was the truth that

13  Sherwin-Williams was sold technology and out in the public

14  domain as far as Mr. Maegerle believed.  And that's the other

15  part of the story that the government didn't tell you about.

16        So let's reset a little bit and talk about this 1998 to

17  2011 conspiracy, this agreement to commit crimes that Mr. Liew

18  and Mr. Maegerle supposedly entered into.

19        So you heard that Mr. Liew, we read into evidence through

20  the stipulation about his -- a little bit about his life.  Born

21  in Malaysia; educated in Taiwan; went to the University of

22  Oklahoma, ends up getting his master's degree in electrical

23  engineering there; moves here to Silicon Valley.  And now we're

24  getting closer to the beginning of the supposed conspiracy.

25        '93 to '96 he starts LH Performance, one of his companies.

CLOSING ARGUMENT / GASNER

1  He and Mike Marinak design an a acrylic resin plant in China.

2  And it's at this point during his relationship with Marinak

3  that the idea of building a TiO2 plant or designing one in

4  China comes to the fore.

5       And you saw in evidence -- Mr. Marinak was here early in

6  the case.  Remember him?  Kind of a very sober gentleman,

7  serious, very concerned about his integrity and making sure

8  that he didn't do anything improper.  And he told you about his

9  work with Mr. Liew building or designing this acrylic resin

10  plant in China.

11       Up on the screen now is Exhibit 1128, which is some of the

12  work product that Mr. Marinak gave to Mr. Liew in this early

13  kind of 1996-97 time period.

14       And as you can see on the screen, you've now seen enough

15  process flow diagrams to know this is one.  It's got the chart

16  at the bottom with all the different process flows.  It's got a

17  schematic of the process flows at the top, with the names of

18  now familiar parts, chlorinators and different tanks, different

19  temperatures, et cetera.  And Mr. Marinak was sketching out

20  kind of here's a process that we might be able to use in China.

21       Mr. Marinak also provided guidance on some patent

22  research.  And you've got in evidence that sheet that's up on

23  the screen now, that is kind of an old -- trying to get my

24  hands on it.  It's an old, dusty piece of paper similar to the

25  other one you're looking at.  You can kind of tell how old

**CLOSING ARGUMENT / GASNER**

1   these things are.  There it is.

2       So this is -- you'll have this back in the jury room.

3   This is just an old -- this is how old this goes back.  This is

4   like on thermal fax paper.

5       And Marinak sketches out here's some patents, Mr. Liew,

6   you ought to look at.

7       And he does.  Mr. Liew continues his research.  Exhibit

8   1131, that's this -- that's '32.

9       1131 is one of the notebooks.  I think it's this one

10  (indicating).  1131, if you dig into this, you'll see a ton of

11  patents in here.  This is just one of them.  It's a DuPont one.

12  It's from 1972.  It has to do with the oxygen preheater part of

13  the oxidation reactor that you've heard all about.  And this is

14  a patent among many that Mr. Liew is studying in this time

15  period.

16      He's also looking at textbooks.  This old, dusty Barksdale

17  is not the only one.  There's been a ton of textbooks in this

18  area.  Mr. Liew is looking at them.

19      There is a ton of scientific research in this era.

20  Titanium dioxide is this incredibly common commodity product,

21  for the most part.  And because of that, it's made all over the

22  world, and there is a ton of research about this product.

23      Mr. Liew dug into the science.  This one is "Difficulties

24  Encountered During the Goralski Growth of TiO2 Single

25  Crystals," in the *Journal of Crystal Growth*.

1    So he's getting pretty deep into this.  And as you can see

2    on the screen now, Exhibit 1133, at page 6, another one of

3    these notebooks I've got up here at the podium, Mr. Liew is

4    taking notes.

5    So he spends two years intensely focused on this area.

6    And what you'll see, if you dig into these notebooks, many of

7    them are on microfiche.

8    For the Baby Boomers among us, you'll remember going to

9    the public library and going to the weird machine and getting a

10   little piece of plastic and trying to find a place to copy it.

11   And that's what Mr. Liew did for years.  He went to the

12   public library and learned all he could about this technology.

13   Marinak refers Mr. Liew to Condux.  This is the next kind

14   of step in this story.  And on the screen now is an invoice

15   from Condux.  And you'll see on the logo they refer to

16   themselves as a consulting association of former DuPont

17   professionals.

