**Volume 24**

**Pages 4471 - 4673**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jeffrey S. White, Judge

```
UNITED STATES OF AMERICA,        )
                                 )
          Plaintiff,             )
                                 )
   VS.                           )        NO. CR 11-00573 JSW
                                 )
WALTER LIEW; ROBERT MAEGERLE;    )
and USA PERFORMANCE TECHNOLOGY,  )
INC.,                            )
                                 )
          Defendants.            )
_____  )
```

San Francisco, California
Tuesday, February 25, 2014

**<u>TRANSCRIPT OF PROCEEDINGS</u>**

<u>**APPEARANCES:**</u>
For Plaintiff:

                    MELINDA HAAG
                    United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
            **BY:  PETE AXELROD**
                    **JOHN H. HEMANN**
                    **ASSISTANT UNITED STATES ATTORNEYS**

                    U.S. DEPARTMENT OF JUSTICE
                    600 E Street NW
                    Washington, D.C.  20044
            **BY:  RICHARD S. SCOTT**
                    **ASSISTANT U.S. ATTORNEY**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
              Official Reporters

```
 1   APPEARANCES:   (CONTINUED)

 2   For Defendant Walter Liew and USA Performance Technology, Inc.:
                         KEKER & VAN NEST LLP
 3                       633 Battery Street
                         San Francisco, California  94111
 4                BY:  STUART L. GASNER
                      SIMONA A. AGNOLUCCI
 5                    KATHERINE M. LOVETT
                      CHRISTINA BLAIS
 6                    ATTORNEYS AT LAW

 7   For Defendant Robert J. Maegerle:
                         MCKENNEY & FROELICH
 8                       1349 West Peachtree Street
                         Two Midtown Plaza - Suite 1250
 9                       Atlanta, Georgia  30309
                  BY:  JEROME J. FROELICH, JR.
10                    ATTORNEY AT LAW

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        **I N D E X**

2    Tuesday, February 25, 2014

3                                              <u>PAGE</u>  <u>VOL.</u>

4    Closing Argument by Mr. Gasner (resumed)     4475   24
     Closing Argument by Mr. Froelich            4552   24
5    Rebuttal Argument by Mr. Hemann             4621   24

6                        **E X H I B I T S**

7    <u>TRIAL EXHIBITS</u>                  <u>IDEN</u>  <u>EVID</u>  <u>VOL.</u>

8      208                                       4475   24

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

```
1   Tuesday - February 25, 2014                          7:56 a.m.

2                      P R O C E E D I N G S

3                          ---000---

4        (Proceedings were heard out of the presence of the jury:)

5            THE COURT:  Good morning, everybody.  Please be

6    seated.

7        Please call the case.

8            THE CLERK:  Calling Case Number CR-11-573,

9    United States versus Walter Liew, United States versus Robert

10   Maegerle, and United States versus USAPTI.

11       Counsel, please state your appearances.

12           MR. HEMANN:  Good morning, Your Honor.  John Hemann,

13   Pete Axelrod, and Richard Scott for the United States.

14           THE COURT:  Good morning.

15           MS. LOVETT:  Good morning, Your Honor.  Katie Lovett,

16   Stuart Gasner, and Simona Agnolucci for USAPTI and Walter Liew

17   who is present.

18           THE COURT:  Good morning, everybody.

19           MR. FROELICH:  Good morning, Your Honor.  Jerry

20   Froelich for Mr. Maegerle.  Mr. Maegerle is standing next to

21   me.

22           THE COURT:  Good morning.  Good morning, Mr. Maegerle.

23       All right.  So I understand there's a minor small issue

24   with respect to an exhibit.

