1  MELINDA HAAG (CABN 132612)
   United States Attorney

2

3  J. DOUGLAS WILSON (DCBN 412811)
   Chief, Criminal Division

4  JOHN H. HEMANN (CABN 165823)
   PETER B. AXELROD (CABN 190843)

5  Assistant United States Attorneys

6  RICHARD S. SCOTT (DCBN 502455)
   Trial Attorney, National Security Division

7
           450 Golden Gate Avenue, Box 36055
8          San Francisco, California 94102-3495
           Telephone: (415) 436-7200
9          FAX: (415) 436-7234
           john.hemann@usdoj.gov
10         peter.axelrod@usdoj.gov

11 Attorneys for United States of America

12

13                    UNITED STATES DISTRICT COURT

14                  NORTHERN DISTRICT OF CALIFORNIA

15                     SAN FRANCISCO DIVISION

16 UNITED STATES OF AMERICA,          )  CASE NO. CR 11-0573 JSW
                                      )
17         Plaintiff,                 )  UNITED STATES' OPPOSITION TO MOTION OF
                                      )  DEFENDANTS WALTER LIEW AND USAPTI
18    v.                              )  FOR JUDGMENT OF ACQUITTAL PURSUANT
                                      )  TO FED. R. CRIM. P. 29 AND FOR NEW TRIAL
19 WALTER LIEW; USA PERFORMANCE       )  PURSUANT TO FED. R. CRIM. P. 33
   TECHNOLOGY, INC.; AND ROBERT       )
20 MAEGERLE,                          )
                                      )
21                                    )
           Defendants.                )
22 _____ )

23         The renewed motion for acquittal of defendants Walter Liew and USAPTI under Fed. R. Crim.

24 P. 29 and, alternatively, for new trial under Fed. R. Crim. P. 33 should be denied.  Set forth below are

25 evidentiary citations and limited argument in response to the specific points raised by defendants.  The

26 United States incorporates throughout its opposition to defendants' mid-trial Rule 29 motion.  Dkt. 745.

27 \\

28 \\

## I.   LEGAL STANDARD

A motion for judgment of acquittal under Rule 29 tests "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt, viewing the evidence in the light favorable to the Government." *United States v. Figueroa-Paz*, 468 F.2d 1055, 1058 (9th Cir.1972). In ruling on a Rule 29 motion, a district court must bear in mind that "it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *United States v. Rojas*, 554 F.2d 938, 943 (9th Cir.1977).  Only when the government's evidence presented at trial fails to establish any reason to believe that an innocent explanation of the evidence was any less likely than the incriminating explanation advanced by the government, is acquittal warranted. *United States v. Vasquez-Chan*, 978 F.2d 546, 551 (9th Cir.1992).

Under Rule 33, the Court may, upon the defendant's motion, vacate a judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a).  In general, "[a] district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal."  *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000).  For example, when evaluating a motion for a new trial, "[t]he court is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses." *Id.* "By the plain terms of Rule 33, however, this Court's focus must be whether failing to grant a new trial would result in manifest injustice."  *United States v. Jinian*, 2011 WL 5056978, at *7 (N.D. Cal. 2011), aff'd 712 F.3d 1255 (9th Cir. 2013).

When a defendant moves for a new trial based on the weight of the evidence, the Court may grant a new trial if it "concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred." *Kellington*, 217 F.3d at 1097.  The Ninth Circuit has repeatedly cautioned that this standard will be met only in "exceptional" cases or circumstances.  *See United States v. Del Toro-Barboza*, 673 F.3d 1136, 1153 (9th Cir. 2012); *United States v. Rush*, 749 F.2d 1369, 1371 (9th Cir. 1984); *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981). "[T]he Ninth Circuit has held that such motions are generally disfavored." *United States v. Wong*, 2014 WL 923347, *8 (N.D. Cal. March 5, 2014) (Judge Edward M. Chen).

## II.     ARGUMENT

### A.  The evidence was more than sufficient to prove that Liew reasonably believed that the DuPont chloride route process was a trade secret.

In keeping with what has been his approach to this case from the beginning, defendant simply tosses everything and the kitchen sink into his post-trial motion, making for the same hodge-podge of arguments to the Court that were presented to the jury.

Liew starts with a puzzlingly irrelevant discussion of something that the government was not required to prove.  He is right that the attempt and conspiracy counts (Counts 1, 2, 3 and 5) do not require proof that the DuPont chloride route process was a trade secret under 18 U.S.C. § 1839, but only that defendant reasonably believed that it was a trade secret.  This Court long ago held that "it is the Defendants' intent and their actions that form the 'core criminality' of these charges, rather than the existence of the asserted trade secret."  Order Denying Joint Motion to Dismiss at 8, Dkt. 338 (6/11/2013).  That being so, the premises of defendant's first argument – that "the government made no effort at trial to prove that Trade Secret 1 is, in fact, a trade secret" and "[i]f alleged as a trade secret in a civil case, Trade Secret would be laughed out of court" – miss the mark by a wide margin.  Defense counsel's oft-repeated lament that this is not a civil case does not provide grounds for an acquittal or new *criminal* trial.

Liew then passes quickly over the evidence of his intent and actions – citing a bit of it in footnotes and declining to address it in any detail.  Def. Mem. at 8.  However, the language of Trade Secret 1, about which defendant so bitterly complains, finds its origin in his own words, and those words manifest his belief that the DuPont process was secret.  Paragraph 14(a) of the Indictment, as the jury was instructed, defines Trade Secret 1 as follows:  "Trade Secret 1:  The DuPont chloride-route process to manufacture TiO2.  Trade Secret 1 includes ways and means in which proprietary and non-proprietary components were compiled and combined by DuPont to form substantial portions of the TiO2 manufacturing process, and Trade Secrets 2 through 5 set forth below."