18   They are proud of the fact that their stock and trade is

19   an array of former DuPont professionals who are now offering

20   their services as consultants.  And you've heard that they have

21   scores of people on their roster, in all kinds of fields.

22   And that's how Mr. Liew comes to meet Mr. Maegerle as a

23   consultant, is through this publicly available consulting

24   expert clearinghouse, if you will, advertised on the Internet,

25   that is proud of the fact that they have former DuPonters as

**CLOSING ARGUMENT / GASNER**

 1  their consultants.

 2       If you want to talk about what the agreement was between

 3  Mr. Maegerle and Mr. Liew, I recommend you look at Exhibit 221.

 4  It's on the screen now.  It's another wrinkly letter from the

 5  late 1990s.  And it lays out what the agreement is.

 6       And it's not an agreement to steal trade secrets.  It is

 7  not a criminal partnership.  It is not an agreement to steal

 8  anything from DuPont or to receive stolen property.  It is a

 9  relatively standard business arrangement.

10       And this is a letter from Mr. Arbogast, who's the head of

11  Condux, to Mr. Maegerle.  And he says:

12          "Dear Bob:

13          "Mike Marinak, private consultant in Petaluma,

14      California, and his partner, Walter Liew, at

15      LH Performance, Inc. in Alameda, California, would like to

16      visit with you at the Condux office in the near future."

17      Condux in back in Wilmington.

18          "Their purpose is to evaluate whether to engage you

19      as a consultant relative to the chloride route to TiO2."

20      Mr. Arbogast goes on to say:

21          "Marinak indicates that he and Liew have done other

22      similar work in China."

23      That's referring to the acrylic resin project that they

24  did together.

25          "Their method of operation, as unbelievable as it

CLOSING ARGUMENT / GASNER

1          sounds, is to gather technical and process information

2          from available public sources and patent literature, and

3          then put a package together."

4     So contemporaneous written evidence of what their business

5 practice was at the time, and the proposal that is made to

6 Mr. Maegerle, which is:  These guys want to meet you.  What

7 they've done in the past is to gather public information and

8 put a package together, and they may want to hire you.

9     Condux also referred a guy named Dan McIntosh.  And

10 McIntosh was a former DuPonter.  Mr. Liew and Mr. Marinak send

11 him a whole package of material about what they're planning to

12 do in China.  And McIntosh writes back and says:

13          "I reviewed the information you sent last week.

14          Attached are my comments on the content of that

15          information."

16     This is at Exhibit 718.

17     And what you'll see when you look at that document is a

18 really long, detailed set of comments and information about the

19 TiO2 process, commenting on what they're doing.  And it's very

20 specific as to operation times and flow rates and everything

21 else.

22     And McIntosh, you know, isn't saying, oh, my god, I'm in a

23 criminal conspiracy.  He sends sketches over.  Again,

24 schematics similar to the ones you've seen in evidence in a

25 variety of places.  Flow rates, temperatures, his

 1  recommendations, his comments.  And he is an ex-DuPonter who

 2  has been retained through Condux, an association of

 3  ex-DuPonters.

 4      And yet there's nothing in the records to suggest that

 5  Mr. McIntosh feels any impropriety here at all.  In fact, if

 6  you look at Exhibit 718 he adds a comment, quote:

 7          "Let me just add one general comment so we can keep

 8      the reality of what we are doing in focus.  Titanium

 9      dioxide production via the chloride process is not

10      clean-cut, nor easy to operate.  Make no mistake, whoever

11      gets this job to help the Chinese to build and commission

12      a plant can look forward to a lot of hard work, difficult

13      work.  Success can be achieved, but it won't be easy and

14      will probably take longer than anticipated."

15      So McIntosh is fine with the concept of what these men are

16  doing, but he warns them it's going to be hard and difficult

17  and it's going to take longer than you think, again, in this

18  time period, 1997, the critical time period when these men

19  first meet and where their relationship is forged and whatever

20  agreement they have between them is made.

21      And what you see in Exhibit 1014 and 1015 is a design

22  basis memo.  We know that this is written in 1997 because of

23  the metadata on Exhibit 1015.  That's kind of the right side of

24  what's on the screen.  It's the data that your computer

25  automatically collects.  And you may be familiar with it.  If

**CLOSING ARGUMENT / GASNER**

1   you right click on things in Word, you can see metadata.

2   That's in evidence to show you the date on an exhibit that

3   otherwise doesn't have a date on it.