25           MS. LOVETT:  Yes, Your Honor.  Just briefly.
```

1        Exhibit 208 was admitted on January 9th, and it was

2   admitted pursuant to a limitation that we remove all

3   handwriting that hadn't been stipulated to.  We've done that

4   now, and the exhibit is ready to be admitted in full.

5            THE COURT:  All right.  Is that acceptable?

6            MR. HEMANN:  That's correct, Your Honor.  Thank you.

7            THE COURT:  All right.  So are you offering that now?

8            MS. LOVETT:  Yes, Your Honor.

9            THE COURT:  All right.  It will be admitted.

10       (Trial Exhibit 208 received in evidence)

11           THE COURT:  All right.  Are we ready to continue?

12           MR. GASNER:  Yes, Your Honor.

13           THE COURT:  Let's bring the jury in, please.

14       (Proceedings were heard in the presence of the jury:)

15           THE COURT:  Please be seated.

16   Good morning, everybody.  Welcome back.

17       And we are continuing with closing argument of Mr. Gasner

18   on behalf of Mr. Liew and USAPTI.

19       You may proceed.

20           MR. GASNER:  Thank you, Your Honor.

21                **CLOSING ARGUMENT**   (resumed)

22           MR. GASNER:  Good morning, ladies and gentlemen.

23       When we left off yesterday, we were talking about the

24   three phases of the time line, and we were almost done.  We

25   went through the period of time before the 30K contract.  We

**CLOSING ARGUMENT / GASNER**

1  talked about Condux and the initial interactions with

2  Mr. Marinak, Mr. Maegerle, and other consultants.

3       We went through the 30K time period.  And when we left

4  off, we were in the 100K time period that we've got up on the

5  board:  2009, 2010, 2011.  And we're almost done.

6       What you've got on the screen now is a list of the people

7  that were working on the 100K project as of June 1, 2010.  You

8  met some of them.  You heard about many of them.  Peter Wong

9  you heard about as the person that was fired and may well have

10  written the anonymous note.  Ruth Oduca, a chemical engineer.

11  You didn't hear from her.  Philipp Ilagan you did hear.  He was

12  a witness in the trial.  And others.

13       Now, there was argument about the number and competency of

14  the employees that USAPTI had and whether they could have done

15  the work that they did, and I just want to show you a chart

16  because you didn't see all the witnesses and consultants in

17  this case.

18       And I'm not going to dwell on each and every one of these,

19  but along the first column are the names of all the people that

20  worked either for Performance Group or USAPTI during the many

21  years that this work went forward over a decade.

22       And it starts, it's in alphabetical order:  Steve Amerine,

23  you met him, an engineer who was there towards the end of the

24  30K project.

25       Wendell Baker, you heard a little bit about him, an

1    instrument engineer, an outside consultant.

2        Brijesh Bhatnagar, or BJ, you heard testimony about BJ

3    during the trial.

4        Ken Chan you didn't meet.  Allen Chang you did meet.

5        But the point of this chart is really to show you the

6    different skills that people had, both employees and

7    consultants, during the course of this long project.  And they

8    do have experience as project managers, process engineers,

9    mechanical engineers, instrument engineering, chemical

10   engineering, computer-assisted design, and just generalist

11   engineers, and IT engineering.

12       So Mr. Liew really ran a company in which he had a

13   relatively small number of employees, and many of them were CAD

14   designers or other types of employees who did mostly drafting.

15   The Government has kind of emphasized, "Gee, you know, you

16   don't know anything about TiO2; do you?"

17       Answer, "Well, you know, no, but my job was, really, to

18   just draw up these elaborate drawings."

19       But there were a lot of other people with deep

20   understanding and knowledge of their disciplines.  And you

21   heard from Paul Cooper and others that many aspects of a plant

22   don't require that you know about TiO2 specifically, and that's

23   not to diminish the importance of Mr. Maegerle.  I mean, he had

24   30 years of experience in TiO2 at DuPont; and the question is:

25   Did Mr. Liew need anybody else besides Mr. Liew [sic] and then

1    a big team in these different disciplines?

2         And I submit to you that this was a good team, a solid

3    team.  They had the skills and experience that they needed.

4         Now, keep in mind, too, that Mr. Liew was a prodigious

5    researcher.  You heard from Mr. Cooper and others that there

6    was a research library on the server at USAPTI in which they

7    assembled a vast collection of materials as time went by.  When

8    we're here in 2010 and they're working on the 100K project,

9    they've been researching the state of the art as it's evolved

10   over a decade and putting that material on the server for

11   people to rely upon and use.

12        Now, did they do their work by looking at patents and

13   going, "Oh, I'm going to do it that way"?  No.  That's not the

14   way they worked.  What happened, the evidence showed, is that

15   there was a long period of early research that Mr. Liew did.

16   You've got that in the notebooks that we talked about

17   yesterday.  And there was a continuing process of staying

18   up-to-date on the state of the art.  And you saw -- you see

19   that on the screen in front of you as the product of the whole

20   research library that they did.

21        But in the day-to-day work, it was, indeed, sketches from

22   Mr. Maegerle, lots of interactions with engineers at the

23   customer, either Jinzhou or Pangang, as the case may be; and

24   interactions with tons of vendors and consultants.

25        So that's the way the work got done.  And the fact that a

1    CAD designer, you know, didn't look at a patent -- I mean, the

2    Government called a lot of low-level employees from USAPTI to

3    ask them, "Well, did you look at patents while you were doing

4    your work?"  No, that's not the way the work got done, and it's

5    not really relevant to the issues at hand.

6        By September 2009, there was a basic information submittal

7    to Pangang on the 100K.  That's Exhibit 189, big fat process

8    description, lots of other work on the 100K.

9        Exhibit 189 also is this huge binder that if you want to

10   dig into the details of the 100K project and how the design

11   actually turned out, you'll have that in evidence.

12       But a bit of a shortcut, if you will, is to look at

13   Exhibit 239T, which is a translation of a summary that was done

14   by the outside consultants hired by Pangang in China.  One was

15   this Australian company TZPI.  The other was Zhi Hua, this

16   Hong Kong consultant, that Pangang, this very big company,

17   hired as kind of a second set of eyes to look at the work that

18   USAPTI did and to evaluate it.

19       And what you've got in evidence is the results of their

20   review in September of 2009 of the 100K project, that basic

21   information package.  And the conclusions that you'll see are,

22   first of all, that there are things that they liked and things

23   that they didn't like about what Mr. Liew and his team had

24   assembled.

25       On the screen now is an excerpt from page 4, and it talks

 1   about a serious error in the balance among petroleum coke,

 2   et cetera.

 3       If there had been just slavish copying of some stolen

 4   DuPont anything, and DuPont is as great as they say it was,

 5   there wouldn't be serious errors.  Ironically, this is a place

 6   in which errors make our point.  This was work that these

 7   people really did, and it rose or fell in a variety of ways;

 8   and the consultants said, "Hey, here's a place where there's a

 9   serious error."

10       The Zhi Hua consultants also talk about, in number two:

11   (reading)

12            "The brick-lined area in the chlorinator is

13            insufficient.  The top portion of the reactor must be

14            brick-lined."

15       Well, you heard a little bit of testimony about that being

16   a design that USAPTI wanted to do as a different way of doing

17   things.  Most people do line the top of the chlorinator.  They

18   decided not to.  These consultants were critical of that.

19   Again, evidence that these gentlemen were doing a

20   chloride-route process, doing a DuPont type of chloride-route

21   process, doing it their own way; making tweaks, and making

22   engineer's decisions where they thought it was appropriate.

23       Item three on the screen now:  (reading)

24            "The diameter of the chlorinator rear cooling flue is

25            too large."

1    This is another area where the Government said, "Oh, you

2   know, the flue pond entrance was copied," and all this kind of

3   stuff; but when consultants looked at it, they were critical of

4   the way USAPTI did it.

5    Engineers are going to disagree about the right ways to do

6   things, and the process of engineering involves a million

7   decisions.  People come out different ways, and you can see

8   that in the Cierra/Zhi Hua criticisms of their design.

9    Now, the most interesting thing about this document is

10  item seven, which we have on the screen now; and what it says

11  is, quote:  (reading)

12        "Judging by the design of the oxidation oven," this

13        is a part of the plant that has been some focus during the

14        trial, "the design is at the level of mid-1970s technology

15        and not a modern design."

16  So these third parties came in and said exactly what we've

17  been telling you during the trial, which is, this is old

18  Ashtabula technology.  Independent consultants came in, looked

19  at the oxidation and the whole thing, did this whole report,

20  and said, "This is really old."  And that's exactly what we've

21  been saying, old and in the public domain.

22   The conclusions from TZMI, the Australian company, were

23  very similar.  They say:  (reading)

24        "This technology originates from DuPont and possesses

25        relatively distinctive characteristics."

1        Let's just pause there.

2        First of all, we don't dispute that this design is very

3    DuPont-like; and what the evidence has shown is that it,

4    indeed, was inspired by the old Ashtabula technology.  So

5    there's no argument there.

6        Interesting, though, that this Australian consulting

7    company knows DuPont technology when it sees it.  They're an

8    independent consulting firm in Australia; but they can look at

9    these designs and go, "Hey, this is the DuPont method.  This is

10   DuPont style, and it possesses relatively distinctive

11   characteristic."

12       There's a whole area of DuPont-like technology that

13   everybody in this industry knows what it looks like when they

14   see it, and TZMI does exactly that.  And they conclude the same

15   thing that Zhi Hua did, which is:  (reading)

16           "This technology is DuPont's relatively dated

17        production technology...."

18       They say, "Look, it will work.  It's really old"; but

19   that's their assessment, and it's exactly what we've been

20   saying.

21       So to sum up on this alleged conspiracy in Count 2, the

22   allegation of the Government that they have to prove beyond a

23   reasonable doubt is that Mr. Liew, Mr. Maegerle, and USAPTI

24   agreed to commit crimes.  And what we talked about yesterday,

25   and we'll talk about more today, there was no such agreement.

 1   It was a standard consulting arrangement to fulfill a standard

 2   commercial contract with some big Chinese companies.  What they

 3   did was to provide the old DuPont technology that had been

 4   disclosed in a score of patents that had been given away,

 5   essentially, in terms of confidentiality in the

 6   Sherwin-Williams transaction, and that's what they did.  There

 7   was no agreement to commit crimes.

 8       Business contracts, relationships with many consultants,

 9   exercise of judgment by those consultants as to what they could

10   and couldn't rely upon.  Remember those Zisko e-mails we talked

11   about.  There are peripheral mentions of this and that from

12   DuPont that engineers are just going to have in their

13   day-to-day interactions.  And, of course, years of hard work.

14       Five terabytes of work, which is what the Government

15   seized, and they had years to go over all this stuff.  We

16   talked about in my opening this graphic of a stack of paper

17   that goes up to a satellite.  If you printed out everything

18   that they seized in electronic form in terms of a certain

19   number of pages per gigabyte, it would be an enormous stack of

20   paper.

21       And from that, the Government has cherry picked a few

22   documents, scraps of paper, that they've emphasized over and

23   over and over again, and it's really the same scraps of paper.

24   I don't know how many times you can wave around those

25   particular things found in Mr. Liew's closet and in his garage,

**CLOSING ARGUMENT / GASNER**

1   but the Government certainly made a big to-do about it because

2   in a 24-mile stack of paper, those are the only three that they

3   found they can even make a fuss about.

4       Let's talk about attempt.  For conspiracy there has to be

5   an agreement, and we talked about that.  For attempt the

6   question is:  Attempted to do what?  And the Indictment, as

7   expressed in the Court's instructions to you, says here's the

8   what:  (reading)

9           "On or about and between 2008 and July 19, 2011...

10      the defendant knowingly attempted to copy," and then

11      there's all these other words, copy, transmit,

12      communicate, blah, blah, blah, "Trade Secret 1."

13      We heard a lot about Trade Secret 1 from the Government,

14  but let's look at what it says.  It says:  (reading)

15          "The DuPont chloride-route process to manufacture

16      TiO2."

17      Now, if there's one thing we've heard, it's that companies

18  all over the world have a chloride-route process.  It has been

19  around since the Barksdale textbook in 1949.  Pieces of it have

20  been around since TiCl was invented in 1919.  This is a very

21  old process, but Trade Secret 1 is the DuPont chloride-route

22  process.

23      Well, what does that mean?  They have plants all over the

24  world.  They're in different locations.  They're in different

25  sizes.  They're on different sites.  Each one of them is a

1   10-million-piece erector set that is custom built for that

2   location.  So what is the DuPont chloride-route process?

3       Okay.  Pretty vague.  Couldn't get much vaguer, or so you

4   would think, until you read the rest of Trade Secret 1:

5   (reading)

6           "Trade Secret 1 includes ways and means in which

7       proprietary and nonproprietary components," that is

8       proprietary things that belong to DuPont; and

9       nonproprietary, that is things that they don't own,

10      they're out in the public, "components compiled and

11      combined by DuPont to form substantial portions of the

12      $TiO_2$ manufacturing process, and Trade Secrets 2 through 5

13      below."

14  Kind of a mind-boggling array of words.  It's the DuPont

15  chloride-route process.  There's no attempt made to distinguish

16  that from any other chloride-route process in the world or

17  between and among all of DuPont's different plants, and it

18  includes every conceivable way and mean and unique combination.

19  Well, this boggles the mind.

20      Now, in terms of the crime that's alleged, what the

21  Government has to prove beyond a reasonable doubt is that the

22  defendant reasonably believed that the information the

23  defendant intended to convert was a trade secret.  And they've

24  made much of this kind of strange quirk in the law, that for

25  attempt to steal a trade secret, it doesn't need to really be a

 1   trade secret.  That's the law that you've been instructed on

 2   and the focus is, indeed, on reasonable belief; what the

 3   defendants thought about the supposed trade secret.

 4        Could it be any more clear that they didn't think that the

 5   entirety of the DuPont chloride-route process was a trade

 6   secret?  Think about the belief that Mr. Liew would have had

 7   after doing years of research on patents and coming to the

 8   conclusion that Mr. Cooper told you about, that the vast

 9   majority of this chloride-route process, whether it's DuPont's

10   or anybody else's, is out there and generally known.

11        So if the test is reasonable belief, come on.  The

12   reasonable belief was informed by years of research of patents

13   and textbooks and articles that make it clear the entire DuPont

14   chloride-route process is not a trade secret.

15        Maybe there's some combination of some, you know, little

16   thing that they developed in secret that is useful and not

17   readily ascertainable and not generally known, but we never

18   heard about it.  And what the allegation of the Indictment is,

19   is it's the entirety plus every conceivable combination.  This

20   is, A, meaningless; and, B, not what the defendants believe.

21        So what the Government has done to try to show this, is

22   that they cite from the same document.  We're going to talk

23   about the puff letter.  But Exhibit 350T, read the whole thing.

24   What the Government keeps doing is taking little snippets from

25   it, cherry picking the parts that they like, and here's the

1    part that they liked yesterday:  (reading)

2            "After several years of dedicated research and

3        practice, my company has mastered the technology of the

4        complete DuPont method for titanium white by

5        chlorination."

6        And, so, the Government's argument is, "Well, you know,

7    this is what Mr. Liew was selling to Pangang.  It's the

8    complete method; therefore, he was attempting to steal Trade

9    Secret 1."

10       Okay.  Not so fast.  Because if you read the rest of the

11   letter, what you will see on page 7 of this long -- remember

12   this letter was read, there was a dramatic reading by Agent Ho

13   of all nine pages early in the trial?  So you probably don't

14   remember it, but you'll have it in evidence.  And it says:

15   (reading)

16           "Given that DuPont has always monopolized that

17       technology and has never transferred that technology to

18       China, the key is to cooperate with a company that has

19       mastery of the technology and can legally resolve

20       intellectual property rights issues...."

21       So if you read the whole letter, what it's saying is,

22   "Yes, we as a company at USAPTI have mastered this technology."

23   And certainly Mr. Maegerle after 30 years had done exactly that

24   and had that skill and knowledge and experience in his mind.

25   Fair statement that they have mastered this because Bob

1    Maegerle is on the team.  And Walter Liew has studied the heck

2    out of this also.

3         But the other part of the story that the Government

4    doesn't put into an excerpt is that they're also saying, "Come

5    to us, USAPTI, because we can legally resolve the intellectual

6    property issues."  Because they feel as though, based on the

7    due diligence they've done, that their consultants, if they're

8    sufficiently long out of DuPont, can rely on their residual

9    knowledge, can rely on things that they know from their years

10   at DuPont, and can legally do this.  You heard from Peter Zisko

11   that Bob Maegerle checked with his lawyer on this.

12        So if you read the whole letter, they're not saying, "Hey,

13   Pangang, we've mastered the technology, and we believe it's

14   stolen and we're going to sell it to you," and they agreed with

15   that.  What they're saying is, "We mastered the technology, and

16   DuPont won't transfer it to you."

17        You remember why.  Because DuPont wants to build its own

18   plant in Dongying and make all the money itself.  It wants to

19   be the sole investor.  So DuPont has a monopoly on the

20   technology, they believe in their mind, and they don't -- they

21   want to keep that to themselves.  "If you want a DuPont-like

22   plant, you've got to buy it from DuPont, and we're going to

23   build it for you and we're going to make all the money."

24        And what Mr. Liew is saying is, "There's another way.

25   Come to a company that has experienced people, that have

 1    themselves mastered this technology and can resolve the

 2    intellectual property issues legally," and that's the

 3    arrangement.  So if you read the whole of the puff letter on

 4    this issue, it's a very different picture.

 5         So let's talk about this.  What is this object of the

 6    attempt?  And it's also -- by the way, the object of the

 7    conspiracy is also to steal Trade Secret 1.  So all these

 8    arguments apply.  I mean, the conspiracy is gone, in our view,

 9    because there was no agreement to do anything illegal; but it's

10    also gone because the object of any agreement that occurred was

11    not to steal Trade Secret 1, but to build or design a plant

12    using legitimate means.

13         So let's focus, again, on this concept of a DuPont

14    chloride-route process.  There is the chloride-route process.

15    You heard about that.  It's basically the same in every plant.

16    It's in Barksdale, it's in the literature, and everybody agrees

17    there is a chemical process for taking TiCl and oxidizing it

18    into white powder; and this has been around forever.  It is the

19    chloride-route process.

20         And you saw lists of plants on some of the slides that are

21    in evidence from Tronox.  Remember I talked to the Government's

22    expert Gibney?  He worked at Tronox.  There was one slide that

23    described all the plants in the world.  They all have

24    chloride-route processes and all of them operate in, basically,

25    the same way.  So that's just the chloride-route process.

**CLOSING ARGUMENT / GASNER**

1    What there also is, number two on the screen, is the

2    generally known DuPont chloride-route process.  This is what's

3    been revealed in 60 years of patent disclosures.  Remember,

4    they started getting patents in the 1940s on what they do and

5    what they presented to the world.

6        And the deal in patents, you heard about this when I

7    talked to Mr. Dayton, is that you can get a patent if it's

8    novel and you are willing to disclose how to do it; and in

9    exchange for that disclosure, the patent rules and laws allow

10   you to get a monopoly for a period of time.  It used to be 17

11   years.  It's now 20.  But that's the deal:  Disclose to the

12   world how you do it, and in exchange you get a limited

13   monopoly.

14       Well, all those patents expired; and as the world moved

15   forward, more of them expired, and more and more of this came

16   into general knowledge known by the public, known by the world.

17   That's the patent deal, and that's why patents are relevant to

18   this case.

19       We know this is a case about -- it's a criminal case about

20   trade secrets, fair enough; but the important part is that

21   there is a body of knowledge that is generally known over a

22   period of years.  And you heard from Mr. Cooper about it.  You

23   heard about it in other places as well.  Gibney discussed it.

24   And it's what TZPI is talking about in their consultant report

25   when they recognized DuPont similarities in the USAPTI work.

1    I mean, how would they know what a DuPont plant looked

2    like?  The reason they know it is because there are decades of

3    patent disclosures that DuPont did.  In order to get its little

4    patent monopoly, it had to disclose many, many aspects of how

5    DuPont does things.

6        Now, there's a third thing, which is the highly specific

7    details of what DuPont actually does in any one of its plants,

8    and that is embodied in part in Trade Secrets 2 and 4, the two

9    big pieces of paper that the Government likes to wave around.

10       But those are different, and we need to -- what the

11   Government constantly does is, they take snippets of documents

12   that are really talking about two, the generally known DuPont

13   process, and they try to confuse you by saying, "Well,

14   that's" -- actually, what they're talking about is three,

15   highly specific details of what DuPont does.

16       And I submit to you that what the defendants were

17   attempting to do was a perfectly legal and legitimate business

18   to do number two, the generally known DuPont process.

19       Now, you've still got to work out the details.  You've got

20   to put together the 10-million-part erector set.  There's a ton

21   of work to be done to accomplish it; but if you're looking at

22   what's the object of the conspiracy, what is the attempt, what

23   were they attempting to do, they're attempting to do the

24   generally known DuPont process based on old school

25   Ashtabula-disclosed technology, and there's been a lot of

 1  confusion over that.

 2      Because if you think about it, what on earth could the

 3  DuPont number three, the highly specific details -- you saw in

 4  the Ti-Cons brochure that Mr. Cooper talked about, a typical

 5  plant has 235 static equipments, 129 rotating equipments,

 6  22 kilometers of pipes, a thousand isometric drawings, 41,000

 7  piping objects.  These are incredibly complicated projects that

 8  cost hundreds of millions of dollars to build; and, so, the

 9  idea that there is the specific DuPont chloride-route process,

10  how on earth -- including all the combinations and compilations

11  and subparts that make up a -- I mean, Trade Secret 1 is

12  impossible to get your mind around.

13      It reminds me of Lucy, Charlie Brown, and the football.  I

14  put up on the screen one of many *Peanuts* cartoons you've

15  probably seen over the years.  Lucy tries to get Charlie Brown

16  to kick the football; and as soon as he's about to kick it, she

17  swoops the football away, and Charlie Brown screams and falls

18  on his head.  And the cartoon is usually Lucy trying, once

19  again, to get Charlie Brown to do it and then she swoops it

20  away.

21      Well, that's what our efforts to get some particularity on

22  Trade Secret 1 have been like.  Because whenever we say, "Hey,

23  every plant has a chlorinator," "Oh," swoop, "but not our kind

24  of chlorinator."

25      And we say, "Well, what's your kind of chlorinator?"

**CLOSING ARGUMENT / GASNER**

1      "Well, we're not going to say."

2      Because if they kept the football in place, Paul Cooper

3  would kick it 50 some yards down the field because his opinion,

4  as you heard, is that these vague kinds of things are simply

5  not trade secrets, that they really are generally known in the

6  industry, readily ascertainable, and they don't derive value by

7  virtue of their secrecy.

8      But every time we try to pin down -- because part of what

9  we wanted to do was to say, "Let us -- tell us what the secret

10  supposedly is in more detail; and we're going to show you that

11  in all these years of work, USAPTI did something different."

12  And the football kept moving around.

13      You know, when you say, "Jeez, look at this particular

14  chlorinator design, and we want to say our chlorinator is

15  different," they go, "Oop, I never looked at the chlorinator."

16  I mean, Dayton never looked at any of the USAPTI stuff.  Gibney

17  never looked at any of it.  And what they kept saying was this

18  confusing mantra, which is, "DuPont has a unique compilation of

19  stuff."

20      Okay.  Well, maybe they do.  Maybe each one of their

21  10-million-part erector sets is unique in its own way, but they

22  never said what they do.  There wasn't a word about that or how

23  it compares to what USAPTI did.  The only witness that had

24  looked at what's in the art, in the publicly available

25  materials, and looked at USAPTI's material, was Paul Cooper.

**CLOSING ARGUMENT / GASNER**

 1   And every time we tried to get specificity, swoop, the football

 2   gets taken away.

 3        It reminds me of another piece of popular culture from the

 4   *Wizard of Oz*.  So you know this scene.  What's up on the screen

 5   now is Mighty Oz.  And there's the scene where Dorothy and her

 6   compatriots finally get to see the Wizard and they go into this

 7   huge chamber, and there's bursts of flame, and Mighty Oz has a

 8   booming voice.  And what they eventually find out is, no, this

 9   is all smoke and mirrors, that there is the little guy behind a

10   screen that is creating the illusion of power.

11        Now, the illusion of power is useful.  It is useful for

12   DuPont for them to claim that they have this vast unique

13   treasure trove of trade secrets and what they do, but you heard

14   that that is not true.  Gave away the Ashtabula technology to

15   Sherwin-Williams.  Not reasonable measures to maintain

16   confidentiality.  After 15 years, all of Ashtabula, was readily

17   available for any owner of that plant to simply publish or do

18   what they wanted to; put in other plants around the world, get

19   their own patents, do whatever they wanted.

20        But DuPont makes no efforts to say, "Oh, we have this vast

21   unique Trade Secret 1.  Our entire process," they claim, like

22   Oz, "is a trade secret, including every compilation and

23   combination thereof."

24        Okay.  Well, what Oz isn't telling you, is that in the

25   Sherwin-Williams deal, the Antioch technology was disclaimed,

1  and that they can't claim that they are the trade secret owner

2  of anything that was at Antioch because they didn't take

3  reasonable measures to protect the Antioch slash Ashtabula

4  technology.

5      It is not reasonable to simply give to your competitor a

6  vast chunk of your technology with no obligation to maintain it

7  confidential after 15 years; and then later to claim, "Yes, we

8  have maintained confidentiality over everything."

9      You remember the last witness that came in,

10  Mr. Livingston, and he said, "Oh, well, Millennium, the later

11  owners of Ashtabula, well, we've kept it confidential."

12      And I asked him, "You know, well, what about before you

13  got there in the year 2000?  You know, what happened when SCM

14  owned this plant?  What happened when it was Millennium?

15  You're at Cristal now, and you've slammed the barndoor shut and

16  have all kinds of procedures."  But this is classic closing the

17  barndoor after the horse is gone.

18      They put on a big show.  It's an Oz-like show with flames

19  and policies, you know, that are a foot thick, but it is not an

20  accurate reflection of what really is a trade secret.  They

21  claim it.

22      You know, there's some harm in claiming.  You can say

23  there's no harm in trying, but you heard from Mr. Livingston.

24  He's moved jobs, and his prior employer, Tronox, then sued him

25  under an inevitable disclosure, "Our trade secrets you will

1  inevitably disclose in your next job."  And he thought that was

2  not right, and he fought it and he ended up resolving it.

3      But this is what big companies do.  It's a lot like Oz.

4  It gives them power.  It's power and ambiguity.  It's power in

5  just saying, "You know, everything we do is a trade secret.

6  Everything we stamp is confidential."

7      But, you know, it doesn't really get narrowed.  You don't

8  see what's behind the screen and whether it's a little guy with

9  no power, or it really is the Almighty Oz, until it gets

10  litigated.  That's what happens.

11      I mean, all these companies try.  They do employment

12  agreements that say, "Everything you learn while you're here is

13  a deep, dark secret and don't you, you know, reveal anything."

14  I mean, that's a way to try and get power over people, but that

15  little piece of paper doesn't make it a trade secret if they

16  gave it away at Ashtabula, if they gave it away in patents.

17  It's an Oz illusion that has its power, but it is not true and

18  it's smoke and mirrors.

19      So Trade Secret 1, take a look at it.  It is impossible to

20  decipher.  It is a proclamation of Oz that everything they do

21  is a trade secret, and that's not true.

22      Now, you heard an attack on Paul Cooper.  And what I told

23  you yesterday is the reason the Government is attacking him is

24  because he's just that important.

25      And it's really up to you to assess credibility of

**CLOSING ARGUMENT / GASNER**

1   witnesses, all the witnesses in the case.  And the Court's

2   given you an instruction, it's up on the screen now, on

3   credibility of witnesses:  Ability to know the things testified

4   to, memory, manner while testifying.

5        And these are, too, of interest in evaluating all the

6   DuPont witnesses that came before you, and there were a lot of

7   them, which is, what is their interest in the outcome of the

8   case, what is their bias or prejudice, items four and five.

9        All of these DuPont witnesses that came in had been at

10  DuPont their entire career.  DuPont has a pending civil case

11  for damages against Mr. Liew.  You will hear about that in

12  connection with the obstruction allegations.  But they have a

13  lawsuit seeking money.  Could they have more of an interest in

14  this case?  They wanted the Dongying project in China.

15  Mr. Liew got it instead of them with Pangang.  Could they have

16  more bias?

17       And if you look at Mr. Dayton, you look at Dr. Diemer,

18  they have spent their whole careers in a DuPont-centric world,

19  and they're biased in favor of DuPont.  So, of course, they're

20  going to say, "Yes, everything we do is secret and important

21  and valuable"; but you have to look at their credibility and

22  compare it to what Paul Cooper told you.

23       And it's not about number of witnesses.  The weight of the

24  evidence, this is another one of the Court's instructions:

25  (reading)

1          "The weight of the evidence as to a fact does not

2      necessarily depend on the number of witnesses who testify.

3      What is important is how believable the witnesses were,

4      and how much weight you think their testimony deserves."

5          So, yes, a lot of DuPont witnesses came in here and said

6      things that were favorable to DuPont; but you can look at their

7      bias, and you can -- you can't just count them up.

8          The fact that a lot of DuPont witnesses came in here tells

9      you that DuPont is very much involved in this case.  It doesn't

10     tell you that because they sent a lot of people that they're

11     right.  And what matters is how believable you find the

12     witnesses to be.

13         Your memory will control.  Paul Cooper was on that stand

14     for a day and a half, and your memory will control as to how he

15     held up on cross-examination and whether any real effect on his

16     credibility was there.

17         And I submit to you, if you think back, that was a man who

18     took that stand, took an oath, and was firm in his opinions;

19     and not because he had been paid an hourly wage, which, by the

20     way, is less than what Gibney was paid.  So if you want to look

21     at, jeez, it's a lot of money that he got, the suggestion that

22     his opinion was different because of how much money he made is

23     for you to decide; and I submit to you it has nothing to do

24     with what Paul Cooper had to say.

25         And if you compare him to Gibney, look at the judge's

**CLOSING ARGUMENT / GASNER**

1   credibility instructions on other things.  Ability to know is

2   one of the things you're entitled to look at in assessing

3   credibility.  And when Paul Cooper tells you there's no trade

4   secrets here, what ability does he have to know that?

5   Forty-four years working in titanium dioxide plants, designing

6   process flow diagrams, piping instrumentation diagrams, piping

7   specifications.

8        He did that work, different shifts, graveyard shifts early

9   in his career, rising through the ranks at SCM and Millennium

10  to positions where he was in a position of importance in those

11  big corporations.

12       And compare -- he's a chemical engineer by trade.  Compare

13  his ability to talk to you and share useful information with

14  you about what is and isn't a trade secret to that of

15  Mr. Gibney, the Government's expert.

16       Yes, he was paid less money, but that's because he didn't

17  spend much time on this case.  He didn't look at any of the

18  USAPTI records.  He didn't study what's in the public record,

19  and he's not an engineer.  He was a salesman.  He was in

20  marketing; and then later in his career he got into

21  restructuring, financial restructuring, which basically means

22  laying off lots of people, and he did that.

23       And, yes, he had some experience in plants when he was

24  restructuring them; and he told you, I think, that there was

25  somebody that quit and he had to take over some plant in

**CLOSING ARGUMENT / GASNER**

1  Germany, which he never went to.

2      Compare their ability to know anything about what's truly

3  a trade secret in all of this, and Paul Cooper comes way out on

4  top.

5      So let's talk a little bit about some of the miscellaneous

6  stuff that the Government has thrown out in this trade secret

7  area.  One is a conversation with Tim Spitler, and it's a note

8  in Mr. Liew's handwriting.  We've got it up on the screen now,

9  Exhibit 199.  And it says:  (reading)

10         "Even with best technology with stolen prints,"

11         exclamation point, "but without the startup people and

12         maintenance experience people, the plant won't be

13         successful."

14      So the Government holds up this scrap of paper and focuses

15  on "stolen," the words "stolen prints," and they act as though

16  that proves something; and they act as though it proves, "Ah

17  ha, this is a giant conspiracy to steal things."

18      But look at the context here.  What they are talking about

19  is the need for maintenance people.  It's exactly the opposite

20  of what the Government is saying.

21      The import of this note is Spitler is telling him that

22  prints don't matter; that what you need is experienced people.

23  The plant isn't going to work with prints.

24      And look at the way he says it -- or Mr. Liew writes down

25  what Spitler says, "even with best technology with stolen

 1   prints."  Usually when you say "even with," you're making a

 2   hypothetical point.  If you're talking to somebody, say a

 3   contractor that's going to do a renovation in your home, and

 4   you lay out, "I want this.  I want that, blah, blah, blah," the

 5   contractor turns to you and says, "Even with all the time in

 6   the world, Mr. Gasner, I couldn't do what you're asking me to

 7   do."  And what that means is, and we all know, we don't have

 8   all the time in the world.  It is a way of saying what you

 9   don't have.

10       And what Spitler is telling him, I submit to you, in this

11   is, "Even with stolen prints," paren, "which we don't have,"

12   comma, "you need maintenance people."

13       I mean, his point is twofold.  One is, prints don't

14   matter.  You could get all the prints in the world, and that

15   gets you nowhere.

16       I mean, these things that the Government waves around, as

17   Mr. Cooper told you, are worthless.  This is not an area of

18   technology in which you can get a print and do anything with

19   it.  And that's what he's saying; and the fact that he uses the

20   word "stolen," by the way, Mr. Liew puts an exclamation point

21   because his ears kind of perk up when Spitler uses the word

22   "stolen."  He goes, kind of, "What," exclamation point.  This

23   note doesn't get you where the Government says it does.

24       How about these photos?  This is another thing that the

25   Government has dwelled upon.  Oh, here's an e-mail where

 1  Maegerle sends photos, and they're from some DuPont plant, and

 2  they made much of the fact that the elbows in the flue pond

 3  from this photo look like the elbows in the flue pond designed

 4  by USAPTI.

 5      Well, first of all, you can see the whole flue pond from

 6  Google Earth.  Everybody admits that if you can see it from

 7  Google Earth, it's not a trade secret.  So what really can you

 8  see in this picture that's at all valuable?  Maybe those little

 9  flanges, the little square things around it.  Well, Paul Cooper

10  showed you an article that was all about designing elbows for

11  abrasive hot gas.  I mean, there are so many subcultures of

12  engineering out there, it's kind of amazing.  There are

13  articles written about how to design an elbow for hot abrasive

14  gases.  I mean, this is what engineers do.  And, you know, so

15  what do you get out of this picture?

16      Here's another photo.  They called I think it was Allen

17  Chang to say, "Yes, Mr. Liew gave me this photo and I used it."

18  What did he use it for?  He used it to measure how wide a

19  concrete wall was.  Okay.  Totally visible from Google Earth,

20  and this is just, you know, to make a concrete wall that has

21  water in it, and they call Allen Chang.

22      When we got up to the witness count, I hadn't counted them

23  up, but it's 33, they were brought in and most of what they

24  said was good for us, I think, if you look back on it, much of