As cited in the government's response to defendant's Rule 29 motion and now basically ignored his post-trial motion, the evidence that Liew reasonably believed that this process was an actual secret includes:

- Liew repeatedly asserted that the DuPont TiO2 process was a trade secret.  Ex. 350T-0006 (letter to Hong Jibi) ("DuPont has the most advanced titanium white by chlorination technology, but DuPont's technology has always been highly monopolized, and absolutely not transferrable"), 350T-0007; Ex. 374-0014 (email to Nora Lam with attachment) (slide titled "Value of TiO2 Technology," "DuPont: Technology not for sale").

- Liew described the plans he received from former DuPont engineer Tim Spitler as "stolen." Ex. 199-0001 ("Notes from Tim Spitler 2/2/2000 . . . Even with the best technology with stolen prints, but without the startup people and maintenance experienced people, the plant won't be successful"), Ex. 208-0005.

- Liew acknowledged that DuPont maintained the confidentiality of its process.  Ex. 201-0001 ("DuPont did a good job of keeping the secret since then . . .DuPont make its people work on restricted area so that no single person can know enough to leak all the secrets.").

- Liew understood DuPont's specialized process knowledge allowed it to "maintain its number one position in the industry for over forty years."  Ex. 243T-0002, 342T-002; Ex. 392T-0002 ("DuPont  Company in America has more than 30 years of history in the steady production of chlorinated titanium white. We possess the complete technology.").

- Messrs. Gibney, Diemer, and Dayton testified that the process was secret and not known. Gibney, Tr. 2198:8 to 2199:23, 2237:9-18; Dayton, Tr. 1564:16-18, 1586:21 to 1587:2.

- The Ashtabula technology is not, in fact, public.  Gibney, Tr. 2282:6-25, 2212:4-21; Dayton, Tr. 1740:11-23; Livingston, Tr. 4187:12 – 4191:9.

- Performance Group did not own the DuPont technology it provided.  Ex. 239T-0005.

- Walter Liew obviously believed that the process was secret because he was not forthcoming about what he did – he concealed his employment of former DuPont employees during his interview with DuPont investigator Jim Jubb (Tr. 2702:22 – 2704:10); he attempted to hide from the FBI the existence of a bank safe deposit box that contained confidential DuPont documents (Bozeman, Tr. 123:14-19); he directed Tony Duong to remove DuPont documents from the company server (Duong, Tr. 2488:4-17, 2490:1-3); and he changed the USAPTI reference to eliminate references to DuPont (Hubbard, Tr. 959:21 – 965:5). The

jury can reasonably infer that he took each of those actions because he understood that he was in possession of confidential information that he was not entitled to possess or use.

- The Basic Data Document covers the entire process for building a new green field plant, and Walter Liew knew they were using that document.  Liew asked Maegerle to check it during their work on the project.  Ex. 67-0001.

Although he declines to linger over (or even acknowledge) the actual words he used, defendant's principal argument is that although he may have *said* many things, he did not reasonably believe that DuPont's process was secret.  Incredibly, defendant likens the DuPont chloride route process to manufacture titanium dioxide to *Zen and the Art of Motorcycle Maintenance* and issues of the *San Francisco Chronicle*.  The comparison is, of course, absurd.  There was no evidence that documents revealing the DuPont process can be acquired from a bookstore, a newsstand, a library, Amazon.com, or some other place in which chemical engineers gather to read.  Defendant's literary reference comes from a Seventh Circuit[1] case in which Judge Easterbrook, in what he describes as musing unnecessary to the court's opinion, 312 F.3d at 269, offers that even if a person believed that the tips offered in *Zen and the Art of Motorcycle Maintenance* were secrets, the book would not be a trade secret because it is publicly available.  *Id.*  This clever cultural reference is unnecessary for a reason that is revealed a paragraph later and is particularly relevant to our case. The defendant in *Lange* wanted the court "to proceed as if all he tried to sell were measurements that anyone could have taken with calipers after disassembling an original equipment part."  *Id.*  But the court of appeals rejected this argument for one of the same reasons that Liew's argument should be rejected – no one would pay ($100,000 in that case) for something that they could do themselves.  *Id.*  The defendant in *Lange* was offering more than just measurements, he was offering something that had been proven to work, and was seeking significant payment for that information.  *Id.*

So it was with Liew.  The Pangang Group would not have paid Liew $28 million for something that their engineers could have simply acquired from publicly available information.  They were paying Liew for something Liew advertised he had:  The DuPont process, something that had proven to be a

---

[1] *United States v. Lange*, 312 F.3d 263 (7th Cir. 2002).

1  great commercial success for many. The jury could fairly have concluded, as common sense would

2  suggest, that Liew not only claimed that he possessed something that was secret, but believed it was so

3  because Pangang Group paid him so handsomely for it.

4         Liew's principal argument that he didn't reasonably believe what he plainly said is, quite clearly,

5  too thin a reed upon which to rest a motion to reject the jury's verdict.  And so comes the kitchen sink.

6  Liew contends that the evidence showed that the chloride-route process in general (not DuPont's) and

7  *portions* of the DuPont process were public.  Def. Mem. at 6.  This argument simply misses the point.

8  Liew was convicted of conspiring and attempting to misappropriate the process as it was conceived and

9  practiced by DuPont, which is precisely what he told Pangang Group he was doing.  Whether other

10  companies had chloride-route technology or some of the components of the DuPont process were

11  publicly known was quite beside the point, as the jury concluded.

12         Liew also returns to the tired argument that DuPont's sale of its Ashtabula plant to Sherwin-

13  Williams in 1968 demonstrates that DuPont did not take reasonable measures to protect its TiO2

14  technology.  If this were true, nothing about the DuPont process that was developed or practiced after

15  1968 could be a trade secret.  That is obviously absurd.  Moreover, DuPont certainly could reasonably

16  assume that its competitors would not make valuable technology available to the public and destroy their

17  competitive advantages.  In fact, the evidence adduced at trial was that the Ashtabula technology was

18  not public.  Sam Livingston, the vice president for technology of the company that currently owns the

19  Ashtabula plant, testified that the Ashtabula technology is not and has not been publicly available.  Tr.

20  4191:6-9.  The jury could reasonably have accepted this testimony to be true.