4       What you see when you read this 1997 memo is that they're

5   talking about the oxidizer reactor design.  And what Mr. Liew

6   says -- and the metadata shows him as the author -- he says:

7           "The oxidizer reactor design will be as per DuPont

8       patents and shown in the attached reactor design

9       sketches."

10      And it goes on to describe what kind of reactor they're

11  thinking about.

12      So this is how the relationship starts.  This is the

13  agreement that Mr. Maegerle signs on to as a consultant, which

14  is they're going to use publicly available information.  The

15  Sherwin-Williams contract is out there.  And people in the

16  industry all know about the sale to Sherwin-Williams.

17      Paul Cooper told you about it at length.  What he told you

18  was that when he came on at SCM and was at Ashtabula, that they

19  had to wait a period of time before they could migrate Line 1

20  to elsewhere in the SCM company because they were waiting for

21  this agreement to expire.

22      And so there's evidence that, at the time, part of what

23  was in the public domain was what DuPont had relinquished in

24  1967.

25      1998, we heard a little bit about the Chengde contract.  A

1   suggestion was made that these gentlemen weren't qualified to

2   do it, and that's why it fell apart.  In fact, the contract was

3   signed.  It's in evidence.  And the testimony was that Chengde

4   just didn't have the money to go forward.

5        But that's the early, formative period.  And the evidence

6   shows a standard consulting relationship between an

7   entrepreneur seeking to design -- do design work in China, who

8   had gotten at least one contract, hadn't been able to get that

9   off the ground, and had forged a relationship with an

10  ex-DuPonter that he met through Condux.

11       That's the formation of the agreement.  That is how these

12  men start off.  And there's no evidence that they ever change

13  from that.  There's no agreement to commit crimes or to steal

14  anything from DuPont.

15       In fact, when they renew this idea they're going to get

16  the band back together, if you will, in 2004, there's renewed

17  effort at a TiO2 contract.

18       What you see on the screen now is Exhibit 1006, which is

19  the metadata for Exhibit 694, just a plain piece of paper.  At

20  top of it it says, "On legal issue with DuPont."

21       But you can tell from the metadata, if you go to this

22  other document, that this was written on April 8, 2004, by

23  Mr. Liew.  And what it says is, quote:

24            "Bob Maegerle said that he talked to DuPont in regard

25        to doing some work for us and got a permission verbally.

1          Bob sent the request in writing to DuPont and called to

2     follow up.  DuPont didn't want to put anything in writing

3     on this kind of issues.  Legally, DuPont have something on

4     ex-DuPont employee for 5 years.  After 5 year, that

5     employee would not be accountable anymore."

6          So this was admitted into evidence on the issue of state

7     of mind, and that's exactly why I bring it to your attention.

8          In 2004, this shows notes that Mr. Liew was taking about

9     discussions with Mr. Maegerle, and what Mr. Maegerle was

10    telling him, which was basically he was legally able to go

11    forward with the project that they envisioned at the time.

12         In fact, you heard from Mr. Zisko -- don't know if you

13    remember Mr. Zisko.  It was a while ago.  Tall gentleman, gray

14    hair, pretty enthusiastic about his testimony, in telling you

15    about his business with Mr. Liew in China.

16         Mr. Zisko said that Mr. Maegerle told him that

17    Mr. Maegerle had checked with a lawyer and felt totally on

18    solid ground in what he was doing.

19         So in 2004, nothing has changed.  This hasn't turned into

20    a criminal conspiracy as of this point.  In fact, there's

21    further due diligence and efforts to make sure that these men

22    are on solid ground in doing what they plan to do.

23         April 11, 2004.  This is Exhibit 1008.  And there's

24    metadata with this also.  This is a letter to a fellow named

25    Finado.

**CLOSING ARGUMENT / GASNER**

1      And in this letter, again, absolutely critical, if you're

2  trying to understand from contemporaneous evidence what the

3  agreement was and whether it was a criminal agreement, please

4  look at this document.

5      What it says is that Mr. Liew has spoken to three

6  ex-DuPont people, Dan McIntosh, Bob Maegerle, and Tim Spitler,

7  in regards to the issue with using the knowledge and experience

8  gained from the employment with DuPont.

9      So, again, for the purposes of understanding Mr. Liew's

10  state of mind and what he was thinking at the time, this

11  writing recites what he heard from Dan McIntosh.  And what Dan

12  says is it's generally okay to practice your consultancy as

13  long as you're not taking any current information from DuPont.