25  what I talked about in this case.  You know, from Zisko and

1  Marinak and all these people said nice things about Walter Liew

2  and his mentorship.

3      I mean, yes, we only had a few witnesses to call at the

4  end of the case because the Government called them all.  That

5  doesn't mean they were good for them.  If you look back, I

6  think you're going to find they supported exactly what I've

7  been telling you here in closing argument.

8      So photos, all right, big deal.  By the way, if you look

9  at all the photos, here's one.  It shows an enormous body of

10  water and a barge behind there.  Now, you know if you can see

11  the barge from the picture, the barge can see you; and any boat

12  going by here would see everything that's depicted.  So between

13  Google Earth and things that you can see from a public

14  waterway, I mean, really, are these trade secrets?

15      Look at this one.  You know, totally same kind of stuff

16  you can see on Google Earth, but the Government wants to pluff

17  up its case with a lot of witnesses and a lot of pieces of

18  paper that they say show something; but when you look at them,

19  they're little carts, they're little scraps of paper which they

20  have carefully arranged into a house of cards.  That game that

21  kids play where you try to carefully arrange the cards and see

22  how high you can get them.

23      Well, this is what the Government's done, and they'll take

24  one photo out of 17 and go, "Well, you can't exactly see this

25  elbow from the sky, so it's valuable."

1     And then they call a witness who says, "Have you ever

2   published a picture of this particular elbow?"  Answer, "No."

3   "Ah ha.  Gotcha."  And this is the way their case has

4   proceeded.

5        Another point that they keep making is this employment

6   agreement, the thing that Mr. Maegerle signed, you know, in

7   1957 that DuPont provided, pulled out of some old dusty file.

8        The fact that DuPont has an overbroad, very broad

9   employment thing that they make people sign on their first day

10  of work doesn't make anything a trade secret.

11       And lots of evidence.  Mr. Liew has a similarly broad

12  thing.  This is standard practice.  First day of work, people

13  sign broad things.  It's feeding, and they can't, for every

14  employee, define all the trade secrets that exist today and

15  next week and the week after because things are coming into the

16  public and new trade secrets may emerge.  So they do the

17  expedient thing and they go, "Okay.  You agree not to disclose

18  anything secret."

19       But Paul Cooper's own employment agreement with SCM, you

20  saw that, Exhibit 943, it's very broad.  But the standard

21  practice in the industry is those agreements don't mean you are

22  a slave to your prior employer.  They don't mean you can't go

23  out and get a job.  They don't mean that you need a lobotomy.

24  They don't mean that you can't think about what you did in your

25  last job or might say to a colleague or put in an e-mail as

1    something you remember.

2         So let's talk about economic espionage.  And as I

3    mentioned to you, it is a case that -- a claim that includes

4    the trade secret conspiracy because everything we talked about

5    up until now, if you find that the Government hasn't proved its

6    case beyond a reasonable doubt as to the trade secret

7    conspiracy, the economic espionage case goes away also.  So you

8    don't even need to get to it on the jury form if you find that

9    there was no trade secret conspiracy, practically speaking.

10        Now, there's a difference in that it's different parties.

11   Trade secret conspiracy in Count 2 is Mr. Maegerle and

12   Mr. Liew.  Count 1, which is the economic espionage conspiracy,

13   are these four Pangang companies and Mr. Liew and USAPTI; but

14   if you find that the object of all this was not to steal

15   anything but an appropriate business deal to do a permissible

16   act, then that's another reason why economic espionage has not

17   been proven.

18        The key additional element for espionage, what makes it

19   espionage in the title of the statute is an intent to benefit

20   the Government of the People's Republic of China or a foreign

21   instrumentality.

22        Now, the Government of the People's Republic of China is

23   the Communist Party.  So what you would need to find beyond a

24   reasonable doubt is that Mr. Liew's intention in doing all this

25   over this 13 years was to benefit the Communist Party in China,

1   and the Government's only evidence of that is this puff letter.

2   We're going to talk about that at length next.

3       But the other way that they can -- that the statute works

4   is an intent to benefit one of these four companies, and I'm

5   going to talk about that afterwards.

6       So, first of all, let's clear out the idea that doing

7   business with China is any part of this; that doing business

8   there, it's what DuPont does.

9       If you look at Exhibit 279, you'll see that Richard

10  Olson -- you met Mr. Olson. He came in here and talked about

11  his attempts to get that plant built at Dongying. And you'll

12  see here that there's a Chinese Government Affairs Department

13  at DuPont. They have all kinds of Chinese people working their

14  government affairs, dealing with the government of China, the

15  Communist Party. A lot of the people that are alleged to be,

16  you know, these deep, dark Communists that Mr. Liew dealt with,

17  Mr. Olson dealt with, too, because you've got to go, for

18  example, to the State Council to get approval for anything in

19  China.

20      So just doing business with China or talking with

21  officials who happen to be members of the Communist Party tells

22  you nothing about intention because to do business there at

23  all, you have to have these interactions.

24      Stacks of business cards tell you absolutely nothing.

25  Everybody's got them, and they don't tell you much.

1 Now, you heard why DuPont didn't get the deal, and

2 elsewhere in 279 it had to do with this deep-welling practice

3 of ferric chloride, which this exhibit tells you has always

4 been controversial.  China didn't like pumping toxic waste deep

5 into the ground.  DuPont defends that.

6 Mr. Olson said nothing wrong with it.  He didn't, you

7 know, bat an eyelash when we were talking about Antioch.  In

8 fact, they had to tear up roads there when the Cierra Creek

9 product, which is another attempt to put this waste in the

10 ground, didn't work.  He said, "No, you know, it didn't work;

11 but, you know, that was just a little project."

12 So DuPont has its beliefs about what's appropriate,

13 environmentally and otherwise, and China disagreed.

14 And DuPont has always insisted on a policy of being the

15 sole investor.  They wanted to make all the money from this

16 project.  Not acceptable to China.  So they didn't get it, but

17 there's nothing wrong with dealing with China and dealing with

18 the Government to the extent that you need to.  That tells you

19 nothing.

20 So let's look at what the Government focuses on almost

21 exclusively.  We call it the puff letter because, I submit to

22 you, it is obviously a marketing letter with a lot of

23 exaggeration and puffery in it.

24 Mr. Liew's a little guy.  He's a small businessman trying

25 to compete with DuPont in China.  He has not had success.  He's

 1  gotten the Chengde contract that wasn't funded.  He got the

 2  Jiangsu micronizer contract, that was okay; but he's not

 3  getting the traction he needs.

 4      He's talking to his friend Changhe Liu, the author of that

 5  book, who's giving him input.  We heard evidence that Changhe

 6  Liu was kind of telling him how to go about doing things, and

 7  this is a letter that is an attempt by a small businessman to

 8  get a big contract; and, yes, he exaggerates.

 9      Here's the e-mail from Changhe Liu, Exhibit 1057, and he

10  says:  (reading)

11          "The letter has been revised but may not be suitable.

12      Please review and make a final decision yourself."

13      So it's obvious this letter is a bit of a committee

14  effort, and there's no evidence it was ever sent.  It has no

15  signature on it.  It is a file on a computer, and Agent Ho

16  admitted that they have no direct evidence that this letter was

17  ever sent.

18      And what they claim to be circumstantial evidence doesn't

19  get you very far.  I mean, the draft mentions people that

20  Mr. Liew knows or has had some relationship with in the past,

21  but that doesn't tell you that the decision he made was to send

22  the letter.

23      It's kind of like going to a career counselor who tells

24  you how to write a résumé, and some of the advice you get is

25  terrible:  You know, get your résumé, you know, at the top of

1    the stack.  If you say this, that, and the other thing, you'll

2    get noticed.  And some of that advice is really bad, and you

3    have to make up your own mind about whether you're going to

4    send it or not, whether you're going to follow the advice of

5    these advisers or not.  And there's no evidence as to whether

6    Mr. Liew decided to send this letter or not.

7        But the Government wants to look at it and say, "Yeah, but

8    it is a map of what was on his mind that shows that he engaged

9    in economic espionage."

10       And the Government takes it all as literally true, or at

11   least the parts they like.  Mr. Axelrod started his closing

12   argument setting the scene in 1991.  Walter Liew attended a

13   banquet with Luo Gan, this high-up guy in the Communist Party,

14   as if he was reciting events that actually happened.  Well,

15   that's because it's a part of the letter that the Government

16   likes for its theory.

17       And he goes on to talk in this banquet paragraph, you've

18   got it up on your screen now, Exhibit 350T:  (reading)

19           "The purpose of the banquet is to thank me for being

20       a patriotic overseas Chinese who has made contributions to

21       China, and has provided key technologies with national

22       defense applications in paint/coating and microwave

23       communications."

24   The Government wants you to believe that that sentence is

25   true and that this one reference to being a patriotic overseas

1    Chinese tells you all you need to know about Mr. Liew's

2    intentions and that he is, therefore, guilty of economic

3    espionage.

4        Well, take a look at this letter of achievements that is

5    being -- you know, paint/coatings and microwave technologies

6    and all this, Exhibit 351T.  The Government flashed this on the

7    screen yesterday.  It's a list of nine projects.  One of them

8    is the acrylic resin project that we saw evidence about.  We

9    heard from Mr. Marinak, and there are documents in evidence

10   about the acrylic resin project.

11       The rest of these there is no evidence that they ever

12   happened:  Microwave technologies, radar, this, that, and the

13   other, paints and coatings and, blah, blah, blah.  There's nine

14   different projects on here.  The Government seized every scrap

15   of evidence from home and office from Mr. Liew, 5 terabytes

16   worth of stuff.  From Pangang also.  They had years to go over

17   it.

18       There was not a single piece of evidence introduced in

19   this trial to suggest that any of these projects ever happened.

20   One of them did, the acrylic resin thing.  The other eight

21   there wasn't a scrap of evidence, and the Government admitted

22   they have no evidence that these things ever happened.

23       This was one grain of truth, acrylic resin project, some

24   experience, and then a lot of puffery and exaggeration around

25   it.  These projects never happened.

1          And Mr. Liew goes on to say:   (reading)

2              "Our cadre of titanium white experts... has abundant

3          actual experience in every area of expertise."

4          This is a badly written letter trying to get a job.   It is

5     not a true intention of what the man actually did or that there

6     was a banquet held to honor him as a patriot.   This is just

7     exaggeration.

8          Now, the Government wants you to -- and, likewise, let's

9     just look at this next thing:   (reading)

10             "At that time Secretary General Luo Gan gave

11         directives so that I would better understand China and

12         continue to make contributions to her.   The following day,

13         I was given a list of key task projects by the appropriate

14         Chinese agency."

15         Okay.   This is in the puff letter.   The Government acts as

16    though it's literally true, that this top Communist official

17    personally gave Walter Liew directives on what to do, his

18    marching orders, if you will, from the top of the Communist

19    Party.   That's the way they want you to believe that this

20    letter was written and what it means.

21         But look at what the evidence shows.   There was no list

22    found in evidence after the Government swooped in and seized

23    everything.   What they did find was a printout from the

24    Internet of major technology projects scheduled for 1993 to

25    2000, Exhibit 387.

1   So you get a list of projects that the Government is

2   interested in.  You could go on any Web site for the United

3   States Government, find a bunch of things, affordable housing,

4   clean energy, you know, priorities of the U.S. Government,

5   projects that we'd like to do.  You could get it off the

6   Internet, you could print it out, and then you could tell

7   people, "You know, I am aware of the top priorities of the U.S.

8   government."

9       But it would be meaningless, and that's what the evidence

10  shows, is a printout from the Internet.  It doesn't show

11  anything from Luo Gan.  And, so, the parts of the letter that

12  the Government likes are obviously exaggerations and puffery by

13  a small businessman trying to get a job.

14      **THE COURT:**  Mr. Gasner, let's take a stretch break,

15  okay?  Is that all right?

16      **MR. GASNER:**  Absolutely.  Of course, Your Honor.

17      **THE COURT:**  Okay.  Thank you.

18                (Pause in proceedings.)

19      **THE COURT:**  Please be seated.

20      **MR. GASNER:**  May I proceed, Your Honor?

21      **THE COURT:**  Yes, please.

22      **MR. GASNER:**  Now, if the Government wanted to accept

23  the entirety of the puff letter as true, it would lead to a

24  conclusion of innocence.

25      Look at this other part of the puff letter, Exhibit 350T,

1  this time at page 7, because what Mr. Liew says, is that given

2  that DuPont has always monopolized that technology, the key is

3  to cooperate with a company that has mastery of the technology

4  and can legally resolve intellectual property rights issues.

5  We talked about this earlier.  It's in that same letter.

6      So if we're going to say that the letter is an accurate

7  reflection of Mr. Liew's state of mind, you've got to take the

8  bitter with the sweet and accept that his state of mind was to

9  do something legal, which completely destroys the Government's

10 case.

11     But that doesn't work for them, of course.  They are

12 building a case.  They are assembling snippets from here and

13 there and putting them into an arrangement that they like; a

14 house of cards, if you will.  So it doesn't serve them to have

15 you read the entire letter.

16     Here's more cherry picking, Exhibit 369.  The part that

17 the Government likes is, they say:  (reading)

18          "... during liaison with the consulting companies,

19      they have clearly indicated that the source of the

20      technology is the DuPont Company in the U.S.A."

21     And they treat that as, well, it's a big admission.  Well,

22 that's part of our defense, is that these men designed a plant

23 modeled on old DuPont, publicly available technology.

24     But if you look elsewhere in this letter, if you read the

25 whole thing -- this is a good one to read the whole thing.

1    It's from Pangang.  It's their assessment of intellectual

2    property risks.  This is a big company with a focus on:  Are we

3    engaged in improper conduct?  What are the intellectual

4    property risks?

5        And in this section, they're dealing with patent

6    infringement; and what they say is that most of the core

7    patents have expired and that there may be some new patents

8    coming out, but those aren't going to be of interest, and that

9    they are happy to do the old technology.

10        And they note, and you'll see it here, "The protection for

11   the core technology has expired."  So in looking at patents,

12   they've said, "The core technology has expired.  All of this is

13   in the public domain.  We're not going to get sued for patent

14   infringement."

15        Then they talk about trade secrets, another section, a

16   different form of intellectual property.  And this long excerpt

17   talks about DuPont stipulating that:  (reading)

18            "Technical staff of DuPont cannot, within five years

19        of leaving employment with DuPont, do similar work for any

20        of DuPont's competitors.  As regards whether it is

21        permissible to do similar work after five years, the

22        experts hired by the consulting companies have made

23        inquiries with the appropriate department at DuPont, and

24        its response is" --

25            THE COURT:  Could you slow down just a little bit,

**CLOSING ARGUMENT / GASNER**

 1    please?

 2         **MR. GASNER:**  Certainly, Your Honor.

 3         **THE COURT:**  Thank you very much.

 4         **MR. GASNER:**  (reading)

 5    -- "its response is can do similar work, but cannot

 6    use official DuPont material, which does not include

 7    the information assimilated by the experts

 8    themselves."

 9    And then they go on to say that:  (reading)

10         "The technical experts are not going to contradict

11    DuPont's trade secret protection."

12    So if you read the whole document, what it basically says

13    is, they gave thoughtful consideration to intellectual property

14    risk.  They focused on what we talked about yesterday, what

15    Mr. Liew had heard from Spitler, Maegerle, and McIntosh, which

16    is that the basic rule of thumb was after five years, you are

17    free to use what's in your mind.

18    And that's communicated to Pangang.  Pangang puts it in

19    their risk assessment.  This is reasoned consideration by

20    responsible people of intellectual property issues with a

21    conclusion that they're okay, but the Government wants to just

22    take snippets.

23    So this puff letter is not evidence of an effort to be

24    disloyal to the United States and benefit the Communist Party

25    of China.  There's snippets in it that if the Government, you

1  know, picked and choose, they could say it's some evidence; but

2  there's not enough in this letter for you to conclude beyond a

3  reasonable doubt that there's any intention here other than a

4  small businessman trying to get a job and exaggerating his

5  credentials and history.

6      You know, we stipulated Mr. Liew didn't get a Ph.D. from

7  Stanford.  He told a lot of people that.  He was embarrassed

8  about, you know, a mere Master's in electrical engineering from

9  the University of Oklahoma, which would be good enough for many

10  people.  He'd been an immigrant to this country.  He had risen

11  to a position of being a master of electrical engineering; but

12  in trying to do this big job, he felt that wasn't good enough.

13  So he put in the puff letter, "I have a Ph.D. from Stanford."

14  He said a lot of other things that were exaggerations.  So if

15  you look at the letter as a whole, it's no evidence of true

16  motivation.

17      And keep in mind when you heard from Professor Lewis, our

18  expert on China, there are cultural traditions -- he called

19  them *guanxi* -- that might lead you to write a letter that is

20  different than the kind of business letter you'd write in the

21  United States.

22      So there is a certain amount of legitimate exaggeration,

23  as Professor Lewis put in there.  And he admitted that there

24  were just lies in the letter; that this is not, you know,

25  proper *guanxi*.  It was kind of fake *guanxi*.  But if you look at

1    this letter, it is in a cultural context where you are going to

2    say things that are not what you would expect to see in an

3    American business letter.

4         So looking at it in that cultural context, looking at

5    Mr. Liew as a small businessman trying to get a job with a

6    cover letter that exaggerates like crazy, this doesn't show his

7    true intention.

8         His true intention was like any small businessman.  He was

9    trying to get a contract, he was trying to make money, and

10   there's no evidence beyond a reasonable doubt to suggest

11   otherwise.

12        The other thing the Government wants to try to prove is

13   this other route as showing somebody to be guilty of economic

14   espionage, which is that you intend to benefit a foreign

15   instrumentality; and you'll see in the Court's definitions and

16   instructions that this has got to be a company dominated by the

17   Communist Party in effect.

18        But if you look at the ones -- if we just go back here,

19   what's on the screen now is kind of the chart that

20   Professor Lewis drew for you, and it describes all the

21   different entities that are involved here.  And in the

22   instructions you're going to see that there are four entities

23   that are alleged to be the foreign instrumentalities, and let's

24   walk through them.

25        PGSVTC, this is a state-invested entity; 64 percent of it

**CLOSING ARGUMENT / GASNER**

1    is owned by private shareholders, including Citibank, Morgan

2    Stanley, other big American companies.  So the state has an

3    investment in it, but it's a minority interest.  It's listed on

4    the Shenzhen Stock Exchange, and Professor Lewis said it was

5    like a public company in the United States.  So that's one

6    thing that's alleged to be a foreign instrumentality, and it's

7    no such thing.

8         PIETC, this is kind of the contracting arm, and this is

9    also a state-invested entity owned by the one that we just

10   talked about, PGSVTC, the public stock exchange company.  And

11   PIETC initial buyer, and then the agent on the 30K contract and

12   the buyer for the 100K contract.  So it's on all of these

13   deals, and it's state-invested minority interest, not

14   dominated.

15        Pangang Titanium, state-invested entity again; and this

16   one replaced Pangang Group as the end user of the 100K

17   contract, and this was the entity that ultimately received the

18   designs for the 100K contract.  That's Pangang Titanium.

19        Now, Pangang Group is the one that the Government dwells

20   on.  Again, it's this kind of focus on what helps their case,

21   and pretend the rest of it doesn't exist.  Pangang Group is the

22   only Central state-owned entity here; and it was the end user

23   of the 100K project for a short while, but it was replaced very

24   quickly and no direct involvement.  It had nothing to do with

25   the 30K contract at all, and this is the hook that the

**CLOSING ARGUMENT / GASNER**

 1   Government has to prove beyond a reasonable doubt.

 2       Now, the way they try to do it, they called I think it was

 3   referred to as Employee Number 59,000, Hu Shaocong, a

 4   translator for Pangang Group who was the one guy in the

 5   Petaluma office.  You remember meeting him, and he testified to

 6   a single phone call with a secretary who relayed a message

 7   about the status of Mr. Liew's application; and from that phone

 8   call, the Government wants to argue beyond a reasonable doubt

 9   that these are state-controlled entities.  One anecdote that

10   just falls way short.

11       And then Pangang Jinzhou is, you know, completely

12   unrelated.  It was the entity -- it's not even alleged to be a

13   foreign instrumentality, and that was the entire 30K contract.

14   So if you look at 13 years of work, the entities that Mr. Liew

15   was dealing with, Professor Lewis, who is an expert on China,

16   on Chinese law, on current state of how the Communist Party

17   interrelates with these entities, established for you that all

18   of these entities, except one, Pangang Group, aren't even in

19   the ballpark and that Pangang Group was only involved in the

20   100K contract very briefly.

21       And from that you simply can't conclude beyond a

22   reasonable doubt that all of these entities are foreign

23   instrumentalities, let alone that Mr. Liew's intention was to

24   benefit them.

25       These are contractual parties on the other side of the

**CLOSING ARGUMENT / GASNER**

1  table.  He's negotiating with them.  He's not intending to

2  benefit them.  He's doing what any businessman would do.

3  They're the party on the other side of the table.  It's a zero

4  sum game.  You're trying to get a good deal for yourself and

5  your company.  The other company has the opposite interest, and

6  your intention is not to benefit them.

7      So, again, there's an attempt charged with economic

8  espionage.  This has the same problem as attempt we talked

9  about before.  There's no proof of Trade Secret 1 or intent to

10  copy it; and it's got another problem, which is there's no

11  proof of intent to benefit the Chinese government or foreign

12  instrumentality.

13      Let's talk about possession.  So this is the Government's

14  fallback is:  Well, okay, maybe over 13 years there wasn't this

15  kind of grand scheme, but at least we can get him on possession

16  because these things were found in his closet or his garage or

17  USAPTI's office in the case of Trade Secret 3.

18      But possession is not that simple.  This is also a crime

19  that requires a specific mental state, and it particularly

20  requires that the item was, in fact, a trade secret.  It

21  requires the defendant knew them to be trade secrets; that he

22  knew them to be stolen or appropriated, obtained, or converted

23  without authorization; that he intended to convert them to the

24  economic benefit of someone other than the owner; and he knew

25  or intended that the offense would injure the owner of the

**CLOSING ARGUMENT / GASNER**

1    trade secret.

2        So this requires a number of pieces of proof. You can't

3    just say, "Here's a piece of paper and it was found in

4    Mr. Liew's house, so he possessed it." And then you bring in

5    the DuPont witness who goes, "Ooh, it's very important. It's a

6    compilation of trade secrets, boom, it's done." That's not the

7    crime of possessing a trade secret. Counts 6 and 7 tell you

8    what it is.

9        Now, Paul Cooper looked at -- he spent a lot of time going

10   over each of these because, you know, each one of them is a

11   separate federal crime, as the Government's alleged it, and he

12   told you Trade Secret 4 completely blank, devoid of useful

13   information.

14       He told you Trade Secret 2 is -- contains information, but

15   all of it publicly disclosed or readily ascertainable and

16   devoid of value. Doesn't meet the criteria for a true trade

17   secret.

18       And Trade Secret 3, same thing. That's what he told you.

19   He looked at those old pieces of paper and told you that they

20   didn't meet the legal criteria.

21       So let's look at it. Trade Secret 4, this Edgemoor R&D

22   flow sheet from 1988. You remember this one. It's completely

23   blank in the guts of it. The interesting part of these

24   diagrams is the flow sheets or the flow table. It's completely

25   blank. There is nothing else in this document.

**CLOSING ARGUMENT / GASNER**

1    There are references to an Aspen model X25, but those are

2    meaningless.  It would be like saying go look at cell C3 in my

3    Excel spreadsheet that's in my computer at home.  That tells

4    you nothing about what is in that cell of some other

5    spreadsheet.

6        Paul Cooper told you this thing was useless and contained

7    nothing of interest.  And the government barely talked about

8    it.

9        Trade Secret 2, this one at least is filled in.  But Paul

10   Cooper told you, too, that this one didn't meet the criteria

11   for being a trade secret.

12       And he did go through the oxidation reactor.  It's your

13   memory that controls.  He went through every item on this

14   colored map version of the trade secrets, and talked about each

15   one of them and told you that there's nothing on there that

16   would be useful.  In fact, his conclusion, you would be better

17   off not having this piece of paper than using it in any way.

18       Mr. Axelrod said yesterday that a good example of use of

19   these things, the best example, I think were his words, was

20   Exhibit 70, which is an email in evidence where Mr. Liew and

21   Mr. Maegerle are talking, and Mr. Liew says look at these

22   numbers from the sheet I got from Spitler and here they are.

23   And those numbers line up with one line on the mass balance

24   table.

25       But what you'll recall Paul Cooper explained, it was

**CLOSING ARGUMENT / GASNER**

1  Mr. Maegerle's response, which is, thanks, I will stick with my

2  original numbers.

3      And I submit to you, that is not the best example of

4  reference to these pieces of paper.  It is the only example.

5  The only example.  And it's one email where Mr. Maegerle just

6  said, no, thanks, I'll stick with my own numbers.

7      So this thing, to the extent that the measure of value is

8  the extent to which he used it, Trade Secret 4, zero.  And this

9  one, kind of minus 1, if you will, in terms of evidence that

10  these things were ever used.

11      Let's look at Trade Secret 3, the Sills/Diemer pamphlet in

12  the Fortran code.

13      Talk about number of witnesses in this case.  The

14  government thought it good to fly Thongchai Thongthawee 19

15  hours from Thailand, to take a video deposition, to tell you

16  what?  To tell you that he was so bored reading this that he

17  fell asleep while reading the Fortran code; that he doesn't

18  speak Fortran; and that he got nothing of value out of this.

19  That's what Thongchai said.  So what conceivable value could

20  this piece of paper have?

21      What about the rest of the report?  They brought in

22  Dr. Diemer to talk at length about the paper, academic paper

23  that his summer intern wrote, Trade Secret 3.

24      Paul Cooper, again, talked about this and told you that if

25  you have an adjustable slot reactor this is not helpful.  And

 1  he also told you that this area of modeling, what happens

 2  inside a chemical reactor process has been overtaken by events.

 3  This is a 1993 document.

 4      Think back to what computers were like in 1993.

 5  Monochrome monitors, floppy disks.  Some of you probably don't

 6  even know what I'm talking about.  Slow, terrible computers.

 7      Compare that to what we have today, and the massive

 8  processing power in just a laptop, let alone a server that's

 9  available to scientists.

10      And think about the differences in software.  That

11  Fortran, that creeky old computer language to do the Diemer

12  equation has been replaced by computational fluid dynamics,

13  vastly more powerful software, that would be the way.  If you

14  were at all interested in modeling a chemical process, you

15  would not think to look at a 1993 era modeling monograph.

16      And, sure, Mr. Diemer will come in and say it's not been

17  published; and that there is interesting information in here

18  about dimensions of things at other places.  But there's zero

19  evidence that this was actually used in any way.

20      In fact, the evidence, the only evidence about it was the

21  Thongchai evidence we talked about.  And Jian Liu, L-i-u, came

22  in to tell you that he asked Mr. Liew to look at it.  And that

23  was it.  Mr. Liew gave it to him, and he looked at it.

24      There was no evidence that anything from this was ever

25  used.  And if that's the measure of value, again, zero value.

1        And that was Paul Cooper's opinion.

2        Now, why would Mr. Liew even have anything from another

3    company?  Why would he have this in his possession?  Isn't that

4    suspicious in some way?

5        But you heard from Connie Hubbard, who is the head of

6    competitive intelligence at DuPont, who came in early in the

7    trial and told you about what she called the mosaic approach to

8    competitive intelligence, what DuPont does.

9        Up on the screen is a close-up of a mosaic, a young woman.

10   And you can see there's little tiles, oddly shaped, that an

11   artist can make into a beautiful picture.  You can even do

12   Van Gogh's Starry Night in a mosaic with all the little tiles.

13       So the mosaic approach, as Ms. Hubbard described it, is

14   you can go out into the world as a company and try to gather

15   little tiles.  And you then put them together in your own

16   picture of the competitor landscape, or how other plants work,

17   or anything of that nature.  And that it is perfectly

18   appropriate to go out, take pictures from public places; talk

19   to people at trade shows, see what they'll tell you; gather

20   documents if people are willing to give them to you.  All of

21   those things are perfectly appropriate.  Google Earth,

22   perfectly appropriate.

23       And these big companies have whole departments of people

24   that do this.  Connie Hubbard was there.  Mr. Dayton spent a

25   lot of his career in competitive intelligence at DuPont.

1    So what Mr. Liew was doing was his own version of small

2    business intelligence.

3    Exhibit 1016, this is in evidence, taken from Mr. Liew's

4    computer.  And what it shows is a section of a memo:

5         "Obtain Technology.  Patent Search.  Sunnyvale Patent

6    Library.  Contact patent owner.  Join ACS.  Get to know

7    the experts.  Attend shows.  Join the hospitality banquet.

8    Read magazines.  Collect company and product info."

9    This is the small business version of the competitive

10   intelligence department at DuPont.  And, yeah, he went out.

11   You saw his notebooks.  He gathered up patents and he also came

12   across things like these, the items that were found in his

13   closet.

14   So mere possession, the physical possession of things, is

15   not the crime.  And it's not even suspicious that he might be

16   out there trying to see what he can get in the world to

17   assemble, you know, his picture of what's out in the public

18   domain.

19   And what you see, too, I mean, the government would have

20   you think that, you know, this is the Rosetta Stone, in some

21   way; that this was the kind of key discovery that led to

22   everything that Mr. Liew did.

23   But there's no evidence of that.  And there's overwhelming

24   evidence that we presented throughout the trial that talks

25   about the different phases.  For a day and a half I went

**CLOSING ARGUMENT / GASNER**

1    through with Paul Cooper each -- we did the walk-through of the

2    3D model.

3         And what I've got on the screen now are those three

4    computer-assisted design pieces from the slides that I went

5    through with -- Mr. Guevara was able to show you, you know, in

6    AutoCAD you could move everything around.  You remember all of

7    that.

8         So these are some screenshots taken from that

9    presentation.  The top one is the whole chlorination part; the

10   middle one is the oxidation; and the bottom one is finishing.

11        Each one of those is made up -- if we're going to do this

12   to scale, there would be 10 million tiles on the screen.  But

13   just for artistic sake, we've simplified it.

14        And what Mr. Cooper told you and what you've learned

15   throughout this trial is that there are functions in these

16   plants that are essential to doing the chloride route: coke and

17   ore handling; the chlorinator; spray condenser; condensation;

18   scrubbing; on and on and on.

19        There are a limited number of ways to do these things.

20   Engineers face these problems.  There are vendors for many of

21   them.  You go to the vendors.  And it makes sense that many of

22   these projects look very similar.  And to the extent that they

23   don't, it's in fairly subtle and minor ways.

24        And there is nothing wrong with going out in the world and

25   trying to figure out what your competitors do.  But that is a

1   far cry from possessing something that you believe to be a

2   trade secret.

3        Now, when Paul Cooper tells you that these things are not

4   trade secrets, that supports the idea that Mr. Liew didn't

5   believe them to be either.

6        So let's talk about Count Eight, copying Trade Secret 5.

7        This is the Basic Data Document (indicating).  You've got

8   to keep in mind when you're looking at this, this is in

9   evidence, you'll have it, but you've got to keep in mind where

10  it came from.  This came from DuPont, provided to the

11  government.  This was not seized from Mr. Liew; it wasn't

12  seized from USAPTI; it wasn't seized from Mr. Maegerle.  This

13  came from DuPont as part of their effort to help the government

14  build a case.

15       And the allegations in Count Eight require -- they're up

16  on the screen now.  It requires that this actually be a trade

17  secret; that the defendant in question knew it was a trade

18  secret; knowingly copied it; intended to convert it; knew it

19  would injure the owner; and related to a product in interstate

20  commerce.

21       So when you look at 161, keep in mind, this is after the

22  great white has gotten interested in this particular company

23  and is on the attack, and they're trying to figure out how to

24  build a case.

25       They provide a copy of their Basic Data Manual and

**CLOSING ARGUMENT / GASNER**

1    obviously go through it with a fine-tooth comb to try to find

2    anything in it that matches something that USAPTI did.

3        And the government went through at great length a summary

4    exhibit with Mr. Dayton.  It's up on the screen now.  It's back

5    there.  It's a big poster board.

6        And when you look at it back in the jury deliberation

7    room, keep in mind what testimony this really related to,

8    because the Court will instruct you that although a summary

9    exhibit goes back into evidence, it's only as good as what

10   underlies it.  And what this big poster board was was nothing

11   more than taking pages of this document, which is really long,

12   and comparing it to language in emails that Mr. Maegerle wrote

13   to Mr. Liew.

14       And they found 28 examples of where the language matched.

15   And Mr. Dayton, took a better part of a day to go through all

16   of that.  Mr. Dayton would occasionally go, you know, is that

17   in the public record?  No.  Move on to the next one.

18       That doesn't tell you anything about what's a trade

19   secret, because the government -- the government witnesses

20   admitted that not everything in this is a trade secret.  Lots

21   of it is publicly available.  Lots of it is common knowledge.

22       And they never really said -- again, it's kind of Lucy and

23   the football.  They never said what parts were proprietary and

24   what parts weren't.  They want to say, oh, well, it's the

25   compilation, it's the unique compilation; this particular thing

**CLOSING ARGUMENT / GASNER**

1   has not been published in *The New York Times*, therefore, it is

2   a trade secret.

3        But then when it comes down to, like, well, what evidence

4   do you have with this whole thing was in Walter Liew's

5   possession?  None.  What evidence do you have that he knew it

6   even existed?  Pretty much none.

7        The government will argue that mentions of, quote, basic

8   data in the emails would have told Mr. Liew that there is a

9   thing -- that there is this thing.  But that doesn't compute.

10       So what we're left with of the summary exhibit is kind of

11   a word comparison that I'm sure Mr. Froelich will address in

12   more detail.

13       But from Mr. Liew's perspective, in the course of a

14   13-year set of projects he gets a handful of emails -- take a

15   look at the dates on these exhibits.  The one that's on the

16   screen here, 2009, 2008, one in 2010.  I mean, there's a

17   handful of emails in the course of 13 years, where the

18   government's big proof is, aha, in this email there's a mention

19   of Kuan Yin or a mention of Basic Data.  And, looky here, those

20   words line up with some page in here.

21       Okay.  So that may tell you something about Mr. Maegerle's

22   source of knowledge or not.  And I will leave that to

23   Mr. Froelich to address.  It tells you nothing about Mr. Liew's

24   knowledge about this document.  There's no evidence that he

25   knows what the heck this thing is or that DuPont even has one.

**CLOSING ARGUMENT / GASNER**

1    In fact, you heard a ton of evidence that, oh, this is a big,

2    dark secret that's kept in the bowels of DuPont.

3         So keep in mind that on this particular count, from

4    Mr. Liew's perspective, the summary exhibits are just a word

5    overlap game in which there's nothing to suggest criminal

6    activity by Mr. Liew.  Especially in light of testimony you

7    heard about "basic data" is a term with various meanings.

8         It's kind of weird that what DuPont claims and the

9    government claims to be this big secret is called "Basic Data."