21    **B.  Liew knew and intended that his actions would injure DuPont.**

22         It is only common sense that taking DuPont's confidential documents and using them to design a

23  TiO2 factory for a competitor would injure DuPont.  The evidence outlined in the previous section

24  shows that Liew very well knew what he was doing and the jury was entitled to use its common sense.

25         One piece of evidence that pointedly shows Liew understood and intended that his conduct

26  would injure DuPont was his June 17, 2005, email to Nora Lam.  In it, Liew wrote:

27         China wants this technology badly.  They have been trying to develop the technology for
          many years but they have realized that they have to buy the technology.  The technology
28         is tightly controlled by a few manufacturers and they are not willing to sell it to China for

1     the obvious reasons.

2 Ex. 374-0001.  In the PowerPoint attached to this email, Liew outlined China's "great need" for the

3 chloride-route process and that the technology was "not available from major producer," i.e., DuPont.

4 Ex. 384-0008.  Liew said that he had the "ability to provide the technology."  *Id.*  In a slide entitled

5 "Value of TiO2 Technology," he laid out the "world consumption" of TiO2 and recited facts regarding

6 DuPont's production and revenue, as well as the fact that DuPont's "Technology not for sale!"  Ex. 374-

7 0014.

8     Liew's words show that he knew that DuPont had made a conscious, economic decision not to

9 sell its TiO2 technology to China and made that decision "for the obvious reasons" that the technology

10 would be stolen in China and its value thereby diluted.  This communication by Liew demonstrated that

11 he understood that by selling DuPont technology to the Pangang Group he was undermining, and thus

12 harming, DuPont's interest in holding closely its valuable technology.

13     Finally, there is no evidence that Liew understood that Maegerle, Spitler, or other former DuPont

14 employees had permission to share confidential DuPont information with him.  The evidence cited by

15 defendant, Def. Mem. at 10, stands only for the unremarkable and undisputed proposition that DuPont

16 did not prohibit its former employees from seeking employment elsewhere.  There is no evidence that

17 Liew (or anyone else) believed that former DuPont employees were permitted to keep confidential

18 DuPont documents and share them freely with competitors.  Liew's understanding of the restrictions on

19 taking and using proprietary information is revealed by the employment agreements he required his own

20 employees to sign, which, as DuPont's did, prohibited forever the use of proprietary information

21 acquired during the employee's employment.  *See, e.g.*, Ex. 783.

22 **C. The evidence decisively proved that Liew intended to benefit a foreign government and a foreign instrumentality.**

23     Defendant spends pages delving into the irrelevant intricacies he paid Donald Lewis to try to sell

24 to the jury.  The jury didn't buy them, and neither should the Court.

25     Although defendant attempts to bury this at the end of the section rather than dealing with it at

26 the beginning, the government's primary assertion was that Liew intended to benefit the Chinese

27

28

government.  The evidence that supported this argument at trial was described in the government's opposition to the defendant's Rule 29 motion and is entirely ignored in defendant's post-trial motion:

- Defendant Walter Liew's 2004 letter to Hong Jibi, the Chairman of the Pangang Group makes multiple references to Chinese government officials and clearly shows Liew's intent to benefit the Chinese government.  Various individuals with whom Liew met in 1991 are set forth in the body of the letter.  Liew states in the letter that a banquet was held in his honor to thank him "for being a patriotic overseas Chinese who has made contributions to China; and who has provided key technologies with national defense implications . . . ."  Liew also notes that China needs titanium dioxide technology and writes that he "has always hoped that China can soon successfully build a production line for titanium white by chlorination, and [he has] always worked towards completion of that mission."  Exhibit 350T at 0003-0004.

- 2005 email from Walter Liew to Nora Lam explains Liew's interest in the titanium dioxide business began at the request of the Chinese government.  He notes that China wants the titanium dioxide technology "badly," as "they have been trying to develop the technology for many years but they have realized that they have to buy the technology."  Liew then states that he "got into this because of the request form State Council."  Exhibit 374 at 0001.

- Walter Liew's 2008 letter to Fan Zhengwei, Chairman of the Pangang Group, explains USAPTI's possession of the titanium dioxide technology "in its entirety" and expresses a belief that together USAPTI and Pangang "can successfully establish China's production of titanium white by chlorination."  Exhibit 342T.

- A number of business cards from Chinese government officials were located in the search of the Liew residence and USAPTI office.  These cards include individuals associated with various Chinese ministries as well as local and provincial entities.  Exhibits 403, 404, 405, 407, and 410.

- An address list was located in the Liew residence.  This list includes various Chinese government officials referenced in Walter Liew's 2004 letter to Hong Jibi.  The individuals listed include: Lou Gan, Secretary General of the State Council, Tan Zhuzhou, the Vice Minister of the Ministry of Chemical Industry, Zhang Yujie, Deputy Director of the State

Administration of Foreign Experts Affairs, and Qiao Shichang, Director Comprehensive Planning Department of the State Administration of Foreign Experts Affairs.  Exhibit 418T at 0003

- A personalized New Year's card from, Zhang Yujie, a Chinese government official, was located in the Liew residence.  The name of the Chinese government's State Administration of Foreign Experts Affairs is found on both the envelope and card.  Zhang Yujie is one of the officials listed in the 2004 letter in Exhibit 350T, and his name is also located in the address list found in Exhibit 418T.  Exhibit 396T at 0002-0003.