14      Now, this is in 2004.  This is way, way out here on the

15  timeline.  Mr. Maegerle hasn't been at DuPont since 1991.  It's

16  13 years after he has left there.  And what Mr. Liew is hearing

17  is it's okay to be a consultant as long as you're not using

18  anything current.  Right or wrong that's what he's hearing.

19  And it's 13 years, and that's what his state of mind is based

20  on this document which you have in evidence.

21      He goes on to talk about Bob retiring from DuPont in 1992,

22  working as a consultant.  And he talks about the letter to

23  DuPont, his follow-up with the phone call, and a verbal okay;

24  and that beyond five years there's no legal issue to worry

25  about.

1      So quite the opposite of a criminal conspiracy.  This

2   document shows due diligence to determine whether Mr. Maegerle

3   is on solid ground and it's okay for him to consult and to do

4   the job that they're going to do.

5      And also from Tim, Tim Spitler, now deceased, but this

6   letter talks about a conversation with Tim.  And what Tim says

7   is:

8           "There is a very small problem to use your knowledge

9       within five years after you left DuPont.  After five

10      years, you are a free man as far as DuPont concerns."

11     So this is what Mr. Liew is hearing in that time frame.

12  And that is the critical time frame in which their relationship

13  is formed.

14     So let's now go to what I'll call the 30K timeline.

15     **THE COURT:**  Before we do that, let's take a stretch

16  break, okay.

17     **MR. GASNER:**  Certainly, Your Honor.

18     (Pause)

19     **THE COURT:**  All right.  Please be seated.  When you

20  are ready you may continue.

21     **MR. GASNER:**  Thank you, Your Honor.

22     What I've got up on the screen and on the board here is

23  another period in the life of Mr. Liew, Mr. Maegerle, and their

24  work.  From 2005 to 2009, so a 4-year period in which they get

25  and are working on the 30K project.

CLOSING ARGUMENT / GASNER

1      So this is the one for Jinzhou, that is more in the north

2   of China.  It's thousands of miles away from a 100K plant,

3   which is in Panzhihua.  So let's talk about the 30K timeline

4   and what's going on there.

5      They get the contract in -- let's go ahead a couple of

6   clicks here.  The contract is in November of 2005.

7      Now, in this same time period, leading up to the contract,

8   you heard from Mr. Zisko, you've got on the screen now as 3129,

9   this is in September of 2005, so in this time period leading up

10  to getting this first contract.

11     And Mr. Liew sends to Zisko with an attachment of a

12  translated RFQ or request for quotation.  So RFQ leading to

13  what you heard from Professor Lewis were in a form contracts

14  that are very common in China.

15     And Mr. Zisko and Mr. Liew are working together to try to

16  put together the package to convince Jinzhou to hire them.

17     They get the contract in November.  And keep in mind that

18  Jinzhou already has a chloride route plant.  It is the

19  predominant one in China, but it also has a huge sulfate route

20  facility there.  And the head of it is this fellow by the name

21  of Changhe Liu, L-i-u, just in case we didn't have enough

22  people named Liu in this case.

23     But Changhe Liu is the author of this textbook.  And Paul

24  Cooper told you about it.  And it goes through.  It's in

25  Chinese.  But Mr. Cooper told you from a translation what it

1  was about.  It described their knowledge of foreign

2  technologies.

3      And it's been raised:  Why would they hire consultants if

4  they already were this good at it?

5      And the answer is that:  No consultants would be in

6  business if that was an answer.  Clients can often do

7  themselves what they hire consultants to do for them.

8      And that was the pitch that Mr. Liew, Mr. Zisko, and

9  others made, which was, hey, we can do this better than you

10  can.

11      And when we talk a little bit more about some of the

12  correspondence, the idea is a lot of this equipment is in the

13  United States: Lawrence pumps; Sturdevant; all these other

14  places.  And every big business -- you heard that Pangang and

15  Jinzhou both big, reputable companies in China.  And they often

16  hire consultants to do things that, yeah, they could do

17  themselves, but they choose to hire consultants.  And the RFQ

18  with -- that work with Zisko leads to the contract.

19      Now, they're also doing pretty well in other ways.  In

20  2005, you can see up on the screen that we've got Exhibit 3128,

21  which is a micronizer project for Jiangsu.

22      So Mr. Liew and his small company have gotten another

23  project for another Chinese company to help design their

24  micronizer, which is part of the finishing plan.