10   That sounds like the opposite.  It's basic.  It's what

11   everybody would know to start with.

12        And if you take a look at Exhibit 55, this is a document

13   that refers to Basic Data supplied by the buyer.  This is

14   Mingbo, another contract.  And it's the initial data that the

15   buyer tells you about their titanium slag requirements and

16   things of that nature.

17        So there's nothing about the words "basic data" that are

18   magic or would alert somebody that they're, you know, being

19   told trade secret information.  There's nothing in the words

20   "Kuan Yin," really, that would tell that Kuan Yin, that it's

21   from some misappropriated source.

22        So that's the end of the trade secret charges.  And I

23   appreciate your patience in going through.  This is a lot of

24   testimony.  It was somewhat dry at times, but I think you're

25   now pretty much familiar with the terms and able in your

1  deliberations to sort out what the evidence is as to what's

2  really a trade secret and what isn't; what the agreement really

3  was here; and whether it was an agreement to commit criminal

4  acts or what we contend; and whether there was an attempt to

5  copy anything known to be a trade secret.

6      So I want to turn to what I called in opening the tack-on

7  charges.  Financial charges.  They are serious and they're to

8  be taken seriously.  But, really, the essence of this case is

9  the trade secret and espionage charges, so I want to spend

10  increasingly less time on these, I hope.

11      But let's talk about the tax charges.

12      What the government alleges is a gross receipts false

13  statement.  You wouldn't know that from their graphics and

14  their closing argument, but if you really look at what the

15  Court's instructions are, there's a very particular federal

16  crime that's charged here.  And it requires that for each tax

17  year at issue Mr. Liew made and signed a tax return that he

18  knew contained false information; and, most importantly, that

19  in filing that false tax return he acted willfully.

20      And in order to act willfully you have to find beyond a

21  reasonable doubt that he knew federal tax law imposed a duty on

22  him and that he intentionally and voluntarily violated that

23  duty.

24      So the government likes to paint with a broad brush here

25  and just talk about the amounts of money.  And, yes, there's a

1    lot of money involved.

2          These plants, as I mentioned, cost hundreds of millions of

3    dollars to build.  The engineering and other fees associated

4    with a project like this are going to be in the neighborhood of

5    28 million.  Now, that's for two different projects, 30K and

6    100K.

7          And if you look at the contracts, you're going to see

8    there are equipment expenses and other things in there.  But,

9    still, it's a lot of money.  And I don't intend to diminish

10   that.  But the amount of money doesn't tell you anything about

11   the alleged crime and whether the government has proved it.

12         What the evidence showed about these transactions is that

13   the money was received via letter of credit transactions.

14         We heard from Joseph Chan from Mega Bank.  He had to come

15   a little bit out of order.  It was earlier in the trial then;

16   when the government presented most of its tax evidence late in

17   the case.

18         You remember he was a gentleman in his early 60s.  Very,

19   very polite bank executive.  And he told you about how the

20   money actually gets transmitted and how these transactions

21   work.

22         And as you can see on the screen, you start with a

23   contract between the parties, either Pangang for a 100K or

24   Jiang Zhou for the 30K, and USAPTI or Performance Group,

25   depending on which plant we're talking about.

**CLOSING ARGUMENT / GASNER**

1          So you have a contract.  And under that contract there

2     were milestones.  And when the milestones were met, Pangang or

3     Jinzhou would talk to their China Correspondent Bank.

4          And what you've got in evidence, and an awful lot of what

5     are in those boxes are just the huge amounts of just kind of

6     the wire transfer stuff and the paperwork associated with these

7     complicated transactions.

8          But to kind of distill it down to the basics, the China

9     Correspondent Bank then tells Mega Bank, you know, here's the

10    money, and we are sending the money to you.

11         Mr. Chan said that the money goes into a suspense account.

12    It is the account of Mega Bank.  And he told you that Mr. Liew

13    didn't have any bank accounts at Mega Bank; Performance Group

14    didn't have any bank accounts there; and USAPTI didn't have any

15    bank accounts at Mega Bank, the U.S. Correspondent Bank.

16         And then you saw that Mr. Liew then instructed, he writes

17    letters, that's the black line up on the graphic, he writes a

18    letter to Mega Bank saying please disburse the money as

19    follows.

20         And then the money goes off to different payees.  Many of

21    them the Singapore companies, but some of them going to the

22    USAPTI or Performance Group, their bank account.

23         So what was the evidence?  That's the background of how

24    this money traveled.  What is the evidence as to how they

25    prepared their taxes?

1    So you heard from Phillip Guan, the accountant, CPA, small

2    office kind of out near Bayview.  And he came in and told you

3    how things worked.  Mr. Liew would come out once a year and

4    bring his bank records and his bookkeeping records that were

5    kept on QuickBooks.

6        And the tax returns were prepared and signed in a single

7    in-person session.  They would get together, go through

8    everything, discuss the issues, and then do the tax return

9    there.  And Mr. Guan said this was his typical practice.

10       What evidence of willfulness was there, really?  USAPTI

11   reported as gross receipts what was received into its bank

12   accounts, the part of these transfers that went into its bank

13   accounts.

14       And there's no evidence that Mr. Liew knew rules to the

15   contrary.  The evidence was that his wife, Christina, handled

16   the financial aspects of the business.  So these once-a-year

17   trips to the accountant were not part of what Mr. Liew did most

18   of the time.

19       There's no evidence of the issue being raised by Mr. Guan.

20   Now, of course, Mr. Liew didn't get into all the complexities

21   of his overall business.  What he did was he brought what

22   Phillip Guan normally does, bank accounts and bookkeeping

23   records.

24       Now, you heard from Revenue Agent Jiang what the rules are

25   here.  She's an expert in this area, from the Internal Revenue

1    Service.  And she told you it depends on four things.

2         First of all, she said not all money that a corporation

3    receives counts as gross receipts.  There's lots of just

4    getting the money at your doorstep doesn't count.  It depends

5    on the structure of the contract.  It depends on the type of

6    corporation, a C corp. or a sub S, for example.  And in that

7    regard, for a C corporation, what she told you is that, yeah,

8    you're supposed to report the amount under the contract.  But

9    for a sub S corp. it passes through to the underlying

10   investors.  And there's no evidence that Mr. Liew knew the

11   difference between tax treatment of a C corp. and an S corp.

12        It depends on the degree of control.  And the prosecutors

13   made a big deal about the degree of control Mr. Liew had over

14   these funds.  Fair enough.  But there's nothing to suggest that

15   he knew how this relates to federal tax law.

16        And then, finally, and most importantly in some ways, the

17   uses to which the money is put.  You remember that with Agent

18   Jiang we went through in detail Exhibit 525.  So this was one

19   of a zillion wire transfer things that showed the paperwork.

20        And you will recall that I pointed out to her, geez,

21   there's these L/C transfer to Thayer Scale and Delta/Ducon for

22   tens of thousands of dollars, that go straight out of the

23   suspense account to these vendors.  And, yet, she did not

24   include these in gross receipts.  And she agreed, in the end,

25   that, yeah, that's proper not to count those.  She stood by the

**CLOSING ARGUMENT / GASNER**

1    way she calculated it and said it was proper.

2        The government then on redirect said, well, there were

3    other L/Cs, these were domestic companies that had their other

4    L/Cs.  And it got even more complicated.

5        But the fact is that not every dime that was received in a

6    kind of common sense way by the corporation in a tax way counts

7    as gross receipts on that one line.

8        So I would just encourage you to keep your eye on what the

9    proof is and what's innuendo and what's proof.

10        Innuendo is something that you probably heard politicians

11    do during campaigns.  What they say is, I'm not saying my

12    opponent is an embezzler, but I'm just saying take a look at

13    the XYZ Corporation.  That way of turning a phrase, I'm not

14    saying this but, you know, and then they go on to basically

15    communicate the innuendo, the suggestion of wrongdoing when you

16    can't prove it, and you simply want to muddy the waters and

17    dirty up your opponents.  So what politicians do, it's called

18    innuendo and it's not evidence.

19        I mean, there's no evidence in this case –– there was lots

20    of innuendo that Walter Liew is greedy and his money was

21    funneled to him and his family, and plenty of innuendo and lots

22    of graphics and lots of name calling.

23        But there's no evidence that any money actually went to

24    him.  Agent Ho –– or Agent Rometo admitted as much.

25        And you heard from many witnesses, there's just no ability

1   to get documents from Singapore and from China that would be

2   sufficient to just trace this all out.

3       So distinguish, when you're thinking about this, what the

4   crime is about is Walter Liew's mental state when in those

5   day-to-day, once-a-year sessions with Phillip Guan what did he

6   think he was doing when he signed it.  Was he willfully

7   violating a known duty, or was he just going about what seemed

8   to be sensible at the time, which is the money received is kind

9   of what went into your bank account.

10      It's really, the focus is on those meetings with Guan.

11  It's not on look at all these Singapore companies and, you

12  know, money to China.  There's no evidence in this case as to

13  whether any of those parties paid taxes themselves, whether

14  this was treated as a passthrough with tax obligations to the

15  recipient rather than USAPTI.

16      There's just -- I talked to Revenue Agent Jiang about

17  that, and she said she didn't know whether taxes had been paid

18  in China or Singapore or anywhere else.

19      So what happens on the other side of the world is not

20  relevant to what Walter Liew's mental state was here in the

21  United States when he signed those tax returns.  And innuendo

22  is not proof.

23          **THE COURT:**  Mr. Gasner, would this be a good time to

24  break?

25          **MR. GASNER:**  Absolutely, Your Honor.

1          **THE COURT:**  Ladies and gentlemen, we are going to take

2   our morning break.  Remember the Court's usual admonition:

3   Keep an open mind; don't discuss the case.  And we'll see you

4   in 15 minutes.

5          (Jury out at 9:45 a.m.)

6          **THE COURT:**  May I assume you're almost done?  It's

7   been about three hours.  Are you almost done?

8          **MR. GASNER:**  Almost done.

9          **THE COURT:**  A few more minutes and we're going to

10  stop.

11         **MR. HEMANN:**  Your Honor, we have a quick issue we

12  wanted to raise with regard to Mr. Froelich's closing.  We can

13  do it now or when the Court comes back.

14         **THE COURT:**  Let's do it real brief.

15      Everybody be seated.

16         **MR. HEMANN:**  It can be very brief.  As we were

17  reviewing last night and looking at some of the exhibits

18  Mr. Gasner had referred to in his closings argument, we

19  realized that two of them -- and I believe that they're

20  Exhibits 1008 and 864, these are the legal notes regarding --

21  one that mentions Mr. Finato and one that was around the same

22  time were admitted -- I'm sorry, 694, Your Honor --

23         **THE COURT:**  All right.

24         **MR. HEMANN:**  -- and 1008 were admitted solely for the

25  state of mind of Walter Liew.  And these are the documents that

1    the metadata connects to Mr. Liew's computer.

2         We believe that it would not be appropriate, given the

3    limited basis for the admission of those documents, for

4    Mr. Froelich to argue in his closing that those documents are

5    evidence of Mr. Maegerle's state of mind.

6         I've got the record cites, Your Honor, as to those

7    documents, and I'm happy to hand them up to the Court.  But

8    they were both admitted solely for the purpose of Mr. Liew's,

9    who's purported to be the author, mental state.

10        Neither Mr. Axelrod nor I want to object during

11   Mr. Froelich's closing so I thought it would be advisable to

12   raise that when the jury was not present.

13        **MR. FROELICH:**  Your Honor, at the time of those -- as

14   the state of the case at that time, there was nothing -- that's

15   the way it was.  But I submit, Your Honor, the case is in a

16   different state now.

17        My client testified -- didn't testify, but the government

18   put in evidence of my client's statements about that he told

19   the FBI five years, and that he told the FBI that he did not

20   believe it was trade secrets.

21        The government in its closing argument basically said my

22   client lied, my client lied, and this was made up, this was

23   made up when the FBI came to my client's house.  That's what

24   they argued, that this is all -- when the government calls, my

25   client made up.

1    That shows that my client was telling people this in 2004.

2  My client was interviewed in 2011. So I think between what the

3  government put on evidence since then and their argument allows

4  that to be a consistent statement because they have argued that

5  my client lied.

6         **THE COURT:** All right.

7         **MR. FROELICH:** That was their argument.

8         **THE COURT:** Last word, briefly.

9         **MR. HEMANN:** Very briefly, Your Honor.

10    The 2011 statements that -- which were the statements

11  Mr. Axelrod mentioned in his argument obviously are fair game

12  for Mr. Froelich. It does not change either the limited nature

13  for which those documents were admitted nor the fact that they

14  are both hearsay that were admitted over the government's

15  objection for a limited purpose.

16    They are connected in no way to -- to Mr. Maegerle. And

17  the evidence rules simply don't permit the sort of

18  bootstrapping Mr. Froelich is suggesting.

19         **THE COURT:** I get the argument.

20    I'm not changing my ruling. The evidence is closed. All

21  of the evidence is in for whatever purpose I allowed it. I'm

22  not going to reconsider a ruling that was made. There was no

23  request before the close of evidence, by you, Mr. Froelich, to

24  change the basis upon which that was ruled on. You could have

25  done it. I'm not going to change the evidence upon which

1    both -- all sides relied in preparing their closing argument.

2        So you're not going to be able to argue the truth of the

3    matter or that that relates to Mr. Maegerle's state of mind.

4    It's in for whatever reason it was in.  I gave a limiting

5    instruction, and I'm not changing that.

6        That's the ruling of the Court.

7        **MR. FROELICH:**  Your Honor, there is one other thing.

8    I certainly -- though that went in for the state of mind, and

9    take the statements out, I'm going to argue and I'm going to

10   tell the government now, and the Court, that one of the

11   documents that was in contained about -- and it's been argued

12   by of the government and by the defense that this was old

13   DuPont technology.  And that's not my client's state -- I mean,

14   that's --

15       **THE COURT:**  Well, my ruling is what it is.  I'm not

16   going to micromanage the closing argument.  I told you what the

17   ruling is, and I will enforce it.

18       Again, you need to wrap up.  It's too long.  It's too long

19   strategically and also in terms of the resources.

20       **MR. GASNER:**  I just need to hit the obstruction

21   charges.  And I think 15 minutes should do it, Your Honor.

22       **THE COURT:**  That's fine.  I'm not going to cut you

23   off.

24       **MR. GASNER:**  I appreciate that, especially in my big

25   finish such as it is.

1          **THE COURT:**  Well, I will look forward to it.  Not

2     really, but thank you.

3          (Laughter)

4          (Recess taken from 9:50 to 10:05 a.m.)

5          **THE COURT:**  All right.  Please bring in the jury.

6          (Jury enters at 10:06 a.m.)

7          **THE COURT:**  Please be seated.  You may wrap up,

8     Mr. Gasner.

9          **MR. GASNER:**  Thank you, Your Honor.

10         Thank you for your patience, ladies and gentlemen.  I have

11    taken up more than my fair share of time so I'm going to be

12    very brief as to the remaining charges.

13         The bankruptcy charges you heard about, and I just want to

14    say a few things there, Exhibit 507 is the petition.  That's

15    really the core of the bankruptcy charges.  It's a complicated

16    form that Mr. Liew filled out quickly, with the help of his

17    lawyer.

18         If you look at page 13, those are the creditors that were

19    involved.  It's $134,000.  And my one point here is that if

20    Mr. Liew actually had control of all these millions of dollars

21    that he had supposedly funneled, as the government dwelled on

22    in their closing, why on earth would he go bankrupt over

23    134,000, and subject his companies to the scrutiny of the

24    bankruptcy trustee and the scrutiny of others, and putting all

25    this in the public record?

1   I submit to you it makes no sense.  If he had been

2   conducting this massive scheme to steal money and to engage in

3   stealing of trade secrets, why would he go bankrupt over

4   $134,000?  Wouldn't it make much more sense to simply settle

5   these lawsuits and keep everything quiet?

6       You heard from Steve Amerine, they really were broke in

7   2008.  He told you that Mr. Liew was worried about money.

8       You know from your own experience of public events in

9   2008, the world had pretty much turned upside-down with the

10  bankruptcy of Lehman Brothers.  Lots of companies were going

11  bankrupt in this time frame.

12      What we're talking about here are checkmarks on forms.

13  You'll see the Count Twenty, the executory contract claim, that

14  boils down to very dense language with a legal term at its

15  heart, "executory contracts."

16      Mr. Liew checked "no executory contracts."  Is that a

17  fraud on the bankruptcy court or a confusion over a form with

18  legalisms and lots of dense language?

19      There's no evidence who put the check mark there, whether

20  it was him or his lawyer.  The bankruptcy expert told you these

21  are done on computer forms.  The checkmarks are often put there

22  in advance.  There's no evidence of knowing falsity.  There's

23  no evidence of intent to deceive.

24      Likewise, for these other questions that are charged in

25  count after count, federal crimes, each one on a different

1  question.  And there's a complete disconnect to the evidence

2  that you heard in this case.

3      All you heard in this case, really, was a bankruptcy

4  expert explained the system to you, and then this form.  And a

5  lot of innuendo, well, it was all obviously knowingly false,

6  with no evidence on the details.

7      Obstruction allegations.  There are a ton of them in this

8  case.  Lots of the later counts, each little bit of supposed

9  obstruction.

10     And the government's theory is that people, when

11  confronted with authority, either tell the whole truth, which

12  an honest person would do, that's their view of the world, or

13  they lie, and that shows that they really are guilty, that the

14  lie shows the guilt.  And they're trying, by bringing these

15  charges and emphasizing this over and over again, to get you to

16  use this as a shortcut.

17     And I don't have time to walk through each one of these

18  obstruction allegations, and I want to give you a single

19  anecdote to think about when you think about these charges.

20     One of my daughters was driving back from a concert with a

21  friend of hers back east.  And she and her girlfriend were on a

22  lonely stretch of interstate back in North Carolina.  It was

23  dark.  And they were -- it was around midnight.  They had not

24  been drinking.  But they passed through one of these speed

25  traps that you see, where small towns make some of their money.

CLOSING ARGUMENT / GASNER

1   And suddenly the police lights went on behind them.

2        Now, we all know the feeling when the police flashes go on

3   behind us.  Immediately our heart stops and we feel a rush of

4   emotion.  Even if we haven't been drinking, even if we thought

5   we were obeying the speed limit, even if we don't think we've

6   done anything wrong.  But there is a wave of emotion when the

7   police lights go on.

8        And my daughter and her friend had a panicky conversation,

9   what do we do?  Because they've seen all these crime shows with

10  like fake policemen, it's a dark interstate, it's two young

11  women in the car.  And they're deciding what to do, and they

12  decided to drive to the next interchange where there were

13  lights.

14       And it turns out that was a mistake, that was the wrong

15  thing to do, because the driver got cited for resisting arrest,

16  in addition to the speeding.  It was the wrong thing to do.

17  And it was borne out of a panicky conversation between two

18  young women when the police lights went on.

19       And I submit to you that when you look at these

20  obstruction charges, ask yourself, does the government's theory

21  really hold up this idea that you would simply tell the truth

22  and the whole long story when the police lights go on, when

23  DuPont attacks, when James Jubb comes to the door at 9 p.m.,

24  when you've got a civil lawsuit threatening your entire

25  economic well-being?  When the FBI shows up at your doorstep at

1   7:00 in the morning, are you thinking clearly?  Are you

2   intending to obstruct justice by doing that?

3       I submit to you the answer is no.  This is an ordinary man

4   who is not used to search warrants or his world getting turned

5   upside-down.  And maybe he didn't handle things in the right

6   way.  I mean, had he said to his wife, Don't talk to the FBI

7   agent; it's your constitutional right; wait until the lawyer

8   calls us back.

9       Remember there was evidence about that at the time of the

10  search Mr. Liew was trying to reach his lawyer.  And you'll see

11  in all these obstruction allegations there are moments where

12  Mr. Liew probably uses the wrong words.  Instead of saying you

13  don't know, you don't know, he should have said, you have a

14  right not to speak to the FBI, or, maybe you should wait until

15  our lawyer calls us back.

16      So maybe he used the wrong words.  Maybe my daughter and

17  her friend did the wrong thing by driving to the next

18  interchange rather than pulling over promptly.

19      But that doesn't make it a federal crime.  And you should

20  ask yourself like any of these other circumstances, the

21  government has to prove it beyond a reasonable doubt.  It's not

22  a crime to assert defenses or constitutional rights.

23      One of the counts that makes this really clear is Count

24  Ten the "answer conspiracy."  I guess it's obstruction of

25  justice to disagree with the government or to disagree with

1    DuPont.  Because if you look at the evidence here, what

2    Mr. Maegerle wrote to Mr. Liew in this supposed answer

3    conspiracy was the gist of their defense that you heard a ton

4    of evidence about, that you heard from Paul Cooper all about.

5    No trade secrets.  Ashtabula technology, dedicated to the

6    public long ago.  Yet the government alleges that they

7    conspired to have a defense.

8        It's a bit outrageous.  It's not obstruction of justice to

9    oppose the government.  It's not obstruction of justice to

10   oppose DuPont.  And just because the government has alleged it

11   doesn't make it so.

12       I'm going to jump way ahead and just talk about your job.

13   I know -- Mr. Hemann, by the way, is also going to get up later

14   this morning.  I'm not going to have a chance to respond to

15   him.  And he will reassemble the house of cards, if you will,

16   and he'll do it in a humorous and persuasive way.  And I can't

17   respond to that.

18       But all I can do is ask you, as you listen to him, as you

19   deliberate, is to think about the burden of proof and whether

20   after careful and impartial consideration of all the evidence

21   you're not convinced beyond a reasonable doubt that the

22   defendant is guilty, it's your obligation to find that

23   defendant not guilty.

24       The other part of that instruction, and I've got on the

25   screen now, is that reasonable doubt is the kind of doubt that

1   would make a reasonable person hesitant to act in a matter of

2   importance in his or her personal life.  It may arise from a

3   careful and impartial consideration of all the evidence, or

4   from a lack of evidence.  Hesitant to act in a matter of

5   importance in your own life.

6        It's hard to imagine an event of more importance in the

7   life of Mr. Liew and Mr. Maegerle and USAPTI than the decision

8   that you have in front of you, so it's hard to come up with an

9   analogy.  But people talk about the biggest purchases in your

10  life being a house, if you're fortunate enough to be in that

11  position, or a car.

12       And think about if you're making that important decision.

13  Say you're looking at a house that you're thinking about

14  buying.  And you go on an inspection tour and you get into the

15  basement and you see a gigantic crack in the foundation of that

16  house.  And you look at the walls, and the walls look thin and

17  flimsy.  You would hesitate to act.  You'd say, geez, whoa,

18  maybe I better stop and think.  And whether or not you decided,

19  ultimately, to buy the house or not, that moment of hesitation

20  when you see a crack in the foundation is what reasonable doubt

21  is about.

22       And I'd encourage you -- or a car for that matter.  You

23  see a little leaky oil, a small leak coming out from underneath

24  the bottom.  You're going to hesitate to act because something

25  is not right.  It's not sure enough.

1          And, now, this isn't about words on a page.  This isn't

2    just it's written down on the judge's instruction and you can

3    kind of treat it as just a dry exercise.  This is how our

4    relationship as citizens to the government works.

5          This is, really, the protection that we have against the

6    powers that be, whether it be a big corporation like DuPont,

7    whether it be a government at a time of surveillance and police

8    involvement in our day-to-day lives.

9          This idea that we're presumed innocent, that we are all

10   presumed innocent, is what allows us to breathe freely in this

11   country.  It creates a zone of freedom in which we operate as

12   citizens.  It matters every day of our lives.  This is why

13   we're concerned when we feel the government is intruding into

14   our life.

15         And we cherish the zone in which we can feel free; in

16   which we can feel free to start a new business; in which we can

17   feel free to operate that business without feeling as though

18   the government or some big, powerful entity is going to come in

19   without the proper foundation to crush our lives, our hopes,

20   dreams, and our freedom.

21         And that's what reasonable doubt is about.  We start off

22   presumed innocent.  And what the government must do in these

23   cases, these important criminal cases, is they must prove a

24   federal crime beyond a reasonable doubt.  That is the barrier

25   that defines our freedom.  It defines the difference as to when

1  the FBI, DuPont, the federal government, the Department of

2  Justice can invade, if you will, that castle of freedom that we

3  have.

4      And they have to climb the castle wall.  It's not a speed

5  bump, ladies and gentlemen.  This isn't just kind of, well,

6  geez, you know, Hemann made a good rebuttal so he's probably

7  right; or, well, you know, I'm suspicious of some of the stuff

8  in this case.  Those are speed bumps.

9      What the law requires you to do is to put the government

10  to its proof.  Make them climb that castle wall and prove

11  beyond a reasonable doubt each and every element of these

12  crimes.

13      And I submit to you that if you do that, because I know

14  you will, you've been so attentive, you've been a wonderful

15  jury, I know you'll be wonderful in your deliberations, if you

16  do that I believe that you will reach the conclusion that

17  Mr. Liew and USAPTI are not guilty of all charges in this case.

18      Thank you.

19      **THE COURT:**  Thank you, Mr. Gasner.

20  Mr. Froelich, you may make your closing argument.

21      **MR. FROELICH:**  Thank you, Your Honor.

22  Your Honor, may I use the podium?

23      **THE COURT:**  Absolutely.

24  (Pause)

25      **THE COURT:**  You may proceed whenever you are ready,

1    Mr. Froelich.

2         MR. FROELICH:   Thank you, Your Honor.

3                        **CLOSING ARGUMENT**

4         MR. FROELICH:   Well, ladies and gentlemen of the jury,

5    it's the end of the journey, at least for the lawyers.  And

6    it's the beginning of yours.

7         Thank you very much for how attentive you've been.  It's

8    been a long trial, a lot of evidence.

9         I want to make it clear that I'm going to argue to you,

10   it's your recollection that controls.  I also want to make it

11   clear that I represent Mr. Maegerle and Mr. Maegerle only.  And

12   you have to give him your individual attention, and you have to

13   decide his individual case.

14        Now, because of the length of the trial I've got a lot of

15   ground to cover.  I don't know if I'm going to be able to cover

16   it.  I'm going to try.  I know I'm not going to actually be

17   able to cover every piece of evidence, because of the amount of

18   evidence here.  And I'm not going to go through witness by

19   witness.

20        What I am going to do is try to outline for you the facts

21   and the evidence which will allow you to make credibility

22   issues and decide the facts of this case as far as my client,

23   which I think is the key element here, is intent, what he

24   believed.  That may not have been the proper belief, but as

25   long as he believed it, that's the key issue in this case.

 1          Now, I may repeat some evidence and that's because I think

 2     there's evidence in this case that support four or five

 3     different of my points.

 4          I'm also going to rely on notes.  Unfortunately -- I don't

 5     know how many of you had Catholic school educations, but the

 6     nuns and priests taught me not to make mistakes.  I'm hoping

 7     not to.  And I've learned that notes are the best way to

 8     travel.

 9          So you'll see me looking down a lot, but it's not trying

10     to not look at you or anything.  It's me trying to keep what I

11     believe are the important points, that I want to get across to

12     you, straight.

13          What have you learned about Bob Maegerle?  He's 78 years

14     old.  He's going to be 79.  He's a father.  He's retired from

15     DuPont.  He lives in Delaware.  He's married.  He started to

16     work for DuPont in 1957, right after he graduated college.

17     Most of his work was in TiO2.

18          I want you to look at Exhibit 722.  That was the personnel

19     documents that Maegerle had in his own house, that were seized

20     by the government.

21          What you will see is it sets out Mr. Maegerle's work

22     history with DuPont.  You will see that he did work at DuPont's

23     plant in Antioch; that he was a lead engineer when DuPont built

24     the Ashtabula plant for Sherwin-Williams.  That's going to be

25     critical in this case.

CLOSING ARGUMENT / FROELICH

1        You're going to see that he was in charge of adding

2   chlorine lines -- chloride lines to DuPont's plants in

3   Johnsonville, Edgemoor.  You'll see he was involved in DuPont's

4   search for a plant in Taiwan.  Then he went to DeLisle,

5   Mississippi.  He had the second line in DeLisle.  You're going

6   to see that he -- you're going to see that he was the lead

7   engineer on that job.  And, finally, that he was in charge of

8   DuPont's efforts to build a plant in Korea.

9        I want to go through those later, okay.  Thank you.

10       He retired from DuPont in 1991, after 35 years -- 34 years

11  as an engineer, almost all in the technology part.

12       He retired almost 24 years ago.  Long time.  Mr. Maegerle

13  receives a pension from DuPont.

14       The evidence is, not only from DuPont's records that

15  you'll see that we were fortunate to get to have here, but the

16  testimony in this case is that Mr. Maegerle was an excellent

17  engineer.

18       Mr. Dayton, DuPont employee, testified Mr. Maegerle was a

19  very experienced engineer, very well thought of at DuPont.

20  Mr. Dayton testified that Mr. Maegerle could probably draw most

21  of a TiO2 plant from memory.  That's how experienced he was.

22       Everyone you heard from in this case who worked with

23  Mr. Maegerle, either at DuPont or at USAPTI, USAPTI, said he

24  was an excellent engineer.

25       When you look at Exhibit 722, you'll see all the awards he

1    won.  The evidence will show you not only from the testimony

2    but from that personnel file he was a hardworking, loyal, well

3    thought of DuPont employee.  Not an employee that was going to

4    go out and sell trade secrets.

5         In fact, and we'll talk about it later, the authority he

6    had at DuPont.

7         How did Mr. Maegerle meet Walter Liew and USAPTI?  You've

8    heard the story.  I'm going to go through it very, very quickly

9    because I think there's some key facts that need to be

10   emphasized.

11        Mr. Marinak, Michael Marinak and Walter Liew were

12   partners, and they were trying to get a contract for a TiO2

13   plant in China.

14        Mr. Marinak looks on the Internet, and what does he find?

15   He finds Condux, which advertises itself that has ex-DuPont

16   engineers who are TiO2 experts and can be hired as consultants

17   in TiO2 projects.  That's what he testified to.

18        As a result, Mr. Marinak contacted Fred Arbogast.  And who

19   is he?  He's an ex-DuPont engineer and the vice president of

20   Condux.  And Marinak tells him he wants TiO2 experts to help

21   build a TiO2 plant in China.

22        Now, remember where Condux is.  It's right, basically,

23   around the corner from DuPont.  And it advertises itself as

24   having experienced DuPont ex-employees.  You don't think DuPont

25   knows that?  You don't think everybody knows it?  That's the

1    only thing they do, according to their -- you've seen the bill.

2        Now, remember Mr. Gibney, he never worked for DuPont.  He

3    was the supposed government expert.  We'll talk about that.

4    Testified he was aware of Condux, and that it advertised it had

5    ex-DuPont employees as consultants experienced in DuPont's TiO2

6    process.

7        Mr. Arbogast, after he hears from Mr. Marinak, he contacts

8    four former DuPont's employees with extensive TiO2 experience

9    at DuPont.  By the way, we know all of this through

10   correspondence because the government didn't call Mr. Arbogast.

11   Wonder why.

12       Look at Exhibit 1004.  All the ex-DuPont employees put

13   their resumes in, and they all emphasized they're DuPont

14   employees.  They're experts in the field of TiO2.

15       With these backgrounds, who do you think -- what do you

16   think people that go to Condux think they're hiring?  DuPont

17   knows that.  They have all these -- all these people, they're

18   right in the same community.  What would you rationally expect

19   from a Condux consultant with that advertisement and those

20   backgrounds?

21       Now, Mr. Arbogast, when he writes to Mr. Marinak, and you

22   can see Exhibit 1004, that letter tells you that, in effect,

23   ex-DuPonts they don't believe they are bound to DuPont or they

24   can't use their expertise.

25       Mr. Arbogast, even he himself, wants to be considered as a

1  consultant and includes his resume. And he starts talking

2  about all his TiO2 experience.

3      And then he writes:

4          "During my recent discussions with Bob Maegerle he

5      indicated that he had past -- he has past approval to

6      consult outside DuPont. However, he may need to update

7      the agreement should you go forward with the project."

8      This is in 1997. Maegerle tells Arbogast, I've got

9  approval. And Arbogast says he may feel. Notice that

10 Mr. Arbogast nor any of the other people say anything about

11 they need to get approval.

12     And the government found, by the way, they've introduced

13 it, believe it's Exhibit 54, the letter that Mr. Maegerle wrote

14 to Mr. Dayton confirming the conversation that he had prior.

15     And what's interesting is, and the government's going to

16 come up and say, well, he said he wouldn't reveal any trade

17 secrets and things, and that's what he said.

18     But what's interesting about it, he refers to five years.

19 You think that's just an accident when he says it's almost five

20 years since I left the company? Does he throw that five years

21 in there? No.

22     I say to you and I submit to you that it speaks volumes.

23 Those letters, those resumes, and Mr. Arbogast wanting to get

24 in, they speak volumes about what DuPont ex-employees felt.

25 They were consultants; they were bound by five years.

 1          So then Mr. Maegerle and Mr. McIntosh are selected as

 2     consultants.  And in early 1998 they go to a meeting in

 3     San Francisco where USAPTI is holding a seminar of potential

 4     Chinese clients.  Both Mr. Maegerle and Mr. McIntosh speak at

 5     the meeting.  Mr. McIntosh, as you've seen, also later provided

 6     TiO2 technology information to USAPTI.  Mr. McIntosh isn't

 7     here.  He hasn't been called as a witness by the government.

 8          At the seminar, after the seminar, Maegerle's next

 9     contract -- contact with Mr. Liew and USAPTI is in about 2004,

10     when Mr. Maegerle is contacted by them about a potential

11     contract in China with Jinzhou.  And Mr. Maegerle and Mr. --

12     because Mr. Liew and Mr. Zisko are seeking a deal in China.

13          This is 13 years after Maegerle is retired from DuPont.

14     And remember the government's charges in Count Two, that

15     Mr. Maegerle engaged in a conspiracy with Mr. Liew and USAPTI.

16     In other words, he agreed to steal DuPont trade secrets in

17     1998.  Have you seen any evidence of that?  That's ludicrous

18     and not supported by the evidence.

19          I think they argued that, well, he told or in 1997 or 1998

20     he provided them with what the proposed cost of the plant in

21     Kuan Yin, and the number of employees or how many employees

22     worked there.  I'll talk about that later, but that was public

23     knowledge.

24          DuPont, one of the executives testified, before DuPont

25     builds a plant they let the public know.  They let the public

1   know, particularly in that community, how many people they are

2   going to hire.  They advertise for kinds of people.  They tell

3   them how much they're going to spend and what the plant is

4   going to cost.

5        DuPont is a public company.  You think they can go out and

6   build a plant without revealing everything to their

7   stockholders and everything else?  It's public knowledge.

8   Ludicrous.  Ludicrous.

9        What is Mr. Maegerle charged with in this case?  Let me

10  remind you, this is not a civil case.  He is not charged with a

11  breach of contract.  If Mr. Maegerle breached some contract he

12  had with DuPont, that doesn't make him guilty of a crime.

13       This is a criminal case.  Mr. Maegerle is charged in Count

14  One with a conspiracy that he conspired with USAPTI and Walter

15  Liew to steal DuPont's alleged trade secrets concerning the

16  TiO2 technology, with the intent to harm DuPont.

17       Count Five charges that they attempted the theft of

18  alleged trade secrets at DuPont of chloride route process for

19  making TiO2, again with the intent to harm DuPont.

20       Count Eight charges him with knowingly aiding and abetting

21  Walter Liew, with conveying an alleged trade secret, with the

22  intent to harm DuPont.

23       That charge -- that charge, and the government has argued

24  to this, that this whole entire book, this whole thing is a

25  trade secret (indicating).  So they say it's made up of public

CLOSING ARGUMENT / FROELICH