- A handwritten note to Walter Liew from Qiao Shichang of the State Administration of Foreign Experts Affairs was located in the Liew residence.  The note references a meeting with Liew in 1992 at the Diaoyutai State Guesthouse in Beijing.  The note includes a specific reference to the State Administration of Foreign Experts Affairs and seeks a meeting with Liew.  Exhibit 398T at 0002-0003.

- In a 2004 memo to the Jinzhou company, Walter Liew attaches a list of Performance Group's "strengths" in the titanium dioxide manufacturing process as well as a statement as to the "company's track record in key Chinese projects."  The list includes projects for the Ministry of National Defense, the Ministry of Aeronautics and Astronautics, and the 47th Institute of the Ministry of Electronic Industry.  Exhibit 351T at 0004, 0006.

Defendant appears to argue that, if anything, this evidence proves Liew's intent to benefit China, as a country, rather than the Chinese government.  This argument no more than empty words – all of the evidence had to do with Chinese government entities and officials.  Indeed, Liew maintained contact through the years with the very Chinese government officials he originally met with in 1991.  There is no evidence that Liew was trying to make China a better *country* by helping the Pangang build a giant TiO2 plant – indeed the idea is absurd.  The evidence, instead, shows that his conduct was to advance an objective of the Chinese government in exchange for financial rewards that came from a company that was owned by the government.

For some unexplained reason, amongst all of this evidence defendant focuses on the list of technology priorities mentioned in the Hong Jibi letter.  Ex. 350T.   He contends that these "types" of

lists were publicly available.  Def's Mem. at 15.  In his letter, Liew says he received the list from a government official.  Whether a list like it was at some point available on the internet (which is most certainly was not in 1991) is in no way relevant to whether Liew intended to benefit the Chinese government.  Moreover, Liew's possession of such a list would allow a reasonable finder of fact to conclude that he was working on the titanium dioxide project in order to benefit the Chinese government.  Finally, the testimony of Michael Marinak establishes that Liew was in possession of such a list on a "handwritten piece of paper," not a list printed from the internet.  Marinak, Tr. 834:15-835:13.

Liew also argues at great length that the evidence that he intended to benefit a foreign instrumentality is not sufficient.  To be clear, the government's theory in this regard was that Pangang Group – the undisputed parent company of the other three group companies – was a central state owned entity that was owned and controlled by SASAC.  This was proven in the government's case and confirmed by Mr. Lewis, the defense expert.

Defendant simply ignores the evidence detailed in the government's Rule 29 brief:

- The testimony of Hu Shaocong and Richard Olson both address state ownership of the Pangang Group.  Hu, Tr. 786:1-787:1; 787:21-788:5; Olson, Tr. 1037:24-1038:25.

- Liew in his own words describes Pangang Group as controlled by the State-owned Assets Supervision and Administration Commission (SASAC) in a handwritten draft letter to Minster Tan Zhuzhou.  Liew's notes state that, "Chairman of the Board of Pangang, Fan Zhengwei . . . hosted a luncheon for us and told me that Secretary Li . . . of the SASAC asked Fan to meet with us as per the instruction of a senior minister."  Exhibit 291T at 0003; Ho, Tr. 321:10-325:9.

- The testimony of Hu Shaocong also discusses an interest expressed at the highest levels of the Chinese government concerning Walter Liew's company's proposal on the titanium dioxide project.  Hu testified that Hong Jibi, the Pangang Chairman, called him in the United States concerning the USAPTI work.  Hu subsequently learned that Jibi's call was prompted by an inquiry from the Premier's office.  Hu, Tr. 795:9-803:3.

- Various chairmen and directors of the Pangang Group are also listed as secretaries and deputy secretaries of the Communist Party of China (CPC).  Chairman of the Board Fang

Zhengwei is listed as a CPC Secretary, and General Manager Yu Zisu is listed as a CPC Deputy Secretary.  Exhibit 347T at 0002.

- A document located in the Liew residence, and admitted into evidence for Walter Liew's state of mind, describes a "meeting of the cadres" held at Pangang.  The document explains how the Director of the Second Bureau for the Administration of Corporate Executives of SASAC of the State Council gave a speech in which various members of the Pangang Group were assigned to certain positions.  Included in these government-directed assignments was that of Fan Zhengwei as Pangang (Group) Company Party Committee Secretary and Vice Chairman of the Board of Directors of Pangang (Group) Company.

- Another document located in the Liew residence, and admitted into evidence for Walter Liew's state of mind, provides a summary of a 2010 meeting in which the Angang and Pangang companies were reorganized.  The Director of SASAC was present to give a speech. The companies are described as state-owned and the reorganization is said to be an effort "to optimize the composition of the State-owned economy, to motivate the structural adjustment of the country's iron/steel industry."

In addition to this evidence introduced in the government's case, defense expert Lewis testified – despite defense counsel's effort to confuse him – that the Pangang Group Co. was a central state owned entity.  Tr. 3530 & 3592.  SASAC, according to its own description of its duties and responsibilities, owns and manages the central state owned entities.  Ex. 960.  *Pangang Group* Co. was the end user – the beneficiary – of the contracts into which Liew entered.  When Liew sought the contracts in 2004 and 2008, he wrote to the Chairmen, Hong Jibi and Fan Zhengwei, of the *Pangang Group*.  When Liew invited delegations to visit the United States, he directed his invitations to the *Pangang Group*.  To argue, as defendant does, that his actions were not intended to benefit the Pangang Group, a state-owned entity, is specious.

**D.  Counts 6, 7, and 9 – Possession of Stolen Trade Secrets**

Defendants challenge the sufficiency of the evidence on three elements with respect to Counts 6, 7, and 9:  (1) that they knew the respective items – Trade Secret 2 (Count 6), Trade Secret 3 (Count 7),

1   and Trade Secret 4 (Count 9) – were trade secrets; (2) that they knew the trade secrets had been stolen or

2   appropriated, obtained, or converted without authorization; and (3) that they knew or intended that the

3   offense would injure the owner of the trade secrets.  *See* Def. Mot at 16; Final Jury Instructions (Dkt.