25      So they are accumulating all kinds of experience in this

1  2005 time frame, of designing a micronizer for Jiangsu.  You've

2  got that up on the screen, Exhibit 3010.

3      And what's on the screen now is kind of a typical

4  interaction between engineers.  This is in evidence as 165.

5  It's an email between Bob Maegerle and Peter Zisko while

6  they're working on the 30K project.  And Mr. Maegerle writes to

7  Peter Zisko and says:

8          "Following are comments on the spray machine

9      conceptual drawing, based on my review with a retired

10      DuPont maintenance supervisor."

11      Oh, my god, there's a mention of DuPont in an email.

12  There you have it.  It's in evidence.  This must be evidence of

13  a crime.

14      Well, look at what the response is from Mr. Zisko.  He

15  took the stand here, told you that he didn't think he did

16  anything wrong in his interactions.  He didn't think he had

17  joined any kind of trade secret conspiracy.  He didn't think he

18  was doing anything improper.  And he writes back and says:

19          "Thanks, Bob.  N2 purge is covered just not shown."

20      And he goes on and on.  And towards the bottom, in number

21  5 he says, quote:

22          "Does DuPont put vibration switches, bearing

23      temperature switches, radiant pyrometers, or thermocouples

24      in the assembly for either safety feedback or tickle

25      feed?"

**CLOSING ARGUMENT / GASNER**

1    You met Mr. Zisko.  He was not joining some criminal

2 conspiracy because he mentions DuPont or because Mr. Maegerle

3 said, hey, I checked with a retired supervisor.

4    In the normal course of consulting, people talk to retired

5 people.  They refer back to their own experience.  And

6 Mr. Zisko takes this in stride.  He didn't feel, and he

7 testified under oath here he didn't feel anything he did on

8 this project was improper in the slightest.  The government

9 hasn't so alleged.

10    And this is an example of what engineers do.  They talk

11 about optical pyrometers, and this, that, and the other thing.

12 And they ask what -- what did you do at DuPont or Kerr-McGee or

13 whatever?

14    And there is a zone in which engineers have to operate.

15 If they're going to use their brain, if they are not going to

16 get a lobotomy when they leave one employer, they need a zone

17 of freedom to use their skill and experience.  And if they

18 happen to mention the prior employer, even if it's DuPont, that

19 doesn't suddenly turn what they're doing into a crime.

20    FactSage, Exhibit 1513, another example from this 2006

21 time period.  So we're in 2005, the contract.  And these men

22 are working for years on the 30K project.  And to give you an

23 example of what Mr. Liew is doing based on the documentary

24 evidence, Exhibit 1513, he says to Mr. Zisko, Mr. Maegerle,

25 Ernie Nelson, another consultant that they've hired:

1          "Hello from Montreal.  We got buried in FactSage for

2      the last two days.  We got most of the calculations

3      figured out and shall compile the real data tomorrow."

4          So you heard some criticism during the trial, oh, USAPTI

5  didn't have chemical engineers.  Well, they had some.  And I'm

6  going to talk about that later.

7          But when they didn't have the expertise in-house, they

8  went to consultants.  And FactSage, you heard, was the software

9  product of a professor in Montreal, named Arthur Pelton.  And

10 Mr. Liew went up there and spent a week with Dr. Pelton, going

11 over their mass balance equations.

12         So, yes, Mr. Liew is an electrical engineer, not a

13 chemical engineer.  But he's an engineer, and a darn good one,

14 as you heard from many people, and a good mentor for those

15 people, and a good teacher.

16         And he was willing to fly out to Montreal and sit down and

17 just do the mass balance equation stuff he needed to do with an

18 expert in the field.

19         Not the way DuPont would do it.  Not the way a lot of

20 bloated, big American companies would do it with departments

21 upon departments and ten people to do the job of one.

22         More the Silicon Valley approach here.  Small group.  If

23 Mr. Liew needed to get some chemical engineering done, jumped

24 on a plane, went to Montreal, talked to an expert in the field,

25 and got it done with fewer people.

**CLOSING ARGUMENT / GASNER**

1        The work on the 30K project.  Let me just show you just

2   some of the work product.  It's kind of hard to give you a

3   sense of the scope of what they're doing.  This is Exhibit

4   3005, some equipment specifications.

5        The government has made it sound as though the people that

6   Mr. Liew hired were just, you know, doing kind of make-work or

7   something.