1    information and everything, but the whole thing is a trade

2    secret.

3         I submit you to that the evidence in this case shows that

4    Mr. Maegerle didn't have this whole thing.  And I'll prove it

5    to you as we go.  And I don't have to prove anything.

6         The last charge Mr. Maegerle -- again, Mr. Maegerle is

7    charged with alleged conspiracy to obstruct justice.

8         What does that involve?  That involves a civil case in

9    which DuPont sued USAPTI, Jian Liu, who came into the court and

10   testified and never mentioned Maegerle, and Walter Liew.

11        Mr. Maegerle was not a defendant in the case.  The

12   government alleges the obstruction of justice was filing a

13   false answer.

14        Well, let's talk about that charge.  The evidence in the

15   case, in this case, in this courtroom does not support that

16   charge, no less provide proof beyond a reasonable doubt.

17        In fact, the lack of evidence concerning this charge in

18   and of itself provides a reasonable doubt.

19        Did the government call even one witness, did you hear a

20   word on the stand, to testify about the answer filed in the

21   civil case?  Not one word.  Lack of evidence, reasonable doubt.

22        There was no witness, no attorney, or judge, or legal

23   expert called by the government -- remember they called legal

24   experts in everything else, in bankruptcy and tax -- to give

25   evidence about how an answer in a civil case constitutes an

1    obstruction of justice.  Reasonable doubt, lack of evidence.

2         Did the government even show the answer to you during the

3    trial or have anyone testify about it?  What's the answer to

4    that?  No.  The first time you heard anything about the answer

5    was in the closing argument.

6         Did the government call the attorney who represented

7    DuPont in that civil case to testify how the answer obstructed

8    justice?  No.  Lack of evidence, reasonable doubt.

9         What happened was DuPont filed a civil suit against Walter

10   Liew, USAPTI, and Jian Liu, as I told you.  The government

11   alleges that Maegerle, Mr. Maegerle and Liew conspired, that is

12   agreed to file a false answer.  In effect, the government's

13   position is that Liew should not have defended himself or

14   Mr. Maegerle shouldn't have given him any advice.

15        Walter Liew asked Bob Maegerle to give his thoughts on a

16   civil suit.  Remember Maegerle is not the defendant in the

17   lawsuit.  Mr. Maegerle responded that he did not believe the

18   suit had much merit, and he believed that DuPont's TiO2

19   technology was in the public domain.  It's not the first time

20   you heard him say that.

21        In Exhibit 682, Maegerle tells Mr. Liew, When the Court

22   asks for my name feel free to identify me to the Court.

23        It's clear, Maegerle is not hiding.  Later he tells

24   Mr. Liew about the sale of DuPont technology to

25   Sherwin-Williams in 1967, and that DuPont's technology had been

1   resold many times.

2       As a result, Maegerle states he believes that DuPont

3   technology is public knowledge.  That's what he believes.  And

4   there's a basis for that belief.  And we're going to show you

5   even more basis for that belief.

6       So USAPTI, Walter Liew -- and Walter Liew's attorneys

7   draft an answer.  There is no evidence Mr. Maegerle ever spoke

8   to an attorney for USAPTI or Walter Liew.  Nor did anyone

9   testify that defense lawyers relied on Mr. Maegerle's

10  statements.

11      Again, the attorneys for USAPTI were not called to testify

12  for the government.  There's lack of evidence, reasonable

13  doubt.

14      The Court has instructed you that an element of the crime

15  of obstruction of justice that the government must prove is

16  that Mr. Maegerle obstructed, influenced or impeded an official

17  proceeding.  Where is that evidence?  Where is that witness?

18  Where is he?  Didn't happen.

19      The government argues that Mr. Maegerle was going to

20  respond to -- this is a big -- they've made a big deal of this:

21  Mr. Maegerle was going to respond to Mr. Liew's request for

22  comments on the summons that Mr. Liew received in regards to

23  DuPont's civil suit by a different email, and that somehow that

24  shows Mr. Maegerle had a bad intent.

25      However, read the email.  It's Exhibit 678.  What you'll

 1   see is that Liew sent an email to Maegerle.  He sends it from

 2   his personal Yahoo! email account.  Mr. Liew sends it on his

 3   personal email account to Mr. Maegerle's personal email

 4   account.  And Mr. Maegerle says, I'm going to respond on your

 5   personal email account.

 6         Remember, it's about a civil lawsuit.  And so rather than

 7   send it to the corporate, where someone else may read it, you

 8   know, what you do when you're in the middle of a lawsuit, you

 9   don't want employees to know what's going on.  How is that bad

10   intent?  That shows you how far the government is reaching in

11   this case.

12         So Maegerle -- it's clear that that's no evidence of

13   anything, no less intent.

14         The natural response -- the government further argues that

15   Exhibit 678, in April 2011, Maegerle states that no Kuan Yin

16   design information has ever been obtained for the current

17   design.

18         First of all, we do not know what current design he's

19   referring to.  As you know, USAPTI was working on several

20   projects.  But you should remember, this is important, because

21   they show you an email before that, way before that, that talks

22   about Kuan Yin or Taiwan.  But remember the evidence shows that

23   the Kuan Yin plant that DuPont eventually designed was

24   different, significantly different from anything that was

25   referenced in the Basic Data book or that when Mr. Maegerle was

 1    at DuPont.

 2        As we know from the testimony of Mr. Olson, who actually

 3    ran the Kuan Yin plant, that the plant that was designed and

 4    was -- and built after Mr. Maegerle left DuPont was

 5    significantly different.

 6        The plant that was eventually designed and completed about

 7    1994 was a hundred -- according to Mr. Olson, DuPont's guy who

 8    ran the plant, was 160,000 to 200 tons.  That's a far cry from

 9    the 60,000 plant referenced in the Basic Data Document.

10        You will see that Mr. Maegerle later expresses this

11    position in Exhibit 679, again, an email where he's responding

12    to the civil case.  He says he doesn't know how big it is but

13    he thinks the Kuan Yin plant is 90,000.  And he says call that

14    a large plant.  That's -- and he goes on to talk about a

15    60,000-ton plant.

16        So he's looking -- he's talking about the plant that was

17    actually built.  I think that's a reasonable, actual thing.

18    They didn't have anything about what was built.

19        He goes on to tell him that DuPont compromised its

20    technology with the sell of the Ashtabula plant to

21    Sherwin-Williams, and he restates his place.  He again says, I

22    did not use any DuPont trade secrets.

23        And he says that DuPont's, really, trade secret and its

24    competitive advantage is not its technology but its operating

25    experience of its employees.

1          We're going to show -- I'm going to show you there was

2     testimony that backs up all This.  He talks about Kuan Yin and

3     Jinzhou.  What's he hiding when he refers to those two?

4          Look at Exhibit 681.  He says, I've looked at the

5     complaint.  DuPont doesn't state in the complaint any specific

6     trade secret.  And then he goes on and gives example of DuPont

7     TiO2 in the public domain.

8          All goes to intent.  All goes to intent.

9          If anyone should know if DuPont TiO2 technology was

10    compromised by DuPont, by Sherwin-Williams contract, or is in

11    the public domain, it is Mr. Maegerle.  He built the Ashtabula

12    plant and, as we know is an expert, according to DuPont, on

13    what is and was not a trade secret.  And I'll show that to you

14    later.  Further, he worked at every DuPont plant and,

15    therefore, he knew each plant.

16         Not an obstructing justice.  Mr. Maegerle tells Mr. Liew

17    what he thinks of the issues.  And, again, as I told you, he

18    tells him, list me as the Ashtabula expert, and tell the Court

19    what he requires.

20         He finally states -- Mr. Maegerle further states he's

21    simply following advice when he was involved in a case with

22    Gaylord Chemical.  We know he was involved with Gaylord

23    Chemical.  And answer only the question that is asked.  He's

24    not hiding anything.  He's giving advice.

25         He did not have the intent to obstruct justice.  He was

 1   not obstructing justice.  More than willing to identify

 2   himself.

 3        Let's talk about the burden of proof in this case.

 4   Mr. Maegerle has no burden.  He doesn't have to prove anything.

 5   Though we think we've proved some things, which we'll talk

 6   about.

 7        Mr. Maegerle, as the Court has instructed you, is presumed

 8   innocent.  He's cloaked with innocence.  He has no obligation

 9   to testify.  And that he didn't testify cannot be considered by

10   you against him.  He has no obligation to produce any evidence,

11   call any witness, nor to prove his innocence.

12        The burden is always on the government.  It never shifts.

13   And they have to prove each and every element of every charge

14   by its very heavy burden beyond a reasonable doubt.

15        Now, the Court gave -- explained a little bit what the

16   standard of proof that the government must meet.  The Court

17   instructed you that a reasonable doubt is the kind of doubt

18   that makes you hesitate to act in a matter of most important

19   decisions in your life.

20        Let me ask you, if you went to a doctor and the doctor

21   told you you needed an operation, then you went to a second

22   doctor and he told you didn't need an operation, would that

23   cause you to hesitate about whether or not you're going to have

24   an operation?  I would think so.

25        You heard the testimony of an expert in this case,

1   Mr. Paul Cooper.  Did not his testimony alone raise many

2   reasonable doubts?

3       Now, Mr. Axelrod, he went after Mr. Cooper both on the

4   stand and in his opening.  He went after him hard because he

5   knew he had been hurt by Mr. Cooper.  And he didn't like

6   Mr. Cooper's answers, the answers he got from Mr. Cooper.  The

7   answers did not confirm the government's theory.  The answers

8   provided reasonable doubt.

9       Later I'm going to compare Mr. Cooper with the

10  government's experts.  And after doing so, I think you're going

11  to see that Mr. Cooper was the most credible witness here, and

12  most reliable witness.

13      I should also remind you that a reasonable doubt not only

14  comes from evidence but lack of evidence.  I would submit

15  there's many, many reasonable doubts in this case, on both.

16      Let's talk about the conspiracy charge.  Mr. Maegerle is

17  charged with the conspiracy to steal alleged DuPont trade

18  secrets.  The Court has instructed you that the government must

19  prove, as he said, beyond a reasonable doubt, that Mr. Maegerle

20  agreed with Mr. Liew and USAPTI to do something unlawful, to do

21  something unlawful.  In other words, do something that the law

22  forbids.

23      The government must prove beyond a reasonable doubt that

24  Mr. Maegerle had an agreement with Mr. Liew to commit the

25  crime.  Mr. Maegerle had to knowingly and willfully agree to

1  participate in an unlawful plan.  No evidence of that.

2      I submit the evidence in this case does not support the

3  government's conspiracy charge, its substantive charge, or

4  aiding and abetting, no less evidence beyond a reasonable

5  doubt.

6      You've heard consistent evidence of what Mr. Maegerle

7  thought.  And with his background and his experience, that's a

8  reasonable doubt.

9      Mr. Maegerle -- intent is the key issue in this case.  Did

10 the government prove beyond a reasonable doubt that

11 Mr. Maegerle intended to violate the law?  Did the government

12 prove beyond a reasonable doubt that Maegerle intended to steal

13 DuPont's trade secrets?

14     Did the government prove beyond a reasonable doubt that

15 Mr. Maegerle had the intent to enter into an unlawful plan?

16 Did the government prove Mr. Maegerle intended to harm DuPont?

17     Those are some of the key issues you must decide in this

18 case.  Not only did the government not prove Mr. Maegerle's

19 intent, but the evidence, common sense, as I'll show you,

20 showed that he had no intent to violate the law; that he did

21 not believe that he was stealing any alleged trade secret of

22 DuPont; that he didn't enter into any unlawful plan.

23     As the Court instructed you, this is very important,

24 Mr. Maegerle's guilt or innocence depends on what he believed

25 the circumstances to be, not what they actually were.  What he

1    believed.  Doesn't matter what they were.  It's what he

2    believed.

3         You saw the evidence in this case what he believed.

4    You'll see more.  I'll go through it.

5         I submit that the evidence that the government didn't

6    prove beyond a reasonable doubt Mr. Maegerle actually stole the

7    secrets nor that he was involved in a conspiracy.

8         The evidence shows Mr. Maegerle believed that DuPont's

9    TiO2 process was known to its competitors because of the sale

10   of Ashtabula and Sherwin-Williams.  Mr. Maegerle believed

11   whatever information that he gave to USAPTI and Mr. Liew was

12   not a trade secret.  He believed that it was in the public

13   domain.

14        And, again, the government has to prove another element,

15   that Mr. Maegerle willfully and knowingly entered into the

16   agreement with Mr. Liew and USAPTI to commit crimes charged in

17   the indictment.

18        I'm going to review much of the evidence with you, but

19   first I want to talk about trade secrets and what's a trade

20   secret and what's not a trade secret, because I don't think you

21   got much of that from the stand.

22        To be a trade secret the information has to be secret.

23   The Court has instructed you that, one, the owner of the secret

24   has to have taken reasonable measures to keep such information

25   secret.  And the secret must have economic value from not being

1    known to or being readily ascertainable by the public.

2        I would submit the government has not met its burden of a

3    reasonable doubt on any of the above evidence.

4        First, let's talk about reasonable steps to keep its TiO2

5    process secret.

6        The evidence is undisputed, I submit, that DuPont lost

7    control of its TiO2 technology when it sold it to

8    Sherwin-Williams.

9        Read, read Exhibit 900.  That is the 1967 contract between

10   Sherwin-Williams and DuPont for the Ashtabula, Ohio plant that

11   DuPont built.  Mr. Maegerle was in charge of that, was the lead

12   engineer.  And it's all in the records.

13       In exchange, this is -- in exchange for Sherwin-Williams

14   paying a fee to DuPont for ten years, DuPont not only turned

15   over its TiO2 technology to Sherwin-Williams, DuPont gave

16   Sherwin-Williams all the following.  Listen to this.  DuPont

17   released its patents concerning its TiO2 process.  DuPont gave

18   its flow sheets for the manufacture of TiO2.  DuPont gave up

19   all confidential information concerning its TiO2 process.

20       Sherwin-Williams had the right to use the DuPont TiO2

21   process at other plants.  DuPont had to design and build the

22   Ashtabula plant with DuPont TiO2 technology and process.

23   DuPont provided Sherwin-Williams with eight complete sets of

24   specifications and drawings used by DuPont to design and build

25   the Ashtabula plant and the TiO2 processes and equipment.

CLOSING ARGUMENT / FROELICH

1      DuPont gave up its operational manuals.  DuPont gave up

2  its engineering standards.

3      DuPont had to train Sherwin-Williams personnel how to

4  operate and maintain a TiO2 plant.  And you know where the

5  training had to take place?  In DuPont's existing plants.

6      DuPont had to provide experienced DuPont personnel to

7  start up and run the Ashtabula plant.

8      The evidence shows, and there's more evidence to support

9  it, and I'll go through it later, that that contract shows that

10  not only did DuPont give up control of its TiO2 process and any

11  alleged trade secrets therein, but in effect it gave up

12  ownership interest.  It lost control of that process after

13  that -- after a 15-year period.

14      You have to have -- you have to own information to have

15  exclusive control over it.  To be a trade secret it has to be a

16  secret.  And we're going to talk about that in a few minutes.

17      In 1982, as I told you, around 1982, it may be a few years

18  afterwards, DuPont lost any and all control over its TiO2

19  technology.

20      Sherwin-Williams could and did do what it wanted with TiO2

21  technology.  And I'm going to -- remember my cross-examination

22  of DuPont executive Dan Dayton, who testified in this case.  He

23  admitted DuPont transferred its TiO2 technology to

24  Sherwin-Williams.

25      Sherwin-Williams sold the Ashtabula plant and TiO2

1    technology to SCM.  SCM took DuPont's TiO2 technology and built

2    a TiO2 plant in Baltimore, Maryland.

3        Then SCM spun off the TiO2 technology and formed a new

4    company, Millennium, which used DuPont technology to build

5    plants in England and Australia.  This is DuPont's guy.

6        There was also a company called Lidell, I believe he said,

7    that owned Ashtabula plant and DuPont's technology at one time.

8        Millennium was bought by Cristal, which now owns the TiO2

9    technology.  And he testified he did not know how many other

10   plants were using DuPont's TiO2 technology.

11       Now, so DuPont lost control of its technology; it lost

12   control of its secret.

13       I stand here and tell all you people, "This is my secret."

14   Do I control it anymore?  Is it really a secret?  And I have to

15   depend on you to hold it?  No way.

16       But there's other evidence that we'll go into, but the

17   Government realized this and they then tried, "How do we combat

18   that DuPont lost its -- it gave up -- gave away its TiO

19   technology?"

20       And, so, what do they do?  It's an undisputable fact that

21   they try to now build a barrier behind it.  And they called

22   Mr. Livingston, and he's from Cristal, a company that now owns

23   DuPont's TiO technology, and they put him on direct.  But you

24   remember my cross?  Mr. Livingston admitted he did not know

25   what happened to the TiO technology from 1974 until 2000 when

1    he joined Cristal.

2        But, more importantly, he admitted that Cristal owned

3    DuPont's TiO technology and could do what it wanted with that

4    technology.  I asked him and that's what he said.  He admitted

5    DuPont had no control over its TiO technology since 19- -- his

6    words -- 1982.

7        Now, Mr. Livingston admitted that Cristal could sell

8    DuPont TiO technology or even publish it in the newspaper.

9    Now, the Government came back, and you probably went, "What's

10   Mr. Froelich doing?  It's silly to say maybe they would publish

11   it in the newspaper."

12       But do you remember Mr. -- again, remember, go back to

13   Mr. Dayton of DuPont?  He testified that he learned about

14   TiO -- tioxides [sic], I believe it is, TiO technology, because

15   it published its TiO technology in a magazine in Canada.

16       But the point of it is that DuPont can't control what

17   Cristal does with the technology.  It can go out tomorrow and

18   take out a full-page ad.  There's nothing DuPont can do about

19   that.

20       It's beyond -- it's also beyond dispute that Mr. Maegerle

21   knew what technology was in the Ashtabula plant because he

22   built it.  He also knew that the plant had been sold to SCM.

23   He's told in numerous papers that, and he was a member of

24   DuPont, and that other companies had it.  It was one of the

25   bases, and he's expressed it numerous times, on his belief that

 1   DuPont's TiO technology was no longer a secret.

 2        Again, I submit to you your secret is not a secret when

 3   someone else controls it.  Do you really own something that

 4   someone else controls?

 5        Remember, how many plants were built, do you think, or do

 6   we even know, with TiO technology by its competitors?  Look at

 7   them all over.  How many people, particularly engineers, built,

 8   consulted, or worked on those plants and have access to

 9   DuPont's TiO technology?

10        Now, Mr. Gibney, the Government's expert, admitted on

11   cross-examination -- he was the Government's expert -- that

12   DuPont lost control of its TiO technology when they sold it to

13   Sherwin-Williams.

14        I might point out when we were talking about experts, we

15   started -- the Government jumped on Mr. Cooper, and I started

16   talking about Mr. Cooper.  I might point out that while

17   Mr. Gibney knew this fact, his expertise should be really

18   questioned by you.  You might remember, and I hope you do,

19   Mr. Gibney claimed on direct examination that Sherwin-Williams

20   built the chlorinator in the Ashtabula plant and not DuPont.

21        When I crossed him, he changed his mind.  He said, no, it

22   wasn't the chlorinator.  It was the oxidation or the oxidizer

23   or the oxidation unit.  That's not correct.  That's not

24   correct.  Other DuPont witnesses have told you and the contract

25   says that they built the whole plant.  They built the whole

CLOSING ARGUMENT / FROELICH

1    TiO2 process.

2        So remember the testimony of Mr. Cooper.  He's certainly

3    more experienced than Mr. Gibney.  He was not even --

4    Mr. Gibney was not even an engineer, but basically a salesman

5    and later an executive.  Here's the kind of expert he was.

6        When I crossed him, he admitted he could not explain flow

7    sheets:  (reading)

8            "All I really know is the pieces of equipment and how

9        they fit together."

10           "All I really know is the pieces of equipment and how

11       they fit together."

12       That's some expert.  That's someone I believe over

13   Mr. Cooper.

14       Mr. Cooper, on the other hand, was an experienced

15   engineer.  He's the only one who testified who actually worked

16   in the Ashtabula plant and been in the Ashtabula plant.

17   Mr. Cooper testified not only can you but he actually has

18   gotten the dimensions of DuPont's flue ponds using

19   Google Earth, particularly Edgemoor plant.

20       Now, Mr. Axelrod got a little, and I can explain -- I

21   understand why he was a little excited about Mr. Cooper,

22   because he confronted Mr. Cooper about that and Mr. Cooper

23   said -- he said, you know -- he said to Mr. Cooper, "You're

24   trying to tell me that you think you can get the dimensions off

25   Google Earth?"

1    What was Mr. Cooper's response?  "Not only can I, I did."

2  And he explained in 20 hours -- it took him 20 hours, but he

3  measured it out, even diameters of the plant -- diameters of

4  the pipes.  What kind of trade secrets are that?

5    He also testified -- Mr. Cooper testified from patent

6  information, which is public information, you can determine

7  flue ponds about any DuPont facility.

8    So then Mr. Cooper testified that Jinzhou plant, which had

9  been built and operating before Mr. Maegerle retired from

10  DuPont, has a flue pond with square elbows.  Remember, they

11  were making a big deal about those elbows they showed?  Those

12  have been in existence a long time.

13    And what does that do to the picture that Mr. Dayton

14  identified?  Do you remember the pictures that Mr. Maegerle

15  has.  They haven't shown you who took them, when they were

16  taken, or what plants they were; nor have they gone through

17  each of them and told you, "Boy, this is a trade secret.  This

18  is really important."

19    They showed you a couple of them, a flue pond, an empty

20  flue pond.  Come on.  I even said to I think it was Chang, "All

21  that is is a retaining wall."

22    He said, "Yeah.  I can do that basically blindfolded."

23    And then you want to talk about the pictures?  Mr. Dayton

24  testified that -- and they've made a big deal out of that

25  Mr. Dayton testified and Mr. Cooper.  Mr. Cooper says you can

 1   get more information than Mr. Dayton said out of the picture

 2   from the chlorinator.

 3       But you look at that picture of a chlorinator, that

 4   chlorinator, and they say, "That's not a trade secret.  DuPont

 5   wasn't exposing anything."  Look at the other -- look at the

 6   pictures Mr. Maegerle had at his house.  You tell me if that

 7   picture of that chlorinator isn't a lot more detailed, a lot

 8   more important than anything Mr. Maegerle has with the pictures

 9   of boats going by, and things like that.

10           THE COURT:  Mr. Froelich, is this a good time to take

11   a stretch break?

12           MR. FROELICH:  Yes, Your Honor.

13           THE COURT:  Let's get up and stretch.

14                   (Pause in proceedings.)

15           THE COURT:  All right.  Please be seated.

16       You may continue, Mr. Froelich.

17           MR. FROELICH:  Thank you, Your Honor.

18       Mr. Cooper also testified and gave us more reasonable

19   doubts.  He testified that SCM had made public disclosures of

20   DuPont's TiO2 technology.  He testified eight different

21   Ashtabula flow process diagrams in DuPont's TiO2 process were

22   on the Internet.

23       Remember, the flow diagrams are not in the Basic Data

24   Book -- the document -- excuse me -- the Basic Data Document,

25   but only referenced in the Basic Data Document.  It's one of

1    the documents engineers have to get.

2        Mr. Cooper testified the particular operating process of

3    the Ashtabula plant can be found on the Internet, which, again,

4    makes it public -- the processes public.  Cooper said that he

5    saw this information on the Internet as early as 1989.

6        And that's a good date, an important date, because the

7    confidentiality agreement runs for 15 years.  Now, the

8    confidentiality agreement is dated in 19- -- that

9    Sherwin-Williams had, that was in 1980 -- 1967; and you add 15

10   years, it's 1982.  But there's a provision in it that says it

11   really doesn't start until the first batch of TiO2 is produced.

12   So give it a few years, and maybe '85, '86, it runs '89 is what

13   he had on the Internet.

14       He also testified that patents for DuPont's oxidation

15   reactor at its Antioch plant were publicly available off the

16   DuPont patent.

17       He was asked by the Government, challenged by the

18   Government, "Give me the output of each DuPont plant today."

19   And he gave it to him.  Mr. Cooper testified that there's a

20   recognized expert on TiO2 that has written a manual on TiO2

21   technology.

22       Based on his testimony alone and the sale of the TiO2 --

23   of its TiO2 technology to Sherwin-Williams -- and there's other

24   evidence that I'll show you -- it's clear it's not a trade

25   secret, DuPont's TiO2 at least, and most of it or all of it is

1  publicly or reasonably acceptable or obtainable.

2      The Government's expert, Mr. Gibney again, he testified,

3  when I cross-examined him, that there are consulting

4  companies -- and I hope you remember this -- with ex-DuPont

5  employees who provide information to the TiO industry and

6  DuPont's competitors.  Some of the information includes the

7  tons per hour each DuPont plant produces, the raw materials

8  DuPont uses in each plant, what it costs DuPont to manufacture

9  a ton of TiO2, how much chlorine it costs that DuPont uses per

10 ton.

11     Gibney testified that these consulting companies use a --

12 and you've heard me mispronounce a lot of names, I'm going to

13 kill this one -- stoichiometric model in their computers which,

14 with the above information, allows them to tell TiO companies

15 the size of DuPont's chlorinator and oxidation.

16     Now, that's what he testified to.  Now, they jumped on him

17 on redirect, but that's what he testified to when I

18 cross-examined him.

19     Gibney also testified that he went to Google Earth and

20 determined the size of DuPont's DeLisle plant's flue pond, and

21 it had serpentine pipes and he actually measured their lengths.

22     Further, he testified you can look at Google Earth and see

23 that DuPont's DeLisle plant, for example, has two oxidation

24 units.

25     He testified that DuPont has separate flue ponds for each

1    lines of the DeLisle plant, and that they could be measured off

2    Google Earth.  And he had measured DeLisle piping off

3    Google Earth, though he said he couldn't get the -- he could

4    measure lengths and things likes that, but he couldn't get

5    the -- he said the width of the pipe.  Mr. Olson said -- I

6    mean, excuse me, Mr. Cooper said now he can do that.

7         One important thing that Mr. Olson testified to.  If you

8    remember, Mr. Olson was pretty high up.  He was a DuPont

9    vice president.  He testified that when DuPont's going to build

10   a new TiO2 plant, it publicizes the cost of the plant and the

11   number of employees who work at the plant so that the

12   information is in the public domain.  It's not a trade secret.

13   It's in the public domain.

14        The Government has showed you some documents about

15   DuPont's -- internal DuPont documents about confidentiality,

16   and they've relied on this to boost their confidentiality

17   argument.  And I say to you, when you read them real close,

18   they really don't help the Government.

19        Exhibit 843 is a 1985 memo entitled "Design Division How,"

20   and there's no evidence that Mr. Maegerle ever saw it.  But I'm

21   going to go -- hold one second on those.

22        But the page 1 of the memo states that DuPont managers

23   have the ability and have the authority to determine what

24   information DuPont's contractors and contract employees

25   receive.  The memo provides that DuPont project managers, like

1    Mr. Maegerle, and supervisors can give any and all documents

2    containing DuPont's TiO technology to contractors and

3    consultants with the only provision being they keep a record of

4    what documents they provide to the contractors and employees.

5         Now, I would like to show, if you can, page 2.

6         And this is the kind of security that's in that memo.  The

7    memo provides:  (reading)

8              "A contract employee is permitted to work on a DuPont

9         site," that's a plant, "only in the company of a DuPont

10        Design Division employee or by agreement (preferably in

11        writing)."

12        You don't even need to have an agreement in writing or any

13   agreement.  As long as -- you can bring a consultant.  You can

14   walk him around the plant.  You can do whatever you want

15   according to this memo that's a DuPont memo.  According to

16   this, you can read this.  It's not something I made up.  All

17   they had to do was have another employee with them.  In other

18   words, there's no requirement for an agreement, no less a

19   written agreement.  What kind of protection is that?  How is

20   that for confidentiality?

21        The memo has a list of security classifications; however,

22   when I went through it, I noticed, and you might want to take a

23   look, one of the classifications, A, it's missing from the

24   document.  There's only a handwritten note on it.  Why is that

25   portion not there?

**CLOSING ARGUMENT / FROELICH**

1       Let me read -- you see, there's a letter attached to that
2   dated February 18th, 1985, from Mr. Clark.

3       Can we pull that up, please?  And can we blow up what it
4   says, the first paragraph, please?

5       What it says is:  Attached is a letter from Charles
6   Baker [sic] describing the fact that all, all, design is now
7   being done by contract employees.  This will result in
8   substantially increased infusion of our chloride TiO technology
9   into the mainstream of chemical engineering and this is not
10  acceptable.

11      It's already in the mainstream it says.  This is a DuPont
12  document.  I'm not making this up.  It's already in the
13  mainstream.  Now it's going to be an increase.  That's what
14  Mr. Cooper's testimony is.

15      And you know what?  Just -- I'm going to get away from my
16  notes for a minute.

17      Do you remember the arguments that the Government made to
18  you that:  Why would you hire consultants?  You had the ability
19  to do it all yourself.  Why would they hire Mr. Wu at USAPTI?
20  Why would any company do that?  If you have all the experience,
21  why do you need consultants to design something?

22      Consultants are doing all -- not this part (indicating);
23  not this part (indicating) -- all of the design for DuPont.
24  What does that tell you?  DuPont even can't design its own
25  plants, and it's got trade secrets?  Come on.  Give me a break.

1      If you read through those documents, it shows that, like,

2  1987-1988 they're saying we don't have -- they've testified

3  about all this stuff -- they don't even have educational

4  programs, and we recommend that we start educational programs

5  for our employees.  Why do you do that?  Because you know

6  things are going out the door.

7      You know, and they -- you know, you have to wonder why the

8  Government didn't bring in some of these employees to say,

9  "Hey, we've got these contracts.  We got this."  Why not?

10 Reasonable doubt.

11     DuPont's own documents show that this technology was

12 publicly available.  It was in the mainstream.  The horse, as

13 counsel said, the horse was out of the barn.  Tough to put one

14 back in.  That's what the Government's been trying to do.

15     Remember the testimony of Paul Cooper, the one they jumped

16 on.  He didn't know what he was talking about.  DuPont's

17 technology was easily accessible in the public and had been out

18 in the mainstream.  DuPont document.  DuPont document.

19     Let's talk about contractors and consultants again for a

20 minute.  We've talked about the internal documents that I've

21 shown you, and that DuPont contractors and consultants had

22 access and ability to have all DuPont's TiO2 technology because

23 we know they're doing all the work.  They're designing all the

24 plants.  DuPont doesn't do that anymore.  DuPont's out of that

25 business.

1    Mr. Dayton, the DuPont executive, testified DuPont used

2    contractors and consultants on their projects because, as those

3    memos say, DuPont cut back on its Engineering Department in the

4    1980s.  It didn't only cut back, it's gone basically.

5    DuPont testified when consultants and contractors finished

6    their work with DuPont, they went to work for other TiO2

7    companies.  That's what he testified.

8    Mr. Gibney testified that noncontracting employees also do

9    TiO2 work, and they had no confidentiality agreements.  Gibney,

10   expert.

11   I hope you remember my cross-examination of Mr. Dayton

12   because what he said was:  Confidentiality agreements with

13   contractors and -- DuPont's confidentiality agreements with

14   contractors and consultants have expiration dates on them.

15   Expiration dates.  That means there's (indicating).

16   That's what Maegerle has been consistently saying;

17   contractors and consultants have access to all of DuPont's TiO

18   technology and they had five-year agreements.  That's what he's

19   been saying.  You've seen it.  He's told everybody that.

20   Mr. Dayton testified that he knew Dan McIntosh and that

21   McIntosh was a consulting engineer for DuPont in the TiO2

22   process, and McIntosh invented the reserve jet storage used by

23   DuPont in the TiO2 process.

24   The Government never brought in any agreement from

25   McIntosh with DuPont.  Why not?  Why not?  Why didn't they

1    bring in Mr. McIntosh?  Do you want reasonable doubt?

2    Reasonable doubt?

3         And you want to talk -- I want to go back and talk about

4    experts for a minute.  Mr. Dayton, you want to talk about his

5    credibility.  Mr. Dayton said that the only time DuPont has

6    ever had an agreement with a company -- given away or talked

7    about its TiO2 technology -- it's never had partners.  It never

8    wanted to do any of that.  It would never do that.  And that

9    the technology, they just didn't do partners.  Well, you

10   remember my cross-examination of him?  "What about the Altamira

11   plant?"

12        "Oh, well, that was when we had -- that's when it was a

13   sulfate plant, and we got rid of that partner."

14        I said, "Don't you have a partner in the TiO plant?"

15        "Well, no."

16        I said, "Didn't you have a partner in the TiO plant?"

17        "Well, yes, we did in the TiO plant -- TiO2 plant, but he

18   went bankrupt and the bank took over that partnership."  That's

19   what he said after denying they didn't have partners after

20   cross-examination.  So that gives you a little bit about -- you

21   want to talk about credibility, you want to talk about experts.

22        I also think that we've shown that the evidence shows that

23   it's not the design of the TiO2 plant that gives DuPont the

24   advantage over its competitors.  DuPont's trade secret

25   competitive advantage is, it uses low-grade ore.  Mr. Gibney

1   testified DuPont's advantage was it was low-grade ore which

2   gave it a lower cost than its competitors.

3        Mr. Dayton again testified low-grade ore was critical to

4   the DuPont process.

5        Agent Ho testified DuPont told her its advantage over its

6   competitors -- remember I crossed her about it -- was it could

7   use low-grade ore.

8        Mr. Olson, DuPont's vice president, testified the

9   advantage was -- DuPont's advantage was it could use low-grade

10  ore.

11       No Government witness testified to any particular portion

12  of DuPont's TiO2 process technology that gave it an advantage

13  over its competitors.  None.  So they've come out and they've

14  thrown this big ball at you.

15       Mr. Cooper testified, again, the competitive advantage was

16  that it had experienced personnel to operate and maintain its

17  plants.  Mr. Olson also testified to this plant; and

18  Mr. Maegerle tells Mr. Liew that when that -- on his thoughts

19  on the civil Complaint filed by DuPont.

20       Let's talk about the Basic Data Document, Exhibit 161.

21  The Government charges that the entire document is an alleged

22  trade secret.  The Government has to prove that beyond a

23  reasonable doubt, that Mr. Maegerle believed that the entire

24  Basic Document is a trade secret.

25       I submit the Government charged that the entire Basic

1 Document as a whole, you know, they can't prove that.  They

2 haven't proved it, and I'll show you that they haven't proved

3 it.

4     First of all, we've never denied -- I've never denied --

5 and I've told you from the opening Mr. Maegerle had notes from

6 that.  Mr. Maegerle did not possess the entire document, and

7 there's several problems with the Government's position.

8 Besides, the evidence doesn't support it.

9     What do we know from the Basic Document?  First of all, as

10 the Government has admitted, this is Mr. Maegerle's document

11 (indicating).  They didn't find it in his house.  DuPont

12 produced it.  Look at it.  It's 500 some odd pages.

13     So the Government, I guess, has fallen back on that my

14 client, Mr. Maegerle, in 1985 said, "Ooh, I'm going to be

15 involved in a conspiracy.  I'm going to copy 500 pages and take

16 it home."  Come on.  It doesn't make sense.  You've got common

17 sense.

18     Now, what do we know?  We know it does not state on its

19 face that it's a trade secret.  Okay?  DuPont didn't stamp it

20 "Trade Secret."  So that -- we know that, first of all.

21     We know that only the first two pages have "Confidential"

22 on it.  Nothing else is stamped "Confidential."  Nothing.  Now,

23 there is a statement, I agree, that says it's confidential.

24     What it does state, I think it's page 35, that there are

25 trade secrets within this document.  So that statement says, in

1    effect, this whole thing is not a trade secret.  Because it

2    says there were some trade secrets in it, that makes this whole

3    thing not a trade secret.

4        But, more importantly, there's not a stamp on any page

5    that says "Trade Secret," "Trade Secret," "Trade Secret."  Not

6    one.  Not one.

7        So how are you supposed to know what's a trade secret?

8    We're going to talk about that in a few minutes.  It's a

9    preliminary document.  It states that -- it states that on

10   every page for a plant to be built in Asia, initially Taiwan.

11   We know when the Basic Document was issued.  The testimony is

12   and it says in the book.  In October of 1985, the Kuan Yin site

13   was not even on DuPont's radar.  It refers to two other sites,

14   and I got Mr. Dayton to admit that.

15       We know the Basic Document was numbered so DuPont would

16   know who had each Basic Document and they'd know what would

17   happen to each Basic Document.  Why else would you number it?

18       Why did no one come in to testify that Maegerle never

19   turned in his numbered Basic Document when he retired from