4   792) at 34.  In responding to these arguments, the United States incorporates by reference its Opposition

5   to defendants' mid-trial motion for judgment of acquittal under Rule 29.  Dkt. 745 at 8.  The United

6   States adds the following:

- Defendants Liew and USAPTI knew the trade secrets had value.  They touted their
  technology as DuPont's and received over $27,000,000 from their Chinese customers for it.
  *See* Ex. 919-0008; Ex. 350T-003 ("[m]y company has mastered the technology of the
  complete DuPont method for titanium white by chlorination"); Ex. 720T-0002 ("Our chloride
  route TiO2 technology is the first class technology in the world, consisting of the most
  advanced DuPont technical processes").  Liew understood the value of the non-public
  DuPont technology – as he stated in a power point attached to an email, "DuPont: 1 million
  tons/year, Revenue: > 2 Billions/year, Technology not for sale!"  Ex. 374-0014.

- Defendants Liew and USAPTI demonstrated the value of the trade secrets by repeatedly
  using them to develop the two TiO2 projects in China.  *See* Ex. 70 (email using Trade Secret
  2); Tr. 2572:8 – 2579:25 (Walter Liew provided Trade Secret 3 to Jian Liu and agreed that it
  was "good information, good document to study"); Tr. 2495:12-2500:2 (Tony Duong
  scanned Fortran code from Trade Secret 3); Testimony of Thongchai Thongthawee regarding
  use of TS 3, Ex. 12-15, 21, 23-32 (portions of Trade Secret 3 found in email and on USAPTI
  server).

- These trade secrets were especially valuable to defendants Walter Liew and USAPTI who,
  with the exception of Robert Maegerle, had no background or experience in designing a
  chloride-route TiO2 plant.  Tr. 1206:13 – 1209:1 (concerns of Zisko and Maegerle about
  USAPTI's lack of qualifications for project); Tr. 2358-2364 (testimony of Dr. Diemer
  articulating value of information in Trade Secret 3 to persons with limited experience).  The
  value of these trade secrets is underscored by the fact that Walter Liew showed DuPont
  blueprints to Pangang in 2008 in Beijing prior to being awarded the contract, which is

consistent with the testimony of Peter Zisko who testified that Walter Liew showed him Trade Secret 2 in Beijing prior to the award of the Jinzhou contract. *See* Ex. 719T, Tr. 1199:13 – 1200:22.[2]

- The evidence of defendants' obstructive conduct demonstrates their knowledge of the value of these materials – Walter Liew directed his IT director to remove all DuPont documents from the USAPTI server and, together with his wife, he attempted to conceal from the FBI the existence of the bank safe deposit box that contained copies of Trade Secrets 2 and 4. *See* Tr. 2487:17 - 2492:17 (testimony of Tony Duong regarding Walter Liew's instructions to remove documents with DuPont references from server); Tr. 121:8 – 124:18 (FBI SA Bozman's testimony that Walter Liew denied having a safe deposit box and told Christina Liew "you don't know, don't know" in Mandarin when asked about safe deposit box keys); Ex. 4 (Trade Secret 2 found in safe deposit box; Tr. 1379), Ex. 9 (Trade Secret 4 found in safe deposit box; Tr. 1382).

- Defendants claim that notwithstanding Walter Liew's use of Trade Secret 2, which relates to the oxidation process, Liew did not know it had value because Peter Zisko once told him that Trade Secret 2 was a "cartoon." Def. Mot. at 16.  However, the defense ignores the rest of Zisko's testimony, which limits the significance of his opinion.  Zisko testified that:  he was a sales representative and not a process designer; he had never seen an oxidation design before, it was not relevant to his work, and he looked at Trade Secret 2 for a few minutes.  Tr. 1193:7 – 9; 1200:14-24; 1298:17 -1300:15.  The jury also heard evidence that both Trade Secret 2 and Trade Secret 4 had value from two witnesses with years of experience in the TiO2 industry, Dan Dayton and Robert Gibney.  Tr. 1687:10 – 1688:20; 1692:1-13; 2219:9 – 228: 25.  Even defense expert Paul Cooper acknowledged that Trade Secret 4 would be used by an R&D Department to set up "a model for the flow rates, temperatures and pressures, of

---

[2]  While defendants claim that the government offered no testimony to explicitly match the dimensions contained in Ex. 719T with Trade Secrets 2 and 4, they miss the point about the value of the trade secrets – the evidence shows that the defendants were using proprietary DuPont technology, including Trade Secrets 2 and 4, to gain business with the Chinese and to perform on the resulting contracts.

1    an existing plant."  Tr. 3748.  Thus, there was ample evidence from which the jury could

2    properly conclude that each of these trade secrets had value.

3    • Defendants also argue there was insufficient evidence that the defendants knew Trade Secrets

4    2-4 had been stolen or taken without authorization.  Yet, each of these three trade secrets had

5    clear confidentiality markings on them.  Exs. 1, 7, and 162.  Moreover, Walter Liew used the

6    very same type of confidentiality markings on his own documents.  *Compare* Ex. 164

7    (USAPTI confidentiality legend) with Exs. 1, 7 (DuPont confidentiality legend).[3]  Liew's

8    own notes establish his knowledge of DuPont's efforts to protect its technology.  Ex. 393T-

9    0042 ("DuPont has always been the number one.  The main reason is that they do an

10    excellent job at keeping it secret."); Ex. 201 ("DuPont makes its people work on restricted

11    area so that no single person can know enough to leak all the secrets").  In fact, he

12    acknowledged having "stolen prints," which he received from former DuPont employee Tim

13    Spitler.  Ex. 199-001, 208-005 ("even with the best technology with stolen prints. . .").[4]

14    Finally, his reaction to being caught, *e.g.*, his lying to the FBI and DuPont representatives,

15    causing a false answer to be filed in the civil lawsuit, and deleting DuPont documents from