8        If you look at what they're actually doing, this is

9   significant engineering work.  And you're going to see that

10  there was back and forth with Pangang.

11       What you'll see in the evidence is that Mr. Maegerle did

12  sketches, conceptual drawings, as a consultant.  And then those

13  were handed off to Performance Group and USAPTI.

14       And they did a ton of work.  There are piping

15  specifications that people have to refer to.

16       You saw how complicated these plants are.  It's an

17  Erector Set of about 10 million parts that you have to put

18  together.

19       And that's what they -- they did.  And, yes, they relied

20  on Mr. Maegerle for the conceptual drawings and his TiO2

21  experience.  But lots of parts of this plant are just like any

22  other.  You need to move ore into the chlorinator.  That's just

23  a materials-moving problem.  The entire finishing plant, you

24  heard, is mostly off-the-shelf equipment from vendors.

25       An awful lot of what these folks had to do was the

**CLOSING ARGUMENT / GASNER**

1    laborious, difficult but important work of putting the

2    10 million piece Erector Set together.  And they did that for

3    years.

4         And there was a lot of management and work required by

5    Mr. Liew to manage this project.  If you want some sense of the

6    scope of what they did -- and we've heard a lot about the

7    safety-deposit boxes, you know, the focus of other supposed

8    crimes, but look what was in the safe-deposit box.  It's a hard

9    drive.  This is a folder tree from it.  This isn't even a

10   printout of any of the real information.  This is like the

11   index to it.  Exhibit 2829.

12        And you will just see nested folder after nested folder of

13   what you need to do to put together a 10 million piece

14   Erector Set.

15        And that's what they were doing.  And it was no trivial

16   task.  And it's the kind of thing that a big company like

17   Pangang might well want to outsource to some skilled engineers.

18        So that's the 30K project.

19        Vendors.  What we've got on the screen, we're now still in

20   this 2005 to 2009 time period.  Exhibit 1681, a list of all

21   these vendors.

22        You heard from Paul Cooper and others that many parts of

23   the Erector Set you can just buy straight from a vendor.  Yes,

24   you have to give them some specifications, but this is pretty

25   standard stuff.

**CLOSING ARGUMENT / GASNER**

1    And they have their own engineers.  They have their own

2  people that are better at telling you what kind of oxygen

3  preheater you need to use than anybody else in the world.

4    You heard about Petro Cam.  They make oxygen preheaters

5  for oil refineries.  They can tell you exactly what you need to

6  know.

7    You don't need engineers in every particular discipline in

8  order to talk to Petro Cam, tell them what you need.  And as

9  you saw in some of those Petro Cam documents, they also brag

10  about, well, here's the ones we've sold to DuPont in the past.

11  You'll see those documents in evidence.

12    So the vendors are a huge part of putting these projects

13  together.  And this is what's going on for years and years.

14    Now, by the way, you'll see on the chart here I've got

15  another line:  Patents, Articles, and Other Public Disclosures.

16    There are tens of thousands of patents and other public

17  disclosures in this area, and more of them coming out every

18  day.  So as the world progresses in this area, and these

19  companies all get their different patents, more and more is

20  coming into the public domain.

21    But you heard nothing in this case about how DuPont treats

22  that.  I mean, when they make a disclosure they don't go back

23  and unstamp things that have now been disclosed.  They don't

24  keep track of what's in the public record and what isn't.

25    And it's an evolving set of public disclosures that are

1   out there.  And that's what Paul Cooper was here to tell you

2   about, was to synthesize all that.  And he described for you

3   what is part of the common knowledge, which is an evolving

4   thing that he came and he told you about, and gave you his

5   opinion that nothing that USAPTI and Performance Group did

6   involved any trade secrets.

7        And they were working themselves to the bone on putting

8   together this gigantic project, in the reasonable belief that

9   what they were doing was perfectly okay.

10       September 2007, Exhibit 167, initial inquiry from Pangang

11  on the 100K project.  This little company is getting some

12  traction in China.  They have successfully done work for

13  Jinzhou.  They have gotten further contracts and amendments to

14  the 30K project.  And things are going well.

15       And now Pangang is interested in them not because of some

16  kind of political fix or what the government suggests, but

17  because they are doing the work and they're doing it well.

18       They get the contract.  They get the 100K contract.  This

19  is in May of 2009.  And this is the next part of the timeline

20  in this supposed 13-year criminal conspiracy, chapter 3, if you

21  will, of this saga.  And, again, more, more work product.