20   DuPont?  In fact, I showed you why.  Right there (indicating).

21   He turned it in.  How's that for reasonable doubt?

22       What else do we know?  We know that DuPont's witnesses

23   have testified that critical information was not in a Basic

24   Document, Basic Data Document.  Electrical diagrams aren't

25   there, equipment diagrams, flow sheets, design data sheets, to

1  name a few.

2      You can look at the document and see, as witnesses

3  testified, critical documents, some of which are referenced in

4  there, others are not; and an individual needs to go and say,

5  "Oh, I see B47214, and I have to go to the Engineering

6  Department or I have to go to the Design Department to get

7  that."  We know because the document itself says it, and I got

8  Mr. Dayton to admit it, that this document contains no new

9  DuPont TiO technology.  It says it and we got testimony on it.

10      We know that the Basic Document has no revisions; and, as

11  I said, it refers to a 60,000 plant -- 60,000-ton plant.

12      We know Mr. Maegerle left the project before the Kuan Yin

13  plant was built.  He went to DeLisle, Mississippi.  Exhibit 722

14  will prove that.  Mr. Dayton testified to that.  We know that

15  he went to the Korea project that was never built, and

16  Mr. Dayton testified to that.

17      We know that Maegerle retired in 1991 before the Kuan Yin

18  plant was built.  Mr. Olson testified the plant did not start

19  operating until about 1994.

20      We know that the plant DuPont built in Kuan Yin was not a

21  DuPont plant from the Basic Document.  I've already told you

22  Mr. Olson, the vice president, said that, according to him, the

23  plant that they eventually built was 160,000 tons to

24  200,000-ton, not the 60,000-ton plant.

25      We know that the Basic Document lists two pages of

1    consultants that they would use to build the plant.  Remember,

2    they're not building their plants.

3        We know that the Basic Data Document contains a lot of

4    publicly available information.  I got Mr. Dayton to admit

5    that, and I showed him some things about the aluminum pellets,

6    the weight of aluminum pellets.  And he said, yeah.  And they

7    even reference a chlorine pamphlet document.  Remember I went

8    through that with him?

9        We know that the plant -- the Data Document, contains

10   numerous references to the Antioch plant.  I've already said

11   that it doesn't state anywhere in the document what's a trade

12   secret.  We know that the information was from 1985 or earlier.

13       And we know that it was basically a reference document

14   that you looked at, and then you went and got information from

15   that.

16       I want to remind you of a few things about Mr. Dayton's

17   testimony.  He admitted that just because something was stamped

18   "Confidential" and not marked "Trade Secret," it did not make

19   it a trade secret.

20       Look at Exhibit 722 seized from Maegerle's home, and

21   you'll see that DuPont stamped almost every document

22   "Confidential," including letters to Mr. Maegerle.

23       Mr. Dayton testified that a trade secret was something so

24   important, it never had to be revealed to a competitor.  Okay?

25   I'm going to show you everything's been revealed to a

1   competitor.

2        You should remember, and I'll go through it again,

3   Agent Ho's testimony, that DuPont told her that the Kuan Yin

4   plant was based on DuPont's Antioch plant.  That's what DuPont

5   told her, that the Kuan Yin plant was based on the Antioch

6   plant.  Antioch.

7        Mr. Dayton testified that DuPont's Antioch and Ashtabula

8   plants were the same plants, and we know that DuPont's

9   competitors had all that TiO2 technology.

10        Look at DuPont's contract with Sherwin-Williams.  It

11  revealed everything, not only how you build the plant but about

12  all their processes, the standards, and everything else, how to

13  run and maintain a plant.

14        Mr. Dayton never testified as to what TiO technology was

15  revealed in the Basic Data Document that was different than

16  DuPont's TiO technology today.

17        He admitted that critical DuPont documents and information

18  were not in the Basic Data Document.  He admitted there was no

19  new technology in the document, and there was a lot of public.

20        Now, this is what really we got to it.  Mr. Dayton

21  testified you could not build a plant based just from the Basic

22  Data Document.  Again he referred -- he said that it was a

23  reference document and the engineers -- to show engineers where

24  critical and essential documents were available at DuPont's

25  Design Center and Engineering Department.

1        This is what -- you want reasonable doubt?  Importantly,

2   Mr. Dayton testified that in 1992, he had to put together a

3   committee -- do you remember this?  I got him to -- that

4   revised how DuPont developed its Basic Data Document.  He

5   established guidelines.  Why?  Do you remember why, what he

6   said?

7        The last three DuPont plants that were built using

8   documents that were even -- that were referenced -- that you

9   got that were referenced in the Basic Data Document that you

10  had to go to work -- that you had to go to get did not work.

11  He said the pieces did not fit.

12       How can there be a trade secret in a Basic Data Document

13  when the documents referenced therein but are not in the

14  documents do not even allow DuPont to build a plant where the

15  pieces would fit?  Maybe that's why they don't have a Design

16  Department anymore.  Maybe that's why they have their

17  consultants.

18       How can anyone know for sure what part of this is a trade

19  secret when it's not stamped?

20       I want to very briefly talk about they showed you that

21  chart, Mr. Dayton went through it, Exhibit 161.  A lot of it

22  were duplications, and a lot of it -- you'll see that

23  approximately 10 of them have no reference to Kuan Yin or

24  Taiwan, but Mr. DuPont -- Mr. Dayton said the information was

25  consistent with what was in 161.

**CLOSING ARGUMENT / FROELICH**

1    Well, you know my client is experienced and everything

2    else.  At DuPont he built all -- he was at all their plants.

3    He helped at all their plants.  And remember Mr. Dayton said

4    that Mr. Maegerle could probably design much of a TiO plant for

5    himself.

6    We've never admitted -- we've never denied, I mean, that

7    he's had portions -- or had notes from those, but there's no

8    evidence that he copied an entire 500 pages; and I would say

9    that there's evidence that support that -- that supports he

10   didn't.

11   Look at Exhibit 63.  And Maegerle in 2008 -- do we have

12   that? -- writes to Jack Sheehand, an ex-DuPont employee, and

13   states:  I tried to design a China 3,000-ton -- 30,000-ton

14   oxidation reactor from memory.  Enclosed is my first attempt.

15   And he asks Mr. Sheehand to review and comment on the design.

16   He's trying to do it from memory.  If he has the Basic

17   Data Book that contains all these trade -- Basic Data Document

18   that contains all these trade secrets, why is he doing that?

19   Exhibit -- you can look at Exhibit 63, same type of thing.

20   He's indicating that he's using his memory.

21   Another thing about common sense.  You've got this -- if

22   you've got this Basic Data Document, if you made the copies of

23   it and you're in this criminal conspiracy -- okay? -- why

24   aren't you just faxing or e-mailing?  Why aren't you just

25   e-mailing the pages to Mr. Liew or USAPTI?  Why are you working

1   and writing all this stuff and handwriting all this stuff?  Why

2   would you be doing that?  It would be easy.

3        I mean, he's a criminal guy.  Criminal guy.  Why not --

4   why not just say, "Stop calling me.  Give me a lot of money and

5   let me bring this thing here and just drop it.  Just send me my

6   check."  I mean, it's common sense; right?

7        Look at Exhibit 46.  That's -- we don't have to pull that

8   up, but that's -- I'm going to talk about it in a few minutes,

9   but Mr. Maegerle gave that to the FBI in his home; and it has

10  all -- I think there's 95 or 85 or 75 pages to it.  There's two

11  references.  There's a reference to Kuan Yin -- there's a

12  reference to Kuan Yin and there's a reference to Taiwan.  But

13  he turns that over to the FBI.  There's sketches, all kinds of

14  sketches.

15       Look at Exhibit 165.  That's Maegerle's conceptual design

16  of the spray machine.  Okay.  And what does he -- how does he

17  do that?  He communicates with a retired DuPont maintenance

18  supervisor.

19       That shows you two things.  DuPont people are talking.

20  They don't think they're obligated.  And are you going to talk

21  to DuPont people if you're in a criminal conspiracy?  And if

22  you've got the Data Book, why are you calling someone to find

23  out what the data is?

24       You also heard that Mr. Maegerle didn't do all the

25  conceptual designs.  For example, Mr. Zisko said that he was in

1   charge -- that he, Mr. Zisko, was in charge of chlorination on

2   the Jinzhou project and he wrote the specifications for the

3   equipment.  He testified he had -- that the chloride-route

4   plant at Jinzhou had a chloride-route plant in China with

5   experienced engineers who had input on a design in a 30,000-ton

6   plant.

7        Why do you bother with Jinzhou if you have all this stuff?

8   Why would he do all the work?  Why would he do all the work?

9   Because he didn't believe he was in any criminal enterprise.

10  He didn't think he was selling or stealing any trade secrets.

11       Also, you have to remember that he didn't hide to anybody.

12  Everybody you heard from that worked at USAPTI, he told

13  everybody he met, "I'm an ex-DuPont engineer with all the

14  experience, TiO2 experience."  So why would he do that?  Why

15  wouldn't he just hide in the shadows?

16       And the other thing is, if you will look at some of the

17  e-mails that had Taiwan and Kuan Yin on them, and he's sending

18  them to Chang -- I know I'm going to butcher his name, it began

19  with a B -- Brijesh Bhatnagar, I think it was, along those

20  lines, and Patel.  Why are you sending them to USAPTI employees

21  and telling them it's Kuan Yin?

22       And, remember, by the time he starts -- Mr. Maegerle

23  starts working at USAPTI -- USAPTI -- USAPTI, it's about

24  1984-19- -- excuse me, 2004-2005.  He's out of DuPont since

25  1991, 13, 14 -- 13, 14 years.

1          Let's just try to get through a little quicker, but the

2     evidence shows Maegerle did not believe he was providing trade

3     secrets.  One, he was contacted, as I said, by Condux to be a

4     consultant.  Condux business is, as everybody knew there and

5     everybody shows, hiring ex-DuPont experts.  Neither Arbogast or

6     any other employees who were contracted -- contacted by Condux

7     had any hesitation about consulting on a TiO2 project.

8     Mr. Gibney told you that he knew about it, he knew about

9     Condux.  Everyone -- as I told you, he told -- Mr. Maegerle

10    told everybody who he had worked for.

11         Experienced businessmen as Peter Zisko and Steve Amerine

12    stated.  They had no hesitation with working with Mr. Maegerle.

13    Even though they knew he was an ex-employee, they asked him

14    questions about what he did at DuPont.  And Mr. Zisko says

15    that, and he told you, that back in 2004 Mr. Maegerle said he

16    could consult and that he had even cleared it through a lawyer.

17         There's no -- you've got to remember he's saying these

18    things, and there's no civil suit, there's no federal

19    investigation.  That's coming seven or eight years later.

20         Mr. Maegerle contacted numerous ex-DuPont employees and

21    told them he was working as a consultant designing a TiO2 plant

22    in China.  Who does that if you're in a criminal conspiracy?

23         He asked DuPont employees for help, and if they wanted to

24    work for USAPTI.  Look at Exhibit 741 that shows that

25    Mr. Maegerle recommended Jim Wheeler to USAPTI who is working

1    as a consultant on DuPont's Edgemoor plant.  Why would you do

2    that if you're in a criminal conspiracy?

3         Look at Exhibit 63.  He contacts Jack Sheehand about

4    working on a TiO2 project.

5         Look at Exhibit 698.  That's a letter from Mr. Pezone, the

6    former DuPont employee that Mr. Maegerle contacted about

7    working on a project.  What's Mr. Pezone's reply?  Not that, "I

8    have a lifetime agreement.  I can't do this"; but he didn't

9    think it was ethical because after he had retired from DuPont,

10   he was working as a consultant on a new product.

11        Look at 779.  That's an e-mail to Mr. Maegerle that

12   Mr. Liew had found a consultant engineer who was working in

13   Australia but had worked on the Kuan Yin plant for DuPont and

14   was willing to provide information.  If the consultant was

15   bound by some agreement, why was he willing to do that?

16        Mr. Livingston, now, he had an ex-DuPont employee come to

17   him with DuPont information.  Mr. Livingston said he wasn't --

18   he wouldn't take it, but it's another example of people from

19   DuPont out with information.

20        Remember, there are two other TiO experts working on the

21   project, Dan McIntosh and Tim Spitler.

22        And look at Exhibit 1004 again, that letter.  Mr. Arbogast

23   says -- he writes to Mr. Marinak that he had contacted one

24   individual that could offer a great deal of assistance relative

25   to chloride process having spent most of his career in

 1  technical work -- in technical work, operations, and management

 2  at one of DuPont's manufacturing plants.  Unfortunately, he

 3  feels uncomfortable.

 4      He doesn't say, "Unfortunately, I have an agreement that I

 5  can't work."  Unfortunately, he feels uncomfortable guiding a

 6  competitor around the minefields of critical separations and

 7  exotic materials.  But he says -- at the end he says, "I may

 8  try to contact him again, perhaps later if really needed."

 9  Where is anybody saying, "Oh.  Oh"?

10      So, you know, Maegerle contacts at least four other

11  individuals who worked for DuPont to discuss the TiO.  He tells

12  everybody.  Is that reasonable doubt?  Does that sound like

13  everybody who was involved in a conspiracy?

14      USAPTI even advertised at one point that -- on the

15  Internet that it had ex-DuPont employees who were TiO experts.

16      I'm going to want to talk very quickly, I don't want to

17  spend too long, but there's --

18          THE COURT:  Maybe before you do, this would be a good

19  time to break.

20          MR. FROELICH:  It's actually a perfect time,

21  Your Honor.  A great time.

22          THE COURT:  All right.  Thank you.

23      So, ladies and gentlemen, we're going to take our last

24  break.  So remember we're going to, if we need to, 2:15.  You

25  agreed to do that.

1    And we'll see you in 15 minutes.  Keep in mind the Court's

2  instruction.  Keep an open mind and don't discuss the case.

3       (Proceedings were heard out of the presence of the jury:)

4       **THE COURT:**  How much more time do you have,

5  Mr. Froelich?

6       **MR. FROELICH:**  I think I'll get through within a half

7  hour, Your Honor, I think.

8       **THE COURT:**  Okay.  Great.  All right.  15 minutes.

9            (Recess taken at 11:42 a.m.)

10           (Proceedings resumed at 12:00 p.m.)

11      (Proceedings were heard out of the presence of the jury:)

12      **THE COURT:**  Please bring the jury in.

13      (Proceedings were heard in the presence of the jury:)

14      **THE COURT:**  Please be seated.

15  You may continue, Mr. Froelich.

16      **MR. FROELICH:**  Thank you, Your Honor.

17  Just I wanted -- before I move on to another topic, I just

18  wanted to restate again, and I think I may have, that when

19  Agent Ho was on the stand, I asked her about what DuPont told

20  her its advantage was over its competitors, and she said it was

21  the use of low-grade ore.

22  You have to ask her why -- you have to ask yourself:  When

23  we're talking about trade secrets, why didn't DuPont tell her

24  its competitive advantage was its superior TiO technology?

25  That's what the investigation is about.

 1          The last two people I want to talk about, and I saved it

 2     for last, is, first of all, Agent Pattillo.  I did this because

 3     I think that her testimony illustrates a lack of intent to

 4     commit a crime and raises reasonable doubts by both the

 5     evidence and lack of evidence; and contrary, I submit to you,

 6     from what Mr. Axelrod argued to you, that my client lied and

 7     that he was hiding and he was making up a story.

 8          I think when we review what was said, not only on direct

 9     examination but on cross-examination, you're going to find

10     totally -- the facts are totally different than what

11     Mr. Axelrod imparted to you.

12          If you remember, Agent Pattillo, a very nice woman,

13     testified on direct examination that eight to ten agents were

14     on the FBI search team that went to search Mr. Maegerle's

15     residence in Delaware in a cottage he owned across the street

16     from the residence.

17          Agent Pattillo is from Delaware.  There was another agent

18     with her -- now you know from now I murder names --

19     Agent Koblitz, who is stationed here in the San Francisco area.

20     They went to Mr. Maegerle's house, according to her, knocked on

21     the door.  Mr. Maegerle answers the door; and they tell

22     Mr. Maegerle they've got an ongoing investigation.  She

23     couldn't remember exactly what she said.  It was about theft of

24     trade secrets from DuPont, and they'd like to talk to him.

25     Maegerle doesn't shut the door.  He didn't say no.  Maegerle

1    says, "Come on in."  He invites them in.  And they talk,

2    according to her, Agent Pattillo testified they talk to

3    Mr. Maegerle for about an hour.

4        She says that -- she testified he worked for DuPont.  He

5    told her that he worked for DuPont from 1960 to 1991.  Do you

6    think Mr. Maegerle forgot when he started working at DuPont, or

7    do you think that maybe Agent Pattillo's memory wasn't correct?

8    We'll talk about her memory in a few minutes.

9        Mr. Maegerle talked about the last two major jobs he did

10   with DuPont; those jobs being DeLisle, Mississippi, and Korea

11   plant that was never built.  That's what he tells her.  And if

12   you look at the exhibits and testimony in this case, again,

13   he's correct.

14       Mr. Maegerle tells the agents that the majority of his

15   work at DuPont was TiO1 -- TiO2, and he talks about

16   Gaylord Chemical.

17       He talks about Kemira, a TiO2 company, and how he and

18   Oliver, an engineering firm in Atlanta where I'm from,

19   contacted him to consult on Kemira.  And he tells them that he

20   talked about seeking approval from DuPont about Kemira, and

21   that he wrote a letter to Mr. Dakin.  And the Government found

22   that letter eventually, and it's Exhibit 54.  And I've already

23   mentioned something about that, and we're going to talk about

24   that in a little while.

25       Mr. Maegerle, he tells the agents that Mr. Dakin called

 1  him and told him that DuPont had no objection to his consulting

 2  on TiO2, but would not put anything in writing.  This is not

 3  the first time Mr. Maegerle made that statement.  As you know,

 4  he replied to the Complaint, and he replied to Mr. Liew.

 5       And the evidence shows that he also made that -- he was

 6  making statements as early -- like that in 1997.  I mean, no --

 7  no civil suits, no federal investigation.  You can go back to

 8  1997.

 9       Interesting is that if you look at a lot of the documents,

10  you see Mr. Dakin is on a lot of the DuPont documents.  And I

11  didn't get a chance to cross-examine him here, because the

12  Government didn't call him.

13       Maegerle talked about Condux and how he met Walter Liew in

14  1997.  He started a consulting relationship 1994 to 2011.  He

15  said he consulted from 1997 to 1998 for USAPTI through Condux,

16  and then earned -- concerning a TiO2 project in China, which

17  never materialized.  He said another ex-DuPont employee was

18  involved, but was reluctant to identify him.

19       Mr. Axelrod in his statement said -- closing argument said

20  that Mr. Maegerle didn't identify any ex-DuPont employees.

21  Well, that's not what the agent testified to; that she

22  testified to he was reluctant to identify anyone.  And I think

23  you would be reluctant to identify anyone with all the FBI

24  crawling all over your house.

25       Later he did identify Dan McIntosh.  He told the agents

1  about the 1998 meeting in California, and that the contract did

2  not materialize, and it was with a Chinese client who built a

3  plant in China that didn't go through.

4      He told the agents that he had another contact from

5  Mr. Liew in 2005 about Jinzhou, and that it was a Chinese

6  company.  They wanted a 30,000-ton plant, and that they already

7  had a chloride-route plant up and running, Jinzhou did.

8      Agent Pattillo claimed that Mr. Maegerle did not mention

9  Kuan Yin or Taiwan, and we'll talk about that in a little

10 while.

11     He also mentioned that he did not mention Tim Spitler, and

12 remember Mr. Spitler is dead.  Maybe he -- and maybe he did and

13 maybe Agent Pattillo forgot.  You'll see Agent Pattillo can

14 forget important names; and I would say that overall when you

15 hear what was really going on at the time, you might understand

16 why Mr. Maegerle might forget or not remember everything --

17 everything that's happened in this courtroom.

18     Mr. Maegerle told the agents that Jinzhou's design was

19 based on Ashtabula, Ohio.  The plant was built for DuPont in

20 the 1960s, and it was sold to Sherwin-Williams; and that he

21 believed that the DuPont -- that the sale of DuPont's TiO

22 technology was public knowledge, and that this was not the

23 first time.

24     And as we know, this isn't the first time Mr. Maegerle

25 states this.  Mr. Maegerle talked about the Pangang project,

 1   the 100,000-ton plant in China.

 2       He talked about USAPTI and how the company, he thought,

 3   lacked the skills to complete the job.  Do you say that if

 4   you're in a conspiracy?  And that's what he said.

 5       Mr. Maegerle said he was paid $125 an hour.  And he told

 6   the agents he did not believe DuPont had a very strong civil

 7   case against USAPTI, because the information was public

 8   information concerning DuPont's TiO2 processes, and he gave

 9   them some examples of that public information.

10       He told the agents he turned in all proprietary

11   information back to DuPont at the time he retired.

12   Mr. Maegerle told the agents he retained some information,

13   including memos, but had destroyed them over time; and he may

14   still have some DuPont information, but he didn't believe any

15   of the memos -- that he had any memos in his possession at the

16   time.

17       He told the agents he did not retain the Basic Data

18   Document, but returned it upon his retirement.  He stated he

19   did not provide DuPont proprietary information to lure USAPTI.

20       Concerning blueprints, Mr. Maegerle stated he did not give

21   any pink or blue sheets to Liew.  He said Liew may have gotten

22   the sheets from a contact Mr. Liew had in China who dealt with

23   dealings with DuPont.

24       The Government has argued that Tim Spitler gave the sheets

25   to Mr. Liew, but there's no evidence that Mr. Maegerle knew

1    where Mr. Liew obtained the documents.  There is -- they

2    referred to one document, I believe it's Exhibit 70, where

3    Mr. Liew prepared -- says, basically, to Mr. Maegerle, "Your

4    numbers are wrong, and I've looked at them.  Tim has sent me

5    some kind of notes or a sheet or something," but it doesn't say

6    "blueprints" or anything like that.

7         Mr. Maegerle denied any design information in the Taiwan

8    plant because he said the plant had not been built until after

9    he retired.  And he said -- remember, the -- and, remember, the

10   Kuan Yin plant was originally to be a 60,000-ton plant, I want

11   you to remember, and we know it's at least 160,000-ton plant.

12        We know that Kuan Yin plant was not completed until after

13   1994, three years after Maegerle retired.

14        After an hour, Agent Pattillo told Maegerle they had a

15   search warrant and they were going to search his home.

16   Maegerle had a few questions, but Agent Pattillo could not

17   remember what they were.  They searched Mr. Maegerle's house,

18   but did not find the Basic Data Book.

19        Clearly Mr. Maegerle had provided the agents with an awful

20   lot of information.  You heard that on direct.  But under

21   cross-examination, you heard more of the circumstances of the

22   providing of the information and how much information

23   Mr. Maegerle really provided to the Government.

24        If you remember, I started out my cross-examination of

25   Agent Pattillo, and you learned that after interviewing a

1  witness, sometime after that, FBI agents make a report called

2  an FBI 302, which is a report of the interview.

3      The 302 of Mr. Maegerle's interview was written by

4  Agent Koblitz from the FBI, in the Palo Alto office of the FBI.

5  You learned that Agent Pattillo took no notes -- that

6  Agent Pattillo took some notes, but we don't know how many or

7  what portions of Mr. Maegerle's interview these notes cover.

8      We know that Agent Pattillo -- Agent -- we know that

9  Agent Koblitz did not write the 302 report until several days

10 after he got back to California from Delaware.  We know that

11 Agent Pattillo didn't write a report of the interview, of

12 Mr. Maegerle's interview.

13     We know that Exhibit 722 that is seized at Mr. Maegerle's

14 home contains DuPont's -- I'll go to that in a little while --

15 DuPont's records, which show Mr. Maegerle's last two

16 assignments were DeLisle, Mississippi, and Korea, just as he

17 told them.

18     We know that none of Maegerle's employee agreements -- I

19 cross-examined her -- none of Maegerle's employee agreements

20 for DuPont were in that folder nor were Gaylord Chemical

21 agreements.  None of these agreements were found at

22 Mr. Maegerle's homes.  They were subpoenaed by the Government.

23     Agent Pattillo admitted that the search team actually

24 consisted of 20 agents all armed and having windbreakers that

25 said "FBI."  She testified that the search team was kept a

1   couple miles away from Mr. Maegerle's house when Agent Pattillo

2   and the other Agent Koblitz approached the home and knocked on

3   the door.

4        I asked Agent Pattillo if that was because she did not

5   want Mr. Maegerle to see the search term.  Agent Pattillo, do

6   you remember what she said?  No, they kept them miles away

7   because she did not need the search team at that time.

8        How did she know that?  Suppose Mr. Maegerle refused to

9   talk to her?  They would have had to serve the search warrant

10  right then and there.  Don't you think they kept -- don't you

11  know they kept that team so he didn't -- you know, because they

12  wanted to talk to him.

13       And she admitted that no one wrote down what they said to

14  Mr. Maegerle when he answered the door.

15       She admitted Mrs. Maegerle was at home, was seriously ill,

16  and had a nurse with her the whole time the FBI was in

17  Maegerle's home.

18       She never told Mr. Maegerle they had the search warrant at

19  the house when she spoke to him at the door.

20       She repeated her story she said on direct that they did

21  not tell Mr. Maegerle that they were there to search his home

22  because they wanted to have a good conversation with

23  Mr. Maegerle, and to tell him there was going to be a search

24  would be a very distracting thing.

25       I don't believe that's the reason.  The reason is they

1    wanted to talk to him.  Maybe they didn't want to panic him, or

2    they didn't want him to know what was going on.

3        Agent Pattillo said they spoke to Maegerle for an hour

4    before she told Mr. Maegerle that there was a search warrant at

5    the home.  Pattillo admitted that when she and Agent -- when

6    they entered the home, Mr. Maegerle asked them to step into the

7    office because he didn't want to upset his wife.

8        I believe you heard the cross-examination that

9    Mr. Maegerle left the door open, and I submit it was so he

10   could see his wife who was ill.

11       The agents asked Mr. Maegerle questions, but they didn't

12   write down any of the questions or his answers.

13       They simply -- Agent Koblitz simply made notes of the

14   interview of Mr. Maegerle.

15       Mr. Maegerle told Agent Pattillo he had a book of

16   conceptual drawings of the two TiO plants he had worked on for

17   Walter Liew and USAPTI, and he got and gave the book to the

18   agents.  It's Exhibit 53.  I believe it's 53.  It's got 75

19   pages and it contains only two references to Kuan Yin and

20   Taiwan.

21       He told them he wasn't aware of the ownership structure of

22   Pangang.

23       She admitted he was very cooperative both before and

24   during the search.  He showed her -- I showed her pictures of a

25   bookcase in Mr. Maegerle's office and I asked, "Do you

1  remember" -- I had asked her if she remembered if she looked at

2  the books and manuals in the bookcase.  "No, didn't look at

3  them.  Don't remember looking at them.  Don't know if we seized

4  them."

5      And she testified after they told Mr. Maegerle that they

6  were going to search his home, they moved Mr. Maegerle from his

7  office to the porch and continued talking to him.  Importantly,

8  they never told him he was a suspect.

9      And Agent Pattillo couldn't distinguish between what

10 information Mr. Maegerle provided on the porch versus in his

11 office.

12     From the time the FBI came into his house, Mr. Maegerle

13 was never alone.  They -- Agent Pattillo was not present at the

14 whole time.  Sometimes it was only Agent Koblitz and sometimes

15 it was only Agent Pattillo with Mr. Maegerle.

16     Agent Pattillo admitted that Mr. Maegerle talked to the

17 agents not one hour, four hours.  Four hours.  But she did not

18 make even one note.

19     At one point during the search, Mr. Maegerle told the

20 agents they'd missed one of the computers and one of his cell

21 phones.

22     Importantly, the agent did not tape record the interview

23 of Mr. Maegerle.  Well, they said that's FBI -- FBI doesn't do

24 that.  Well, don't you think when it's an important case like

25 this, when you know there's a possibility you're going to

 1   charge someone, and you're going to stand up here and have an

 2   Assistant U.S. Attorney say you lied, that you sure want it

 3   recorded?

 4        They did not write out a statement exactly what he

 5   asked -- what they asked or what he told them.  They did not

 6   have Mr. Maegerle write out a statement.  They didn't have him

 7   sign a statement.  They didn't have Mr. -- they didn't have

 8   Mr. Maegerle review the FBI 302.

 9        I ask you:  How can you rely on what Agent Pattillo tells

10   you about what she remembers in a four-hour interview that

11   occurred on July 2011 when she didn't make one note of such an

12   important interview, not one note?  And the FBI 302 wasn't made

13   till several days -- we don't know how many days afterwards.

14   How can you not report stuff?

15        In some of the ways, too, Agent Pattillo's statements

16   don't make sense.  How come the -- how come they didn't call

17   the agent that's in South -- San -- Palo Alto?  I'm not from

18   here.  But he's here in California.  He's in the Bay Area.  Why

19   would they -- why did they put up an agent that didn't take a

20   note, that didn't write a report?

21        Agent Pattillo admitted that she remembered that

22   Mr. Maegerle provided other information to the FBI.  He told

23   the agents he believed that since the TiO2 technology was in

24   the Ashtabula plant, it was available.  He told about the sale

25   of the plant to Sherwin-Williams, and the plant had been sold

CLOSING ARGUMENT / FROELICH

 1    to other competitors; that based on this sale, Maegerle --

 2    Mr. Maegerle believed DuPont's technology was in the public

 3    domain.  Maegerle also gave examples of DuPont's technology

 4    that was in the public domain, including the chlorine catch

 5    tank.  Agent Pattillo didn't make -- did not make a list of the

 6    examples Mr. Maegerle gave her.

 7        Mr. Maegerle consistently stated he believed DuPont's

 8    technology was in the public -- TiO technology was in the

 9    public domain.  Mr. Maegerle said he believed that the civil

10    case -- he did not find it very compelling.

11        He told the FBI he believed he was subject to a five-year

12    limitation on DuPont's contractors just as DuPont's contractors

13    and consultants who had complete access to DuPont's TiO

14    technology because after the five years period, the consultants

15    and the contractors had no further obligation to DuPont.

16        He said that he could not -- he believed he could not

17    consult for a DuPont competitor five years.  After that time,

18    he was free to consult with anyone.

19        He also said -- well, as we know, this isn't the first

20    time that Maegerle has made these statements.  There's evidence

21    from as early as 1997.  He told the FBI he still may have some

22    DuPont memos around the house, but they would not contain any

23    proprietary information.

24        I cross-examined her and she admitted he always used the

25    word "proprietary" -- the words "proprietary information" when

**CLOSING ARGUMENT / FROELICH**

1   talking about information from DuPont, and consistently

2   maintained he had not used any proprietary information when

3   working for USAPTI.

4        Agent Pattillo admitted that Mr. Maegerle volunteered to

5   the agents his e-mail address.  Volunteered.  Not only does he

6   give a computer and his cell phone in this, he volunteers his

7   e-mail address.

8        He also gave the names of eight different people who

9   worked at USAPTI.  And, remember, Mr. Maegerle used the terms

10  "Kuan Yin" and "Taiwan" freely in his e-mails, e-mails to

11  USAPTI.  Why would Mr. Maegerle give employees' names and his

12  e-mail address and not tell them about -- not use "Taiwan" or

13  "Kuan Yin."  It could be we don't know what the questions were

14  asked.  It could be she forgot.

15       He gave -- he gave the FBI the name of one of the Pangang

16  executives who USAPTI met with in California.  He gave the

17  background on Dan McIntosh, that he was an ex-DuPont employee

18  who consulted and attended meetings.

19       Agent Pattillo admitted she wasn't even there when

20  Maegerle gave that information to Agent Koblitz.  That happened

21  out on the porch or someplace else.

22       Maegerle told the FBI he had no animosity towards DuPont,

23  and his father worked for and had retired from DuPont.

24       Maegerle told the agents he had retired from DuPont 20

25  years ago and had a DuPont pension.  Again, he repeated he took

1    no proprietary information, and any information he had at this

2    time was 25 years old.

3        Does that sound like a man who, you know, was lying or

4    trying not to cooperate?

5        This is very important.  Agent Pattillo could only

6    remember the name of Dennis Dakin when I asked her did

7    Mr. Maegerle tell the agents about getting oral permission from

8    DuPont to do work as a TiO2 consultant.

9        I hope you remember I said to her -- I asked her, "Didn't

10   Mr. Maegerle give you another name who he talked to at DuPont

11   on another occasion who gave him permission to work as a TiO

12   consultant?"  She said she didn't remember.

13       And I asked her, "Didn't he give you the name Mr. McCullin

14   at DuPont in connection with DuPont's approving his work with

15   the TiO2 technology?"  She admitted she didn't remember the

16   name until I reminded her of it because it had been a while

17   since she had interviewed Mr. Maegerle.

18       Mr. Maegerle, in fact, had given her -- she admitted

19   Mr. Maegerle had, in fact, given her Mr. McCullin's name as one

20   of the people having approved him as a consultant.  Where's

21   Mr. McCullin?  Why didn't the FBI call him?

22       You should ask yourself several questions about the

23   testimony.  How come the agent who was stationed here in the

24   Bay Area was not called?  Is it logical that Mr. Maegerle was

25   involved in a conspiracy to steal DuPont trade secrets, would

 1  give all the information he gave to the FBI in that house, that

 2  he would stay there for four hours?

 3      And if he did forget something -- oh, and he had given up

 4  a computer which they missed, a cell phone, and he voluntarily

 5  gave them his e-mail address.  Voluntarily.  He volunteered it.

 6  And he gave the names.  Why would he do that?  And if he did

 7  miss something, he knew he had a seriously ill wife.  He had

 8  10, 15, armed FBI agents running around his house.  Tell me

 9  you're going to remember everything.

10      So there's one other -- I submit to you that rather than

11  hurting or some argument that Mr. Maegerle's contact with the

12  FBI at his house is in some way that he lied, I submit to you

13  that it shows his innocence, that he cooperated that way,

14  volunteered the things that he did and under the conditions

15  that he did.

16      The last witness I want to talk about, I know you've heard

17  a lot, is Brian McLaughlin.  You may not remember who

18  Mr. McLaughlin was, but he was a very important witness in this

19  case.  He was the head of Human Resources at DuPont.  He was

20  not the custodian of DuPont's -- the custodian of DuPont's

21  personnel records.  That's the person in charge of maintaining

22  and producing DuPont's records in court.

23      Mr. McLaughlin never reviewed Mr. Maegerle's entire

24  personnel file, nor did he ever have it, nor did he bring it to

25  court.

1      What he told you was, under my cross-examination, several

2   weeks before he testified, DuPont's attorneys and some agents

3   called Mr. Maegerle into a room at DuPont's corporate

4   headquarters and showed him a few documents from Mr. Maegerle's

5   personnel file.  And that's all he brought, and we'll talk

6   about those documents.

7      I asked him if there could be other documents in

8   Mr. Maegerle's personnel file that could affect this case.  He

9   said, there could be but he's not sure because he was never

10  shown Mr. Maegerle's personnel file.

11     Well, that file could and did contain critical

12  information.  And you want reasonable doubt why DuPont did not

13  want Mr. McLaughlin to bring Mr. Maegerle's entire personnel

14  file to court?  I believe I'll show you that there were reasons

15  that DuPont did not want Mr. Maegerle's entire file, and I will

16  discuss that in a few minutes.

17     Mr. McLaughlin only had Exhibit 775, which was the

18  employment agreements.  Mr. Maegerle signed those agreements in

19  1957 and 1961; and when he retired, there was an agreement --

20  there was a note that he signed in 1991.

21     Look at the 1957 agreement.  It's mostly about inventions.

22  It's signed 33 years prior to Mr. Maegerle's retirement and

23  about 47 years after he started working for -- before -- after

24  he started -- before he started working for USAPTI.

25     Look at the 1963 agreement, and it states in the first

 1   paragraph that DuPont seeks to protect three types of

 2   information:  Patent, confidential, and secret.  It shows there

 3   is a difference between those types of information; however,

 4   the agreement does not define what secret information is or

 5   even confidential information.

 6       There is no evidence Mr. Maegerle received a copy of the

 7   documents.  In fact, I would submit that the evidence is to the

 8   contrary.  Mr. McLaughlin had no evidence that Mr. Maegerle

 9   received copies of any of these documents.  Maegerle's home was

10   searched and the FBI didn't find them.

11       And Mr. Maegerle does not know, importantly, how many

12   documents Mr. Maegerle signed and the dates he signed the above

13   documents or if he read any of them.  Who knows?  You're coming

14   to a new job, there's a lot of things you sign.  Anyone had

15   that experience of closing out a house?  They shove documents

16   in front of you, you sign them.

17       Let's stop here for a minute, and I want you to remember

18   certain things.  Mr. Maegerle is not charged with breach of

19   contract.  That's a civil action.  If he breached his contract

20   with DuPont, it does not make him guilty of a crime.

21       He's not charged with having -- improperly having DuPont

22   documents or information.

23       He's not charged with theft of confidential information.

24       Mr. Maegerle -- the charges against Mr. Maegerle are the

25   alleged trade secrets of DuPont trade documents -- trade

 1  secrets -- excuse me -- the alleged theft of alleged DuPont

 2  trade secrets.

 3      Now, as I said to you, no document in this case,

 4  particularly this (indicating), is stamped "Trade Secret."  And

 5  I want you to remember some testimony in this case, some

 6  cross-examinations I did.

 7      Mr. Dayton, DuPont executive, who was involved deeply in