16    USAPTI's server demonstrates his consciousness of guilt.

17    • Defendants argue that Liew relied on former DuPont employees he hired to only share

18    appropriate information with him and thus the evidence is insufficient to show that Liew

19    knew the trade secrets had been stolen.  However, to support that claim, the defense points to

20    only one document, an August 5, 1997 letter from Fred Arbogast at Condux to Robert

21    Maegerle, which was found at Maegerle's residence.  Ex. 221.  The letter does not bear the

---

[3] The evidence – in the form of employment and confidentiality agreements – demonstrated that Walter Liew was focused on protecting confidential information of the very type contained in Trade Secrets 2-4 and thus the jury could reasonably find that he knew the DuPont information was taken without authorization.  Ex. 783 (USAPTI employee confidentiality agreement), Ex. 786 (agreement with Glenn Chase; defines trade secrets); Ex. 835T (confidentiality agreement with East China Engineering), Ex. 777-778 (employment agreements with Jian Liu).

[4] Although defendants argue that Liew's statements about the stolen prints (in documents titled "notes from Tim Spitler, 2/2/00), are hypothetical, not specific to Trade Secrets 2 & 4, and too flimsy, the jury was free to disregard those assertions, particularly in light of all of the above-referenced evidence, and the fact that Liew specifically referred to Trade Secret 2 as "the reference sheet that I got from Spitler," (Ex. 70) and the Court is bound to view the evidence in the light most favorable to the government.  *Figueroa-Paz*, 468 F.2d at 1058.

weight the defendants' place on it.  First, there is no evidence that Liew was aware of the letter or relied on it in any way.  Second, the letter predates Liew's knowing receipt of stolen plans from Spitler.  Ex. 199-001, 208-005.  Third, the letter refers to a fundamentally different type of project, in which Maegerle's was not responsible for the design and the source material was publicly available, than the two projects (30k and 100k) in which the defendants ultimately engaged.  Essentially, the defendants are asking the Court to ignore the voluminous evidence of defendants' criminal conduct and instead rely on one letter that captures an early effort to learn about TiO2, well before Liew paid hundreds of thousands of dollars to Maegerle for DuPont technology.  The law does not countenance this approach, and the Court should reject it.

- Finally, the defendants argue that there was insufficient evidence that Liew knew or intended that his use of these trade secrets would injure DuPont.  Wrong.  The evidence established that Liew was aware of the fact that: China was a big market with a bright future (ex. 374-0001, -0008 to -0014), China wanted this technology but could not get it (Ex. 374-001; 350T-007), DuPont did not sell its technology in China (Exs. 350T, 374), and DuPont maintained its market advantage based on the superiority and secrecy of its technology (Ex. 393T-0042).  Liew then offered DuPont's technology for sale in China and sold it to a Chinese state-owned entity in two different projects.  Exs. 350T-003, 342T, 720T-002, 313, 317.  Liew also showed DuPont blueprints to Pangang and told them that he would design the 100k plant based on DuPont's Delisle facility.  Ex. 719T-002, 279T-0004.

**E.  Count 8 – Copying Stolen Trade Secrets**

There is sufficient evidence for a reasonable juror to conclude that defendants Liew and USAPTI knew that the Basic Data Document, Trade Secret 5, was a trade secret and that its use would injure DuPont or, at a minimum, that Liew and USAPTI aided and abetted Maegerle in the misappropriation of this trade secret.  While that evidence is summarized in the United States' opposition to defendants' mid-trial Rule 29 motion (Dkt. 745 at 9), there are a few additional points:

- Liew understood that DuPont kept its technology secret in general (Ex. 201) and that information about Kuan Yin in particular was not publically available.  Exs. 171-001, 878-001.

- Liew asked Maegerle to check for information in the Basic Data document and Maegerle did so.  Exs. 67, 82.

- Over several years, Maegerle routinely provided Liew with information from the Basic Data document, which he identified as coming from Kuan Yin.  *See, e.g.*, Ex. 918 (summarizing evidence containing information from the Basic Data document), Ex. 78 (identifying source of data as "Basic Data for the Taiwan, 60k T/Y Plant"), Ex. 108 ("I checked Quan Yin design"), Ex. 119 ("The specified Quan Yin purge rate"), Ex. 126 ("The Quan Yin nitrogen flow"), Ex. 82 ("The Quan Yin chlorinator brick ID"), Ex. 100 ("My manual calls for").

- Liew and USAPTI filed a false answer in the DuPont civil suit which denied their misappropriation of DuPont information in general and Kuan Yin information in particular.  Ex. 676-0006.  The jury could reasonably rely on that filing to infer defendants' consciousness of guilt.

**F.  Count 10 – Conspiracy to Obstruct Justice**

As set forth in the United States' opposition to defendants' mid-trial Rule 29 motion (*see* Dkt. 745 at 9-10), the evidence, which includes the following, is sufficient to prove that defendant Liew conspired with defendant Maegerle to file a false answer in the DuPont civil action.

- After DuPont filed its civil lawsuit, defendants Liew and Maegerle emailed about how to respond to the suit.  Exs. 678, 679, 682.  Those emails contained numerous false statements.  For example, in making comments on the complaint (Ex. 679), Maegerle stated that "trade secret materials have not been wrongfully obtained.  DuPont detailed specifications have not been obtained."  Yet, Maegerle and Liew both knew that the Basic Data document contained detailed specifications.  Likewise, Maegerle stated that "USA-PTI design contains no Kuan Yin technology," even though both Liew and Maegerle knew that they used Kuan Yin basic data in their work.