22  Years of work being put together.

23       Now, what, again, as I mentioned to you, we've got on the

24  screen here is Exhibit 46, at page 12.  This is one of

25  Maegerle's sketches.  From the very beginning, this is the way

**CLOSING ARGUMENT / GASNER**

1   these men worked, is Maegerle would do simple sketches.

2        And, by the way, look in the upper right (indicating),

3   "RJM 8/3/09."  Mr. Maegerle has signed and dated his sketch.

4   He's proud of what he's doing.  This is not a criminal

5   conspiracy.

6        No criminal conspirator would sign and date their work

7   that is supposedly the theft of a trade secret.  Bank robbers

8   don't leave their business cards; don't sign their name at the

9   teller's desk; they don't make their presence known.  This is

10  contemporaneous evidence that Mr. Maegerle doesn't think he's

11  doing anything wrong.

12       And when Mr. Liew receives this, this is evidence that to

13  him would show, I've hired a consultant who's proud of his

14  work.

15       So there you have it.  Sketches that come in signed and

16  dated.

17       Here's another one.  This one is Exhibit 46, at page 54.

18  This is of the oxidation reactor.  Oh, my god, the all

19  important oxidation reactor.  Signed and dated by Mr. Maegerle.

20       And, by the way, this shows that adjustable slide that we

21  talked about a little bit, that Paul Cooper told you about.

22  And once there's an adjustable slide designed under the

23  reactor, all this business about Trade Secret 3 and the Diemer

24  equation and how long the mixing length is irrelevant.  They

25  already designed an oxidation reactor with an adjustable slide.

**CLOSING ARGUMENT / GASNER**

1    And whoever runs this plant is going to have to figure out the

2    right way to run it, but for their job it's got an adjustable

3    slide.

4        And, by the way, Mr. Cooper told you this is pretty much

5    the same design that Jinzhou already had in 2005.  Before

6    Mr. Maegerle and Mr. Liew design anything for them, they

7    already have in place a reactor that looks pretty much like

8    this one.

9        We're not talking about stealing anything from anyone.

10   We're talking about a consulting relationship for an

11   established company that already has a reactor that looks

12   pretty much like this one.

13       So, again, no evidence of a criminal conspiracy.  Lots of

14   evidence of hard work.  Lots of evidence of a legitimate

15   consulting relationship.  Lots of work of these men not

16   thinking in their own minds that they're doing anything wrong.

17       So the work on the 100K project we've got a long list up

18   on the screen, if you want to look at it.  Pretty much the same

19   kind of stuff.

20       I'll just show you some samples.  So, again, this is no

21   trivial task to put these -- these plants together.  And

22   there's less in evidence on the 100K plant because the great

23   white strikes and the searches happen and work is ended.

24       But you'll see that on the -- on the 100K project, there's

25   plenty of work that happens in this time period between getting

1   the contract in 2009 and then when the world kind of falls

2   apart, or wheels come off the wagon, whatever metaphor you

3   want, when DuPont gets involved and the searches follow.

4       So there's work on the 100K project that proceeds.  Let's

5   talk a little bit about who's doing the work.

6            **THE COURT:**  Mr. Gasner.

7            **MR. GASNER:**  Yes, Your Honor.

8            **THE COURT:**  Let the Court to know when it is a

9   convenient breaking point.

10           **MR. GASNER:**  Now is as good any, Your Honor.

11           **THE COURT:**  Great.

12      Well, I'm going to give the jury the final instructions

13  for the evening, so if anybody in the spectator section wants

14  to leave please do so now because we're going to lock the door

15  during the instruction.  So this would be a good time to make

16  your way out.  Thank you.

17       (Pause)

18           **THE COURT:**  Thanks to our official door locker.

19  Again, we appreciate your service to the Court and the parties.

20      So I'm going to give you your final instruction.  And just

21  to, you know, emphasize in addition to the words that are

22  really important, is the case isn't over yet.

23      Counsel is still in the midst of their arguments.  And

24  until they finish and I give you your final final instruction

25  the case is not in your hands.  It would be completely

**CLOSING ARGUMENT / GASNER**

1  inappropriate to discuss the case, much less make up your mind.

2  So these words take on added significance because we're at

3  the -- really, at the culmination of the trial.