 8  the TiO2 process, testified just because something was marked

 9  "Confidential" did not make it a trade secret.  Both Mr. Dayton

10  and Mr. Olson, both DuPont employees, testified there's a

11  difference between confidential information and trade secret.

12      Mr. Livingston, the Cristal vice president, was who was

13  called here by the Government, said there is a difference

14  between trade secret and confidential information.

15      Mr. Cooper, the TiO expert, testified there's a difference

16  between trade secret and confidential information.  If a trade

17  secret is not defined, the person has to use their own

18  judgment.

19      Now, I'd like to show you exhibit -- some things from

20  Exhibit 722.  These are documents that were seized from

21  Mr. Maegerle's residence that were part of his employment at

22  DuPont.

23      I would also add that Mr. Gibney also said there was a

24  difference between -- Mr. Gibney also said that there was a

25  difference between secret information and confidential

 1   information.

 2       Hold just one second.  I want -- would you just take that

 3   down for a second?  I just want to talk about one other thing.

 4       I want to talk very quick about confidentiality.  By way

 5   of speaking of confidentiality, Mr. Gibney, the Government

 6   expert on confidentiality, he worked for NL Industries and

 7   Tronox, and he talked about how tight security was on their

 8   TiO2 technology.  He said nobody knew about NL Securities [sic]

 9   or Tronox's TiO2 processes.

10       You know what?  He should have been in the courtroom when

11   Mr. Dayton, of DuPont, testified that he had full knowledge of

12   NL Industries TiO2 technology because a company that was

13   looking into buying one of NL Industries TiO plants put all of

14   NL Industries' TiO2 technology, to quote Mr. Dayton, in the

15   public record.  Mr. Dayton also testified at the trial they

16   published its technology in Canada.

17       I would like you also to remember that Mr. Cooper talked

18   about knowledge in the trade, which is a term used in

19   engineering, and that it's recognized in the engineering field

20   that you're allowed to carry the knowledge with you.

21       I want to talk -- another important piece of testimony

22   from Mr. McLaughlin was he was asked by Mr. Scott here on

23   direct examination -- this is not me cross-examining him, this

24   is direct examination -- "How long does Mr. Maegerle's

25   employment agreement last?"  That was the question.  I hope you

1    remember the answer.  The answer was:  (reading)

2              "The employment agreement lasts for the duration of

3         the employee's employment, and up to three years from the

4         termination of their employment from the company."

5         He was looking at the agreement.  He was looking at the

6    agreement, and that's what he said.

7         Now, Mr. -- they came back and they asked him, after -- he

8    was stunned after that, so they came back and said, "Well, the

9    agreement is really permanent."  Well, is it three years or is

10   it permanent?  I mean, if you're looking at an agreement and

11   you're the head of Human Resources and you don't know, how else

12   should anybody else know?

13        Now I'd like to just show you a couple of pages from

14   Mr. Maegerle's, and then I'm just about finished.

15        Look at pages 3 and 4 of Exhibit 722.  It's the review of

16   Mr. Maegerle's responsibilities.  One was to develop the idea

17   in DuPont that full-service design contractors had a

18   transparent relationship with DuPont.

19        You've got to remember what's been going on.  DuPont's no

20   longer doing any of its design.  It's feeding everything to its

21   consultants, and that's what Mr. Maegerle's thing is to do.

22   One of his things was to be transparent, to promote the value

23   of the release of design information, and to have technical

24   packages sent to the contractors' offices.  That's some of the

25   things they were saying he should do.

 1          On page 5:  Maegerle had strong technical knowledge of

 2     Mr. DuPont -- excuse me, of DuPont's TiO technology.  No doubt.

 3          Look at page 11.  It talks about Mr. Maegerle's work with

 4     outside contractors.  Based on the above, I mean, it's evidence

 5     he knew what was going on.  He knew that they -- what was trade

 6     secrets; and he knew, Mr. Maegerle, that there were no trade

 7     secrets involved in this.

 8          But the most important thing I would like to talk to you

 9     about is that Mr. McLaughlin talked about -- testified about

10     pages 1 and 2 of Exhibit 722.  And what did that show?  It

11     showed that Maegerle's knowledge and experience authorized him

12     and designated Mr. Maegerle -- and this was testimony, not only

13     this -- as an expert in DuPont's trade secret policy, and

14     DuPont gave Maegerle the authorization and power to decide what

15     is a true DuPont trade secret and could even advise others on

16     what was a trade secret.

17          Okay.  In effect, DuPont gave Mr. Maegerle the authority

18     and the ability to make the determination of what was or was

19     not a DuPont trade secret, and even to give others advice on

20     that, and to even give advice on that.

21          Mr. Maegerle used -- he used that authority or decision in

22     making it what he did in this case.  And you heard from the

23     agents and he told you that these were not trade secrets.

24     How's that for reasonable doubt?

25          Mr. Maegerle had the experience, had the authority when he

 1  was at DuPont, and he's consistently said what he gave to

 2  USAPTI was not trade secrets; and I submit to you that was his

 3  belief, and I think that was the fact.  And as long as he

 4  believed it and had a reasonable belief, he's innocent.

 5      I know I ramble.  I tend to do that.  I jump around a lot.

 6  I mispronounce names like crazy, but I'm trying to get points

 7  across to you and I hope I have.  And I hope -- they wouldn't

 8  allow me to bring a translator for my New Jersey accent,

 9  otherwise it would have been much better probably.

10      This is the last time I get to speak to you.  I know

11  you've been very, very attentive.  I've tried a lot of cases

12  and you're as attentive as any jury I've ever seen.

13      You've been told Mr. Hemann's going to get the last word.

14  I will not get to respond.  I'm going to be sitting there

15  jumping up and down dying to respond, so I ask you one favor,

16  it's up to you.  But when Mr. Hemann makes his argument and

17  cites to different things in the record, say -- just ask

18  yourself:  What would Jerry Froelich say about that?  And then

19  make your decision.  Thanks a lot.

20          **THE COURT:**  Thank you, Mr. Froelich.

21      Mr. Hemann?

22          **MR. HEMANN:**  Thank you, Your Honor.

23                        **CLOSING ARGUMENT**

24          **MR. HEMANN:**  So good afternoon.  This is going to be a

25  little bit rougher, I think, than some of the closing arguments

1    because my job is to try to take on, as directly as I can, some

2    of the things that have been said by Mr. Gasner and

3    Mr. Froelich over the last five or so hours.

4         I'm going to try to do so within about an hour, and I'm

5    going to try to do so as directly as I possibly can by talking

6    about the arguments that they have made.  And I'm not going to

7    try to shy away from the evidence that they have focused on

8    both throughout the trial and today and yesterday in their

9    closings.

10        One of the things that I'd like to start with is, that I'm

11   going to try to do something that I feel is a little bit

12   different than what they did.  I don't feel, based on what we

13   have seen over the last five hours, that the Defense

14   meaningfully addressed the evidence that the Government put on

15   with regard to the elements of the case at hand.

16        There was a great deal of evidence about stacks of paper

17   to the moon.  There were arguments about how out of all the

18   evidence that you've seen over the past, you know -- you know,

19   all the evidence available in Mr. Maegerle's house and the

20   office and the residence, they only focused on a couple of

21   pieces of paper.  And we're not really going to focus that much

22   on those pieces of paper.

23        We're really not going to focus that much on that chart

24   that Mr. Dayton and Mr. Axelrod did painstakingly go through

25   over about a day.  That really didn't come up at all.  That

**REBUTTAL ARGUMENT / HEMANN**

 1    wasn't put in front of you.  They didn't go down and say,

 2    "Well, this one.  This one.  This one.  Explain where that one

 3    is."  Mr. Cooper hit a couple of them, and then on

 4    cross-examination admitted, "Well, ranges really, not that

 5    number."  Well, those numbers are important, and they come from

 6    somewhere, and they come from these documents (indicating).

 7          And it's the evidence in the case that you've seen that's

 8    important.  It is not the argument of the lawyers.  It's the

 9    pieces of paper that were found in the defendants' houses and

10    offices, the words that the defendants used at the time.

11          And we've gone back and forth over this over seven weeks

12    now, and what is more important, the things the defendant said

13    at the time about what they were doing; or the things that

14    their lawyers, with the benefit of a couple of years of

15    rehearsal, have come up to explain, "Well, maybe he didn't

16    really mean this; maybe he didn't really mean that?"

17          I do agree with something that both Mr. Gasner and

18    Mr. Froelich said when they stood up.  The first four counts of

19    this case are about what was in the defendants' heads.  And

20    what is the best evidence of what's in a person's head?  Well,

21    I would submit to you, ladies and gentlemen, that it's what

22    they say at the time that they are doing the things that are at

23    issue.

24          And that is what this case is about, not a post hoc

25    explanation justification come up with by lawyers and experts

 1   years later on.  And it is those things that I would like to

 2   focus with you on for the next hour or so.

 3       I sat here with Mr. Axelrod yesterday at the beginning of

 4   Mr. Gasner's argument, and you typically wait and hear you're

 5   going to get hit hard right away, right out of the box, and

 6   what are they going to start with that's going to be their best

 7   argument.  And what did we hear?  This is their best argument

 8   (indicating), the anonymous letter that some guy may or may not

 9   have sent to DuPont in August of 2010.

10       Mr. Gasner -- no evidence -- Mr. Gasner says it was

11   probably a former employee named Peter Wong.  Well, that's not

12   evidence.  That's Mr. Gasner's speculation.

13       And where's Peter Wong?  You heard over and over again

14   from Mr. Gasner and Mr. Froelich, "Where's so and so?  Where's

15   so and so?"  We have subpoenas here in court.  It's the

16   United States of America.  Send the guy a subpoena, and bring

17   him on in.  We can do it.  They can do it.  Even playing field.

18       Who knows who wrote this letter?  But, more importantly,

19   ladies and gentlemen, who cares?  The point of this anonymous

20   letter is to say that DuPont has said -- has persuaded, somehow

21   forced, compelled Cynthia Ho, and Richard Scott, and Pete

22   Axelrod, Chris White, Cecily Rometo to go after the little

23   fish.  Big bad DuPont has somehow leaned on the United States

24   Government to victimize Walter Liew.

25       And how did they do it?  Well, they probably waited and

 1   waited and waited.  Because they were so worried about USAPTI

 2   that they waited for an anonymous letter; and the anonymous

 3   letter came, thank God, in August of 2010.  And what did they

 4   do?  They waited until February of 2011 to go to see the FBI

 5   after they had done an investigation and had some evidence.

 6        Now, I think I have this right.  This is my first unholy

 7   alliance, and so I'm struggling through it.  But that's what

 8   they're accusing DuPont and the government of.

 9        And they're saying that the stew that Walter Liew finds

10   himself in is because of an anonymous letter by somebody that

11   they can't identify, and not because these documents or

12   evidence of these documents were found in his possession; not

13   because he skipped out on $6 million in United States taxes;

14   not because he lied to the Bankruptcy Court; not because he

15   tried to get Jian Liu to lie; not because he lied to the FBI;

16   but because of some guy's anonymous letter to DuPont.

17        And then there's DuPont.  DuPont is centric; DuPont is

18   bad; DuPont is evil.

19        Well, the great irony of that is that Mr. Liew sets out to

20   do exactly what DuPont was doing.

21        And Mr. Gasner derisively accused DuPont of being this

22   bloated American company.  It's rather extraordinary that he is

23   derisively calling DuPont that while his client is in bed with

24   a 60- or 70,000 employee Chinese state-owned entity.

25        It is absurd to suggest that Walter Liew is a Silicon

1    Valley entrepreneur who is trying to be squashed by a bloated

2    American company.

3         And why, ladies and gentlemen, should DuPont be any

4    different than any other victim of any other crime?  DuPont is

5    entitled to attempt to protect its trade secrets.

6         So the beginning of this case is DuPont has somehow made

7    the Department of Justice and the FBI go after little Walter

8    Liew, to protect some unknown agenda that DuPont has.

9         I would submit to you that when Congress enacted the

10   Economic Espionage Act their purpose was to protect the Burt

11   Diemers and the Dan Daytons of the world who have a right to

12   work at their jobs in the United States; who have a right to

13   protect their intellectual property, and to have it not

14   distributed to foreign state-owned -- foreign state-owned

15   enterprises that come by these documents unethically and

16   illegally.

17        The second issue that we got to, and we got to this with

18   both Mr. -- with Mr. Gasner and with Mr. Froelich.  And the

19   issue is this issue of Mr. Maegerle being free to consult with

20   or work for Walter Liew after he left DuPont.

21        This has been an issue, as you all know, since almost the

22   first day of the trial.  And the question, ladies and

23   gentlemen, is what is it exactly that he is free to do, and

24   what is he not free to do?

25        And that issue has been clouded and clouded and clouded.

 1    And it's almost if the more words that are used in court to

 2    talk about that issue, maybe you'll forget what -- what the

 3    real issue is here.

 4         And it's incredibly simple.  The real issue here is that,

 5    of course, Mr. Maegerle is free to walk out the door at DuPont

 6    and the next day get a job at a competitor.  There is no

 7    dispute about that.  Nobody has said otherwise.  Every witness

 8    that the government called said exactly that.  He is free to do

 9    this.  No restriction.

10         Mr. Liew didn't even have such a free -- give his

11    employees such free rein.  He had a noncompete clause, you'll

12    remember, in his employee agreements where he said you can't go

13    work for somebody else for three years.

14         What can't you do?  You cannot take DuPont's stuff and

15    walk out the door with it and give it to somebody else, whether

16    that stuff is in your head or whether that stuff is in your

17    hands.  That is what you're not permitted to do.

18         The distinction is clear.  All of Mr. Liew's agreements

19    that he wrote and gave to his employees say that.  The DuPont

20    agreements that Mr. Maegerle signed, both at the beginning, and

21    we keep conveniently forgetting, at the end of his employment,

22    say that.

23         You can't take their stuff.  And, again, it's so basic

24    Mr. Axelrod described it as something you learn in

25    kindergarten.  Of course.  This isn't some complicated concept.

REBUTTAL ARGUMENT / HEMANN

1    You're not allowed to take somebody else's stuff.

2        Mr. Maegerle is a sophisticated guy.  As Mr. Froelich just

3    wrapped up on, he is a guy who was involved in the intellectual

4    property protection program at DuPont.  He knew.  He signed the

5    documents.  He can read.  He said, I'm not going to take their

6    stuff.  In fact, he said, importantly, I've given everything

7    back.  And those are the rocks on which the defense argument

8    fails in this regard.

9        Mr. Gasner and Mr. -- Mr. Gasner showed you a couple of

10   documents here, Exhibit 694 and Exhibit 1008.  They are two

11   documents that have been admitted for Mr. Liew's state of mind.

12       And one of them is this note to Roger Finato, or a draft

13   of the note to Roger Finato.  And one of them is on legal issue

14   with DuPont.  And these are shown to you with great fanfare, as

15   if they say something other than that which I just said.

16       They say after five years -- and, again, nobody has

17   explained to you, none of our witnesses, none of the defense

18   witnesses, have explained to you where this 5-year thing comes

19   from.  It comes from nowhere.  Mr. Maegerle may have come to

20   that in good faith.  Maybe he did; maybe he didn't.  But it

21   doesn't come from anywhere because it doesn't mean anything.

22       He could have left DuPont the next day and worked for

23   Walter Liew.  But neither of these letters say that he's

24   allowed to use DuPont stuff.

25       In fact, the letters say exactly the opposite.  When

1    Mr. Liew was reciting what he learned from Tim, Mr. Spitler,

2    and Maegerle, and McIntosh, there is an underlying assumption

3    that you can't take DuPont stuff.  Because Mr. Maegerle has

4    signed --

5            **MR. FROELICH:**  I have an objection, Your Honor.

6            **THE COURT:**  Overruled.

7            **MR. HEMANN:**  -- has signed a document saying, I've

8    returned everything.

9        And the reason that these -- these notes are totally

10   irrelevant is because they assume a person, a former DuPont

11   employee, who has -- who does not have trade secrets because

12   DuPont employees, like all employees of companies, are required

13   to return everything.

14       So these notes don't say Mr. Liew -- Mr. Maegerle can come

15   work for Mr. Liew and bring all of his DuPont stuff and bring

16   all of his DuPont knowledge and share DuPont trade secrets.

17       What they say is Mr. Maegerle can work for Mr. Liew.

18   That's what they say.  There's no -- that's unremarkable.

19   There's no dispute about it.  It's true.

20       These notes don't give him permission to do anything he

21   wants to do.  And we know that for a variety of reasons.

22       One of them is -- and, Ms. Mahoney, could you put up

23   369T-0004.

24           **THE CLERK:**  It will be a moment.

25       (Document displayed.)

1        **MR. HEMANN:**  About halfway through there's a paragraph

2   in the middle, that one, "DuPont stipulates that ..."

3        Now, this is information that the Pangang Group received

4   from Walter Liew.  And what it says is, you can work, we can

5   get former DuPont people to work for us, but it says right in

6   the middle "can do similar work but cannot use official DuPont

7   material."

8        That's what Mr. Liew told the Pangang Group.

9        You heard a conversation about how engineers, they need to

10  leave and they need to work.  Sometimes they get laid off, they

11  move on.  And they have to have a zone of freedom, was the term

12  that Mr. Gasner used.

13       Well, again, this is a Mr. Gasner term.  This is not a --

14  an evidence term.  None of the agreements that we've looked at

15  talked about a zone of freedom.

16       But what we know is that you are allowed to work on one

17  hand, and that you are not allowed to use DuPont's stuff on the

18  other hand, whether you've memorized it, which is what the jury

19  instruction says, or that you have straight up taken it, like

20  we see in this case.  There's no zone there, no judgment needs

21  to be exercised.  It's kind of a black and white sort of thing.

22       And, of course, it is that case for the obvious reason,

23  because take a moment and exercise, when you go back to the

24  jury room, just your common sense, which is why we have jurors

25  in the first place.  What's the world look like if this isn't

REBUTTAL ARGUMENT / HEMANN

1   the case?

2        The world looks like, I will get a job at DuPont; I work

3   there for three weeks; I grab a bunch of stuff; I sign my thing

4   saying I returned it, but I don't; and then I go home and watch

5   TV for five years; and then on five year and one day I go to

6   the place that wants it and I open up a little storefront and I

7   say, For sale, DuPont stuff; come on in.

8        Well, that's obviously not, and the defense doesn't

9   articulate it that way because they know that it's absurd.  But

10  that's what they're trying to get you to buy off on.

11       Of course, Mr. Maegerle can leave; of course he can work

12  for DuPont.  But he can't say after five years I'm a free man;

13  i.e. I'm a free man to use the DuPont stuff that I took with me

14  when I left.

15       And Mr. Axelrod went through with you all of the evidence

16  about how Mr. Liew and Mr. Maegerle understood that there were

17  secrecy obligations before; they understood it during; and they

18  understood it after these crimes took place.  And he showed the

19  examples to you in their own words at each point along the

20  spectrum.

21       This, ladies and gentlemen, is a -- has been, maybe, along

22  with the Ashtabula thing that I'm going to get to in a moment,

23  the biggest thing in the trial.  And it is resolved simply by

24  the most basic exercise of common sense plus looking at the

25  words like this on the screen, that the defendants used at the

 1    time that this was all going down.

 2        Thank you, Ms. Mahoney.

 3        So the Ashtabula contract --

 4            THE COURT:  Before we do that, let's take a stretch

 5    break.

 6            MR. HEMANN:  Thank you, Your Honor.

 7         (Pause)

 8            THE COURT:  Please be seated.

 9        You may continue.

10            MR. HEMANN:  Thank you very much, Your Honor.

11        So we also have the Ashtabula contract.  And we have a

12    contract.  And that's it.  We have a lot of lawyer words about

13    what this contract means, but we really don't have any evidence

14    of what the contract means.

15        We've got some evidence, however, of what happened in real

16    life after this contract was -- was executed in 1967.

17        The statements of the lawyers are they gave it all away in

18    1967.  "They" means DuPont.  They lost control; they sold their

19    technology; and it is all out in the public domain.

20        Those are a couple of examples of the words that you've

21    heard since the first day of this trial, about the Ashtabula

22    contract.

23        I would submit to you, ladies and gentlemen, there is

24    absolutely no evidence of any of that.  And, in fact, I would

25    submit to you that the words of the defendants themselves are

 1    going to pretty much wreak havoc with those lawyer conclusions.

 2        Ms. Mahoney, could you put up 679, page 4.

 3        (Document displayed.)

 4        **MR. HEMANN:**  And if you go down to the bottom -- I'm

 5    sorry, top.  Top, top, top.  Sorry.  There we go.  Paragraph

 6    58.

 7        This is what Mr. Maegerle's interpretation of this was:

 8            "DuPont released its technology to the competition in

 9        1978 as previously documented."  And that's his

10        interpretation of what happened with this.  "Process

11        improvements made by DuPont, since that date, are unknown

12        and are not a part of the USAPTI design."

13        This stuff is all after DuPont (indicating).  This might

14    be the most terrific argument in the history of the law, if

15    anything in this case had anything to do with Ashtabula.

16        The defendants' position is that DuPont, DuPont's TiO2

17    business, has no trade secrets at all, anywhere, because in

18    1967 they sold it to Sherwin-Williams.  But Mr. Maegerle

19    recognized there had been process improvements since then.  And

20    he claims not to know them, which is not true, obviously.

21        Thank you, Ms. Mahoney.

22        But there were projects at DuPont that we know about, that

23    were not based on the Ashtabula technology.  Edgemoor was a

24    perfectly good example.

25        There are projects that -- in DeLisle, which is the

 1   factory that Mr. and -- that Mr. Liew told Pangang he was going

 2   to base his design on.

 3        The Accession Report doesn't mention Ashtabula.  It has

 4   all sorts of data and facts and figures and conclusions based

 5   on other DuPont facilities.

 6        And the Basic Data Document just -- I'm sure this will be

 7   totally fascinating for you.  Go through it.  You'll see

 8   records as to all of the DuPont factories.  Because what

 9   they're doing is compiling information about DuPont's

10   experience over the years in one place, so that they can build

11   a state-of-the-art factory, which is precisely what

12   Mr. Maegerle and Mr. Liew were trying to do.  This isn't an

13   Ashtabula document.  It wasn't written in 1967.  And it refers

14   to a bunch of DuPont factories that are not Ashtabula.

15        So this case really doesn't have anything to do about

16   Ashtabula.  And this contract does not come close to bearing

17   the weight that the defendants need for you to put on it in

18   order to reach a not guilty verdict.

19        This contract doesn't say that all of the Ashtabula

20   technology is public.  And, in fact, it's not public.

21   Mr. Cooper did not identify anything from the Ashtabula plant

22   that is public.  What he said is, yeah, well, we started it;

23   and then we built on it, and built on it, and built on it

24   within SCM.

25        I'm going to give you a little chronology, not too long.

 1    In 1967, the contract was entered into.  1974, Sherwin-Williams

 2    apparently decides it doesn't want to make the stuff and sells

 3    it to SCM.

 4        So even by the time the contract-mandated silence period

 5    or nontransfer of technology period is over, it has gone to

 6    SCM.  SCM is a DuPont competitor.  SCM has no interest in

 7    giving away its Ashtabula technology.  They didn't make it

 8    public.  It has value.

 9        The defense argument has been, well, it's not reasonable

10    for DuPont to protect its technology by selling Ashtabula to a

11    competitor.  Putting aside for a moment that Ashtabula is not

12    the basis for all the DuPont technology.  It's not reasonable

13    for them to do that.

14        Well, they sold it to somebody who is not going to make it

15    public because it would be like selling you a diamond ring and

16    thinking, well, maybe I'll -- you know, tomorrow he's going to

17    take the diamond ring and put it on the curb and now the

18    diamond ring is public.

19        No.  You don't sell something to somebody who actually is

20    going to maintain the value, and assume that the next day

21    they're going to, as Mr. Froelich suggested, publish it in the

22    newspaper.  What reasonable economic actor would do that?

23        So when DuPont puts this small, outdated project on the

24    market -- and it's small.  If you look at the contract, you'll

25    see it's a 27,000-ton project.  Maybe it was big in -- in 1967,

 1   but nobody is going to use a 27,000-ton project now to build a

 2   100,000 ton.  It is one-tenth of the size of DuPont's DeLisle

 3   factory.  It is a fifth of the size of Kuan Yin.  It is a

 4   fourth of the size of the proposed Pangang project.

 5         Mr. Gibney said nobody would want to build Ashtabula

 6   because it doesn't -- it's just irrelevant to what you all are

 7   doing and what they're doing.

 8         The idea that Ashtabula and its small size are somehow

 9   relevant to this much larger process that DuPont is involved in

10   is absurd.

11         I would encourage all of you to spend some time looking,

12   first, at the jury instructions.  The jury instructions don't

13   get into this distraction.

14         The jury instructions have a test.  And the test is, were

15   reasonable measures taken?  And the reasonable measures in this

16   case involve these things (indicating).  And is the technology

17   or the actual compilations, are the trade secrets public?

18         Go to the law and apply the test.  There's nothing in the

19   law that says that licensing technology 50 years ago, almost 50

20   years ago, makes it public.  There's a factual test.  It means

21   you go back and look at the evidence and make a decision as to

22   whether the technology is, in fact, public.

23         I would also go back again and echo the words of the

24   defense lawyers, which is this is about what was in their head.

25         You've seen nothing in the evidence about Ashtabula being

1   in the heads of these defendants until April of 2011.  And all

2   the sudden Ashtabula becomes incredibly important.  It becomes

3   incredibly important because it's done a heck of a lot better

4   than Kuan Yin.

5        You don't see it in the defendants' heads.  And, in fact,

6   what you see in the defendants' head is just the opposite.  We

7   see Mr. Liew saying again and again and again, the reason that

8   DuPont has done such a good job maintaining its position in the

9   industry is because it keeps its stuff secret.  Those are his

10  own words.  That's what's in his head.

11       Mr. Maegerle, in the 1980s, after the 1967 sale, is

12  writing memos at Kuan Yin saying the Basic Data Document and

13  the flow sheets need to be kept under lock and key.

14       He receives a memo while he's there.  Can you put up

15  Exhibit 374, please.  Oh, I'm sorry, I don't have the right

16  number on this one, Ms. Mahoney.

17       So I'll remind you of it -- oh, I know where it is.

18       It says -- Mr. Maegerle received a memo, it's 847, when he

19  was working on Kuan Yin, that says:

20            "Although one of our competitors knows all about our

21       Antioch technology, others do not have that degree of

22       knowledge."

23       So Mr. Maegerle is saying, yeah, one of our competitors,

24  SCM, knows about our Antioch technology.  Others don't though,

25  so it still has value.  Because one does, that doesn't mean the

1   public.

2       And if you look at the jury instruction, it says -- the

3   questions is whether the public knows.  One competitor is not

4   the public.  Even if one knows, but the others don't.

5       And then, second of all, even with the Antioch technology

6   we all know the other plants have technology beyond the Antioch

7   process.  These are words, at the time, by people at DuPont.

8       I think there's one last point I'd like to make about

9   Ashtabula, and in particular about this 1967 contract that's

10  very important to what you all are going to be thinking about

11  over the next few days.

12      What Ashtabula illustrates is that there is a right way to

13  do this.  There's a fair way to do what Mr. Liew and

14  Mr. Maegerle were trying to do.  And that way is to go buy it.

15      Sherwin-Williams and SCM bought it.  They paid money for

16  it.  They didn't have the technology.  They wanted the

17  technology.  They went out and bought it.

18      Pangang wanted the DuPont technology.  They had a meeting

19  in 2008.  And DuPont said, no, it's not for sale.  And Mr. --

20  Mr. Liew knew that.

21      In the PowerPoint attached to the Nora Lam email, which is

22  Exhibit 374, he says "Technology not for sale."

23      He knows DuPont technology is not for sale.  There's a

24  meeting.  Pangang tried to buy it.  DuPont wouldn't sell it.

25      I don't know whether Pangang went to Kerr-McGee.  Maybe

 1   Kerr-McGee will sell it.  You heard some testimony that there

 2   are companies that license their technology.  Go buy the

 3   technology.  Do it the fair way.  Do it the right way.

 4        But they wanted the DuPont technology, and the DuPont

 5   technology was not for sale.  So what did they do?  They went

 6   for Mr. Liew.

 7        And what value proposition does an electrical engineer

 8   from Silicon Valley have to a Chinese state-owned chemical

 9   company?  He's got some DuPont stuff.  He doesn't have all the

10   DuPont stuff, but he's got some DuPont stuff.

11        He goes over there and he rolls out the Edgemoor plans,

12   and that's Exhibit 719, and he shows them, I've got the DuPont

13   stuff.  And that gives him an advantage, and it gives Pangang

14   an advantage.  It doesn't give them the whole thing.

15        We've heard over and over and over again, well, the final

16   thing didn't look like this.  The final thing never looks like

17   that.  And I'm going to talk about that in a moment with regard

18   to Mr. Cooper.  The final thing, when you build a TiO2 plant,

19   never looks like the first thing.

20        But he stole an advantage, and that's unfair.  And that's

21   wrong.  And there was a right way to do it, and he and they

22   should have done it the right way.

23        I want to talk a little bit now -- I'm going to step

24   back -- and I do think those are the three biggest evidentiary

25   themes that the defense in the trial -- I've tried to calibrate

1   them a little bit, and I think those are the three most

2   important, at least in terms of quantity, points that the

3   defense has made over the course of the trial.

4       I want to -- I'll go back to a couple of things that were

5   said in closing in a moment.  But I want to talk a little bit

6   about the way Mr. Gasner characterized the way you should

7   approach the legal analysis.

8       And yesterday he said, look at Count Two first.  And it's

9   sort of an umbrella count, is the way I think that he described

10  it.  And he said, with this umbrella count, once you've worked

11  that one out you'll be able to figure out the Count One, Count

12  Three, and Count Five afterwards; all sort of rise and fall

13  together once you figure out Count Two.

14      That's not what the instructions say.  The instructions,

15  first of all, say you must look at every count separately.  You

16  heard that from the Court.  And you'll see that the elements of

17  Counts One and Two, while the same in some ways, are different

18  in other ways.

19      And you need to respect those differences, and you need to

20  go back and do what the Judge has told you to do, and go

21  through the counts individually and look at the individual

22  elements for each one.

23      Now, the reason, I believe, that Mr. Gasner suggested to

24  you that you start with Count Two instead of Count One is

25  because of the disaster that Professor Lewis was.  And this is

REBUTTAL ARGUMENT / HEMANN

1   an effort to try to avoid too much conversation about getting

2   into the economic espionage charge right off -- right out of

3   the box.

4        But I would encourage you to follow the instruction.

5   Don't forget about the economic espionage charge.  And begin

6   with Count One and work through the instructions individually,

7   like the Court's instructed you to do.

8        Now, Count One and Count Two are conspiracy charges.  And

9   as the defense pointed out, the conspiracy charges allege a

10  conspiracy that begins in or about, which is a lawyer way of

11  saying around, you know, 1998, and continues until 2011.

12       And both Mr. Gasner and Mr. Froelich got up, and they said

13  you to, well, Mr. Maegerle wasn't doing anything in 1998.  This

14  is outrageous that you've talked about Mr. Maegerle being

15  involved in this criminal agreement in 1998.

16       Well, they say that, and then the first thing they do,

17  Mr. Gasner did, was drop back into 1997, and talk to you a lot

18  about what happened in 1997.

19       And I'm going to talk to you a little about what was going

20  on in 1997.  And I would encourage you to go back and think,

21  and this gets to be a while ago, about the testimony of

22  Mr. Marinak.

23       What Mr. Marinak said was, we were working on a bunch of

24  other stuff and one day Walter Liew says, I want to work on

25  this TiO2 process.

1       He has come by some patents in 1996.  And you heard the

2   very last witness talked about some old binders that had some

3   1996 patents in them.

4       So Mr. Liew had been reading some patents.  He goes to

5   Mr. Marinak and he said, we're going to China; let's go.  And

6   they get on an airplane and they go to China together.

7   Mr. Marinak said it happened very quickly.

8       They get over to China and they have, all of a sudden,

9   this giant meeting with all the guys from the Chengde project.

10       And Mr. Marinak said Mr. Liew didn't know anything.  He

11   couldn't answer any of the questions.  It was like out of the

12   blue.  And this is after the 1996 patent research.

13       Well, they come back, and there's some interest in this.

14   But Marinak says, well, I got him some historical patents.  We

15   didn't know anything about this, so we went and found these

16   guys at Condux.

17       Again, let's be clear.  Totally legitimate.  You are

18   allowed to consult.  Condux is not a criminal enterprise.

19   We're not suggesting that Condux is a criminal enterprise.

20   Condux is a group of former DuPont employees who do consulting,

21   apparently, in TiO2 and outside of TiO2.  Totally fine.

22       And when you go back and look at those initial pieces of

23   correspondence, there's this guy Fred Arbogast.  And he's

24   another person who we got the, well, why didn't the government

25   call him?  Probably because we have his letters and it was in

1    1997, and why didn't we.

2         But what Mr. Arbogast says is two things.  First of all,

3    they're looking for people to review a technology package that

4    is put together, a design that is put together by Mr. Liew and

5    Mr. Marinak.  So they're not looking for designers at that

6    point in time.  They're not looking for Mr. Maegerle to design

7    a TiO2 plant.  They're looking at Mr. Maegerle to review a TiO2

8    design.

9         And for the purposes of what's kosher in terms of using

10   DuPont materials, that's a very important distinction.

11   Reviewing somebody else's design and designing it yourself are

12   different things.  And it was the review somebody else's design

13   that was the first order of business.

14        But the words that Mr. Arbogast used in this connection

15   were really important.  He said:

16             "As unbelievable as it sounds, they are going to use

17        public information, sources in order to design the TiO2

18        plant."

19        "As unbelievable as it sounds."  Something that an

20   engineer says is unbelievable is probably not reasonable.  They

21   are opposites.

22        And so when Mr. Arbogast says it's unbelievable that

23   they're going to try to do this, and then you've got the

24   defense saying, oh, it's totally reasonable, Walter Liew got a

25   bunch of patents, got a couple of textbooks, he's going to

1  design a TiO2 plant, no.  It's unbelievable that they are going

2  to do this.  Not worthy of belief.  Can't believe it.

3      And that's in 1997.  They're moving along in 1997 and then

4  what happens?  Mr. Marinak gets in a car.  He drives to Reno

5  with Mr. and Mrs. Liew, and he meets Tim Spitler.  Tim of the

6  flow sheets from Tim, Tim.  Tim of the I got this print from

7  Tim.  Tim of the stolen prints Tim.  That Tim.

8      They go visit him at the end of 1997.  And then, suddenly,

9  miraculously, as if the sun had risen, 1998, Mr. Liew suddenly

10  has a TiO2 contract with the Chengde company.

11      Where did that come from?  How did he suddenly go from

12  knowing nothing in 1997 to Chengde contract in 1998?  It was

13  flow sheet 10.  That's when the conspiracy starts, ladies and

14  gentlemen.

15      I'll give you, it wasn't Mr. Maegerle who started the

16  conspiracy, but that's not what the indictment says.  The

17  indictment says in or about 1998, and continuing until

18  October 2011, two or more people.  The two more people are Tim

19  Spitler and Walter Liew.

20      The conspiracy instruction also says to you that people

21  may join a conspiracy in progress; and people who join a

22  conspiracy in progress are just as culpable as people who were

23  there from the beginning.

24      So Mr. Maegerle was around, but he didn't do anything.  A

25  couple thousand dollars in '97, '98.  And then nothing until

1    2004.  So you've heard all the way back to openings, it's not a

2    decade like the green eye shade, figuring out how to ... no,

3    they didn't do diddly from '98 to 2004.

4        And then the Hong Jibi opportunity arises at the Pangang

5    Group.  And after that Mr. Maegerle is back in.  And after that

6    Mr. Maegerle is using his Basic Data Document.

7        The Basic Data Document.  He said at the time the Jinzhou

8    specifications were scaled down from the Basic Data

9    information.  Jinzhou was the first project.  He, in his own

10   words, admitted he was using the Basic Data Document for

11   Jinzhou as early as 2004.