- Following those communications, Liew caused his lawyer to file an answer which stated that "Defendants have never misappropriated any information from DuPont or any of its locations, whether the Kuan Yin facility or otherwise." Ex. 676-0006. Liew knew that statement was false at the time that it was made. In addition to his actual possession of numerous proprietary DuPont documents (including flow sheets and the Accession Report), Liew knew that the actual design basis came from Kuan Yin but nonetheless directed the filing of a false answer. The evidence includes emails showing what defendants Liew and Maegerle said about the projects before *and* after the DuPont lawsuit. *Compare* Ex. 78 (before the lawsuit: identifying "Basic Data for the Taiwan, 60k T/Y Plant" as basis for chlorinator design on both projects) *with* Ex. 678 (after the lawsuit: "No Quan Yin design information has ever been obtained for our current design"); *compare* Ex. 126 (before the lawsuit: using Kuan Yin piping specifications) with Ex. 679 ("there is no direct comparison of the USA-PTI piping specifications to Kuan Yin").

Defendant suggests that the litigation-related communications between Liew and Maegerle are worthy of First Amendment protections. Yet, the defendant conveniently ignores that the First Amendment does not protect criminal conduct such as obstruction, perjury or other fraud on the courts and they cite no authority to the contrary. *See United States v. Stevens*, 559 U.S. 460, 468 (2010) (First Amendment does not protect certain "historical and traditional categories long familiar to the bar" including fraud and speech integral to criminal conduct).

### G. Count 11 - Witness Tampering Concerning Jian Liu

The evidence was sufficient to prove that Walter Liew corruptly persuaded Jian Liu to lie about Robert Maegerle's and Tim Spitler's work for USAPTI. Moreover, it was foreseeable that the lies would have been asserted as part of the response to a civil suit filed by Dupont against Walter Liew and Jian Liu, as the lies were told only after the suit was filed. The United States hereby incorporates its opposition to defendants' mid-trial Rule 29 motion. *See* Dkt. 745 at 11. Additional arguments and citations to trial testimony supporting the convictions on Count 11 are provided below.

- According to Liu's trial testimony, Walter Liew discussed the DuPont civil lawsuit and instructed Liu not to reveal Maegerle's and Spitler's names. Tr. 2604:2-20. Liu also testified that he lied to DuPont investigator James Jubb during an interview conducted in Liu's attorney's office. Tr. 2619:12-2620:1 ("Q. Why didn't you tell him about Tim or Maegerle? A. . . . I tried to – I was really trying to honor my promise to Walter, with Walter Liew.").

- Liu testified that in addition to Walter Liew's instruction not to reveal Maegerle's and Spitler's names, Liew also suggested that any such revelation would not be good for Liu's family. Tr. 2604:21-25. The defendants' attempt to describe Jian Liu as "annoyed" by Walter Liew's comments about Liu's family. In fact, a reasonable inference to be drawn from this testimony was that Liu was angry with Walter Liew, for somehow linking the well-being of Liu's family with instructions to tell lies concerning the employees of USAPTI. Defendants' characterization of Liu's feelings on the issue as annoyance is only one potential interpretation of the situation. In fact, Liew's statement could certainly be interpreted as corrupt persuasion, since there was at least the suggestion that if Liu told the truth about Maegerle's and Spitler's involvement, such action could negatively impact Liu's family.

- The jury also could have drawn inferences from Liu's testimony concerning his decision to throw away DuPont documents after the DuPont investigator visited his home. *See* Tr. 2615:24-2615:21 ("Q. Why did you throw your copy of that document in the garbage? A. I was panicked. Anything that was related to -- because I was interviewed and asked about DuPont. So anything related to DuPont, I was panicked and I just threw it out. Q. Why were you panicked? A. Because actually, at that time -- first, we are suspended by company; second, there was DuPont people asking me, do you have that? Now I realize I have some material. I try to hide the evidence."). That Jian Liu was so concerned about possessing DuPont-related materials that he disposed of them after a visit from DuPont security supports a reasonable inference that Liu *did*

know of wrongdoing by Walter Liew.  The disposal of the DuPont documents by Liu suggests significant concerns about the provenance of the materials – materials which he testified were originally made available to him by Walter Liew.  Tr. at 2572:18-2574:3; 2577:21-2578:2.

- Defendants make much of government arguments concerning Liu's demeanor on the stand.  *See* Defs' Mot. at 22-23.  While they characterize these arguments as "flimsy" and state that it is an "implausible inference" that this nervousness was related to corrupt persuasion by Walter Liew, it is the province of the jury to assess witness credibility.  Indeed, the instructions provided by the Court provide that the jury may take into account "the witness's manner while testifying" as well as "any other factors that bear on believability."  *See* Final Jury Instr. at 14.  Liu appeared uncomfortable and nervous on the stand, and the jury was free to draw the inference put forth by the government as to the significance of these mannerisms.

## H. Counts 13-14 – Conspiracy to Tamper with Evidence and False Statements

The evidence concerning tampering and false statements related to the safe deposit box was sufficient to support the conviction against Walter Liew.  Walter and Christina Liew, communicating in Mandarin Chinese (under the mistaken belief that the FBI agent positioned nearby could not understand their discussions), knowingly provided false information to the FBI in an effort to prevent the discovery of incriminating evidence in a bank safe deposit box.  Defendants' attempt in their post-trial motions to completely recharacterize the Liews' actions should be considered for what it is: an inaccurate portrayal of the facts which fails to meaningfully address the overwhelming evidence of false statements and evidence tampering.  The United States hereby incorporates its Opposition to Defendants Walter Liew's and USAPTI's Motion for Judgment of Acquittal Pursuant to Fed. R. Crim. P. 29.  *See* Dkt. 745 at 12.  Additional arguments and citations to trial testimony supporting the convictions on Counts 13 and 14 are provided below.