4      Again, because you must base your verdict only on the

5  evidence received in the case and on these instructions, I

6  remind you that you must not be exposed to any other

7  information about the case or to the issues it involves.

8      Except for discussing the case with your fellow jurors

9  during your deliberations, do not communicate with anyone in

10  any way, and do not let anyone else communicate with you in any

11  way about the merits of the case or anything to do with it.

12      This includes discussing the case in person, in writing,

13  by phone, smartphone, or electronic means, via email, text

14  messaging or in or on any Internet chat room, blog, website,

15  including such social networking media like Facebook, Myspace,

16  LinkedIn, YouTube, and Twitter or other such service.  This

17  applies to communicating with your family members, your

18  employer, the media or press and the people involved in the

19  trial.

20      If you are asked or approached in any way about your jury

21  service or anything else about this case, you must respond that

22  you've been ordered not to discuss the matter, and to report

23  the contact to the Court.

24      Do not read, watch, or listen to any news or media

25  accounts or commentary about the case or anything to do with

1   it.  Do not do any research such as consulting dictionaries,

2   searching the Internet, or using other reference materials, and

3   do not make any investigation or in any way try to learn about

4   the case on your own.

5        The law requires these restrictions to ensure the parties

6   have a fair trial based on the same evidence that each party

7   has had an opportunity to address.

8        A juror who violates these restrictions jeopardizes the

9   fairness of these proceedings and a mistrial could result that

10  would require the entire trial process to start over.

11       If any juror is exposed to any outside information, please

12  notify the Court immediately through Ms. Ottolini.

13       So there's updated schedules in the jury room for you to

14  take with you.  A couple of dates were changed but basically

15  what we told you.

16       So tomorrow, Tuesday the 25th, we'll be sitting from 8:00

17  to as late as 2:15.  Depending upon when we conclude closing

18  arguments and the Court gives you a last little bit of

19  instructions, you may begin your deliberations tomorrow and

20  then continue them on Wednesday and on Thursday.  And then

21  Friday we will be dark.

22       So that's the schedule for now.  We'll see you tomorrow

23  morning.  Thanks for your attention and your punctuality.  It

24  enabled us to start on time.

25       Have a wonderful evening.

 1            (Proceedings were heard out of presence of the jury:)

 2            **THE COURT:**  All right.  So are we relatively on

 3    schedule, Mr. Gasner?

 4            **MR. GASNER:**  Yes.  Yes, Your Honor.

 5            **THE COURT:**  So we may have time, and I'm not -- I'll

 6    give everybody as much time as they need, but I'm not

 7    indicating the appropriate engineering principle is about

 8    filling the time because it's there, because I would like to

 9    get the case to the jury and have it at least begin the process

10    of deliberation.

11            So if counsel would stick to the current schedule and be

12    here by 7:30, in case something occurs and then when the jury

13    is here we'll continue with the closing arguments.

14            Yes, Mr. Froelich.

15            **MR. FROELICH:**  Your Honor, just as a technical thing

16    that, you've now instructed the jury and we have to put any

17    objections after you instructed.  I think we have to,

18    technically, make the objection.

19            **THE COURT:**  That's a fair point.

20            Does anybody have any further objection?

21            **MR. FROELICH:**  My objection would be the failure to

22    give the good faith and the theory of the defense.

23            I know Your Honor's position on it, but I want to put it

24    on the record.

25            **THE COURT:**  That objection is noted and overruled.

CLOSING ARGUMENT / GASNER

1    I assume, Mr. Gasner, from your side you wish to reiterate

2  all the objections and --

3         **MR. GASNER:**  Yes, Your Honor.  We won't recite them,

4  but there's been a long track record of objections, both

5  written and verbal on the record, and we stand by those and

6  reassert them now.

7         **THE COURT:**  The same ruling will apply, but they are

8  ordered confirmed for any appellate use later on.

9    Thank you, counsel.  See you tomorrow morning.

10    (Counsel simultaneously thank the Court.)

11         (Proceedings adjourned at 1:25 p.m.)

12              ---oOo---

13         <u>**CERTIFICATE OF REPORTERS**</u>

14    I certify that the foregoing is a correct transcript

15  from the record of proceedings in the above-entitled matter.

16

17  DATE:   Monday, February 24, 2014

18

19  _____

20    Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
           U.S. Court Reporter

21

22

23  _____

24    Katherine Powell Sullivan, CSR #5812, RMR, CRR
           U.S. Court Reporter

25