12       And I'll get to this, but I struggle with dignifying the

13   argument that Mr. Maegerle somehow thought it was totally cool

14   to use the Basic Data Document.  That's absurd.

15       Mr. Froelich doesn't even admit that he had it.  There's a

16   lot of wishy-washy about exactly whether he's got it; whether

17   there are notes in a travel bag; you know, did he take some

18   notes; where are the notes; did he find the notes; when did he

19   find the notes.  He either had it or he didn't have it.  We're

20   going to talk about that in a minute.

21       But your first conspirators are flow sheet 10 and

22   Mr. Liew.  And when the conspiracy lights up again in 2004, you

23   see Mr. Maegerle working on the Jinzhou project and using the

24   Basic Data Document.

25       And by 2004-2005, Mr. Maegerle's work had fundamentally

1    changed from what Mr. Arbogast was selling in the late '90s

2    because it had gone from reviewing designs by Mr. Liew and

3    Mr. Marinak to being the designer on the project.

4        Mr. Gasner offered some opinions about what must have been

5    going on in Mr. Maegerle's head.  He was looking at the

6    collection of drawings that Mr. Maegerle had done over the

7    years, and he said "RJM" is up in the top corner with a date;

8    well, he must have been proud of the work he had done, and

9    that's why -- how is that possibly criminal?

10       And, first of all, I'd like to say how Mr. Gasner knows

11   what's going on in Mr. Maegerle's head is an evidentiary

12   mystery, given what is in the record and is not in the record

13   here.  He doesn't know.

14       There is no evidence of this.  You don't know.  That is

15   speculation, and it's not appropriate for you to consider in

16   your deliberations.

17       What we do know is that Peter Zisko said that Mr. Maegerle

18   was bitter about what had happened to him at DuPont.  And he

19   had given some examples about the engineering department being

20   closed at DuPont, which may have accelerated his being laid

21   off, which is obviously a perfectly appropriate reason to be

22   angry.

23       But that was Mr. Zisko's recollection of conversations,

24   and the Korea project and how Mr. Maegerle was mad that the

25   Korea project had fallen apart.

1          But we also have Mr. Maegerle being told by his -- his

2     friend, Mr. Bizone, or his former colleague Mr. Bizone, that

3     there was an ethical issue with working on this project because

4     of his experience in the titanium dioxide industry.

5          So what's in Mr. Maegerle's head?  Maybe this is a little

6     problematic.  He also wrote to Mr. Sheehand.

7          Could you put up Exhibit 63, please.

8          And he said to Mr. Sheehand -- and this is interesting for

9     a couple of reasons.  One, he said, I've drawn an oxidation

10    reactor from memory.

11         If you look down at the last instruction, the last part of

12    this instruction you're really not supposed to do that.  You

13    know, this is not -- he's not a chemical engineer, ladies and

14    gentlemen.  He's a mechanical engineer.

15         You can't memorize stuff and just suddenly say, totally

16    fine, I can just take it, walk out the door, and knock it out.

17         He also says here:

18              "I would like to have your comments if you feel so

19         inclined.  And if you would rather not, just throw it away

20         and I will understand."

21         That reflects a comprehension that he'll understand if you

22    just throw it away because this is out -- this is out beyond

23    what we are supposed to be doing.  That's the natural

24    interpretation of Mr. Maegerle's words here.  And Mr. Gasner's

25    speculation as to what is going on in his head is just that,

**REBUTTAL ARGUMENT / HEMANN**

1    speculation.

2         Mr. Maegerle is also engaged in attempting to find

3    information about Kuan Yin for Walter.  And -- for Walter Liew.

4         And you'll remember that he sends an email to a fellow by

5    the name of Sherman Chen, that I think that you should spend

6    some time looking at, and that's Exhibit 878, in which he is

7    trying to bring in information about Kuan Yin, and trying to

8    find people who are going to work at Kuan Yin at USAPTI or work

9    on Kuan Yin information.

10        I want to kind of wrap up on the conspiracy charges this

11   issue, which is really the issue in the case about whether

12   Mr. Liew and Mr. Maegerle reasonably believed that what they

13   were doing was -- that they were dealing with DuPont trade

14   secrets by, again, asking you to look both at their -- their

15   words and common sense, and the natural reaction or the natural

16   consequence of a situation in which all of this is not a

17   secret, which all of this information is public, which is what

18   they're saying they reasonably believed at the time.

19        If all of this information, ladies and gentlemen, was

20   public, there would be a titanium dioxide factory on every

21   street corner in China.  If all of this information was public,

22   Chinese engineers, who are perfectly good engineers, would be

23   able to design a titanium dioxide factory.

24        One of the most stunning pieces of evidence in this case

25   is this textbook by Liu Changhe, one of the managers at the

**REBUTTAL ARGUMENT / HEMANN**

1    Jinzhou project.  The guy is an expert in titanium dioxide.  He

2    apparently can write.  He apparently can read.  He apparently

3    can read English because he was communicating with Mr. Liew

4    about Mr. Liew's letter.

5        What is preventing Liu Changhe from looking at all -- an

6    expert, a chemical engineer, looking at all of the available

7    public information, such as it is, and buildings his own

8    titanium dioxide factory in China?

9        Nothing is preventing him from doing that.  But what he

10   doesn't have is the DuPont information that Mr. Liew, Walter

11   Liew, was marketing.  And that, ladies and gentlemen, is simply

12   a matter of common sense.

13       I'd like to speak for a moment about the attempt charges.

14   Mr. Gasner talked a little bit about the two -- and

15   Mr. Froelich, about the -- about the attempt charges.  And I

16   have a couple of items with regard to that, that I want to

17   cover.

18       This, in many ways, when you look at Trade Secret 1, is

19   sort of the classic attempt case.  The language which

20   Mr. Gasner focused on of Trade Secret 1 and suggested was

21   impossibly too vague to understand or get your minds around,

22   ironically it's Mr. Liew's own language.  It's the DuPont

23   chloride route process.  It's what he said that he was

24   attempting to transfer to the Chinese state-owned companies.

25       You remember a slide that Mr. -- Mr. Gasner put up under

1    the attempt.  It said "the generally known" and then put

2    "DuPont process."

3        Well, the term "generally known" is not from any document.

4    That's Mr. Gasner's term.  And that's not what is alleged in

5    the indictment.  It's the DuPont process, is that which is

6    alleged in the indictment.

7        And those are Walter Liew's own words about what he was

8    attempting to do.  And he was moving along in this process in

9    April of 2011, when he got sued, and in July of 2011, when the

10   FBI conducted its searches at USAPTI, and it was those

11   intervening events that got in the way of his completing his

12   effort to transfer the DuPont information to the Pangang Group.

13       This is not an impossible concept to get your mind around.

14   But it's not our minds that are important.  It's Walter Liew's

15   mind and Bob Maegerle's mind that's important.  And these words

16   having been used by Mr. Liew are what matters, and it reflects

17   what his intent was at the time.

18       Mr. Liew, Mr. Gasner, and Mr. Froelich -- or Mr. Gasner,

19   I'm sorry, talked a little bit about the economic espionage

20   charges.  And I'd like to just address those fairly briefly.

21       There are several ways that are alternative ways in which

22   the government can prove economic espionage.  Mr. Gasner

23   suggested that the only way that we can prove the benefit prong

24   of economic espionage is to prove that the government equals

25   the Communist Party.

 1          Well, that's not what the instructions say and that's not
 2     what the evidence is in this case.  The evidence is that the
 3     State Council is the highest executive agency in the Chinese
 4     government.
 5          Mr. Liew said, himself, I got into this at the request of
 6     the State Council.  That's probably enough and should be enough
 7     for all of you.
 8          But the evidence goes on.  And the United States is also
 9     able to prove this element by showing that a -- a foreign
10     instrumentality is the beneficiary.
11          Here, the foreign instrumentality is the Pangang Group, as
12     to which it is undisputed is a Central state-owned, 100 percent
13     SASAC-owned company.  That's ownership.  Again, enough.
14          And when Mr. Liew was seeking these contracts, he wrote
15     directly to the chairman of the Central state-owned entities.
16          And one of those people, Hong Jibi, the chairman of this
17     large company, called Mr. Hu.  It wasn't a secretary, if you go
18     back and look at your notes.  It was Mr. Hong.  The secretary
19     called to set up the call.  Mr. Hu got on the phone with
20     Mr. Hong himself, of the Panzhihua Iron and Steel Group Company
21     Limited.  And that is ownership.
22          It's also control, which is a third way of dealing with
23     this element.  And it shows this control.
24          There was also a note a few years later on, in Mr. Liew's
25     own handwriting, where he's talking about a meeting that he had

 1   with Fan Zhengwei, the chairman of the Pangang Group in 2008,

 2   that Mr. Fan had been directed by Mr. SASAC to have with

 3   Mr. Liew, and SASAC had been directed by a senior minister to

 4   have.

 5       The response to this letter has been described -- the

 6   defense argument is that it's something called puffery.  And

 7   they rely on this puffery argument on the testimony of

 8   Mr. Lewis.

 9       I think that it is hard to capture in words how

10   fundamentally offensive Mr. Lewis's opinion is.  Mr. Lewis's

11   opinion is that East Asians, when in East Asia, exaggerate in

12   order to get things.  That's what he said.

13       Now, he said he can't really say what they do in the

14   United States because he's only been back for four years;

15   doesn't really know.

16       That is -- that is a very problematic conclusion by

17   somebody who is not -- has no way of knowing what Walter Liew

18   intended or didn't intend.

19       And I would submit to you that Walter Liew's genetic

20   makeup doesn't make him a liar or a truth teller.  Walter

21   Liew's greed has made him lie.  But that's a different thing.

22   It doesn't have anything to do with the fact that he is a -- a

23   Malaysia-born Chinese man.

24       **THE COURT:**  Mr. Hemann, given the time, I would like

25   you to start wrapping up.

1          **MR. HEMANN:**  I will, Your Honor.

2          **THE COURT:**  I would like to instruct the jury with

3     more instructions.

4          **MR. HEMANN:**  I will, Your Honor.

5          **THE COURT:**  Thank you.

6          **MR. HEMANN:**  A couple of things on the -- on the

7     individual trade secrets.  First of all, I'd like to sort of

8     cut through the distractions on the actual trade secret

9     charges.  Number one, here's -- here's a theory, the

10    government's theory that covers every single one of the four

11    alleged trade secrets.

12         Number one, the defendants possessed these compilations,

13    these compilations which are unique compilations about how to

14    manufacture titanium dioxide.  And that is exactly what the law

15    says.

16         These were in the defendants' possessions.  A compilation

17    is a trade secret.  The compilations belonged to DuPont.  They

18    have "DuPont" stamped on them.  They are all marked

19    confidential.

20         The compilations, none of these compilations were

21    available to the public.  Mr. Cooper said that none of the

22    compilations were available to the public.

23         The compilations had value to somebody who is trying to

24    replicate the DuPont process.  Both Mr. Maegerle and Mr. Liew

25    treated these as if they had value.  And these were used by the

REBUTTAL ARGUMENT / HEMANN

1  defendants in connection with their contracts with the Chinese

2  state-owned entities.

3       That is more than reasonable doubt.  None of those things

4  that I just said to you are disputed by any evidence in this

5  case.  That's what this case is about.  It's about -- that's

6  what it's been about since the very first day.  And nothing

7  that Mr. Cooper said or didn't say or changed his mind about

8  saying over the two days that he testified disturbs that in the

9  least.

10       And I'd like to just say the following about Mr. Cooper.

11  I would say that Mr. Gasner and I certainly agree on one thing.

12       You should take this credibility of witnesses instruction

13  and you should go back and you should apply it to Mr. Cooper.

14  And you should reach the conclusion, having applied it to

15  Mr. Cooper, that he is not worthy of your belief.

16       I would point out to you that Mr. Axelrod pointed out 11

17  things about Mr. Cooper that should have you questioning his

18  creditability.

19       In their arguments, the defense only dealt with the

20  $200,000 point by saying he did a lot of work.  None of the

21  other points were dealt with in the defense cross.

22       Mr. Cooper was revealed as the worst kind of hired gun

23  when he came in and testified to you.  His opinions were long,

24  long, long on broad generalities, but very, very, very short on

25  actual specifics.  And those actual specifics had a lot to do

1    with ranges, and almost nothing to do, in fact, nothing to do

2    with the actual numbers found in the Basic Data Document.

3        With regard to the accession memo, the memo that the

4    Diemer correlation is in, I would like to point out to you that

5    this is a useful -- a useful item to look at in connection with

6    the attempt charges.  And I'll tell you why.  What Mr. Cooper

7    said was that this is useful in -- that this relates to sizing

8    the adjustable slot in the oxidation reactor.

9        Jinzhou has an adjustable slot.  And what the testimony

10   was, was, well, wait a minute, like, once the factory is built,

11   we have to figure out how big or small to make the slot so we

12   can figure out how big or small to make the particles that we

13   want.

14       Jinzhou was just wrapping up in the spring of 2011.  The

15   plans were done.  The factory was being built.  Guess what it's

16   time to do?  Figure out how big to make the observation reactor

17   slot, which is exactly what this document has to do with.

18       And, lo and behold, it's sitting on Walter Liew's desk.

19   Mr. Liew describes it to Jian Liu to as an important document.

20   And he tasks Thongchai Thongthawee with trying to figure out

21   how to make it work.

22       It wasn't ideal.  It's Fortran code.  I guess it is old

23   and people don't use it much.  But it's what he had.  And the

24   testimony was you can use it, you just have to figure out.

25       Thongchai Thongthawee was not the guy to figure it out,

REBUTTAL ARGUMENT / HEMANN

1    probably, but he was trying to figure it out.  And what got in

2    the way of it?  What got in the way of it was DuPont and the

3    FBI investigation that happened at the same time.

4        And I'll say this with regard to this document and

5    Jian Liu.  The argument was made that Jian Liu to didn't think

6    that anything was wrong, that Mr. Liew hadn't done anything

7    wrong, that there was any problem at all.

8        But what did Jian Liu to do after Jim Jubb showed up at

9    his house?  He threw this away.  And why did he do it?  Because

10   he said, I didn't want any DuPont stuff in my house.

11       And he lied about Mr. Maegerle and Mr. Spitler.  And why?

12   He did it to honor his promise to Mr. and Mrs. Liew.  But he

13   knew that it was wrong.

14       There's been a lot of testimony in the case about the

15   vendors and the role of the vendors in -- we've seen emails, a

16   lot of emails back and forth between employees and vendors.

17   And there's been a lot of testimony about, sort of, what's off

18   the shelf and what vendors do and things like that.

19       I'm going to commend to you this exhibit, Exhibit 189, and

20   ask you to look at the very, very back of it.  It's an

21   equipment list.  And you'll see in this equipment list that

22   there are lists of suppliers.  And you're going to see all of

23   these lists of suppliers.

24       You're going to see in these lists of suppliers names that

25   you have heard about over and over and over again:  Petrochem;

REBUTTAL ARGUMENT / HEMANN

1    Lawrence Pump; Hazelton; FLSmidth.  You're going to see them

2    listed as the suppliers of certain pieces of equipment.

3        You will also see something described as USAPTI Custom

4    Fabrication.  And those are for the pieces of equipment that

5    you will have heard throughout the trial are the important

6    pieces of equipment, the things that are not off the shelf:

7    The oxidation reactor; the chlorinator; the aluminum chloride

8    generator; those items, the not-off-the-shelf stuff.  Those are

9    USAPTI Custom Fabrication.

10       So then think back about all of this testimony about the

11   stuff that Claudius Peters and the other vendors are providing.

12   It's the off-the-shelf stuff.  Totally fine.  Everybody says

13   you buy off-the-shelf stuff.

14       But there's stuff about this process that is hard.

15   There's stuff about this process that is not publicly

16   available.

17       And, ladies and gentlemen, ask yourselves when you go back

18   in the jury room what USAPTI Custom Fabrication means.  And

19   think about Brijesh Bhatnagar, who sat up there.  And he

20   testified, well, I'm a mechanical engineer, and we got

21   everything from Mr. Maegerle.

22       And then he made this distinction that's very useful

23   between criteria, equipment criteria, the thought, and then

24   specs.  He was like, yeah, we would get the criteria from

25   Mr. Maegerle and then we would do what engineers do, we'd draw

REBUTTAL ARGUMENT / HEMANN

1    it out.  But he didn't know the criteria.

2        Mr. Anroc said the same thing.  All the witnesses said the

3    criteria, hard stuff, is coming, and it's coming from one

4    person.  And it's coming from Mr. Maegerle.  And that's what

5    USAPTI Custom Fabrication means in this case.

6        And now take that evidence and apply your common sense to

7    it.  Is it really the case that with nothing other than his

8    engineering background Mr. Maegerle's capable of designing a

9    100,000-ton operating -- well operating TiO2 plant for the

10   Pangang Group?  If that was the case, I seriously doubt that

11   Mr. Liew would have been paid $28 million.

12       On the point of the $28 million, you've also heard a lot

13   of evidence about all of the work that was done.  And I submit

14   to you, ladies and gentlemen, that the work that was done falls

15   into this category of Mr. Bhatnagar working out the specs,

16   Mr. Ilagan doing these CAD drawings, which take up a lot of

17   bites and bits and pile up the paper to the satellite pretty

18   quickly.

19       There's a lot of work being done.  Mr. Liew and

20   Mr. Maegerle were not indicted for being lazy.  They worked.

21   They worked.  And we know precisely how much they worked.

22       Can you switch to the -- I'll give you a number.

23   $4.821 million.  That's how much work was done in this case.

24   That's a lot of work.  It's a ton of work.  You can generate a

25   lot of paper for $4.821 million.

REBUTTAL ARGUMENT / HEMANN

1    And we know that because when you go back and you look at

2    of the tax returns and all of those QuickBook entries that

3    Mr. Guan testified about, if you wish to do this, you can add

4    up all of the contractor payments, all of the employee -- and

5    those are the two big issues, the two big items are payments to

6    contractors and subcontractors, and payments to employees.  And

7    then there's a little bit of rent that goes on top of it.

8    That's where all the work is.

9         And where is all -- and there's almost $18 million that is

10   nothing but profit.  And it's being shot over, and all the

11   work, all the work product, all the computers, it's in your

12   $4.8 million which, again, is not an insignificant amount of

13   money, but it's not $17.7 million.

14        While this slide is up I want to talk briefly about the

15   willfulness.  And I want to say to you that the willfulness in

16   this case comes directly from this set of data.

17        It had to have been remarkably hard over a five-year

18   period of time to balance your reported gross receipts with

19   your total deductions within to $42,000 out of $22.5 million.

20   That is probably the quintessential example of willfulness.

21        Just about five minutes, Your Honor, if that's okay.

22             **THE COURT:**  Thank you.

23             **MR. HEMANN:**  With regard to the patents and textbooks

24   before -- and, again, ladies and gentlemen, I know there's a

25   lot going on.  I know that you're tired.  I'm trying to hit the

**REBUTTAL ARGUMENT / HEMANN**

1   things that have been the bigger themes in the case, and hit

2   them as quickly as I can.

3        I do want to spend a couple of minutes talking about the

4   patents and the -- and the textbooks.

5        I think the easiest way to dispose of the entire

6   conversation about patents came out of the mouth of Mr. Cooper.

7   When asked by Mr. Axelrod about the patents, Mr. Cooper said, I

8   don't design with patents.

9        Of course not.  Of course he doesn't design with patents.

10  That's consistent -- it's a defense witness, which is why I

11  think that alone should be the end of the story.  But that's

12  what all the other witnesses said.

13       Mr. Marinak said background information, can't really get

14  it to work.  If you want it to work, you don't use patents.

15  Mr. Dayton said that.  Again, it's not a remarkable

16  proposition, but it's a very clear proposition.

17       The evidence you have in regard to patents is that

18  Mr. Liew collected a few in '96 and '97, and a bunch more in

19  2011, after the civil suits.

20       But you don't hear any evidence about anybody between

21  those two periods of time reading patents, looking at patents,

22  designing patents.  That's all there is about patents.

23       There was some question by Mr. Gasner about why the FBI

24  didn't pick them up in the search.  Well, it's really for good

25  reason.  They're patents.  They're not design documents.  And

1    they're publicly available.  Lots of things.  It doesn't sound

2    like it.

3         Sounds like, from Mr. Gasner's closing, it sounds like

4    after the FBI left the USAPTI office it was like after the

5    Grinch left, there was just a couple of Christmas bulbs and

6    these five binders.  They didn't take everything.  But they

7    didn't take these binders because they're patents and who

8    cares.

9         Same, perhaps even more so, about the textbooks.  When

10   asked about Barksdale, Mr. Cooper said I don't use Barksdale.

11        When asked about Liu Changhe's textbook, he said

12   Mr. Gasner gave him a translation of it, and it's a kind of

13   textbook that he would look at.

14        Again, the textbooks are good helpful background.  But

15   they don't show you how to build a titanium dioxide plant, or

16   the Chinese state-owned companies would not have paid all this

17   money to have somebody build them a titanium dioxide plant.

18        The information is not in textbooks.  The textbooks and

19   patents, despite the enormous amounts of time that we've spent

20   thinking about them, talking about them here, don't help you

21   design a titanium dioxide plant.

22        I want to hit a couple of things that Mr. Froelich talked

23   about.  He mentioned, at one point in time, that with regard to

24   these consultants like Mr. Liew, you all the sudden have a

25   situation in which consultants are doing all of the work.  And

 1   he cited a letter -- if you could put up 843, page 7, please.

 2        And you'll recall, if you blow up all of the text, that

 3   Mr. Guevara put up all of the text and Mr. Froelich said, no,

 4   no, just the first paragraph.  And that's because the second

 5   two paragraphs say this is bad; we've got to do something about

 6   it; we've got to tighten up our procedures.

 7        And if you look at the evidence in the case, you'll see

 8   that Mr. Maegerle became one of the chief tighteners in the

 9   aftermath of this very letter.  To tighten up the procedures to

10   make sure that information wasn't getting out through the

11   contractors.

12             THE COURT:  All right.  Please --

13             MR. HEMANN:  Thank you, Your Honor.  I'm going wrap up

14   right now.

15        Ladies and gentlemen, there's a lot to say, obviously, but

16   at the end of the day this does come down to the things we

17   learned about the world when we were very young, which is that

18   it's not okay to steal somebody else's stuff.

19        There's no dispute, no rational dispute in this case that

20   these documents were in the possession of the defendants and

21   the defendants were using these documents.

22        The distractions that the defendants have offered as

23   defenses are just that, distractions, because they don't

24   comport with common sense.

25        And the reason that we in the United States have juries,

1   the reason that we have asked you and are very grateful for the

2   fact that you have come in day after day, week after week, is

3   because we lawyers need you to add and inject a little bit of

4   common sense, sometimes, into what we do for a living.

5       The Court, during jury selection, said that your voice,

6   your jury service reflects the conscience of the community.

7       And it is the position of the United States that your

8   verdict today should reflect that conscience today, the next

9   couple of days.  Your verdict in this case should reflect that

10  conscience and the reality that the sort of stealing and

11  cheating and lying that went on in this case is not acceptable;

12  that companies, whether big or small, in the United States have

13  the right to have their own intellectual property; have the

14  right to invent, and the right to innovate.  And that's true

15  whether they are large companies like DuPont or small companies

16  in Silicon Valley.

17      Taxpayers have the right not to have somebody skip out on

18  $6 million in taxes.  The court system has the right not to

19  have people lie in connection with court proceedings.

20      We need all of these things.  We need them in order to

21  preserve our civil institutions.  And that is why we have

22  juries.

23      And that is why Mr. Axelrod, Mr. Scott, Special Agent Ho,

24  and I are asking you to return verdicts of guilty against the

25  defendants in each one of the counts in the indictment.

1            **THE COURT:**  Thank you, Mr. Hemann.

2        I'm going to give the remaining instructions so if any

3    spectator wants to leave they should do so now because I'm

4    going to lock the door.

5        So if you'll turn to page 48 of your instructions I'm

6    going to give you your remaining instructions, and then we will

7    finish up for the day.

8        Everyone on page 48 and reading along?

9        Okay.  When you begin your deliberations, elect one member

10   of the jury as your foreperson, who will preside over the

11   deliberations and speak for you here in court.

12       You will then discuss the case with your fellow jurors, to

13   reach agreement if you can do so.  Your verdict, whether guilty

14   or not guilty, must be unanimous.

15       Each of you must decide the case for yourself, but you

16   should do so only after you have considered all the evidence,

17   discussed it fully with the other jurors, and listened to the

18   views of your fellow jurors.

19       Do not be afraid to change your opinion if the discussion

20   persuades you that you should.  But do not come to a decision

21   simply because other jurors think it is right.  It is important

22   that you attempt to reach a unanimous verdict but, of course,

23   only if each of you can do so after having made your own

24   conscientious decision.  Do not change an honest belief about

25   the weight and effect of the evidence simply to reach a

1    verdict.

2        Because you must base your verdict only on the evidence

3    received in the case and on these instructions, I remind you

4    that you must not be exposed to any other information about the

5    case or to the issues it involves.

6        Except for discussing the case with your fellow jurors

7    during your deliberations, do not communicate with anyone in

8    way, and do not let anyone else communicate with you in any way

9    about the merits of the case or anything to do with it.

10       This includes discussing the case in person, in writing,

11   by phone, Smartphone, or electronic means, via email, text

12   messaging or in or on any Internet chat room, blog, website,

13   including such social networking media like Facebook, Myspace,

14   LinkedIn, YouTube, and Twitter, or other feature.  This applies

15   to communicating with your fellow -- I'm sorry with your family

16   members, your employer, the media or press, and the people

17   involved in the trial.

18       If you are asked or approached in any way about your jury

19   service or anything about this case, you must respond that you

20   have been ordered not to discuss the matter, and to report the

21   contact to the Court.

22       Do not read, watch, or listen to any news or media

23   accounts or commentary about the case or anything to do with

24   it.

25       Do not do any research such as consulting dictionaries,

 1   searching the Internet, or using other reference materials.

 2   And do not make any investigation or in any other way try to

 3   learn about the case on your own.

 4        The law requires these restrictions to ensure the parties

 5   have a fair trial based on the same evidence that each party

 6   has had an opportunity to address.  A juror who violates these

 7   restrictions jeopardizes the fairness of these proceedings and

 8   a mistrial could result that would require the entire trial

 9   process to start over.  If any juror is exposed to any outside

10   information, please notify the Court immediately.

11        Some of you have taken notes during the trial.  Whether or

12   not you took notes you should rely on your own memory of what

13   was said.  Notes are only to assist your memory.  You should

14   not be overly influenced by your notes or those of your fellow

15   jurors.

16        The punishment provided by law for these crimes is for the

17   court to decide.  You may not consider punishment in deciding

18   whether the government has proved its case against any of the

19   defendants beyond a reasonable doubt.

20        A verdict form has been prepared for you.  After you have

21   reached unanimous agreement on your verdict, your foreperson

22   should complete the verdict form according to your

23   deliberations, sign and date it, and advise my courtroom

24   deputy, Ms. Ottolini, that you are ready to return to the

25   courtroom.

1    If it becomes necessary during your deliberations to

2  communicate with me, you may send a note through my courtroom

3  deputy, Ms. Ottolini, signed by any one or more of you.  No

4  member of the jury should ever attempt to communicate with me

5  except by a signed writing, and I will respond to the jury

6  concerning the case only in writing or here in open court.

7    If you send out a question, I will consult with the

8  lawyers before answering it, which may take some time.  You may

9  continue your deliberations while waiting for the answer to any

10  question.

11    Remember that you are not to tell anyone, including me,

12  how the jury stands numerically or otherwise on any question

13  submitted to you, including the question of the guilt of a

14  defendant, until after you have reached a unanimous verdict or

15  have been discharged.

16    So that is the final-final instruction.

17    I'm now going to tell you who the alternates are, and I

18  will give some special instructions and words for the

19  alternates.

20    And you can open the door.  That's fine.

21    The names of the alternates, Alternate 1 is Joanne Miller;

22  Alternate 2 is Wesley McBride; Alternate 3 is Anthony

23  Christopher; and Alternate 4 is Catherine Lindberg.

24    Now, the first thing I want to do on behalf of the Court

25  and all the parties is to thank the alternates for their

1    service, which is not over.  And it's very important to know.

2        But you are there, and those of you who follow basketball,

3    the fifth man or woman or the bench are extremely important.

4    Sometimes they do -- they're more important or as important as

5    the starting five, if you will, or the starting 11, or whatever

6    the sport is.  So you played an incredibly important role as

7    insurance should any juror not be able to attend the trial or

8    have to be excused for some other reason.  So it's a very

9    important role.

10       And your role is not done for the following reason:  The

11   deliberations will start tomorrow morning and will continue

12   until the jury has reached a verdict.  If there is some reason

13   that a juror needs to be excused during the deliberations or

14   the Court must excuse a particular juror, then, one, depending

15   on how many that would be, one or more of the alternates would

16   have to take their place.  And the law says that at that point

17   the deliberations would have to start all over again, just the

18   deliberations.

19       So, therefore, those four alternates need to be kept

20   pristine, if you will, in the sense that you may not -- all of

21   the instructions I gave you throughout the trial, that you can

22   probably recite by heart, still apply to you until such time as

23   the Court, through Ms. Ottolini, will call you and tell you

24   that your service is completed because the jury has reached a

25   verdict.  And you are then free to do what any citizen can do,

1    and discuss the case as you see fit.

2         It's extremely important, as part of those instructions,

3    as much as you all have obviously bonded together in these

4    many, many weeks, that you may not discuss the matter at all

5    with the remaining jurors.

6         So the remaining jurors cannot discuss the matter with the

7    alternates, and the alternates cannot discuss the remaining

8    matters with the other jurors.  And the alternate jurors should

9    follow the same instruction as they have throughout the trial

10   and as applies now to the deliberating jury.

11        But I do want to thank you again.  It's been extremely

12   gratifying for the Court and the lawyers and the parties to

13   have you here because it gave us the assurance that we were

14   going to be able to get through this trial without any mishaps.

15        So thank you.  We don't have any sort of parting ceremony

16   or closing ceremony or, you know, Olympic greens or anything.

17        I would suggest, please, in order to keep the process

18   appropriate, that you leave all your pads and everything here,

19   go to the jury room, and obtain your belongings and then leave,

20   with the Court's thank you.  Yes.  I hate to be so abrupt, but

21   that's what I'm required to do.

22             **THE CLERK:**  The rest of the jury stays.

23             **THE COURT:**  The rest of the jury stays here.

24             **THE CLERK:**  Just the four that are leaving.

25             (Alternate jurors exit the courtroom.)

1        **THE COURT:**  All right.  So we now have the remaining

2   12.  So let me just tell you a little bit about we have a

3   couple more minutes left.  Always on schedule here, happy to

4   say, to the last day and last minute that you kindly allotted

5   us of your time.

6        So tomorrow, again, there's no opening ceremony or

7   comments by the Court, or introduction.  You now need to go to

8   work.  So you come in here, and preferably by 8:00.  We're

9   going to keep the normal schedule on Thursday and not have you

10  deliberate on Friday.

11       But as soon as you are all in the room with the door

12  closed, you may start deliberating.  There's no magic bell

13  that's going to go off at 8:00.  But you must all be in the

14  room at all times when you deliberate.  In other words, be in

15  the room with the door closed.

16       There will be probably a marshal, which is what we

17  typically do, or somebody watching the door.  But you should

18  all be deliberating only when all of you are present in the

19  jury room with the door closed, because your deliberations are

20  your deliberations, and they are private, not to be disclosed

21  to anybody.

22       So you can start whenever you get here all together.

23  Whether it's before 8:00 or 8:00, just wait for everybody to be

24  there.  Then the deliberations are in your hands.

25       As I mentioned, if you want to work a normal court day of

REBUTTAL ARGUMENT / HEMANN

1    8:00 to 1:30, it's up to you to do that.  I would appreciate if

2    you would at least work that period of time.  If you wanted to

3    stay later, within reason, the room is yours.  You have the

4    case now and you're in charge.  You are the judges of the

5    facts.  And you're doing your duty now, finishing your duty.

6    So you can work later.

7        The only thing we ask you is that if you decide to work

8    later or outside the normal hours tomorrow, just let

9    Ms. Ottolini know because the parties and the Court have to be

10   on call in case we need to hear from you.

11       The other -- the only other thing I want to tell you is

12   when you arrive tomorrow, the special verdict form I mentioned

13   will be there.

14       And, also, the parties, the lawyers have agreed upon a

15   table of contents of the exhibits so that it's not like finding

16   a needle in the proverbial haystack.  You'll actually have a

17   table of contents, like with the jury instructions, that will

18   enable you to find exhibits that you wish to find.

19       So there it is.  The case is in your hands.  We will not

20   see you again until there's some reason that you initiate.

21       At the end of the day, by the way, again, we don't have

22   any closing ceremonies or we don't have to say a blessing or

23   anything like that.  You just can leave just like you do.  But

24   you don't come to court.

25       Just remember the Court's instruction.  But I don't think

1    it's necessary to actually meet with you before you leave and

2    just say good-bye because that's basically all I would be doing

3    since I am not permitted to communicate with you in any way

4    except officially, and there would be no reason to do that.

5         So those are your instructions.  You have the jury

6    instructions.  Yes.

7              **JUROR DUPONT:**  Are we allowed to leave the room for

8    breaks?

9              **THE CLERK:**  I'll explain to them.

10             **THE COURT:**  That's totally up to you.  You can leave

11   for breaks.  You make your own breaks.  The case is in your

12   hands, and I don't tell you how to run your deliberations.

13   That's up to you, and you'll decide that, and that will be your

14   job.

15        All right.  Thank you very much.  You're excused until

16   further --

17             **THE CLERK:**  Bring your notepads and all of your

18   instructions because you're going to put them in the jury room

19   before you leave.

20        (Jury out at 2:11 p.m.)

21             **THE COURT:**  So the jury is gone.  Thanks for staying

22   on time, just barely.  But we made it.

23        And Ms. Ottolini, if she hasn't already done so, will talk

24   to you about availability because we don't want any of us, the

25   Court or any of you to be the weak link or the missing link or

 1   especially if the jury has a question or has a verdict.

 2        So we don't want there to be too long a delay.  You don't

 3   have to hang around the courthouse, but you should be within a

 4   reasonable period of time away.  And give your cell phone

 5   information so at least one person from the team or for each

 6   party will be available to talk to their colleagues.

 7        All right.  Other than that, thank you very much.  And

 8   we'll see what happens.  And we'll await the result of the

 9   jury.  Thanks.

10        (Counsel simultaneously thank the Court.)

11             (Proceedings adjourned at 2:12 p.m.)

12                      ---oOo---

13             **CERTIFICATE OF REPORTERS**

14        I certify that the foregoing is a correct transcript

15   from the record of proceedings in the above-entitled matter.

16   DATE:   Tuesday, February 25, 2014

17

18

19   _____

20        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter

21

22

23   _____

24        Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
                U.S. Court Reporter

25