- Defendants' motion focuses entirely on the testimony of Special Agent Bozman, but quotes selectively and mischaracterizes aspects of the testimony. Bozman testified that Walter Liew, in Mandarin Chinese, told his wife to respond to an FBI agent's questions about safe deposit box key by saying she didn't know whether they were for a safe deposit box. Defendants seem to argue that because Special Agent Bozman acknowledged in his testimony that it *would have been* permissible for both Mr. and Mrs. Liew to say nothing to the FBI agents, they should not be held accountable for what *was* said. This argument hardly merits a response. The fact remains that words were said to the FBI agents concerning the safe deposit box and these words were lies designed to prevent the discovery of evidence in the case.

- The evidence located in the Bank of East Asia safe deposit box included proprietary information from DuPont as well as documents linking the Liews to the Pangang Group companies. *See, e.g.*, Exhibits 4, 9, 199, 201, 350, 384, 397, 841.

- Based upon the repeated instances of misleading conduct by the Liews ("you don't know, don't know" in Mandarin, Tr. 123:14-19; claiming to be going out for breakfast when actually headed to the bank, Tr. 126:2-8; stating to bank employee that safe deposit keys were lost at a BART station; Tr. 225:14-226:5), as well as the significant inculpatory information located in the box, a reasonable juror could certainly find that the Liews' conduct hindered, delayed, or prevented the communication of information regarding the safe deposit box and the evidence it contained. Similarly, the Liews' denial of knowledge of the safe deposit box allowed a reasonable juror to find that Walter Liew knowingly and willfully made false, fictitious, and fraudulent statements and representations to the FBI.

## I.   The Financial Charges Were Properly Joined

Defendants' arguments concerning severance are flawed from the outset. They contend that the evidence on the non-financial charges is lacking, and thus the guilty verdicts must be based upon a

"spillover effect" from the bankruptcy and tax charges against Walter Liew.  First, as explained above, the evidence against defendants Walter Liew and USAPTI on the non-financial charges was more than sufficient.  Second, the defendants' claim that Liew's financial dishonesty was not established by the evidence falls flat.  Contrary to their claims, there was significant evidence of Performance Group's financial condition, including exhibits and testimony showing large financial transfers to Walter Liew and his companies, Performance Group and USAPTI.

- The evidence showed Walter Liew's companies received money on the contracts.  See, e.g., Tr. 1142:17-23; Tr. 1158:12-1159:5; Tr. 1161:8-14; Tr. 1170:25-1171:12 (Performance Group and USAPTI as beneficiaries under contracts).

- The evidence also clearly established Liew's control over the funds.  *See, e.g.*, Tr. 1144:18-1145:23 ("Q. And who -- from whom could you accept instructions on this letter of credit? A. For Performance Group we receive instruction from Mr. Walter Liew. Q. Did you receive instructions from anyone else? A. No."); 1176:20-1177:12 ("Q. After reviewing these letters of credit and letters of guarantee, did you determine how much money was paid to Performance Group under the letters of credit and the letters of guarantee? A. It was about 18 million paid to Performance Group. Q. 18 million? A. Yes. Q. And after reviewing these records, did you also determine how much of that money was sent to companies in Singapore on the instructions of Walter Liew? A. There was 16 million, about 16 million. Q. $16 million? A. To Singapore, yes.").

- Moreover, while there were difficulties in obtaining records from overseas, incorporation documents and bank records from Singapore were provided pursuant to a request by the Department of Justice.  *See, e.g.*, Exs. 904-909, 936-937, 939-942.  These documents revealed millions of dollars being sent to various Singaporean shell companies controlled by Liew and/or Liew's family members.  *See, e.g.*, Tr. 2936:4-25;  The documents obtained from Singapore also

established the Liews' control over bank accounts affiliated with these Singaporean companies. *See, e.g.*, Tr. 2940:7-2941:10. Thus, despite defendants' claims to the contrary, significant evidence, including the business records obtained through the Singaporean government, was adduced at trial to establish Performance Group's receipt of millions of dollars under the contracts.

To the extent that defendants' discussion of a "spillover effect" is an attempt to again raise an argument put forth in their Motion to Sever (Dkt. 359), this argument should not be countenanced by the Court. The government will not repeat arguments already put before the court in its opposition to defendants' severance motions, *see* Dkt. 374 & 375, but incorporates by reference those submissions. Essentially, defendants contend that jurors were unable to follow the Court's instructions and consider the evidence of each charge separately, an argument considered and rejected by the Court in its Order denying defendants' motions to sever (Dkt. 398). Defendants provide no support for this bald assertion, only offering that the evidence of trade secret theft was "thin." As noted above, the trial testimony of Dan Dayton, Bert Diemer, and Robert Gibney all provided ample support for the government's allegations of trade secret theft and economic espionage in Counts 1 through 3 and 5 through 9.

Despite defendants' unsupported claims to the contrary, the trial record bore out the Court's position in its Order denying severance, as the government alleged and proved that the Pangang contracts, and the income flowing from those contracts, were illicit proceeds from theft of trade secrets and economic espionage. Joinder was thus proper, as the financial crimes were part of a common scheme, a scheme to engage in theft of DuPont's intellectual property for the benefit of a foreign government and foreign instrumentalities.

As for defendants' arguments about jury confusion, the evidence presented on the trade secret charges was distinct from that supporting the financial crimes. Federal tax returns and forms submitted to the bankruptcy trustee are not easily confused with technical information, including manufacturing

processes and plans associated with the manufacture of titanium dioxide.  Moreover, the jury

instructions for the trade secret offenses were distinct from the instructions for the financial offenses,

and the jury was able to "compartmentalize the evidence and judge each count separately and

objectively."  *United States v. Kinslow*, 860 F.2d 963, 967 (9th Cir. 1988).

**III.    CONCLUSION**

Based on the foregoing, the Court should deny the defendants' motion under Rule 29 and,

alternatively, under Rule 33.

Respectfully submitted,

MELINDA HAAG
United States Attorney


_____
JOHN H. HEMANN
PETER B. AXELROD
Assistant United States Attorneys


RICHARD S. SCOTT
Trial Attorney